DAILY COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No.: 14-20017-CR-KMW

**UNITED STATES OF AMERICA,**

Plaintiff,

-v-

**MAURIN CHACON,**
**RODOLFO PORTELA,**
**CHRISTOPHER ALTAMIRANO,**
**JAMES DIXON,**
**JAY ANTHONY FLORES,**

Defendants.

February 11, 2015

**DAY 3**
**P.M. SESSION**

MIAMI, FLORIDA

1-106

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

FOR THE UNITED STATES:

**IGNACIO J. VÁZQUEZ, AUSA**
**ILHAM HOSSEINI, AUSA**
**MARK DISPOTO, AUSA**
99 N.E. Fourth Street
Miami, FL 33132

FOR THE DEFENDANTS:

**MANUEL GONZALEZ, JR., ESQUIRE**
2000 Ponce De Leon Boulevard
Suite 614
Coral Gables, FL 33134

**PAUL M. KORCHIN, AFPD**
150 West Flagler Street
Miami, FL 33130

**PHILIP R. HOROWITZ, ESQUIRE**
9130 South Dadeland Boulevard
Suite 1910
Miami, FL 33156

DAILY COPY

APPEARANCES CONTINUED:

**DAVID A. DONET, JR., ESQUIRE**
3250 Mary Street
Suite 406
Coconut Grove, FL 33133

**HERMAN F. RUBIO, JR., ESQUIRE**
1107 N.E. 104th Street
Miami Shores, FL 33138

REPORTED BY:

TAMRA K. PIDERIT, FPR, RDR, CRR
Janoca Reporting Services, Inc.
681 Live Oak Lane
Weston, Florida 33327

P R O C E E D I N G S

(Proceedings resumed at 1:32 p.m.)

THE COURT: Be seated. I apologize for the delay.

Mr. Vázquez, I rethought some of your phraseology. Since it's early days, if you could refer to people or codefendants that associated -- not associated, were seen together or they were together at a location, that's fine. I do believe your evidence will deduce the association, but we are early hours, actually, and I think it would be a cleaner record if we went that way.

MR. VÁZQUEZ: Not a problem, Your Honor.

THE COURT: Okay.

MR. VÁZQUEZ: I also neglected to invoke the rule. I invoke the rule now.

THE COURT: So if there is anyone in the courtroom that is possibly going to be a witness, they must leave.

(Translated by an interpreter.)

THE COURT: What she said.

Is there anything else that I need to take up before?

MR. VÁZQUEZ: I did mention to Ms. Greer that some of the testimony, while we will not address 404(b) convictions today, we will be addressing robbery activity and responding to the November 20, 2013, residence that is charged in Count 6 --

THE COURT: Okay.

MR. VÁZQUEZ: -- today. That will be referred to, and

the January 25, 2014, robbery that was noticed regarding the video of Mr. Chacon robbing a citizen.

THE COURT: Clearly when you play that video, then, has to do with -- well, is this a conspiracy act, or is it really just going to Mr. Chacon?

MR. VÁZQUEZ: Well, there is multiple defendants in it. We believe there are associates of Mr. Chacon party to this group. We think it is conspiracy evidence. It does not -- it's conspiracy evidence in the eyes of the Government.

THE COURT: Okay. But the Vicar count, 6, that goes only to -- I'm looking for my indictment.

MR. VÁZQUEZ: The enumerated defendants are Maurin Chacon under Pinkerton theory, Christopher Altamirano that is charged in this trial. Mr. Thompson and Mr. Forte are in trial, too.

THE COURT: So Count 6.

MR. VÁZQUEZ: And the ensuing, the related 924(c).

THE COURT: Right. Would you alert me to that evidence so I can give a limiting instruction to the jury?

MR. VÁZQUEZ: This witness will testify to it once he passes some activities in September. I can break and say, Your Honor, at this time referencing the November 20th incident.

THE COURT: Yes, that would be good.

MR. RUBIO: Just for the record, I'm objecting to that.

Judge, I don't know if I need to make it part of the

record my requested jury instruction regarding 404(b) when the Government does attempt to introduce it.

THE COURT: Let's be clear. You are not objecting to me giving an instruction limiting the evidence to Mr. Chacon and Mr. Altamirano?

MR. RUBIO: No.

THE COURT: Okay. And I know you don't like that.

MR. GONZALEZ: Also with regards to the January 25, 2014, video, I don't believe that that has anything to do with BMT or the count. I think it's highly prejudicial under 403. All it is -- first of all, I don't believe that that witness is going to testify, and all it is is sort of a pushing or a back-and-forth with this individual between my client and this individual. There isn't no punching, you know.

THE COURT: Was something taken from this individual?

MR. GONZALEZ: We don't know. It looks like Mr. Chacon pats him down. You know, that's about it, you know.

THE COURT: Well --

MR. VÁZQUEZ: It appears to me that there is a taking and that Mr. Chacon is doing what -- frisking this citizen and holding them against their will.

MR. GONZALEZ: The guy leaves, you know, voluntarily. They let him leave.

MR. VÁZQUEZ: Yes, he is not killed, that's correct.

THE COURT: One at a time.

Mr. Vázquez, so is anyone going to tell us what the video is about?

MR. VÁZQUEZ: Your Honor, there is a neighbor who will testify today --

THE COURT: Yes.

MR. VÁZQUEZ: -- who lives across the street from the 428 N.W. 11th Avenue building.

THE COURT: Okay.

MR. VÁZQUEZ: The defendant, Mr. Chacon, appears on a video that is captured by a camera that is mounted on this neighbor's residence.

THE COURT: Right.

MR. VÁZQUEZ: The evidence and the theory the Government has advanced is that these individuals robbed persons for money to buy drugs.

THE COURT: Okay.

MR. VÁZQUEZ: This looks very much like a group activity robbery of a person who just happens to be in the area that they get ahold of.

THE COURT: Okay. Did this person ever complain he was robbed?

MR. VÁZQUEZ: It is an unreported robbery.

THE COURT: Okay. Can the person in the house say I saw them take something from him?

MR. VÁZQUEZ: He can say -- no. He can say that this

is my video system, I am familiar with these people, with Mr. Chacon, with associates of Mr. Chacon, he knows him as "Patron," and he is familiar with them robbing people in the neighborhood, which is what we noticed pretrial, that these are unreported robberies that occur in the area, and seeing them sell narcotics in the area, seeing Mr. Chacon, for example, in possession of a firearm shooting in the air.

THE COURT: Okay.

MS. HOSSEINI: The citizen will say that, and this is a video example of the conduct of Mr. Chacon on video.

THE COURT: Okay. So the witness will say I have seen this person sell drugs?

MR. VÁZQUEZ: Yes.

THE COURT: I have seen this person rob another guy?

MR. VÁZQUEZ: Yes.

THE COURT: I have seen him shoot into the air?

MR. VÁZQUEZ: Yes.

THE COURT: My video camera took this image. I can't tell you if he robbed the guy or not, I can just tell you that's what they did?

MR. VÁZQUEZ: Right. Yes.

THE COURT: As long as he does not use the term "robbery" with regard to that activity, you can argue it, and you can say no. But he can't put a label if he didn't see it or if someone isn't going to say they were robbed.

MR. HOROWITZ: My concern as far as Mr. Altamirano is concerned is a limiting instruction as to this purported robbery on January 25, 2014. My understanding is the evidence is coming in against Mr. Chacon and no one else.

THE COURT: Is it just Mr. Chacon?

MR. VÁZQUEZ: There are multiple persons in it, but Mr. Altamirano, as best I can see, is not on it.

THE COURT: Okay. But that's why I started with is this part of the conspiracy or is this a 404 against Mr. Chacon.

MR. VÁZQUEZ: We believe this is conspiracy evidence. This is how the group operated and acquired funds. We will argue to the jury, if the Court allows us, that this is -- you know a robbery when you see it, and what's happening here is a taking by force or fear.

THE COURT: Okay.

MR. HOROWITZ: Judge, the only conspiracy that's charged in this indictment is in Count 1, which is conspiracy to possess with intent to distribute various quantities of narcotics. There is no robbery conspiracy, and the fact that it's coming in at all is prejudicial to Mr. Altamirano. And the fact that Mr. Altamirano is not on a videotape of an incident that involves a violent crime that he is not charged with is prejudicial to him.

I think it shouldn't be admitted at all, but assuming that it is admitted, the witness is only going to be able to

testify I recognize the image of Mr. Chacon, not anybody else. So we should be entitled to, at a minimum, a limiting instruction.

THE COURT: The theory of conspiracy is that the money from the robbery was used to purchase the drugs. I think, though, because we don't see any actual on this video and no one can tell us, I think this only goes to Mr. Chacon in this instance because it's -- there is no money, there is nobody who says he took my chain. Do you understand what I'm saying, Mr. Vázquez?

MR. VÁZQUEZ: I do, but I think when the video is played, that it will -- it's clear there are multiple assailants that are involved. Only Mr. Chacon in this trial is a part of that.

THE COURT: Okay. You know what I'm going to do? I'm going to say at this point in the trial I'm asking you to consider this only against Mr. Chacon. If something comes in that ties it up to the conspiracy, then, gentlemen, we will talk about it. Right now it's only going to come in against Mr. Chacon.

MR. VÁZQUEZ: Yes, Your Honor.

THE COURT: So you will let me know when the November and January incidents are coming up?

MR. VÁZQUEZ: Yes, the January incident will come in the second witness.

THE COURT: Okay.

MR. VÁZQUEZ: The November incident I will alert the Court.

THE COURT: If you will bring the witness back in.

(Officer Coladas returns to the witness stand.)

THE COURT: Bring in the jury, please.

(Jury returns at 1:43 p.m.)

THE COURT: Be seated, everyone.

Two things, Ladies and Gentlemen. I'm really sorry about my voice. It doesn't seem to be getting any better.

Second, I'm sorry about the delay, but as I told you before, sometimes we have to work things out, and that's what we were doing. So hopefully things will go quicker this afternoon, and we won't have to take as many breaks.

All right. Mr. Vázquez, continue, please.

**CONTINUED DIRECT EXAMINATION**

**BY MR. VÁZQUEZ:**

**Q. Officer Coladas, when we left off, we were talking about the 528 building and your interaction with it on May 28, 2013. Do you remember that line of questioning?**

A. Yes.

**Q. In the months prior to May 28, 2013, had you seen individuals that you have identified today in court and through photos in the area of 528 N.W. 11th Avenue?**

MR. HOROWITZ: I'm going to object to the phrase "in

the area."

THE COURT: Okay. Well, overruled.

**BY MR. VÁZQUEZ:**

**Q. Who?**

A. Maurin Chacon and Christopher Altamirano.

**Q. What did you see them doing?**

A. Loitering, hanging out at that location, in front of that location.

**Q. On May 28, 2013, what did you do with regard to this building that's been admitted into evidence, a picture of it, on Government's 24?**

A. I made contact with Earl Harralson.

**Q. Were you able to enter the building?**

A. Yes.

**Q. Did you recover anything?**

A. Yes.

**Q. What did you recover?**

A. A firearm and narcotics.

**Q. Prior to May 28, 2013, had you become aware of anyone else being arrested at this location?**

A. Yes.

**Q. Who?**

A. Christopher --

MR. HOROWITZ: Objection; hearsay.

THE COURT: Overruled.

A. Christopher Altamirano.

MR. VÁZQUEZ: Your Honor, permission to approach?

THE COURT: Yes.

**BY MR. VÁZQUEZ:**

**Q. Sir, I have shown you what's been marked for identification as Government's 28. Do you recognize it?**

A. Yes.

**Q. What is it?**

A. The firearm that I recovered at that location.

**Q. This is a case that you were a party to?**

A. Yes.

**Q. Did you see this firearm at the time?**

A. Yes, eventually I did.

MR. VÁZQUEZ: At this time I move Government's 28 into evidence.

THE COURT: Any objection?

MR. RUBIO: My continuing objection, Your Honor, on behalf of Mr. Flores.

MR. VÁZQUEZ: Very well.

THE COURT: Exhibit 28 is admitted.

(Document marked as Government's Exhibit 28 admitted into evidence)

**BY MR. VÁZQUEZ:**

**Q. Did you recover anything else from the location?**

A. Yes, narcotics.

MR. VÁZQUEZ: Permission to approach?
THE COURT: Yes.
MR. RUBIO: Same objection as to Mr. Flores, on behalf of Mr. Flores.
THE COURT: Yes.
**BY MR. VÁZQUEZ:**
**Q. Sir, I'm showing you what has been marked for identification as Government's 30. Do you recognize it?**
A. Yes.
**Q. What is it?**
A. The narcotics that were recovered at that location.
MR. VÁZQUEZ: Your Honor, at this time I would move Government's 30 into evidence.
THE COURT: Any objection other than Mr. Rubio?
MR. HOROWITZ: No, Your Honor.
THE COURT: Thirty is admitted without objection.
(Document marked as Government's Exhibit 30 admitted into evidence)
MR. VÁZQUEZ: Permission to approach?
THE COURT: Yes.
**BY MR. VÁZQUEZ:**
**Q. Sir, I'm showing you what's been marked for identification as Government's 29. Do you recognize it?**
A. Yes.
**Q. What is it?**

A. Ammunition that was found at that location.

**Q. This was on May 28, 2013?**

A. Yes.

MR. VÁZQUEZ: Your Honor, at this time I would move Government's 29 into evidence.

MR. HOROWITZ: No objection.

THE COURT: All right. It's admitted.

(Document marked as Government's Exhibit 29 admitted into evidence)

**BY MR. VÁZQUEZ:**

**Q. Sir, in addition to Mr. Chacon and Mr. Altamirano, do you see a person by the name of Angel Martinez at the 528 N.W. building?**

A. Yes.

**Q. Did you also see a person named Alioth Salas at the 528 N.W. building?**

A. Yes.

**Q. Did you also see a person by the name of Luis Salas at the 528 N.W. building?**

A. Yes.

**Q. Sir, I want to draw your attention to June 4, 2013. On that day did you come in contact with a person known as Raymond Moore?**

A. Yes.

**Q. How did you come in contact with the person?**

A. He was walking towards 12th Avenue and N.W. 4th Street.

MR. VÁZQUEZ: Your Honor, permission to approach for purposes of identification.

THE COURT: I think we can -- if we could turn off the jurors' screens.

MR. HOROWITZ: We have no objection to the admission of those two exhibits.

THE COURT: There we go. Let's put the jurors' screens back on.

What numbers are these, Mr. Vázquez?

MR. VÁZQUEZ: 25 and 33.

THE COURT: 25 and 33 are admitted without objection.

(Documents marked as Government's Exhibits 25 and 33 admitted into evidence)

**BY MR. VÁZQUEZ:**

**Q. Sir, I'm showing you what's been admitted into the record as Government's 25. Do you recognize this area?**

A. Yes.

**Q. What is it?**

A. N.W. 12th Avenue and 4th Street where I made contact with Raymond Moore.

**Q. I'm showing you another image, Government's 33. Do you recognize it?**

A. Yes.

**Q. What is it?**

A. N.W. 12th Avenue and 4th Street where I made contact with Raymond Moore.

**Q. Now, with regard to Government's 25, in the months prior to June 4, 2013, did you see any of the defendants that have been identified today in court or through photos at the location?**

A. Yes.

**Q. Who did you see?**

A. James Dixon, Christopher Altamirano, Maurin Chacon, Jay Flores, Alioth Salas, Luis Salas, Angel Martinez, Carlos Tinoco, and Joel Diaz.

THE COURT: Ms. Greer, did you turn off the -- or did Mr. Vázquez?

MR. VÁZQUEZ: It might have been me, Your Honor. I apologize.

THE COURT: Very good.

**BY MR. VÁZQUEZ:**

**Q. Did you see these individuals together?**

A. Yes.

**Q. And what activity did you see at this location?**

A. Hanging out at the corner or by the cafeteria area.

**Q. On June 4, 2013, did you recover any items?**

A. Yes.

**Q. What was that?**

A. A baggie of suspected marijuana.

**Q. Who did you recover that from?**

A. Raymond Moore.

MR. VÁZQUEZ: Permission to approach.

THE COURT: Yes.

**BY MR. VÁZQUEZ:**

**Q. Sir, I'm showing you what's been marked for identification as Government's 34. Do you recognize it?**

A. Yes.

**Q. What is it?**

A. A clear baggie with suspected marijuana.

**Q. Where was this recovered from?**

A. Raymond Moore.

MR. VÁZQUEZ: At this time I would move Government's 34 into evidence.

MR. RUBIO: Objection.

THE COURT: Where was Raymond Moore when you --

THE WITNESS: Inside the store, ma'am, the side store. The cafeteria, actually.

THE COURT: Objections?

MR. RUBIO: Objection to behalf of Mr. Flores.

THE COURT: Okay. Overruled. It's admitted.

MR. VÁZQUEZ: Thank you.

(Document marked as Government's Exhibit 34 admitted into evidence)

**BY MR. VÁZQUEZ:**

**Q. On July 3, 2013, did you have the opportunity to come in**

**contact with a person known as Joseph Thompson?**

A. Yes.

**Q. And how is it that you came in contact with Mr. Thompson on July 3, 2013?**

A. While I was patrolling that area, I observed Thompson attempting to roll up a cigarette with suspected marijuana.

**Q. And what area were you patrolling at that time?**

A. N.W. 11th Avenue and 4th Street.

MR. VÁZQUEZ: I offer Government's 36 and 42, images, to the Court.

MR. HOROWITZ: No objection, Your Honor.

THE COURT: Okay. What numbers again, Mr. Vázquez?

MR. VÁZQUEZ: 36 and 42, Your Honor.

THE COURT: 36 and 42 admitted without objection.

(Documents marked as Government's Exhibits 36 and 42 admitted into evidence)

**BY MR. VÁZQUEZ:**

**Q. Sir, I'm showing you what's admitted into evidence as Government's 36. Do you recognize it?**

A. Yes.

**Q. What is it?**

A. An abandoned building. That's where Joseph Thompson was at in the area.

**Q. Have you patrolled in this area in the year 2013 with some degree of regularity?**

A. Yes.

**Q. Did you have the opportunity to come in contact with the defendants, those identified today in court, in the area of this building?**

MR. RUBIO: Objection. I request that it be more specific.

THE COURT: All right. First let him answer, and then a block, two blocks, whatever. Overruled.

MR. VÁZQUEZ: I withdraw that.

THE COURT: Okay.

**BY MR. VÁZQUEZ:**

**Q. In the time frame from June to August of 2013, were you patrolling in the area of 435 N.W. 11th Avenue?**

A. Yes.

**Q. During that time frame, the summer 2013, did you have the opportunity to see the defendants, those who have been identified today in court, in the area of this building?**

A. Yes.

MR. RUBIO: Objection; leading.

THE COURT: Overruled.

A. Yes.

**Q. Showing you an image entered into evidence as Government's 42, do you recognize it?**

A. Yes.

**Q. What is it?**

A. That's across the street from that building -- sorry, N.W. 11th Avenue and 4th Street.

**Q. In the time frame of the summer of 2013, did you have the opportunity to come in contact with the defendants who you have identified in court today in this building?**

A. Yes.

**Q. Did you also have the opportunity to come in contact with the persons that you have identified by photograph at the area of this building?**

A. Yes.

MR. VÁZQUEZ: Permission to approach?

THE COURT: Yes.

**BY MR. VÁZQUEZ:**

**Q. Sir, I'm showing you what has been marked for identification purposes as Government's 35. Do you recognize it?**

A. Yes.

**Q. What is it?**

A. A clear, orange baggie with suspected marijuana.

**Q. How was this recovered?**

A. Joe Thompson's pocket.

**Q. Did you do that?**

A. Yes.

MR. VÁZQUEZ: At this time I would offer Government's 35 offer to admit it into evidence.

THE COURT: Objection?

MR. RUBIO: Objection on behalf of Mr. Flores.

MR. HOROWITZ: None, Your Honor.

THE COURT: Overruled and it is admitted.

(Document marked as Government's Exhibit 35 admitted into evidence)

**BY MR. VÁZQUEZ:**

**Q. Sir, on September 20th of 2013, did you have the opportunity to come in contact with Nadim Guzman and Luis Salas?**

A. Yes.

**Q. How is it that that occurred?**

A. A traffic stop.

**Q. And did you recover any evidence in the course of that traffic stop?**

A. Yes.

**Q. What did you recover?**

A. Suspected marijuana.

**Q. How is it that you recovered that marijuana?**

A. Off of Luis Salas.

**Q. Did you recover any other items?**

A. Yes.

**Q. And what else did you recover?**

A. There was more suspected marijuana in the car.

**Q. Did you impound items that were suspected of being cocaine that were not cocaine?**

A. Yes.

**Q. Did you impound those things also?**

A. Yes.

MR. VÁZQUEZ: Permission to approach?

THE COURT: Yes.

**BY MR. VÁZQUEZ:**

**Q. Sir, I'm showing you what's been marked for identification purposes as Government's 37 and 37B. I believe on the exhibit list it's 37A and 37B. Do you recognize these items?**

A. Yes.

**Q. And what are they?**

A. The suspected marijuana clear baggie, and the clear baggie with suspected crack cocaine.

**Q. And on the top of Government's 37 --**

A. A clear baggie of marijuana.

MR. VÁZQUEZ: At this time I would move Government's 37A and 37B into evidence.

THE COURT: Any objection?

MR. RUBIO: Objection.

THE COURT: Any objection?

MR. HOROWITZ: No objection, Your Honor.

MR. RUBIO: Objection to Mr. Flores.

THE COURT: Counsel would you approach.

(Bench conference commenced):

THE COURT: I hope you can hear me. Mr. Rubio, I thought you wanted a continuing objection, not that you were

going to continue to object.

MR. RUBIO: If I have a continuing objection, then I'm satisfied.

THE COURT: Okay. I wanted to make sure we are on the same page.

Mr. Vázquez, I understand that you are laying some evidentiary groundwork, but I hope we are going to have a witness tomorrow who is going to bring everybody together as coconspirators.

MR. VÁZQUEZ: Coconspirators later, yes, they are.

THE COURT: I think we ought to get one of them in just to tie it up. I don't want to try your case for you, but this is a little -- okay. Thank you.

(Bench conference concluded.)

THE COURT: 37A and B is admitted.

(Documents marked as Government's Exhibits 37A and 37B admitted into evidence)

**BY MR. VÁZQUEZ:**

**Q. Sir, on September 26th of 2013, did you have the opportunity to come in contact with Nadim Guzman again?**

A. Yes.

**Q. And on that date did you have the opportunity to recover narcotics?**

A. Yes.

**Q. How was it that you came in contact with Mr. Guzman?**

A. Stop on the corner while he was riding a bicycle.

**Q. And what area? Where was he?**

A. If I'm not mistaken, it's going to be S.W. 9th Avenue and 5th Street, if I'm not mistaken.

**Q. Did you stop him?**

A. Yes.

**Q. Were you able to recover narcotics on that incident?**

A. Yes.

MR. VÁZQUEZ: Your Honor, permission to approach?

THE COURT: Yes.

**BY MR. VÁZQUEZ:**

**Q. Sir, I'm showing you what's been marked for identification purposes as Government's 38. Do you recognize it?**

A. Yes.

**Q. What is it?**

A. Clear baggie with suspected crack cocaine.

**Q. Is this crack cocaine that you recovered from Mr. Guzman?**

A. Yes.

**Q. It was on September 20th -- excuse me, September 26th of 2013?**

A. Yes.

MR. VÁZQUEZ: Your Honor, at this time I would move Government's 38 into evidence.

MR. HOROWITZ: No objection, Your Honor.

THE COURT: All right. Thirty-eight is admitted

without objection, and Mr. Flores has a continuing objection to all.

