DAILY COPY

SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NUMBER 14-20017-CR-KMW

UNITED STATES OF AMERICA 2-20-2015

DAY NINE
A.M. SESSION

vs.

PAGES 1-93

MAURIN CHACON
RODOLFO PORTELA
CHRISTOPHER ALTAMIRANO
JAMES DIXON
JAY ANTHONY FLORES,
Defendants

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS HELD
BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT COURT JUDGE

---

APPEARANCES:

FOR THE UNITED STATES:
IGNACIO VAZQUEZ, A.U.S.A.
ILHAM HOSSEINI, A.U.S.A.
MARK DISPOTO, A.U.S.A.
99 N.E. 4th Street
Miami, FL 33132

FOR DEFENDANTS:
MANUEL GONZALEZ, ESQ.
2000 Ponce DeLeon Boulevard
Suite 614
Coral Gables, FL 33134

PAUL KORCHIN, A.F.P.D
150 West Flagler Street
Miami, FL 33130

PHILIP HOROWITZ, ESQ.
9130 South Dadeland Boulevard
Suite 1910 - Two Datran Center
Miami, FL 33156

**APPEARANCES CONTD.**

**DAVID DONET, JR. ESQ.**
**3250 Mary Street**
**Suite 406**
**Fort Lauderdale, FL 33133**

**HERMAN FRANK RUBIO, JR. ESQ.**
**1107 N.E. 104th Street**
**Miami Shores, FL 33138**

REPORTED BY:

PATRICIA SANDERS, RPR
*United States Court Reporter*
400 North Miami Avenue, Suite 11-3
Miami, FL 33128
T: 305.523.5528
patricia_sanders@flsd.uscourts.gov.

THE COURT: Please be seated everyone. The jurors are here. We're ready to start. I did have my normal 3:00 a.m. wake up question.

We were talking yesterday about the video and the fact that the detective was not on scene that got the money and drugs.

At sidebar, Mr. Vazquez, you indicated there was somebody else who was eyes on. I don't know if the Government is going to call that person.

Have you identified, and do the defendants know the name of the officer who was eyes on for that event?

MR. VAZQUEZ: We have given then the un-redacted reports. I am happy to tell them; it's detective Cadavid.

THE COURT: All right. I just wanted to make sure.

MR. HOROWITZ: While I appreciate the Government telling us the name of the witnesses, the difficulty we're having is -- if he could give us the dates of the incidents it allows us to get the report or look through the un-redacted discovery, which is about 2,000 pages.

And that way we could locate the reports.

MR. VAZQUEZ: Your Honor, I can give them the dates; I have the folder with that here.

THE COURT: I appreciate that, Mr. Vazquez.

MR. VAZQUEZ: November 22nd, December 6th, December

13th, December 17th, January 9th, January 16th, January 23rd, January 28th and May 1st for the witness that was handling the confidential informant.

MR. HOROWITZ: Thank you very much.

THE COURT: All right. I have been advised at least one of the defense attorneys wanted to have a working lunch with his client, and I thought others might want to do that today because it seems we have been moving at a good pace; although sometimes I am not so sure.

Is that the consensus, if the Marshals can do that, would defense counsel like to have a working lunch with their clients?

MR. GONZALEZ: Yes, Your Honor.

MR. HOROWITZ: Yes, Your Honor.

THE COURT: All right. The Marshals are working on it, as I understand it. And I would again like to thank the Marshal Service for their helpfulness.

MR. DONET: Your Honor, I am going to switch seats to help Mr. Gonzalez with the technology.

THE COURT: All right. Bring in our jury, please.

COURT SECURITY OFFICER: All rise, please.

THE COURT: Please be seated everyone. Good morning, ladies and gentlemen.

Mr. Gonzalez, you may continue with your cross of the detective.

MR. GONZALEZ: Thank you, Your Honor.

BY MR. GONZALEZ:

Q. Detective San Juan, yesterday we were going over the video, which is Government's Exhibit 140 in evidence.

I am going to ask you a couple of questions regarding like five different events during that video.

If you have any problem and you need to ask me to -- for us to replay it or go back just let us know.

A. Yes, sir.

MR. GONZALEZ: Mr. Donet, if you could please cue up Government's Exhibit 140, 9:55.

VIDEOTAPE PLAYED FOR THE RECORD.

BY MR. GONZALEZ:

Q. I believe yesterday when you were questioned with regard to the individual with the dreadlocks and the light colored cap you indicated that that was Maurin Chacon?

A. Yes, sir, I did.

Q. Before we move on, let me ask you -- you had this recording that was being done by a confidential informant?

A. That's correct.

Q. In order to do this he is wearing somewhere on his body a hidden camera?

A. That's correct.

Q. And so for him to be recording the individuals that he is talking to, he is in close proximity to, would be the ones that

come out on the video?
A. Yes, sir.
Q. Does that camera have a certain amount of range, five feet, 10 feet or it all depends on the circumstances?
A. I don't know the range of the camera.
Q. All right.
MR. GONZALEZ: If we could move on to 10:35, please.
VIDEOTAPE PLAYED FOR THE RECORD
BY MR. GONZALEZ:
Q. At 10:36 there you basically see the cap. Can you tell from looking at this image whether that is the same individual you identified previously?
A. No, sir, not on that image.
Q. The only thing we can tell from that is it is a light colored cap also?
A. That's correct.
Q. You can't pinpoint whether it is the exact colored cap, but it is at least light colored like the previous one?
A. That's correct.
Q. From that still you cannot say that is Maurin Chacon; is that correct?
A. That's correct.
MR. GONZALEZ: May we proceed please to 10:45.
VIDEOTAPE PLAYED FOR THE RECORD
BY MR. GONZALEZ:

Q. Here at 10:45 at the far right you see the individual coming back on with a cap; it looks like he has dreadlocks.
Is this Maurin Chacon in this picture?
A. I cannot tell from that picture.
Q. Okay.
MR. GONZALEZ: Can we move to 10:58.
VIDEOTAPE PLAYED FOR THE RECORD
BY MR. GONZALEZ:
Q. We saw there the individual pokes his head in front of the camera and back out.
Was that Maurin Chacon right there?
A. That is not.
Q. That is not Maurin Chacon?
A. No, sir.
Q. Light colored cap also?
A. Yes, sir.
Q. Dreadlocks?
A. Yes, sir.
Q. What characteristics of this photo, this photo still on the video, gives you the ability to say it's not Maurin Chacon?
A. The -- I believe it is a Chicago Black Hawks on the front logo. And the future frame it is not Maurin Chacon; you can tell by the tattoo on the face.
Q. So this individual has a tattoo on the face?
A. Yes, sir.

MR. GONZALEZ: Thank you. Can we proceed to 11:07.

VIDEOTAPE PLAYED FOR THE RECORD.

BY MR. GONZALEZ:

Q. Is this individual Maurin Chacon or the other individual that you identified with the tattoo?

A. The other individual.

Q. The identification you made initially with Government's Exhibit 140 at 9:55:56 you would agree Mr. Chacon -- that you identified wearing a cap and the dreadlocks?

A. What I believe was the long dreadlocks was Maurin Chacon.

Q. And he had a cap also?

A. Yes, sir.

Q. And you did not witness what was going on?

A. No, sir.

Q. Here at 11:07, and we will play for just a few seconds, the confidential informant is basically talking to this individual, the one with the tattoo that you have identified as not Mr. Chacon.

A. I would have to hear the audio.

MR. GONZALEZ: Can we play it from 11:07 on.

VIDEOTAPE PLAYED FOR THE RECORD

BY MR. GONZALEZ:

Q. Do you recognize the voice of the informant?

A. No, sir.

Q. Do you recognize the voice of this individual, the one you

have identified with the tattoo?
A. Yes, sir.
Q. That is the individual speaking with the informant at that point?
A. Yes, sir.
MR. GONZALEZ: Nothing further.
THE COURT: Thank you. Mr. Horowitz.
MR. HOROWITZ: No questions, Your Honor.
THE COURT: Mr. Korchin.
BY MR. KORCHIN:
Q. Detective San Juan, this encounter you had on July 26th, 2013 with Rodolfo Portela took place at 8 o'clock at night?
THE WITNESS: I do not recall the time; I would have to look at the arrest form.
MR. KORCHIN: May I approach the witness?
THE COURT: You may.
BY MR. KORCHIN:
Q. Handing you a copy of your arrest form for that night. Can you read it and when you are done reading it let me know, please.
A. All right.
Q. That is your A form from July 26th, 2013?
A. Yes, sir.
Q. Does that refresh your memory as to the time this incident occurred on that date?

**A. Yes, sir.**
**Q. So this encounter took place approximately 8:00 p.m. that night?**
**A. Yes, sir, around 7:57.**
**Q. 3 minutes to 8?**
**A. Correct.**
**Q. Now, there were other officers on the scene that night in addition to yourself?**
**A. Correct.**
**Q. One of those officers was a Miami police officer named Surami Kelly?**
**A. Yes.**
**Q. Can you explain what she was doing there that night? What were her duties there that night?**
**A. Also on surveillance in the area.**
**Q. Did she assist you in anyway with the recovery of the firearm or the magazine with ammunition you have testified about?**
**A. Yes, sir.**
**Q. What did she do in connection with that?**
**A. I believe she walked with me to pick up the magazine and she also turned in the firearm later that night.**
**Q. So after Mr. Portela was apprehended did you go together or by yourself to get that magazine?**
**A. I believe we went together.**

Q. You say you went together. But in your arrest affidavit didn't you indicate you recovered the magazine yourself?
A. I did recover the magazine; I picked it up.
Q. You did not mention Officer Kelly accompanying you to get the magazine, did you?
A. No, sir.
Q. In addition to what you have testified about regarding Officer Kelly -- she is the officer who gathered together the firearm and the ammunition and turned it over to the property room at the Miami Police Department?
A. According to the property report yes, sir.
Q. Before Officer Kelly took the firearm and ammunition to the Miami Police Department property room you had given those items to her?
A. No, sir; the firearm was still underneath the car.
Q. All right. In order for Officer Kelly to take the firearm and ammunition to the Miami Police Department she had to receive them from somebody, correct?
A. I believe she collected them from the scene.
Q. Did you look at the ammunition and the firearm that night?
A. When I recovered the magazine, yes.
Q. You looked at the ammunition inside the magazine?
A. Not the actual projectiles -- I just looked and saw it was loaded.
Q. You looked at the firearm though?

A. No, sir, I did not touch the firearm that night.
Q. Getting back to your arrest affidavit; what type of firearm was this.
A. I believe it was a Kel-Tec.
Q. What was the caliber of the firearm.
A. .32 caliber.
Q. What does caliber mean, can you explain that?
A. I am not an expert in firearms, sir.
Q. The caliber of a firearm is the measurement of the diameter or width of the part of the gun that sticks out, not the trigger --
A. Is that a question?
Q. Yes?
A. I really don't -- I believe so, but I am not an expert.
Q. You went to the Police Academy?
A. Yes, sir.
Q. They have courses on guns and ammunition, don't they?
A. The guns that we are issued.
Q. They only teach you about the gun they issue you, they don't teach you about other guns?
A. No, sir; just the guns they issue us.
Q. You looked at the gun?
A. Yes, sir.
Q. As a matter of fact, in your arrest affidavit you wrote down the caliber of the gun?

A. I believe so.
Q. You put down .380 caliber firearm?
A. Correct.
Q. The gun in evidence is not a .380 caliber firearm, is it?
A. Correct.
Q. It is a .32 caliber?
A. Correct.
A. Those are two totally different kinds of guns, aren't they?
A. Different calibers, yes, sir.
Q. You wrote down in your arrest affidavit .380, correct?
A. Correct.
Q. You say you did not look at the projectiles that night; is that your testimony?
A. Yes; I did not take them out of the magazine.
Q. Do you know what caliber the ammunition is in evidence?
A. If I see the property receipt -- it should be listed on the property receipt.
Q. Do you recall Officer Kelly actually took the ammunition to the Miami Dade Police Department?
A. Yes, sir.
Q. Do you recall she submitted it as .380 caliber ammunition?
A. According to the property receipt, yes.
Q. But the ammunition in evidence is .32 caliber?
A. I need to see the ammunition, sir.
Q. I will show it to you.

**A. Yes, sir.**
**Q. To make this clear, the ammunition in evidence in this case is .32 caliber ammunition?**
**A. Correct.**
**Q. All right. When Officer Kelly submitted the ammunition to the Miami Police Department in connection with this case she submitted it as .380 caliber, correct?**
**A. Correct.**
**Q. In talking about caliber of ammunition, not of a firearm but the ammunition, the caliber of the ammunition is the measurement or the diameter of the width of the bullet, right?**
**A. That's what you are stating, sir, yes.**
**Q. In these types of situations where firearms and ammunition are seized by the police it's standard to have these items processed for fingerprints?**
**A. Correct.**
**Q. In order to have a DNA analysis done?**
**A. Two separate things, but DNA and fingerprints, yes.**
**Q. To your knowledge the firearm was processed for both fingerprints and DNA analysis?**
**A. I believe so.**
**Q. To your knowledge was the ammunition and the magazine also processed for fingerprints and DNA analysis?**
**A. I don't recall that; I don't know that.**
**Q. You believe the firearm was processed that way, but you do**

not know if the magazine and ammunition were processed that way?
A. Correct.
Q. I don't know if you are aware of the details of this case, but Mr. Portela with respect to July 26th, 2013 is only charged with possession of the ammunition.
Are you aware of that?
A. No, sir.
Q. He is not charged with possession of the firearm.
Are you aware of that?
A. No, sir.
Q. If I am understanding you correctly, with respect to the item he is charged with in this case, the ammunition, you do not know if that was processed for fingerprints or DNA analysis?
A. No, I personally do not know.
MR. KORCHIN: I have no further questions.
THE COURT: Mr. Donet.
MR. DONET: I have no questions.
THE COURT: Mr. Rubio.
MR. RUBIO: No questions, Your Honor.
THE COURT: Redirect.
BY MR. VAZQUEZ:
Q. Detective San Juan, Mr. Korchin asked you about property receipts submitted by Detective Kelly.

A. Yes.
Q. Do you recall reviewing those?
A. Yes.
MR. VAZQUEZ: May I approach the witness?
THE COURT: You may.
BY MR. VAZQUEZ:
Q. Have you had a chance to review these property receipts?
A. Yes, sir, I have now.
Q. How was the Kel-Tec firearm described in the property receipts defense counsel asked you about?
MR. KORCHIN: Objection, hearsay.
MR. VAZQUEZ: It was elicited on cross examination.
THE COURT: Sustained.
BY MR. VAZQUEZ:
Q. Have you handled different kinds of firearms as a police officer? I know you stated to defense counsel that you were not an expert.
A. Yes, sir.
Q. Do you know if there is a significant difference in size between a .32 caliber and a .380 caliber round?
A. I believe there is not.
Q. Are you familiar with the Kel-Tec involved in this case?
A. Yes, sir.
Q. Do you know how this firearm is described on the face of the firearm?

A. I believe it is Kel-Tec .32.
Q. The firearm that was admitted in evidence in this case was that the firearm you saw on July 26th, 2013?
A. Yes, sir.
Q. You looked at the ammunition on July 26th, 2013 and the magazine, correct?
A. Correct.
Q. Is this the ammunition you saw on July 26th, 2013?
A. Yes, sir.
Q. Was there any gap between your observation of the magazine and the ammunition and Detective Kelly's possession of these items?
A. Was there a gap?
Q. Was there a transfer between you and her?
A. She collected it from the scene -- the magazine I gave her on the scene, but the firearm was recovered by her.
Q. Were you present for that transfer?
A. Yes, sir.
Q. I want to talk about the February 5th, 2014 recording we discussed earlier.
You were not eyes-on for the transaction, correct?
A. No, sir.
Q. When you talk about Maurin Chacon, you have talked about him today, what is the feature you used to know about Maurin Chacon that described him best?

A. Very long dreads.
Q. All right. In the transaction, do you hear Maurin Chacon participating in a drug transaction on the recording?
A. Yes, sir.
Q. Did you hear that at the time the transaction was happening?
A. No, sir.
Q. Were you listening to the transaction while it was happening?
A. Yes, sir.
Q. Did you hear the transaction being discussed while the recording was taking place?
A. I could hear it live, yes, sir.
Q. Did you hear Maurin Chacon participating in that transaction?
A. Yes, sir.
Q. When you were attempting to look at the video, for which you were not the eyes-on, what was the feature that led you to believe a person might be Maurin Chacon when you identified him as such on the video?
A. The long dreads.
Q. Anything else?
A. Just the long dreads.
Q. In addition to the long dreads, do you recognize the voice of Maurin Chacon?

A. Yes, sir, I did hear his voice .

Q. Mr. Korchin asked why or what Mr. Portela was particularly charged with regarding the firearm on July 26, and the ammunition it contained, do you recall that line of questioning?

A. Yes, sir.

Q. Do you know the legal grounds for the necessity of a firearm to move in Interstate Commerce in order for a person to be charged with possession of a firearm?

MR. KORCHIN: Objection; beyond the scope of cross?

THE COURT: Yes. It also calls for a legal conclusion; so I will sustain it.

BY MR. VAZQUEZ:

Q. Are you aware that Mr. Portela was charged with ammunition possession in this case?

A. No, sir.

Q. Were you aware that ammunition was found on July 26th, 2013?

A. Yes, sir.

Q. Did you see that that ammunition was transferred to Detective Kelly?

A. Yes, sir

MR. VAZQUEZ: No further questions.

THE COURT: Thank you, detective, you may step down.

Government, call your next witness.

MS. HOSSEINI: Government calls Francisco Theye.

WITNESS SWORN

THE CLERK: Please state your full name and spell it for the record.

THE WITNESS: Francisco Theye. F-R-A-N-C-I-S-C-O T-H-E-Y-E.

BY MS. HOSSEINI:

Q. Good morning, Mr. Theye.

A. Good morning.

Q. Where do you work?

A. City of Miami Police Department.

Q. What is your title?

A. Crime Scene Investigator supervisor?

Q. How long have you worked as a crime scene investigator?

A. As a crime scene investigator over 13 years.

Q. The entire time with the City of Miami?

A. Five years as a public serve aid, yes.

Q. What did you do prior to being a crime scene investigator?

A. A public service aid.

Q. Have you had any education or training in forensics?

A. I have.

Q. Can you please describe that?

A. I have had over 1400 hours of class room instruction in documentation collection and preservation of evidence from local police agencies as well as from the University of

**Tennessee, National Forensics Academy.**

**Q. What are your duties as a crime scene investigator?**

**A. To respond to crime scenes and search for evidence, document collection and to preserve evidence as well.**

**Q. Did you process any items of evidence in this case?**

**A. Yes, I did.**

**Q. Was that on July 26th, 2013?**

**A. Yes, it is.**

**Q. Can you tell us how you came to process the evidence?**

**A. I was requested by Officer Kelly to process a weapon.**

**Q. What were you looking for when you processed this weapon?**

**A. When we process a weapon we are looking for fingerprints and DNA.**

**Q. And how was this item of evidence packaged when you received it from Officer Kelly?**

**A. Inside a clear plastic bag with a flex cuff through the gun to make it safe.**

**Q. Was there anything else aside from the gun?**

**A. Also a magazine with six live rounds inside of it.**

**Q. Six live rounds.**

**A. Yes.**

**Q. What are live rounds?**

**A. Un-fired bullets.**

**Q. Do you know the type of gun it was?**

**A. A .32 caliber.**

MS. HOSSEINI: May I approach the witness?
THE COURT: You may.
Q. Showing you what has been admitted into evidence as Government's Exhibit 98. Do you know what that is?
A. Yes, I do.
Q. What is it?
A. The .32-caliber we were speaking of.
Q. How do you know that?
A. It has a serial number which identifies it -- the same condition as I saw it that day.
Q. What is the serial number?
A. CF020.
Q. How did you process the gun?
A. We have charcoal powder and apply to it a brushes we put -- pass the brush over the surface we're looking for the fingerprints this case the gun the magazine and the live rounds.
Q. Were you looking for fingerprints?
A. I was looking for fingerprints.
Q. What were the results?
A. No results. There were no fingerprints on it.
Q. You said you also processed this for DNA?
A. Once we process it for fingerprints we then swab it for DNA.
Q. How do you do that?