(Document marked as Government's Exhibit 38 admitted into evidence)

MR. VÁZQUEZ: At this time I will be referencing November 2013.

THE COURT: Ladies and Gentlemen, the Government is going to introduce evidence as to an event that took place in November of 2013; it goes to Count 6 of the indictment. This evidence is to be considered only against Mr. Chacon and Mr. Altamirano.

MR. VÁZQUEZ: Your Honor, may I have a sidebar? I apologize.

(Bench conference commenced):

THE COURT: Did I not get this right? I'm asking Mr. Vázquez if I got it wrong.

MR. VÁZQUEZ: You got it correct as to the robbery. There is narcotics allegations that are tied to it, so with regard to that, he was responding to the scene of the robbery, as the Court said. But as regarding narcotics, it is relevant to the conspiracy as a whole.

MR. HOROWITZ: I think an instruction only as to the --

MR. VÁZQUEZ: Narcotics.

THE COURT REPORTER: Mr. Horowitz, please speak into the microphone.

MR. HOROWITZ: That the narcotics were not part of the robbery, so there is no instruction. If it's only narcotics, (inaudible), and it's not because the narcotics were not proceeds of the robbery.

THE COURT: Oh, dear. So how do you want me to fix this?

MR. VÁZQUEZ: Not fix it so much, that the references to narcotics are attributable to the defendants as charged in the conspiracy.

THE COURT: Okay.

MR. HOROWITZ: Our position --

THE COURT: And this is specific as to this November incident?

MR. VÁZQUEZ: Yes.

THE COURT: And you reference narcotics except to Mr. Flores?

MR. RUBIO: As to Mr. Flores we have a continuing objection.

THE COURT: Okay.

(Bench conference concluded.)

THE COURT: This is why we have these conferences. I misspoke as to one element of the evidence. As to this November incident, you will hear testimony about narcotics. The narcotics have to do with the entire conspiracy, do you understand, as to all defendants.

The other evidence in this November incident goes only to Mr. Chacon and Mr. Altamirano, but the narcotics evidence has to do with the conspiracy as a whole. I hope this makes sense as the officer testifies.

Please, Mr. Vázquez, I'm going to allow you to lead a little bit.

**BY MR. VÁZQUEZ:**

**Q. Sir, on November 20th and 21st of 2013, were you on duty?**

A. Yes.

**Q. On that date did you respond to a place at 435 N.W. 11th Avenue?**

A. Yes.

MR. VÁZQUEZ: Permission to publish Government's 36?

THE COURT: Yes.

MR. HOROWITZ: 36 is already in evidence.

THE COURT: It's already in evidence.

**BY MR. VÁZQUEZ:**

**Q. Did you respond to the building located at N.W. -- 435 N.W. 11th Avenue?**

A. Yes.

**Q. Is that the structure that is depicted on Government's 36?**

A. Yes.

**Q. How is it that you came to this building on November 20-21 of 2013?**

A. There was a robbery that went out involving a red Magnum.

**Q. Did you go to the scene of the 435 building?**
A. Yes.
**Q. And did you see a vehicle there?**
A. Yes.
**Q. What vehicle did you see there?**
A. A red Magnum.
**Q. Are you familiar with the occupancy of this residence?**
A. Yes.
**Q. Is this residence abandoned?**
A. Yes.
**Q. Did you go inside the abandoned building?**
A. Yes.
**Q. What did you find inside the building?**
A. Joseph Thompson, Christopher Altamirano -- oh, Christopher Altamirano, sorry, he was down the block, he wasn't in the location. But Maurin Chacon, Joel Diaz, Nadim Guzman, Dwight Forte. I think that's it.
**Q. In the course of your entry into this abandoned building at 435 N.W. 11th Avenue, did you recover any evidence?**
A. Yes.
**Q. What did you recover?**
A. Narcotics.
**Q. And at the time that you went into the building, did you have the opportunity to see any other pieces of evidence?**
A. Yes.

**Q. What did you see in addition to the narcotics?**

A. There was a firearm.

**Q. Did you physically see the firearm?**

A. Eventually I did.

MR. VÁZQUEZ: Your Honor, permission to approach?

THE COURT: Yes.

**BY MR. VÁZQUEZ:**

**Q. Sir, I'm showing you what's been marked for identification as Government's 40 and 40A. Do you recognize these items?**

A. Yes.

**Q. What are they?**

A. Several clear baggies of suspected marijuana, and there is a plastic bag with suspected Xanax pills.

**Q. And if I turn your attention to the bottom -- or the top of 40, what is that?**

A. Several pieces of suspected crack cocaine.

MR. VÁZQUEZ: At this time I would move Government's 40 and 40A into evidence.

THE COURT: Any objection?

MR. HOROWITZ: No objection, Your Honor.

THE COURT: All right. It is admitted.

(Documents marked as Government's Exhibits 40 and 40A admitted into evidence)

**BY MR. VÁZQUEZ:**

**Q. Sir, where did you recover the baggies of marijuana and**

**crack cocaine?**

A. When I entered the location, I made contact with Joseph Thompson, and he dropped it.

**Q. And the items in 40A, these pills, Xanax pills, where are they from?**

A. From Joseph Thompson as well.

**Q. Do you recall recovering those items from him?**

A. Yes, from the bed area.

**Q. The 435 building, what was inside of that building?**

A. It was abandoned. There was some furniture, but all beat up, no lighting. Just abandoned.

**Q. Was there a place to sleep?**

A. Like one bed on the floor. Other than that, no.

**Q. Had you responded to 435 N.W. 11th Avenue in the month, 2 months before?**

A. Yes.

**Q. And had you seen individuals -- those individuals that you have identified in court today in the area of 435 in the month, 2 months before?**

A. Yes.

**Q. Now, in the course of your assignment in the Little Havana Net, did you continue to patrol and surveil the area near 535 N.W. 11th Avenue and the 428 building?**

A. Yes.

**Q. On April 3rd of 2014, did you come in contact with**

**defendants Dayaan Zerquera and Christopher Ramirez?**
A. Yes.
**Q. How did that occur?**
A. I was conducting surveillance at that location.
**Q. And what did you see during the course of your surveillance?**
A. I observed Christopher Ramirez in a hand-to-hand transaction with an unknown subject.
**Q. Did you see Mr. Zerquera?**
A. Yes.
**Q. What was Mr. Zerquera doing?**
A. Loitering, hanging around, looking around.
**Q. Do you know what a lookout is?**
A. Yes.
**Q. What is a lookout?**
A. It's a person that protects the drug dealer from rival drugs, gang members, or police.
**Q. How do you serve as a lookout?**
A. Repeat again.
**Q. How do you serve as a lookout? What does somebody do?**
A. Looking around, calling out if police or rival gang members or...
**Q. And if you would, what did you see Mr. Zerquera doing that led you to conclude that he was a lookout?**
A. He was looking around. He looked more nervous, just looking around. He wasn't really doing anything, just looking around

for people.

**Q. Did you see -- on that day do you recall if you saw anyone else at the 428 building?**

A. Yes, just one more person.

**Q. Do you remember who that is?**

A. Alioth Salas.

**Q. Now, in the course of your surveillance, what did you do?**

A. After I observed Christopher Ramirez do the hand-to-hand transaction, he went towards the fence area.

**Q. And what happened?**

A. I observed him lift up a large baggie with several baggies inside of it.

**Q. As a result of seeing that conduct, what did you do?**

A. I got into my vehicle with other officers, and we went around to make contact with him.

**Q. Who did you make contact with?**

A. Christopher Ramirez and Dayann Zerquera.

**Q. In the course of that transaction, did you recover any evidence?**

A. Yes.

**Q. What evidence did you recover?**

A. Firearm and narcotics.

MR. VÁZQUEZ: Permission to approach.

THE COURT: Yes.

**BY MR. VÁZQUEZ:**

**Q. Sir, I'm showing you what's been marked for identification as Government's 44, Government's 45, Government's 45B, 43, and 27. Do you recognize these items?**

A. Yes.

**Q. What are they?**

A. Firearm, a spent casing -- well, casing, and then a spent casing. I can't really see. A clear baggie with suspected crack cocaine, and a large baggie with several baggies of suspected marijuana.

**Q. And did you recover these items from the scene of your interaction with Mr. Ramirez and Mr. Zerquera?**

A. Yes.

MR. VÁZQUEZ: Your Honor, at this time I would move Government's 27, 44, 45, 45B, and 43 into evidence.

THE COURT: 43, 44, 45A and B; is that right?

MR. VÁZQUEZ: 45A and B, yes.

THE COURT: Okay.

MR. HOROWITZ: No objection, Your Honor.

THE COURT: 43, 44, 45A and B are admitted without objection.

MR. RUBIO: My continuing objection on Flores.

THE COURT: Yes, Mr. Rubio.

(Documents marked as Government's Exhibits 43, 44, 45A, and 45B admitted into evidence)

**BY MR. VÁZQUEZ:**

**Q. Where did you recover the firearm from?**

A. Dayaan Zerquera.

**Q. Where was it?**

A. In his right pocket.

**Q. Was it loaded?**

A. Yes.

**Q. Were you able to recover the larger baggie of drugs?**

A. Yes.

**Q. Where was that baggie of drugs in relationship to where you saw the defendants?**

A. Several feet away. It was right there.

**Q. Showing you what's been admitted into evidence as Government's 42, do you have the ability to use the screen to sort of paint this picture --**

A. Yes.

**Q. -- where you saw Mr. Ramirez?**

A. Ramirez was in the front by the sidewalk area right here (indicating).

**Q. And where did you see Mr. Zerquera?**

A. A little more up to here by the fence area (indicating).

**Q. And the area that you have identified, for the record, it's on the bottom, left side of the image. There is two dots, one of the dots is on the fence line. On the fence line, is that where you saw Mr. Zerquera?**

A. Yes.

**Q. And where is it that you saw the larger baggie of drugs being tended to?**

A. In the fence right here (indicating) on the floor.

**Q. Can you explain to the jury the sequence of events between reaching for the large baggie of drugs and serving the customer?**

A. He went to the bag, the large baggie, retrieved a small baggie, which I don't know what it was, and approached the unknown subject and handed it to him.

**Q. Mr. Ramirez did not have the large baggie on his person?**

A. No.

MR. VÁZQUEZ: If I may ask the Court, does the Court have a record of Government's 27 being admitted into evidence?

THE COURT: No.

MR. VÁZQUEZ: Permission to approach?

THE COURT: Yes.

**BY MR. VÁZQUEZ:**

**Q. Sir, I'm showing you what's been marked for identification purposes as Government's 27. Do you recognize it?**

A. Yes.

**Q. What is it?**

A. The clear -- a large clear bag with several baggies of suspected marijuana.

**Q. Was this item recovered on April 3, 2014, by you during the incident involving Mr. Ramirez and Mr. Zerquera?**

A. Yes.

MR. VÁZQUEZ: At this time I would move Government's 27 into evidence.

MR. HOROWITZ: No objection, Your Honor.

THE COURT: All right. Government's 27 is admitted.

(Document marked as Government's Exhibit 27 admitted into evidence)

MR. VÁZQUEZ: May I have a moment, Your Honor?

THE COURT: You may.

MR. VÁZQUEZ: Permission to publish Government's 44?

THE COURT: Yes, you may.

**BY MR. VÁZQUEZ:**

**Q. Sir, I'm showing you what has been admitted into evidence as Government's 44. Do you recognize it?**

A. Yes.

**Q. Is this the weapon you recovered, the firearm that you recovered from Mr. Zerquera on April 3, 2014?**

A. Yes.

MR. VÁZQUEZ: Your Honor, tender the witness.

THE COURT: All right. Cross examination, Mr. Gonzalez.

**CROSS EXAMINATION**

**BY MR. GONZALEZ:**

**Q. Officer Coladas, my name is Manny Gonzalez. I represent Maurin Chacon. We've never met before, right?**

A. No.
**Q. No? You have to answer for the --**
A. Yeah, no.
**Q. Officer Coladas, you said that you had patrolled this area for roughly 3 years, correct?**
A. Yes.
**Q. All right. And the one time that you mentioned with regards to my client and you arresting him was in 2011, correct?**
A. I have arrested him before or after that, but for another incident.
**Q. For a trespass or something in that area?**
A. As well as marijuana as well.
**Q. Okay. With regards to the events that you testified in 2011, that was a traffic stop, correct?**
A. Yes.
**Q. All right. And the vehicle that Mr. Chacon was driving was a 2002 van, correct?**
A. Yes.
**Q. All right. And the reason that you arrested him, one of the reasons was that his license was suspended, correct?**
A. Well, yes, he was arrested for that.
**Q. All right. And you testified that you found some marijuana, right?**
A. Yes.
**Q. Okay. And that was, I believe, Government's 23.**

MR. GONZALEZ: Your Honor, may I approach?

THE COURT: Yes, you may.

MR. GONZALEZ: Thank you.

**BY MR. GONZALEZ:**

**Q. I have shown you Government's 23. That's a bud?**

A. Yes, this is a bud.

**Q. A little bud of marijuana, right?**

A. Yes.

**Q. You know, you have been an officer for 6 years. That represents maybe a joint?**

A. Yes.

**Q. Okay. So you would -- that could be personal use? It's a joint, right?**

A. It could be.

**Q. And you didn't see him sell that to anyone or giving it to anyone, nothing like that, correct?**

A. No.

**Q. Now, in the 3 years that you have been patrolling that area, that is the amount of narcotics that you personally retrieved from my client, Mr. Chacon, correct?**

A. There was another occasion, but it was just a marijuana cigarette.

**Q. A marijuana cigarette?**

A. Yes.

**Q. Okay. All right.**

**You testified with regards to this exhibit, Government's 25, that is a market and a cafeteria at the same time, correct?**

A. Yes. It's separated, but, yes.

**Q. But there is a market towards the front of the truck that's there? That would be the market area, correct?**

A. Yeah.

**Q. And then towards the back here at the corner, we are talking about that that would be where the cafeteria area is, right?**

A. Yes.

**Q. Now, can you buy stuff from that little cafeteria spot from the outside, or do you have to go inside the market?**

A. I believe you can do it outside. I'm not sure. I never bought anything there.

**Q. So you can either buy stuff on the outside, as far as you know, or on the inside also, correct?**

A. Yes.

**Q. And when you have seen Mr. Chacon in that area, you would see him -- you saw him drinking beer there?**

A. I have never seen him drinking beer.

**Q. You never saw Chacon drinking beer?**

A. Not me.

**Q. And the times that you have seen him around the neighborhood, you never saw him drinking any beer, anything of that nature?**

A. Not to my knowledge.

**Q. And you don't know whether he would go there -- or at least Mr. Chacon would go there to buy food or to buy beer?**

A. I wouldn't know.

**Q. All right. You testified with regards to the 528 building, and that is regarding May 28th of 2013. You made an arrest that day, correct?**

A. Yes.

**Q. And the person that you arrested was not Mr. Chacon, correct?**

A. No.

**Q. And you arrested, I believe, a Mr. Harralson?**

A. Earl Harralson.

**Q. I think he has Earl Tyrone Harralson, something to that effect?**

A. Yes.

**Q. All right. You said that you seized a firearm and some narcotics from this gentleman, correct?**

A. Yes.

**Q. All right. And that was inside the residence, right?**

A. Yes.

**Q. Now, were you doing surveillance of that residence that led you to go to the house?**

A. No.

**Q. Did you receive a BOLO, or a call out, meaning a be on the**

**lookout for someone, is that the reason that you responded to the area?**

A. No.

**Q. Okay. Why did you respond to this particular building, 528, on May 28, 2013?**

A. Several complaints were received as well as a previous arrest that was made there by another officer.

**Q. A prior arrest made there by another officer?**

A. Yes, and several complaints we received.

**Q. Okay. But on this particular date, what did you have -- did you see Mr. Harralson committing any crime before you went into this house and got this stuff?**

A. No.

**Q. And any reason that you went to his residence? To follow up on an investigation? To question him about something?**

A. Just for reference on the complaints and previous arrest for narcotics there.

**Q. Okay. And so the person that you arrested was Mr. Harralson?**

A. Yes.

**Q. All right. And you basically testified that you saw Mr. Chacon hanging out, but not on May 28th of 2013, correct?**

A. No, he wasn't there. I didn't see him there.

**Q. So he wasn't there this day that you arrested this individual, and that would have been inside the residence,**

**correct?**
A. Yes.
**Q. And you never saw Mr. Chacon inside the residence at the 528 building, correct?**
A. No.
**Q. Now, with regards to June 4, 2013, you mentioned Raymond Moore. And I'm referencing, actually, to Exhibit No. 34.**
MR. GONZALEZ: Your Honor, may I approach?
THE COURT: Yes.
**BY MR. GONZALEZ:**
**Q. That's Exhibit 34 is what you retrieved from Raymond Moore, correct?**
A. Yes.
**Q. And Raymond Moore, what was he doing when you retrieved this from him?**
A. What do you mean what was he doing?
**Q. What was he doing? Was he walking down the street? Driving a car? Driving a bicycle?**
A. He was walking down the street. When he saw my marked vehicle, he went back and he went immediately inside the cafeteria and attempted to conceal himself behind the cafeteria.
**Q. So Raymond Moore sees you and basically walks away from you and goes into the cafeteria?**
A. All the way in the back.
**Q. Did you get that from his pocket, or did you see him throw**

**it?**

A. He handed it to me.

**Q. He had it on him?**

A. Yeah, he handed it to me though.

**Q. Okay. He handed it to you?**

A. Yes.

**Q. So what he handed to you was basically a small amount of marijuana, right?**

A. Yes.

**Q. And that is roughly a bud, maybe a joint, half a joint, something like that? Is that what we are talking about?**

A. Yes.

**Q. Okay. Now, you didn't see Mr. Chacon give it to Mr. Moore or anything of that nature, correct?**

A. No.

**Q. And Mr. Chacon was not with Mr. Moore on this date of June 4, 2013, when you made this arrest and seizure, correct?**

A. No, he wasn't.

**Q. Now -- and I'm not going to go through all these exhibits because, first of all, it takes me, like, 5 minutes just to find it in that box there.**

**But Joseph Thompson on July 3rd of 2013, I think you said that you seized from him a little bit of marijuana, and we are talking about exhibits -- I think it's Exhibit No. 35, and you said it's a clear, plastic baggie of marijuana, correct?**

A. Yes.

**Q. All right. And this is -- and when you approached Mr. Thompson, you said that he was attempting, and maybe I'm misspeaking here, if I do, you correct me, that he was attempting to roll a joint?**

A. Yeah, that's what it looked like he was doing.

**Q. And I think you said maybe a stick of marijuana?**

A. Yeah, he was doing it with his hands, so it looked like he was rolling a joint.

**Q. So Mr. Thompson is rolling a joint of marijuana, and you ran into him, right?**

A. I approached him.

**Q. You approached him. Okay.**

**Mr. Chacon wasn't there? You don't know where Thompson got the marijuana, correct?**

A. No.

**Q. Now, with regards to the buildings here, there has been reference to several of them, but I'm going to talk to you about the 435 N.W. 11th and the 428 building. Those were abandoned buildings, correct, or only one of them was?**

A. One of them was.

**Q. All right. Did you on any occasion see any families living in those abandoned buildings for periods of time?**

A. Just the one toward the right that I remember, and the ones to the left an old man that did live there at one point.

**Q. All right. So there was a point in time where not only were maybe other individuals like you mentioned that you have seen in there, whether it be Mr. Chacon and others, but there are also people in those buildings that may have been, or at least one of them abandoned, maybe they didn't have a place to stay, they would stay there for at least periods of time, right?**

A. Who would stay there?

**Q. Other individuals. You said you saw families there.**

A. Yes, yes. Another individual, yes.

**Q. Okay. Now, you mentioned several matters with regards to Nadim Guzman on September 20th of 2013, and you seized some suspected marijuana and suspected rock cocaine, but apparently it wasn't cocaine?**

A. No, it wasn't.

**Q. It wasn't. Maybe it looked like it, but it wasn't?**

A. It wasn't, yeah.

**Q. And this small amount of marijuana that was seized from Mr. Guzman, and he was accompanied by Mr. Salas, that was small personal use amount of marijuana, right?**

A. It could have been.

**Q. Right. Okay. And Mr. Chacon was not with neither Guzman or Salas when you made the seizure on September 20th of 2013, correct?**

A. No.

**Q. And September 26th you said -- well, let me backtrack. In**

**the 3 years that you have been there in that -- patrolling that area and working that area, besides the time that you stopped Mr. Chacon in the 2002 van, did you ever run into him driving any vehicle?**

A. Not to my knowledge.

**Q. Okay. And if you would have run into him driving a vehicle, most likely you would have stopped him because you figured he would be driving with a suspended license because that's what happened when you stopped him with the vehicle, the van, correct?**

A. I wouldn't stop him just for that. I will stop him for whatever violation he does while driving.

**Q. All right. But you never stopped him in a vehicle again? You never saw him in a vehicle again, correct?**

A. No.

**Q. Did you see him -- whenever you saw him in the neighborhood, was he walking?**

A. Yes.

**Q. Did you ever see him on a motorcycle?**

A. No.

**Q. Did you ever see him riding a bicycle?**

A. Not to my knowledge.

**Q. Officer Coladas, since you have worked that area for 3 years, some of the individuals that you mentioned and you identified by photos, did you see those individuals either on**

**foot or riding bicycles in the neighborhood?**
A. The ones here on foot.
**Q. On foot?**
A. Yes.
**Q. You didn't see any of them in vehicles, right?**
A. Another individual, yes.
**Q. But not these individuals, right?**
A. No.
**Q. Not Mr. Chacon, right?**
A. No.
**Q. So on September 26, 2013, you stopped Mr. Guzman while he was riding a bicycle, and you got some drugs from him, right?**
A. Yes.
**Q. All right. And Chacon wasn't there?**
A. No.
**Q. And you didn't see Guzman selling the drugs to anyone, right?**
A. No.
**Q. Now, with regards to the events of November 20, 2013, you said that you saw narcotics either in the hand or Mr. Thompson throwing narcotics to the ground; is that what you are saying?**
A. Yes, he dropped it on the bed that he was on.
**Q. Do you know whether any other drug was found there?**
A. No, not to my knowledge.
**Q. Okay. Do you know whether any drugs were found on Nadim**

**Guzman?**

A. Not to my knowledge.

**Q. When you approached to come into the building, who was the first person that you encountered? Was that Nadim Guzman?**

A. I didn't encounter him. Another officer encountered him first and got him out.

**Q. So you weren't the first officer to basically walk into the building?**

A. No.

**Q. Who was the first officer to walk into the building?**

A. If I give you a name, I would be lying. I'm not sure who was the first one.

**Q. Would it be fair to say that there were other officers besides you who got there first?**

A. Yes.

**Q. All right.**

MR. GONZALEZ: Did I do that? The computer? Okay. Thanks.

**BY MR. GONZALEZ:**

**Q. So you did not see Mr. Chacon on November 20th with any narcotics on him, correct?**

A. No.

**Q. All right. And you certainly didn't see Mr. Chacon with a firearm on him?**

A. No.

**Q. Now, you said, and your testimony was, that eventually you found a firearm, correct?**

A. Yes.

**Q. And by that do you mean that it took a while to search the place before the firearm was actually found?**

A. No. An officer saw it in the beginning. I'm not sure what it was, but when you walk in, you could see it on top of the ceiling area, the handgun coming out.

**Q. Do you know whether that gun had been discharged or not? Could you tell? Was it warm or anything of that nature?**

A. I didn't touch it, so...

**Q. Did you seize the firearm or did another officer seize it?**

A. Some other officer, I guess.

**Q. Now, Officer Coladas, were you there at that location when certain individuals were brought by law enforcement to see if they could make an identification of anyone? Were you there?**

A. Yes.

**Q. All right. And you were there. Did you witness the fact that none of these individuals identified Mr. Chacon as being part of a robbery?**

A. I wasn't there -- I was there when they were identifying, but I was sitting in my car, so I'm not sure who they pointed out. In the end I don't know what happened there.