A. Basically a DNA swab is what we get; it comes in a sealed glassine envelope. And normally what is inside are one or two sterile tip cotton applicators on a wooden stick and cotton swab at the end. You put distilled water over the cotton swab and rub the surface of the item you are trying to get DNA from.
In this case it was the weapon.
Q. How are these cotton swabs packaged?
A. Sealed inside the glassine envelope.
Q. Are they sterile?
A. Yes.
Q. Do you do anything to preserving the integrity of the swabs?
A. After we swab it we place it back inside the glassine envelope and seal it up.
Q. What happens to that swab once you are done?
A. That gets turned into my property unit.
Q. Can you tell in just looking at a gun whether there are fingerprints on it?
A. No -- unless the fingerprints are actually visible.
Q. Can you tell whether DNA is present?
A. No.
Q. This is the gun you swabbed on July 26th, 2013?
A. Yes, it is.
Q. Showing you what has been admitted into evidence as Government's Exhibit 99. Do you know what that is?

A. These were the .32 caliber bullets that were inside the magazine, six of them.
Q. Did you process those?
A. Yes, for fingerprints.
Q. What were the results?
A. Negative results.
Q. Did you process them for DNA?
A. In this case, no.
MS. HOSSEINI: No further questions.
THE COURT: Cross examination.
MR. GONZALEZ: No questions.
MR. HOROWITZ: No questions.
BY MR. KORCHIN:
Q. Good morning. How is your name pronounced, Theye?
A. Theye.
Q. Officer Theye, what time did you arrive on the scene that you have been testifying about?
A. I think I was dispatched around 11:30. I would have to see my report to refresh my recollection to see what time I actually arrived.
Q. You were dispatched at 11:30?
A. Correct.
Q. And then what?
A. Shortly thereafter -- I would have to look at my report to refresh my recollection.

Q. Oh, okay.
MR. KORCHIN: May I approach the witness?
THE COURT: You may.
BY MR. KORCHIN:
Q. That is a copy of your report?
A. Correct.
Q. Please read it.
A. Same time dispatch, arrival time.
Q. I'm sorry?
A. Dispatch and arrival time was at the station, the same time 11:30.
Q. 11:30 p.m.?
A. Correct.
Q. What was the time you actually performed the processing of the ammunition and the firearm.
A. Shortly thereafter.
Q. You received these items from Officer Kelly not Detective San Juan, correct?
A. Correct.
Q. When you were requested to process these items you understood that to mean to process these items for both fingerprints and DNA, correct?
A. Correct, that's our standard protocol.
Q. You then did process the firearm for both fingerprints and DNA?

A. Correct.
Q. I think I understood you to say that the processing of the firearm resulted in a negative or no fingerprints on the firearm, right?
A. Correct.
Q. And of course as far as the DNA on the firearm goes, you are not the person who analyzes the DNA from swabbing the firearm, correct?
A. Correct, I am not.
Q. It is my understanding you processed the ammunition only for fingerprints?
A. That's correct.
Q. You did not process the ammunition for DNA?
A. Correct, I did not.
Q. The package you were given also contained a magazine?
A. Yes.
Q. The magazine is an object that contains the ammunition, correct?
A. Could you rephrase the question?
Q. The ammunition fits into a magazine, correct?
A. Yes.
Q. Did you process the magazine for fingerprints?
A. Yes, I did.
Q. Also negative results?
A. Correct.

Q. And negative results of fingerprints on the ammunition?
A. Correct.
Q. Did you process the magazine for DNA?
A. I did not.
Q. This processing you did was late the night of July 26th, 2013, right?
A. Yes.
Q. You eventually delivered these items -- you delivered something to the property room. What did you deliver?
A. The DNA swabs.
Q. You delivered those two days later on July 28th, correct?
A. I would have to look at the actual receipt.
Q. So you do not recall when you delivered the DNA swabs?
A. I don't have any independent recollection of actually when I turned it in.
Q. All right.
MR. KORCHIN: May I approach the witness?
THE COURT: You may.
BY MR. KORCHIN:
Q. I am going to show you a copy of the property receipt up in the top right hand part.
Can you take a look at that, please.
A. Okay.
Q. Does that refresh your recollection as to when you dropped off the DNA swabs in the property room?

A. Says the 28th.
Q. Between your processing of the DNA swabs on July 26th and dropping them off to the property room on July 28th where would they be?
A. They would be in a locker at the processing area.
Q. So it is not the property room that you delivered it to?
A. Can you rephrase the question?
Q. You said you delivered those swabs to the property room or evidence room?
A. Yes, I did.
Q. So this other place you are talking about is not -- it is a different place?
A. Correct; different building.
Q. Did you take it to that building yourself?
A. That's where I processed the weapon, yes.
MR. KORCHIN: I have no further questions.
THE COURT: Mr. Donet.
MR. DONET: No, Your Honor.
MR. RUBIO: No questions, Your Honor.
THE COURT: Redirect.
BY MS. HOSSEINI:
Q. Mr. Theye, can you tell us some of the reasons why when you swab an item of evidence for fingerprints no fingerprints are found?
A. In this case we are talking about the actual gun. The gun

is meant to be held in your hand. There are a lot of grooves and stippling on the actual grip, and the area where you hold the actual weapon. There are ribbed areas on the surface that makes it harder to obtain a fingerprint.

Q. I'm sorry, go ahead.

A. And that is just one of the reasons. And there is also environmental; if it was too wet or too dry or if it was rubbed against something.

There are a lot of factors that inhibit you getting an actual fingerprint. It's not just like because you touch something you leave an actual fingerprint like you see on t.v.

It does not work that way.

Q. The fact that no fingerprints are found on an item like a gun does that mean nobody touched it?

A. It does not mean that. In fact, five percent of the time that a --

THE COURT: No, no, no no. We have our answer.

BY MS. HOSSEINI:

Q. Thank you. Why didn't you process the live rounds or the ammunition in this case?

A. I did process it for fingerprints.

Q. I'm sorry, for DNA?

A. For DNA; it was not the protocol to swab the bullets for DNA.

MS. HOSSEINI: No further questions.

THE COURT: Thank you, sir, you may step down. Government call your next witness.

MS. HOSSEINI: United States calls Officer Argel Sierra.

WITNESS SWORN

THE COURTROOM DEPUTY: Please state your full name and spell it for the record.

THE WITNESS: Argel Sierra; A-R-G-E-L S-I-E-R-R-A.

BY MS. HOSSEINI:

Q. Good morning, Officer Sierra.

A. Good morning.

Q. Where do you work?

A. I work for the City of Miami Police Department the South District in Coconut Grove at this moment.

Q. What is your title?

A. Police officer, patrol.

Q. How long have you worked as a police officer?

A. Just over six years.

Q. What did you do prior to being a police officer?

A. I was in the Military before then.

Q. Can you tell us more about that?

A. I was in the United States Navy. I served with the Third Marines.

Q. What are your duties as a police officer?

A. I have been assigned to road patrol the entire time, just

answering calls, dispatched calls, and pretty much enforcement.
Q. Are you are assigned to a particular area or unit?
A. I am now assigned to Coconut Grove. Before that I worked in Little Havana.
Q. How long did you work in Little Havana?
A. I worked in Little Havana probably four and half, five years all together.
Q. Until recently?
A. Until the end of December.
Q. December 2014?
A. Correct.
Q. Directing your attention to April 4, 2014, were you working that day?
A. Yes.
Q. What shift did you work?
A. B shift 1:00 p.m. to 11.
Q. Did you conduct any investigations on that day?
A. Yes, at least one.
Q. Do you remember the name of the person involved in that investigation?
A. It was an arrest; the person's name was Christopher Altamirano.
Q. If you were to see that person do you think you would be able to identify that person?
A. By face probably not.

**Q. I'm sorry?**
**A. Probably not, no.**
**Q. How did you become involved in that investigation?**
**A. I was dispatched that day at an address reference a male -- we were given a description -- of a male selling narcotics out of that address.**
**Q. What address was that?**
**A. 528 NW 11th Avenue.**
**Q. How do you remember that address specifically?**
**A. That was my first Methamphetamine arrest.**
**Q. Showing you what has been admitted into evidence as Government's Exhibit 24.**
**Can you see what is on the screen?**
**A. That is the building we were dispatched to that day.**
**Q. What happened when you arrived there.**
**A. I remember responding, and I remember making contact after we had -- shortly after we arrived we made contact with the defendant Christopher, and he was by a mail box that would be on the left side of the picture**
**Q. You can touch the screen there?**
**THE COURT: You can draw a circle or something.**
**THE WITNESS: It's going to be right here; right to the left side of the wall before the balcony.**
**I remember when I was approaching where he was standing by the mail box. He walked away definitely because he**

was looking at us coming towards him before we said anything.

And he was definitely walking away very nervous and looking back a couple times and walking back towards the apartment towards the door with the intent to not stay close to us --

MR. HOROWITZ: Objection.

THE COURT: Sustained. No intent, just how he looked.

THE WITNESS: Yes. He looked nervous that we were approaching. When he started walking away from the mail box he did drop a key. It appeared to me it was a key from a mail box since he was at the mail box.

It was a small key. Like I said, he continued to walk away. After we made contact with him he said that was the mail box of an apartment he was visiting.

There was another gentleman that said that that was his apartment --

MR. HOROWITZ: Objection, hearsay.

THE COURT: Overruled.

THE WITNESS: After that -- after we made contact with Christopher, the other gentleman, we requested for a K-9 officer, and the K-9 officer thereafter responded.

I remember that the dog alerted to the mail box that Christopher was standing by.

After that the owner of the apartment gave consent to search. The K-9 had already alerted. From the mail box we

recovered several narcotics, and that's it.
BY MS. HOSSEINI:
Q. Showing you what has been marked for identification as Government's Exhibit 205.
MS. HOSSEINI: May I approach the witness?
THE COURT: You may.
BY MS. HOSSEINI:
Q. Do you recognize this?
A. Yes.
Q. What is it?
A. On the yellow bag -- up here this is the Methamphetamine capsules. There is some Xanax here in the middle, and some crack cocaine rocks on the bottom. And the field testing kit is on the top.
Q. Do the drugs -- I'm sorry.
A. This is definitely the narcotics we got from the mail box that day.
Q. Is it in substantially the same condition as when you saw it on April fourth?
A. As I remember it.
MS. HOSSEINI: At this time I would move to admit into evidence Government's Exhibit 205.
MR. HOROWITZ: Objection as to foundation, subject to being tied up later.
THE COURT: Understanding defendant's objection the

Court will admit 205 into evidence.

MS. HOSSEINI: Permission to publish.

THE COURT: Yes.

BY MS. HOSSEINI:

Q. You mentioned the yellow baggie. What is that?

A. That is going to be a yellow bag with clear capsules with Methamphetamine inside.

Q. How about in the middle?

A. Those are Xanax bars.

Q. At the bottom.

A. Crack cocaine rocks.

Q. You said field testing was done?

A. Yes. The K-9 officer had the field test kit; he tested the Methamphetamine that tested positive and a different kit for the crack cocaine rocks, and that tested positive as well.

Q. Was anything else found aside from the narcotics?

A. The search incident to arrest -- I know Christopher, the defendant, had $69 on him in small denominations.

To us that is definitely consistent --

MR. HOROWITZ: Objection.

THE COURT: No, no, no.

BY MS. HOSSEINI:

Q. Was Mr. Altamirano arrested that day?

A. Yes, he was.

Q. What was he charged with?

A. Possession and intent to sell for Methamphetamine, which is a controlled substance; which was the Xanax bars and the crack cocaine.
Q. During this encounter did Mr. Altamirano say anything?
A. I made notes on that day on the paperwork. He definitely made an excited utterance without being asked any questions.
He said right after we had recovered the narcotics, this happens because I am in the open.
He also said, don't do the crime if you are not willing to do the time.
Later on he said he would take the crack but not the rest of the dope, referring to the charges.
MS. HOSSEINI: May I have a moment?
THE COURT: Sure.
BY MS. HOSSEINI:
Q. Office Sierra when you were speaking with Mr. Altamirano did you document any biographical or identifying information as to what he looked like?
A. I don't remember -- I remember I wrote a note at the end of the A form of the statements he had made.
Q. I'm sorry, I meant -- please finish your answer.
A. I noted on the A form the money that was found and the statements.
Q. Do you remember what he looked like? Could you describe a race, skin tone?

A. Young Latin male. I don't remember the age, but probably early twenties.
Q. Skin complexion?
A. Medium.
Q. Height?
A. 5'9, 5'10.
Q. Build?
A. Medium build, not heavy, not too skinny.
Q. Anything else you remember about what he looked like?
A. Pretty sure he had like long hair.
Q. Do you remember the color of his hair?
A. Black hair, black or brown, not blond.
MS. HOSSEINI: No further questions at this time.
MR. GONZALEZ: No questions, Your Honor.
THE COURT: Mr. Horowitz.
MR. HOROWITZ: Thank you, Your Honor.
BY MR. HOROWITZ:
Q. Good morning, Office Sierra, how are you?
A. Good, sir.
Q. Office Sierra, when you were dispatched to 528 NW 11th Avenue was it day or night?
A. It was daylight.
Q. Do you recall it being almost 8 o'clock at night?
A. Almost 8 o'clock -- it was daylight for sure.
Q. Would anything help to refresh your recollection as to what

time you arrived at the scene?
A. The time would definitely be on the document.
Q. It would be on the A form?
A. Yes.
Q. The A form is an arrest affidavit, something you fill out shortly after you make the arrest?
A. That's correct.
MR. HOROWITZ: May I approach the witness?
THE COURT: You may.
THE WITNESS: 7:42.
BY MR. HOROWITZ:
Q. When you write these A forms you put the time in Military time?
A. Correct.
Q. In this case you put down 19:42 so that would be 7:42 p.m.?
A. Correct.
Q. You stated when you got there you encountered someone you later learned to be Christopher Altamirano?
A. Correct.
Q. And in your testimony you made contact with Mr. Altamirano by a mail box?
A. Correct.
Q. And those mail boxes are mounted on the wall; are they not?
A. Correct.
Q. You never saw Mr. Altamirano going to the mail box,

correct?
A. I don't recall seeing him go inside the mail box. I remember seeing him standing by the mail box and dropping the key when we approached.
Q. Showing you Defendant Altamirano A and B and ask if you remember these two photos.
MR. HOROWITZ: May I approach the witness?
THE COURT: You may.
BY MR. HOROWITZ:
Q. Do you recognize this?
A. It's the building.
MR. HOROWITZ: At this time I would move for the admission out of turn of Government's Exhibit A and B.
MS. HOSSEINI: No objection, Your Honor.
THE COURT: This is the building we have been chatting about?
THE WITNESS: Yes.
BY MR. HOROWITZ:
Q. Is this the building at 528 NW 11th Avenue?
A. Back then this building was white.
Q. It is currently blue?
A. Now it is.
Q. Nice paint job.
A. Yes.
Q. Defendant's Exhibit B is that a picture of the mail boxes

themselves?
A. It definitely looks like the mail box in that building.
THE COURT: The building in that picture is a different color from the building the day you were there?
THE WITNESS: Correct.
BY MR. HOROWITZ:
Q. But it's the same building?
A. It's the same exact building.
MR. HOROWITZ: May I publish on the ELMO?
THE COURT: Yes, you may.
BY MR. HOROWITZ:
Q. Exhibit A that is the way 528 NW 11th Avenue looks today?
A. Yes.
Q. You can see the mail boxes on the wall where my finger is?
A. Yes.
Q. Is that the same way the mail box was back then?
A. Yes.
Q. Exhibit B is that a close-up of the mail boxes?
A. Correct.
Q. It's not a free standing mail box, it is a mail box that is in a wall, correct?
A. Correct, mounted on the wall.
Q. In order to access the mail boxes you need a key?
A. Yes.
Q. That is for the tenants to access their mail?

A. Yes.
Q. Which one of the mail boxes in Exhibit B was the mail box you ultimately went into?
And you can circle it.
A. If I recall correctly it is this one right here.
Q. That would be the second from the right?
A. The second from the east, yes.
Q. And throughout your time at 528 NW 11th Avenue you were observing Mr. Altamirano; were you not.
A. When I approached Mr. Altamirano -- I don't remember where I parked. I remember approaching him when he was by the mail box. I am pretty sure I was approaching from this side because obviously the mail box is on that side.
Q. When you were approaching him how close were you when you said he threw the key?
A. Probably 20 feet away, approximately.
Q. From the distance you and I are right now how close were you to Mr. Altamirano? I will start walking, and you tell me where to stop.
A. A little further back; probably by the table behind you.
Q. Where I am standing right now?
A. About there.
Q. From the distance you are from where I am it is your testimony you saw Mr. Altamirano throw a single mail box key?
A. That's correct.

Q. You were able to see the mail box key from this distance?
A. Correct. It was a metal object in the shape of a key.
Q. A metal object in the shape of a key?
A. Yes.
Q. How did he do it? Did he wind it up and throw it or did he just toss it?
A. He tossed it downwards.
Q. By his feet?
A. Correct.
Q. As a trained law enforcement officer when you see a suspect drop something you have a great interest in it; do you not?
A. Yes.
Q. And you have such an interest that it is something you should further investigate and maybe even recover as evidence?
A. Definitely; when I am dispatched reference a narcotics investigation.
Q. That is because that key both figuratively and literally is the key to your investigation -- could be the key to your investigation?
A. Definitely could be.
Q. Office Sierra, how many keys did you recover that night?
A. That key, as far as I recall, because obviously we accessed the mail box.
Q. Is that key in evidence today?
A. I don't recall if it was put into evidence.

Q. Were you shown a key by this prosecutor?
A. No, I have not seen it.
Q. Was a key impounded and submitted as evidence in this case?
A. I don't recall.
Q. It would be in the A form, correct?
A. If it was impounded.
Q. And there should be a property receipt?
A. Yes.
Q. Where is the property receipt for any key?
A. I did not impound any of the evidence.
Q. Because you never looked for the key that night, correct?
A. No, incorrect.
Q. You called the K-9 officer to come out?
A. Correct.
Q. And the K-9 alerted to the mail box?
A. Yes.
Q. You got consent to enter the mail box?
A. Correct.
Q. Mr. Altamirano did not give you consent?
A. Correct.
Q. It was the owner of the mail box that gave you consent?
A. Correct.
Q. A gentleman by the name of Earl Harralson? Does that sound familiar?
A. It sounds familiar.

Q. He opened the mail box for you?
A. I don't remember if he opened the mail box.
Q. Because he had the key?
A. I don't recall that. But I doubt on a call like that we would let someone open the mail box for us.
Q. But this is the gentleman, Mr. Harralson, who gave you consent?
A. Or he would give us the key.
Q. From Mr. Harralson?
A. The key we recovered, sir.
Q. But you didn't impound and recover any key?
A. I did not impound any evidence that day, another officer did.
Q. You arrested Mr. Altamirano that night, correct?
A. I was part of the arrest. I was the co-signer of the A form.
Q. And that was with Officer Bodie?
A. Correct.
Q. You either did or participated in or witnessed a patdown of Mr. Altamirano?
A. The notes I wrote on the documentation of money he had on him, yes.
Q. Did he have any crack cocaine on his person?
A. No, we did not take any narcotics from him.
Q. No narcotics were seized from Mr. Altamirano?

A. Not from his person.
Q. Just $69 in cash?
A. Correct.
Q. Government's Exhibit 205 you mentioned something called a field test kit can you explain for the members of the jury what a field test kit is?
A. A field test kit has -- like a little capsule that has chemicals inside to show you whether it is positive or negative depending on the narcotics. You test by color code.
Q. The field test kit you used is where my finger is, correct?
A. I did not use it, it was another officer.
Q. The field test kit -- sometimes people call it a Ferguson field test kit for cocaine?
A. I believe that is the name of one of them.
Q. And if it turns blue it's enough to arrest somebody?
A. Depending on what it says there. I don't know how they do it.
Q. Whether these are narcotics or not is not your decision to make, correct?
A. I'm sorry?
Q. In other words, all this goes to the laboratory?
A. That's correct. That is impounded and sent to the lab.
Q. It is the lab that makes the determination as to whether it is cocaine or not, correct?
A. They definitely make the arrest based on the suspicion --

our training and our experience with the narcotics.
Q. You make the arrest because you have probable cause to believe that these are drugs?
A. Correct.
Q. But the actual opinion as to what is in here is up to the laboratory?
A. When they send it to the laboratory the lab will tell you, but our field tests are useful.
Q. You can testify that it appears to be Methamphetamine?
A. Correct.
Q. And it appears to be Xanax?
A. Correct; the Xanax and the crack cocaine rocks. The Methamphetamine, like I said before, this was my first arrest with Methamphetamine.
And I was taught by the other officer that was there, the K-9 officer that definitely had experience with that narcotic had --
MR. HOROWITZ: Objection, hearsay, as to what the other officer told him.
THE COURT: Well, yes. Just what you observed and knew.
But Mr. Horowitz, please stop talking over the witness.
MR. HOROWITZ: One moment, Your Honor.
THE COURT: Yes.