**Q. But you were at least there to know that these individuals, at least some, were brought over to see if they could make an**

**identification as to who had been involved in a robbery, correct?**

A. Yes.

**Q. And what you are saying is that you did not witness these individuals either identifying or not identifying?**

A. Yeah. I was sitting in there while they were doing it, I see kind of what they are doing, but I'm not sure what happened.

**Q. Now, with regards to that day, November 20, 2013, Mr. Chacon was arrested for trespass, correct?**

A. Yes.

**Q. And that was that he was trespassing in the building that was abandoned?**

A. Yes.

**Q. Okay. Did you have anything to do with the arrest of Nadim Guzman, the detention of him, at least temporary detention of him?**

A. Other officers did. I mean, we are all there, but I was there.

**Q. Okay. But did you have anything to do with interviewing Mr. Guzman?**

A. No.

**Q. Anything of that nature?**

A. No, sir.

**Q. Okay. Now, you also testified to April 3rd of 2014, the events of that day and the arrest of two individuals, correct?**

A. Yes.
**Q. All right. And you were the officer that was doing surveillance?**
A. Yes.
**Q. All right. Can you tell the ladies and gentlemen of the jury what type of surveillance were you doing? Were you using binoculars? You know, just tell us exactly what it was that you were doing.**
A. I was behind the building where they were at looking through the fence, which is a good-sized hole that you could look through, and observed what they were doing.
**Q. Were you on foot or were you inside a vehicle? Let's say an unmarked vehicle.**
A. Conducting the surveillance I was on foot.
**Q. On foot. All right. So you weren't in an undercover car that doesn't have the signs of Miami police or anything like that, right?**
A. Eventually I got into it, but while doing the surveillance, no.
**Q. So you basically got out of the car and were checking out the area, is that basically it?**
A. Yes.
**Q. Now, were you videotaping, photographing any of this?**
A. No.
**Q. On your cell phone, now that cell phones are pretty fancy,**

**were you recording it? Taking pictures? Anything on your cell phone? Anything like that?**

A. No.

**Q. Were there any other officers that were doing that on April 3, 2014?**

A. To my knowledge, no.

**Q. And were you aware that at one point in time that there was a pole camera, that is, a camera that was placed on a location to actually be seeing or videotaping the front of that residence, that area, if you know?**

A. I eventually found out, but during that time frame, no.

**Q. At that time you did not know that at all?**

A. No.

**Q. And you were not involved with regards to getting the pole camera set up and getting the proper authorization from the Court? You were not involved in that; is that correct?**

A. No.

**Q. All right. And you said that two individuals that you apprehended was Dayaan Zerquera and Christian -- or Christopher Ramirez, correct?**

A. Christian Ramirez, yes.

**Q. Christian Ramirez, right?**

A. Yes.

**Q. And Maurin Chacon was not there?**

A. There were two other subjects there, but I cannot remember

who it was right now.

**Q. And I believe you mentioned someone else's name, but it was not Mr. Chacon, correct?**

A. No, it wasn't him.

**Q. I think you said it was Mr. Salas, Alioth Salas?**

A. Yes.

MR. GONZALEZ: Your Honor, if I may have just a brief moment?

THE COURT: Sure.

**BY MR. GONZALEZ:**

**Q. Do you recall, Officer Coladas, that on the evening of November 20, 2013, do you remember being told by Nadim Guzman that he and others were sleeping there when you guys came there?**

MR. VÁZQUEZ: Objection; hearsay.

A. No.

THE COURT: Overruled anyway.

MR. GONZALEZ: Your Honor, thank you. I have nothing further.

THE COURT: All right. Ladies and Gentlemen, we are going to take our afternoon recess for about 15 minutes.

(Jury retires at 2:53 p.m.)

THE COURT: All right. We are going to go until about 4:30, and at the end of the day I will share some notes. It's getting worse, not better.

One thing, gentlemen, if you are all going to go

through each date and your client not being there, you are going to do it in less time than Mr. Gonzalez did it. So make sure you do.

Okay.

(Recessed at 2:54 p.m.)

(Resumed at 3:10 p.m.)

THE COURT: Everyone else can be seated.

Bring in the jury.

(Jury returns at 3:10 p.m.)

THE COURT: Be seated everybody.

Mr. Horowitz.

MR. HOROWITZ: Yes, Your Honor.

**CROSS EXAMINATION**

**BY MR. HOROWITZ:**

**Q. Good afternoon, Officer Coladas. How are you?**

A. Good.

**Q. We have never met, have we?**

A. No.

**Q. The events that you testified, the stops and arrests that you made, you didn't see Christopher Altamirano at any of those places and occasions, correct?**

A. On arrests that I made, no.

**Q. And that goes for each and every one that you testified?**

A. Not at the locations.

**Q. Now, let's start with the neighborhood -- is it enhancement**

**or enforcement team?**
A. Enhancement team.
**Q. When were you first assigned to basically the Little Havana substation?**
A. I want to say maybe 4 years ago.
**Q. You don't have a recollection as to the exact date?**
A. Not to the exact date, no.
**Q. Are you still there?**
A. Yes.
**Q. During the time that you were there, were you wearing a uniform or plain clothes like you are right now?**
A. Sometimes plain clothes, sometimes in tactical uniform.
**Q. What type of uniform?**
A. It says Miami Police on it, a T-shirt and BDUs.
**Q. But you were clearly able to identify you as a member of the Miami Police Department, correct?**
A. Yes.
**Q. And you would patrol on occasion, would you not?**
A. Yes.
**Q. In other words, you would get out on foot, walk the neighborhood, talk to some of the residents of the neighborhood?**
A. Yes.
**Q. Ask about problems?**
A. Yes.
**Q. And when is the first time you saw Christopher Altamirano?**

A. I don't recall when, but it would be -- I don't recall the date.

**Q. Do you have a date?**

A. No.

**Q. A month? A year?**

A. Just in the time period of -- it would be right after the Earl Harralson incident. Maybe a couple months back after the Earl Harralson incident.

**Q. And the Harralson incident, that's the one we talked about, Earl Harralson, H-A-R-R-A-L-S-O-N, right?**

A. Yes.

**Q. And that was May 28th of 2013, was it not?**

A. Yes.

**Q. So basically your first encounter with Mr. Altamirano may have been late March, early April of 2013, correct?**

A. Part of the beginning of the year.

**Q. And as part of your duties with the City of Miami Police Department and strolling that neighborhood, you would also conduct what's known as field interviews, would you not?**

A. Sometimes.

**Q. Can you tell the ladies and gentlemen of the jury what a field interview is?**

A. Make contact with a subject, get their names, date of birth, and run them to see if they have any warrants.

**Q. For example, if you had seen me walking down the street and**

**you wanted to talk to me, I was doing nothing suspicious other than walking down the street, that's what you call a consensual contact, correct?**

A. Yes.

**Q. I'm free to talk to you, am I not?**

A. Yes.

**Q. I'm free to walk away from you, am I not?**

A. Yes.

**Q. And if I decided to talk to you, you would ask for my driver's license, would you not, means of identification?**

A. Yes.

**Q. Whether it's a driver's license, passport, anything that shows who I am, correct?**

A. Yes.

**Q. And all this time I have done nothing wrong, have I?**

A. No.

**Q. You haven't seen me commit a crime in your presence, correct?**

A. No.

**Q. But that's something that you would do, correct?**

A. Yes.

**Q. As a matter of fact, if you came into contact with me, would you create a report?**

A. Not necessarily.

**Q. So the fact that you and I had, as you call it, a consensual**

**encounter, there would be no report created?**
A. No.
**Q. There would be no record of you stopping me, correct?**
A. Just if anything by the radio for officer safety, so if something happens, they would know where we are at.
**Q. And they only retain those tapes on the police bands for about 90 days, right?**
A. I have no idea.
**Q. But you wouldn't have to write any report that you and I ever spoke, correct?**
A. No.
MR. HOROWITZ: Christopher, stand up.
**BY MR. HOROWITZ:**
**Q. How many reports or field interviews did you write pertaining to the time that you had this consensual encounter with Mr. Altamirano?**
A. Probably none.
MR. HOROWITZ: You can have a seat.
**BY MR. HOROWITZ:**
**Q. How many times did you stop him for a field interview?**
A. Not many times because he would come and go. I mean, he wasn't there for periods of months as well sometimes.
**Q. But when you saw him, you would stop him, correct?**
A. Not all the time.
**Q. How many times did you stop him over a period of a couple**

**years?**
A. Maybe five, five times. Not that much. It wasn't really that much.
**Q. You have no idea because you have no reports to refresh your recollection, correct?**
A. Correct.
**Q. But when you would stop him, did you ask him for his ID?**
A. Sometimes, yes, I do. I already knew him by name, so...
**Q. Did you pat him down?**
A. Sometimes for safety.
**Q. In the times you had these field interviews or consensual encounters with Christopher Altamirano, how many times did you find a gun on him?**
A. Never.
**Q. How many times did you find drugs on him?**
A. Never.
**Q. How many times did you find large quantities of cash on him?**
A. I don't recall finding any cash on him sometimes.
**Q. As a matter of fact, sometimes you didn't find any money on him, correct?**
A. I don't recall, but, no.
**Q. If it was something significant, you would have written a report, would you not have?**
A. Yes.
**Q. For example, if you would have found -- I don't know if you**

**can see it over there, this little bit of marijuana over here, you would have arrested him, correct?**
A. Yes.
**Q. You never found any marijuana on him, correct?**
A. No.
**Q. Did you find any cocaine on him?**
A. No.
**Q. Any Mollies, MDMA Ecstasy, Xanax, anything like that?**
A. Not me.
**Q. And if you found it, you would have arrested him, correct?**
A. Yes.
**Q. Now, I want to talk to you a little bit about Earl Harralson; that's May 28, 2013. Earl Harralson, the address that you listed, he didn't live in the whole building, he lived in an apartment, did he not?**
A. Yes.
**Q. As a matter of fact, he lived in apartment number 2, correct?**
A. Yes.
**Q. And you desired to get into that apartment, did you not?**
A. Not necessarily. It ended up being that he gave us consent, written consent, we went.
**Q. Well, you had this, as you call it, a consensual encounter with Mr. Harralson, did you not?**
A. Yes.

**Q. In other words, you walked up to him to talk to him, correct?**
A. Yes.
**Q. Mr. Harralson had nothing on him, correct?**
A. No.
**Q. And you presented Mr. Harralson with a consent form, did you not?**
A. Yes.
**Q. What was the consent for?**
A. To search the whole apartment, his apartment.
**Q. To search the apartment you didn't want to go into?**
A. That we wanted to get into eventually.
**Q. And you did get in, and Mr. Harralson told you that he gave you permission to get into that apartment, correct?**
A. Well, he signed. He gave me permission, yes.
**Q. He gave you personally permission to search his apartment?**
A. Yes.
**Q. And when you searched his apartment, you found Government's Exhibit 28, this firearm, correct?**
A. Yes.
**Q. This is Earl Harralson's gun, is it not?**
A. Yes.
**Q. Where did you find it?**
A. Under his -- well, another officer searched it, but, yeah, under his bed.

**Q. You found this gun and the ammo as well under his bed, did you not?**
A. Yes.
**Q. Not out in the open, hidden from view, correct?**
A. Yes.
**Q. And it's your understanding Mr. Harralson kept the gun hidden from view because he is a convicted felon?**
A. He is a convicted felon.
**Q. As a matter of fact, you arrested Mr. Harralson that morning, did you not?**
A. Yes.
**Q. And you arrested him for possession of a firearm by a convicted felon, correct?**
A. Yes.
**Q. You arrested him for possession of cocaine, did you not?**
A. Yes.
**Q. And you arrested him for misdemeanor possession of marijuana, small quantity of marijuana, correct?**
A. Yes.
**Q. And one of the other things that you found in Mr. Harralson's house that the Government didn't show you was a pipe, correct?**
A. There was a pipe in the bag.
**Q. And the Government didn't show you this pipe that you found, and the pipe had crack cocaine residue in it, did it not?**

A. The pipe is there. I did see it.

**Q. It was a crack pipe?**

A. Yes.

**Q. That Mr. Harralson told you was for his use, correct?**

A. I never asked him about the pipe.

**Q. And you arrested him for possession of drug paraphernalia for having his crack pipe with crack cocaine residue in it, correct?**

A. Yes.

**Q. Now, on June 4th you arrested Raymond Moore at the grocery store?**

A. It's a cafeteria.

**Q. Is it a cafeteria and a grocery store?**

A. It's not connected, so it's separate.

**Q. It's separate, but there is a grocery store right there?**

A. Yes.

**Q. Right next door?**

A. Yes.

**Q. And people -- and you know that neighborhood real well. You have been there for 4 years?**

A. Yes.

**Q. The grocery store as well as the cafeteria, people walk to the store that don't own a car, correct?**

A. Yes.

**Q. It's a neighborhood grocery, neighborhood cafeteria, is it**

**not?**
A. Yes.
**Q. The marijuana that you found on Raymond Moore, was he distributing marijuana at the time?**
A. Not to my knowledge.
**Q. Was he selling it?**
A. Not to my knowledge.
**Q. Did you arrest him for simple --**
THE COURT: Haven't we gone over this with Mr. Gonzalez?
MR. HOROWITZ: Yes, Your Honor.
THE COURT: Let's not go over it again.
MR. HOROWITZ: Yes, Your Honor.
**BY MR. HOROWITZ:**
**Q. I want to talk about September 26th. On September 26, 2013, you saw Nadim Guzman, right, and you arrested him that day?**
A. Yes.
**Q. Now, when you stopped Mr. Guzman, it wasn't one of these field interview consensual encounters, was it?**
A. No.
**Q. You saw Mr. Guzman riding a bicycle, did you not?**
A. Yes.
**Q. In the opposite way of traffic?**
A. Yes.
**Q. Danger to himself as well as the drivers on the road that**

**day, correct?**
A. Yes.
**Q. He was going northbound on a southbound street; fair enough?**
A. Yes.
**Q. Based on that -- you were in a marked vehicle that day, were you not?**
A. Yes.
**Q. What did you do?**
A. I activated my lights.
**Q. Once you activated your lights, did Mr. Guzman stop?**
A. Yes.
**Q. He was on his bicycle, he stops, you activate your lights, you stop your vehicle, you get out of the vehicle. Does Mr. Guzman stick around to talk to you?**
A. No.
**Q. He took off running, did he not?**
A. Yes.
**Q. And you chased him?**
A. Yes.
**Q. And while you were chasing him, you are saying stop, police, or words to that effect, are you not?**
A. Yes.
**Q. What does Mr. Guzman do?**
A. Kept on running.
**Q. Did you advise Mr. Guzman that if he didn't stop running,**

**you would Taser him?**
A. Yes.
**Q. Did you, in fact, employ your Taser?**
A. Yes.
**Q. Tell the jury, ladies and gentlemen of the jury what happened when you took your Taser out on Mr. Guzman?**
A. I told him to stop or I'm going to Taser you and he didn't, and he was Tased.
**Q. Now, Taser is an electronic unit that emits -- once the defendant is -- or in this case Mr. Guzman gets the probe stuck in him, you can jolt him with a jolt of electricity, correct?**
A. Yes.
**Q. It's designed to be nonlethal force to stop a suspect who won't stop, correct?**
A. Correct.
**Q. How many times did you Taser Mr. Guzman?**
A. Not sure.
**Q. At least once?**
A. Yes.
**Q. Mr. Guzman, when he hit the ground, he had a balled-up tissue in his hand, did he not?**
A. Yes.
**Q. Did he drop that?**
A. Yes, when he got Tased.
**Q. When he got Tased, he dropped what was in his hand?**

A. Yes.
**Q. That was 20 rocks of crack?**
A. Yes.
**Q. And Mr. Guzman, you arrested him, did you not?**
A. Yes.
**Q. You arrested him for possession with intent to sell, right?**
A. Yes.
**Q. The 20 rocks that was in his hands wasn't for personal use, was it?**
A. No.
**Q. You arrested him for resisting an officer, did you not?**
A. Yes.
**Q. Mr. Guzman was not cooperative with you that day, was he?**
A. No.
**Q. Now, the prosecutor asked you some questions about November 20th and the morning of November 21st, early morning hours of November 21st. Do you recall those questions?**
A. Yes.
**Q. When you got the call regarding a suspected robbery, were you on duty that night?**
A. Yes.
**Q. At what time did you arrive at the 435 residence?**
A. I'm not sure, sir.
**Q. Did you write any reports as a result of your involvement that evening?**

A. Should be there.

**Q. And you got to the house. What time did you get there?**

A. I don't recall.

**Q. Was it -- without guessing, you get to the house, Christopher Altamirano is not in the house when you got there, correct?**

A. No.

**Q. Now, I want to talk to you about the events of April 3, 2014, involving Mr. Zerquera and Christian Ramirez. Okay?**

A. Yes.

**Q. You arrested Dayaan that day, right?**

A. Yes.

**Q. And that's Dayaan Zerquera?**

A. Yes.

**Q. You said that you saw a hand-to-hand transaction, and he was loitering and hanging around; is that a fair statement?**

A. Yeah, Christian Ramirez.

**Q. And as a result you approached Mr. Ramirez and Mr. Zerquera, did you not?**

A. Yes.

**Q. Mr. Zerquera you said was looking nervous, was he not?**

A. Yeah.

**Q. And when you approached Dayaan Zerquera, he began to walk away quickly, did he not?**

A. After I got the narcotic, he began to walk away quickly.

**Q. With his hand in his right pocket?**
A. Yes.
**Q. Right front packet or right rear pocket?**
A. Front pocket.
**Q. Showing you what's been previously admitted as Government's Exhibit 44, can you tell the ladies and gentlemen of the jury what this is?**
A. The handgun.
**Q. Was it in his right front pocket?**
A. Yes.
**Q. So at this time you didn't know he had a gun, correct?**
A. No.
**Q. Dayaan Zerquera is walking away from you with his hand in his right front pocket that had this firearm in it, correct?**
A. Yes.
**Q. This gun was loaded, was it not?**
A. Yes.
**Q. It had four rounds in the chamber and one spent round, correct?**
A. Yes.
**Q. This gun was ready to go, was it not?**
A. Yeah.
**Q. Ready to utilize?**
A. Yes.
**Q. And though it may be small in stature --**

THE COURT: It was ready to go. Move on, Mr. Horowitz.

**BY MR. HOROWITZ:**

**Q. You arrested Mr. Zerquera that day, did you not?**

A. Yes.

**Q. Also for possession of a firearm by a convicted felon; true?**

A. Yes.

**Q. You arrested him also for possession of a firearm during the commission of a felony?**

A. Yes.

**Q. As well as possession with intent to sell cocaine, correct?**

A. Yes.

MR. HOROWITZ: May I have one moment, Your Honor?

THE COURT: Yes.

MR. HOROWITZ: Thank you very much. No further questions.

THE COURT: Mr. Korchin.

MR. KORCHIN: No questions, Your Honor.

THE COURT: Mr. Donet.

**CROSS EXAMINATION**

**BY MR. DONET:**

**Q. Officer Coladas, how are you this afternoon?**

A. Good.

**Q. Now, I believe it was your testimony that you first saw Mr. Dixon prior to May of 2013?**

A. It was the 428 building. I'm not sure what time frame I saw

him.

**Q. Well, in response to one of Mr. Vázquez's questions, you said that you saw him prior -- somewhere prior to May of 2013?**

A. Yes. Yes.

**Q. Now, do you have a report of that encounter?**

A. No.

**Q. Now, you don't always make reports during field interviews, but sometimes you do, correct?**

A. Sometimes.

**Q. And your department actually has field interview cards, correct?**

A. Yes.

**Q. And oftentimes officers will fill out that field interview card that has information, correct?**

A. Yes.

**Q. But in this instance you did not do that, correct?**

A. I'm not sure if I did with him. I remember writing a report, but I'm not sure if I wrote a field interview with him. If we do, we turn it in. I have no idea where it goes after that, but we turn it in.

**Q. Do you know whether a report or a field interview card exists of your encounters with Mr. Dixon?**

A. I remember doing one for him. I just don't remember dates. We turn it in. I'm not sure where it goes.

**Q. How are you sure as you sit here today that the first time**

**you saw him was before May of 2013?**

A. Because I didn't know who he was, and then I made contact and got his name, and I wrote it down.

**Q. Right. But how do you know what day it was?**

A. It was before 2013.

**Q. How do you know that?**

A. Before May 2013.

**Q. How do you know? That is my question.**

A. Because I made contact before that.

**Q. So you have a memory of it happening before May of 2013?**

A. Yes, I'm just not sure of the month. Because I made contact with him, like, on four or five occasions. I'm just not sure month or date.

**Q. But you are absolutely sure?**

A. Yes, before May.

**Q. How many months before May?**

A. I see him in the streets, but making contact physically maybe a month before, 2 months before. Just not sure of the month.

**Q. So 1 or 2 months before May of 2013, you are absolutely sure that you saw James Dixon and had contact with him, correct?**

A. Yes.

**Q. And this would have been in the Little Havana area?**

A. Specifically 428. That's where I always saw them at most the time.

**Q. Okay. Let's talk about that. The first time you had contact with Mr. Dixon, he was a passenger in a car, correct?**
A. I don't think that was my first contact with him.
**Q. Okay. There was a time when he was a passenger in a car, and you pulled the car over, correct?**
A. Yes.
**Q. And you asked the occupants to get out of the car, correct?**
A. Yes.
**Q. Because you had told the driver there was some sort of BOLO or the car was involved in something, correct?**
A. There was a call specifically reference that specific vehicle, reference firearms in the trunk of the car.
**Q. But there were no firearms in the trunk of the car, correct?**
A. No.
**Q. You asked all the occupants to get out of the car, correct?**
A. Yes.
**Q. Specifically you asked Mr. Dixon to get out of the car, correct?**
A. Everyone.
**Q. But you searched Mr. Dixon, correct?**
A. Of course.
**Q. And Mr. Dixon on that occasion did not have a firearm, correct?**
A. No.
**Q. He had no marijuana, correct?**

A. No.
**Q. No cocaine, correct?**
A. No.
**Q. No crack drugs, correct?**
A. No.
**Q. No Mollies, correct?**
A. No, sir.
**Q. Didn't even have a dollar on him, correct?**
A. I don't remember if he had money.
**Q. He didn't have a large amount of cash, correct? You would have made a note of that?**
A. Yes.
**Q. And you photographed him that day, correct?**
A. Yes.
**Q. And that photograph would have been attached to a report, correct? Because this isn't an encounter now, you are investigating firearms in the car? You take a photograph of him. This must clearly be documented, correct?**
A. Yes.
**Q. So this is one time that you documented that, correct?**
A. Yes.
**Q. Prior to May of 2013, 1 or 2 months before, correct?**
A. Yes.
**Q. Now, there was another time when you stopped Mr. Dixon, correct? There were several?**

A. There was at least five occasions.

**Q. Every single time you stopped Mr. Dixon, asked to speak to him, he never ran from you, correct?**

A. Never.

**Q. He was always cooperative with you, correct?**

A. Yes.

**Q. And on several occasions you have patted him down and searched him, correct?**

A. Yes.

**Q. And every single encounter that you had with Mr. Dixon he did not have any illegal narcotics, any firearms, or any large amounts of cash on him, correct?**

A. No.

**Q. He didn't have any fancy jewelry, correct?**

A. I don't remember if he had jewelry or not.

**Q. Other than the time that he was a passenger in a car, he was always on foot, correct?**

A. Yes.

**Q. You never saw Mr. Dixon sell any narcotics, correct?**

A. No.

**Q. You never saw Mr. Dixon commit any acts of violence against any other individuals in the neighborhood, correct?**

A. No.

**Q. Every single time you saw Mr. Dixon, he was acting and behaving lawfully?**

A. Yes.

**Q. You never saw him do anything unlawful, correct?**

A. No.

**Q. Now, what was your schedule, what was your shift back between May of 2013 and May of 2014?**

A. It's sporadic, sir, I'm sorry. They change hours almost every other week, so I can't give you the time that we work. They always change it.