MR. HOROWITZ: No further questions. Thank you.

THE COURT: Thank you. Mr. Korchin.

MR. KORCHIN: No questions.

THE COURT Mr. Donet.

MR. DONET: No question.

MR. RUBIO: No questions, Your Honor.

THE COURT: Redirect.

MS. HOSSEINI: Thank you, Your Honor.

BY MS. HOSSEINI:

Q. Office Sierra, can you see me from here?

A. Yes.

Q. Can you see me from head to toe?

A. Yes.

Q. Did you see what I just did?

A. You tossed something away from here; looked like a little piece of paper or something.

Q. Did you use the key that Mr. Altamirano tossed to open the mail box?

A. I don't recall if I opened the mail box. We definitely used the key; once the K-9 alerted and we had the consent from the owner.

Q. It was that key that was dropped by Mr. Altamirano?

A. Correct.

Q. Mr. Altamirano said I will take the crack but not the rest of it what was he referring to?

MR. HOROWITZ: Objection, beyond the scope of cross.
THE COURT: Overruled.
BY MS. HOSSEINI:
Q. You may answer.
A. He was referring to the charges we were putting on the document.
Q. Was there anything on scene -- was it the narcotics that you pulled out of the mail box?
MR. HOROWITZ: Objection, leading.
THE COURT: Sustained.
BY MS. HOSSEINI:
Q. What was he referring to? You said the charges. Anything else?
A. The charges. He said that he will take the charges for the crack, but not the rest of the dope as far as the Methamphetamine and the crack cocaine rocks.
MS. HOSSEINI: Thank you. No further questions.
THE COURT: Thank you, officer, you may step down.
Ladies and gentlemen, we will take our morning break.
Again, don't talk about the case with each. We will be back in about ten minutes or so.
JURORS EXCUSED
THE COURT: All right. We talked about the status conference yesterday, Mr. Vazquez. I am scheduling that for the afternoon of March 2nd since we have March 2nd off -- well, we

don't have March 2nd off because from 2:30 on we will be here doing a charge conference no matter where we are in the trial. I just want to make sure we get that taken care of.

So everybody put that on your calendars.

All right. Ten minutes.

RECESS TAKEN

THE COURT: Please be seated everyone.

Government, call your next witness.

MR. VAZQUEZ: United States calls Officer David Segovia from the Miami Dade Police Department.

WITNESS SWORN

THE COURTROOM DEPUTY: Please state your full name and spell it for the record.

THE WITNESS: David Segovia; D-A-V-I-D S-E-G-O-V-I-A.

BY MR. VAZQUEZ:

Q. Sir, how are you currently employed?

A. I work for the Miami Dade Police Department.

Q. And how long have you worked with the Miami Dade Police Department?

A. Approximately ten years.

Q. What is your current assignment?

A. I work for the South District as uniform patrol.

Q. Prior to your assignment in the South District what positions have you held with the Miami Dade Police Department.

A. Previous to the South District I was in the Robbery

Intervention Detail, known as RID. I was there for the last five to six years.
Q. Prior to your assignment with RID what roles have you held in the Miami Dade Police Department?
A. Previous to that I was in the Northside District. I was in a Neighborhood Resource Unit. And previous to that I was in Northside uniform patrol.
Q. I want to draw your attention to November 18, 2013. Do you recall that date?
A. Yes
Q. On that date did you have the opportunity to come into contact with a person who became known to you as Rodolfo Portela?
A. Yes, I did.
Q. How did you come into contact with that person you later learned was Rodolfo Portela?
A. On a traffic stop.
Q. How did that traffic stop occur?
A. I saw a gold Pontiac driving down the wrong side of the street on NW 51st Street approaching NW 22nd Avenue.
Q. What area of the County is that?
A. North end of the County within the Northside District.
Q. How close is that to the City of Miami's border?
A. Real close.
Q. After observing the traffic infraction what did you do?

A. Activated my emergency equipment and conducted a traffic stop.
Q. Did the vehicle pull over?
A. Yes.
Q. When the vehicle pulled over what did you notice going on inside the car?
A. Some movement as I was walking towards the car.
Q. How would you describe the movement?
A. I saw the passenger look back and started moving around inside the vehicle.
Q. What did you do after seeing what was going on inside the car?
A. I approached the car by the driver's side and asked to see some identification from the driver. As I was requiring the ID the defendant was acting very nervous and attempted to exit the car.
Q. The person you described as the defendant do you see that person in court?
A. Yes, sir.
Q. Would you please identify him by an article of clothing.
A. He is wearing a green shirt with a light green tie.
MR. VAZQUEZ: Let the record reflect the witness has identified the witness.
THE COURT: The record will so reflect.
Q. What did you do when you saw this attempt to get out of the

car?
A. I ordered him to stay inside car.
Q. Where did you go after that?
A. The backup units arrived, so I directed myself towards the passenger side of the vehicle. I walked over to the passenger side of the vehicle.
As I walked over, the door was opened, and I smelled a strong odor of marijuana emanating from inside the vehicle.
Q. What did you do upon smelling that?
A. I started asking -- I told him -- I asked why he was being so nervous, and he told me he had a little bit of weed on him. That's when I told him to relax, not to worry about it, so he won't feel -- my past experience people get a little bit nervous and attempt to run away from me, so I wanted him to feel some type of rapport with me.
Q. What happened after you smelled the odor?
A. He stepped outside the vehicle, and I ordered him to go to one of my partners to run his name to make sure -- to give his identification and name and date of birth so we could do like a warrants check.
Q. What did you do at that time?
A. I continued to go inside the vehicle reference the smell of marijuana. I looked underneath the passenger seat and observed -- a Chrome revolver underneath the passenger seat.
Q. Did you get a good look at the firearm?

**A. Yes.**

**Q. During the course of the investigation did you ultimately see the firearm taken out of the car?**

**A. Yes.**

**MR. VAZQUEZ: Permission to approach.**

**THE COURT: Yes.**

**BY MR. VAZQUEZ:**

**Q. Showing you what has been marked for identification as Government's Exhibit 232. Do you recognize it?**

**A. Yes.**

**Q. Have you inspected its contents?**

**A. Yes.**

**Q. Have you looked inside the bag inside the box?**

**A. Not today.**

**Q. Have you had the box opened for you today and looked inside it?**

**A. Yes.**

**Q. What is inside it?**

**A. A Chrome revolver with nine bullets.**

**Q. Is this the same firearm that was recovered on November 18th, 2013?**

**A. Yes.**

**Q. Is this the same ammunition that was recovered on November 18th, 2013.**

**A. Yes, sir.**

MR. VAZQUEZ: At this time I would move to admit into evidence Government's Exhibit 232.

MR. KORCHIN: No objection.

THE COURT: Government's Exhibit 232 is admitted.

MR. VAZQUEZ: Permission to publish.

THE COURT: Yes.

BY MR. VAZQUEZ:

Q. Showing you what has been admitted into evidence as Government's Exhibit 232 do you recognize that?

A. Yes.

Q. What is it?

A. The revolver we recovered that night.

Q. Do you recognize the items that I am holding now?

A. Yes.

Q. What is it?

A. The bullets.

Q. After discovering the firearm what did you do in this case?

A. I was told he had an active --

MR. KORCHIN: Objection, hearsay, move to strike.

THE COURT: Motion to strike is granted.

BY MR. VAZQUEZ:

Q. What did you physically do?

A. I put him into custody and walked him back to my police car.

Q. What happened between you and the defendant at that time?

A. As I was putting him inside the police vehicle he advised me he had some weed on him.
Q. What happened to that weed that the defendant described?
A. He reached inside his underwear and retrieved a plastic bag with weed.
Q. Did you allow him to do that yourself?
A. Yes, sir.
Q. Did you receive the marijuana?
A. Yes.
MR. VAZQUEZ: Permission to approach?
THE COURT: Yes.
BY MR. VAZQUEZ:
Q. Showing you what has been marked for identification as Government Exhibit 233.
Do you recognize it?
A. Yes.
Q. What is it?
A. The plastic bag with the weed?
Q. Did you receive it on November 18th, 2013, from the defendant?
A. Yes, sir.
MR. VAZQUEZ: At this time I would move to admit into evidence Government's Exhibit 233.
MR. KORCHIN: No objection.
THE COURT: It is admitted without objection.

BY MR. VAZQUEZ:
Q. While you were on scene did you meet a Detective Wever?
A. Yes.
Q. Did he handle the remainder of this on scene investigation?
A. Yes.
Q. To the best of your recollection do you recall the general area or address of where the stop happened?
A. Yes. 51st -- approaching NW 22nd Avenue in front of a store by the name of Beyonce store.
MR. VAZQUEZ: Tender the witness.
THE COURT: Cross examination.
BY MR. GONZALEZ:
Q. Good morning Officer Segovia?
A. Good morning.
Q. Officer Segovia, the location you testified about was NW 51st Street and NW 22nd Avenue?
A. Yes.
Q. You said that is the north end. Is that also an area known as Liberty City?
A. Yes.
Q. Where this traffic stop takes place is nowhere near Marlins Park, right?
A. No.
Q. It is nowhere near Little Havana the area of NW 11th Avenue and Fourth Street?

A. No, sir.
Q. Where the traffic stop stopped occurred is closer to Hialeah than Little Havana, correct?
A. Hialeah is a few miles from where the stop occurred, but closer to the scene.
Q. Closer than Little Havana certainly?
A. It is borderline with the City of Miami.
Q. Hialeah is off of 54th Street which is the equivalent of East Ninth Avenue, correct?
A. Correct.
Q. When you made the traffic stop there were two individuals, one female and one male?
A. Correct.
Q. There was no one else in the vehicle?
A. Correct.
Q. My client Maurin Chacon was not there?
A. Correct.
MR. GONZALEZ: No further questions. Thank you.
THE COURT: Mr. Horowitz.
MR. HOROWITZ: No questions.
THE COURT: Mr. Korchin.
BY MR. KORCHIN:
Q. Officer Segovia, I think you mentioned that after you saw the traffic infraction and you were in the process of making the traffic stop that you noticed the passenger looking back?

A. Correct.
Q. And you noticed the passenger moving around inside the vehicle you were stopping?
A. Correct.
Q. Did the vehicle you were stopping have clear windows or any tinting of the windows?
A. It had some tint.
Q. Would you describe it as sort of light or moderate or strong tints?
A. Moderate.
MR. KORCHIN: May I approach the witness?
THE COURT: You may.
BY MR. KORCHIN:
Q. Showing you what has been marked for identification as Defendant Portela A. Please take a look at that photograph.
Can you identify what you see in that photograph?
A. The gold Pontiac and my police car at the time.
Q. Does this photograph accurately depict the scene of the traffic stop that you have been testifying about on the night of November 18th, 2013?
A. Yes.
MR. KORCHIN: At this time I would move Defendant's Exhibit A into evidence.
MR. VAZQUEZ: No objection.
THE COURT: Defendant Portela's Exhibit A is admitted

without objection.

MR. KORCHIN: May I publish.

THE COURT: You may.

BY MR. KORCHIN:

Q. So this is the condition of the automobile you stopped on that night when you say you were able to see the passenger look back and move around in the vehicle?

A. Correct.

Q. And that is the type of tinting in the back window that was present that evening?

A. Correct.

Q. You testified in the course of the encounter that evening you noticed a very strong smell of marijuana coming out of the car; is that correct?

A. Yes.

Q. The marijuana which is in evidence -- what is the quantity of this marijuana by your estimate?

A. Plus or minus a gram.

Q. One gram plus or minus?

A. Yes.

Q. You say there was a strong odor of marijuana coming from the car?

A. Correct.

Q. The only marijuana you seized on that night was that one gram of marijuana?

A. Correct.
Q. As a matter of fact, it was volunteered by Mr. Portela saying I have some weed on me, and he handed it to you, right?
A. Correct.
Q. You have indicated that you located the gun underneath a seat in the car, correct?
A. The passenger seat of the car.
Q. So, in order to locate the gun did you open the passenger door?
A. It was already open when I had made contact with the defendant.
Q. Were you conversing with the defendant a while before locating a gun?
A. A few seconds; not a long while.
Q. And then he left the area -- you handed him off to your partner, correct?
A. He didn't leave the area; it was right next to where my partner was.
Q. I meant -- you just handed him off to your partner right in that location where the stop had occurred?
A. Yes.
Q. And the door was open at that point?
A. Yes.
Q. And you were able to locate the gun by looking underneath the seat, correct?

A. Yes.
Q. When you handed off Mr. Portela to your partner you did not see the gun at that time, did you?
A. No.
Q. Were photographs eventually taken by the police of the gun and the ammunition that was found?
A. Correct.
Q. Were those photographs taken when the gun was underneath the passenger seat?
A. I don't recall -- you would have to ask the person who took the pictures.
Q. But you have seen the photographs?
A. Yes.
Q. Do you recall whether the gun was moved from where you saw it underneath the seat in order for the photographs to be taken?
A. Eventually the gun had to be taken out so it could be made safe. I guess once Detective Wever arrived he was the one.
Q. I'm sorry, I didn't understand --
A. He took additional pictures of the gun.
Q. So, do I understand you to say the photographs were taken after the gun was removed from underneath the passenger seat.
A. Not after, while the gun was underneath the seat.
Q. Are you saying the photographs were taken while the gun was underneath there?

A. Correct.
Q. Was the gun made safe before the photographs were taken?
A. No.
Q. So this stop occurred when, what time of night?
A. After 9:30 at night.
Q. There were no police photographs there when you made the stop, correct?
A. No.
Q. Nor were there any police photographers there when you discovered the gun under the seat?
A. No.
Q. When did the police photographer arrive, can you recall approximately?
A. I don't think -- Detective Wever is the only one who took the pictures.
Q. So, Detective Wever eventually arrived and took the photographs?
A. Yes.
Q. You are saying before Detective Wever -- you had not made the gun safe before he came?
A. It was myself and two other detectives there, so we had the car secure, and the driver of the car was out of the car.
Q. This firearm in evidence has a serial number of Y14350 correct, or do you need to see it?
A. I need to see it.

MR. KORCHIN: May I approach the witness?
THE COURT: You may.
BY MR. KORCHIN:
Q. Please take a look at the firearm in evidence and examine it for the serial number. Am I correct the serial number is Y14350?
A. Correct.
Q. After you seized the firearm you prepared a number of reports relating to your seizure of the gun?
A. Correct.
Q. You prepared an arrest affidavit?
A. Right.
Q. A narrative continuation form.
A. Right.
Q. You took the firearm to the property room and described the firearm for the property receipt, correct?
A. I handed over to Detective Wever.
Q. You also filled out a document called a vehicle property report form?
A. Correct.
Q. Now every document that you filled out, you wrote that the serial number on the gun was V14350, correct?
A. I have to look at the report.
MR. KORCHIN: May I approach the witness?
THE COURT: You may.

BY MR. KORCHIN:
Q. Please take a look at the various documents for this case. Having reviewed those documents does that refresh your recollection as to the serial number that you wrote applied to the firearm that you seized?
A. Yes.
Q. And, in fact, in every document you wrote in this case you attributed the serial number to the firearm that you had seized as V14350?
A. Yes.
Q. As you know, serial numbers on firearms are unique, every single firearm has its own unique serial number, correct?
A. Correct.
Q. This firearm and ammunition were processed for fingerprints and DNA?
A. Correct.
Q. It would not have been you it would have been someone else who made the determination whether Mr. Portela's fingerprints and DNA were on these items, correct?
A. Correct.
Q. I think I covered this -- I just want to make certain I did -- the only marijuana that you seized that night was that one gram in evidence now?
A. Correct.
Q. And do you know if that item has actually been tested to

determine whether it is marijuana or not?
A. Yes.
Q. It has been?
A. Yes.
MR. KORCHIN: No further questions, Your Honor.
THE COURT: Thank you, Mr. Korchin.
Mr. Donet.
MR. DONET: No questions, Your Honor.
THE COURT: Mr. Rubio.
MR. DONET: No, Your Honor, thank you.
THE COURT: Redirect.
BY MR. VAZQUEZ:
Q. Officer, when you were looking inside the car were your lights on?
A. Yes.
Q. Were you looking at the gold Pontiac depicted in Defendant's Exhibit A outside the car at an angel?
A. Correct.
Q. Were you inside the car or were you from the perspective of the photographer?
A. I was outside the car walking towards the driver's side of the vehicle.
Q. Were you closer to the vehicle?
A. Yes.
Q. Than the photographer?

A. Yes.
Q. Were you looking at the car illuminated by your vehicle?
A. Yes.
Q. Did you see individuals moving inside vehicle?
A. Yes.
Q. Do you know where this gold Pontiac had come from?
A. No, sir.
Q. Do you know what contents it had before it came into contact with you?
A. No.
Q. Do you know if any other marijuana had been inside that vehicle at another time?
A. No.
Q. And do you know how long it had been before it had last parked?
A. No.
Q. Do you know if you smelled a strong odor of marijuana inside of that car?
A. Yes.
Q. And what did you smell?
A. Strong odor of marijuana.
Q. Showing you the serial number. Do you see it?
A. Yes.
Q. Are the numbers the same -- on the serial number -- as those you have reflected in your report?

A. Yes.
Q. The first digit of the serial number you acknowledge you wrote a V instead a Y?
A. Yes.
Q. Is it an older weapon?
A. Yes.
Q. Does it show some nicks on it?
A. Yes.
Q. Is this the gun you recovered on November 18th, 2013?
A. Yes.
Q. Did this gun have the ammunition you recovered on November 18th, 2013?
A. Yes.
Q. Who took custody of the gun after you collected it?
A. Detective Wever.

MR. VAZQUEZ: No further questions, Your Honor.

THE COURT: Thank you, you may step down, officer.

Government call your next witness.

MR. VAZQUEZ: Government calls Detective Thomas Wever.

THE CLERK: Please state your full name and spell it for the record.

THE WITNESS: Thomas Wever. T-H-O-M-A-S W-E-V-E-R.

BY MR. VAZQUEZ:

Q. Where are you currently employed?
A. The Miami Dade Police Department.

Q. What is your current assignment?
A. I am assigned as a task force officer to ATF.
Q. How long have you held that position?
A. Approximately a year and a half.
Q. Who do you interact with on a day-to-day basis as part of your duties?
A. I usually interact with robbery detectives and also patrol officers on the street.
Q. Do you share office space on a day-to-day basis with the Miami Dade police officers?
A. Yes, I do. We're also assigned to a task force.
Q. Are uniformed officers a part of your task force or who you see every day?
A. No, they are not.
Q. When is it you see a uniformed officer?
A. When I am called to the scene, when they have located a firearm, and which is in the possession of a convicted felon.
Q. Prior to your current assignment what positions have you held within the City of Miami Dade Police Department?
A. Worked patrol, the K-9 Unit; I worked in the Robbery Intervention Detail and in the Robbery Investigations Section.
Q. In total how long have you been a police officer with the Miami Dade Police Department?
A. Almost 13 years now.
Q. Drawing your attention to November 18th, 2013; on that date

did you have the opportunity to come in contact with a person who became known to you as Rodolfo Portela?
A. Yes, I did.
Q. How did you come into contact with the person you have described as Rodolfo Portela?
A. I was called over the phone by Detective Ramirez from the Robbery Intervention Detail. He said he was on scene --
MR. KORCHIN: Objection, hearsay.
THE COURT sustained.
BY MR. VAZQUEZ:
Q. All right. How did you get to the scene on November 18th, 2013, the incident involving Defendant Portela -- without saying what you heard from someone else?
A. I was called to the scene by detectives from the Robbery Intervention Detail.
Q. What happened once you arrived?
A. I arrived, I spoke with David Segovia who gave us a synopsis of the stop he made of the vehicle.
He told me --
Q. Without telling us what someone else told you.
A. I became aware of the stop he had made. And at that point I became aware he was a convicted felon in possession of a firearm, and so I began my investigation.
Q. Did you inspect any items or any places on the scene?
A. Yes, I inspected a firearm on the scene, and I inspected a

**vehicle that was on scene.**
**Q. While you were on scene inspecting the vehicle did you personally notice the smell of marijuana?**
**A. I did not.**
**Q. Did you -- how many did you maneuver inside of that vehicle?**
**A. I did not maneuver around inside the vehicle, I inspected it from the outside.**
**Q. In fact, as a part of your investigation did you take any interest in the marijuana at all?**
**A. I did not.**
**Q. Were you able to inspect the firearm on that day?**
**A. Yes, I was.**
**MR. VAZQUEZ: Permission to publish.**
**THE COURT: Yes.**
**BY MR. VAZQUEZ:**
**Q. Showing you what has been admitted into evidence as Government's Exhibit 232. Do you recognize it?**
**A. Yes, I do.**
**Q. What is it?**
**A. The firearm I inspected that night on scene.**
**Q. Showing you an item included in Government's Exhibit 232. Do you recognize it?**
**A. The item inside the box is the ammunition that was inside the firearm.**

Q. Did you collect these items from on scene officers?
A. Yes, I did.
Q. Do you recall taking photographs on scene?
A. Yes, I did.
Q. What did you take photographs of?
A. Of the scene in general, which really included the vehicle.
Q. After you took the photographs did you have the opportunity to come into contact with Defendant Portela?
A. I did.
Q. Do you see that person in court today?
A. Yes, I do, sitting at the table wearing a green shirt.