**Q. Are you not in a road patrol capacity? Explain that.**

A. I a member of the problem solving team.

THE COURT: Officer, you have to slow down.

**BY MR. DONET:**

**Q. As you sit here today, approximately how many reports do you think you made of Mr. Dixon in your encounters with him?**

A. More likely two, if any. More likely two. I remember the contact in the car and then the first street contact I made with him.

**Q. Now, you testified, and I'm not going to go over all those dates, I'm going to try to be efficient in my questioning. But during those dates that you talked about, those incidents, those arrests, Mr. Dixon was never present, correct?**

A. No.

**Q. Mr. Dixon was not identified as someone who committed the robbery that occurred, correct?**

A. Not to my knowledge.

**Q. The day that you were conducting surveillance on April 3rd of 2014 where you saw Zerquera and Ramirez, Mr. Dixon was not present that day, correct?**
A. No.
**Q. All right. And the large bags of drugs from that day, April 3rd, I don't remember what exhibit number that was, but the bag that Zerquera had by the -- the bag that Ramirez placed by the chain-link fence, that's what you saw, correct --**
A. Yes.
**Q. -- on April 3rd?**
**That bag is commonly referred to as a bomb?**
A. Yes.
**Q. Bomb, B-O-M-B?**
A. Yes.
**Q. And that's a larger bag with smaller distributing amounts of drugs inside, correct?**
A. Yes.
**Q. Now, when Mr. Vázquez showed you Government's Exhibit No. 42, that was a picture of the front of the 428 house, correct?**
A. Yes.
**Q. Now, I think there is a button near your screen where you can white out those pink marks, reset it.**
**It's just a quick question. Where you saw Mr. Ramirez place the bomb, the bigger bag, that was inside the chain-link**

**fence in front of 428?**

A. The outside area. Where the driveway is at.

**Q. Near where the small little palm tree is behind the gentleman?**

A. A little bit more down, but it wasn't on this side of the fence, it was on the other side.

**Q. On the driveway side of the fence?**

A. Yes.

**Q. But near that palm tree?**

A. A little bit more down.

**Q. You mean closer to the house or closer to the street?**

THE COURT: Mr. Donet, where are we going? Your client wasn't there, is that the point?

MR. DONET: I just want to establish as to where the bomb is being placed.

THE COURT: Where was the bomb being placed?

THE WITNESS: Closer to the house.

THE COURT: Closer to the house.

MR. DONET: Thank you, Your Honor. That's the question that I have as to that.

I have no further questions, Your Honor.

THE COURT: All right. Mr. Rubio.

**CROSS EXAMINATION**

**BY MR. RUBIO:**

**Q. Officer Coladas, I just have a few questions with respect to**

**Mr. Flores. Do you understand?**
A. Yes.
**Q. You have been a patrol officer in this area for a number of years; is that correct?**
A. Yes.
**Q. I believe you said four?**
A. Four years.
**Q. Four years.**
**Do you recall when and where you first saw Mr. Flores in that area?**
A. I don't recall what area I saw him first. I probably only seen him two occasions. I really didn't see him much.
**Q. And if you did, you said approximately two occasions?**
A. Yes, sir.
**Q. And you didn't arrest him for anything; is that correct?**
A. No, sir.
**Q. Would it also be fair to say that in none of these items that have been introduced, none of these narcotics or the weapons or anything like that, Mr. Flores was not involved in that, correct?**
A. No.
**Q. And he wasn't arrested for any of those offenses?**
A. No.
**Q. The market, I believe it's Exhibit 25, and to save time I will just ask you, it's the market photograph that was**

**introduced here, that's a little store that's in that area; is that correct?**

A. Yes, sir.

**Q. And are you aware that Mr. Flores resides at 1135 N.W. 6th Street?**

A. That's the address he gave me, and we later on towards on down the line, yes.

**Q. Would it be fair to say that where he resided was approximately 2 blocks from that market?**

A. Yes.

**Q. Did you ever see him at that market on the one or two occasions?**

A. Yes.

**Q. You did?**

A. Yes.

**Q. But it was innocent conduct there; is that correct?**

A. Yes.

**Q. Okay. And you have never had occasion to arrest him for anything; is that fair to say?**

A. I think I only stopped him once, and I never arrested him ever.

**Q. All right.**

MR. RUBIO: I have nothing further. Thank you, Judge.

THE COURT: You may step down, sir. I'm sorry, wait a minute. Redirect.

**REDIRECT EXAMINATION**

**BY MR. VÁZQUEZ:**

**Q. Officer, when you were speaking with defense counsel about Mr. Chacon's marijuana from December 11, 2011, do you recall that line of questioning?**

A. Yes.

**Q. There was a reference to Government's 23. I'm showing it on the TV. Do you see it?**

A. Yes.

**Q. This is a bag, correct?**

A. Yes.

**Q. You also spoke with defense counsel, Mr. Donet, about a bomb, correct?**

A. Yes.

**Q. And a bomb is what?**

A. Has several baggies inside of it.

**Q. And you talked to Mr. Donet about the bomb and the drug sale that you saw on April 3rd of 2014, correct?**

A. Yes.

**Q. You saw drug sales happening at the 428 building, correct?**

A. Yes.

**Q. Did you see a sale involving the entire bomb being handed to a person?**

A. No.

**Q. What did you see being handed to the person?**

A. One bag.
**Q. A bag like this (indicating)?**
A. Yes.
**Q. You spoke with defense counsel about the Harralson incident referenced May 28, 2013, correct?**
A. Yes.
**Q. And you talked with defense counsel, Mr. Horowitz, regarding Mr. Altamirano whether you saw him in the building, correct?**
A. Yes.
**Q. You said no?**
A. No.
**Q. On May 28, 2013, did you see Mr. Altamirano in the area?**
A. Yes.
**Q. Where was he?**
A. Around the corner of the area we were doing.
**Q. And what was he doing?**
A. Just watching us.
**Q. He was watching you?**
A. Yes.
**Q. And this was while you were conducting -- what were you doing that he was watching?**
A. Conducting an investigation.
**Q. And to be clear, showing you Government's 28, this is the investigation where this weapon was seized, correct?**
A. Yes.

**Q. Is this the investigation where narcotics were recovered from the home?**

A. Yes.

**Q. Okay. Mr. Horowitz asked you about speaking with Mr. Harralson, correct?**

A. I'm sorry?

**Q. Mr. Horowitz asked you about speaking with Mr. Harralson?**

A. Yes.

**Q. And you told him some of the things that Mr. Harralson brought up to you, correct?**

A. Yes.

**Q. Did Mr. Harralson talk to you about his circumstances being inside that home reference Mr. Altamirano and his associates?**

A. Yeah.

MR. HOROWITZ: Objection.

THE COURT: Approach.

I'm going to send them home.

Ladies and Gentlemen, I think this is going to take a little time, so I'm going to let you go for the day. I know you have given me some scheduling issues, and I'm going to have to review that and work it out. But since I'm not going to last much longer anyway, and I'm going to have to deal with the lawyers, I'm going to let you go home for the day.

Now remember, don't talk about this case to anyone, not your loved ones, not online, not anyone.

Go home, have a good meal, have a good rest, and be back tomorrow at 9:30. I will see you tomorrow.

(Jury retires at 3:45 p.m.)

THE COURT: We are going to talk about you, so...

(Witness leaves courtroom.)

THE COURT: Everybody be seated.

Okay. Who is Mr. Harralson?

MR. VÁZQUEZ: Mr. Harralson was the person who occupied the 528 N.W. 11th Avenue building on May 28, 2013.

THE COURT: Okay.

MR. VÁZQUEZ: He is an associate of these individuals, he is a person who is subject to a writ from the Government in this case.

THE COURT: Okay.

MR. VÁZQUEZ: Mr. Harralson provided statements, statements that have been provided to the defense, that in exchange for allowing the individuals from this group to sell drugs from his residence, he was provided narcotics. He told that to the police.

Mr. Horowitz opened up the door when he asked him about what Mr. Harralson said and he elicited hearsay. I think it's proper for us to allow the jury to have everything in the event as a consequence of what defense counsel elicited on cross examination.

THE COURT: Mr. Horowitz.

MR. HOROWITZ: First of all, Mr. Harralson is an -- was a resident of a group of apartments within the building.

Number two, what he told to the police officer is pure, unadulterated hearsay. It's no longer in furtherance of a conspiracy as he is being questioned by the police officer.

In addition, Your Honor, we have not been provided the statements that Mr. Harralson made on May 28th in that the only thing that I had was Mr. Harralson's arrest form. And in the arrest form it talks about a consensual encounter and consent was given by Mr. Harralson for the officer to enter his apartment. That doesn't open the door to anything that he told the police officer after a firearm was seized from under his bed along with ammunition.

I haven't opened the door at all. The Government chose not to object to the consent to search his apartment. That's their choice.

THE COURT: Well --

MR. HOROWITZ: I didn't say anything about any post-arrest statements that Mr. Harralson made. These were never provided. The only thing I have is the May 28, 2013, arrest form, and there is no evidence within the four corners of the arrest form that Mr. Harralson made any admissions concerning Mr. Altamirano.

THE COURT: Okay. Have you given the statements to the defense?

MR. VÁZQUEZ: Your Honor, I believe that we did. There is a transcript of a statement from Detective Quintaro. I believe that it was provided to the defense. I will review that on the hard drives, but I believe that is accurate.

MR. HOROWITZ: It was never provided. Even if it was, and, Judge, I have gone through the discovery with a fine-tooth comb, and we have this post-arrest, pre-arrest statements of all the defendants. First time we heard of Mr. Harralson is when the Government issued a writ for Mr. Harralson.

THE COURT: Well, first I think you should give up the statements anyway so you can be careful about cross.

Second, I don't know what Mr. Harralson has said about others is admissible even at this point, but it would be nice to know what Mr. Harralson has to do with these folks, that he knew them, that he worked with them, something other than all we know -- all this jury knows is that some guy name Earl got arrested at this address that they have frequented every now and again.

So if you would, please, get me the statement, get them the statement, and is Mr. Harralson on his way here?

MR. VÁZQUEZ: We have executed the writ. We haven't determined if we are going to call him.

However, Your Honor, so there is context, in Facebook messages on or about May 28, 2013, these defendants are saying oh, we can't go to Tyrone's crib, his residence, anymore, and

that is in time connected to the time of the arrest.

THE COURT: Okay.

MR. VÁZQUEZ: We also believe -- I understand that it's coming in.

THE COURT: It doesn't make it any less hearsay because it's on Facebook.

MR. VÁZQUEZ: I agree. These are coconspirator statements, so it's an exception, the Government would offer.

THE COURT: I'm saying the post-arrest statement, the Facebook doesn't change that.

MR. VÁZQUEZ: No. I'm offering context to the Court as far as who he is.

THE COURT: Okay.

MR. VÁZQUEZ: I agree with Mr. Horowitz, it is hearsay. My position is that he has opened the door to it, not that he can't -- not that it is somehow not hearsay because -- for any other exception. I agree but for what he asked the officer it would not be admissible.

THE COURT: Well, give up the statements tonight. We can recall the officer if at some time I allow you to elicit it. Right now I'm not going to allow it in.

If Mr. Harralson is an unindicted coconspirator, that would still be a post-arrest statement, so it would come in.

Give them the statements, and we will see what you decide to do with Mr. Harralson as far as calling him, and then

he can say I gave a statement to the officer.

MR. VÁZQUEZ: He would just testify --

THE COURT: Right.

MR. VÁZQUEZ: -- this is what I did.

THE COURT: That's true. If there is any question about the officer's credibility about the account or what he did that day. Okay. So we have solved that.

MR. VÁZQUEZ: Yes, Your Honor.

THE COURT: Now, as to other matters, I have to place this in context. I have the jurors' requests in terms of scheduling. They want to leave -- one juror wants to leave by 3 every day. Actually, she wants to leave at 2. I'm going to have to make some accommodation for her children, but that just means we have a tighter schedule, which is why I go back to what I had counseled defense attorneys.

If one attorney covers the various components of the stop and the report and when you write a report, all that, then you can get up and say you didn't see my client on this date, this date, this date, or this date, but I'm not going to allow you to redo it again. I'm going to cut you off as asked and answered because we need to keep this moving. All right?

I understand you need to bring out Mr. Rubio, Mr. Donet that your client wasn't involved.

Mr. Korchin, I think you brought it out brilliantly.

You need to listen to each other as to what you can and

cannot go into again. Because by the time you get up, Mr. Vázquez will have hit it, Mr. Gonzalez, Mr. Horowitz. By that time my head is going to be exploding even more than it might ordinarily.

MR. DONET: I will try to be as specific as I can as to Mr. Dixon, but there are some questions that I need to ask. I can't rely on other counsel to ask questions for my client.

THE COURT: So this is the only person that you are going to ask about those drugs that were recovered, the bomb?

MR. DONET: Well, Judge --

THE COURT: Just this guy? Because if there are other guys and you are going to be asking them, then not only is it repetitive of them, but it's going to be repetitive to other witnesses. I'm telling you all to keep it tight and focused. That's all.

MR. RUBIO: To save a little time, my continuing objection applies to Mr. Harralson.

THE COURT: Your continuing objection applies to the world of evidence that is coming in that actually will be considered against your client because he is alleged to be part of a conspiracy, but I understand your position.

MR. RUBIO: Thank you, Judge.

THE COURT: Now, as to the Government, Mr. Vázquez, I gave you a lot of room today in terms of leading. So, for instance, you asked the officer were you able to recover

narcotics? The question is what did you recover. You led him in terms of did you encounter defendants. That's fine because you are focusing them. But I'm going to start sustaining leading objections, and I do think we need to have somebody give an overview of BMT to put all these players in play because right now the jury just -- I don't think they have a story, and they are going to need to have it pretty soon.

So continuing objection for Mr. Rubio. Everybody focused on their cross. Less leading from the Government. What else have I missed? Get someone to fix that screen before I kick it out of the courtroom. And Earl Tyrone, we are going to tie him into this somehow.

Is there anything else housekeepingwise?

MR. KORCHIN: We will be getting a list of potential witnesses for tomorrow from the Government sometime later today?

THE COURT: Yeah, I think they gave you the week.

MR. VÁZQUEZ: I provided the week, and last evening I provided potential civilians who were not able to be called today.

THE COURT: Right. So they will be tomorrow.

MR. GONZALEZ: We want to know if you are going to be calling any of the codefendants that have plead for tomorrow.

MR. VÁZQUEZ: In light of the Court's suggestion, I think that it's possible that the Government might call Nadim Guzman tomorrow.

THE COURT: Okay. So maybe they would be calling Mr. Guzman toward the end of the day because they want to take care of their civilian witnesses. But that I think would be a good idea to get somebody with the big picture.

MR. VÁZQUEZ: I have just asked so I can move some civilians out so they can return to their lives.

THE COURT: Yes. And because of your concerns, absolutely.

MR. VÁZQUEZ: I will just qualify that and confirm the marshals have our letters. I sent letters for our cooperators.

THE COURT: Okay. How much more do you have of our officer?

MR. VÁZQUEZ: I am finishing redirect. I don't think I'm going to take very long.

THE COURT: Okay.

MR. VÁZQUEZ: I just want to respond to a few points raised by the defendants.

THE COURT: And then we will have civilians and maybe Mr. Guzman.

MR. VÁZQUEZ: Yes, Your Honor.

MR. GONZALEZ: Yes, Judge. This has nothing to do with our trial, but has to do with sometimes we -- the defense have other matters or new matters that may walk in the door.

So I just wanted to ask because during the break I got a call of someone that's been detained federally, I believe it's

a case before Judge Scola, and they have a detention hearing tomorrow. Of course, I'm not going to be able to be there at 10, but I was trying to see if we may be able to resolve a bond or a stipulation to, you know, no bond. And I wanted to get feedback from the Court if I were to be able to place that on the afternoon calendar, I think it's Judge Goodman, for Friday, let's say, 1:30. Is that something that the Court can accommodate, or if not, I will have to see what I can come up with.

THE COURT: It would be an agreed-upon bond.

MR. GONZALEZ: Pardon me?

THE COURT: It would be an agreed bond.

MR. GONZALEZ: All right. I think it's for detention, but, yes. I will find out by tomorrow. I mean, let's put it this way: When I come in hopefully in the morning, I may have a better idea, and I can let the Court know what the situation is. But I just wanted to be able to get -- I mean, I will have somebody cover for me tomorrow.

THE COURT: Right.

MR. GONZALEZ: That's where I'm at. You know, I prefer to do it in the afternoon so it wouldn't cut the morning. Maybe we can take an extended -- a later lunch, and I can, you know, if it's worked out something to that effect.

THE COURT: If it's worked out and you just need to make an appearance, we can break for 10 or 15 minutes.

MR. GONZALEZ: Okay.

THE COURT: If it's not worked out, the only --

MR. GONZALEZ: I'm not going to do detention here.

THE COURT: Okay. If you can work it out, I can even ask Judge Goodman perhaps to take it at 1, if he would do that.

MR. GONZALEZ: Okay. Thank you, Your Honor.

MR. HOROWITZ: Judge, I just need to confirm what time we are starting tomorrow morning.

THE COURT: 9:30.

MR. HOROWITZ: Thank you, Judge.

THE COURT: Thank you.

(Thereupon, the proceedings were adjourned at 4 p.m.)

DAILY COPY

# I N D E X

WITNESS PAGE

**MIAMI POLICE OFFICER JORGE COLADAS**

CONTINUED DIRECT EXAMINATION BY MR. VÁZQUEZ............. 10
CROSS EXAMINATION BY MR. GONZALEZ....................... 36
CROSS EXAMINATION BY MR. HOROWITZ....................... 54
CROSS EXAMINATION BY MR. DONET.......................... 70
CROSS EXAMINATION BY MR. RUBIO.......................... 78
REDIRECT EXAMINATION BY MR. VÁZQUEZ..................... 81

EXHIBITS

Government's Exhibit 28 in evidence..................... 12
Government's Exhibit 30 in evidence..................... 13
Government's Exhibit 29 in evidence..................... 14
Government's Exhibits 25 and 33 in evidence............. 15
Government's Exhibit 34 in evidence..................... 17
Government's Exhibits 36 and 42 in evidence............. 18
Government's Exhibit 35 in evidence.................... 21
Government's Exhibits 37A and 37B in evidence........... 23
Government's Exhibit 38 in evidence..................... 25
Government's Exhibits 40 and 40A in evidence............ 29
Government's Exhibits 43, 44, 45A and 45B in evidence... 33
Government's Exhibit 27 in evidence..................... 36

* * * * * * * *

DAILY COPY

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

February 11, 2015

/s/ ***Tamra K. Piderit***

Florida Professional Reporter
Registered Diplomate Reporter
Certified Realtime Reporter

## /

**/s** [1] - 95:7

## 1

**1** [4] - 8:17, 72:20, 74:22, 93:5
**10** [3] - 92:3, 92:25, 94:4
**104th** [1] - 2:5
**11** [3] - 1:4, 81:4, 95:6
**1107** [1] - 2:5
**1135** [1] - 80:4
**11th** [12] - 6:7, 10:24, 18:8, 19:13, 20:2, 27:10, 27:19, 28:19, 30:14, 30:23, 44:19, 84:9
**12** [1] - 94:12
**12th** [3] - 15:1, 15:20, 16:1
**13** [1] - 94:13
**14** [1] - 94:14
**14-20017-CR-KMW** [1] - 1:2
**15** [3] - 53:20, 92:25, 94:15
**150** [1] - 1:22
**17** [1] - 94:16
**18** [1] - 94:17
**1910** [1] - 1:24
**1:30** [1] - 92:7
**1:32** [1] - 3:2
**1:43** [1] - 10:7

## 2

**2** [8] - 30:15, 30:19, 60:17, 72:18, 72:20, 74:22, 80:9, 88:12
**20** [6] - 3:23, 47:19, 50:8, 53:12, 67:2, 67:8
**20-21** [1] - 27:23
**2000** [1] - 1:19
**2002** [2] - 37:17, 46:3
**2011** [3] - 37:8, 37:14, 81:4
**2013** [52] - 3:23, 10:19, 10:22, 11:9, 11:19, 14:2, 14:21, 16:4, 16:21, 17:25, 18:4, 18:24, 19:12, 19:15, 20:3, 21:7, 23:19, 24:20, 25:6, 25:9, 27:8, 27:24, 40:6, 41:5, 41:22, 42:6, 43:17, 43:22, 45:11, 45:22, 47:11, 47:19, 50:8, 53:12, 56:12, 56:15, 60:13, 64:15, 70:24, 71:3, 72:1, 72:5, 72:7, 72:10, 72:20, 74:22, 76:5, 82:5, 82:12, 84:9, 85:20, 86:24
**2014** [12] - 4:1, 5:9, 8:3, 30:25, 35:24, 36:17, 50:24, 52:5, 68:9, 76:5, 77:2, 81:18
**2015** [2] - 1:4, 95:6
**20th** [8] - 4:22, 21:7, 24:19, 27:8, 45:11, 45:22, 48:20, 67:16
**21** [1] - 94:18
**21st** [3] - 27:8, 67:16, 67:17
**23** [4] - 37:25, 38:5, 81:7, 94:19
**24** [1] - 11:11
**25** [12] - 4:1, 5:8, 8:3, 15:11, 15:12, 15:13, 15:17, 16:3, 39:2, 79:24, 94:15, 94:20
**26** [2] - 47:11, 64:15
**26th** [4] - 23:19, 24:19, 45:25, 64:15
**27** [8] - 33:4, 33:15, 35:13, 35:19, 36:2, 36:5, 36:6, 94:23
**28** [19] - 10:19, 10:22, 11:9, 11:19, 12:6, 12:14, 12:20, 12:21, 14:2, 41:5, 60:13, 61:19, 82:5, 82:12, 82:23, 84:9, 85:20, 86:24, 94:12
**28th** [4] - 40:6, 41:22, 56:12, 85:7
**29** [5] - 13:23, 14:5, 14:8, 94:14, 94:21
**2:53** [1] - 53:21
**2:54** [1] - 54:5

## 3

**3** [12] - 1:5, 17:25, 18:4, 35:24, 36:17, 37:5, 38:18, 46:1, 46:24, 52:5, 68:8, 88:11
**30** [4] - 13:8, 13:13, 13:17, 94:13
**3250** [1] - 2:2
**33** [6] - 15:11, 15:12, 15:13, 15:22, 94:15, 94:22
**33130** [1] - 1:22
**33132** [1] - 1:17
**33133** [1] - 2:3
**33134** [1] - 1:20
**33138** [1] - 2:5
**33156** [1] - 1:25
**33327** [1] - 2:10
**34** [6] - 17:6, 17:12, 17:22, 42:7, 42:11, 94:16
**35** [5] - 20:15, 20:24, 21:4, 43:24, 94:18
**36** [11] - 18:9, 18:13, 18:14, 18:15, 18:19, 27:13, 27:15, 27:21, 94:5, 94:17, 94:23
**37** [2] - 22:7, 22:13
**37A** [5] - 22:8, 22:16, 23:15, 23:16, 94:19
**37B** [5] - 22:7, 22:8, 22:16, 23:16, 94:19
**38** [4] - 24:13, 24:23, 25:3, 94:20
**3:10** [2] - 54:6, 54:9
**3:45** [1] - 84:3
**3rd** [7] - 30:25, 43:22, 50:24, 77:1, 77:6, 77:10, 81:18