MR. VAZQUEZ: Let the record reflect the witness has identified the defendant.

THE COURT: The record will so reflect.

BY MR. VAZQUEZ:

Q. How is it you interacted with Defendant Portela?
A. Mr. Portela was in the back seat of the detective's unmarked car.

I asked the detective to remove the handcuffs from Mr. Portela so I could interview him. I then sat in the back seat of the vehicle with another task force officer standing at the window of the driver's side as I sat on the passenger side.

MR. VAZQUEZ: Permission to approach.

THE COURT: Yes.

BY MR. VAZQUEZ:

Q. Showing you what has been marked for identification as Government's Exhibit 234. Do you recognize it?
A. I do.
Q. What is it?
A. This is the Miranda Rights waiver form that I presented to Mr. Portela that night.
Q. Is that a fair and accurate representation of that form?
A. Yes.
MR. VAZQUEZ: At this time I would move to admit into evidence Government's Exhibit 234.
MR. KORCHIN: No objection.
THE COURT: It will be admitted without objection.
MR. VAZQUEZ: Permission to publish.
THE COURT: Yes.
BY MR. VAZQUEZ:
Q. Who was in the car with you?
A. Myself and Mr. Portela.
Q. Were any other officers in the car with you while the Miranda Rights waiver form was being administered?
A. Not inside the car with me. As I said, the task force officer whose name is on the Miranda Rights waiver form was standing at the window next to Mr. Portela; the window was down, and he was there to witness the Miranda Rights being given.
Q. At the top of the Miranda waiver form there are some

handwritten notes. Who is the author?
A. I authored that as I asked Mr. Portela his general information.
Q. There are a series of questions here. How were these questions provided to Mr. Portela?
A. Before I presented those questions I asked if he could read and write and understand the English language. He said he did, so I asked him to read all of those questions starting from the point under where his name and address is that I authored.
From that point below I asked him to read that out loud to me, which he did.
Q. Were you able to understand him?
A. Yes, I was.
Q. Was his speech coherent?
A. Yes, it was.
Q. Did affirmatively agree with each of the questions?
A. Yes, he did.
Q. Who filled out the initials in response to each of the yes markers in the Miranda Rights waiver form?
A. Mr. Portela.
Q. Did you see him do that?
A. Yes.
Q. Did Mr. Portela agree to speak with you after being advised of his rights?
A. Yes, he did.

Q. Did you have Mr. Portela sign his acknowledgement?
A. I did. At the bottom he signed.
Q. After giving Mr. Portela his rights, what did he tell you?
A. I told him I was there to speak about the firearm and I asked him how he came to have this firearm that was recovered that night.
Mr. Portela told me that he lives -- at the time he lived on the streets and he needed the firearm for his safety. He also told me he purchased the firearm the day before in Little Havana and that he kept it on him because it was dangerous where he was living.
Q. Did you show Mr. Portela the gun?
A. I did not.
Q. Did you reference the firearm that was recovered in the case?
A. Yes, I did.
Q. Did Mr. Portela acknowledge that gun was his?
A. Yes, he did.
Q. In addition to admitting to the firearm did Mr. Portela offer anything to you?
A. Yes. He continued on -- I asked if he put the gun under the seat because he was being stopped?
He said he did put the gun under the seat, it was on him, but prior to being stopped he put the gun under the seat -- he did not know they were being stopped by the police, but he was

going to go in the store, and he did not want the gun on him when he went in the store. That's why he placed it under the seat. I told him I would like to collect a DNA sample to compare it to the DNA, if any, on the firearm.

At that time he told me that he would give me a sample but only if I could offer him something as far as like a plea deal.

I told him I was in no position to do that, and I again asked if he wanted to give DNA. And he said he did not want to give a sample at that time.

Q. Did Mr. Portela offer you anything else to do anything for you?

A. At that time, no. I asked about the DNA sample; he said he would give it if I could offer him something.

A. I told him I could not. He told me he wasn't going to give it because his DNA would be on the firearm, so he would wait until he was able to, I guess, get a plea offer.

MR. VAZQUEZ: Tender the witness.

THE COURT: Cross examination.

MR. GONZALEZ: No questions, Your Honor.

MR. HOROWITZ: No questions, Your Honor.

THE COURT: Mr. Korchin.

BY MR. KORCHIN:

Q. Are you addressed as officer or detective, what is your title?

A. Normally detective.

Q. Detective. Your last name is Weaver?
A. Wever.
Q. Detective Wever, how long have you been a police officer?
A. Almost 18 years.
Q. I imagine during that period of time you have received a lot of training in how to conduct interviews of suspects?
A. I have, yes.
Q. Has that training been just with the local police department or has it been elsewhere as well?
A. Just locally.
Q. How many times do you think you have taken a statement from somebody you have interviewed?
A. Over the course of my career hundreds of times.
Q. On this night, November 18th, 2013, what time did you receive a call to respond to this location where Officer Segovia was?
A. Around 10:00 I got the phone call.
Q. Where were you when you got that call?
A. I was home.
Q. And once you got the call where did you go from your home?
A. To the scene.
Q. Straight to the scene?
A. Yes.
Q. And did you go in a Government car?
A. Yes, I did.

Q. Is it an unmarked vehicle?
A. It is an unmarked vehicle.
Q. Is it a Miami Dade police car which is unmarked?
A. It is an ATF vehicle.
Q. Because you work with the ATF?
A. Yes.
Q. In order to do what you needed at the scene what did you take with you?
A. Whatever is in my vehicle at the time; Miranda Rights waiver form, DNA consent.
Q. Did you take a pad and paper?
A. Yes.
Q. What form was the pad and paper in, like a legal pad, a little note pad from the kitchen?
A. I think on that night I had a smaller pad ring binder; smaller than a legal pad.
Q. Is it something you took from your home or something you have in connection with your work?
A. Something from work that was in my car.
Q. A binder with paper in it?
A. Yes.
Q. You had of course writing utensils like a pencil, a pen?
A. A pen.
Q. One pen or more?
A. I wrote with one. There were probably several in the car.

Q. Did you have a tape recording device?
A. I did not.
Q. Why not?
A. Because it was at my office.
Q. You didn't go to your office to get the tape recorder prior to going to the scene?
A. No. I used the tape recorder earlier in the day for a different investigation. It was left to download the audio on my desk.
Q. Have you used a tape recorder in the past in interviewing suspects?
A. Yes.
Q. About how many times have you interviewed suspects when you interview them?
A. I'm sorry?
Q. I'm sorry. How many times have you tape recorded suspects when you interviewed them?
MR. VAZQUEZ: Objection, relevance.
THE COURT: Overruled.
BY MR. KORCHIN:
Q. How many times have you tape recorded suspects when you interview them, in your experience?
A. Around a hundred I would say.
Q. Is the tape recording of suspects for interviews a matter that is addressed in your training as a police officer?

A. Yes. Whenever possible it should be recorded.
Q. Whenever it is possible it should be recorded?
A. Correct.
Q. I don't need to know your home address, but from the time you got the call to go to the scene -- how long did it take you to get from your home to the scene?
A. Approximately half an hour.
Q. So, you could have gone to the office to get the tape recorder?
A. I could have, yes.
Q. You didn't have the tape recorder but you did have paper and writing utensils?
A. Yes.
Q. You have testified today about statements that Mr. Portela made to you. Did you in the course of the interview of Mr. Portela, or at the conclusion of your interview, hand to Mr. Portela one of your pieces of paper and one of your writing utensils and ask Mr. Portela to write a statement down?
Did you do that?
A. I don't recall doing that.
Q. Did you in the course of the interview with Mr. Portela, or at the conclusion of it, show to Mr. Portela what you had written down?
Did you do that?
A. I don't recall doing that either.

Q. And you did not ask Mr. Portela to read what you had written and sign it or initial it, did you?
A. No. The only thing he signed was the Miranda Rights waiver form.
Q. Precisely. You were very careful, very meticulous in having Mr. Portela initial the Miranda Rights and sign it?
A. Yes.
Q. But having been so careful to have Mr. Portela initial and sign the Miranda Rights waiver form you never tape recorded him or had him write out a statement in his own hand or sign a statement you had written for him, correct?
A. Correct.

MR. KORCHIN: No further questions.

THE COURT: Mr. Donet.

MR. DONET: No questions.

THE COURT: Mr. Rubio.

MR. RUBIO: No, Your Honor.

THE COURT: Redirect.

MR. VAZQUEZ: No further questions, Your Honor.

THE COURT: Thank you, detective. All right, ladies and gentlemen, I think this would be a good time to take our lunch recess.

It is a little nippy outside, but not too bad. Remember don't talk about the case or let anyone talk about the case with you. Why don't we come back at 1:30 so it will give

you time to stretch your legs, get some lunch and relax. All right. I will see you back at 1:30

JURY EXCUSED

THE COURT: Please be seated. Gentlemen, feel free to bring your lunch into the courtroom so you can have as much time as you need with your clients.

All right. Is there anything we need to take up before we break for lunch?

MR. GONZALEZ: One matter, Your Honor, and it has nothing to do with the actual trial.

My client of course is in court Monday through Friday. His visitation with his family is usually Saturday morning. There is a separation order with his cousin Mr. Tinoco, and we would ask if the Court would consider lifting that so he can have contact with his family.

THE COURT: No. Until this trial is over we will have to deal with the orders that are out there.

All right. I will see you back here at 1:30.

LUNCH RECESS TAKEN

- - -

**C E R T I F I C A T E**

**I hereby certify that the foregoing is an accurate transcription of proceedings in the above-entitled matter.**

**/S/PATRICIA SANDERS**

**DATE FILED** **PATRICIA SANDERS, RPR**

## $

**$69** [2] - 35:17, 45:1

## /

**/S/PATRICIA** [1] - 82:3

## 1

**1-85** [1] - 1:6
**10** [1] - 6:3
**104th** [1] - 2:4
**10:00** [1] - 76:16
**10:35** [1] - 6:6
**10:36** [1] - 6:9
**10:45** [2] - 6:22, 6:25
**10:58** [1] - 7:5
**11** [1] - 31:15
**11-3** [1] - 2:7
**1107** [1] - 2:4
**11:07** [3] - 7:25, 8:14, 8:19
**11:30** [4] - 24:17, 24:20, 25:10, 25:11
**11th** [6] - 32:7, 37:19, 39:18, 40:11, 41:7, 56:23
**13** [2] - 20:14, 68:23
**13th** [1] - 3:25
**14-20017-CR-KMW** [1] - 1:2
**140** [3] - 5:3, 5:10, 8:7
**1400** [1] - 20:22
**150** [1] - 1:20
**16th** [1] - 3:25
**17th** [1] - 3:25
**18** [2] - 50:7, 76:3
**18th** [9] - 53:20, 53:23, 55:18, 58:19, 67:8, 67:11, 68:24, 69:10, 76:13
**1910** [1] - 1:23
**19:42** [1] - 38:14
**1:00** [1] - 31:15
**1:30** [3] - 80:24, 81:1, 81:17
**1st** [1] - 4:1

## 2

**2,000** [1] - 3:19
**2-11-2015** [1] - 1:3
**20** [1] - 41:15
**2000** [1] - 1:18
**2013** [20] - 9:11, 9:21, 15:4, 17:2, 17:4, 17:7, 19:17, 21:6, 23:21, 27:5, 50:7, 53:20, 53:23, 55:18, 58:19, 67:8, 67:11, 68:24, 69:11, 76:13
**2014** [3] - 17:18, 31:9, 31:11
**205** [4] - 34:3, 34:21, 34:25, 45:3
**22nd** [4] - 3:24, 50:19, 56:7, 56:15
**232** [6] - 53:8, 54:1, 54:3, 54:8, 70:17, 70:21
**233** [2] - 55:13, 55:22
**234** [2] - 72:1, 72:9
**23rd** [1] - 3:25
**24** [1] - 32:11
**26** [1] - 19:2
**26th** [11] - 9:10, 9:21, 15:4, 17:2, 17:4, 17:7, 19:16, 21:6, 23:21, 27:4, 28:1
**28th** [4] - 4:1, 27:10, 27:25, 28:2
**2:30** [1] - 48:25
**2nd** [3] - 48:24, 48:25

## 3

**3** [1] - 10:4
**305.523.5528** [1] - 2:8
**32** [8] - 12:5, 13:5, 13:22, 14:2, 16:19, 16:25, 21:24, 23:25
**32-caliber** [1] - 22:6
**3250** [1] - 2:2
**33128** [1] - 2:7
**33130** [1] - 1:21
**33132** [1] - 1:16
**33133** [1] - 2:3
**33134** [1] - 1:19
**33138** [1] - 2:5
**33156** [1] - 1:23
**380** [6] - 13:1, 13:3, 13:9, 13:20, 14:6, 16:19
**3:00** [1] - 3:2

## 4

**4** [1] - 31:11
**400** [1] - 2:7
**406** [1] - 2:2
**4th** [1] - 1:15

## 5

**5'10** [1] - 37:5
**5'9** [1] - 37:5
**51st** [3] - 50:19, 56:7, 56:15
**528** [5] - 32:7, 37:19, 39:18, 40:11, 41:7
**54th** [1] - 57:7
**5th** [1] - 17:18

## 6

**614** [1] - 1:18
**6th** [1] - 3:24

## 7

**7:42** [2] - 38:9, 38:14
**7:57** [1] - 10:3

## 8

**8** [4] - 9:11, 10:4, 37:22, 37:23
**8:00** [1] - 10:1

## 9

**9130** [1] - 1:22
**98** [1] - 22:3
**99** [2] - 1:15, 23:24
**9:30** [1] - 62:4
**9:55** [1] - 5:10
**9:55:56** [1] - 8:7
**9th** [1] - 3:25

## A

**A.F.P.D** [1] - 1:20
**A.M** [1] - 1:5
**a.m** [1] - 3:2
**A.U.S.A** [3] - 1:14, 1:14, 1:15
**ability** [1] - 7:19
**able** [7] - 31:23, 41:25, 59:5, 60:23, 70:11, 73:11, 75:15
**above-entitled** [1] - 82:2
**Academy** [2] - 12:14, 20:25
**access** [2] - 40:22, 40:24
**accessed** [1] - 42:21
**accompanying** [1] - 11:3
**according** [2] - 11:10, 13:21
**accurate** [2] - 72:6, 82:2
**accurately** [1] - 58:17
**acknowledge** [2] - 67:1, 74:16
**acknowledgement** [1] - 73:25
**acting** [1] - 51:14
**activated** [1] - 50:25
**active** [1] - 54:17
**actual** [9] - 11:22, 27:11, 28:24, 29:1, 29:2, 29:9, 29:10, 46:4, 81:9
**addition** [4] - 10:7, 11:6, 18:23, 74:18
**additional** [1] - 61:19
**address** [7] - 32:3, 32:5, 32:6, 32:8, 56:6, 73:8, 79:3
**addressed** [2] - 75:22, 78:24
**administered** [1] - 72:18
**admission** [1] - 39:12
**admit** [5] - 34:20, 34:25, 53:25, 55:21, 72:8
**admitted** [10] - 17:1, 22:2, 23:23, 32:10, 54:3, 54:7, 55:24, 58:24, 70:16, 72:11
**admitting** [1] - 74:18
**advised** [3] - 4:4, 54:25, 73:22
**affidavit** [6] - 10:25, 12:1, 12:23, 13:9, 38:4, 63:10
**affirmatively** [1] - 73:15
**afternoon** [1] - 48:24
**age** [1] - 36:25
**agencies** [1] - 20:24
**agree** [3] - 8:7, 73:15, 73:22
**ahead** [1] - 29:4
**aid** [2] - 20:16, 20:18
**alerted** [4] - 33:21, 33:24, 43:14, 47:19
**allow** [1] - 55:5
**allows** [1] - 3:18
**almost** [4] - 37:22, 37:23, 68:23, 76:3
**ALTAMIRANO** [1] - 1:7
**Altamirano** [19] - 31:21, 35:22, 36:3, 36:15, 38:17, 38:19, 38:24, 39:4, 41:8, 41:9, 41:17, 41:23, 43:18, 44:13, 44:19, 44:24, 47:16, 47:21, 47:23
**AMERICA** [1] - 1:3
**ammunition** [42] - 10:16, 11:8, 11:11, 11:16, 11:19, 11:21, 12:16, 13:14, 13:17, 13:20, 13:22, 13:23, 14:1, 14:2, 14:4, 14:8, 14:9, 14:12, 14:21, 14:25, 15:5, 15:12, 17:4, 17:7, 17:10, 19:3, 19:13, 19:16, 19:19, 25:14, 26:9, 26:12, 26:16, 26:19, 26:25, 29:19, 53:22, 61:5, 64:13, 67:10, 70:23
**amount** [1] - 6:2
**analysis** [4] - 14:16, 14:19, 14:22, 15:14
**analyzes** [1] - 26:6
**angel** [1] - 65:16
**answer** [3] - 29:16, 36:20, 48:3
**answering** [1] - 30:25
**ANTHONY** [1] - 1:8
**anyway** [1] - 10:15
**apartment** [4] - 33:3, 33:13, 33:15, 33:23
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:13
**appeared** [1] - 33:9
**applicators** [1] - 23:2
**applied** [1] - 64:3
**apply** [1] - 22:13
**appreciate** [2] - 3:15, 3:23
**apprehended** [1] - 10:22
**approach** [14] - 9:14, 16:3, 21:25, 25:1, 27:16, 34:4, 38:7, 39:6, 53:4, 55:9, 58:10, 62:25, 63:23, 71:22
**approached** [3] - 39:3, 41:9, 51:12
**approaching** [7] - 32:23, 33:8, 41:10, 41:11, 41:13, 50:19, 56:7
**April** [2] - 31:11, 34:18
**area** [10] - 10:14, 28:4, 29:1, 31:1, 50:20, 56:6, 56:17, 56:23, 60:14, 60:16

**areas** [1] - 29:2
**Argel** [2] - 30:2, 30:7
**ARGEL** [1] - 30:7
**arrest** [17] - 9:13, 9:17, 10:25, 12:1, 12:23, 13:9, 31:20, 32:9, 35:16, 38:4, 38:5, 44:14, 45:14, 45:24, 46:1, 46:12, 63:10
**arrested** [2] - 35:22, 44:13
**arrival** [2] - 25:7, 25:9
**arrive** [2] - 24:15, 62:11
**arrived** [9] - 24:19, 32:14, 32:16, 37:25, 52:3, 61:17, 62:15, 69:15, 69:16
**article** [1] - 51:19
**aside** [2] - 21:17, 35:15
**assigned** [5] - 30:24, 31:1, 31:2, 68:1, 68:10
**assignment** [5] - 49:20, 49:22, 50:2, 67:25, 68:17
**assist** [1] - 10:15
**ATF** [3] - 68:1, 77:3, 77:4
**attempt** [2] - 51:24, 52:13
**attempted** [1] - 51:14
**attempting** [1] - 18:16
**attention** [3] - 31:11, 50:7, 68:24
**attorneys** [1] - 4:5
**attributed** [1] - 64:7
**audio** [2] - 8:18, 78:7
**author** [1] - 72:25
**authored** [2] - 73:1, 73:8
**automobile** [1] - 59:4
**Avenue** [11] - 2:7, 32:7, 37:20, 39:18, 40:11, 41:7, 50:19, 56:7, 56:15, 56:23, 57:8
**aware** [7] - 15:3, 15:6, 15:9, 19:13, 19:16, 69:20, 69:21