## 4

**4** [8] - 14:21, 16:4, 16:21, 42:6, 43:17, 55:5, 63:20, 93:12
**40** [5] - 29:9, 29:15, 29:17, 29:22, 94:21
**403** [1] - 5:10
**404** [1] - 8:9
**404(b** [2] - 3:21, 5:1
**406** [1] - 2:3
**40A** [5] - 29:9, 29:18, 29:22, 30:4, 94:21
**42** [8] - 18:9, 18:13, 18:14, 18:15, 19:23, 34:14, 77:19, 94:17
**428** [9] - 6:7, 30:23, 32:3, 44:19, 70:25, 72:24, 77:19, 78:1, 81:20
**43** [6] - 33:3, 33:15, 33:16, 33:20, 33:24, 94:22
**435** [10] - 19:13, 27:10, 27:18, 28:1, 28:19, 30:9, 30:14, 30:18, 44:19, 67:22
**44** [9] - 33:3, 33:15, 33:16, 33:20, 33:24, 36:10, 36:14, 69:6, 94:22
**45** [2] - 33:3, 33:15
**45A** [5] - 33:16, 33:17, 33:20, 33:24, 94:22
**45B** [4] - 33:3, 33:15, 33:24, 94:22
**4:30** [1] - 53:23
**4th** [6] - 15:1, 15:20, 16:1, 18:8, 20:2, 63:10

## 5

**5** [1] - 43:20
**528** [9] - 10:19, 10:24, 14:12, 14:15, 14:19, 40:5, 41:4, 42:3, 84:9
**535** [1] - 30:23
**54** [1] - 94:6
**5th** [1] - 24:4

## 6

**6** [5] - 3:23, 4:10, 4:16, 25:9, 38:9
**614** [1] - 1:20
**681** [1] - 2:10
**6th** [1] - 80:4

## 7

**70** [1] - 94:7
**78** [1] - 94:8

## 8

**81** [1] - 94:9

## 9

**90** [1] - 58:7
**9130** [1] - 1:24
**924(c)** [1] - 4:17
**99** [1] - 1:17
**9:30** [2] - 84:2, 93:9
**9th** [1] - 24:3

## A

**abandoned** [10] - 18:22, 28:9, 28:11, 28:18, 30:10, 30:11, 44:19, 44:23, 45:5, 50:12
**ability** [1] - 34:14
**able** [11] - 8:25, 11:13, 24:7, 34:8, 55:15, 89:25, 90:18, 92:2, 92:3, 92:5, 92:17
**above-entitled** [1] - 95:3
**absolutely** [3] - 72:14, 72:20, 91:8
**accommodate** [1] - 92:8
**accommodation** [1] - 88:13
**accompanied** [1] - 45:18
**account** [1] - 88:6
**accurate** [1] - 86:4
**acquired** [1] - 8:11
**act** [1] - 4:4
**acting** [1] - 75:24
**activate** [1] - 65:12
**activated** [2] - 65:9, 65:10
**activities** [1] - 4:21
**activity** [4] - 3:22, 6:18, 7:23, 16:19
**acts** [1] - 75:21
**actual** [1] - 9:6
**addition** [3] - 14:11, 29:1, 85:6
**address** [4] - 3:21, 60:13, 80:6, 86:17
**addressing** [1] - 3:22
**adjourned** [1] - 93:12
**admissible** [2] - 86:13, 87:18
**admission** [1] - 15:6
**admissions** [1] - 85:22
**admit** [1] - 20:24
**admitted** [33] - 8:24, 8:25, 11:10, 12:20, 12:22, 13:16, 13:18, 14:7, 14:9, 15:12, 15:14, 15:16, 17:20, 17:23, 18:14, 18:16, 18:18, 21:3, 21:5, 23:15, 23:17, 24:25, 25:4, 29:21, 29:23, 33:20, 33:25, 34:13, 35:13, 36:5, 36:7, 36:13, 69:5
**advanced** [1] - 6:14
**advise** [1] - 65:25
**AFPD** [1] - 1:21
**afternoon** [6] - 10:13, 53:20, 54:15, 70:21, 92:6, 92:21
**ago** [1] - 55:5
**agree** [3] - 87:7, 87:14, 87:17
**agreed** [2] - 92:10, 92:12
**agreed-upon** [1] - 92:10
**ahold** [1] - 6:19
**air** [2] - 7:7, 7:16

**alert** [2] - 4:18, 10:2
**Alioth** [4] - 14:15, 16:9, 32:6, 53:5
**allegations** [1] - 25:18
**alleged** [1] - 89:20
**allow** [5] - 27:5, 84:22, 87:20, 87:21, 88:19
**allowing** [1] - 84:17
**allows** [1] - 8:12
**almost** [1] - 76:6
**ALTAMIRANO** [1] - 1:8
**Altamirano** [24] - 4:13, 5:5, 8:1, 8:7, 8:20, 8:21, 11:5, 12:1, 14:11, 16:8, 25:11, 27:2, 28:14, 28:15, 54:20, 55:25, 56:14, 58:16, 59:12, 68:5, 82:8, 82:12, 83:13, 85:23
**AMERICA** [1] - 1:4
**ammo** [1] - 62:1
**ammunition** [2] - 14:1, 85:13
**amount** [5] - 38:19, 43:7, 45:17, 45:19, 74:10
**amounts** [2] - 75:12, 77:15
**Angel** [2] - 14:12, 16:9
**answer** [2] - 19:7, 37:2
**answered** [1] - 88:21
**ANTHONY** [1] - 1:9
**anyway** [3] - 53:16, 83:22, 86:11
**apartment** [11] - 60:15, 60:17, 60:20, 61:10, 61:11, 61:14, 61:16, 61:18, 85:11, 85:15
**apartments** [1] - 85:2
**apologize** [3] - 3:3, 16:14, 25:13
**appearance** [1] - 92:25
**APPEARANCES** [2] - 1:14, 2:1
**applies** [2] - 89:17, 89:18
**apprehended** [1] - 52:19
**approach** [15] - 12:2, 13:1, 13:19, 15:2, 17:2, 20:11, 22:3, 22:22, 24:9, 29:5, 32:23, 35:15, 38:1, 42:8, 83:16
**approached** [7] - 35:8, 44:2, 44:12, 44:13, 48:3, 68:18, 68:23
**April** [11] - 30:25, 35:24, 36:17, 50:24, 52:5, 56:15, 68:8, 77:1, 77:6, 77:10, 81:18
**area** [44] - 6:18, 7:5, 7:6, 10:24, 11:1, 15:17, 16:20, 18:5, 18:7, 18:23, 18:24, 19:3, 19:13, 19:17, 20:8, 24:2, 30:8, 30:18, 30:22, 32:9, 34:18, 34:21, 34:22, 37:4, 37:11, 38:18, 39:6, 39:9, 39:18, 41:2, 46:2, 46:23, 49:8, 51:21, 52:10, 72:23, 78:2, 79:3, 79:10, 79:11, 80:1, 82:12, 82:15
**argue** [2] - 7:23, 8:12
**arrest** [20] - 40:6, 41:7, 41:8, 41:16, 43:17, 50:14, 50:25, 64:8, 79:15, 80:18, 85:8, 85:9, 85:19, 85:21, 85:22, 86:7, 87:1, 87:9, 87:23
**arrested** [27] - 11:20, 37:9, 37:19, 37:21, 40:9, 40:12, 41:18, 41:24, 50:9, 60:2, 60:10, 62:9, 62:12, 62:15, 62:17, 63:6, 63:10, 64:16, 67:4, 67:6, 67:11, 68:11, 70:3, 70:7, 79:22, 80:20, 86:17
**arresting** [1] - 37:8
**arrests** [3] - 54:19, 54:22, 76:21
**arrive** [1] - 67:22
**assailants** [1] - 9:12
**assigned** [1] - 55:3
**assignment** [1] - 30:21
**associate** [1] - 84:11
**associated** [2] - 3:6
**associates** [3] - 4:7, 7:2, 83:13
**association** [1] - 3:8
**assuming** [1] - 8:24
**attached** [1] - 74:15
**attempt** [1] - 5:2
**attempted** [1] - 42:21
**attempting** [3] - 18:6, 44:3, 44:5
**attention** [2] - 14:21, 29:14
**attorney** [1] - 88:16
**attorneys** [1] - 88:15
**attributable** [1] - 26:8
**August** [1] - 19:12
**AUSA** [3] - 1:15, 1:16, 1:16
**authorization** [1] - 52:15
**Avenue** [15] - 6:7, 10:24, 15:1, 15:20, 16:1, 18:8, 19:13, 20:2, 24:3, 27:11, 27:19, 28:19, 30:14, 30:23, 84:9
**aware** [3] - 11:19, 52:7, 80:4

## B

**back-and-forth** [1] - 5:13
**backtrack** [1] - 45:25
**bag** [12] - 29:13, 35:7, 35:22, 62:23, 77:7, 77:11, 77:15, 77:25, 81:10, 82:1, 82:2
**baggie** [18] - 16:24, 17:9, 20:18, 22:11, 22:14, 24:16, 32:11, 33:8, 33:9, 34:8, 34:10, 35:2, 35:6, 35:7, 35:8, 35:10, 43:25
**baggies** [6] - 29:12, 29:25, 32:11, 33:9, 35:22, 81:16
**bags** [1] - 77:5
**balled** [1] - 66:20
**balled-up** [1] - 66:20
**bands** [1] - 58:6
**based** [1] - 65:5
**BDUs** [1] - 55:14
**beat** [1] - 30:10
**become** [1] - 11:19
**bed** [6] - 30:8, 30:13, 47:22, 61:25, 62:1, 85:12
**beer** [5] - 39:19, 39:20, 39:21, 39:24, 40:3
**began** [2] - 68:23, 68:25
**beginning** [2] - 49:6, 56:16
**behalf** [4] - 12:18, 13:3, 17:19, 21:1
**behaving** [1] - 75:25
**behind** [3] - 42:21, 51:9, 78:3
**bench** [2] - 22:23, 23:14
**Bench** [2] - 25:14, 26:20
**best** [1] - 8:7
**better** [3] - 10:10, 53:24, 92:16
**between** [3] - 5:13, 35:5, 76:5
**bicycle** [6] - 24:1, 42:18, 46:21, 47:12, 64:21, 65:12
**bicycles** [1] - 47:1
**big** [1] - 91:4
**bigger** [1] - 77:25
**binoculars** [1] - 51:7
**birth** [1] - 56:23
**bit** [6] - 27:6, 43:23, 60:1, 60:12, 78:5, 78:10
**block** [2] - 19:8, 28:15
**blocks** [2] - 19:8, 80:9
**BMT** [2] - 5:10, 90:5
**BOLO** [2] - 40:25, 73:9
**bomb** [10] - 77:11, 77:13, 77:25, 78:15, 78:16, 81:13, 81:15, 81:17, 81:22, 89:9
**BOMB** [1] - 77:13
**bond** [4] - 92:3, 92:4, 92:10, 92:12
**bottom** [2] - 29:14, 34:23
**bought** [1] - 39:14
**Boulevard** [2] - 1:19, 1:24
**box** [1] - 43:21
**break** [3] - 4:21, 91:24, 92:25
**breaks** [1] - 10:14
**brief** [1] - 53:7
**brilliantly** [1] - 88:24
**bring** [5] - 10:4, 10:6, 23:8, 54:8, 88:22
**brought** [4] - 49:15, 49:25, 83:10, 88:24
**bud** [4] - 38:5, 38:6, 38:7, 43:10
**building** [39] - 6:7, 10:19, 11:10, 11:13, 14:13, 14:16, 14:19, 18:22, 19:4, 19:17, 20:1, 20:5, 20:9, 27:18, 27:23, 28:1, 28:11, 28:13, 28:18, 28:23, 30:9, 30:23, 32:3, 40:5, 41:4, 42:4, 44:19, 48:3, 48:8, 48:10, 50:11, 51:9, 60:14, 70:25, 81:20, 82:8, 84:9, 85:2
**buildings** [4] - 44:17, 44:20, 44:23, 45:4
**button** [1] - 77:22
**buy** [5] - 6:15, 39:11, 39:15, 40:3
**BY** [47] - 2:9, 10:17, 11:3, 12:4, 12:23, 13:6, 13:21, 14:10, 15:15, 16:16, 17:4, 17:24, 18:17, 19:11, 20:13, 21:6, 22:5, 23:18, 24:11, 27:7, 27:17, 29:7, 29:24, 33:1, 34:1, 35:17, 36:12, 36:23, 38:4, 42:10, 48:19, 53:10, 54:14, 58:13, 58:19, 64:14, 70:2, 70:20, 76:12, 78:24, 81:2, 94:4, 94:5, 94:6, 94:7, 94:8, 94:9

## C

**cafeteria** [12] - 16:20, 17:17, 39:2, 39:9, 39:11, 42:21, 42:23, 63:12, 63:13, 63:22, 63:25
**calendar** [1] - 92:6
**camera** [5] - 6:10, 7:18, 52:8, 52:15
**cannot** [2] - 52:25, 89:1
**capacity** [1] - 76:9
**captured** [1] - 6:10
**car** [18] - 21:22, 42:18, 49:22, 51:15, 51:20, 63:23, 73:2, 73:4, 73:5, 73:7, 73:10, 73:12, 73:13, 73:15, 73:17, 74:17, 75:16, 76:16
**card** [2] - 71:14, 71:21
**cards** [1] - 71:10
**care** [1] - 91:3
**careful** [1] - 86:11
**Carlos** [1] - 16:9
**case** [7] - 1:2, 12:10, 23:12, 66:10, 83:24, 84:13, 92:1
**cash** [4] - 59:17, 59:18, 74:10, 75:12
**casing** [3] - 33:7, 33:8
**ceiling** [1] - 49:8
**cell** [3] - 51:25, 52:1
**certain** [1] - 49:15
**certainly** [1] - 48:23
**Certified** [1] - 95:9

**certify** [1] - 95:2
**Chacon** [49] - 4:2, 4:5, 4:7, 4:13, 5:4, 5:16, 5:20, 6:9, 7:2, 7:6, 7:10, 8:4, 8:5, 8:9, 9:1, 9:7, 9:13, 9:17, 9:20, 11:5, 14:11, 16:8, 25:10, 27:2, 28:16, 36:25, 37:16, 38:20, 39:18, 39:21, 40:3, 40:9, 41:22, 42:3, 43:13, 43:16, 44:14, 45:3, 45:21, 46:3, 47:9, 47:14, 48:20, 48:23, 49:19, 50:8, 52:24, 53:3
**CHACON** [1] - 1:7
**Chacon's** [1] - 81:4
**chain** [3] - 9:9, 77:8, 77:25
**chain-link** [2] - 77:8, 77:25
**chamber** [1] - 69:18
**change** [3] - 76:6, 76:8, 87:10
**charged** [5] - 3:23, 4:14, 8:17, 8:22, 26:8
**chased** [1] - 65:18
**chasing** [1] - 65:20
**checking** [1] - 51:20
**children** [1] - 88:13
**choice** [1] - 85:16
**chose** [1] - 85:14
**Christian** [5] - 52:19, 52:21, 52:22, 68:9, 68:17
**Christopher** [17] - 4:13, 11:5, 11:23, 12:1, 16:8, 28:14, 31:1, 31:6, 32:8, 32:17, 52:19, 54:20, 55:25, 58:12, 59:12, 68:5
**CHRISTOPHER** [1] - 1:8
**cigarette** [3] - 18:6, 38:22, 38:23
**circumstances** [1] - 83:12
**citizen** [3] - 4:2, 5:20, 7:9
**City** [1] - 56:17
**civilian** [1] - 91:3
**civilians** [3] - 90:18, 91:6, 91:18
**cleaner** [1] - 3:9
**clear** [14] - 5:3, 9:12, 17:9, 20:18, 22:11, 22:14, 24:16, 29:12, 33:8, 35:22, 43:25, 82:23
**clearly** [3] - 4:3, 55:15, 74:18
**client** [9] - 5:13, 37:8, 38:20, 54:1, 78:12, 88:18, 88:23, 89:7, 89:20
**closer** [4] - 78:11, 78:17, 78:18
**clothes** [2] - 55:11, 55:12
**cocaine** [16] - 21:23, 21:24, 22:12, 24:16, 24:17, 29:16, 30:1, 33:9, 45:12, 45:13, 60:6, 62:15, 62:25, 63:7, 70:10, 74:2
**coconspirator** [2] - 87:7, 87:22
**coconspirators** [2] - 23:9, 23:10
**Coconut** [1] - 2:3
**codefendants** [2] - 3:6, 90:22
**COLADAS** [1] - 94:3
**Coladas** [10] - 10:5, 10:18, 36:24, 37:4, 46:23, 49:14, 53:11, 54:15, 70:21, 78:25
**comb** [1] - 86:7
**coming** [6] - 8:3, 8:20, 9:23, 49:8, 87:4, 89:19
**commenced** [2] - 22:23, 25:14
**commission** [1] - 70:8
**commit** [2] - 57:17, 75:21
**committed** [1] - 76:23
**committing** [1] - 41:11
**commonly** [1] - 77:11
**complain** [1] - 6:20
**complaints** [3] - 41:6, 41:9, 41:16
**components** [1] - 88:16
**computer** [1] - 48:17
**conceal** [1] - 42:21
**concern** [1] - 8:1
**concerned** [1] - 8:2
**concerning** [1] - 85:23
**concerns** [1] - 91:7
**conclude** [1] - 31:23
**concluded** [2] - 23:14, 26:20
**conduct** [4] - 7:10, 32:13, 56:19, 80:16
**conducting** [5] - 31:4, 51:14, 77:1, 82:20, 82:22
**conference** [4] - 22:23, 23:14, 25:14, 26:20
**conferences** [1] - 26:21
**confirm** [2] - 91:9, 93:7
**connected** [2] - 63:14, 87:1
**consensual** [7] - 57:2, 57:25, 58:15, 59:11, 60:23, 64:19, 85:9
**consent** [6] - 60:21, 60:22, 61:6, 61:9, 85:9, 85:15
**consequence** [1] - 84:23
**consider** [1] - 9:17
**considered** [2] - 25:10, 89:20
**conspiracy** [16] - 4:4, 4:8, 4:9, 8:9, 8:10, 8:16, 8:17, 8:19, 9:4, 9:18, 25:21, 26:9, 26:24, 27:3, 85:5, 89:21
**contact** [29] - 11:12, 14:22, 14:25, 15:20, 16:1, 18:1, 18:3, 19:2, 20:4, 20:7, 21:8, 23:20, 23:25, 30:2, 30:25, 32:15, 32:16, 56:23, 57:3, 57:22, 72:2, 72:9, 72:11, 72:17, 72:21, 73:2, 73:3, 76:16
**context** [3] - 86:23, 87:11, 88:10
**continue** [3] - 10:15, 23:1, 30:22
**CONTINUED** [3] - 2:1, 10:16, 94:4
**continuing** [9] - 12:17, 22:25, 23:2, 25:1, 26:17, 33:22, 89:16, 89:18, 90:8
**convicted** [4] - 62:7, 62:8, 62:13, 70:5
**convictions** [1] - 3:21
**cooperative** [2] - 67:13, 75:5
**cooperators** [1] - 91:10
**Coral** [1] - 1:20
**corner** [4] - 16:20, 24:1, 39:8, 82:15
**corners** [1] - 85:21
**correct** [129] - 5:24, 25:17, 37:5, 37:8, 37:14, 37:17, 37:20, 38:16, 38:20, 39:3, 39:6, 39:16, 40:7, 40:10, 40:18, 41:22, 42:1, 42:4, 42:12, 43:14, 43:17, 43:25, 44:4, 44:15, 44:20, 45:23, 46:10, 46:14, 48:21, 49:2, 50:2, 50:9, 50:25, 52:16, 52:20, 53:3, 54:21, 55:16, 56:15, 57:3, 57:13, 57:18, 57:20, 58:3, 58:10, 58:23, 59:5, 59:6, 59:20, 60:2, 60:4, 60:10, 60:18, 61:2, 61:4, 61:14, 61:19, 62:4, 62:13, 62:18, 62:22, 63:4, 63:8, 63:23, 65:1, 66:11, 66:14, 66:15, 68:6, 69:11, 69:14, 69:19, 70:10, 71:8, 71:11, 71:14, 71:16, 72:21, 73:2, 73:5, 73:7, 73:10, 73:13, 73:15, 73:18, 73:20, 73:23, 73:25, 74:2, 74:4, 74:6, 74:8, 74:10, 74:13, 74:16, 74:18, 74:20, 74:22, 74:25, 75:3, 75:5, 75:8, 75:12, 75:14, 75:17, 75:19, 75:22, 76:2, 76:21, 76:24, 77:3, 77:8, 77:16, 77:20, 79:4, 79:15, 79:20, 80:2, 80:16, 81:10, 81:13, 81:18, 81:20, 82:5, 82:8, 82:24, 83:5, 83:10, 95:2
**Counsel** [1] - 22:22
**counsel** [6] - 81:3, 81:12, 82:4, 82:7, 84:23, 89:7
**counseled** [1] - 88:15
**Count** [4] - 3:23, 4:16, 8:17, 25:9
**count** [2] - 4:10, 5:10
**couple** [2] - 56:7, 58:25
**course** [8] - 21:12, 28:18, 30:21, 31:5, 32:7, 32:18, 73:21, 92:2
**COURT** [157] - 1:1, 3:3, 3:12, 3:15, 3:18, 3:24, 4:3, 4:10, 4:16, 4:18, 4:23, 5:3, 5:7, 5:15, 5:18, 5:25, 6:5, 6:8, 6:12, 6:16, 6:20, 6:23, 7:8, 7:11, 7:14, 7:16, 7:18, 7:22, 8:5, 8:8, 8:15, 9:4, 9:15, 9:22, 10:1, 10:4, 10:6, 10:8, 11:2, 11:25, 12:3, 12:16, 12:20, 13:2, 13:5, 13:14, 13:16, 13:20, 14:7, 15:4, 15:8, 15:12, 16:11, 16:15, 17:3, 17:15, 17:18, 17:20, 18:12, 18:14, 19:7, 19:10, 19:20, 20:12, 20:25, 21:3, 22:4, 22:17, 22:19, 22:22, 22:24, 23:4, 23:11, 23:15, 24:10, 24:25, 25:7, 25:15, 25:24, 26:5, 26:10, 26:12, 26:15, 26:19, 26:21, 27:14, 27:16, 29:6, 29:19, 29:21, 32:24, 33:16, 33:18, 33:20, 33:23, 35:14, 35:16, 36:5, 36:9, 36:11, 36:20, 38:2, 42:9, 53:9, 53:16, 53:19, 53:22, 54:7, 54:10, 64:9, 64:12, 70:1, 70:13, 70:16, 70:18, 76:11, 78:12, 78:16, 78:18, 78:22, 80:24, 83:16, 84:4, 84:6, 84:10, 84:14, 84:25, 85:17, 85:24, 86:10, 87:2, 87:5, 87:9, 87:13, 87:19, 88:3, 88:5, 88:9, 89:8, 89:11, 89:18, 89:23, 90:16, 90:20, 91:1, 91:7, 91:11, 91:15, 91:18, 92:10, 92:12, 92:19, 92:24, 93:2, 93:4, 93:9, 93:11
**court** [6] - 10:23, 16:5, 19:3, 19:17, 20:5, 30:18
**Court** [11] - 8:12, 10:3, 18:10, 25:20, 35:12, 52:16, 87:11, 92:5, 92:7, 92:16
**Court's** [1] - 90:23
**courtroom** [2] - 3:15, 90:11
**cover** [1] - 92:18
**covers** [1] - 88:16
**crack** [12] - 22:12,