## B

**backup** [1] - 52:3
**bad** [1] - 80:22
**bag** [6] - 21:15, 34:10, 35:5, 53:12, 55:3, 55:17
**baggie** [1] - 35:4
**balcony** [1] - 32:22
**bars** [2] - 35:8, 36:1
**based** [1] - 45:24
**basis** [2] - 68:4, 68:8
**became** [4] - 50:11, 69:1, 69:20, 69:21
**become** [1] - 32:2
**began** [1] - 69:22
**behind** [1] - 41:19
**below** [1] - 73:9
**best** [2] - 17:24, 56:5
**between** [5] - 16:19, 17:9, 17:13, 28:1, 54:24
**Beyonce** [1] - 56:8
**beyond** [2] - 19:9, 47:25
**binder** [2] - 77:14, 77:19
**biographical** [1] - 36:16
**birth** [1] - 52:18
**bit** [2] - 52:10, 52:12
**Black** [1] - 7:20
**black** [2] - 37:11
**blond** [1] - 37:11
**blue** [2] - 39:20, 45:14
**Bodie** [1] - 44:16
**body** [1] - 5:20
**border** [1] - 50:22
**borderline** [1] - 57:6
**bottom** [3] - 34:12, 35:9, 74:1
**Boulevard** [2] - 1:18, 1:22
**box** [35] - 32:17, 32:24, 33:8, 33:9, 33:10, 33:13, 33:21, 33:24, 34:15, 38:20, 38:24, 39:1, 39:2, 40:1, 40:15, 40:19, 41:1, 41:11, 41:12, 41:23, 41:25, 42:22, 43:14, 43:16, 43:20, 43:25, 44:1, 44:4, 47:17, 47:18, 48:7, 53:12, 53:14, 70:23
**boxes** [6] - 38:22, 39:24, 40:13, 40:17, 40:22, 41:1
**break** [2] - 48:18, 81:7
**bring** [2] - 4:19, 81:4
**brown** [1] - 37:11
**brush** [1] - 22:14
**brushes** [1] - 22:13
**build** [2] - 37:6, 37:7
**building** [12] - 28:12, 28:13, 32:13, 39:10, 39:14, 39:18, 39:19, 40:1, 40:2, 40:3, 40:6, 40:7
**bullet** [1] - 14:10
**bullets** [5] - 21:22, 23:25, 29:22, 53:18, 54:15
**BY** [55] - 2:6, 5:1, 5:12, 6:8, 6:24, 7:7, 8:2, 8:21, 9:9, 9:16, 15:22, 16:5, 16:13, 19:12, 20:6, 24:12, 25:3, 27:18, 28:20, 30:8, 34:1, 34:6, 35:3, 35:21, 36:14, 37:16, 38:10, 39:8, 39:17, 40:5, 40:10, 47:8, 48:2, 48:10, 49:14, 53:6, 54:6, 54:20, 55:11, 55:25, 56:11, 57:21, 58:12, 59:3, 63:2, 63:25, 65:11, 67:22, 69:9, 70:15, 71:14, 71:24, 72:14, 75:21, 78:19

## C

**Cadavid** [1] - 3:13
**calendars** [1] - 49:3
**caliber** [19] - 12:4, 12:5, 12:6, 12:8, 12:24, 13:1, 13:3, 13:5, 13:14, 13:20, 13:22, 14:2, 14:6, 14:8, 14:9, 16:19, 21:24, 23:25
**calibers** [1] - 13:8
**camera** [4] - 5:21, 6:2, 6:4, 7:9
**cannot** [2] - 6:19, 7:3
**cap** [8] - 5:14, 6:9, 6:14, 6:16, 7:1, 7:14, 8:8, 8:10
**capsule** [1] - 45:6
**capsules** [2] - 34:11, 35:5
**car** [32] - 11:14, 51:5, 51:6, 51:11, 51:12, 51:15, 51:25, 52:1, 53:2, 54:23, 58:16, 59:13, 59:21, 60:5, 60:6, 62:21, 65:12, 65:16, 65:18, 65:20, 66:1, 66:17, 71:17, 72:15, 72:17, 72:19, 76:23, 77:2, 77:18, 77:24
**care** [1] - 49:2
**career** [1] - 76:12
**careful** [2] - 80:4, 80:7
**case** [23] - 1:2, 14:1, 14:5, 15:3, 15:12, 16:21, 17:1, 19:14, 21:4, 22:15, 23:5, 24:7, 28:24, 29:19, 38:14, 43:2, 48:19, 54:16, 64:1, 64:6, 74:14, 80:23, 80:24
**cash** [1] - 45:1
**Center** [1] - 1:23
**certain** [2] - 6:2, 64:20
**certainly** [1] - 57:5
**certify** [1] - 82:2
**CF020** [1] - 22:11
**Chacon** [18] - 5:15, 6:19, 7:2, 7:10, 7:12, 7:19, 7:21, 8:3, 8:7, 8:9, 8:17, 17:22, 17:24, 18:1, 18:13, 18:18, 18:24, 57:15
**CHACON** [1] - 1:6
**chance** [1] - 16:6
**characteristics** [1] - 7:18
**charcoal** [1] - 22:13
**charge** [1] - 49:1
**charged** [7] - 15:4, 15:8, 15:12, 19:2, 19:8, 19:13, 35:24
**charges** [5] - 36:11, 48:4, 48:11, 48:13
**chatting** [1] - 39:14
**check** [1] - 52:19
**chemicals** [1] - 45:7
**Chicago** [1] - 7:20
**Christopher** [6] - 31:20, 32:17, 33:19, 33:22, 35:16, 38:17
**CHRISTOPHER** [1] - 1:7
**Chrome** [2] - 52:23, 53:18
**circle** [2] - 32:20, 41:3
**circumstances** [1] - 6:3
**City** [7] - 20:10, 20:15, 30:12, 50:22, 56:18, 57:6, 68:18
**class** [1] - 20:22
**clear** [4] - 14:1, 21:15, 35:5, 58:4
**CLERK** [2] - 20:2, 67:19
**client** [3] - 4:6, 57:15, 81:10
**clients** [2] - 4:11, 81:5
**close** [7] - 5:24, 33:3, 40:17, 41:13, 41:16, 50:22, 50:23
**close-up** [1] - 40:17
**closer** [4] - 57:1, 57:4, 57:5, 65:22
**clothing** [1] - 51:19
**co** [1] - 44:14
**co-signer** [1] - 44:14
**cocaine** [9] - 34:12, 35:10, 35:14, 36:2, 44:22, 45:12, 45:23, 46:11, 48:15
**Coconut** [2] - 30:13, 31:2
**code** [1] - 45:8
**coherent** [1] - 73:13
**collect** [2] - 70:25, 75:2
**collected** [3] - 11:18, 17:14, 67:13
**collection** [2] - 20:23, 21:3
**color** [3] - 37:10, 40:3, 45:8
**colored** [5] - 5:14, 6:14, 6:16, 6:17, 7:14
**coming** [4] - 7:1, 32:25, 59:12, 59:20
**Commerce** [1] - 19:7
**compare** [1] - 75:3
**complexion** [1] - 37:2
**conclusion** [3] - 19:10, 79:15, 79:21
**condition** [3] - 22:9, 34:17, 59:4
**conduct** [2] - 31:16, 76:5
**conducted** [1] - 50:25
**conference** [2] - 48:23, 49:1
**confidential** [3] - 4:2, 5:18, 8:15
**connection** [3] - 10:19, 14:5, 77:17
**consensus** [1] - 4:9
**consent** [7] - 33:23, 43:16, 43:18, 43:20, 44:6, 47:19, 77:9
**consider** [1] - 81:13
**consistent** [1] - 35:18
**contact** [13] - 32:15, 32:16, 33:12, 33:18,

38:19, 50:11, 50:14, 60:9, 66:8, 68:25, 69:3, 71:7, 81:14
**contained** [2] - 19:3, 26:14
**contains** [1] - 26:16
**CONTD** [1] - 2:1
**contents** [2] - 53:10, 66:7
**continuation** [1] - 63:12
**continue** [1] - 4:23
**continued** [3] - 33:11, 52:21, 74:20
**controlled** [1] - 36:1
**conversing** [1] - 60:11
**convicted** [2] - 68:16, 69:21
**copy** [3] - 9:17, 25:4, 27:19
**Coral** [1] - 1:19
**correct** [110] - 5:19, 5:22, 6:15, 6:18, 6:20, 6:21, 10:5, 10:8, 11:17, 13:2, 13:4, 13:6, 13:9, 13:10, 14:3, 14:6, 14:7, 14:15, 15:2, 17:5, 17:6, 17:20, 24:21, 25:5, 25:12, 25:17, 25:18, 25:21, 25:22, 25:25, 26:4, 26:7, 26:8, 26:11, 26:13, 26:17, 26:19, 26:24, 27:1, 27:10, 28:12, 31:10, 38:6, 38:13, 38:15, 38:18, 38:21, 38:23, 38:25, 40:4, 40:18, 40:20, 40:21, 41:24, 42:1, 42:8, 43:4, 43:10, 43:13, 43:17, 43:19, 43:21, 44:13, 44:17, 45:2, 45:9, 45:18, 45:21, 45:23, 46:3, 46:9, 46:11, 47:22, 57:2, 57:8, 57:9, 57:12, 57:14, 57:16, 57:25, 58:3, 59:7, 59:10, 59:13, 59:22, 59:25, 60:3, 60:5, 60:15, 60:24, 61:6, 61:25, 62:6, 62:23, 63:4, 63:6, 63:9, 63:15, 63:19, 63:21, 64:11, 64:12, 64:15, 64:18, 64:19, 64:23, 65:17, 79:2, 80:10, 80:11
**correctly** [2] - 15:11, 41:4
**cotton** [4] - 23:2, 23:3, 23:6
**counsel** [3] - 4:10, 16:9, 16:15
**County** [2] - 50:20, 50:21
**couple** [2] - 5:4, 33:2
**course** [8] - 26:5, 53:1, 59:11, 76:12, 77:21, 79:14, 79:20, 81:10
**courses** [1] - 12:16
**Court** [3] - 2:6, 34:25, 81:13
**court** [3] - 51:17, 71:9, 81:10
**COURT** [85] - 1:11, 3:1, 3:14, 3:23, 4:4, 4:14, 4:19, 4:20, 4:21, 9:6, 9:8, 9:15, 15:17, 15:19, 15:21, 16:4, 16:12, 19:10, 19:23, 22:1, 24:9, 25:2, 27:17, 28:16, 28:19, 29:16, 29:25, 32:20, 33:6, 33:17, 34:5, 34:24, 35:2, 35:20, 36:13, 37:14, 38:8, 39:7, 39:14, 40:2, 40:9, 46:19, 46:24, 47:1, 47:3, 47:6, 48:1, 48:9, 48:17, 48:22, 49:6, 51:23, 53:5, 54:3, 54:5, 54:19, 55:10, 55:24, 56:10, 57:18, 57:20, 58:11, 58:24, 59:2, 63:1, 63:24, 65:5, 65:8, 65:10, 67:16, 69:8, 70:14, 71:13, 71:23, 72:11, 72:13, 75:17, 75:20, 78:18, 80:13, 80:15, 80:17, 80:19, 81:3, 81:15
**COURTROOM** [2] - 30:5, 49:11
**courtroom** [1] - 81:4
**cousin** [1] - 81:12
**covered** [1] - 64:20
**crack** [10] - 34:12, 35:10, 35:14, 36:1, 36:10, 44:22, 46:11, 47:23, 48:14, 48:15
**Crime** [1] - 20:12
**crime** [6] - 20:13, 20:14, 20:17, 21:1, 21:2, 36:8
**cross** [7] - 4:23, 16:11, 19:9, 24:9, 47:25, 56:10, 75:17
**cue** [1] - 5:9
**cuff** [1] - 21:15
**current** [3] - 49:20, 67:25, 68:17
**custody** [2] - 54:22, 67:13


## D


**Dade** [11] - 13:18, 49:9, 49:16, 49:17, 49:23, 50:3, 67:24, 68:9, 68:18, 68:22, 77:2
**Dadeland** [1] - 1:22
**dangerous** [1] - 74:9
**date** [5] - 9:24, 50:8, 50:10, 52:18, 68:24
**DATE** [1] - 82:4
**dates** [2] - 3:17, 3:21
**Datran** [1] - 1:23
**David** [3] - 49:8, 49:13, 69:16
**DAVID** [2] - 2:1, 49:13
**DAY** [1] - 1:4
**day-to-day** [2] - 68:4, 68:8
**daylight** [2] - 37:21, 37:23
**days** [1] - 27:10
**deal** [2] - 75:5, 81:16
**December** [5] - 3:24, 3:25, 31:8, 31:9
**decision** [1] - 45:17
**defendant** [10] - 32:17, 35:17, 51:14, 51:16, 54:24, 55:2, 55:19, 60:10, 60:11, 71:12
**Defendant** [6] - 39:4, 58:14, 58:24, 69:11, 71:7, 71:15
**defendant's** [1] - 34:24
**Defendant's** [3] - 39:24, 58:21, 65:16
**defendants** [1] - 3:10
**Defendants** [1] - 1:8
**DEFENDANTS** [1] - 1:17
**defense** [4] - 4:5, 4:10, 16:9, 16:15
**definitely** [12] - 32:24, 33:1, 34:15, 35:18, 36:4, 38:1, 40:1, 42:14, 42:19, 45:24, 46:15, 47:18
**DeLeon** [1] - 1:18
**deliver** [1] - 27:8
**delivered** [6] - 27:7, 27:10, 27:12, 28:5, 28:7
**denominations** [1] - 35:17
**Department** [15] - 11:9, 11:12, 11:16, 13:18, 14:5, 20:10, 30:12, 49:9, 49:16, 49:18, 49:23, 50:3, 67:24, 68:18, 68:22
**department** [1] - 76:8
**depict** [1] - 58:17
**depicted** [1] - 65:15
**DEPUTY** [2] - 30:5, 49:11
**describe** [4] - 20:21, 36:23, 51:7, 58:7
**described** [7] - 16:8, 16:23, 17:24, 51:16, 55:2, 63:14, 69:4
**description** [1] - 32:4
**desk** [1] - 78:8
**Detail** [4] - 49:25, 68:20, 69:6, 69:14
**details** [1] - 15:3
**Detective** [17] - 5:2, 9:10, 15:23, 15:24, 17:10, 19:20, 25:16, 56:1, 61:17, 62:13, 62:15, 62:18, 63:16, 67:14, 67:18, 69:5, 76:2
**detective** [9] - 3:5, 3:13, 4:24, 19:23, 71:18, 75:22, 75:24, 75:25, 80:19
**detective's** [1] - 71:16
**detectives** [3] - 62:20, 68:6, 69:13
**determination** [2] - 45:22, 64:17
**determine** [1] - 64:25
**device** [1] - 77:25
**diameter** [2] - 12:8, 14:10
**difference** [1] - 16:18
**different** [9] - 5:5, 13:7, 13:8, 16:14, 28:11, 28:12, 35:13, 40:3, 78:7
**difficulty** [1] - 3:16
**digit** [1] - 67:1
**directed** [1] - 52:3
**directing** [1] - 31:11
**discovered** [1] - 62:9
**discovering** [1] - 54:16
**discovery** [1] - 3:19
**discussed** [2] - 17:19, 18:10
**dispatch** [2] - 25:7, 25:9
**dispatched** [7] - 24:17, 24:20, 30:25, 32:3, 32:13, 37:19, 42:14
**DISPOTO** [1] - 1:15
**distance** [3] - 41:16, 41:22, 41:25
**distilled** [1] - 23:3
**District** [6] - 30:13, 49:21, 49:22, 49:24, 50:4, 50:21
**DISTRICT** [2] - 1:1, 1:11
**DIVISION** [1] - 1:2
**DIXON** [1] - 1:7
**DNA** [33] - 14:16, 14:17, 14:19, 14:22, 15:13, 21:12, 22:21, 22:23, 22:25, 23:4, 23:19, 24:6, 25:21, 25:24, 26:5, 26:6, 26:12, 27:2, 27:9, 27:12, 27:24, 28:1, 29:21, 29:22, 29:23, 64:14, 64:18, 75:2, 75:3, 75:7, 75:11, 75:14, 77:9
**document** [7] - 21:3, 36:16, 38:1, 48:5, 63:17, 63:20, 64:6
**documentation** [2] - 20:23, 44:20
**documents** [2] - 64:1, 64:2
**dog** [1] - 33:21
**done** [5] - 5:18, 9:18, 14:16, 23:14, 35:11
**DONET** [8] - 2:1, 4:17, 15:18, 28:17, 47:4, 65:7, 65:9, 80:14
**Donet** [6] - 5:9, 15:17, 28:16, 47:3, 65:6, 80:13
**door** [4] - 33:3, 52:6, 60:8, 60:21
**dope** [2] - 36:11, 48:14
**doubt** [1] - 44:3
**down** [12] - 12:24, 13:1, 13:9, 19:23, 29:25, 38:14, 48:17, 50:18, 67:16, 72:22,

79:17, 79:22
**download** [1] - 78:7
**downwards** [1] - 42:6
**draw** [2] - 32:20, 50:7
**drawing** [1] - 68:24
**dreadlocks** [5] - 5:14, 7:1, 7:16, 8:8, 8:9
**dreads** [4] - 17:25, 18:20, 18:22, 18:23
**driver** [2] - 51:13, 62:21
**driver's** [3] - 51:12, 65:20, 71:21
**driving** [1] - 50:18
**drop** [2] - 33:9, 42:10
**dropped** [2] - 27:23, 47:21
**dropping** [2] - 28:2, 39:2
**drug** [1] - 18:2
**drugs** [3] - 3:6, 34:14, 46:2
**dry** [1] - 29:6
**during** [4] - 5:5, 36:3, 53:1, 76:4
**duties** [4] - 10:13, 21:1, 30:23, 68:5

## E

**Earl** [1] - 43:22
**early** [1] - 37:1
**East** [1] - 57:8
**east** [1] - 41:6
**education** [1] - 20:19
**either** [2] - 44:18, 79:24
**elicited** [1] - 16:11
**ELMO** [1] - 40:8
**elsewhere** [1] - 76:8
**emanating** [1] - 52:7
**emergency** [1] - 50:25
**employed** [2] - 49:15, 67:23
**encounter** [4] - 9:10, 10:1, 36:3, 59:11
**encountered** [1] - 38:16
**end** [5] - 23:3, 31:8, 36:18, 50:21, 56:17
**enforcement** [2] - 30:25, 42:9
**English** [1] - 73:6
**enter** [1] - 43:16
**entire** [2] - 20:15, 30:24
**entitled** [1] - 82:2
**envelope** [3] - 23:1, 23:7, 23:13
**environmental** [1] - 29:6
**equipment** [1] - 50:25
**equivalent** [1] - 57:7
**ESQ** [4] - 1:17, 1:22, 2:1, 2:4
**estimate** [1] - 59:16
**evening** [2] - 59:9, 59:11
**event** [1] - 3:11
**events** [1] - 5:5
**eventually** [4] - 27:7, 61:4, 61:16, 62:15
**evidence** [35] - 5:3, 13:3, 13:14, 13:22, 14:1, 17:1, 20:23, 21:2, 21:3, 21:4, 21:8, 21:13, 22:2, 23:23, 28:8, 28:22, 32:10, 34:21, 34:25, 42:13, 42:23, 42:24, 43:2, 43:9, 44:11, 54:1, 54:7, 55:22, 58:22, 59:15, 62:22, 63:3, 64:22, 70:16, 72:9
**exact** [2] - 6:16, 40:7
**examination** [4] - 16:11, 24:9, 56:10, 75:17
**examine** [1] - 63:3
**excited** [1] - 36:5
**EXCUSED** [2] - 48:21, 81:2
**Exhibit** [27] - 5:3, 5:10, 8:7, 22:3, 23:24, 32:11, 34:3, 34:21, 39:12, 39:24, 40:11, 40:17, 41:1, 45:3, 53:8, 54:1, 54:3, 54:8, 55:13, 55:22, 58:22, 58:24, 65:16, 70:17, 70:21, 72:1, 72:9
**exit** [1] - 51:14
**experience** [4] - 45:25, 46:15, 52:12, 78:21
**expert** [3] - 12:7, 12:13, 16:16
**explain** [3] - 10:12, 12:6, 45:4
**eyes** [4] - 3:8, 3:11, 17:20, 18:17
**eyes-on** [2] - 17:20, 18:17