24:16, 24:17, 29:16, 30:1, 33:9, 62:25, 63:2, 63:7, 67:2, 74:4
**create** [1] - 57:23
**created** [1] - 58:1
**credibility** [1] - 88:6
**crib** [1] - 86:25
**crime** [3] - 8:22, 41:11, 57:17
**cross** [4] - 36:20, 84:23, 86:11, 90:9
**CROSS** [8] - 36:22, 54:13, 70:19, 78:23, 94:5, 94:6, 94:7, 94:8
**CRR** [1] - 2:9
**customer** [1] - 35:6
**cut** [2] - 88:20, 92:21

## D

**Dadeland** [1] - 1:24
**danger** [1] - 64:25
**date** [15] - 23:22, 27:10, 41:10, 43:16, 54:1, 55:6, 55:7, 56:2, 56:3, 56:23, 72:13, 88:18, 88:19
**dates** [3] - 71:23, 76:19, 76:20
**DAVID** [1] - 2:2
**DAY** [1] - 1:5
**Dayaan** [7] - 31:1, 34:3, 52:19, 68:11, 68:13, 68:23, 69:13
**Dayann** [1] - 32:17
**days** [2] - 3:5, 58:7
**De** [1] - 1:19
**deal** [1] - 83:22
**dealer** [1] - 31:15
**dear** [1] - 26:5
**December** [1] - 81:4
**decide** [1] - 87:25
**decided** [1] - 57:9
**deduce** [1] - 3:8
**defendant** [2] - 6:9, 66:10
**defendants** [14] - 4:6, 4:12, 16:4, 19:3, 19:16, 20:4, 26:8, 26:25, 31:1, 34:11, 86:8, 86:24, 90:2, 91:17
**Defendants** [1] - 1:10
**DEFENDANTS** [1] - 1:19
**defense** [10] - 81:3, 81:12, 82:4, 82:7, 84:16, 84:23, 85:25, 86:3, 88:15, 91:22
**degree** [1] - 18:25
**delay** [2] - 3:3, 10:11
**department** [1] - 71:10
**Department** [2] - 55:16, 56:18
**depicted** [1] - 27:21
**designed** [1] - 66:13
**desired** [1] - 60:20
**detained** [1] - 91:25
**Detective** [1] - 86:2
**detention** [5] - 50:15, 92:1, 92:13, 93:3
**determined** [1] - 86:22
**Diaz** [2] - 16:10, 28:16
**Diplomate** [1] - 95:8
**DIRECT** [2] - 10:16, 94:4
**discharged** [1] - 49:9
**discovery** [1] - 86:6
**DISPOTO** [1] - 1:16
**distribute** [1] - 8:18
**distributing** [2] - 64:4, 77:15
**DISTRICT** [3] - 1:1, 1:1, 1:13
**DIVISION** [1] - 1:2
**Dixon** [19] - 16:8, 70:24, 71:22, 72:21, 73:2, 73:17, 73:20, 73:22, 74:24, 75:2, 75:10, 75:19, 75:21, 75:24, 76:14, 76:21, 76:23, 77:2, 89:6
**DIXON** [1] - 1:8
**Document** [7] - 12:21, 13:17, 14:8, 17:22, 21:4, 25:3, 36:6
**documented** [2] - 74:18, 74:20
**Documents** [5] - 15:13, 18:15, 23:16, 29:22, 33:24
**dollar** [1] - 74:8
**done** [1] - 57:15
**DONET** [7] - 2:2, 70:20, 76:12, 78:14, 78:19, 89:5, 89:10
**Donet** [5] - 70:18, 78:12, 81:12, 81:17, 88:22
**DONET........................** [1] - 94:7
**door** [6] - 63:17, 84:20, 85:11, 85:14, 87:15, 91:23
**dots** [2] - 34:23, 34:24
**down** [14] - 5:17, 28:15, 42:17, 42:19, 56:25, 57:2, 59:9, 72:3, 75:7, 76:11, 78:5, 78:10, 80:7, 80:24
**draw** [1] - 14:21
**drinking** [4] - 39:19, 39:20, 39:21, 39:24
**driver** [1] - 73:9
**driver's** [2] - 57:10, 57:12
**drivers** [1] - 64:25
**drives** [1] - 86:4
**driveway** [2] - 78:2, 78:7
**driving** [7] - 37:16, 42:17, 42:18, 46:3, 46:6, 46:8, 46:12
**drop** [1] - 66:23
**dropped** [3] - 30:3, 47:22, 66:25
**drug** [5] - 31:15, 47:23, 63:6, 81:17, 81:20
**drugs** [17] - 6:15, 7:12, 9:5, 31:16, 34:8, 34:10, 35:2, 35:6, 47:12, 47:16, 47:25, 59:15, 74:4, 77:5, 77:16, 84:18, 89:9
**during** [9] - 19:15, 31:5, 35:24, 52:11, 55:10, 70:7, 71:7, 76:20, 91:24
**duties** [1] - 56:17
**duty** [2] - 27:8, 67:20
**Dwight** [1] - 28:16

## E

**Earl** [11] - 11:12, 40:13, 40:14, 56:7, 56:8, 56:10, 60:12, 60:13, 61:21, 86:16, 90:11
**early** [4] - 3:5, 3:9, 56:15, 67:16
**Ecstasy** [1] - 60:8
**effect** [3] - 40:15, 65:21, 92:23
**efficient** [1] - 76:19
**eight** [1] - 24:25
**either** [4] - 39:15, 46:25, 47:20, 50:5
**electricity** [1] - 66:11
**electronic** [1] - 66:9
**element** [1] - 26:22
**elicit** [1] - 87:20
**elicited** [2] - 84:21, 84:23
**emits** [1] - 66:9
**employ** [1] - 66:3
**encounter** [10] - 48:5, 56:14, 58:1, 58:15, 60:23, 71:5, 74:16, 75:10, 85:9, 90:2
**encountered** [2] - 48:4, 48:5
**encounters** [4] - 59:12, 64:19, 71:22, 76:14
**end** [3] - 49:23, 53:23, 91:2
**ended** [1] - 60:21
**enforcement** [2] - 49:15, 55:1
**enhancement** [2] - 54:25, 55:2
**ensuing** [1] - 4:17
**enter** [2] - 11:13, 85:10
**entered** [2] - 19:22, 30:2
**entire** [2] - 26:24, 81:22
**entitled** [2] - 9:2, 95:3
**entry** [1] - 28:18
**enumerated** [1] - 4:12
**ESQUIRE** [4] - 1:19, 1:23, 2:2, 2:4
**establish** [1] - 78:14
**evening** [3] - 53:11, 67:25, 90:17
**event** [2] - 25:8, 84:22
**events** [6] - 35:5, 37:13, 47:19, 50:25, 54:19, 68:8
**eventually** [6] - 12:13, 29:4, 49:1, 51:18, 52:11, 61:12
**evidence** [50] - 3:8, 4:8, 4:9, 4:18, 5:4, 6:13, 8:3, 8:10, 11:10, 12:15, 12:22, 13:13, 13:18, 14:5, 14:9, 15:14, 17:13, 17:23, 18:16, 18:18, 19:22, 20:24, 21:5, 21:12, 22:16, 23:17, 24:23, 25:4, 25:8, 25:10, 26:22, 27:1, 27:2, 27:15, 27:16, 28:19, 28:24, 29:18, 29:23, 32:19, 32:21, 33:15, 33:25, 34:13, 35:13, 36:3, 36:7, 36:13, 85:21, 89:19
**evidence..** [1] - 94:22
**evidence..........** [1] - 94:19
**evidence...........** [1] - 94:21
**evidence...........** [2] - 94:15, 94:17
**evidence..................** [1] - 94:18
**evidence...................** [6] - 94:12, 94:13, 94:14, 94:16, 94:20, 94:23
**evidentiary** [1] - 23:7
**exact** [2] - 55:6, 55:7
**exactly** [1] - 51:7
**examination** [2] - 36:20, 84:24
**EXAMINATION** [12] - 10:16, 36:22, 54:13, 70:19, 78:23, 81:1, 94:4, 94:5, 94:6, 94:7, 94:8, 94:9
**example** [4] - 7:6, 7:10, 56:25, 59:25
**except** [1] - 26:15
**exception** [2] - 87:8, 87:17
**exchange** [1] - 84:17
**excuse** [1] - 24:19
**excused** [1] - 84:5
**executed** [1] - 86:21
**exhibit** [3] - 22:7, 39:1, 77:6
**Exhibit** [22] - 12:20, 12:21, 13:17, 14:8, 17:22, 21:4, 25:3, 36:6, 42:7, 42:11, 43:24, 61:19, 69:6, 77:18, 79:24, 94:12, 94:13, 94:14, 94:16, 94:18, 94:20, 94:23
**EXHIBITS** [1] - 94:11
**exhibits** [3] - 15:7, 43:19, 43:24
**Exhibits** [10] - 15:13, 18:15, 23:16, 29:22, 33:24, 94:15, 94:17, 94:19, 94:21, 94:22
**exists** [1] - 71:22
**explain** [2] - 35:5, 76:9
**exploding** [1] - 89:3
**extended** [1] - 92:22
**eyes** [1] - 4:9

## F

**Facebook** [3] - 86:23, 87:6, 87:10
**fact** [9] - 8:19, 8:21, 49:18, 57:22, 57:25, 59:19, 60:17, 62:9, 66:3
**fair** [6] - 48:13, 65:3, 68:16, 79:17, 80:8,

80:19
**familiar** [3] - 7:1, 7:3, 28:7
**families** [2] - 44:22, 45:8
**fancy** [2] - 51:25, 75:14
**far** [4] - 8:1, 39:15, 87:12, 87:25
**fear** [1] - 8:14
**February** [2] - 1:4, 95:6
**federally** [1] - 91:25
**feedback** [1] - 92:5
**feet** [1] - 34:12
**felon** [4] - 62:7, 62:8, 62:13, 70:5
**felony** [1] - 70:8
**fence** [10] - 32:9, 34:21, 34:24, 35:4, 51:10, 77:8, 78:1, 78:6, 78:7
**few** [2] - 78:25, 91:16
**field** [11] - 56:19, 56:22, 58:14, 58:20, 59:11, 64:19, 71:7, 71:10, 71:13, 71:18, 71:21
**figured** [1] - 46:7
**fill** [1] - 71:13
**fine** [3] - 3:7, 86:6, 90:2
**fine-tooth** [1] - 86:6
**finishing** [1] - 91:13
**firearm** [22] - 7:7, 11:18, 12:9, 12:12, 29:2, 29:3, 32:22, 33:7, 34:2, 36:16, 40:17, 48:24, 49:2, 49:5, 49:12, 61:19, 62:12, 69:14, 70:5, 70:7, 73:22, 85:12
**firearms** [4] - 73:12, 73:13, 74:17, 75:11
**first** [22] - 5:11, 19:7, 43:20, 48:4, 48:6, 48:7, 48:10, 48:12, 48:14, 55:3, 55:25, 56:14, 70:23, 71:25, 73:1, 73:3, 76:16, 79:9, 79:11, 85:1, 86:8, 86:10
**five** [4] - 59:2, 72:12, 75:1
**fix** [3] - 26:5, 26:7, 90:10
**FL** [6] - 1:17, 1:20, 1:22, 1:25, 2:3, 2:5
**Flagler** [1] - 1:22
**floor** [2] - 30:13, 35:4
**Flores** [15] - 12:18, 13:3, 13:4, 16:9, 17:19, 21:1, 22:21, 25:1, 26:16, 26:17, 33:22, 79:1, 79:9, 79:19, 80:4
**FLORES** [1] - 1:9
**Florida** [1] - 2:10
**FLORIDA** [2] - 1:1, 1:7
**florida** [1] - 95:8
**focused** [2] - 89:14, 90:9
**focusing** [1] - 90:3
**folks** [1] - 86:14
**follow** [1] - 41:14
**food** [1] - 40:3
**foot** [8] - 47:1, 47:2, 47:3, 51:12, 51:14, 51:15, 55:20, 75:17
**FOR** [2] - 1:15, 1:19
**force** [2] - 8:14, 66:13
**foregoing** [1] - 95:2
**form** [5] - 61:6, 85:8, 85:9, 85:21, 85:22
**forte** [1] - 4:14
**Forte** [1] - 28:17
**forth** [1] - 5:13
**four** [6] - 69:18, 72:12, 79:6, 79:7, 79:8, 85:21
**Fourth** [1] - 1:17
**FPR** [1] - 2:9
**frame** [5] - 19:12, 19:15, 20:3, 52:11, 70:25
**free** [2] - 57:5, 57:7
**frequented** [1] - 86:17
**Friday** [1] - 92:6
**frisking** [1] - 5:20
**front** [10] - 11:7, 34:18, 39:5, 52:9, 69:3, 69:4, 69:9, 69:14, 77:19, 78:1
**funds** [1] - 8:11
**furniture** [1] - 30:10
**furtherance** [1] - 85:4

## G

**Gables** [1] - 1:20
**gang** [2] - 31:16, 31:20
**gentleman** [2] - 40:18, 78:4
**gentlemen** [6] - 9:18, 51:5, 53:25, 56:21, 66:5, 69:6
**Gentlemen** [4] - 10:9, 25:7, 53:19, 83:18
**given** [3] - 83:20, 85:10, 85:24
**GONZALEZ** [22] - 1:19, 5:8, 5:16, 36:23, 38:1, 38:3, 38:4, 42:8, 42:10, 48:17, 48:19, 53:7, 53:10, 53:17, 90:21, 91:21, 92:11, 92:13, 92:20, 93:1, 93:3, 93:6
**Gonzalez** [5] - 36:21, 36:24, 54:2, 64:10, 89:2
**GONZALEZ**..................... [1] - 94:5
**good-sized** [1] - 51:10
**Goodman** [2] - 92:6, 93:5
**Government** [14] - 4:9, 5:2, 6:14, 25:7, 62:21, 62:24, 84:12, 85:14, 86:9, 87:8, 89:23, 90:9, 90:15, 90:24
**Government's** [69] - 11:11, 12:6, 12:14, 12:21, 13:8, 13:13, 13:17, 13:23, 14:5, 14:8, 15:13, 15:17, 15:22, 16:3, 17:6, 17:12, 17:22, 18:9, 18:15, 18:19, 19:23, 20:15, 20:24, 21:4, 22:7, 22:13, 22:15, 23:16, 24:13, 24:23, 25:3, 27:13, 27:21, 29:9, 29:17, 29:22, 33:3, 33:15, 33:24, 34:14, 35:13, 35:19, 36:2, 36:5, 36:6, 36:10, 36:14, 37:25, 38:5, 39:2, 61:18, 69:5, 77:18, 81:7, 82:23, 94:12, 94:13, 94:14, 94:15, 94:16, 94:17, 94:18, 94:19, 94:20, 94:21, 94:22, 94:23
**Greer** [2] - 3:20, 16:11
**grocery** [5] - 63:10, 63:13, 63:15, 63:22, 63:25
**ground** [2] - 47:21, 66:20
**groundwork** [1] - 23:7
**group** [5] - 4:8, 6:17, 8:11, 84:17, 85:2
**Grove** [1] - 2:3
**guess** [1] - 49:13
**guessing** [1] - 68:4
**gun** [8] - 49:9, 59:13, 61:21, 62:1, 62:6, 69:11, 69:16, 69:21
**guy** [5] - 5:22, 7:14, 7:19, 86:16, 89:11
**guys** [2] - 53:13, 89:12
**Guzman** [31] - 21:8, 23:20, 23:25, 24:17, 28:16, 45:11, 45:18, 45:21, 47:11, 47:16, 48:1, 48:4, 50:15, 50:20, 53:12, 64:16, 64:18, 64:21, 65:10, 65:14, 65:23, 65:25, 66:6, 66:10, 66:16, 66:20, 67:4, 67:13, 90:25, 91:2, 91:19

## H

**half** [1] - 43:10
**hand** [11] - 31:6, 32:8, 47:20, 66:21, 66:25, 68:15, 69:1, 69:13
**hand-to-hand** [3] - 31:6, 32:8, 68:15
**handed** [7] - 35:9, 43:2, 43:4, 43:5, 43:7, 81:22, 81:25
**handgun** [2] - 49:8, 69:8
**hands** [2] - 44:8, 67:8
**hanging** [5] - 11:7, 16:20, 31:11, 41:22, 68:16
**hard** [1] - 86:4
**HARRALSON** [1] - 56:10
**Harralson** [41] - 11:12, 40:12, 40:13, 40:14, 41:11, 41:19, 56:7, 56:8, 56:9, 56:10, 60:13, 60:24, 61:4, 61:6, 61:13, 62:6, 62:9, 63:4, 82:4, 83:5, 83:7, 83:9, 83:12, 84:7, 84:8, 84:15, 84:21, 85:1, 85:7, 85:10, 85:19, 85:22, 86:8, 86:9, 86:12, 86:14, 86:20, 87:22, 87:25, 89:17
**Harralson's** [3] - 61:21, 62:21, 85:8
**Havana** [3] - 30:21, 55:3, 72:23
**head** [1] - 89:3
**hear** [2] - 22:24, 26:23
**heard** [1] - 86:8
**hearing** [1] - 92:1
**hearsay** [7] - 11:24, 53:14, 84:21, 85:4, 87:5, 87:14, 87:16
**HERMAN** [1] - 2:4
**hidden** [2] - 62:4, 62:7
**highly** [1] - 5:10
**himself** [2] - 42:21, 64:25
**hit** [2] - 66:20, 89:2
**holding** [1] - 5:21
**hole** [1] - 51:10
**home** [5] - 83:2, 83:13, 83:17, 83:23, 84:1
**Honor** [43] - 3:11, 4:22, 6:3, 9:21, 12:2, 12:17, 13:12, 13:15, 14:4, 15:2, 16:13, 18:11, 18:13, 21:2, 22:20, 24:9, 24:22, 24:24, 25:12, 29:5, 29:20, 33:14, 33:19, 36:4, 36:8, 36:19, 38:1, 42:8, 53:7, 53:17, 54:12, 64:11, 64:13, 70:12, 70:17, 78:19, 78:21, 85:6, 86:1, 86:23, 88:8, 91:20, 93:6
**HONORABLE** [1] - 1:12
**hope** [3] - 22:24, 23:7, 27:3
**hopefully** [2] - 10:13, 92:15
**horowitz** [1] - 25:24
**Horowitz** [9] - 54:11, 70:1, 82:7, 83:4, 83:7, 84:20, 84:25, 87:14, 89:2
**HOROWITZ** [37] - 1:23, 8:1, 8:16, 10:25, 11:24, 13:15, 14:6, 15:6, 18:11, 21:2, 22:20, 24:24, 25:22, 26:1, 26:11, 27:15, 29:20, 33:19, 36:4, 54:12, 54:14, 58:12, 58:13, 58:18, 58:19, 64:11, 64:13, 64:14, 70:2, 70:12, 70:14, 83:15, 85:1, 85:18, 86:5, 93:7, 93:10
**HOROWITZ**..................... [1] - 94:6
**HOSSEINI** [2] - 1:16, 7:9
**hours** [3] - 3:9, 67:17, 76:6

house [11] - 6:23, 40:23, 41:12, 62:21, 68:2, 68:4, 68:5, 77:19, 78:11, 78:17, 78:18
housekeepingwise [1] - 90:13

**I**

ID [1] - 59:7
idea [5] - 58:8, 59:4, 71:19, 91:4, 92:16
identification [14] - 12:5, 13:7, 13:22, 15:3, 17:5, 20:14, 22:6, 24:12, 29:8, 33:2, 35:18, 49:16, 50:1, 57:10
identified [11] - 10:23, 16:5, 19:3, 19:17, 20:5, 20:8, 30:18, 34:22, 46:25, 49:19, 76:23
identify [1] - 55:15
identifying [3] - 49:21, 50:5
IGNACIO [1] - 1:15
ILHAM [1] - 1:16
illegal [1] - 75:11
image [5] - 7:18, 9:1, 15:22, 19:22, 34:23
images [1] - 18:9
immediately [1] - 42:20
impound [2] - 21:23, 22:1
inaudible [1] - 26:3
Inc [1] - 2:9
incident [14] - 4:22, 8:21, 9:24, 10:2, 24:7, 26:13, 26:23, 27:1, 35:25, 37:10, 56:7, 56:8, 56:9, 82:4
incidents [2] - 9:23, 76:20
indicating [2] - 35:4, 82:2
indicating) [2] - 34:19, 34:21
indictment [3] - 4:11, 8:17, 25:9
individual [6] - 5:13, 5:14, 5:15, 41:25, 45:9, 47:6
individuals [19] - 6:14, 10:23, 16:17, 30:17, 45:2, 45:8, 46:24, 46:25, 47:7, 49:15, 49:19, 49:24, 50:5, 50:25, 52:18, 75:22, 84:11, 84:17
information [1] - 71:14
innocent [1] - 80:16
inside [16] - 17:16, 28:11, 28:13, 30:9, 32:12, 39:12, 39:16, 40:20, 41:25, 42:3, 42:20, 51:12, 77:16, 77:25, 81:16, 83:13
instance [3] - 9:8, 71:16, 89:25
instruction [7] - 4:19, 5:1, 5:4, 8:2, 9:3, 25:22, 26:2
intent [3] - 8:18, 67:6, 70:10
interaction [2] - 10:19, 33:12
interpreter [1] - 3:17
interview [7] - 56:22, 58:20, 64:19, 71:10, 71:13, 71:18, 71:21
interviewing [1] - 50:19
interviews [4] - 56:19, 58:14, 59:11, 71:7
introduce [2] - 5:2, 25:8
introduced [2] - 79:18, 80:1
investigating [1] - 74:17
investigation [4] - 41:15, 82:22, 82:24, 83:1
invoke [2] - 3:13, 3:14
involved [7] - 9:13, 50:1, 52:14, 52:16, 73:10, 79:19, 88:23
involvement [1] - 67:24
involves [1] - 8:22
involving [4] - 27:25, 35:25, 68:9, 81:22
issued [1] - 86:9
issues [1] - 83:20
item [1] - 35:24
items [10] - 16:21, 21:19, 21:23, 22:8, 29:9, 30:4, 30:7, 33:4, 33:11, 79:17

**J**

JAMES [1] - 1:8
James [2] - 16:8, 72:21
janoca [1] - 2:9
January [5] - 4:1, 5:8, 8:3, 9:23, 9:24
Jay [1] - 16:8
JAY [1] - 1:9
jewelry [2] - 75:14, 75:15
Joe [1] - 20:20
Joel [2] - 16:10, 28:16
joint [7] - 38:10, 38:13, 43:10, 44:5, 44:9, 44:10
jolt [2] - 66:11
JORGE [1] - 94:3
Joseph [6] - 18:1, 18:22, 28:14, 30:2, 30:6, 43:22
JR [3] - 1:19, 2:2, 2:4
judge [1] - 4:25
JUDGE [1] - 1:13
Judge [11] - 8:16, 80:23, 86:6, 89:10, 89:22, 91:21, 92:1, 92:6, 93:5, 93:7, 93:10
July [3] - 17:25, 18:4, 43:22
June [7] - 14:21, 16:4, 16:21, 19:12, 42:6, 43:17, 63:10
juror [1] - 88:11
jurors' [3] - 15:5, 15:8, 88:10
jury [18] - 4:19, 5:1, 8:12, 10:6, 10:7, 35:5, 51:6, 53:21, 54:8, 54:9, 56:21, 66:5, 69:6, 84:3, 84:22, 86:16, 90:6
JURY [1] - 1:12