## F

**face** [4] - 7:22, 7:23, 16:23, 31:24
**fact** [7] - 3:4, 12:23, 29:12, 29:14, 60:1, 64:6, 70:8
**factors** [1] - 29:8
**fair** [1] - 72:6
**familiar** [3] - 16:21, 43:23, 43:24
**family** [2] - 81:11, 81:14
**far** [5] - 6:25, 26:5, 42:21, 48:14, 75:5
**feature** [2] - 17:23, 18:17
**February** [1] - 17:18
**feet** [4] - 6:2, 6:3, 41:15, 42:7
**felon** [2] - 68:16, 69:21
**female** [1] - 57:11
**Ferguson** [1] - 45:11
**few** [3] - 8:14, 57:3, 60:13
**field** [10] - 34:12, 35:11, 35:12, 45:4, 45:5, 45:6, 45:9, 45:11, 45:12, 46:7
**figuratively** [1] - 42:16
**FILED** [1] - 82:4
**fill** [1] - 38:4
**filled** [3] - 63:17, 63:20, 73:17
**finger** [2] - 40:13, 45:9
**fingerprint** [3] - 29:3, 29:9, 29:10
**fingerprints** [26] - 14:14, 14:17, 14:19, 14:22, 15:13, 21:11, 22:15, 22:17, 22:18, 22:20, 22:22, 23:17, 23:18, 24:3, 25:21, 25:23, 26:2, 26:10, 26:21, 26:25, 28:22, 29:12, 29:20, 64:13, 64:17
**finish** [1] - 36:20
**firearm** [60] - 10:16, 10:21, 11:8, 11:11, 11:14, 11:15, 11:19, 11:24, 11:25, 12:1, 12:4, 12:8, 13:1, 13:3, 14:8, 14:18, 14:24, 15:8, 16:8, 16:23, 16:24, 17:1, 17:2, 17:15, 19:2, 19:7, 19:8, 25:14, 25:23, 26:2, 26:3, 26:5, 26:7, 52:24, 53:2, 53:19, 54:16, 62:22, 63:3, 63:7, 63:14, 63:15, 64:4, 64:7, 64:11, 64:13, 68:16, 69:22, 69:24, 70:11, 70:20, 70:24, 74:3, 74:4, 74:7, 74:8, 74:13, 74:18, 75:3, 75:14
**firearms** [4] - 12:7, 14:12, 16:14, 64:10
**fired** [1] - 21:22
**first** [3] - 32:9, 46:12, 67:1
**fits** [1] - 26:19
**five** [6] - 5:5, 6:2, 20:16, 29:14, 31:5, 50:1
**FL** [7] - 1:16, 1:19, 1:21, 1:23, 2:3, 2:5, 2:7
**Flagler** [1] - 1:20
**flex** [1] - 21:15
**FLORES** [1] - 1:8
**FLORIDA** [1] - 1:1
**folder** [1] - 3:22
**FOR** [8] - 1:14, 1:17, 5:11, 6:7, 6:23, 7:6, 8:1, 8:20
**force** [5] - 68:1, 68:10, 68:11, 71:20, 72:19
**foregoing** [1] - 82:2
**forensics** [1] - 20:19
**Forensics** [1] - 20:25
**form** [21] - 9:13, 9:17, 9:21, 36:19, 36:21, 38:2, 38:4, 43:4, 44:15, 63:12, 63:18, 72:4, 72:6, 72:18, 72:20, 72:24, 73:18, 77:9, 77:12, 80:3, 80:8
**forms** [1] - 38:11
**Fort** [1] - 2:3
**foundation** [1] - 34:22
**four** [1] - 31:5
**Fourth** [1] - 56:24
**fourth** [1] - 34:18
**frame** [1] - 7:21
**Francisco** [2] - 19:25, 20:4
**FRANCISCO** [1] - 20:4
**FRANK** [1] - 2:4
**free** [2] - 40:19, 81:3
**Friday** [1] - 81:10
**front** [3] - 7:8, 7:20, 56:7
**full** [4] - 20:2, 30:5, 49:11, 67:19
**future** [1] - 7:21

## G

**Gables** [1] - 1:19
**gap** [2] - 17:9, 17:12
**gathered** [1] - 11:7
**general** [3] - 56:5, 71:5, 73:1
**gentleman** [4] - 33:14, 33:19, 43:22, 44:5
**gentlemen** [4] - 4:22, 48:18, 80:20, 81:3
**given** [5] - 3:12, 11:12, 26:14, 32:4, 72:23
**glassine** [3] - 23:1, 23:7, 23:12
**gold** [4] - 50:18, 58:16, 65:15, 66:5
**Gonzalez** [2] - 4:18, 4:23
**GONZALEZ** [23] - 1:17, 4:12, 4:25, 5:1, 5:9, 5:12, 6:6, 6:8, 6:22, 6:24, 7:5, 7:7, 7:25, 8:2, 8:19, 8:21, 9:5, 24:10, 37:13, 56:11, 57:17, 75:18, 81:8
**Government** [10] - 3:8, 3:15, 19:24, 19:25, 30:1, 49:7, 55:13, 67:17, 67:18, 76:23
**Government's** [19] - 5:3, 5:10, 8:6, 22:3, 23:24, 32:11, 34:3, 34:21, 39:12, 45:3, 53:8, 54:1, 54:3, 54:8, 55:22, 70:17, 70:21, 72:1, 72:9
**gram** [4] - 59:17, 59:18, 59:24, 64:22
**granted** [1] - 54:19
**great** [1] - 42:10
**green** [3] - 51:20, 71:10
**grip** [1] - 29:1
**grooves** [1] - 28:25
**grounds** [1] - 19:6
**Grove** [2] - 30:13, 31:2
**guess** [2] - 61:17, 75:15

**gun** [42] - 12:9, 12:18, 12:21, 12:24, 13:3, 21:15, 21:17, 21:23, 22:12, 22:15, 23:16, 23:21, 28:24, 29:13, 60:4, 60:7, 60:12, 60:23, 61:2, 61:4, 61:7, 61:13, 61:16, 61:19, 61:21, 61:22, 61:23, 62:1, 62:9, 62:19, 63:8, 63:21, 67:8, 67:10, 67:13, 74:11, 74:16, 74:20, 74:22, 74:23, 74:25
**guns** [5] - 12:16, 12:17, 12:19, 12:20, 13:7

## H

**hair** [3] - 37:9, 37:10, 37:11
**half** [3] - 31:5, 68:3, 79:6
**hand** [4] - 27:20, 28:25, 79:15, 80:9
**handcuffs** [1] - 71:18
**handed** [5] - 60:2, 60:14, 60:18, 61:1, 63:16
**handing** [1] - 9:17
**handle** [1] - 56:3
**handled** [1] - 16:14
**handling** [1] - 4:1
**handwritten** [1] - 72:25
**happy** [1] - 3:13
**harder** [1] - 29:3
**Harralson** [3] - 43:22, 44:5, 44:8
**Havana** [7] - 31:3, 31:4, 31:5, 56:23, 57:2, 57:5, 74:9
**Hawks** [1] - 7:20
**head** [2] - 7:8, 47:11
**hear** [7] - 8:18, 18:1, 18:4, 18:10, 18:12, 18:13, 18:25
**heard** [1] - 69:12
**hearsay** [5] - 16:10, 33:16, 46:17, 54:18, 69:7
**heavy** [1] - 37:7
**height** [1] - 37:4
**held** [5] - 28:25, 49:23, 50:2, 68:2, 68:18
**HELD** [1] - 1:10
**help** [2] - 4:18, 37:24
**helpfulness** [1] - 4:16
**hereby** [1] - 82:2
**HERMAN** [1] - 2:4
**Hialeah** [3] - 57:2, 57:3, 57:7
**hidden** [1] - 5:21
**hold** [1] - 29:1
**holding** [1] - 54:12
**home** [5] - 76:18, 76:19, 77:16, 79:3, 79:5
**Honor** [24] - 3:21, 4:12, 4:13, 4:17, 4:25, 9:7, 15:20, 28:17, 28:18, 37:13, 37:15, 39:13, 46:23, 47:5, 47:7, 65:4, 65:7, 65:9, 67:15, 75:18, 75:19, 80:16, 80:18, 81:8
**HONORABLE** [1] - 1:11
**HOROWITZ** [28] - 1:22, 3:15, 4:3, 4:13, 9:7, 24:11, 33:5, 33:16, 34:22, 35:19, 37:15, 37:16, 38:7, 38:10, 39:6, 39:8, 39:11, 39:17, 40:5, 40:8, 40:10, 46:17, 46:23, 46:25, 47:25, 48:8, 57:19, 75:19
**Horowitz** [4] - 9:6, 37:14, 46:21, 57:18
**HOSSEINI** [26] - 1:14, 19:25, 20:6, 21:25, 24:8, 28:20, 29:17, 29:24, 30:2, 30:8, 34:1, 34:4, 34:6, 34:20, 35:1, 35:3, 35:21, 36:12, 36:14, 37:12, 39:13, 47:7, 47:8, 48:2, 48:10, 48:16
**hour** [1] - 79:6
**hours** [1] - 20:22
**hundred** [1] - 78:22
**hundreds** [1] - 76:12

## I

**ID** [1] - 51:13
**identification** [8] - 8:6, 34:2, 51:13, 52:18, 53:7, 55:12, 58:13, 71:25
**identified** [9] - 3:10, 6:11, 8:4, 8:8, 8:16, 8:25, 18:18, 51:22, 71:12
**identifies** [1] - 22:8
**identify** [3] - 31:23, 51:19, 58:15
**identifying** [1] - 36:16
**IGNACIO** [1] - 1:14
**ILHAM** [1] - 1:14
**illuminated** [1] - 66:1
**image** [2] - 6:10, 6:12
**imagine** [1] - 76:4
**impound** [3] - 43:9, 44:10, 44:11
**impounded** [3] - 43:2, 43:5, 45:21
**incident** [3] - 9:23, 35:16, 69:11
**incidents** [1] - 3:17
**included** [2] - 70:21, 71:5
**incorrect** [1] - 43:11
**independent** [1] - 27:13
**indicate** [1] - 11:1
**indicated** [3] - 3:7, 5:15, 60:4
**individual** [11] - 5:14, 6:10, 6:25, 7:8, 7:23, 8:3, 8:5, 8:15, 8:24, 9:2
**individuals** [3] - 5:23, 57:10, 66:3
**informant** [5] - 4:2, 5:18, 8:15, 8:22, 9:2
**information** [2] - 36:16, 73:2
**infraction** [2] - 50:24, 57:23
**inhibit** [1] - 29:8
**initial** [3] - 80:1, 80:5, 80:7
**initials** [1] - 73:17
**inside** [33] - 11:21, 21:15, 21:18, 23:1, 23:7, 23:12, 23:25, 35:6, 39:1, 45:7, 51:5, 51:9, 51:10, 52:1, 52:7, 52:21, 53:12, 53:14, 53:17, 54:25, 55:3, 58:1, 65:12, 65:18, 66:3, 66:10, 66:17, 70:4, 70:6, 70:23, 72:19
**inspect** [2] - 69:23, 70:11
**inspected** [5] - 53:10, 69:24, 70:6, 70:20
**inspecting** [1] - 70:1
**instead** [1] - 67:2
**instruction** [1] - 20:22
**integrity** [1] - 23:10
**intent** [3] - 33:3, 33:6, 35:25
**interact** [2] - 68:4, 68:6
**interacted** [1] - 71:15
**interest** [3] - 42:10, 42:12, 70:9
**Interstate** [1] - 19:7
**Intervention** [4] - 49:25, 68:20, 69:6, 69:14
**interview** [6] - 71:19, 78:13, 78:21, 79:14, 79:15, 79:20
**interviewed** [3] - 76:11, 78:12, 78:16
**interviewing** [1] - 78:9
**interviews** [2] - 76:5, 78:23
**investigate** [1] - 42:13
**investigation** [10] - 31:19, 32:2, 42:15, 42:17, 42:18, 53:1, 56:3, 69:22, 70:8, 78:7
**Investigations** [1] - 68:20
**investigations** [1] - 31:16
**Investigator** [1] - 20:12
**investigator** [4] - 20:13, 20:14, 20:17, 21:1
**involved** [3] - 16:21, 31:18, 32:2
**involving** [1] - 69:11
**issue** [2] - 12:18, 12:20
**issued** [1] - 12:17
**item** [8] - 15:12, 21:13, 23:4, 28:22, 29:12, 64:24, 70:21, 70:23
**items** [12] - 11:12, 14:13, 17:11, 21:4, 25:16, 25:19, 25:20, 27:7, 54:12, 64:18, 69:23, 70:25

## J

**JAMES** [1] - 1:7
**January** [4] - 3:25, 4:1
**JAY** [1] - 1:8
**job** [1] - 39:22
**JR** [2] - 2:1, 2:4
**Juan** [4] - 5:2, 9:10, 15:23, 25:17
**JUDGE** [1] - 1:11
**July** [14] - 9:10, 9:21, 15:4, 17:2, 17:4, 17:7, 19:2, 19:16, 21:6, 23:21, 27:4, 27:10, 28:1, 28:2
**jurors** [1] - 3:1
**JURORS** [1] - 48:21
**jury** [2] - 4:19, 45:4
**JURY** [2] - 1:10, 81:2

## K

**K-9** [9] - 33:19, 33:20, 33:24, 35:12, 43:12, 43:14, 46:15, 47:19, 68:19
**KATHLEEN** [1] - 1:11
**Kel** [4] - 12:3, 16:8, 16:21, 16:25
**Kel-Tec** [4] - 12:3, 16:8, 16:21, 16:25
**Kelly** [12] - 10:10, 11:3, 11:7, 11:11, 11:15, 13:17, 14:4, 15:24, 19:20, 21:9, 21:14, 25:16
**Kelly's** [1] - 17:10
**kept** [1] - 74:9
**key** [26] - 33:9, 33:11, 39:3, 40:22, 41:14, 41:23, 41:25, 42:1, 42:2, 42:16, 42:17, 42:21, 42:23, 42:25, 43:2, 43:8, 43:10, 44:2, 44:7, 44:9, 44:10, 47:16, 47:19, 47:21
**keys** [1] - 42:20
**kinds** [2] - 13:7, 16:14
**kit** [9] - 34:12, 35:12, 35:13, 45:4, 45:5, 45:6, 45:9, 45:11, 45:12
**kitchen** [1] - 77:13
**knowledge** [2] - 14:18, 14:21
**known** [4] - 49:25, 50:11, 56:17, 69:1
**Korchin** [7] - 9:8, 15:23, 19:1, 47:1, 57:20, 65:5, 75:20
**KORCHIN** [33] -

1:20, 9:9, 9:14, 9:16, 15:16, 16:10, 19:9, 24:12, 25:1, 25:3, 27:16, 27:18, 28:15, 47:2, 54:2, 54:18, 55:23, 57:21, 58:10, 58:12, 58:21, 59:1, 59:3, 62:25, 63:2, 63:23, 63:25, 65:4, 69:7, 72:10, 75:21, 78:19, 80:12

## L

**lab** [3] - 45:21, 45:22, 46:6
**laboratory** [3] - 45:20, 46:5, 46:6
**ladies** [3] - 4:22, 48:18, 80:20
**language** [1] - 73:6
**last** [3] - 49:25, 66:13, 75:25
**late** [1] - 27:4
**Latin** [1] - 36:25
**Lauderdale** [1] - 2:3
**law** [1] - 42:9
**leading** [1] - 48:8
**learned** [2] - 38:17, 50:15
**least** [3] - 4:4, 6:17, 31:17
**leave** [2] - 29:10, 60:16
**led** [1] - 18:17
**left** [4] - 32:18, 32:22, 60:14, 78:7
**legal** [4] - 19:6, 19:10, 77:12, 77:15
**legs** [1] - 80:25
**Liberty** [1] - 56:18
**lifting** [1] - 81:13
**light** [6] - 5:14, 6:13, 6:17, 7:14, 51:20, 58:7
**lights** [1] - 65:13
**line** [1] - 19:3
**listed** [1] - 13:15
**listening** [1] - 18:7
**literally** [1] - 42:16
**live** [6] - 18:12, 21:18, 21:19, 21:21, 22:15, 29:18
**lived** [1] - 74:6
**lives** [1] - 74:6
**living** [1] - 74:10
**loaded** [1] - 11:23
**local** [2] - 20:24, 76:7
**locally** [1] - 76:9
**locate** [3] - 3:20, 60:7, 60:23
**located** [2] - 60:4, 68:15
**locating** [1] - 60:12
**location** [3] - 56:14, 60:19, 76:14
**locker** [1] - 28:4
**logo** [1] - 7:21
**look** [15] - 3:18, 9:13, 11:19, 13:11, 18:16, 24:23, 27:11, 27:21, 51:8, 52:24, 58:14, 59:5, 63:3, 63:22, 64:1
**looked** [15] - 11:21, 11:22, 11:24, 12:21, 17:4, 33:6, 33:7, 36:17, 36:23, 37:8, 43:10, 47:14, 52:22, 53:12, 53:14
**looking** [14] - 6:10, 21:10, 21:11, 22:14, 22:17, 22:18, 23:16, 32:25, 33:2, 57:24, 60:23, 65:12, 65:15, 66:1
**looks** [3] - 7:1, 40:1, 40:11
**loud** [1] - 73:9
**lunch** [6] - 4:5, 4:10, 80:21, 80:25, 81:4, 81:7
**LUNCH** [1] - 81:18

## M

**magazine** [22] - 10:16, 10:20, 10:23, 11:1, 11:2, 11:4, 11:20, 11:21, 13:13, 14:21, 14:25, 17:5, 17:9, 17:14, 21:18, 22:15, 24:1, 26:14, 26:16, 26:19, 26:21, 27:2
**mail** [39] - 32:17, 32:24, 33:8, 33:9, 33:10, 33:12, 33:21, 33:24, 34:15, 38:20, 38:22, 38:24, 39:1, 39:2, 39:24, 40:1, 40:13, 40:15, 40:17, 40:19, 40:22, 40:24, 41:1, 41:10, 41:12, 41:23, 41:25, 42:22, 43:14, 43:16, 43:20, 43:25, 44:1, 44:4, 47:17, 47:18, 48:7
**male** [4] - 32:3, 32:4, 36:25, 57:11
**maneuver** [2] - 70:4, 70:6
**MANUEL** [1] - 1:17
**March** [3] - 48:24, 48:25
**marijuana** [16] - 52:7, 52:22, 55:7, 59:12, 59:15, 59:16, 59:20, 59:23, 59:24, 64:21, 64:25, 66:10, 66:16, 66:20, 70:2, 70:9
**Marines** [1] - 30:22
**MARK** [1] - 1:15
**marked** [5] - 34:2, 53:7, 55:12, 58:13, 71:25
**markers** [1] - 73:18
**Marlins** [1] - 56:20
**Marshal** [1] - 4:16
**Marshals** [2] - 4:9, 4:14
**Mary** [1] - 2:2
**matter** [6] - 12:23, 49:1, 60:1, 78:23, 81:8, 82:2
**MAURIN** [1] - 1:6
**Maurin** [16] - 5:15, 6:19, 7:2, 7:10, 7:12, 7:19, 7:21, 8:3, 8:9, 17:22, 17:23, 18:1, 18:13, 18:18, 18:24, 57:15
**mean** [4] - 12:6, 25:20, 29:13, 29:14
**meant** [3] - 28:25, 36:20, 60:18
**measurement** [2] - 12:8, 14:10
**medium** [2] - 37:3, 37:7
**meet** [1] - 56:1
**members** [1] - 45:4
**memory** [1] - 9:23
**mention** [1] - 11:3
**mentioned** [3] - 35:4, 45:3, 57:22
**metal** [2] - 42:1, 42:2
**Methamphetamine** [9] - 32:9, 34:10, 35:6, 35:13, 35:25, 46:8, 46:12, 46:13, 48:15
**meticulous** [1] - 80:4
**mIAMI** [1] - 1:2
**Miami** [26] - 1:16, 1:21, 1:23, 2:5, 2:7, 2:7, 10:9, 11:9, 11:12, 11:16, 13:18, 14:5, 20:10, 20:15, 30:12, 49:9, 49:16, 49:17, 49:23, 50:3, 57:6, 67:24, 68:9, 68:18, 68:22, 77:2
**Miami's** [1] - 50:22
**middle** [2] - 34:11, 35:7
**might** [2] - 4:6, 18:18
**miles** [1] - 57:3
**Military** [2] - 30:19, 38:11
**minus** [2] - 59:17, 59:18
**minutes** [3] - 10:4, 48:20, 49:4
**Miranda** [10] - 72:4, 72:18, 72:20, 72:22, 72:24, 73:18, 77:8, 80:2, 80:5, 80:8
**moderate** [2] - 58:7, 58:9
**moment** [3] - 30:13, 36:12, 46:23
**Monday** [1] - 81:10
**money** [3] - 3:5, 36:21, 44:20
**morning** [11] - 4:21, 20:7, 20:8, 24:13, 30:9, 30:10, 37:17, 48:18, 56:12, 56:13, 81:11
**motion** [1] - 54:19
**mounted** [2] - 38:22, 40:21
**move** [12] - 5:17, 6:6, 7:5, 19:7, 34:20, 39:11, 53:25, 54:18, 55:21, 58:21, 59:6, 72:8
**moved** [1] - 61:13
**movement** [2] - 51:6, 51:7
**moving** [4] - 4:7, 51:8, 58:1, 66:3
**MR** [134] - 3:12, 3:15, 3:21, 3:24, 4:3, 4:12, 4:13, 4:17, 4:25, 5:1, 5:9, 5:12, 6:6, 6:8, 6:22, 6:24, 7:5, 7:7, 7:25, 8:2, 8:19, 8:21, 9:5, 9:7, 9:9, 9:14, 9:16, 15:16, 15:18, 15:20, 15:22, 16:3, 16:5, 16:10, 16:11, 16:13, 19:9, 19:12, 19:22, 24:10, 24:11, 24:12, 25:1, 25:3, 27:16, 27:18, 28:15, 28:17, 28:18, 33:5, 33:16, 34:22, 35:19, 37:13, 37:15, 37:16, 38:7, 38:10, 39:6, 39:8, 39:11, 39:17, 40:5, 40:8, 40:10, 46:17, 46:23, 46:25, 47:2, 47:4, 47:5, 47:25, 48:8, 49:8, 49:14, 51:21, 53:4, 53:6, 53:25, 54:2, 54:4, 54:6, 54:18, 54:20, 55:9, 55:11, 55:21, 55:23, 55:25, 56:9, 56:11, 57:17, 57:19, 57:21, 58:10, 58:12, 58:21, 58:23, 59:1, 59:3, 62:25, 63:2, 63:23, 63:25, 65:4, 65:7, 65:9, 65:11, 67:15, 67:18, 67:22, 69:7, 69:9, 70:13, 70:15, 71:11, 71:14, 71:22, 71:24, 72:8, 72:10, 72:12, 72:14, 75:16, 75:18, 75:19, 75:21, 78:17, 78:19, 80:12, 80:14, 80:16, 80:18, 81:8
**MS** [25] - 19:25, 20:6, 21:25, 24:8, 28:20, 29:17, 29:24, 30:2, 30:8, 34:1, 34:4, 34:6, 34:20, 35:1, 35:3, 35:21, 36:12, 36:14, 37:12, 39:13, 47:7, 47:8, 48:2, 48:10, 48:16