**K**

KATHLEEN [1] - 1:12
keep [2] - 88:21, 89:14
kept [2] - 62:6, 65:24
kick [1] - 90:11
killed [1] - 5:24
kind [1] - 50:7
knowledge [9] - 40:1, 46:5, 46:22, 47:24, 48:2, 52:6, 64:5, 64:7, 76:25
known [3] - 14:22, 18:1, 56:19
knows [2] - 7:2, 86:16
KORCHIN [3] - 1:21, 70:17, 90:14
Korchin [2] - 70:16, 88:24

**L**

label [1] - 7:24
ladies [4] - 51:5, 56:21, 66:5, 69:6
Ladies [4] - 10:9, 25:7, 53:19, 83:18
Lane [1] - 2:10
large [10] - 32:11, 33:9, 35:6, 35:7, 35:10, 35:22, 59:17, 74:10, 75:11, 77:5
larger [3] - 34:8, 35:2, 77:15
last [2] - 83:21, 90:17
late [1] - 56:15
law [1] - 49:15
lawfully [1] - 75:25
lawyers [1] - 83:23
laying [1] - 23:6
lead [1] - 27:5
leading [4] - 19:19, 89:24, 90:4, 90:9
least [8] - 40:2, 45:4, 45:6, 49:24, 49:25, 50:15, 66:18, 75:1
leave [5] - 3:16, 5:23, 88:11, 88:12
leaves [1] - 5:22
led [3] - 31:23, 40:22, 90:1
left [3] - 10:18, 34:23, 44:25
Leon [1] - 1:19
less [3] - 54:2, 87:5, 90:9
letters [2] - 91:10
license [4] - 37:20, 46:8, 57:10, 57:12
lift [1] - 32:11
light [1] - 90:23
lighting [1] - 30:11
lights [3] - 65:9, 65:10, 65:12
likely [3] - 46:7, 76:15
limiting [4] - 4:19, 5:4, 8:2, 9:2
line [5] - 10:20, 34:24, 80:7, 81:5
link [2] - 77:8, 77:25
list [2] - 22:8, 90:14
listed [1] - 60:14
listen [1] - 88:25
Live [1] - 2:10
live [2] - 44:25, 60:14
lived [2] - 60:14, 60:17
lives [2] - 6:6, 91:6
living [1] - 44:22
loaded [2] - 34:6, 69:16
located [1] - 27:18
location [15] - 3:7, 11:7, 11:8, 11:20, 12:9, 12:24, 13:11, 14:1, 16:5, 16:19, 28:16, 30:2, 31:4, 49:14, 52:8
locations [1] - 54:24
loitering [3] - 11:7, 31:11, 68:16
look [1] - 51:10
looked [4] - 31:24, 44:6, 44:8, 45:15
looking [8] - 4:11, 31:11, 31:20, 31:24, 31:25, 51:9, 68:21
lookout [6] - 31:12, 31:14, 31:17, 31:19, 31:23, 41:1
looks [2] - 5:16, 6:17
loved [1] - 83:25
Luis [4] - 14:18, 16:9, 21:8, 21:18
lunch [1] - 92:22
lying [1] - 48:11

**M**

ma'am [1] - 17:16
Magnum [2] - 27:25, 28:6
man [1] - 44:25
Manny [1] - 36:24
MANUEL [1] - 1:19
March [1] - 56:15
marijuana [35] - 16:24, 17:9, 18:6, 20:18, 21:16, 21:17, 21:22, 22:11, 22:14, 29:12, 29:25, 33:10, 35:23, 37:12, 37:22, 38:7, 38:21, 38:23, 43:8, 43:23, 43:25, 44:7, 44:10, 44:15, 45:12, 45:17, 45:19, 60:1, 60:4, 62:18, 64:3, 64:4, 73:25, 81:4
MARK [1] - 1:16
marked [24] - 12:5, 12:21, 13:7, 13:17, 13:22, 14:8, 15:13, 17:5, 17:22, 18:15, 20:14, 21:4, 22:6, 23:16, 24:12, 25:3, 29:8, 29:22, 33:2, 33:24, 35:18, 36:6, 42:19, 65:5
market [8] - 39:2, 39:5, 39:6, 39:12,

79:24, 79:25, 80:9, 80:11
**marks** [1] - 77:23
**marshals** [1] - 91:10
**Martinez** [2] - 14:12, 16:9
**Mary** [1] - 2:2
**matter** [5] - 57:22, 59:19, 60:17, 62:9, 95:3
**matters** [4] - 45:10, 88:9, 91:23
**MAURIN** [1] - 1:7
**Maurin** [6] - 4:12, 11:5, 16:8, 28:16, 36:25, 52:24
**MDMA** [1] - 60:8
**meal** [1] - 84:1
**mean** [7] - 42:16, 49:4, 50:17, 58:21, 78:11, 92:14, 92:17
**meaning** [1] - 40:25
**means** [2] - 57:10, 88:14
**member** [2] - 55:15, 76:10
**members** [2] - 31:16, 31:20
**memory** [1] - 72:10
**mention** [1] - 3:20
**mentioned** [6] - 37:7, 42:6, 45:2, 45:10, 46:24, 53:2
**messages** [1] - 86:24
**met** [2] - 36:25, 54:17
**MIAMI** [3] - 1:2, 1:7, 94:3
**Miami** [8] - 1:17, 1:22, 1:25, 2:5, 51:16, 55:14, 55:16, 56:17
**microphone** [1] - 25:25
**might** [3] - 16:13, 89:4, 90:24
**minimum** [1] - 9:2
**minute** [1] - 80:25
**minutes** [3] - 43:20, 53:20, 92:25
**misdemeanor** [1] - 62:17
**missed** [1] - 90:10
**misspeaking** [1] - 44:4
**misspoke** [1] - 26:22
**mistaken** [2] - 24:3, 24:4
**Mollies** [2] - 60:8, 74:6
**moment** [3] - 36:8, 53:8, 70:12
**money** [5] - 6:15, 9:4, 9:8, 59:19, 74:9
**month** [7] - 30:14, 30:18, 56:5, 72:11, 72:13, 72:18, 72:19
**months** [10] - 10:22, 16:3, 30:15, 30:19, 56:7, 58:22, 72:16, 72:18, 72:20, 74:22
**Moore** [14] - 14:23, 15:21, 16:2, 17:1, 17:11, 17:15, 42:7, 42:11, 42:14, 42:22, 43:13, 43:16, 63:10, 64:3
**morning** [6] - 62:10, 67:16, 92:15, 92:21, 93:8
**most** [2] - 46:7, 72:24
**motorcycle** [1] - 46:19
**mounted** [1] - 6:10
**move** [11] - 12:14, 13:12, 14:4, 17:12, 22:15, 24:22, 29:17, 33:14, 36:2, 70:1, 91:5
**moving** [1] - 88:21
**MR** [205] - 3:11, 3:13, 3:20, 3:25, 4:6, 4:12, 4:17, 4:20, 4:24, 5:6, 5:8, 5:16, 5:19, 5:22, 5:24, 6:3, 6:6, 6:9, 6:13, 6:17, 6:22, 6:25, 7:13, 7:15, 7:17, 7:21, 8:1, 8:6, 8:10, 8:16, 9:11, 9:21, 9:24, 10:2, 10:17, 10:25, 11:3, 11:24, 12:2, 12:4, 12:14, 12:17, 12:19, 12:23, 13:1, 13:3, 13:6, 13:12, 13:15, 13:19, 13:21, 14:4, 14:6, 14:10, 15:2, 15:6, 15:11, 15:15, 16:13, 16:16, 17:2, 17:4, 17:12, 17:14, 17:19, 17:21, 17:24, 18:9, 18:11, 18:13, 18:17, 19:5, 19:9, 19:11, 19:19, 20:11, 20:13, 20:23, 21:1, 21:2, 21:6, 22:3, 22:5, 22:15, 22:18, 22:20, 22:21, 23:2, 23:10, 23:18, 24:9, 24:11, 24:22, 24:24, 25:5, 25:12, 25:17, 25:22, 25:23, 26:1, 26:7, 26:11, 26:14, 26:17, 27:7, 27:13, 27:15, 27:17, 29:5, 29:7, 29:17, 29:20, 29:24, 32:23, 33:1, 33:14, 33:17, 33:19, 33:22, 34:1, 35:12, 35:15, 35:17, 36:2, 36:4, 36:8, 36:10, 36:12, 36:19, 36:23, 38:1, 38:3, 38:4, 42:8, 42:10, 48:17, 48:19, 53:7, 53:10, 53:14, 53:17, 54:12, 54:14, 58:12, 58:13, 58:18, 58:19, 64:11, 64:13, 64:14, 70:2, 70:12, 70:14, 70:17, 70:20, 76:12, 78:14, 78:19, 78:24, 80:23, 81:2, 83:15, 84:8, 84:11, 84:15, 85:1, 85:18, 86:1, 86:5, 86:21, 87:3, 87:7, 87:11, 87:14, 88:2, 88:4, 88:8, 89:5, 89:10, 89:16, 89:22, 90:14, 90:17, 90:21, 90:23, 91:5, 91:9, 91:13, 91:16, 91:20, 91:21, 92:11, 92:13, 92:20, 93:1, 93:3, 93:6, 93:7, 93:10, 94:4, 94:5, 94:6, 94:7, 94:8, 94:9
**MS** [1] - 7:9
**multiple** [3] - 4:6, 8:6, 9:12
**must** [2] - 3:16, 74:18

**N**

**N.E** [2] - 1:17, 2:5
**N.W** [20] - 6:7, 10:24, 14:12, 14:15, 14:19, 15:1, 15:20, 16:1, 18:8, 19:13, 20:2, 27:10, 27:18, 28:19, 30:14, 30:23, 44:19, 80:4, 84:9
**Nadim** [10] - 21:8, 23:20, 28:16, 45:11, 47:25, 48:4, 50:14, 53:12, 64:16, 90:24
**name** [8] - 14:12, 14:18, 36:24, 48:11, 53:2, 59:8, 72:3, 86:16
**named** [1] - 14:15
**names** [1] - 56:23
**narcotic** [1] - 68:25
**narcotics** [33] - 7:6, 8:19, 11:18, 12:25, 13:11, 23:23, 24:7, 25:18, 25:20, 25:23, 26:1, 26:2, 26:3, 26:8, 26:15, 26:23, 26:24, 27:2, 28:22, 29:1, 32:22, 38:19, 40:18, 41:17, 47:20, 47:21, 48:21, 75:11, 75:19, 79:18, 83:1, 84:18, 90:1
**nature** [4] - 39:25, 43:14, 49:10, 50:22
**near** [4] - 30:22, 77:22, 78:3, 78:9
**necessarily** [2] - 57:24, 60:21
**need** [10] - 3:19, 4:25, 88:21, 88:22, 88:25, 89:6, 90:4, 90:7, 92:24, 93:7
**neglected** [1] - 3:13
**neighbor** [1] - 6:3
**neighbor's** [1] - 6:11
**neighborhood** [12] - 7:4, 39:24, 46:16, 47:1, 54:25, 55:21, 56:18, 63:19, 63:25, 75:22
**nervous** [2] - 31:24, 68:21
**Net** [1] - 30:22
**never** [23] - 36:25, 39:13, 39:20, 39:21, 39:24, 42:3, 46:13, 46:14, 54:17, 59:14, 59:16, 60:4, 63:5, 75:3, 75:4, 75:19, 75:21, 76:2, 76:21, 80:18, 80:20, 85:20, 86:5
**new** [1] - 91:23
**next** [1] - 63:17
**nice** [1] - 86:13
**night** [1] - 67:20
**nobody** [1] - 9:8
**none** [5] - 21:2, 49:19, 58:17, 79:17, 79:18
**nonlethal** [1] - 66:13
**northbound** [1] - 65:3
**note** [1] - 74:11
**notes** [1] - 53:23
**nothing** [7] - 38:16, 53:17, 57:1, 57:15, 61:4, 80:23, 91:21
**noticed** [2] - 4:1, 7:4
**November** [18] - 3:23, 4:22, 9:22, 10:2, 25:6, 25:9, 26:12, 26:22, 27:1, 27:8, 27:23, 47:19, 48:20, 50:8, 53:12, 67:16, 67:17
**number** [4] - 60:17, 77:6, 79:3, 85:3
**numbers** [2] - 15:10, 18:12

**O**

**Oak** [1] - 2:10
**object** [3] - 10:25, 23:1, 85:15
**objecting** [2] - 4:24, 5:3
**objection** [39] - 11:24, 12:16, 12:17, 13:3, 13:14, 13:16, 14:6, 15:6, 15:12, 17:14, 17:19, 18:11, 18:14, 19:5, 19:19, 20:25, 21:1, 22:17, 22:18, 22:19, 22:20, 22:21, 22:25, 23:2, 24:24, 25:1, 26:18, 29:19, 29:20, 33:19, 33:21, 33:22, 36:4, 53:14, 83:15, 89:17, 89:18, 90:8
**objections** [2] - 17:18, 90:4
**observed** [5] - 18:5, 31:6, 32:8, 32:11, 51:11
**occasion** [5] - 38:21, 44:22, 55:18, 73:22, 80:18
**occasions** [7] - 54:21, 72:12, 75:1, 75:7, 79:12, 79:13, 80:12
**occupancy** [1] - 28:7
**occupants** [2] - 73:7, 73:15
**occupied** [1] - 84:8
**occur** [2] - 7:5, 31:3
**occurred** [2] - 21:10, 76:24
**OF** [3] - 1:1, 1:4, 1:12
**offenses** [1] - 79:22
**offer** [4] - 18:9, 20:23, 20:24, 87:8
**offering** [1] - 87:11
**OFFICER** [1] - 94:3
**Officer** [9] - 10:5, 36:24, 37:4, 46:23, 49:14, 53:11, 54:15, 70:21, 78:25
**officer** [27] - 10:18, 27:4, 38:9, 41:7, 41:8, 48:5, 48:7,

48:10, 49:6, 49:12, 49:13, 51:2, 58:4, 61:24, 67:11, 76:11, 79:3, 81:3, 85:3, 85:5, 85:10, 85:12, 87:17, 87:20, 88:1, 89:25, 91:12
**officer's** [1] - 88:6
**officers** [5] - 32:14, 48:13, 50:17, 52:4, 71:13
**oftentimes** [1] - 71:13
**old** [1] - 44:25
**once** [5] - 4:20, 65:10, 66:9, 66:18, 80:20
**one** [31] - 5:25, 8:4, 9:6, 23:11, 26:22, 30:13, 32:4, 34:23, 37:7, 37:19, 44:20, 44:21, 44:24, 44:25, 45:4, 48:12, 52:7, 53:25, 54:23, 56:9, 62:20, 64:18, 69:18, 70:12, 71:2, 71:23, 74:20, 80:11, 82:1, 88:11, 88:16
**ones** [3] - 44:24, 47:2, 83:25
**online** [1] - 83:25
**open** [2] - 62:4, 85:11
**opened** [3] - 84:20, 85:14, 87:15
**operated** [1] - 8:11
**opportunity** [9] - 17:25, 19:2, 19:16, 20:4, 20:7, 21:7, 23:19, 23:22, 28:24
**opposite** [1] - 64:23
**or..** [1] - 31:21
**orange** [1] - 20:18
**ordinarily** [1] - 89:4
**ought** [1] - 23:11
**outside** [4] - 39:12, 39:13, 39:15, 78:2
**overruled** [7] - 11:2, 11:25, 17:20, 19:8, 19:20, 21:3, 53:16
**overview** [1] - 90:5
**own** [1] - 63:23

## P

**p.m** [8] - 3:2, 10:7, 53:21, 54:5, 54:6, 54:9, 84:3, 93:12
**P.M** [1] - 1:5
**packet** [1] - 69:3
**PAGE** [1] - 94:2
**page** [1] - 23:5
**PAGES** [1] - 1:10
**paint** [1] - 34:15
**palm** [2] - 78:3, 78:9
**paraphernalia** [1] - 63:6
**pardon** [1] - 92:11
**part** [8] - 4:25, 8:9, 9:13, 26:1, 49:20, 56:16, 56:17, 89:20
**particular** [2] - 41:4, 41:10
**party** [2] - 4:7, 12:10
**passenger** [3] - 73:2, 73:4, 75:16
**passes** [1] - 4:21
**passport** [1] - 57:12
**pat** [1] - 59:9
**patrol** [4] - 30:22, 55:18, 76:9, 79:3
**patrolled** [2] - 18:24, 37:4
**patrolling** [5] - 18:5, 18:7, 19:13, 38:18, 46:1
**Patron** [1] - 7:3
**pats** [1] - 5:17
**patted** [1] - 75:7
**PAUL** [1] - 1:21
**people** [7] - 3:5, 7:1, 7:3, 32:1, 45:4, 63:19, 63:22
**perhaps** [1] - 93:5
**period** [2] - 56:6, 58:25
**periods** [3] - 44:23, 45:6, 58:22
**permission** [16] - 12:2, 13:1, 13:19, 15:2, 17:2, 20:11, 22:3, 24:9, 27:13, 29:5, 32:23, 35:15, 36:10, 61:14, 61:15, 61:16
**person** [22] - 6:18, 6:20, 6:23, 7:12, 7:14, 14:12, 14:15, 14:18, 14:22, 14:25, 18:1, 31:15, 32:4, 35:10, 40:9, 41:18, 48:4, 81:23, 81:25, 84:8, 84:12, 89:8
**personal** [3] - 38:12, 45:19, 67:8
**personally** [2] - 38:19, 61:16
**persons** [3] - 6:14, 8:6, 20:8
**pertaining** [1] - 58:15
**PHILIP** [1] - 1:23
**phone** [2] - 51:25, 52:2
**phones** [1] - 51:25
**photograph** [4] - 20:8, 74:15, 74:17, 79:25
**photographed** [1] - 74:13
**photographing** [1] - 51:23
**photos** [3] - 10:24, 16:5, 46:25
**phrase** [1] - 10:25
**phraseology** [1] - 3:4
**physically** [2] - 29:3, 72:17
**picture** [4] - 11:10, 34:15, 77:19, 91:4
**pictures** [1] - 52:1
**piderit** [1] - 95:7
**PIDERIT** [1] - 2:9
**pieces** [2] - 28:24, 29:16
**pills** [3] - 29:13, 30:4
**pink** [1] - 77:23
**Pinkerton** [1] - 4:13
**pipe** [8] - 62:22, 62:23, 62:24, 62:25, 63:1, 63:2, 63:5, 63:7
**place** [8] - 25:8, 27:10, 30:12, 45:5, 49:5, 77:25, 88:9, 92:5
**placed** [4] - 52:8, 77:7, 78:15, 78:16
**places** [1] - 54:21
**plain** [2] - 55:11, 55:12
**Plaintiff** [1] - 1:5
**plastic** [2] - 29:13, 43:25
**play** [2] - 4:3, 90:5
**played** [1] - 9:12
**players** [1] - 90:5
**plead** [1] - 90:22
**pocket** [8] - 20:20, 34:5, 42:25, 69:1, 69:3, 69:4, 69:9, 69:14
**point** [6] - 9:16, 44:25, 45:1, 52:7, 78:13, 86:13
**pointed** [1] - 49:22
**points** [1] - 91:16
**pole** [2] - 52:8, 52:14
**POLICE** [1] - 94:3
**police** [9] - 31:16, 31:20, 51:16, 58:6, 65:20, 84:19, 85:3, 85:5, 85:12
**Police** [3] - 55:14, 55:16, 56:17
**Ponce** [1] - 1:19
**PORTELA** [1] - 1:7
**position** [3] - 26:11, 87:15, 89:21
**possess** [1] - 8:18
**possession** [9] - 7:7, 62:12, 62:15, 62:17, 63:6, 67:6, 70:5, 70:7, 70:10
**possible** [1] - 90:24
**possibly** [1] - 3:16
**post** [4] - 85:19, 86:7, 87:9, 87:23
**post-arrest** [4] - 85:19, 86:7, 87:9, 87:23
**potential** [2] - 90:14, 90:18
**pre** [1] - 86:7
**pre-arrest** [1] - 86:7
**prefer** [1] - 92:20
**prejudicial** [3] - 5:10, 8:20, 8:23
**presence** [1] - 57:17
**present** [2] - 76:21, 77:3
**presented** [1] - 61:6
**pretrial** [1] - 7:4
**pretty** [2] - 51:25, 90:7
**previous** [2] - 41:6, 41:16
**previously** [1] - 69:5
**probe** [1] - 66:10
**problem** [2] - 3:11, 76:10
**problems** [1] - 55:23
**Proceedings** [1] - 3:2
**PROCEEDINGS** [1] - 1:12
**proceedings** [2] - 93:12, 95:3
**proceeds** [1] - 26:4
**Professional** [1] - 95:8
**proper** [2] - 52:15, 84:22
**prosecutor** [1] - 67:15
**protects** [1] - 31:15
**provided** [9] - 84:15, 84:16, 84:18, 85:6, 85:20, 86:3, 86:5, 90:17, 90:18
**publish** [2] - 27:13, 36:10
**pulled** [1] - 73:5
**punching** [1] - 5:14
**purchase** [1] - 9:5
**pure** [1] - 85:3
**purported** [1] - 8:2
**purposes** [5] - 15:3, 20:15, 22:7, 24:13, 35:19
**pushing** [1] - 5:12
**put** [4] - 7:24, 15:8, 90:5, 92:14

## Q

**qualify** [1] - 91:9
**quantities** [2] - 8:18, 59:17
**quantity** [1] - 62:18
**questioned** [1] - 85:5
**questioning** [3] - 10:20, 76:19, 81:5
**questions** [9] - 67:15, 67:17, 70:15, 70:17, 71:2, 78:21, 78:25, 89:6, 89:7
**quick** [1] - 77:24
**quicker** [1] - 10:13
**quickly** [2] - 68:24, 68:25
**Quintaro** [1] - 86:2

## R

**radio** [1] - 58:4
**raised** [1] - 91:17
**Ramirez** [18] - 31:1, 31:6, 32:8, 32:17, 33:12, 34:17, 34:18, 35:10, 35:25, 52:20, 52:21, 52:22, 68:9, 68:17, 68:18, 77:2, 77:7, 77:24
**ran** [2] - 44:10, 75:3
**Raymond** [12] - 14:22, 15:21, 16:2, 17:1, 17:11, 17:15, 42:6, 42:11, 42:14, 42:22, 63:10, 64:3
**RDR** [1] - 2:9
**reaching** [1] - 35:6
**ready** [3] - 69:21, 69:23, 70:1
**real** [1] - 63:19
**really** [6] - 4:4, 10:9, 31:25, 33:8, 59:2, 79:12
**Realtime** [1] - 95:9
**rear** [1] - 69:3
**reason** [3] - 37:19, 41:1, 41:14
**reasons** [1] - 37:20
**receive** [1] - 40:25
**received** [2] - 41:6, 41:9
**recess** [1] - 53:20
**recessed** [1] - 54:5
**recognize** [16] - 9:1, 12:6, 13:8, 13:23, 15:17, 15:23, 17:6,