## N

**N.E** [2] - 1:15, 2:4
**name** [17] - 3:11, 3:16, 20:2, 24:13, 30:5, 31:18, 31:20, 43:22, 45:13, 49:11, 52:17, 52:18, 56:8, 67:19, 72:20, 73:8, 75:25
**named** [1] - 10:9
**narcotic** [1] - 46:15
**narcotics** [12] - 32:4, 33:25, 34:15, 35:15, 36:6, 42:14, 44:23, 44:24, 45:8, 45:17, 45:25, 48:6
**narrative** [1] - 63:12
**National** [1] - 20:25
**Navy** [1] - 30:21
**near** [2] - 56:20, 56:23
**necessity** [1] - 19:6
**need** [8] - 5:6, 13:23,

40:22, 62:23, 62:24, 79:3, 81:5, 81:6
**needed** [2] - 74:7, 77:6
**negative** [5] - 24:5, 26:2, 26:23, 26:25, 45:7
**Neighborhood** [1] - 50:5
**nervous** [5] - 33:1, 33:7, 51:14, 52:10, 52:13
**never** [3] - 38:24, 43:10, 80:8
**next** [6] - 19:24, 30:1, 49:7, 60:16, 67:17, 72:21
**nice** [1] - 39:22
**nicks** [1] - 67:6
**night** [28] - 9:11, 9:17, 10:2, 10:6, 10:12, 10:13, 10:21, 11:19, 11:25, 13:11, 27:4, 37:20, 37:22, 42:20, 43:10, 44:13, 54:11, 58:18, 59:5, 59:23, 62:3, 62:4, 64:21, 70:20, 72:5, 74:5, 76:13, 77:14
**NINE** [1] - 1:4
**nine** [1] - 53:18
**Ninth** [1] - 57:8
**nippy** [1] - 80:22
**nobody** [1] - 29:13
**normal** [1] - 3:2
**normally** [2] - 23:1, 75:24
**North** [1] - 2:7
**north** [2] - 50:21, 56:17
**Northside** [3] - 50:4, 50:6, 50:21
**note** [2] - 36:18, 77:13
**noted** [1] - 36:21
**notes** [3] - 36:4, 44:20, 72:25
**nothing** [2] - 9:5, 81:9
**notice** [2] - 51:4, 70:2
**noticed** [3] - 57:24, 58:1, 59:12
**November** [11] - 3:24, 50:7, 53:19, 53:22, 55:18, 58:19, 67:8, 67:11, 68:24, 69:10, 76:13
**nowhere** [2] - 56:20, 56:23
**Number** [1] - 1:2
**number** [13] - 22:8, 22:10, 62:22, 63:4, 63:7, 63:21, 64:3, 64:7, 64:11, 66:21, 66:23, 67:1
**numbers** [2] - 64:10, 66:23
**NW** [11] - 32:7, 37:19, 39:18, 40:11, 41:7, 50:19, 56:7, 56:14, 56:15, 56:23

## O

**o'clock** [3] - 9:11, 37:22, 37:23
**object** [3] - 26:16, 42:1, 42:2
**objection** [21] - 16:10, 19:9, 33:5, 33:16, 34:22, 34:24, 35:19, 39:13, 46:17, 47:25, 48:8, 54:2, 54:18, 55:23, 55:24, 58:23, 58:25, 69:7, 72:10, 72:11, 78:17
**observation** [1] - 17:9
**observed** [2] - 46:19, 52:22
**observing** [2] - 41:8, 50:24
**obtain** [1] - 29:3
**obviously** [2] - 41:12, 42:21
**occur** [1] - 50:17
**occurred** [5] - 9:24, 57:1, 57:3, 60:19, 62:3
**odor** [5] - 52:7, 52:15, 59:20, 66:16, 66:20
**OF** [3] - 1:1, 1:3, 1:10
**offer** [5] - 74:19, 75:5, 75:9, 75:12, 75:15
**Office** [5] - 36:15, 37:17, 37:19, 42:20, 47:9
**office** [4] - 68:8, 78:3, 78:4, 79:7
**Officer** [17] - 11:3, 11:7, 11:11, 11:15, 13:17, 14:4, 21:9, 21:14, 25:16, 30:2, 30:9, 44:16, 49:8, 56:12, 56:14, 57:22, 76:14
**officer** [30] - 3:11, 10:9, 11:7, 16:15, 24:15, 30:15, 30:16, 30:18, 30:23, 33:20, 35:12, 42:9, 43:12, 44:11, 45:10, 46:14, 46:15, 46:18, 48:17, 65:12, 67:16, 68:1, 68:14, 68:21, 71:20, 72:20, 75:22, 76:2, 78:24
**OFFICER** [1] - 4:20
**officers** [7] - 10:6, 10:9, 68:7, 68:9, 68:11, 70:25, 72:17
**older** [1] - 67:4
**once** [6] - 22:22, 23:14, 47:19, 61:17, 69:15, 76:19
**one** [26] - 4:4, 6:17, 8:16, 8:24, 10:9, 23:1, 29:5, 31:17, 41:1, 41:4, 45:13, 46:23, 52:17, 57:11, 57:13, 59:18, 59:23, 61:17, 62:13, 64:22, 77:23, 77:24, 79:16, 81:8
**ones** [1] - 5:24
**open** [6] - 36:7, 44:4, 47:16, 60:7, 60:9, 60:21
**opened** [5] - 43:25, 44:1, 47:18, 52:6, 53:14
**opinion** [1] - 46:4
**opportunity** [3] - 50:10, 68:25, 71:6
**order** [9] - 5:20, 11:15, 14:16, 19:7, 40:22, 60:7, 61:14, 77:6, 81:12
**ordered** [2] - 52:1, 52:16
**orders** [1] - 81:16
**outside** [5] - 52:16, 65:16, 65:20, 70:7, 80:22
**overruled** [2] - 33:17, 78:18
**Overruled** [1] - 48:1
**own** [2] - 64:11, 80:9
**owner** [3] - 33:23, 43:20, 47:20

## P

**p.m** [4] - 10:1, 25:11, 31:15, 38:14
**pace** [1] - 4:7
**package** [1] - 26:14
**packaged** [2] - 21:13, 23:6
**pad** [6] - 77:10, 77:12, 77:13, 77:14, 77:15
**PAGES** [1] - 1:6
**pages** [1] - 3:19
**paint** [1] - 39:22
**paper** [6] - 47:15, 77:10, 77:12, 77:19, 79:10, 79:16
**paperwork** [1] - 36:4
**Park** [1] - 56:21
**parked** [2] - 41:10, 66:14
**part** [6] - 12:9, 27:20, 44:14, 68:4, 68:11, 70:8
**participated** [1] - 44:18
**participating** [2] - 18:2, 18:13
**particular** [1] - 31:1
**particularly** [1] - 19:1
**partner** [4] - 60:15, 60:17, 60:18, 61:1
**partners** [1] - 52:17
**pass** [1] - 22:14
**passenger** [13] - 51:8, 52:4, 52:22, 52:23, 57:24, 58:1, 59:5, 60:6, 60:7, 61:8, 61:21, 71:21
**past** [2] - 52:12, 78:9
**patdown** [1] - 44:18
**PATRICIA** [2] - 2:6, 82:4
**patricia_sanders@flsd.uscourts.gov** [1] - 2:8
**patrol** [6] - 30:15, 30:24, 49:21, 50:6, 68:6, 68:19
**PAUL** [1] - 1:20
**pen** [3] - 77:21, 77:22, 77:23
**pencil** [1] - 77:21
**people** [2] - 45:11, 52:12
**percent** [1] - 29:14
**performed** [1] - 25:13
**period** [1] - 76:4
**permission** [7] - 35:1, 53:4, 54:4, 55:9, 70:13, 71:22, 72:12
**person** [17] - 3:9, 18:18, 19:7, 26:6, 31:18, 31:22, 31:23, 44:22, 44:25, 50:11, 50:14, 51:16, 51:17, 61:9, 68:25, 69:3, 71:9
**person's** [1] - 31:20
**personally** [2] - 15:15, 70:2
**perspective** [1] - 65:18
**PHILIP** [1] - 1:22
**phone** [2] - 69:5, 76:16
**photo** [2] - 7:18
**photograph** [3] - 58:14, 58:15, 58:17
**photographer** [3] - 62:11, 65:19, 65:24
**photographers** [1] - 62:8
**photographs** [12] - 61:4, 61:7, 61:11, 61:14, 61:20, 61:23, 62:1, 62:5, 62:16, 71:2, 71:4, 71:6
**photos** [1] - 39:5
**physically** [1] - 54:21
**pick** [1] - 10:20
**picked** [1] - 11:2
**picture** [5] - 7:2, 7:3, 32:18, 39:24, 40:2
**pictures** [3] - 61:10, 61:19, 62:14
**piece** [1] - 47:15
**pieces** [1] - 79:16
**pinpoint** [1] - 6:16
**place** [7] - 9:11, 10:1, 18:11, 23:12, 28:10, 28:11, 56:20
**placed** [1] - 75:1
**places** [1] - 69:23
**plastic** [3] - 21:15, 55:3, 55:17
**play** [2] - 8:14, 8:19
**PLAYED** [6] - 5:11, 6:7, 6:23, 7:6, 8:1, 8:20
**plea** [2] - 75:5, 75:15
**plus** [2] - 59:17, 59:18
**point** [5] - 9:3, 60:21, 69:20, 73:8, 73:9
**pokes** [1] - 7:8
**Police** [16] - 11:9, 11:12, 11:16, 12:14, 13:18, 14:5, 20:10, 30:12, 49:9, 49:16, 49:17, 49:23, 50:3, 67:24, 68:18, 68:22
**police** [22] - 10:9, 14:13, 16:14, 20:24, 30:15, 30:16, 30:18,

30:23, 54:22, 54:25, 58:16, 61:4, 62:5, 62:8, 62:11, 68:9, 68:21, 74:24, 76:2, 76:7, 77:2, 78:24
**Ponce** [1] - 1:18
**Pontiac** [4] - 50:18, 58:16, 65:15, 66:5
**PORTELA** [1] - 1:6
**Portela** [40] - 9:11, 10:22, 15:4, 19:1, 19:13, 50:12, 50:15, 58:14, 60:1, 61:1, 69:1, 69:4, 69:11, 71:7, 71:15, 71:16, 71:19, 72:5, 72:16, 72:21, 73:1, 73:4, 73:19, 73:22, 73:25, 74:2, 74:6, 74:11, 74:16, 74:18, 75:9, 79:13, 79:15, 79:16, 79:17, 79:20, 79:21, 79:25, 80:5, 80:7
**Portela's** [2] - 58:24, 64:17
**position** [2] - 68:2, 75:6
**positions** [2] - 49:23, 68:17
**positive** [3] - 35:13, 35:14, 45:7
**possession** [8] - 15:5, 15:8, 17:10, 19:8, 19:14, 35:25, 68:16, 69:21
**possible** [2] - 78:25, 79:1
**powder** [1] - 22:13
**precisely** [1] - 80:4
**prepared** [2] - 63:7, 63:10
**present** [3] - 17:16, 23:19, 59:9
**presented** [2] - 72:4, 73:5
**preservation** [1] - 20:23
**preserve** [1] - 21:3
**preserving** [1] - 23:10
**pretty** [3] - 30:25, 37:9, 41:11
**previous** [4] - 6:17, 49:24, 50:4, 50:5
**previously** [1] - 6:11
**probable** [1] - 46:1
**problem** [1] - 5:6
**proceed** [2] - 6:22, 7:25
**proceedings** [1] - 82:2
**PROCEEDINGS** [1] - 1:10
**process** [17] - 21:4, 21:8, 21:9, 21:11, 22:12, 22:22, 24:2, 24:6, 25:19, 25:20, 25:23, 26:12, 26:21, 27:2, 29:18, 29:20, 57:23
**processed** [11] - 14:14, 14:18, 14:22, 14:24, 14:25, 15:13, 21:10, 22:21, 26:9, 28:14, 64:13
**processing** [5] - 25:13, 26:1, 27:4, 28:1, 28:4
**projectiles** [2] - 11:22, 13:11
**pronounced** [1] - 24:13
**property** [21] - 11:8, 11:10, 11:12, 13:15, 13:16, 13:21, 15:23, 16:6, 16:8, 23:15, 27:8, 27:19, 27:24, 28:2, 28:5, 28:7, 43:6, 43:8, 63:14, 63:15, 63:17
**prosecutor** [1] - 42:25
**protocol** [2] - 25:22, 29:22
**provided** [1] - 73:4
**proximity** [1] - 5:24
**public** [2] - 20:16, 20:18
**publish** [6] - 35:1, 40:8, 54:4, 59:1, 70:13, 72:12
**pull** [1] - 51:2
**pulled** [2] - 48:7, 51:4
**purchased** [1] - 74:8
**put** [11] - 13:1, 22:13, 23:3, 38:11, 38:14, 42:24, 49:3, 54:22, 74:20, 74:22, 74:23
**putting** [2] - 48:4, 54:25

## Q

**quantity** [1] - 59:15
**questioned** [1] - 5:13
**questioning** [1] - 19:4
**questions** [34] - 5:4, 9:7, 15:16, 15:18, 15:20, 19:22, 24:8, 24:10, 24:11, 28:15, 28:18, 29:24, 36:5, 37:12, 37:13, 46:25, 47:2, 47:5, 48:16, 57:17, 57:19, 65:4, 65:7, 67:15, 73:3, 73:4, 73:5, 73:7, 73:15, 75:18, 75:19, 80:12, 80:14, 80:18

## R

**race** [1] - 36:24
**Ramirez** [1] - 69:5
**range** [2] - 6:2, 6:4
**rapport** [1] - 52:14
**reached** [1] - 55:3
**read** [6] - 9:18, 25:6, 73:5, 73:7, 73:9, 79:25
**reading** [1] - 9:18
**ready** [1] - 3:2
**real** [1] - 50:23
**really** [2] - 12:13, 71:5
**reasons** [2] - 28:21, 29:5
**receipt** [8] - 13:15, 13:16, 13:21, 27:11, 27:19, 43:6, 43:8, 63:15
**receipts** [3] - 15:24, 16:6, 16:9
**receive** [4] - 11:17, 55:7, 55:18, 76:14
**received** [3] - 21:14, 25:16, 76:4
**recently** [1] - 31:7
**RECESS** [2] - 49:5, 81:18
**recess** [1] - 80:21
**recognize** [12] - 8:22, 8:24, 18:23, 34:7, 39:9, 53:8, 54:8, 54:12, 55:14, 70:17, 70:22, 72:1
**recollection** [7] - 24:18, 24:24, 27:13, 27:23, 37:24, 56:5, 64:3
**RECORD** [6] - 5:11, 6:7, 6:23, 7:6, 8:1, 8:20
**record** [8] - 20:3, 30:6, 49:12, 51:21, 51:23, 67:20, 71:11, 71:13
**recorded** [5] - 78:15, 78:20, 78:25, 79:1, 80:8
**recorder** [5] - 78:4, 78:6, 78:9, 79:8, 79:10
**recording** [7] - 5:18, 5:23, 17:18, 18:2, 18:11, 77:25, 78:23
**recover** [4] - 11:2, 42:13, 42:20, 44:10
**recovered** [13] - 11:1, 11:20, 17:15, 33:25, 36:6, 44:9, 53:19, 53:22, 54:11, 67:8, 67:10, 74:4, 74:13
**recovery** [1] - 10:15
**redacted** [2] - 3:12, 3:18
**redirect** [5] - 15:21, 28:19, 47:6, 65:10, 80:17
**reference** [4] - 32:3, 42:14, 52:21, 74:13
**referring** [4] - 36:11, 47:24, 48:4, 48:11
**reflect** [4] - 51:21, 51:23, 71:11, 71:13
**reflected** [1] - 66:24
**refresh** [6] - 9:23, 24:18, 24:24, 27:23, 37:24, 64:2
**regard** [1] - 5:13
**regarding** [3] - 5:4, 11:6, 19:2
**relating** [1] - 63:8
**relax** [2] - 52:11, 80:25
**relevance** [1] - 78:17
**remainder** [1] - 56:3
**remember** [19] - 31:18, 32:8, 32:15, 32:23, 33:21, 34:19, 36:18, 36:23, 36:25, 37:8, 37:10, 39:2, 39:5, 41:9, 41:10, 44:1, 80:23
**remove** [1] - 71:18
**removed** [1] - 61:21
**rephrase** [2] - 26:18, 28:6
**replay** [1] - 5:7
**report** [8] - 3:18, 11:10, 24:18, 24:23, 25:4, 63:18, 63:22, 66:24
**REPORTED** [1] - 2:6
**Reporter** [1] - 2:6
**reports** [3] - 3:13, 3:20, 63:8
**representation** [1] - 72:6
**requested** [3] - 21:9, 25:19, 33:19
**requiring** [1] - 51:13
**Resource** [1] - 50:5
**respect** [2] - 15:4, 15:11
**respond** [2] - 21:2, 76:14
**responded** [1] - 33:20
**responding** [1] - 32:15
**response** [1] - 73:17
**rest** [3] - 36:10, 47:23, 48:14
**resulted** [1] - 26:2
**results** [6] - 22:19, 22:20, 24:4, 24:5, 26:23, 26:25
**retrieved** [1] - 55:3
**review** [1] - 16:6
**reviewed** [1] - 64:2
**reviewing** [1] - 16:1
**revolver** [3] - 52:23, 53:18, 54:11
**ribbed** [1] - 29:2
**RID** [2] - 49:25, 50:2
**Rights** [9] - 72:4, 72:18, 72:20, 72:22, 73:18, 77:8, 80:2, 80:5, 80:8
**rights** [2] - 73:23, 74:2
**ring** [1] - 77:14
**rise** [1] - 4:20
**road** [1] - 30:24
**robbery** [1] - 68:6
**Robbery** [5] - 49:24, 68:19, 68:20, 69:6, 69:13
**rocks** [5] - 34:12, 35:10, 35:14, 46:11, 48:15
**Rodolfo** [5] - 9:11, 50:11, 50:15, 69:1, 69:4
**RODOLFO** [1] - 1:6
**roles** [1] - 50:2
**room** [10] - 11:9, 11:12, 20:22, 27:8, 27:24, 28:2, 28:5, 28:7, 28:8, 63:14
**round** [1] - 16:19
**rounds** [5] - 21:18, 21:19, 21:21, 22:16, 29:18
**RPR** [2] - 2:6, 82:4
**rub** [1] - 23:4
**rubbed** [1] - 29:6