18:19, 19:23, 20:15, 22:8, 24:13, 29:9, 33:4, 35:19, 36:14
**recollection** [2] - 55:6, 59:5
**record** [8] - 3:9, 4:24, 5:1, 15:16, 34:22, 35:13, 58:3, 95:3
**recording** [1] - 52:1
**recover** [21] - 11:15, 11:17, 12:24, 16:21, 16:25, 21:12, 21:15, 21:19, 21:21, 23:22, 24:7, 28:19, 28:21, 29:25, 32:18, 32:21, 33:11, 34:2, 34:8, 89:25, 90:1
**recovered** [11] - 12:9, 13:11, 17:10, 20:19, 21:17, 24:17, 35:24, 36:16, 36:17, 83:1, 89:9
**recovering** [1] - 30:7
**red** [2] - 27:25, 28:6
**redirect** [2] - 80:25, 91:13
**REDIRECT** [2] - 81:1, 94:9
**redo** [1] - 88:20
**refer** [1] - 3:5
**reference** [7] - 26:15, 41:16, 44:18, 73:11, 73:12, 81:7, 83:13
**referenced** [1] - 82:5
**references** [1] - 26:7
**referencing** [3] - 4:22, 25:5, 42:7
**referred** [2] - 3:25, 77:11
**refresh** [1] - 59:4
**regard** [4] - 7:23, 11:9, 16:3, 25:19
**regarding** [6] - 4:1, 5:1, 25:20, 40:6, 67:19, 82:7
**regards** [11] - 5:8, 37:7, 37:13, 39:1, 40:5, 42:6, 44:17, 45:10, 47:19, 50:8, 52:14
**Registered** [1] - 95:8
**regularity** [1] - 18:25
**related** [1] - 4:17
**relationship** [1] - 34:10
**relevant** [1] - 25:20
**rely** [1] - 89:7
**remember** [13] - 10:20, 32:5, 44:24, 52:25, 53:12, 71:17, 71:23, 74:9, 75:15, 76:15, 77:6, 83:24
**repeat** [1] - 31:18
**repetitive** [2] - 89:13
**report** [10] - 57:23, 58:1, 58:9, 59:23, 71:5, 71:18, 71:21, 74:15, 88:17
**REPORTED** [1] - 2:9
**REPORTER** [1] - 25:24
**Reporter** [3] - 95:8, 95:8, 95:9
**Reporting** [1] - 2:9
**reports** [5] - 58:14, 59:4, 67:24, 71:7, 76:13
**represent** [1] - 36:24
**represents** [1] - 38:10
**request** [1] - 19:5
**requested** [1] - 5:1
**requests** [1] - 88:10
**reset** [1] - 77:23
**resided** [1] - 80:8
**residence** [13] - 3:23, 6:11, 28:7, 28:9, 40:20, 40:22, 41:14, 41:25, 42:3, 52:10, 67:22, 84:18, 86:25
**resident** [1] - 85:2
**residents** [1] - 55:21
**resides** [1] - 80:4
**residue** [2] - 62:25, 63:7
**resisting** [1] - 67:11
**resolve** [1] - 92:3
**respect** [1] - 78:25
**respond** [4] - 27:10, 27:18, 41:4, 91:16
**responded** [2] - 30:14, 41:1
**responding** [2] - 3:22, 25:19
**response** [1] - 71:2
**rest** [1] - 84:1
**result** [3] - 32:13, 67:24, 68:18
**resumed** [2] - 3:2, 54:6
**retain** [1] - 58:6
**rethought** [1] - 3:4
**retires** [2] - 53:21, 84:3
**retrieved** [4] - 35:7, 38:19, 42:11, 42:14
**return** [1] - 91:6
**returns** [3] - 10:5, 10:7, 54:9
**review** [2] - 83:21, 86:3
**riding** [5] - 24:1, 46:21, 47:1, 47:12, 64:21
**rival** [2] - 31:15, 31:20
**road** [2] - 64:25, 76:9
**rob** [1] - 7:14
**robbed** [4] - 6:14, 6:21, 7:19, 7:25
**robberies** [1] - 7:5
**robbery** [18] - 3:22, 4:1, 6:18, 6:22, 7:23, 8:2, 8:13, 8:19, 9:5, 25:17, 25:19, 26:2, 26:4, 27:25, 49:20, 50:1, 67:19, 76:24
**robbing** [2] - 4:2, 7:3
**rock** [1] - 45:12
**rocks** [2] - 67:2, 67:8
**RODOLFO** [1] - 1:7
**roll** [2] - 18:6, 44:5
**rolling** [2] - 44:9, 44:10
**room** [1] - 89:24
**roughly** [2] - 37:5, 43:10
**round** [1] - 69:18
**rounds** [1] - 69:18
**RUBIO** [19] - 2:4, 4:24, 5:6, 12:17, 13:3, 17:14, 17:19, 19:5, 19:19, 21:1, 22:18, 22:21, 23:2, 26:17, 33:22, 78:24, 80:23, 89:16, 89:22
**Rubio** [6] - 13:14, 22:24, 33:23, 78:22, 88:22, 90:8
**RUBIO.......................** .. [1] - 94:8
**rule** [2] - 3:13, 3:14
**run** [3] - 46:3, 46:6, 56:24
**running** [3] - 65:16, 65:24, 65:25

## S

**S.W** [1] - 24:3
**safety** [2] - 58:4, 59:10
**Salas** [11] - 14:15, 14:18, 16:9, 21:8, 21:18, 32:6, 45:18, 45:22, 53:5
**sale** [2] - 81:17, 81:22
**sales** [1] - 81:20
**satisfied** [1] - 23:3
**save** [2] - 79:24, 89:16
**saw** [40] - 6:24, 32:2, 34:11, 34:17, 34:25, 35:2, 39:19, 39:21, 39:24, 41:21, 42:3, 42:19, 45:8, 46:14, 46:16, 47:20, 49:6, 55:25, 58:23, 64:16, 64:21, 68:15, 70:23, 70:25, 71:3, 72:1, 72:21, 72:24, 75:19, 75:21, 75:24, 76:2, 77:2, 77:8, 77:24, 79:9, 79:11, 81:18, 81:20, 82:8
**scene** [3] - 25:19, 28:1, 33:11
**schedule** [2] - 76:4, 88:14
**scheduling** [2] - 83:20, 88:11
**Scola** [1] - 92:1
**screen** [3] - 34:14, 77:22, 90:10
**screens** [2] - 15:5, 15:8
**search** [5] - 49:4, 61:10, 61:11, 61:16, 85:15
**searched** [4] - 61:18, 61:24, 73:20, 75:8
**seat** [1] - 58:18
**seated** [5] - 3:3, 10:8, 54:7, 54:10, 84:6
**second** [3] - 9:25, 10:11, 86:12
**see** [60] - 7:24, 8:7, 8:13, 9:6, 11:6, 12:12, 14:12, 14:15, 14:18, 16:4, 16:7, 16:17, 16:19, 19:16, 28:3, 28:5, 28:24, 29:1, 29:3, 31:5, 31:8, 31:22, 32:2, 33:8, 34:20, 38:15, 39:19, 41:11, 41:23, 42:25, 43:13, 44:22, 46:16, 46:19, 46:21, 46:25, 47:5, 47:16, 48:20, 48:23, 49:7, 49:15, 49:25, 50:7, 54:20, 56:24, 60:1, 63:1, 72:17, 79:12, 80:11, 81:8, 81:22, 81:25, 82:12, 84:2, 87:24, 88:18, 92:3, 92:8
**seeing** [4] - 7:5, 7:6, 32:13, 52:9
**seem** [1] - 10:10
**sees** [1] - 42:22
**seize** [2] - 49:12
**seized** [6] - 40:17, 43:23, 45:11, 45:17, 82:24, 85:12
**seizure** [2] - 43:17, 45:22
**sell** [7] - 7:6, 7:12, 38:15, 67:6, 70:10, 75:19, 84:17
**selling** [2] - 47:16, 64:6
**send** [1] - 83:17
**sense** [1] - 27:3
**sent** [1] - 91:10
**separate** [2] - 63:14, 63:15
**separated** [1] - 39:4
**September** [11] - 4:21, 21:7, 23:19, 24:19, 45:11, 45:22, 45:25, 47:11, 64:15
**sequence** [1] - 35:5
**serve** [2] - 31:17, 31:19
**Services** [1] - 2:9
**serving** [1] - 35:6
**SESSION** [1] - 1:5
**set** [1] - 52:15
**several** [13] - 29:12, 29:16, 32:11, 33:9, 34:12, 35:22, 41:6, 41:9, 44:18, 45:10, 74:25, 75:7, 81:16
**share** [1] - 53:23
**shift** [1] - 76:4
**shirt** [1] - 55:14
**shoot** [1] - 7:16
**shooting** [1] - 7:7
**Shores** [1] - 2:5
**show** [2] - 62:21, 62:24
**showed** [1] - 77:18
**showing** [18] - 13:7, 13:22, 15:16, 15:22, 17:5, 18:18, 19:22, 20:14, 22:6, 24:12, 29:8, 33:2, 34:13, 35:18, 36:13, 69:5, 81:7, 82:23
**shown** [2] - 12:5, 38:5
**shows** [1] - 57:13
**side** [5] - 17:16, 34:23, 78:5, 78:6, 78:7
**sidebar** [1] - 25:12
**sidewalk** [1] - 34:18
**signed** [1] - 61:15
**significant** [1] - 59:22
**signs** [1] - 51:16
**simple** [1] - 64:8
**single** [3] - 75:2, 75:10, 75:24
**sit** [2] - 71:25, 76:13
**sitting** [2] - 49:22,

50:6
**situation** [1] - 92:16
**sized** [1] - 51:10
**sleep** [1] - 30:12
**sleeping** [1] - 53:13
**slow** [1] - 76:11
**small** [7] - 35:7, 43:7, 45:17, 45:18, 62:18, 69:25, 78:3
**smaller** [1] - 77:15
**so..** [3] - 49:11, 59:8, 84:4
**solved** [1] - 88:7
**solving** [1] - 76:10
**someone** [6] - 7:25, 41:1, 53:2, 76:23, 90:10, 91:25
**sometime** [1] - 90:15
**sometimes** [12] - 10:12, 55:12, 56:20, 58:22, 59:8, 59:10, 59:18, 59:19, 71:8, 71:9, 91:22
**somewhere** [1] - 71:3
**soon** [1] - 90:7
**sorry** [7] - 10:9, 10:11, 20:1, 28:15, 76:6, 80:24, 83:6
**sort** [3] - 5:12, 34:15, 73:9
**South** [1] - 1:24
**southbound** [1] - 65:3
**SOUTHERN** [1] - 1:1
**speaking** [3] - 81:3, 83:4, 83:7
**specific** [4] - 19:6, 26:12, 73:11, 89:5
**specifically** [3] - 72:24, 73:11, 73:17
**spent** [3] - 33:7, 69:18
**sporadic** [1] - 76:6
**spot** [1] - 39:11
**stand** [2] - 10:5, 58:12
**start** [2] - 54:25, 90:3
**started** [1] - 8:8
**starting** [1] - 93:8
**statement** [7] - 68:16, 86:2, 86:19, 86:20, 87:9, 87:23, 88:1
**statements** [10] - 84:15, 84:16, 85:7, 85:19, 85:24, 86:7, 86:11, 87:8, 87:19, 87:24
**STATES** [4] - 1:1, 1:4, 1:13, 1:15
**stature** [1] - 69:25
**stay** [3] - 45:5, 45:6, 45:7
**step** [1] - 80:24
**stick** [2] - 44:7, 65:14
**still** [2] - 55:8, 87:23
**stipulation** [1] - 92:4
**stop** [19] - 21:11, 21:13, 24:1, 24:5, 37:14, 46:11, 58:20, 58:23, 58:25, 59:7, 65:10, 65:13, 65:20, 65:25, 66:7, 66:13, 66:14, 88:17
**stopped** [9] - 46:2, 46:7, 46:9, 46:13, 47:11, 64:18, 74:24, 75:2, 80:20
**stopping** [1] - 58:3
**stops** [2] - 54:19, 65:12
**store** [8] - 17:16, 63:11, 63:13, 63:15, 63:22, 63:23, 80:1
**story** [1] - 90:6
**Street** [11] - 1:17, 1:22, 2:2, 2:5, 15:1, 15:20, 16:1, 18:8, 20:2, 24:4, 80:5
**street** [9] - 6:6, 20:1, 42:17, 42:19, 56:25, 57:2, 65:3, 76:16, 78:11
**streets** [1] - 72:17
**strolling** [1] - 56:18
**structure** [1] - 27:21
**stuck** [1] - 66:10
**stuff** [3] - 39:11, 39:15, 41:12
**subject** [4] - 31:7, 35:9, 56:23, 84:12
**subjects** [1] - 52:25
**substation** [1] - 55:4
**suggestion** [1] - 90:23
**suite** [1] - 1:20
**Suite** [2] - 1:24, 2:3
**summer** [2] - 19:15, 20:3
**surveil** [1] - 30:22
**surveillance** [9] - 31:4, 31:5, 32:7, 40:22, 51:3, 51:6, 51:14, 51:18, 77:1
**suspect** [1] - 66:13
**suspected** [19] - 16:24, 17:9, 18:6, 20:18, 21:16, 21:22, 21:23, 22:11, 22:12, 24:16, 29:12, 29:13, 29:16, 33:8, 33:10, 35:23, 45:12, 67:19
**suspended** [2] - 37:20, 46:8
**suspicious** [1] - 57:1
**sustaining** [1] - 90:3
**system** [1] - 7:1

## T

**T-shirt** [1] - 55:14
**tactical** [1] - 55:12
**talks** [1] - 85:9
**Tamra** [1] - 95:7
**TAMRA** [1] - 2:9
**tapes** [1] - 58:6
**Tased** [3] - 66:8, 66:24, 66:25
**Taser** [6] - 66:1, 66:3, 66:6, 66:7, 66:9, 66:16
**team** [3] - 55:1, 55:2, 76:10
**temporary** [1] - 50:15
**tended** [1] - 35:3
**tender** [1] - 36:19
**term** [1] - 7:22
**terms** [3] - 88:10, 89:24, 90:2
**testified** [9] - 37:13, 37:22, 39:1, 40:5, 41:21, 50:24, 54:19, 54:23, 76:18
**testifies** [1] - 27:4
**testify** [5] - 4:20, 5:12, 6:4, 9:1, 88:2
**testimony** [4] - 3:21, 26:23, 49:1, 70:23
**THE** [161] - 1:12, 1:15, 1:19, 3:3, 3:12, 3:15, 3:18, 3:24, 4:3, 4:10, 4:16, 4:18, 4:23, 5:3, 5:7, 5:15, 5:18, 5:25, 6:5, 6:8, 6:12, 6:16, 6:20, 6:23, 7:8, 7:11, 7:14, 7:16, 7:18, 7:22, 8:5, 8:8, 8:15, 9:4, 9:15, 9:22, 10:1, 10:4, 10:6, 10:8, 11:2, 11:25, 12:3, 12:16, 12:20, 13:2, 13:5, 13:14, 13:16, 13:20, 14:7, 15:4, 15:8, 15:12, 16:11, 16:15, 17:3, 17:15, 17:16, 17:18, 17:20, 18:12, 18:14, 19:7, 19:10, 19:20, 20:12, 20:25, 21:3, 22:4, 22:17, 22:19, 22:22, 22:24, 23:4, 23:11, 23:15, 24:10, 24:25, 25:7, 25:15, 25:24, 26:5, 26:10, 26:12, 26:15, 26:19, 26:21, 27:14, 27:16, 29:6, 29:19, 29:21, 32:24, 33:16, 33:18, 33:20, 33:23, 35:14, 35:16, 36:5, 36:9, 36:11, 36:20, 38:2, 42:9, 53:9, 53:16, 53:19, 53:22, 54:7, 54:10, 64:9, 64:12, 70:1, 70:13, 70:16, 70:18, 76:11, 78:12, 78:16, 78:17, 78:18, 78:22, 80:24, 83:16, 84:4, 84:6, 84:10, 84:14, 84:25, 85:17, 85:24, 86:10, 87:2, 87:5, 87:9, 87:13, 87:19, 88:3, 88:5, 88:9, 89:8, 89:11, 89:18, 89:23, 90:16, 90:20, 91:1, 91:7, 91:11, 91:15, 91:18, 92:10, 92:12, 92:19, 92:24, 93:2, 93:4, 93:9, 93:11
**theory** [3] - 4:13, 6:13, 9:4
**Thereupon** [1] - 93:12
**thirty** [2] - 13:16, 24:25
**thirty-eight** [1] - 24:25
**Thompson** [13] - 4:14, 18:1, 18:3, 18:5, 18:22, 28:14, 30:3, 30:6, 43:22, 44:3, 44:10, 44:14, 47:20
**Thompson's** [1] - 20:20
**throw** [1] - 42:25
**throwing** [1] - 47:21
**tie** [2] - 23:12, 90:12
**tied** [1] - 25:18
**ties** [1] - 9:18
**tight** [1] - 89:14
**tighter** [1] - 88:14
**Tinoco** [1] - 16:9
**tissue** [1] - 66:21
**today** [14] - 3:22, 3:25, 6:4, 10:23, 16:5, 19:3, 19:17, 20:5, 30:18, 71:25, 76:13, 89:24, 90:15, 90:19
**together** [4] - 3:7, 16:17, 23:8
**tomorrow** [11] - 23:8, 84:2, 90:15, 90:20, 90:22, 90:25, 92:2, 92:14, 92:18, 93:8
**tonight** [1] - 87:19
**took** [6] - 7:18, 9:9, 25:8, 49:4, 65:16, 66:6
**tooth** [1] - 86:6
**top** [3] - 22:13, 29:14, 49:7
**touch** [1] - 49:11
**toward** [2] - 44:24, 91:2
**towards** [5] - 15:1, 32:9, 39:5, 39:8, 80:6
**traffic** [4] - 21:11, 21:13, 37:14, 64:23
**transaction** [4] - 31:6, 32:9, 32:18, 68:15
**TRANSCRIPT** [1] - 1:12
**transcript** [2] - 86:2, 95:2
**translated** [1] - 3:17
**tree** [2] - 78:3, 78:9
**trespass** [2] - 37:11, 50:9
**trespassing** [1] - 50:11
**trial** [5] - 4:14, 9:13, 9:16, 91:22
**TRIAL** [1] - 1:12
**truck** [1] - 39:5
**true** [2] - 70:5, 88:5
**trunk** [2] - 73:12, 73:13
**try** [3] - 23:12, 76:19, 89:5
**trying** [1] - 92:3
**turn** [6] - 15:4, 16:11, 29:14, 71:19, 71:20, 71:24
**TV** [1] - 81:8
**two** [13] - 10:9, 15:7, 19:8, 34:23, 50:25, 52:18, 52:25, 76:15, 79:12, 79:13, 80:11, 85:3
**type** [2] - 51:6, 55:13
**Tyrone** [2] - 40:14, 90:11
**Tyrone's** [1] - 86:25

## U

**unadulterated** [1] - 85:4
**under** [6] - 4:13, 5:10, 61:24, 61:25, 62:1, 85:12
**undercover** [1] - 51:15
**uniform** [3] - 55:11, 55:12, 55:13
**unindicted** [1] - 87:22

**unit** [1] - 66:9
**UNITED** [4] - 1:1, 1:4, 1:13, 1:15
**unknown** [2] - 31:7, 35:9
**unlawful** [1] - 76:2
**unmarked** [1] - 51:13
**unreported** [2] - 6:22, 7:5
**up** [21] - 3:19, 9:18, 9:23, 18:6, 23:12, 30:11, 32:11, 34:21, 41:14, 52:15, 58:12, 60:21, 61:1, 66:20, 83:10, 84:20, 86:10, 87:19, 88:18, 89:1, 92:8
**utilize** [1] - 69:23

**V**

**van** [3] - 37:17, 46:3, 46:9
**various** [2] - 8:18, 88:16
**vehicle** [16] - 28:3, 28:5, 32:14, 37:16, 42:20, 46:4, 46:6, 46:9, 46:13, 46:14, 51:12, 51:13, 65:5, 65:13, 73:12
**vehicles** [1] - 47:5
**Vicar** [1] - 4:10
**video** [11] - 4:2, 4:3, 5:9, 6:2, 6:10, 7:1, 7:10, 7:18, 9:6, 9:11
**videotape** [1] - 8:21
**videotaping** [2] - 51:23, 52:9
**view** [2] - 62:4, 62:7
**violation** [1] - 46:12
**violence** [1] - 75:21
**violent** [1] - 8:22
**voice** [1] - 10:10
**voluntarily** [1] - 5:22
**VÁZQUEZ** [117] - 1:15, 3:11, 3:13, 3:20, 3:25, 4:6, 4:12, 4:17, 4:20, 5:19, 5:22, 5:24, 6:3, 6:6, 6:9, 6:13, 6:17, 6:22, 6:25, 7:13, 7:15, 7:17, 7:21, 8:6, 8:10, 9:11, 9:21, 9:24, 10:2, 10:17, 11:3, 12:2, 12:4, 12:14, 12:19, 12:23, 13:1, 13:6, 13:12, 13:19, 13:21, 14:4, 14:10, 15:2, 15:11, 15:15, 16:13, 16:16, 17:2, 17:4, 17:12, 17:21, 17:24, 18:9, 18:13, 18:17, 19:9, 19:11, 20:11, 20:13, 20:23, 21:6, 22:3, 22:5, 22:15, 23:10, 23:18, 24:9, 24:11, 24:22, 25:5, 25:12, 25:17, 25:23, 26:7, 26:14, 27:7, 27:13, 27:17, 29:5, 29:7, 29:17, 29:24, 32:23, 33:1, 33:14, 33:17, 34:1, 35:12, 35:15, 35:17, 36:2, 36:8, 36:10, 36:12, 36:19, 53:14, 81:2, 84:8, 84:11, 84:15, 86:1, 86:21, 87:3, 87:7, 87:11, 87:14, 88:2, 88:4, 88:8, 90:17, 90:23, 91:5, 91:9, 91:13, 91:16, 91:20
**VÁZQUEZ............** [1] - 94:4
**VÁZQUEZ...................** [1] - 94:9
**Vázquez** [13] - 3:4, 6:1, 9:10, 10:15, 15:10, 16:12, 18:12, 23:6, 25:16, 27:5, 77:18, 89:2, 89:23
**Vázquez's** [1] - 71:2

**W**

**wait** [1] - 80:24
**walk** [9] - 48:7, 48:10, 49:7, 55:20, 57:7, 63:22, 68:23, 68:25, 91:23
**walked** [1] - 61:1
**walking** [7] - 15:1, 42:17, 42:19, 46:17, 56:25, 57:2, 69:13
**walks** [1] - 42:22
**wants** [2] - 88:11, 88:12
**warm** [1] - 49:10
**warrants** [1] - 56:24
**watching** [3] - 82:17, 82:18, 82:21
**weapon** [2] - 36:16, 82:24
**weapons** [1] - 79:19
**wearing** [1] - 55:10
**week** [3] - 76:7, 90:16, 90:17
**West** [1] - 1:22
**Weston** [1] - 2:10
**white** [1] - 77:23
**whole** [4] - 25:21, 27:3, 60:14, 61:10
**WILLIAMS** [1] - 1:12
**withdraw** [1] - 19:9
**witness** [13] - 3:16, 4:20, 5:11, 7:11, 8:25, 9:25, 10:4, 10:5, 23:8, 36:19, 49:18, 50:4, 84:5
**WITNESS** [3] - 17:16, 78:17, 94:2
**witnesses** [3] - 89:14, 90:15, 91:3
**words** [3] - 55:20, 61:1, 65:21
**world** [1] - 89:19
**worse** [1] - 53:24
**writ** [3] - 84:12, 86:9, 86:21
**write** [4] - 58:9, 58:14, 67:24, 88:17
**writing** [1] - 71:17
**written** [2] - 59:22, 60:22
**wrote** [2] - 71:18, 72:3

**X**

**Xanax** [3] - 29:13, 30:4, 60:8

**Y**

**year** [3] - 18:24, 56:5, 56:16
**years** [11] - 37:5, 38:9, 38:18, 46:1, 46:24, 55:5, 59:1, 63:20, 79:4, 79:7, 79:8

**Z**

**Zerquera** [21] - 31:1, 31:8, 31:10, 31:22, 32:17, 33:12, 34:3, 34:20, 34:25, 35:25, 36:17, 52:19, 68:9, 68:13, 68:18, 68:21, 68:23, 69:13, 70:3, 77:2, 77:7