**Rubio** [3] - 15:19, 65:8, 80:15
**RUBIO** [5] - 2:4, 15:20, 28:18, 47:5, 80:16
**run** [2] - 52:13, 52:17

## S

**S-E-G-O-V-I-A** [1] - 49:13
**S-I-E-R-R-A** [1] - 30:7
**safe** [4] - 21:16, 61:17, 62:1, 62:19
**safety** [1] - 74:7
**sample** [4] - 75:2, 75:4, 75:8, 75:11
**San** [4] - 5:2, 9:10, 15:23, 25:17
**SANDERS** [3] - 2:6, 82:3, 82:4
**sat** [2] - 71:19, 71:21
**Saturday** [1] - 81:11
**saw** [13] - 7:8, 11:22, 17:2, 17:7, 22:9, 34:17, 38:24, 41:23, 50:18, 51:8, 51:24, 57:22, 61:13
**Scene** [1] - 20:12
**scene** [34] - 3:5, 10:6, 11:18, 17:14, 17:15, 20:13, 20:14, 20:17, 21:1, 24:15, 37:25, 48:6, 56:1, 56:3, 57:4, 58:17, 68:15, 69:6, 69:10, 69:13, 69:23, 69:24, 69:25, 70:1, 70:20, 70:25, 71:2, 71:5, 76:20, 76:21, 77:6, 78:5, 79:4, 79:5
**scenes** [1] - 21:2
**scheduling** [1] - 48:23
**scope** [2] - 19:9, 47:25
**screen** [2] - 32:12, 32:19
**seal** [1] - 23:13
**sealed** [2] - 22:25, 23:7
**search** [3] - 21:2, 33:24, 35:16
**seat** [16] - 52:22, 52:23, 60:5, 60:6, 60:24, 61:8, 61:14, 61:21, 61:22, 62:9, 71:16, 71:19, 74:21, 74:22, 74:23, 75:2
**seated** [4] - 3:1, 4:21, 49:6, 81:3
**seats** [1] - 4:17
**second** [2] - 41:5, 41:6
**seconds** [2] - 8:14, 60:13
**Section** [1] - 68:20
**secure** [1] - 62:21
**SECURITY** [1] - 4:20
**see** [32] - 6:9, 6:25, 13:15, 13:23, 19:19, 24:17, 24:18, 29:10, 31:22, 32:12, 40:13, 41:25, 42:9, 47:9, 47:11, 47:13, 51:12, 51:16, 53:2, 58:15, 59:5, 61:2, 62:23, 62:24, 66:3, 66:21, 68:12, 68:14, 71:9, 73:20, 81:1, 81:17
**seeing** [3] - 39:1, 39:2, 51:10
**Segovia** [7] - 49:8, 49:13, 56:12, 56:14, 57:22, 69:16, 76:15
**seized** [7] - 14:13, 44:24, 59:23, 63:7, 64:4, 64:7, 64:21
**seizure** [1] - 63:8
**sell** [1] - 35:25
**selling** [1] - 32:4
**send** [1] - 46:6
**sent** [1] - 45:21
**separate** [1] - 14:17
**separation** [1] - 81:12
**serial** [13] - 22:8, 22:10, 62:22, 63:4, 63:21, 64:3, 64:7, 64:10, 64:11, 66:21, 66:23, 67:1
**series** [1] - 73:3
**serve** [1] - 20:16
**served** [1] - 30:21
**service** [1] - 20:18
**Service** [1] - 4:16
**SESSION** [1] - 1:5
**several** [2] - 33:25, 77:24
**shape** [2] - 42:1, 42:2
**share** [1] - 68:8
**shift** [2] - 31:14, 31:15
**shirt** [2] - 51:20, 71:10
**Shores** [1] - 2:5
**shortly** [4] - 24:23, 25:15, 32:16, 38:5
**show** [6] - 13:24, 27:19, 45:7, 67:6, 74:11, 79:21
**showing** [13] - 22:2, 23:23, 32:10, 34:2, 39:4, 53:7, 54:7, 55:12, 58:13, 66:21, 70:16, 70:21, 71:25
**shown** [1] - 42:25
**side** [11] - 32:18, 32:22, 41:11, 41:12, 50:18, 51:12, 52:4, 52:5, 65:20, 71:21
**sidebar** [1] - 3:7
**Sierra** [8] - 30:3, 30:7, 30:9, 36:15, 37:17, 37:19, 42:20, 47:9
**sign** [5] - 73:25, 80:1, 80:5, 80:8, 80:9
**signed** [2] - 74:1, 80:2
**signer** [1] - 44:14
**significant** [1] - 16:18
**single** [2] - 41:23, 64:11
**sitting** [1] - 71:10
**situations** [1] - 14:12
**six** [5] - 21:18, 21:19, 24:1, 30:17, 50:1
**size** [1] - 16:18
**skin** [2] - 36:24, 37:2
**skinny** [1] - 37:7
**small** [2] - 33:11, 35:17
**smaller** [2] - 77:14, 77:15
**smell** [4] - 52:21, 59:12, 66:19, 70:2
**smelled** [3] - 52:6, 52:15, 66:16
**smelling** [1] - 52:8
**someone** [5] - 38:16, 44:4, 64:16, 69:12, 69:19
**sometimes** [2] - 4:8, 45:11
**somewhere** [1] - 5:20
**sorry** [10] - 25:8, 29:4, 29:21, 31:25, 34:14, 36:20, 45:19, 61:18, 78:14, 78:15
**sort** [1] - 58:7
**sound** [1] - 43:22
**sounds** [1] - 43:24
**South** [5] - 1:22, 30:12, 49:21, 49:22, 49:24
**sOUTHERN** [1] - 1:1
**space** [1] - 68:8
**speaking** [3] - 9:2, 22:6, 36:15
**specifically** [1] - 32:8
**speech** [1] - 73:13
**spell** [4] - 20:2, 30:6, 49:12, 67:19
**standard** [2] - 14:13, 25:22
**standing** [7] - 32:24, 33:22, 39:2, 40:19, 41:20, 71:20, 72:21
**start** [2] - 3:2, 41:17
**started** [3] - 33:8, 51:8, 52:9
**starting** [1] - 73:7
**state** [4] - 20:2, 30:5, 49:11, 67:19
**statement** [4] - 76:10, 79:17, 80:9, 80:10
**statements** [3] - 36:19, 36:22, 79:13
**States** [4] - 2:6, 30:2, 30:21, 49:8
**STATES** [3] - 1:3, 1:11, 1:14
**stating** [1] - 14:11
**station** [1] - 25:9
**status** [1] - 48:22
**stay** [2] - 33:3, 52:1
**step** [4] - 19:23, 29:25, 48:17, 67:16
**stepped** [1] - 52:16
**sterile** [2] - 23:2, 23:8
**stick** [1] - 23:2
**sticks** [1] - 12:9
**still** [3] - 6:19, 7:18, 11:14
**stippling** [1] - 29:1
**stop** [17] - 41:18, 46:21, 50:16, 50:17, 51:1, 56:6, 56:20, 57:1, 57:3, 57:10, 57:24, 58:18, 60:19, 62:3, 62:6, 69:17, 69:20
**stopped** [5] - 57:1, 59:4, 74:21, 74:23, 74:24
**stopping** [2] - 58:2, 58:4
**store** [4] - 56:7, 56:8, 74:25, 75:1
**straight** [1] - 76:21
**Street** [8] - 1:15, 1:20, 2:2, 2:4, 50:19, 56:15, 56:24, 57:7
**street** [2] - 50:19, 68:7
**streets** [1] - 74:7
**stretch** [1] - 80:25
**strike** [2] - 54:18, 54:19
**strong** [6] - 52:7, 58:8, 59:12, 59:20, 66:16, 66:20
**subject** [1] - 34:22
**submitted** [5] - 13:20, 14:4, 14:6, 15:24, 43:2
**substance** [1] - 36:1
**substantially** [1] - 34:17
**Suite** [4] - 1:18, 1:23, 2:2, 2:7
**supervisor** [1] - 20:12
**Surami** [1] - 10:10
**surface** [3] - 22:14, 23:4, 29:2
**surveillance** [1] - 10:14
**suspect** [1] - 42:9
**suspects** [6] - 76:5, 78:10, 78:12, 78:15, 78:20, 78:23
**suspicion** [1] - 45:24
**sustain** [1] - 19:11
**sustained** [4] - 16:12, 33:6, 48:9, 69:8
**swab** [8] - 22:22, 22:25, 23:3, 23:12, 23:14, 28:22, 29:22
**swabbed** [1] - 23:21
**swabbing** [1] - 26:6
**swabs** [7] - 23:6, 23:11, 27:9, 27:12, 27:24, 28:1, 28:7
**switch** [1] - 4:17
**SWORN** [3] - 20:1, 30:4, 49:10
**synopsis** [1] - 69:17

## T

**T-H-E-Y-E** [1] - 20:5
**t.v** [1] - 29:10
**table** [2] - 41:19, 71:10
**TAKEN** [2] - 49:5, 81:18
**tape** [10] - 77:25, 78:4, 78:6, 78:9, 78:15, 78:20, 78:23, 79:7, 79:10, 80:8

**task** [5] - 68:1, 68:10, 68:11, 71:20, 72:19
**tattoo** [5] - 7:22, 7:23, 8:4, 8:16, 8:25
**taught** [1] - 46:14
**teach** [2] - 12:18, 12:19
**Tec** [4] - 12:3, 16:8, 16:21, 16:25
**technology** [1] - 4:18
**ten** [3] - 48:20, 49:4, 49:19
**tenants** [1] - 40:24
**tender** [2] - 56:9, 75:16
**Tennessee** [1] - 20:25
**test** [8] - 35:12, 45:4, 45:5, 45:6, 45:8, 45:9, 45:11, 45:12
**tested** [4] - 35:12, 35:13, 35:14, 64:24
**testified** [5] - 10:16, 11:6, 56:14, 59:11, 79:13
**testify** [1] - 46:8
**testifying** [2] - 24:16, 58:18
**testimony** [3] - 13:12, 38:19, 41:23
**testing** [2] - 34:12, 35:11
**tests** [1] - 46:7
**THE** [106] - 1:11, 1:14, 3:1, 3:14, 3:23, 4:4, 4:14, 4:19, 4:21, 5:11, 6:7, 6:23, 7:6, 8:1, 8:20, 9:6, 9:8, 9:12, 9:15, 15:17, 15:19, 15:21, 16:4, 16:12, 19:10, 19:23, 20:2, 20:4, 22:1, 24:9, 25:2, 27:17, 28:16, 28:19, 29:16, 29:25, 30:5, 30:7, 32:20, 32:21, 33:6, 33:7, 33:17, 33:18, 34:5, 34:24, 35:2, 35:20, 36:13, 37:14, 38:8, 38:9, 39:7, 39:14, 39:16, 40:2, 40:4, 40:9, 46:19, 46:24, 47:1, 47:3, 47:6, 48:1, 48:9, 48:17, 48:22, 49:6, 49:11, 49:13, 51:23, 53:5, 54:3, 54:5, 54:19, 55:10, 55:24, 56:10, 57:18, 57:20, 58:11, 58:24, 59:2, 63:1, 63:24, 65:5, 65:8, 65:10, 67:16, 67:19, 67:21, 69:8, 70:14, 71:13, 71:23, 72:11, 72:13, 75:17, 75:20, 78:18, 80:13, 80:15, 80:17, 80:19, 81:3, 81:15
**themselves** [1] - 39:25
**thereafter** [3] - 24:23, 25:15, 33:20
**Theye** [7] - 19:25, 20:4, 20:7, 24:13, 24:14, 24:15, 28:21
**Third** [1] - 30:21
**Thomas** [2] - 67:18, 67:21
**THOMAS** [1] - 67:21
**threw** [1] - 41:14
**throughout** [1] - 41:7
**throw** [2] - 41:23, 42:4
**tie** [1] - 51:20
**tied** [1] - 34:23
**Tinoco** [1] - 81:12
**tint** [1] - 58:6
**tinting** [2] - 58:5, 59:8
**tints** [1] - 58:8
**tip** [1] - 23:2
**title** [3] - 20:11, 30:14, 75:23
**today** [8] - 4:6, 17:23, 40:11, 42:23, 53:13, 53:14, 71:9, 79:13
**toe** [1] - 47:11
**together** [5] - 10:22, 10:24, 10:25, 11:7, 31:6
**tone** [1] - 36:24
**took** [12] - 9:11, 10:1, 11:11, 13:17, 61:9, 61:19, 62:13, 62:15, 63:14, 67:13, 71:6, 77:16
**top** [3] - 27:20, 34:13, 72:24
**toss** [1] - 42:5
**tossed** [3] - 42:6, 47:14, 47:16
**total** [1] - 68:21
**totally** [1] - 13:7
**touch** [3] - 11:25, 29:9, 32:19
**touched** [1] - 29:13
**towards** [6] - 32:25, 33:2, 33:3, 51:6, 52:3, 65:20
**traffic** [10] - 50:16, 50:17, 50:24, 50:25, 56:20, 57:1, 57:10, 57:23, 57:24, 58:18
**trained** [1] - 42:9
**training** [5] - 20:19, 45:25, 76:5, 76:7, 78:24
**transaction** [7] - 17:20, 18:1, 18:2, 18:4, 18:7, 18:10, 18:14
**TRANSCRIPT** [1] - 1:10
**transcription** [1] - 82:2
**transfer** [2] - 17:13, 17:16
**transferred** [1] - 19:19
**trial** [3] - 49:1, 81:9, 81:15
**TRIAL** [1] - 1:10
**trigger** [1] - 12:10
**trying** [1] - 23:4
**turn** [1] - 39:12
**turned** [4] - 10:21, 11:8, 23:15, 27:14
**turns** [1] - 45:14
**twenties** [1] - 37:1
**Two** [1] - 1:23
**two** [7] - 13:7, 14:17, 23:1, 27:10, 39:5, 57:10, 62:20
**type** [4] - 12:1, 21:23, 52:14, 59:8
**types** [1] - 14:12

**U**

**ultimately** [2] - 41:2, 53:1
**un-fired** [1] - 21:22
**un-redacted** [2] - 3:12, 3:18
**under** [6] - 62:9, 73:8, 74:20, 74:22, 74:23, 75:1
**underneath** [10] - 11:14, 52:22, 52:23, 60:4, 60:23, 61:7, 61:14, 61:21, 61:22, 61:24
**understood** [2] - 25:20, 26:1
**underwear** [1] - 55:3
**uniform** [2] - 49:21, 50:6
**uniformed** [2] - 68:11, 68:14
**unique** [2] - 64:10, 64:11
**unit** [2] - 23:15, 31:1
**Unit** [2] - 50:5, 68:19
**UNITED** [2] - 1:3, 1:14
**United** [4] - 2:6, 30:2, 30:21, 49:8
**uNITED** [1] - 1:11
**units** [1] - 52:3
**University** [1] - 20:24
**unless** [1] - 23:18
**unmarked** [4] - 71:17, 76:25, 77:1, 77:2
**up** [12] - 3:3, 5:9, 10:20, 11:2, 23:13, 27:19, 34:10, 34:23, 40:17, 42:4, 46:4, 81:6
**useful** [1] - 46:7
**utensils** [3] - 77:21, 79:11, 79:17
**utterance** [1] - 36:5

**V**

**V14350** [2] - 63:21, 64:8
**various** [1] - 64:1
**Vazquez** [3] - 3:7, 3:23, 48:23
**VAZQUEZ** [43] - 1:14, 3:12, 3:21, 3:24, 15:22, 16:3, 16:5, 16:11, 16:13, 19:12, 19:22, 49:8, 49:14, 51:21, 53:4, 53:6, 53:25, 54:4, 54:6, 54:20, 55:9, 55:11, 55:21, 55:25, 56:9, 58:23, 65:11, 67:15, 67:18, 67:22, 69:9, 70:13, 70:15, 71:11, 71:14, 71:22, 71:24, 72:8, 72:12, 72:14, 75:16, 78:17, 80:18
**vehicle** [30] - 51:2, 51:4, 51:9, 52:4, 52:5, 52:7, 52:16, 52:21, 54:25, 57:13, 58:2, 58:4, 59:6, 63:17, 65:21, 65:22, 66:1, 66:3, 66:11, 69:17, 69:25, 70:1, 70:5, 70:6, 71:5, 71:20, 76:25, 77:1, 77:3, 77:8
**video** [7] - 3:4, 5:2, 5:5, 5:25, 7:19, 18:16, 18:19
**VIDEOTAPE** [6] - 5:11, 6:7, 6:23, 7:6, 8:1, 8:20
**visible** [1] - 23:18
**visitation** [1] - 81:11
**visiting** [1] - 33:13
**voice** [4] - 8:22, 8:24, 18:23, 18:25
**volunteered** [1] - 60:1
**vs** [1] - 1:5

**W**

**W-E-V-E-R** [1] - 67:21
**wait** [1] - 75:14
**waiver** [8] - 72:4, 72:18, 72:20, 72:24, 73:18, 77:9, 80:2, 80:8
**wake** [1] - 3:2
**walk** [1] - 33:11
**walked** [5] - 10:20, 32:24, 52:4, 52:6, 54:22
**walking** [6] - 33:1, 33:2, 33:8, 41:17, 51:6, 65:20
**wall** [5] - 32:22, 38:22, 40:13, 40:20, 40:21
**warrants** [1] - 52:19
**water** [1] - 23:3
**weapon** [7] - 21:9, 21:10, 21:11, 23:5, 28:14, 29:2, 67:4
**wearing** [4] - 5:20, 8:8, 51:20, 71:10
**Weaver** [1] - 75:25
**weed** [6] - 52:10, 55:1, 55:2, 55:4, 55:17, 60:2
**West** [1] - 1:20
**wet** [1] - 29:6
**Wever** [11] - 56:1, 61:17, 62:13, 62:15, 62:18, 63:16, 67:14, 67:18, 67:21, 76:1, 76:2
**white** [1] - 39:19
**width** [2] - 12:9, 14:10
**WILLIAMS** [1] - 1:11
**willing** [1] - 36:8
**wind** [1] - 42:4
**window** [4] - 59:8, 71:21, 72:21
**windows** [2] - 58:4, 58:5

**WITNESS** [14] - 9:12, 20:1, 20:4, 30:4, 30:7, 32:21, 33:7, 33:18, 38:9, 39:16, 40:4, 49:10, 49:13, 67:21
**witness** [24] - 4:1, 8:12, 9:14, 16:3, 19:24, 21:25, 25:1, 27:16, 30:1, 34:4, 38:7, 39:6, 46:22, 49:7, 51:21, 51:22, 56:9, 58:10, 62:25, 63:23, 67:17, 71:11, 72:22, 75:16
**witnessed** [1] - 44:18
**witnesses** [1] - 3:16
**wooden** [1] - 23:2
**words** [1] - 45:20
**worry** [1] - 52:11
**write** [4] - 38:11, 73:6, 79:17, 80:9
**writing** [3] - 77:21, 79:11, 79:16
**written** [3] - 79:22, 80:1, 80:10
**wrote** [9] - 12:23, 13:9, 36:18, 44:20, 63:20, 64:3, 64:6, 67:2, 77:24

## X

**Xanax** [5] - 34:11, 35:8, 36:1, 46:10, 46:11

## Y

**Y14350** [2] - 62:22, 63:5
**year** [1] - 68:3
**years** [8] - 20:14, 20:16, 30:17, 31:6, 49:19, 50:1, 68:23, 76:3
**yellow** [3] - 34:10, 35:4, 35:5
**yesterday** [4] - 3:4, 5:2, 5:13, 48:23
**young** [1] - 36:25
**yourself** [5] - 10:7, 10:23, 11:1, 28:13, 55:5