UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NUMBER 14-20017-CR-KMW

UNITED STATES OF AMERICA 2-25-2015

DAY TWELVE
vs. A.M. SESSION

MAURIN CHACON PAGES 1-100
RODOLFO PORTELA
CHRISTOPHER ALTAMIRANO
JAMES DIXON
JAY ANTHONY FLORES,
Defendants

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS HELD
BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT COURT JUDGE

---

APPEARANCES:

FOR THE UNITED STATES: IGNACIO VAZQUEZ, A.U.S.A.
ILHAM HOSSEINI, A.U.S.A.
MARK DISPOTO, A.U.S.A.
99 N.E. 4th Street
Miami, FL 33132

FOR DEFENDANTS: MANUEL GONZALEZ, ESQ.
2000 Ponce DeLeon Boulevard
Suite 614
Coral Gables, FL 33134

PAUL KORCHIN, A.F.P.D
150 West Flagler Street
Miami, FL 33130

PHILIP HOROWITZ, ESQ.
9130 South Dadeland Boulevard
Suite 1910 - Two Datran Center
Miami, FL 33156

**APPEARANCES CONTD.**

**DAVID DONET, JR. ESQ.**
**3250 Mary Street**
**Suite 406**
**Fort Lauderdale, FL 33133**

**HERMAN FRANK RUBIO, JR. ESQ.**
**1107 N.E. 104th Street**
**Miami Shores, FL 33138**

REPORTED BY: PATRICIA SANDERS, RPR
*United States Court Reporter*
400 North Miami Avenue, Suite 11-3
Miami, FL 33128
T: 305.523.5528
patricia_sanders@flsd.uscourts.gov.

THE COURT: Please be seated everyone. We're waiting for three jurors.

So we can take up the 404 B as to Mr. Dixon if you would like.

MR. VAZQUEZ: Yes, Your Honor. I attempted to e-mail Mr. Donet very early this morning, but I provided a paper copy to Mr. Donet and Ms. Greer.

This 404 B involves six plastic baggies containing suspect cocaine. The item was analyzed and it came to less than 28 grams of cocaine.

As we learned through Mr. Horowitz's cross examination cocaine is not distinguished in the State unless it is specifically asked for between base and powder.

So this was analyzed simply for cocaine. But it was referenced in six plastic baggies so it was individually packaged.

We think consistent with the activity that has been involved in this case that would be relevant to intent.

THE COURT: When was the arrest date-wise?

MR. VAZQUEZ: February 2010.

THE COURT: All right. Mr. Donet.

MR. DONET: Your Honor, the six baggies contained powder cocaine and not crack cocaine. Also, it is too remote in time. Although we're talking about 2010, given how old Mr. Dixon was, which was February 16th of 2010, he was three weeks

past his 16th birth date. This did not occur in the area of Little Havana. He was arrested it what was considered to be Liberty City or Overtown, NW 47th Avenue and about -- NW 47th Stret and 20 Something Avenue.

He was not arrested with the other members that are in this conspiracy -- or have been alleged to have been associated with this conspiracy.

He was a juvenile at the time, although it became a felony conviction. He was initially placed in Bootcamp and his case was bound up to Adult Court.

He was given Youthful Offender Sanctions, he violated those conditions, and they closed his case out as an adult to a felony conviction.

Based on the remoteness of time, the different type of narcotics, the fact he was not associated with any of these defendants or at a place anywhere near these defendants -- the primary charges were something completely different.

He was arrested at home, and the cocaine was on him. He was not arrested for any type of sale; it was a simple possession.

We would argue it was a personal use amount of cocaine. We are talking about six little baggies. We don't know if all the baggies were full of cocaine.

We know it's less than 28 grams. Some of those baggies may have contained residue, we don't know.

Based on those arguments we submit it should not come in under 404 B.

THE COURT: The fact of packaging tends to put me over the line in terms of 404 B. I understand the law with regard to possession, sale and use of 404 B,. But I am unclear here.

It seems at this point Mr. Dixon was not putting his intent at issue and was acknowledging the one time at Count 25, and that might be a misapprehension on my part.

But Mr. Vazquez, the events you wish to put in are sanitized, the false imprisonment is out --

MR. VAZQUEZ: Yes, Your Honor. What I propose to do -- with some of the other counsel I have worked this out -- is to draft stipulations, and it would only say Defendant X was convicted of this offense on this day.

It is a stipulation by the parties. The jury does not have to question if something is redacted. I find that to be a cleaner process for both the Government and the defense.

THE COURT: All right. You can talk to Mr. Donet about if he would like to do that as well.

MR. DONET: Your Honor, I would agree with some type of stipulation saying Mr. Dixon was convicted of possession of cocaine.

We have conceded in opening as to the sale on April 1st. I believe the Government is trying to introduce this evidence -- I guess to go towards the conspiracy count.

THE COURT: So you have basically said -- I thought I heard that in opening -- but that was the death flu.

MR. DONET: We conceded that.

MR. VAZQUEZ: Your Honor, it is for conspiracy purposes.

THE COURT: I don't know that possession gets you to conspiracy. I understand why you tried to argue -- although I don't think you were going to get there -- the group dynamics.

MR. VAZQUEZ: Your Honor, I have cited, and I can get the case, but there is Eleventh Circuit case law that says that possession can be used -- a possession incident can be used to prove intent to conspiracy.

THE COURT: All right. There's a new case, I have not had a chance to read it because I am --

MR. VAZQUEZ: Here.

THE COURT: But I think it is Judge Rosenbaum when she was a District Judge; Nathaniel Holt. It is 67 pages.

If I find the pertinent portions I will get them to you, Mr. Donet and you, Mr. Vazquez. It does talk about 404 B.

I know you have cited the case in your papers, Mr. Vazquez, but if you could hand up the cite at some point.

MR. VAZQUEZ: Yes, Your Honor.

THE COURT: That's what I have been thinking about in terms of the 404 B. I thought the nature of either the product or the amount would let me know.

Since Mr. Dixon has given up the ghost on sale; yes, I have sold, I don't know where saying he has done that before helps you on a conspiracy issue.

But let me look at the case, and let's all look at the Holt Case.

MR. VAZQUEZ: Just so I am clear, on the 404 B, I have spoken with Mr. Gonzalez and Mr. Korchin, and if their clients are in accord I would intend to draft a similar stipulation to the 404 B that the Court has admitted as to to Mr. Portela.

THE COURT: Very good.

MR. VAZQUEZ: If I have time I can send counsel a draft.

THE COURT: All right.

MR. VAZQUEZ: Your Honor, as to Mr. Chacon -- I don't recall specifically, but I thought the Court left it open.

Mr. Gonzalez recalls that the Court decided the strong armed robbery was not going to come in.

I thought Your Honor said we could revisit it as the evidence was coming in. We were seeking to admit it reference to the charged Vicar count, although he is charged under Pinkerton, not as an actual participant.

There was a cocaine conviction that I spoke with Mr. Gonzalez about that we would enter into a stipulation on.

THE COURT: I will have to go back and look at my notes, Mr. Gonzalez.

I think I had indicated I was not inclined on the strong armed robbery, but I think I had reserved.

Let me check on that before you go forward on that, Mr. Vazquez.

MR. GONZALEZ: My understanding was the one felony convictions for conviction was coming in for purposes of establishing he is a prior convicted felon, which we stipulated to.

I think there was a chain snatching in Miami Beach or something.

THE COURT: But I think the possession -- I asked again for the amount.

MR. VAZQUEZ: And Mr. Gonzalez found it was nine rocks, and forwarded the A form in response.

THE COURT: I don't think that was the predicate for convicted felon. I thought that was 404 B in general.

MR. GONZALEZ: Right. But with regard to the one about the arrest for the rocks, I had not seen any lab report on that, but that was the State case that was no action'd by the State.

MR. VAZQUEZ: I'm sorry -- I am a little confused. There was a conviction for possession of cocaine.

THE COURT: That is what I thought we were talking about.

MR. VAZQUEZ: That's the only one that -- I am not

going to advance evidence of the no action'd acquitted count.

THE COURT: All right.

MR. VAZQUEZ: If everyone is in accord, I would do the same thing, by written stipulation.

THE COURT: All right.

MR. VAZQUEZ: Then we don't have to call the person that compared and took their fingerprints.

MR. GONZALEZ: That is fine with the defense; we have talked about that.

THE COURT: Mr. Korchin.

MR. KORCHIN: Yes, Your Honor.

THE COURT: Yes Mr. Rubio.

MR. RUBIO: Your Honor, I wanted to object for the record to Exhibit 35 that we talked about at the end of the day yesterday, which is a small quantity of personal possession that Mr. Flores was alleged to have had on him when he was arrested.

I would object on the grounds that it's not relevant, part of the conspiracy; it's personal use.

It was not something that was sold to him by a BMT member or marijuana that he was going to sell, and on that basis I would object to the introduction.

If the Court is inclined to let it in I would stipulate as I told Mr. Vazquez to chain of custody.

THE COURT: Well, I am going to let it in, so I will

overrule your objection. But thank you for discussing the chain of custody with Mr. Vazquez.

All right. The Marshals need a little extra time for lunch so we will take an hour and a half for lunch, noon to 1:30.

All right. Is there anything else?

MR. VAZQUEZ: Your Honor, I anticipate that our last witness will be the case agent, given the stipulations by counsel.

I expect he will be a fairly long witness. I would ask if perhaps have could have one of the lead detectives sit in as the substitute case agent to help out --

THE COURT: To assist with evidence.

MR. VAZQUEZ: The evidence and things of that nature.

THE COURT: Defense.

MR. HOROWITZ: I would object.

THE COURT: Why do you object?

MR. HOROWITZ: The Government is entitled to one case agent. I think they can marshall the evidence and have it right next to him. But I don't think they are entitled to have a second case agent.

THE COURT: Well, I think that is a kind of a fluid situation.

Where is Mr. Dispoto?

MR. VAZQUEZ: He stepped out.

THE COURT: His silence may cost him.

MR. GONZALEZ: Your Honor, there are three Assistant United States Attorneys. I think they can keep track of the evidence between the three of them.

THE COURT: They can, yes. But my concern is what would advance the efficiency of this trial.

Mr. Dispoto, do you think while your case agent is testifying you may be able to help Ms. Hosseini marshall the evidence to pass up to Mr. Vazquez.

MR. DISPOTO: Of course, Your Honor.

THE COURT: Let's go with that, Mr. Vazquez; see how we do.

MR. VAZQUEZ: Your Honor, if we have to go overnight -- which we probably will -- we of course won't talk about the case.

But there are pieces of evidence that may be coming to him as my surrogate. I assume I would be allowed the receive that evidence, but not have any narrative communication about that.

THE COURT: Of course.

MR. VAZQUEZ: If he receives a document from another agency he could press click and forward it to me.

THE COURT: He certainly could.

MR. VAZQUEZ: Without talking about it.

THE COURT: And then you will press forward to

counsel. Okay we have our jury; let's bring them in.

COURT SECURITY OFFICER: All rise, please.

THE COURT: Please be seated everyone. Good morning ladies and gentlemen of the jury.

All right. Ms. Hosseini, call your next witness.

MS. HOSSEINI: The United States calls Javier Ribbas

WITNESS SWORN

THE COURTROOM DEPUTY: Please state your full name and spell it for the record.

THE WITNESS: My name is Javier Ribbas; J-A-V-I-E-R R-I-B-B-A-S.

BY MS. HOSSEINI:

Q. Good morning, agent.

A. Good morning.

Q. How are you currently employed?

A. I am a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Q. Commonly referred to as ATF?

A. That's correct.

Q. How long have you been employed by ATF?

A. Approximately seven years.

Q. Can you briefly describe your educational background?

A. I graduated from Florida International University with a Bachelor's Degree. After graduating I was a Deputy United States Marshal here in Miami.

Q. What is your current assignment with ATF?
A. I am a special agent. As a special agent I enforce Federal regulations regarding firearms and explosive violations.
Q. What are your present duties just generally?
A. Part of my duties are to enforce Federal regulations regarding firearms and explosives.
Additionally I am an interstate nexus examiner here in Miami.
Q. What does it mean to be an interstate nexus examiner?
A. As an examiner I examine various firearms and ammunition on a daily basis to determine if a certain firearm or ammunition traveled in Interstate Commerce.
An example would be if a particular firearm was manufactured outside of the State of Florida and traveled through commerce by plane, train or car to the State of Florida.
There are a lot of firearms manufactured outside of the United States. So whatever the commerce to get into the State of Florida as well.
Q. Have you had any kind of training to become an interstate nexus examiner?
A. I had numerous training (sic) to become an interstate nexus examiner. I first started as -- training in our firearms technology branch. They provide training for -- to be certified as an examiner.

Training to be familiar with all the Federal regulations regarding firearms labeling. For example, all firearms need to have identifying features such as manufacturer, caliber, serial number.

If it was transported from outside the United States into the United States it needs an importer mark as well as a serial number.

Q. And are you certified?

A. Yes.

Q. Do you need to be certified to testify in Federal Court?

A. Yes, ma'am.

Q. How do you go about identifying a firearm's origins?

A. For example, yesterday I examined a firearm. An agent or task force officer asked me to examine a firearm for interstate nexus. I retrieved the firearm, put on gloves; I looked at all the features on the firearm. I looked at the manufacturer, the caliber, the model, serial number.

I looked at any other identifying features. For example, a manufacturer outside of the United States has markings that are specific to their manufacture.

Also I look at the ammunition for the caliber and also the manufacturer via the head stamp on the bottom of the cartridge case.

Q. In your duties as an ATF agent you say you have had the opportunity to examine firearms to be able to determine their

identification, classification and origin; is that right?
A. That's correct.
Q. How many times have you done so?
A. Over 500 firearms and thousands of rounds of ammunition.
Q. Have you testified before and been recognized as an expert in Federal Court in the field of identification, classification and origination of firearms and ammunition?
A. Yes, ma'am.
Q. How many times.
A. Eight times.
Q. Have you ever failed to qualify as an expert?
A. No, ma'am.
MS. HOSSEINI: At this time I would tender the witness as an expert in the origin, identification and classification of firearms and ammunition.
THE COURT: Any objection?
MR. GONZALEZ: No, Your Honor.
THE COURT: All right.
Q. Agent Ribbas showing you what has been admitted into evidence as Government's Exhibit 232.
A. Yes.
MS. HOSSEINI: May I approach.
THE COURT: You may.
BY MS. HOSSEINI:
Q. Do you recognize this item?

A. Yes, ma'am.
Q. How do you recognize it?
A. It is an H & R, also known as Harrington & Richardson, revolver, model 90122 caliber, bearing a serial number of Y14350.
Q. Is there anything else aside from the firearm you showed us --
A. Yes. There are approximately nine rounds of .22 caliber long rifle ammunition.
Q. Have you had the opportunity to examine these items before coming to court today?
A. Yes, ma'am.
Q. Can you describe your examination, please.
A. Yes. I looked at the revolver previous to coming to court and made notes of the labeling, the manufacturer, model number, the serial number.
From there I look at the research -- I have electronic research, I have a library of books I use. From there I was able to determine that the firearm was manufactured in the State of Massachusetts.
MS. HOSSEINI: Would it be possible if the witness could use the ELMO to describe what he is looking at.
THE COURT: Yes.
BY MS. HOSSEINI:
Q. Agent Ribbas if you could step down.

A. Yes, ma'am.
Q. If you could continue, please.
A. Yes. As I said, I found and looked at the manufacturer. You can see there it says H & R -- it says H & R, Incorporated.
The model number is here 901, .22 caliber. And it was manufactured in Massachusetts. And also you will see the serial number right here Y14350.
Q. And, agent, is this in fact a firearm?
A. Yes, ma'am.
THE COURT: Everybody check their phones, make sure they are off.
You may continue, Ms. Hosseini.
BY MS. HOSSEINI:
Q. Agent Ribbas, you said this is a firearm, correct?
A. Yes, ma'am.
Q. How do you know that?
A. It fits the Federal definition of a firearm, which is any weapon which will or is designed to or readily convertible to expel a projectile by the action of an explosive.
Additionally, it is a frame or receiver. And this right here is the frame of the firearm.
Q. Can we look at the rounds you were discussing previously.
A. Yes, ma'am.
Q. What is this?
A. This is the cartridge -- you can see what looks to be a U

shaped marking on the head-stamp. This is an identifying marking from Remington where they manufactured the firearm -- manufactured the ammunition.

This is a .22 caliber long rifle cartridge.

Q. Government's Exhibit 232 is in fact ammunition?

A. Yes.

Q. Can it operate within the firearm you were previously discussing, also part of Government's Exhibit 232?

A. That's correct.

Q. Based on your examination do you have an opinion as to whether the firearm and the ammunition was manufactured outside of the State of Florida?

A. Yes, ma'am. The revolver was manufactured in the State of Massachusetts.

Additionally, the ammunition was manufactured in Arkansas or in Connecticut, and there is one round of Federal ammunition that was manufactured in Massachusetts -- I'm sorry, Minnesota; I apologize.

Q. Based on your examination do you have an opinion whether the firearm and the ammunition traveled in Interstate or Foreign Commerce?

A. Both the revolver and the ammunition traveled in Interstate Commerce in order to arrive in the State of Florida.

Q. I would like to show you Government's Exhibit 98 and 99. Do you recognize Government's Exhibit 98?

A. Yes, ma'am.
Q. What is it.
A. The firearm is a Kel-Tec P-32, 32 auto caliber C F 020. Semi automatic pistol.
Q. Is that if fact a firearm?
A. Yes, ma'am.
Q. Can you take us through who made the firearm and where it was made?
A. On the frame of the firearm you can see that it's made by Kel-Tec. It is a P-32; it is a .32 auto. It was manufactured in Cocoa Beach; of course made in the United States.
You can see the serial number here bearing number CF020.
Q. Can I have Exhibit 98 back, and you can hold onto Exhibit 99.
A. Sure.
Q. What is Exhibit 99?
A. It is six rounds of ammunition of .32 auto Federal cartridge ammunition.
Q. Can that operate within Government's Exhibit 98?
A. Yes, ma'am.
Q. Based on your examination do you have an opinion whether the firearm and the ammunition were manufactured outside the State of Florida?
A. Yes. The ammunition was manufactured outside of the State of Florida in Minnesota. However the Kel-Tec firearm was

manufactured in the State of Florida, so I am unable to determine if it traveled in Interstate Commerce.
Q. As to the Kel-Tec, you are unable to determine whether it traveled in Interstate Commerce?
A. Yes, ma'am.
Q. How about the ammunition?
A. It traveled from Minnesota, in order to arrive in the State of Florida, in Interstate Commerce.
MS. HOSSEINI: Tender the witness.
THE COURT: Cross examination, Mr. Gonzalez.
MR. GONZALEZ: No questions, Your Honor.
THE COURT: Mr. Horowitz.
MR. HOROWITZ: No questions.
THE COURT: Mr. Korchin.
BY MR. KORCHIN:
Q. Agent Ribbas, with respect to Exhibit 232, the H & R revolver, the first firearm you testified about, can you tell from your training and experience when the firearm was manufactured?
A. Based on the serial number approximately early 1960's.
Q. That's over 50 years ago?
A. I am doing math too -- approximately 55 years give or take.
Q. Would that be an antique firearm?
A. No, sir.
Q. What is an antique firearm?

A. An antique firearm is any firearm manufactured prior to 1898 and uses an antique ignition system such as the Flint lock system, like you see in old movies, the big flash powder.
Q. How can you determine -- you say an antique firearm is a firearm manufactured before 1898?
A. Yes, sir.
Q. How do you know that is the definition of an antique firearm?
A. The training I have done in the past with ATF they taught us what an antique firearm is.
Q. With respect to the Kel-Tec -- when you examined that firearm to determine whether it had traveled in Interstate or Foreign Commerce you described it as a .32 caliber?
A. .32 auto.
Q. When you examined it, it was obvious to you it was not a .380 caliber?
A. It was a .32 auto.
Q. Just by looking at it you were able to see it was not a .380 caliber?
A. I would have to see the frame to see what the firearm is chambered in --
Q. I'm sorry?
A. I would have to see the frame to see what the firearm is chambered in. I can't look at a firearm over there and see what it is chambered in --

Q. When you say chambered in what are you referring to?
A. When the round enters the barrel -- there is like a little ramp it feeds into. And when you rack the slide, or chamber around, the round goes into the barrel and it is seeded there in order to be fired.
Q. What I am really asking is -- you were able to determine the Kel-Tec was a .32 caliber by picking it up and looking at the firearm itself and reading on it the description, correct?
A. Correct, sir.
MR. KORCHIN: No further questions.
THE COURT: Mr. Donet.
MR. DONET: No questions.
THE COURT: Mr. Rubio.
MR. RUBIO: No, Your Honor.
THE COURT: Any redirect?
MS. HOSSEINI: Very briefly, Your Honor.
THE COURT: All right.
BY MS. HOSSEINI:
Q. Agent Ribbas, where were you when you examined the firearm and ammunition?
A. I believe I looked at them in different locations. The Kel-Tec was the City of Miami Police Department and I believe the H & R revolver was in our office.
Q. Was it at the crime scene?
A. No, ma'am.

MS. HOSSEINI: Thank you, Your Honor.

THE COURT: All right, agent, you may step down.

Government, call your next witness.

MS. HOSSEINI: United States calls Special Agent Jason Stankiewicz.

WITNESS SWORN

THE COURTROOM DEPUTY: Please state your full name and spell it for the record.

THE WITNESS: My name Jason Stankiewicz, which is spelled S-T-A-N-K-I-E-W-I-C-Z.

BY MS. HOSSEINI:

Q. Good morning, agent.

A. Good morning.

Q. How are you currently employed?

A. I am currently employed with the Bureau of Alcohol, Tobacco, Firearms and Explosives here in Miami, Florida.

Q. How long have you been employed there?

A. Ten years.

Q. What is your current assignment?

A. I am a special agent assigned to the ATF, Miami Field Division, Miami Group Four.

Q. What are your present duties?

A. I investigate violent crimes involving firearms, and in most cases narcotics.

Q. Do you also inspect firearms?

A. Yes, I do.
Q. Have you had any advanced training in the inspection of firearms?
A. Yes, I have. I attended and passed the ATF Advanced Firearms or Interstate Nexus School in 2009.
Q. Did that school allow you to be an interstate nexus examiner?
A. Yes, it did.
Q. Did you receive a certification?
A. Yes, I did.
Q. Do you need to be certified as such to testify in Federal Court?
A. Yes.
Q. How did you go about identifying the firearms' origins?
A. The process is something we do with each firearm that we come in contact with. It also pertains to ammunition as well.
We conduct a physical examination of each firearm and ammunition, and we identify the markings the writing on each firearm and ammunition.
And based on those markings we are able to determine when and where the firearm and ammunition were originally manufactured.
Q. In your duties as an ATF special agent have you had a chance to identify firearms to determine the identification, classification and origin?

A. Yes, I have.
Q. How many times have you done so?
A. Hundreds of times with firearms, thousands of times with ammunition.
Q. Have you testified before and been recognized as an expert in Federal Court in the field of identification, classification and origination of firearms and ammunition?
A. Yes.
Q. Approximately how many times?
A. 25.
Q. Have you ever failed to qualify as an expert?
A. No, I have not.
MS. HOSSEINI: At this time I would tender the witness as an expert in the origin, identification and classification of firearms and ammunition.
THE COURT: Any objection?
MR. GONZALEZ: No, Your Honor.
THE COURT: I so find. You may proceed.
MS. HOSSEINI: Thank you, Your Honor.
BY MS. HOSSEINI:
Q. Special Agent Stankiewicz, I would like to show you what has been previously entered into evidence as Government's Exhibit 167 A
A. Yes.
MS. HOSSEINI: May I approach the witness?

THE COURT: You may.

BY MS. HOSSEINI:

Q. Do you recognize this item?

A. Yes.

Q. What is it?

A. This is a Smith & Wesson; a .38 caliber revolver, model number 49, with a serial number of ADE8232.

MS. HOSSEINI: May the witness step down to use the ELMO?

THE COURT: Yes.

BY MS. HOSSEINI:

Q. If you would step down, agent.

A. Yes.

Q. Can you show us the markings on the firearm?

A. Yes. If you look at the barrel where my finger is, you can see the name of the firearm's company, Smith & Wesson, which is a company based in the State of Massachusetts.

Right here you can see the model, MOD49. You can see here a stamp mark from the Smith & Wesson Company.

On the bottom of the wooden handle you can see the serial number. On the opposite side of the revolver you can see -- next to my thumb .38 special caliber, which is the caliber of the revolver.

Right here, next to my thumb, you can see it says made in the USA, Springfield, Massachusetts.

Q. And is this, in fact, a firearm?
A. Yes, it is.
Q. How do you know?
A. Based on my physical examination of the weapon and based on my training and experience this object here does meet the Federal definition of a firearm, which is a weapon designed to fire a projectile by the action of an explosive.
Q. Showing you Government's Exhibit 168. Can you tell us about this item?
A. This is eight rounds of .38-caliber ammunition. As you can see here, there are eight rounds. There are four from the Remington Peters Ammunition Company.
Those are represented by the copper colored. The other four pieces of ammunition are made by the Poongsan Corporation which is an ammunition company based in South Korea.
Q. And can these eight rounds operate within Government's Exhibit 167 A?
A. Yes they can.
Q. Did you have an opportunity to examine these two items before coming to court today?
A. Yes, I did.
Q. Based on your examination do you have an opinion as to whether the firearm and ammunition were manufactured outside of the State of Florida?
A. Yes, I do. That opinion is since the revolver was made in

the State of Massachusetts and this ammunition was made outside of the State of Florida, both the firearm and the ammunition traveled across state and/or foreign lines which affects commerce, which give us our Federal jurisdiction in this case.
Q. I would like to show you Government's Exhibit 337. What is is this item?
A. This is a firearm, specifically it is a Sig Sauer semi-automatic pistol, black in color. It is a .40 caliber firearm. As you can see, there are markings on the Sig Sauer as there were with the Smith & Wesson revolver.
As you can see here, .40 S & W, Smith & Wesson caliber, which is the size of the round of ammunition, that goes into this firearm.
On the opposite side, SIG, which is the acronym for the firearm's manufacturer, which is Sig Sauer, which is a company based in the country of Switzerland.
SP 2340 is the model of the weapon. And right here is the importer of the weapon. One of the things the ATF makes every manufacturer of weapons outside of the United States -- the ATF make them put the importer information on each weapon.
As you can see here Sig Arms Incorporated is the importer and they are based in Exeter New Hampshire.
And finally the serial number of the weapon is on the bottom.
Q. And can you tell us whether that firearm has traveled in

Interstate Commerce.
A. Yes, it has.
Q. Handing you Government's Exhibit 336. Can you please tell us about this item.
A. This is eight rounds of .40 caliber ammunition. The cartridge case is gold in color, with the copper colored projectile. This .40 caliber ammunition can fit the firearm that we saw previously, the Sig Sauer.
Q. Showing you Government's Exhibit 44. What is this item?
A. This item Government's Exhibit 44 is also a firearm. It is smaller than the two previous weapons, but it is in fact a firearm under the Federal definition.
It is made by a company called the North American Arms Company, which is based in the State of Utah. It is a .22 caliber firearm, which is silver in color with a wooden handle.
It is disassembled here, but it still meets the Federal definition and can fire .22 caliber ammunition.
Q. Showing you 45 A and 45 B. Can you take us through these items?
A. Government's Exhibit 45 A is four rounds of .22 caliber ammunition made by the Federal Cartridge Company, which is a company here in the United States based in the State of Minnesota.
Government's Exhibit 45 B is one spent casing. This is just one empty cartridge case, also .22 caliber, also made by the

Federal Cartridge Company in Minnesota. And under Federal law just it is -- just because there is no projectile and only the cartridge case, simply having the cartridge case does meet the Federal definition of ammunition.

Q. I would like to show you next Government's Exhibit 28. Can you please tell us about this item.

A. Government's Exhibit 28 is also a firearm. As you can see under the plastic it is a black and wood colored semi-automatic pistol. My finger here represents the name of the manufacture of the weapon, Smith & Wesson.

Also made in the State of Massachusetts, as is the same case with the revolver, which is the first weapon we looked at.

Above me is the nine millimeter firearm magazine that is inserted in the weapon here with the ammunition.

Q. I would like to show you now Government's Exhibit 29. What is that, please?

A. Government's Exhibit 29 is 16 rounds of ammunition. What we are looking at here is the head stamp of the ammunition. Every piece of ammunition has to have a head stamp to identify the name of the manufacturer and the caliber of the ammunition.

This particular piece of ammunition you can see the top says -- has the name Sphere. Sphere is a major ammunition manufacturer here in this country.

On the bottom is the caliber of the firearm, nine millimeter Luger.

Q. Thank you.
A. None of them have been spent or used.
MS. HOSSEINI: No further questions.
THE COURT: Mr. Gonzalez.
MR. GONZALEZ: No questions.
THE COURT: Mr. Horowitz.
MR. HOROWITZ: No questions.
THE COURT: Mr. Korchin.
BY MR. KORCHIN:
Q. Is it Special Agent Stankiewicz?
A. Yes.
Q. I am not going to be asking you any questions about these particular firearms, but just generally from your training and experience.
A serial number on a firearm is unique to that particular firearm, correct?
A. Yes.
Q. A firearm cannot have two different serial numbers, correct?
A. No.
Q. With respect to the caliber of the ammunition that is stamped right on the bottom of the piece of ammunition?
A. Yes.
Q. And 32-caliber ammunition is different from .380-caliber ammunition, correct?

A. Yes.

MR. KORCHIN: No further questions.

THE COURT Mr. Donet.

MR. DONET: No questions.

THE COURT: Mr. Rubio.

MR. DISPOTO: No questions.

THE COURT: Redirect.

BY MS. HOSSEINI:

Q. Special Agent Stankiewicz, could a 32-caliber round fit into a .380 caliber firearm?

A. Yes, it could.

MS. HOSSEINI: No further questions Your Honor.

THE COURT: Agent, you may step down.

Government, call your next witness.

MR. DISPOTO: Government calls Mr. Stephen Snipes.

WITNESS SWORN

THE COURTROOM DEPUTY: Please state your full name and spell it for the record.

THE WITNESS: Good morning. My name is Stephen John Snipes; S-T-E-P-H-E-N S-N-I-P-E-S.

BY MR. DISPOTO:

Q. Good morning, Mr. Snipes, could you identify yourself for the ladies and gentlemen of the jury and tell them where you work.

A. My name is Stephen Snipes. I am a criminalist with the

Miami Dade Police Department Crime Laboratory.

Q. How long have you worked as a criminalist for the Crime Laboratory?

A. More than 30 years.

Q. Do your duties and responsibilities include analyzing items to determine whether they are controlled substances?

A. That is mostly what I do.

Q. Have you been doing that during your entire 30-year career?

A. I have.

Q. I assume you are sufficiently educated and trained to work in that capacity?

A. The laboratory thinks so. I have a Bachelor's Degree in Chemistry from Florida International University.

I went through a training program at the lab a long time ago, and I have gone through some seminars and training to keep abreast in the field.

Q. Have you ever testified in court as an expert in the field of chemistry as relates to the analysis of controlled substances?

A. I have.

Q. Approximately how many times?

A. 300.

Q. In what Courts have you so testified?

A. In the State and County Courts in Dade County, in Federal Court here and in Indiana.

MR. DISPOTO: At this time I would proffer the witness as an expert in the field of chemistry as it relates to the analysis of controlled substances.

MR. GONZALEZ: No objection.

THE COURT: Mr. Snipes will be so recognized.

BY MR. DISPOTO:

Q. I am going to place in front of you several items for the record, Government's Exhibit 143, 174, 27, 178, 154, 339 and 233.

Now, Mr. Snipes, in your capacity as a chemist for the laboratory were you asked to examine those items to determine whether they were controlled substances?

A. I was.

Q. After completing those tests did you draft any reports that documented the results of your analysis?

A. I did.

Q. I am showing you now what has previously been marked for identification as Government's Exhibit 347.

Can you tell us what that nine page composite exhibit is?

A. Appears to be the packet of reports I prepared for this case.

MR. DISPOTO: At this time I would move to admit into evidence Government's Exhibit 347.

MR. GONZA EZ: No objection.

THE COURT: It is admitted.

BY MR. DISPOTO:
Q. For my remaining questions I will be asking you about the individual items of evidence.
A. Okay.
Q. I would ask you to identify the pages of this nine page exhibit that correspond to that exhibit -- and I am starting with Exhibit 143.
A. Yes.
Q. And when I make reference to Exhibit 143 -- there are exhibit stickers on each of those items. There should be one in front of you with a number 143 on it.
A. There's the exhibit and -- my reports are all one exhibit number, 347.
You just want to talk about the report for this item?
Q. Correct. If you could make reference to the page number in Exhibit 347 --
A. Got it.
Q. Exhibit 143 is the one on your screen, correct?
A. Yes.
Q. Let's move to Exhibit 174. Can you tell us what page corresponds to Exhibit 174 in your Composite Exhibit 347?
A. Look like pages 2 and 3.
Q. On page two of this exhibit you were requested to analyze an item identified as -- described as six plastic bags/ baggie containing suspected crack rock cocaine?

A. Yes.
Q. And in your report of April 16, 2014 you identified that as cocaine less than 28 grams?
A. That's correct.
Q. If we turn to page three of this report, you generated a supplemental report regarding those same six plastic bags containing suspected crack rock cocaine?
A. That's correct.
Q. Can you explain why you drafted a supplemental report?
A. Yes. This is a submission from a City of Miami officer. We normally analyze those cases based on State law and State limits on drugs.
And for small amounts we tell them it's below a certain State statute criteria. They submitted it back and said we would like you to weigh the contents and report it as a weight.
So, all I did is -- I calculated the weight as an item. I did not have to retest it because my testing was sufficient to identify it as free base or crack cocaine. But I did calculate the weight and report that.
Q. Is it common in your duties as an analyst to have to draft supplemental reports like this to subsequently weigh items that originally tested to be below 28 grams?
A. It is not uncommon. When we have to come in and testify in Federal Court they usually would like us to have a specific weight. And while the Federal Court is a small amount of our

duties, if that is needed we will do a supplemental report.
Q. All right. I notice that next to the cocaine results you put in parens free base.
A. Yes.
Q. Is there a chemical difference between free base and crack cocaine?
A. Crack cocaine is a street term for what scientifically we call free base.
Q. Moving on to Exhibit 27, which should be in front of you.
A. Yes.
Q. Can you tell us which page of Government's Exhibit 347 corresponds to Exhibit 27?
A. Look like pages 4 and 5.
Q. Once again with respect to this Exhibit 27, as you previously described you had to subsequently weigh it to give an exact amount, correct?
A. On the cocaine, yes.
Q. Initially the cocaine was less than 28 grams?
A. Correct.
Q. And then on page five you actually weighed it to be one?
A. Yes.
Q. If you would turn to Exhibit 178 -- tell us which page that corresponds to with reference to Government's Exhibit 347?
A. Page 26.
Q. For the record that is the page I am displaying on the

screen?
A. That's correct.
Q. Let's move to Exhibit 154. Tell us which page that corresponds to, please.
A. That would be page number seven.
Q. That is the report dated November fifth, 2014 that I have on the screen?
A. Yes.
Q. Next, Government's Exhibit 339.
A. Yes, that would be page number eight.
Q. That is the page, for the record, I have on the screen?
A. Correct.
Q. Finally, Government's Exhibit 233.
A. Yes.
Q. With respect to this particular exhibit, I see there was a determination that this particular item which was Cannabis was less than 20 grams. Do you see that?
A. I do.
Q. There does not appear to be a supplemental report. Did you do any additional testing to weigh that amount?
A. I did not. The weight of the bag was seven tenths of a gram, and they did not tell me when it came in that it was part of this. So I did not do an exact weight.
But it's not a lot.
MR. DISPOTO: No further questions. Thank you, Mr.

Snipes.

THE COURT: Mr. Gonzalez.

BY MR. GONZALEZ:

Q. Good morning, Mr. Snipes.

A. Good morning.

Q. With regard to what is in evidence as Government's Exhibit 347, I am going to ask you a couple questions.

With regard to page one, this report that you did the amount is 1.1 grams, correct?

A. Right. That's the content of the little plastic bag.

Q. Was this weighed net versus gross?

Can you explain?

A. The weight I am recording is the weight of the little white substance in the bag. That is the net weight. The gross weight with the bag would have been a little larger.

Q. The date you made your report is February 25th, 2014, correct?

A. That's correct.

Q. The Metro Dade Police case number, the fact it begins with 14 that would be that the year was 2014, correct?

A. It's actually a City of Miami Case No. But the date is embedded into the number.

Q. This would pertain to when the item was turned in, but the date of the alleged transaction is February 6th of 2014, correct?

**A. I don't know anything about the transaction. I know that the city would assign it their case number based somewhere around when they had the item. But it has no bearing on when I receive it or do my testing.**
**Q. But the date that corresponds to the City number is February 6, 2014?**
**A. That's correct.**
**Q. I am going to ask questions with regard to page seven. That corresponds to what is in evidence as Government's Exhibit 154.**
**And let me back up a second. Page one corresponds to Government's Exhibit 143; is that correct?**
**A. That's correct.**
**Q. The next one I am going to ask you about is page seven and that corresponds to Government's Exhibit 154.**
**A. Okay.**
**Q. Once, again, the amount here is .7 grams, correct?**
**A. Correct. Again, that's the amount of the content inside that little plastic bag.**
**Q. The date that was basically given to the report is 2014, February 18th?**
**A. That's correct.**
**Q. The final one I will ask you about is page number eight, which corresponds to Government's Exhibit 339.**
**Do you have that?**
**A. Yes.**

Q. The weight you have for that is .1 grams, correct?
A. That's correct.
Q. So it's even less than -- it's clearly less than one gram, it's almost nothing, right?
A. What happened is they threw a small chunk into the evidence package, loose by itself, and came back and said what does it weigh?
So I scraped out what I could. You can see there is a lot of residue in there. So, they packaged it in such a way that made it difficult to get the actual weight.
It was pretty much in the bag like that by the time I got it.
Q. You would agree, at least, the property receipt description is it is suspect rock cocaine, so talking about one rock --
A. That's how it was described. By time I saw it, it was more like dust.
Q. So your weight is .1?
A. That's what I was able to scrape out.
Q. The City date that corresponds to on this report is the year being 2013 and the date of December sixth 2013?
A. That's correct.
MR. GONZALEZ: I have no further questions. Thank you, Mr. Snipes.
THE COURT: Mr. Horowitz.
MR. HOROWITZ: Thank you, Your Honor.

BY MR. HOROWITZ:
Q. Good morning, Mr. Snipes, how are you?
A. Fine.
Q. I want to ask you some questions about pages 2 and 3 of the report as pertains to Government's Exhibit 174.
A. Okay.
Q. I am putting it on the screen. You see it?
A. Yes, sir.
Q. Page two on the screen is a report you made for a case being prosecuted in State Court -- this is the one with the supplemental report?
A. Right. I had a couple of those. This is one that I tested the first time based on State criteria that I usually do with City cases.
Q. The State criteria you are instructed to use is whether it's more than 28 grams or less than 28 grams?
A. That's the State trafficking criteria.
Q. So, if it is more than 28 grams it would be considered under State law trafficking in cocaine, and the penalties would be much greater?
A. State law they have their own minimum standards for that.
Q. Also under State law there is no differentiation between crack cocaine and powder cocaine?
MR. DISPOTO: Objection as to relevance.
THE COURT: Sustained.

BY MR. HOROWITZ:
Q. When you analyzed Government's Exhibit 174 did you use the three tests, the color test, the spec microscope and the infrared spectrometer?
A. I used those three tests, yes.
Q. Now, going to page three of your supplemental report on November 5th, 2014.
When it was generated you were requested to redo your prior analysis?
A. I was requested to report an exact weight of the contents.
Q. In addition, under results interpretation you were asked to put free base on there, correct?
A. I was.
Q. In order to put the words free base did you conduct any additional testing on the substance in Government's Exhibit 174?
A. I did not.
MR. HOROWITZ: No further questions. Thank you.
THE COURT: Mr. Korchin.
BY MR. KORCHIN:
Q. Good morning, Mr. Snipes. I am going to be referring only to page nine of your report.
A. Yes, sir.
Q. This pertains to Government's Exhibit 233, correct?
A. That's correct.

Q. This number up here would indicate that the local law enforcement authorities either seized or came into contact with this item around the date of November 18, 2013, correct?
A. I don't know exactly, but that would be my presumption from the date included in that case number.
Q. So 13 is the year and then we have 111813, right?
A. Yes.
Q. When did you get the items contained in Exhibit 233 to conduct your test?
A. It's only one item. It was submitted to the laboratory on February 3rd, and I got it on the fourth and tested it and generated this report.
Q. So you were given the item, as you say on February 3rd, 2015, correct?
A. That's correct, earlier this month.
Q. That is about -- if I calculated this correctly -- this is approximately 15 months later, which would mean you received this item about 15 months after this date, the police department case number date, correct?
A. Certainly more than a year, correct.
Q. Is that a common occurrence with your laboratory?
MR. DISPOTO: Objection as to relevance.
THE COURT: Sustained.
A. Going to the bottom here, I think you originally indicated you tested the items under the State criteria?

A. At the time they submitted it I did not know it was part of this or for a Federal case, so I did it the way I normally would do for a small amount of marijuana item for State standards.
Q. You did not do a supplemental test to determine the exact weight of the marijuana?
A. That's correct.
Q. I believe you testified on direct examination that the package with the item in it weighed approximately seven tenths of a gram?
A. I believe that was the case.
Q. The marijuana inside the package would then be something less than seven tenths of a gram?
A. That would be correct.
Q. Can you give a guesstimate?
A. I would say about a half a gram.
Q. Five tenths of a gram would be your estimate?
A. Yes.
MR. KORCHIN: No further questions.
THE COURT: Mr. Donet.
BY MR. DONET:
Q. Good morning, Mr. Snipes.
A. Good morning.
Q. I am going to ask you some questions related to Exhibit 174, and those are pages 2 and 3 of your report.

Q. Those are the reports referenced with the case number dealing with the date April 1st of 2014.
A. I have it.
Q. When you examined Exhibit 174 there were six pieces of suspected crack cocaine, correct?
A. That's correct.
Q. Were you able to determine one of these rocks was of a higher quality than the other five?
A. In my testing I do not test for purity or for percentage of cocaine. If it has cocaine in it that's all I am trying to determine.
Q. It is possible to test further to test the purity of each of the six individual pieces?
A. It would be possible. In our laboratory we never do a purity test on free base or crack cocaine.
Q. You were not able to tell all of the pieces came from the same larger piece or cookie, could you?
A. No that's beyond my scope.
Q. Total weight of Exhibit 174, the total weight of those six rocks was two tenths of one gram?
MR. DONET: Thank you.
THE COURT: Mr. Rubio.
MR. RUBIO: No questions, Your Honor.
THE COURT: Redirect.
MR. DISPOTO: Yes, Your Honor.

BY MR. DISPOTO:
Q. Mr. Snipes, I want to ask you some questions about some of the things you were asked by defense counsel on cross examination.
I would like to begin with some questions that Mr. Horowitz had asked during his cross examination.
Do you recall Mr. Horowitz asking about you having generated a supplemental report in reference to, I believe it was, page three in Government's Exhibit 347 after you were asked to weigh the cocaine.
Do you recall those questions?
A. Yes, I do.
Q. Mr. Horowitz asked if you were asked to indicate on your report that the cocaine you had tested was free base, correct?
A. Yes.
Q. And you indicated that, in fact, you were asked to indicate whether it was free base in your report?
A. That's correct.
Q. And Mr. Horowitz then asked you whether you did any additional testing on the cocaine to determine whether it was free base or crack cocaine, and you said you did not?
A. That's correct.
Q. Did you need to do any additional testing prior to drafting the supplemental report to determine whether the cocaine you had previously analyzed was free base?

A. No. The three tests I did were sufficient for me to determine it was free base. The only reason I did not indicate that on the report is because, as I mentioned before, the State of Florida does not differentiate or care what kind of cocaine it is.

Legally they are equivalent. The Federal Courts handle it differently. They wanted me to clarify from my testing what kind of cocaine I had analyzed.

Q. I want to ask you some questions regarding Mr. Korchin's questions. Specifically Mr. Korchin was questioning you about page nine of Government's Exhibit 347.

A. The Cannabis.

Q. You testified on cross examination that the Cannabis that was submitted to the lab and subsequently analyzed by you was submitted about fifteen months after it was seized, at least according to the date and the case number.

A. Yes.

Q. From your perspective as an analyst are you concerned at all?

MR. KORCHIN: I object to this redirect because there was a sustained objection to my questions so it is beyond the scope of cross.

THE COURT: That was a different question about the lab. This is about his findings. So I will overrule that.

Q. Were you concerned at all as an analyst as to potential

degradation of the integrity of the item you are testing, in this case Cannabis, when that item was submitted fifteen months after it may have been seized by law enforcement?
A. It is a plant material so there is the possibility of degradation. And depending on how it is stored it can get rotten or moldy over that time. All I can do is test it.
If it has degraded to the point that I cannot determine what it is I will say no drug found or not controlled.
But in this case since I looked at the item and it passed the test that I did on it, I can still make the determination, and it does not matter how old it is or low long it has been stored as long as it is testable.
Q. Are you concerned at all, Mr. Snipes, about possibly observing a false positive in your analysis with an item that may have taken fifteen months to get to your lab?
A. My concern is not where it's been or how long it's been anywhere. All I am doing is a scientific test to see if it passes the criteria for analysis.
That's all I really care about.
MR. DISPOTO: Thank you. That's all I have.
THE COURT: You may step down. Government call your next witness.
MR. DISPOTO: Government calls Miss Karen Fleischer.
THE COURTROOM DEPUTY: Please state your full name and spell it for the record.

THE WITNESS: My name is Karen Fleisher; K-A-R-E-N F-L-E-I-S-H-E-R.

BY MR. DISPOTO:

Q. Good morning Ms. Fleisher, where do you currently work?

A. I work for the Miami Dade Crime Laboratory.

Q. What capacity do you work there?

A. I am a Criminalist II.

Q. As a Criminalist II do your duties include analyzing items to determine whether they are controlled substances?

A. Yes.

Q. How long have you worked in that capacity?

A. I have been there since March of 1982.

Q. And during the time you have worked at the lab have you ever testified in court as an expert in the field of chemistry as relates to analyzing items to determine whether in fact they are controlled substances?

A. Yes.

Q. How many times have you testified as an expert?

A. I have testified more than a hundred times.

Q. Is it safe to assume you are sufficiently educated and trained to work in the capacity that you have described?

A. Yes.

MR. DISPOTO: Your Honor, at this time the Government proffers the witness as an expert in the field of chemistry as it relates to the analysis of controlled substances.

THE COURT: Any objection?
MR. GONZALEZ: No, Your Honor.
THE COURT: Ms. Fleisher is recognized as an expert.
MR. DISPOTO: May I approach the witness.
THE COURT: You may.
BY MR. DISPOTO:
Q. I am going to place in front of you five items. For the record Government's Exhibit 37 A, 38, 120, 173 and 43.
Do you recognize those items as items that you analyzed to determine whether they were controlled substances?
A. Yes, I recognize them.
Q. How do you recognize those items as items that you analyzed?
A. I see my signature across the seals and I see my handwriting on the packaging.
Q. When you completed your analysis of these items did you prepare reports that memorialized the results of those tests?
A. Yes.
Q. Showing you what has been marked for identification as Government's Exhibit 342.
Do you recognize that composite exhibit?
A. Yes, I do.
Q. What do you recognize those to be?
A. Those are the reports that correspond to each package.
MR. DISPOTO: At this time I would move to admit into

evidence Government's Exhibit 342.
MR. GONZALEZ: No objection.
THE COURT: It will be admitted without objection.
BY MR. DISPOTO:
Q. I want to, for my remaining questions, ask you about which exhibits correspond to which pages of the composite exhibit.
A. All right.
Q. If we can start with 37 A. Which page of your report corresponds to that exhibit?
A. Exhibit 342.
Q. Specifically which page of Exhibit 342?
A. Page one.
Q. Placing a copy of 342 on the ELMO. This is page one?
A. Yes.
Q. You were requested to test one plastic baggie containing suspected crack rock cocaine?
A. Yes.
Q. And one plastic baggie containing suspected marijuana?
A. Yes.
Q. What was the result of your testing of item number one?
A. Item number one was no drug was found.
Q. What was the result of item number two the suspected marijuana.
A. It was Cannibis.
Q. If I could see Government's Exhibit 37 A..

**A. Yes.**
**Q. This is the item of suspected crack cocaine which you determined was not crack cocaine?**
**A. Correct.**
**Q. With respect to the Cannibis this is the item you confirmed was in fact Cannibis?**
**A. Correct.**
**Q. If we could move to Government's Exhibit 38. What page of your report corresponds to that exhibit?**
**A. That is page two.**
**Q. Going now to Government's Exhibit 120. Can you tell us which page of your report corresponds to Government's Exhibit 120?**
**A. Page three and page four.**
**Q. On page three you initially weighed the cocaine at less than 28 grams?**
**A. Correct.**
**Q. Is that what gave rise to the supplemental report where the actual amount was indicated?**
**A. Yes.**
**Q. If we turn back to page two we also have cocaine less than 28 grams as relates to Government's Exhibit 38.**
**Do you see that?**
**A. Yes.**
**Q. There does not appear to be a supplemental report.**

A. Correct.
Q. You were not requested to weigh that item?
A. It did not come back for further analysis.
Q. Let's turn to Government's Exhibit 173. Which page of your report corresponds to that exhibit.
A. Page five.
Q. That's the report now on the screen?
A. Correct.
Q. With respect to Government's Exhibit 43.
A. Yes. That was page six and page seven.
Q. Those are the two pages I am displaying on the screen?
A. Yes.
Q. I see you weighed it and memorialized the weight in a supplemental report?
A. Correct.
MR. DISPOTO: No further questions of the witness.
THE COURT: Cross, Mr. Gonzalez.
BY MR. GONZALEZ:
Q. Good morning Ms. Fleisher?
A. Good morning.
Q. Ms. Fleisher I am going to refer you to Government's Exhibit 342, pages 3 and 4, which corresponds to the exhibit -- the narcotics which is 120.
You have that?
A. Yes.

Q. Page three IS when you weighed it initially, and that came back less than 28 grams, correct?
A. Correct.
Q. Then when you subsequently weighed it that is page four, the next page?
A. Correct.
Q. The actual weight is .2 grams?
A. Correct.
Q. With regard to the property receipt we're talking about -- at least what is indicated -- it's suspected cocaine, four rocks?
A. Yes.
Q. Four rocks gave you the weight of .2 grams?
A. Correct.
Q. The day you prepared the report is October 30th of 2014?
A. Yes.
Q. And what is the date you analyzed it?
A. May I refresh my recollection?
Q. Sure.
A. I analyzed it on October 30, 2014.
Q. And the Police Department case number, the date on that is 2013, December 17th; is that correct?
A. The case number is the year 2013, and the date was 12-17.
Q. If you go back to page three of Exhibit 341, it has the same date which is 12-17-2013, which means you tested the same

drugs again or weighed it?
A. I tested it again.
Q. You tested it and weighed it a second time?
A. Yes.
Q. Both times we're talking about the same drug, it's crack cocaine, it's just the first time -- it's less than 28 grams, and then when you were asked to do it for the exact weight you gave us the weight of .2 grams, which is page four?
A. Yes.
MR. GONZALEZ: I have nothing further.
THE COURT: Mr. Horowitz.
MR. HOROWITZ: No questions.
THE COURT: Mr. Korchin.
MR. KORCHIN: No questions.
MR. DONET: No questions.
MR. RUBIO: No questions.
MR. DISPOTO: No redirect.
THE COURT: Call your next witness.
MR. DISPOTO: The United States will call Ms. Jonia Prieto.

WITNESS SWORN

THE COURTROOM DEPUTY: Please state your full name and spell it for the record.
THE WITNESS: Good morning. My name is Jonia Prieto; J-O-N-I-A P-R-I-E-T-O.

BY MR. DISPOTO:
Q. Good morning, ma'am.
A. Good morning.
Q. Ms. Prieto, where do you currently work?
A. Miami Dade Police Department Crime Laboratory for the forensic Service Bureau.
Q. Can you tell us a little bit about what you do at the Crime Laboratory.
A. I work with chemistry and I analyze evidence for the presence of controlled substances.
I also testify in a court of law.
Q. Briefly can you tell us what is your educational background and training that enables you to work in that job?
A. I have a Bachelor of Science in chemistry from Florida International University. I also have a forensic science certificate from Florida International University.
Q. How many times have you been qualified as an expert in the field of chemistry as relates to analyzing controlled substances?
A. 26 times.
Q. And what Courts were you qualified?
A. All the Courts
MR. DISPOTO: Your Honor, at this time the Government proffers the witness as an expert in the field of chemistry as it relates to the analysis of controlled substances.

THE COURT: Any objection?
MR. GONZALEZ: No, Your Honor.
THE COURT: Ms. Prieto is so recognized.
BY MR. DISPOTO:
Q. Ms. Prieto I have placed in front of you two items, Government's Exhibits 194 and 349.
Do you recognize those items?
A. Yes, I do.
Q. What are they?
A. Evidence that I analyzed.
Q. What is it about those items that you recognize as evidence you analyzed.
A. I recognize the case number and my signature on the packet.
Q. I have also placed in front of you Government's Exhibit 344.
Can you tell us what that is?
A. Two pages of two reports I completed.
Q. And do the results that are indicated in Government's Exhibit 344 -- are they accurate in terms of results of your analysis?
A. Yes, they are.
MR. DISPOTO: At this time I would move to admit into evidence Government's Exhibit 344.
MR. GONZALEZ: No objection.
THE COURT: 344 is admitted without objection.

BY MR. DISPOTO:

Q. For my remaining few questions I want to ask which item in front of you corresponds to which page of Government's Exhibit 344.

We will start with Exhibit 194. Does that correspond to page one or page two of Government's Exhibit 344?

A. Page one.

Q. That is the page displayed on the screen?

A. Yes.

Q. And Government's Exhibit 349 corresponds to page two?

A. Yes.

MR. DISPOTO: That's all I have. Thank you.

THE COURT: Cross examination, Mr. Gonzalez.

BY MR. GONZALEZ:

Q. Good morning, Ms. Prieto. I am going to ask you with regard to page two, item number two, the cocaine. It is .4 grams?

A. Correct.

Q. The case number, the Miami Dade Police Department case number, that gives you the date, and that would be the year 2014?

A. Yes.

Q. And the date would also -- that corresponds to it is May second of 2014, correct?

A. Yes.

MR. GONZALEZ: I have nothing further thank you.

MR. HOROWITZ: I have no questions of the witness.

But I do have a question, and that is, is Exhibit 349 in evidence?

THE COURT: I don't have an answer to that. But remind me, Mr. Horowitz, to take that up at a break.

MR. HOROWITZ: Yes, Your Honor.

THE COURT Mr. Korchin.

MR. KORCHIN: No questions.

MR. DONET: No questions.

MR. RUBIO: No questions.

MR. DISPOTO: No redirect.

THE COURT: You may step down. Call your next witness, Government.

MR. DISPOTO: Government calls Karen Bromfield.

WITNESS SWORN

THE COURTROOM DEPUTY: Please state your full name and spell it for the record.

THE WITNESS: My name is my name is Karen Bromfield; B-R-O-M-F-I-E-L-D.

BY MR. DISPOTO:

Q. Good morning, ma'am.

A. Good morning.

Q. Where do you currently work?

A. The Miami Dade Police Department Crime Laboratory, now

known as the Forensic Services Bureau.

Q. What do you do there?

A. I analyze physical evidence and testify to my findings in a court of law.

Q. Can you briefly tell us about your education and training that qualifies you to do this kind of work.

A. I have a Bachelor's of Science Degree in chemistry from Mt. Claire State in New Jersey.

Once I got the job at the Miami Dade Police Department Crime Laboratory we had four months of extensive training with formal lectures and examinations.

Q. How long have you worked at the lab?

A. This year will make 15 years.

Q. Have you ever testified in any Courts as an expert in the field of chemistry as relates to analyzing controlled substances?

A. I have.

Q. How many times?

A. A minimum of 25 times.

Q. Would that be both Federal and State Court?

A. Yes, and Juvenile.

MR. DISPOTO: Your Honor, at this time the Government proffers the witness as an expert in the field of chemistry as it relates to the analysis of controlled substances.

THE COURT: Any objection?

MR. GONZALEZ: No, Your Honor.
THE COURT: Ms. Fleisher is recognized as an expert.
MR. DISPOTO: May I approach the witness.
THE COURT: You may.
BY MR. DISPOTO:
Q. I am placing in front of you Government's Exhibit 147, 158 and Government's Exhibit 209 B.
Are these the items that you were requested to examine?
A. May I look at them in conjunction with my report?
Q. Yes, ma'am.
A. Yes, they were.
Q. How is it you recognize these items as ones you tested?
A. The unique Miami Dade Police Department case number on the packages. And that case number corresponds to the case number on my reports.
Q. All right.
A. I also see my signature on the seals.
Q. Did you memorialize the results of your analysis in any reports.
A. Could you rephrase your question?
Q. Did you document your analysis in any reports?
A. Yes. I entered the results in our tracking system and we were able to print the reports as you have them.
Q. Showing you what has been marked as 345. Do you recognize those documents?

A. May I reference them --
Q. Sure.
A. Yes, I recognize them.
Q. Are these your reports?
A. These are the reports I mentioned.
Q. Do these reports accurately document the results of your analysis?
A. Yes, they do.
MR. DISPOTO: At this time I would move to admit into evidence Government's Exhibit 345.
MR. GONZALEZ: No objection.
THE COURT: It will be admitted without objection.
BY MR. DISPOTO:
Q. For my remaining questions I want to ask which of those exhibits correspond to which pages in Government's Exhibit 345
If you could start with Government's Exhibit 147. Which page of Government's Exhibit 345 is the report that corresponds to Exhibit 147?
A. The page that has the Case No. M1140211042695.
Q. And that would be the first page of Government's Exhibit 345?
A. I don't recall the order you have it, but, yes, I am looking at it now.
Q. With respect to page one of the report you initially tested 20 rocks of suspected crack cocaine?

A. Yes, I did.
Q. The weight you initially indicated in your report was less than 28 grams?
A. That's correct.
Q. Page two relates to a supplemental report regarding those same items?
A. That's correct.
Q. This shows the actual weight of those items?
A. That's correct.
Q. Moving to Government's Exhibit 158. Which page of your report corresponds to Exhibit 158?
A. The page that has the Case No. M1140219050998
Q. So the record is clear, that would be page three of Government's Exhibit 345?
A. Yes.
Q. Finally, Exhibit 209, which page or pages relate to that exhibit?
A. The page that relates to that exhibit is the one with the Case No. M11140502128817.
Q. And that would be pages 4 and 5 of the reports I have placed in front of you?
A. That's correct.
MR. DISPOTO: For the record, Your Honor, I think I misspoke when I referred to the exhibit as 209; it is 209 B
THE COURT: All right.

MR. DISPOTO: With that I have no further questions.
THE COURT: All right. Mr. Gonzalez.
MR. GONZALEZ: Thank you, Your Honor.
BY MR. GONZALEZ:
Q. Good morning, Ms. Bromfield.
A. Good morning.
Q. With regard to Government's Exhibit 345, the series of reports that have been admitted. I am going to refer you to page three, which is the report that correlates with Government's Exhibit 158 in evidence.
Do you see that?
A. Yes, I do.
Q. The amount with regard to this testing and analysis that you did and the weighing was .7 grams?
A. That's correct.
Q. This consisted of two plastic baggies of suspected crack cocaine?
A. That's correct.
Q. The date as correlates to the Miami Dade Police Department case number would be the year 2014, February 19th; is that correct that's correct?
Q. With regard to Government's Exhibit 290 B that you tested -- I am going to refer you to the supplemental report which is the last page -- the amount is .6 grams?
A. That's correct.

Q. The date as in accordance with the Miami Dade Police Department case number would be May second of the year 2014?
A. That's correct.
MR. GONZALEZ: Thank you. I have nothing further.
MR. KORCHIN: No questions.
MR. DONET: No questions.
MR. RUBIO: No questions.
MR. DISPOTO: No redirect.
MR. VAZQUEZ:
THE COURT: You may step down. Call your next witness, Government
WITNESS SWORN
THE COURTROOM DEPUTY: Please state your full name and spell it for the record.
THE WITNESS: My name is Christopher Mayo; M-A-Y-O.
BY MR. VAZQUEZ:
Q. How are you currently employed?
A. I am employed as a special agent with the Federal Bureau of Investigations Miami Division.
Q. What is your currently assignment?
A. I am on a narcotics squad which covers -- is responsible for Central America, South America and the Caribbean.
Q. Prior to your current assignment have you held positions in law enforcement?
A. Yes.

Q. Starting from your most -- starting with your earliest date what was your first position in law enforcement?
A. I was a police officer nine and a half years in North Carolina.
Q. What wee your duties there?
A. I started in patrol and then spent my last seven years as a detective in Vice and Narcotics.
Q. While a detective investigating narcotics what types of cases did you handle?
A. Mostly street level open air narcotics investigations; cocaine, marijuana, heroin -- retail.
Q. While you were a detective in North Carolina did you investigate the sale of crack cocaine?
A. I did.
Q. While a North Carolina detective did you participate in any proactive or long term investigations?
A. Yes, sir.
Q. What types of investigative tools and means did you use during these investigations?
A. We utilized undercover agents to purchase narcotics. We also used confidential informants to purchase narcotics at various locations.
I was also involved in a wire intercept case in North Carolina.
Q. During your participation in North Carolina in the wire

intercept did you have the opportunity to listen to street terms and slang related to the distribution of narcotics?
A. Yes, sir.
Q. Following your time -- while in North Carolina did you testify as an expert in the field of distribution of narcotics?
A. Yes, sir.
Q. Agent, following your time in North Carolina what was your next law enforcement assignment?
A. In 2010 I was hired by the FBI. Upon arriving in Miami initially I was assigned to the Violent Gang Squad, where I spent approximately three years.
Q. And what areas, geographic areas, did that assignment call for you to investigate?
A. Liberty City, Overtown and Little Haiti areas.
Q. While a member of that squad did you participate in the collection of electronic evidence where you were required to listen to recordings?
A. Yes, sir I was the case agent on approximately seven Federal wire intercepts.
Q. In the course of that experience did you hear terminology associated with the distribution of narcotics?
A. Yes, sir.
Q. How many investigations have you participated in regarding street level distribution of narcotics as a Federal agent?
A. Numerous. I am not sure of an exact number.

Q. While a Federal agent have you ever testified as an expert in the field of distribution of street level narcotics?
A. Yes, sir, I have.
MR. VAZQUEZ: I would tender the witness as an expert in the subject of distribution of street level narcotics.
THE COURT: Defense.
MR. HOROWITZ: May we have a moment.
OFF THE RECORD DISCUSSION HELD BETWEEN COUNSEL
MR. DONET: If I may voir dire?
THE COURT: Yes.
BY MR. DONET:
Q. Good morning, agent, how are you?
A. Good morning, sir.
Q. Are you fluent in Spanish?
A. No, sir.
Q. Do you speak rudimentary Spanish.
A. A little Spanish.
Q. You are not familiar with the different accents that -- of different people who speak Spanish from different countries?
A. That would be correct.
Q. And the experience you have here in Miami Dade County is in Liberty City, Overtown and Little Haiti areas?
A. Correct.
Q. None of your experience dealt with gangs in Little Havana or predominately Spanish speaking neighborhoods?

A. That would be correct.
Q. And you would agree that street slang in Wilmington, North Carolina from ten years ago is different than in Little Havana?
A. There are some similarities as far as street slang. There are differences between Miami Dade County versus Broward County.
Depends on how you look at it.
Q. Only some similarities?
A. As compared to ten years ago. As far as street slang the last few years I would say there are a lot of similarities in Miami Dade County and different geographic areas.
Q. Have you ever authored any articles regarding street level narcotics distribution?
A. I have not.
Q. You have never published anything that has been up for peer review?
A. That's correct.
Q. You have never published anything that has been used by other law enforcement agencies as an example?
A. That's correct.
Q. You talked about being qualified in North Carolina. Here in the Southern District you were only qualified as an expert on one occasion, correct?
A. That's correct.
Q. That was last July when Mr. Vazquez was the prosecutor?

A. Correct.
Q. You were not challenged, your qualifications were not challenged?
THE COURT: No no, Mr. Donet.
MR. DONET: Yes, Judge.
BY MR. DONET:
Q. The task force you were in deals with -- I believe you said the Caribbean, Central America and South America?
A. I am currently assigned to a squad that handles that. Most of my cases are in the Little Haiti area of Miami.
MR. DONET: I have no further questions. I believe Mr. Horowitz has some.
THE COURT: All right. You may inquire as to qualifications.
BY MR. HOROWITZ:
Q. Special Agent Mayo, in connection with your employment both as a police officer in North Carolina and the FBI you have received special training?
A. Yes.
Q. You have received special training regarding slang terms?
A. As far as special training -- just, as I said, numerous wire intercepts.
Q. All on the job training?
A. For slang, yes, sir.
Q. How about Spanish slang, any training and experience?

**A. No, sir.**

**Q. You testified you were a case agent on seven Title III wire intercepts.**

**A. While on the gang squad. There has been more since the current squad I am on.**

**Q. A Title III wire intercept is a court ordered wire intercept --**

**A. That's correct.**

**Q. It is your understanding there is no Title III wire intercept in this case?**

**THE COURT: That is sustained. Do you have any other questions.**

**MR. HOROWITZ: No, Your Honor.**

**THE COURT: Anything else from the defense with regard to the agent's qualifications.**

**MR. DONET: No, Your Honor. I would object to his being qualified as an expert. He lacks the proper foundation.**

**THE COURT: Overruled. Mr. Vazquez you may continue.**

**BY MR. VAZQUEZ:**

**Q. Agent, have your investigations dealt with the origin of crack cocaine that has become the object of any particular case you were working on?**

**MR. HOROWITZ: Objection, relevance.**

**THE COURT: Let's see where we go. I would like to see the follow-up, Mr. Vazquez. I will allow the answer.**

THE WITNESS: Yes, sir.
BY MR. VAZQUEZ:
Q. Does crack cocaine come from Florida?
MR. HOROWITZ: Objection, leading.
THE COURT: Sustained.
BY MR. VAZQUEZ:
Q. Where does cocaine come from?
A. Central and South America.
Q. Do you know if cocaine is grown in the State of Florida?
BY MR. HOROWITZ: Objection, relevance.
THE COURT: Overruled.
BY MR. VAZQUEZ:
Q. You may answer.
A. It does not.
Q. How does cocaine arrive in the State of Florida?
A. Comes in typically through Mexico and also through the Caribbean. Most of the time through other countries, Colombia, Venezuela up through the Dominican Republic, Haiti, Bahamas and eventually into the Miami area.
Q. How does cocaine go from -- what is cocaine -- not for the chemical aspect, but what does it look like on the streets?
A. White powdery substance. It can be cooked into crack cocaine, which is a different chemical make-up, also sold on the streets.
Q. How does cocaine become crack cocaine?

A. It is cooked where they add -- they cook it into a rock form of the cocaine.
Q. Have you kept abreast of the values of cocaine and crack cocaine?
A. Yes, sir.
Q. What is the typical value of a gram of crack cocaine?
A. Typically a hundred dollars or so.
Q. How is crack cocaine distributed at a street level as far as quantities?
A. Most of the retail narcotics distribution points sell small amounts of crack cocaine. Normally by each location they will sell a set amount like $10 or $5 worth, most times in those ranges in an open air retail distribution point.
Q. Where does the small amount come from?
A. Normally there is a small amount of cocaine -- anywhere from a hundred to $400 worth, all individually packaged small rocks of cocaine, maybe 5, $10 a piece.
They are normally not huge amounts. So when the sellers run out of the crack cocaine then they will resupply the retail locations with additional narcotics.
Q. Do these street level distribution sites also sell quanties of hundreds of dollars?
A. Not typically.
Q. How often are drug sales made from these distribution sites?

A. Continuously. Some locations are obviously busier than others. Just as narcotics users know where to go and purchase narcotics, local law enforcement is also aware of these locations.

Sometimes you will surveil them and see constant traffic going in and out; you will see people leaving and so forth.

Q. Special Agent Mayo, are you familiar with the term half cookie?

A. Yes.

Q. Have you seen that at these drug distribution sites?

A. I have seen it; it's very rare.

Q. Have you seen three grams being sold of crack cocaine from a drug distribution site?

A. Yes, sir.

Q. Is that a more common experience?

A. It is.

Q. And at a particular drug distribution site how are the drugs maintained.

A. Another common street term in Miami Dade County is what they call a bomb. You have the individual packaging inside of what is called a bomb.

Normally somewhere within the location they may hide it. Again, just as narcotics users know where to go for drugs, law enforcement is also aware of these retail locations. So, a lot of times they hide it somewhere around the location so law

enforcement will not recover those narcotics.

Q. Agent, who is it typically in a drug distribution group would have access to or control the larger amount of drugs that are then distributed in these smaller amounts to the drug distribution site?

A. The person in charge of or running the drug distribution site. Maybe not someone who is actually there on site, but the person in charge of the location.

Q. Are you familiar with individuals holding different roles in these drug distribution sites?

A. Yes, I am.

Q. What types of roles are available?

A. They will have people that are the look-outs, to look out for approaching law enforcement. That can be someone maybe riding around on a bicycle. They may pay them a set amount to look out for law enforcement.

Some locations have a money person, where they take the money from the buyer but they don't touch the narcotics, so they keep the money separate.

There may be someone who is the bomb man that distributes the narcotics. You may have a location with the phone where someone calls first, and you may have someone that answers the phone that day telling someone whether to come to the location or not to come to the location to purchase drugs.

Q. All right. And are you familiar with drug distribution

sites where individual members may keep their own money?
A. Yes.
Q. From their sales?
A. Yes, sir.
Q. How do these individuals in these situations aid each other in the drug distribution site?
A. Some drug distribution sites when the person in charge delivers an amount of narcotics -- let's say it is worth $400. At the end of the day when those drugs are gone and they bring more drugs, they want the $400 they are owed.
But other people that were selling the narcotics may have made money or made additional money off the sale, so it could be their money.
As far as other people's money, they may watch each other's money; they may hold onto it for them.
Q. And are you familiar with drug distribution sites where individuals hold drugs for each other?
A. Yes, sir, I have seen it.
Q. How does that occur in the course of the drug distribution site operation?
A. It is someone that is holding narcotics so that if a sale is made to a customer that would be the person that would distribute the narcotics to a customer, but they may be working in conjunction with each other.
Q. Are you familiar with participants in a drug distribution

site aiding each other to make change for a customer?

MR. GONZALEZ: Objection, leading.

THE COURT: Sustained. Approach sidebar, please.

Mr. Vazquez, I think you need to let your expert be your expert. You are basically summarizing your theory of the case and asking your expert to give it back to you.

He can describe street level distribution; he can describe the roles he has seen, the business paradigms they use. You can say, what have you seen here in Miami.

But you have to let him tell you what he has seen, and what his expertise is.

BY MR. VAZQUEZ:

Q. Agent, are there different business models for how a drug distribution site may operate in Miami Dade County or other locations?

A. Yes, sir, definitely.

Q. What are some of the business models you have seen?

A. Some locations have set roles; some have a lieutenant that is in charge of operations at the retail location, and that is the person who may be in charge of calling the main supplier to tell them when they need more narcotics.

There are other distribution points where it is kind of each man for themselves. When they have something to sell they may gather together and work together. They may not have the same supplier, but they may work at the same location, just

depends on what the location is.

Q. With regard to the location of a drug distribution site how does location impact the sale by sellers at a particular site?

A. Some sites are busier than others. Some sites are known to be good locations, busy locations based on -- as I have said, several factors may play into that as far as location.

They may want an area where they feel they don't look out of place if they are driving through or walking through the area, to avoid detection by law enforcement.

Q. What relationship does a drug distribution site have to a particular drug distribution group?

A. Most times it is somebody -- if somebody has what they would call a trap or distribution point it is normally run by that person or group, it's their location, it's like a network.

Other narcotics traffickers may be aware that they are there, and they are not going to move into the territory of another person.

So they are aware of who is running locations, which areas of town and so on.

Q. How does a drug trafficking organization maintain their area?

A. Most of the time they protect themselves by people knowing they -- of course to protect their areas they may use firearms or anything they can to keep people away; if there is not any in-fighting.

I have also observed numerous conversations where they talk about setting up in a new location and another person says, that's another person's location so they can't set up.

But to protect what they normally have it's normally a known fact in the area that, that location is run by certain people.

So, most of the times they protect the location the same way as they protect the narcotics; a lot of times by the use of firearms.

Q. For open air drug sales what types of firearms have you been familiar with seeing?

A. Numerous firearms, all sorts of pistols, all the way to AKA rifles, assault rifles, numerous weapons.

Q. Have you seen small firearms?

A. Of course yes, sir.

Q. What is the significance of a small firearm used at an open air drug distribution site?

A. A small firearm may be able to be carried on a person without being seen by law enforcement if law enforcement drives by.

Sometimes on the wire intercepts you may hear someone say they are going to get the bigger guns or the rifles.

But normally if they are doing the normal business they would be protecting -- it would a small pistol or firearm to protect the location from be robbed or a potential drive-by or

some sort of retaliation, to protect against that.

Q. For purposes of conducting a drug trafficking operation what is the difference between the use of a revolver and the use of a semi-automatic pistol?

A. The difference between a revolver and a semi-automatic pistol is a revolver is the wheel type action pistol.

With a semi-automatic pistol the spent casing after the round is shot is ejected from the weapon, which would leave evidence of the shooting at the crime scene.

Whereas if you are using a revolver and fire the rounds the spent casings are contained within the revolver.

So, for evidentiary purposes if you don't want to leave any evidence at the scene of a shooting a revolver may be better because you don't leave any spent casings.

MR. VAZQUEZ: Permission to approach.

THE COURT: Yes.

BY MR. VAZQUEZ:

Q. Showing you what has been admitted into evidence as Government's Exhibit 209 B. Look up when you have had a chance to inspect it.

A. Yes, sir.

Q. What is that?

A. Appears to be a small baggie containing numerous rocks of crack cocaine.

Q. What do you see on the packaging?

A. Appears to be some type of stamp on the baggie itself perhaps a Samurai Warrior or Ninja Warrior.
Q. Showing you Government's Exhibit 194, do you recognize it?
A. Yes, sir.
Q. What does it appear to be?
A. Several baggies containing crack cocaine.
Q. Is this a large or small amount from your perspective.
A. As far as retail distribution point?
Q. Yes.
A. Medium quanties packaged. Like I said, individual rocks, but not huge.
Q. Are you familiar with this quantity being distributed from a drug distribution site?
A. Yes, sir.
Q. Government's Exhibit 147.
A. Yes, sir.
Q. Is this a large or small amount of street level crack?
A. Small amount.
Q. The same for Government's Exhibit 173 and 38.
A. 173 is a little more typical of the fact -- each individual rock, individual baggie, packaged into a larger package, what I referred to earlier as a bomb. It contained each little rock and an individual baggie.
So, it is very consistent.
A. Yes, sir.

Q. Government's Exhibit 38?
A. Yes, sir. Once again appears to be another baggie containing crack cocaine rocks.
Q. Is it a small or large amount?
A. Small amount for narcotics sale at a retail location.
MR. VAZQUEZ: Permission to publish.
THE COURT: Yes.
BY MR. VAZQUEZ:
Q. Showing you Government's Exhibit 173 with the aid of the ELMO. Is this what you referred to earlier as a typical bomb?
A. Yes.
Q. Why is that?
A. Like I said, you would have one individual rock that may be for sale for 5 or $10 depending on the location. There are numerous of those individually packaged and put together in a larger package, what I called the bomb.
Q. Showing you Government's Exhibit 38.
A. Yes, sir.
Q. Showing you Government's 147 and Government's Exhibit 194.
A. Yes, sir.
Q. And showing you Government's Exhibit 209 B.
A. Yes.
Q. Agent are you familiar with the phrase eight ball.
A. Yes.
Q. What is an eight ball?

A. Refers to an amount -- normally an eighth of an ounce, 3.5 grams of narcotics.
Q. And are you familiar with the term ball in the context of narcotics distribution?
A. Yes, another slang term for eight ball.
Q. Are you familiar with the term banger or bang?
A. Normally typical of a firearm.
Q. Are you familiar with the term banging?
A. Yes. It could be referred to as the gang -- it could be gang banging.
Q. Are you familiar with the phrase clean?
A. Yes.
Q. What is that?
A. Clean would be typically used to describe narcotics -- cocaine is a certain purity level. From the time it leaves Colombia it may have many stops along the way.
When it arrives in Miami to the eventual sale on the street cocaine traffickers will normally add to the cocaine to try to make more money by what is called cutting the drugs.
So they add cut to the drugs and the purity level decreases. So someone who purchases it and who wants good narcotics or more potent narcotics may ask if it's clean or not. Basically the reference to the purity of the narcotics.
Q. In the course of investigating these types of narcotic distribution cases have you come across the term crackers.

A. Yes, sir.
Q. What does that mean?
A. It refers to the police. Typically on a wire intercept they will refer to the fact that the crackers are coming, which refers to a police present.
Q. Are you familiar with the phrase dove?
A. Yes. That normally refers to 20; could be $20 worth of narcotics.

THE COURT: All right. Ladies and gentlemen of the jury I have another matter to take up today so I am going to recess for lunch at this time. We will come back at 1:30.

So, have a nice lunch; be back and ready to go at 1:30. Don't talk about the case to each other or let anyone talk to you about the case. And I will see you back at 1:30.

JURY EXCUSED

THE COURT: So the record is clear, the defendants objected to Special Agent Mayo's capacity to testify, and I overruled that consistent with the cases that suggest that the defendant's challenge goes to the weight rather than his capacity to testify as an expert.

Obviously specialized knowledge can be based on practical experience, and there is no need always to have academic training or to have published in the academic field.

I know there was a question as to Exhibit 349 being in evidence or not.

**MR. DISPOTO: It is not yet in evidence. We will be admitting it through the case agent.**

**THE COURT: So it is forthcoming.**

**MR. DISPOTO: Yes, Your Honor.**

**THE COURT: All right. See you back at 1:30.**

**LUNCH RECESS TAKEN**

- - -

**C E R T I F I C A T E**

**I hereby certify that the foregoing is an accurate transcription of proceedings in the above-entitled matter.**

**/S/PATRICIA SANDERS**

**DATE FILED** **PATRICIA SANDERS, RPR**

## $

**$10** [3] - 74:12, 74:17, 83:14
**$20** [1] - 85:7
**$400** [3] - 74:16, 77:8, 77:10

## /

**/S/PATRICIA** [1] - 87:7

## 0

**020** [1] - 19:3

## 1

**1** [3] - 1:6, 41:1, 41:17
**1.1** [1] - 39:9
**104th** [1] - 2:5
**11-3** [1] - 2:7
**1107** [1] - 2:5
**111813** [1] - 44:6
**12-17** [1] - 55:23
**12-17-2013** [1] - 55:25
**120** [4] - 51:8, 53:11, 53:13, 54:23
**13** [1] - 44:6
**14** [1] - 39:20
**14-20017-CR-KMW** [1] - 1:3
**143** [6] - 34:8, 35:7, 35:9, 35:11, 35:18, 40:11
**147** [5] - 62:6, 63:16, 63:18, 82:15, 83:19
**15** [3] - 44:17, 44:18, 61:13
**150** [1] - 1:22
**154** [4] - 34:8, 38:3, 40:9, 40:14
**158** [4] - 62:6, 64:10, 64:11, 65:10
**16** [2] - 30:17, 36:2
**167** [2] - 25:23, 27:17
**168** [1] - 27:8
**16th** [2] - 3:25, 4:1
**173** [5] - 51:8, 54:4, 82:19, 82:20, 83:9
**174** [9] - 34:8, 35:20, 35:21, 42:5, 43:2, 43:16, 45:25, 46:4, 46:19
**178** [2] - 34:8, 37:22
**17th** [1] - 55:22
**18** [1] - 44:3
**1898** [2] - 21:2, 21:5
**18th** [1] - 40:20
**1910** [1] - 1:24
**194** [4] - 58:6, 59:5, 82:3, 83:19
**1960's** [1] - 20:20
**1982** [1] - 50:12
**19th** [1] - 65:20
**1:30** [5] - 10:5, 85:11, 85:13, 85:14, 86:5
**1st** [2] - 5:24, 46:2

## 2

**2** [6] - 35:22, 42:4, 45:25, 55:7, 55:13, 56:8
**2-25-2015** [1] - 1:4
**20** [4] - 4:4, 38:17, 63:25, 85:7
**2000** [1] - 1:19
**2009** [1] - 24:5
**2010** [4] - 3:20, 3:24, 3:25, 68:9
**2013** [5] - 41:20, 44:3, 55:22, 55:23
**2014** [15] - 36:2, 38:6, 39:16, 39:20, 39:24, 40:6, 40:19, 43:7, 46:2, 55:15, 55:20, 59:21, 59:24, 65:20, 66:2
**2015** [1] - 44:14
**209** [6] - 62:7, 64:16, 64:24, 81:19, 83:21
**22** [7] - 16:8, 17:5, 18:4, 29:14, 29:17, 29:20, 29:25
**232** [4] - 15:20, 18:5, 18:8, 20:16
**233** [4] - 34:9, 38:13, 43:24, 44:8
**2340** [1] - 28:17
**25** [3] - 5:7, 25:10, 61:19
**25th** [1] - 39:16
**26** [2] - 37:24, 57:20
**27** [4] - 34:8, 37:9, 37:12, 37:14
**28** [15] - 3:10, 4:24, 30:5, 30:7, 36:3, 36:22, 37:18, 42:16, 42:18, 53:16, 53:22, 55:2, 56:6, 64:3
**29** [2] - 30:15, 30:17
**290** [1] - 65:22

## 3

**3** [4] - 35:22, 42:4, 45:25, 54:22
**3.5** [1] - 84:1
**30** [2] - 33:4, 55:20
**30-year** [1] - 33:8
**300** [1] - 33:22
**305.523.5528** [1] - 2:8
**30th** [1] - 55:15
**32** [7] - 19:3, 19:10, 19:17, 21:13, 21:14, 21:17, 22:7
**32-caliber** [2] - 31:24, 32:9
**3250** [1] - 2:2
**33128** [1] - 2:8
**33130** [1] - 1:22
**33132** [1] - 1:17
**33133** [1] - 2:3
**33134** [1] - 1:20
**33138** [1] - 2:5
**33156** [1] - 1:25
**336** [1] - 29:3
**337** [1] - 28:5
**339** [3] - 34:8, 38:9, 40:23
**341** [1] - 55:24
**342** [6] - 51:20, 52:1, 52:10, 52:11, 52:13, 54:22
**344** [6] - 58:15, 58:19, 58:23, 58:25, 59:4, 59:6
**345** [7] - 62:24, 63:10, 63:15, 63:17, 63:21, 64:14, 65:7
**347** [10] - 34:18, 34:23, 35:13, 35:16, 35:21, 37:11, 37:23, 39:7, 47:9, 48:11
**349** [4] - 58:6, 59:10, 60:3, 85:24
**35** [1] - 9:14
**37** [3] - 51:8, 52:8, 52:25
**38** [8] - 26:6, 26:22, 51:8, 53:8, 53:22, 82:19, 83:1, 83:17
**38-caliber** [1] - 27:10
**380** [3] - 21:16, 21:19, 32:10
**380-caliber** [1] - 31:24
**3rd** [2] - 44:11, 44:13

## 4

**4** [4] - 37:13, 54:22, 59:16, 64:20
**40** [4] - 28:8, 28:11, 29:5, 29:7
**400** [1] - 2:7
**404** [10] - 3:3, 3:8, 5:2, 5:4, 5:5, 6:19, 6:24, 7:6, 7:9, 8:16
**406** [1] - 2:3
**43** [2] - 51:8, 54:9
**44** [2] - 29:9, 29:10
**45** [4] - 29:18, 29:20, 29:24
**47th** [2] - 4:3
**49** [1] - 26:7
**4th** [1] - 1:17

## 5

**5** [5] - 37:13, 64:20, 74:12, 74:17, 83:14
**50** [1] - 20:21
**500** [1] - 15:4
**55** [1] - 20:22
**5th** [1] - 43:7

## 6

**6** [2] - 40:6, 65:24
**614** [1] - 1:20
**67** [1] - 6:17
**6th** [1] - 39:24

## 7

**7** [2] - 40:16, 65:14

## 9

**901** [1] - 17:5
**90122** [1] - 16:4
**9130** [1] - 1:24
**98** [4] - 18:24, 18:25, 19:13, 19:19
**99** [4] - 1:17, 18:24, 19:14, 19:16

## A

**A.F.P.D** [1] - 1:21
**A.M** [1] - 1:5
**A.U.S.A** [3] - 1:15, 1:16, 1:16
**able** [11] - 11:8, 14:25, 16:19, 21:18, 22:6, 24:20, 41:18, 46:7, 46:16, 62:23, 80:18
**above-entitled** [1] - 87:4
**abreast** [2] - 33:16, 74:3
**academic** [2] - 85:23
**accents** [1] - 69:18
**access** [1] - 76:3
**accord** [2] - 7:8, 9:3
**accordance** [1] - 66:1
**according** [1] - 48:16
**accurate** [2] - 58:19, 87:4
**accurately** [1] - 63:6
**acknowledging** [1] - 5:7
**acquitted** [1] - 9:1
**acronym** [1] - 28:14
**action** [3] - 17:19, 27:7, 81:6
**action'd** [2] - 8:19, 9:1
**activity** [1] - 3:17
**actual** [5] - 7:21, 41:10, 53:19, 55:7, 64:8
**add** [3] - 74:1, 84:18, 84:20
**addition** [1] - 43:11
**additional** [6] - 38:20, 43:15, 47:20, 47:23, 74:20, 77:12
**Additionally** [1] - 13:7
**additionally** [2] - 17:20, 18:15
**ADE8232** [1] - 26:7
**admit** [5] - 7:19, 34:22, 51:25, 58:22, 63:9
**admitted** [8] - 7:9, 15:19, 34:25, 52:3, 58:25, 63:12, 65:8, 81:18
**admitting** [1] - 86:2
**Adult** [1] - 4:10
**adult** [1] - 4:12
**advance** [2] - 9:1, 11:6
**advanced** [1] - 24:2
**Advanced** [1] - 24:4
**affects** [1] - 28:3
**agencies** [1] - 70:19
**agency** [1] - 11:22
**Agent** [12] - 15:19, 16:25, 17:14, 20:16, 22:19, 23:4, 25:21, 31:10, 32:9, 71:16, 75:7, 85:17
**agent** [30] - 10:8, 10:12, 10:19, 10:21, 11:7, 12:13, 12:16, 13:2, 14:13, 14:24, 17:8, 23:2, 23:12, 23:20, 24:23, 26:12, 32:13, 66:18, 68:7,

68:18, 68:24, 69:1, 69:12, 72:2, 72:20, 76:2, 78:13, 83:23, 86:2
**agent's** [1] - 72:15
**agents** [1] - 67:20
**ago** [4] - 20:21, 33:15, 70:3, 70:9
**agree** [3] - 5:20, 41:13, 70:2
**aid** [2] - 77:5, 83:9
**aiding** [1] - 78:1
**air** [4] - 67:10, 74:13, 80:10, 80:17
**AKA** [1] - 80:12
**Alcohol** [2] - 12:16, 23:15
**alleged** [3] - 4:6, 9:16, 39:24
**allow** [2] - 24:6, 72:25
**allowed** [1] - 11:17
**almost** [1] - 41:4
**ALTAMIRANO** [1] - 1:7
**America** [5] - 66:22, 71:8, 73:8
**AMERICA** [1] - 1:4
**American** [1] - 29:13
**ammunition** [50] - 13:10, 13:11, 14:21, 15:4, 15:7, 15:15, 16:9, 18:3, 18:5, 18:11, 18:15, 18:16, 18:20, 18:22, 19:17, 19:18, 19:22, 19:24, 20:6, 22:20, 24:16, 24:18, 24:19, 24:21, 25:4, 25:7, 25:15, 27:10, 27:14, 27:15, 27:23, 28:1, 28:2, 28:12, 29:5, 29:7, 29:17, 29:21, 30:4, 30:14, 30:17, 30:18, 30:19, 30:20, 30:21, 30:22, 31:21, 31:22, 31:24, 31:25
**Ammunition** [1] - 27:12
**amount** [25] - 4:21, 6:25, 8:12, 36:25, 37:16, 38:20, 39:9, 40:16, 40:17, 45:3, 53:19, 65:13, 65:24, 74:12, 74:14, 74:15, 76:3, 76:15, 77:8, 82:7, 82:17, 82:18, 83:4, 83:5, 84:1
**amounts** [4] - 36:13, 74:11, 74:18, 76:4
**analysis** [16] - 33:18, 34:3, 34:15, 43:9, 49:14, 49:18, 50:25, 51:16, 54:3, 57:25, 58:20, 61:24, 62:18, 62:21, 63:7, 65:13
**analyst** [3] - 36:20, 48:18, 48:25
**analyze** [4] - 35:23, 36:11, 57:9, 61:3
**analyzed** [12] - 3:9, 3:14, 43:2, 47:25, 48:8, 48:14, 51:9, 51:13, 55:17, 55:20, 58:10, 58:12
**analyzing** [5] - 33:5, 50:8, 50:15, 57:18, 61:15
**answer** [3] - 60:5, 72:25, 73:13
**answers** [1] - 76:22
**ANTHONY** [1] - 1:8
**anticipate** [1] - 10:7
**antique** [7] - 20:23, 20:25, 21:1, 21:2, 21:4, 21:7, 21:10
**apologize** [1] - 18:18
**appear** [3] - 38:19, 53:25, 82:5
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:14
**approach** [6] - 15:22, 25:25, 51:4, 62:3, 78:3, 81:15
**approaching** [1] - 76:14
**April** [3] - 5:23, 36:2, 46:2
**area** [7] - 4:1, 71:10, 73:19, 79:7, 79:9, 79:21, 80:5
**areas** [7] - 68:12, 68:14, 69:22, 70:11, 79:18, 79:23
**argue** [2] - 4:21, 6:7
**arguments** [1] - 5:1
**Arkansas** [1] - 18:15
**armed** [2] - 7:17, 8:2
**Arms** [2] - 28:21, 29:13
**arrest** [2] - 3:19, 8:18
**arrested** [5] - 4:2, 4:5, 4:18, 4:19, 9:17
**arrive** [3] - 18:23, 20:7, 73:15
**arrives** [1] - 84:17
**arriving** [1] - 68:9
**articles** [1] - 70:12
**aside** [1] - 16:6
**aspect** [1] - 73:21
**assault** [1] - 80:13
**assign** [1] - 40:2
**assigned** [3] - 23:20, 68:10, 71:9
**assignment** [6] - 13:1, 23:19, 66:20, 66:23, 68:8, 68:12
**assist** [1] - 10:13
**Assistant** [1] - 11:2
**associated** [3] - 4:6, 4:15, 68:21
**assume** [3] - 11:17, 33:10, 50:20
**ATF** [10] - 12:18, 12:20, 13:1, 14:24, 21:9, 23:20, 24:4, 24:23, 28:18, 28:19
**attempted** [1] - 3:5
**attended** [1] - 24:4
**Attorneys** [1] - 11:3
**authored** [1] - 70:12
**authorities** [1] - 44:2
**auto** [5] - 19:3, 19:10, 19:17, 21:14, 21:17
**automatic** [6] - 19:4, 28:8, 30:8, 81:4, 81:5, 81:7
**available** [1] - 76:12
**Avenue** [3] - 2:7, 4:3, 4:4
**avoid** [1] - 79:9
**aware** [4] - 75:3, 75:24, 79:15, 79:18

## B

**B,** [1] - 5:5
**B-R-O-M-F-I-E-L-D** [1] - 60:20
**Bachelor** [1] - 57:14
**Bachelor's** [3] - 12:24, 33:12, 61:7
**background** [2] - 12:22, 57:12
**bag** [6] - 38:21, 39:10, 39:14, 39:15, 40:18, 41:11
**baggie** [8] - 35:24, 52:15, 52:18, 81:23, 82:1, 82:21, 82:23, 83:2
**baggies** [8] - 3:8, 3:15, 3:22, 4:22, 4:23, 4:24, 65:16, 82:6
**bags** [2] - 35:24, 36:6
**Bahamas** [1] - 73:19
**ball** [4] - 83:23, 83:25, 84:3, 84:5
**bang** [1] - 84:6
**banger** [1] - 84:6
**banging** [2] - 84:8, 84:10
**barrel** [3] - 22:2, 22:4, 26:15
**base** [13] - 3:13, 36:18, 37:3, 37:5, 37:8, 43:12, 43:14, 46:15, 47:14, 47:17, 47:21, 47:25, 48:2
**based** [21] - 4:14, 5:1, 18:10, 18:19, 19:21, 20:20, 24:20, 26:17, 27:4, 27:15, 27:22, 28:16, 28:22, 29:14, 29:22, 36:11, 40:2, 42:13, 79:5, 85:21
**basis** [2] - 9:22, 13:11
**Beach** [2] - 8:9, 19:11
**bearing** [3] - 16:4, 19:12, 40:3
**became** [1] - 4:8
**become** [4] - 13:20, 13:22, 72:21, 73:25
**begin** [1] - 47:5
**begins** [1] - 39:19
**below** [2] - 36:13, 36:22
**better** [1] - 81:13
**between** [7] - 3:13, 11:4, 37:5, 42:22, 70:5, 81:3, 81:5
**BETWEEN** [1] - 69:8
**beyond** [2] - 46:18, 48:21
**bicycle** [1] - 76:15
**big** [1] - 21:3
**bigger** [1] - 80:22
**birth** [1] - 4:1
**bit** [1] - 57:7
**black** [2] - 28:8, 30:8
**BMT** [1] - 9:20
**bomb** [6] - 75:20, 75:21, 76:20, 82:22, 83:10, 83:16
**books** [1] - 16:18
**Bootcamp** [1] - 4:9
**bottom** [6] - 14:22, 26:20, 28:24, 30:24, 31:22, 44:24
**Boulevard** [2] - 1:19, 1:24
**bound** [1] - 4:10
**branch** [1] - 13:24
**break** [1] - 60:6
**briefly** [4] - 12:22, 22:16, 57:12, 61:5
**bring** [2] - 12:1, 77:9
**Bromfield** [3] - 60:15, 60:19, 65:5
**Broward** [1] - 70:5
**Bureau** [5] - 12:16, 23:15, 57:6, 61:1, 66:18
**busier** [2] - 75:1, 79:4
**business** [4] - 78:8, 78:13, 78:17, 80:23
**busy** [1] - 79:5
**buyer** [1] - 76:18
**BY** [46] - 2:6, 12:12, 15:24, 16:24, 17:13, 20:15, 22:18, 23:11, 25:20, 26:2, 26:11, 31:9, 32:8, 32:21, 34:6, 35:1, 39:3, 42:1, 43:1, 43:20, 45:21, 47:1, 50:3, 51:6, 52:4, 54:18, 57:1, 58:4, 59:1, 59:14, 60:21, 62:5, 63:13, 65:4, 66:16, 69:11, 71:6, 71:15, 72:19, 73:2, 73:6, 73:10, 73:12, 78:12, 81:17, 83:8

## C

**calculate** [1] - 36:18
**calculated** [2] - 36:16, 44:16
**caliber** [27] - 14:3, 14:17, 14:21, 16:4, 16:8, 17:5, 18:4, 19:3, 21:13, 21:16, 21:19, 22:7, 26:6, 26:22, 28:8, 28:11, 29:5, 29:7, 29:15, 29:17, 29:20, 29:25, 30:20, 30:24, 31:21, 32:10
**Cannabis** [4] - 38:16, 48:12, 48:13, 49:2
**Cannibis** [3] - 52:24, 53:5, 53:6
**cannot** [2] - 31:18, 49:7
**capacity** [7] - 33:11, 34:10, 50:6, 50:11, 50:21, 85:17, 85:20
**car** [1] - 13:15
**care** [2] - 48:4, 49:19
**career** [1] - 33:8
**Caribbean** [3] - 66:22, 71:8, 73:17

**Carolina** [10] - 67:4, 67:12, 67:15, 67:24, 67:25, 68:4, 68:7, 70:3, 70:21, 71:17
**carried** [1] - 80:18
**cartridge** [8] - 14:22, 17:25, 18:4, 19:18, 29:6, 29:25, 30:3
**Cartridge** [2] - 29:21, 30:1
**Case** [5] - 7:5, 39:21, 63:19, 64:12, 64:19
**case** [54] - 1:3, 3:18, 4:10, 4:12, 6:10, 6:13, 6:20, 7:4, 8:19, 10:8, 10:12, 10:18, 10:21, 11:7, 11:15, 14:23, 28:4, 29:6, 29:25, 30:3, 30:12, 34:21, 39:19, 40:2, 42:9, 44:5, 44:19, 45:2, 45:11, 46:1, 48:16, 49:2, 49:9, 55:21, 55:23, 58:13, 59:19, 62:13, 62:14, 65:20, 66:2, 67:23, 68:18, 72:2, 72:10, 72:21, 78:5, 85:13, 85:14, 86:2
**cases** [7] - 23:24, 36:11, 42:14, 67:9, 71:10, 84:25, 85:18
**casing** [2] - 29:24, 81:7
**casings** [2] - 81:11, 81:14
**Center** [1] - 1:24
**Central** [3] - 66:22, 71:8, 73:8
**certain** [4] - 13:11, 36:13, 80:5, 84:15
**certainly** [2] - 11:23, 44:20
**certificate** [1] - 57:16
**certification** [1] - 24:9
**certified** [4] - 13:24, 14:8, 14:10, 24:11
**certify** [1] - 87:3
**CF020** [1] - 19:12
**CHACON** [1] - 1:6
**Chacon** [1] - 7:14
**chain** [3] - 8:9, 9:24, 10:2
**challenge** [1] - 85:19
**challenged** [2] - 71:2, 71:3
**chamber** [1] - 22:3
**chambered** [4] - 21:21, 21:24, 21:25, 22:1
**chance** [3] - 6:14, 24:24, 81:19
**change** [1] - 78:1
**charge** [5] - 76:6, 76:8, 77:7, 78:19, 78:20
**charged** [2] - 7:20
**charges** [1] - 4:17
**check** [2] - 8:3, 17:10
**chemical** [3] - 37:5, 73:21, 73:23
**chemist** [1] - 34:10
**Chemistry** [1] - 33:13
**chemistry** [11] - 33:18, 34:2, 50:14, 50:24, 57:9, 57:14, 57:18, 57:24, 61:7, 61:15, 61:23
**CHRISTOPHER** [1] - 1:7
**Christopher** [1] - 66:15
**chunk** [1] - 41:5
**Circuit** [1] - 6:10
**cite** [1] - 6:21
**cited** [2] - 6:9, 6:20
**city** [1] - 40:2
**City** [9] - 4:3, 22:22, 36:10, 39:21, 40:5, 41:19, 42:14, 68:14, 69:22
**Claire** [1] - 61:8
**clarify** [1] - 48:7
**classification** [6] - 15:1, 15:6, 15:15, 24:25, 25:6, 25:15
**clean** [3] - 84:11, 84:14, 84:22
**cleaner** [1] - 5:17
**clear** [3] - 7:6, 64:13, 85:16
**clearly** [1] - 41:3
**click** [1] - 11:22
**clients** [1] - 7:7
**closed** [1] - 4:12
**cocaine** [74] - 3:9, 3:10, 3:12, 3:14, 3:23, 4:18, 4:22, 4:23, 5:22, 7:22, 8:22, 35:25, 36:3, 36:7, 36:18, 37:2, 37:6, 37:7, 37:17, 37:18, 41:14, 42:19, 42:23, 46:5, 46:10, 46:15, 47:10, 47:14, 47:20, 47:21, 47:24, 48:4, 48:8, 52:16, 53:2, 53:3, 53:15, 53:21, 55:10, 56:6, 59:16, 63:25, 65:17, 67:11, 67:13, 72:21, 73:3, 73:7, 73:9, 73:15, 73:20, 73:23, 73:25, 74:2, 74:3, 74:4, 74:6, 74:8, 74:11, 74:15, 74:17, 74:19, 75:12, 81:24, 82:6, 83:3, 84:15, 84:18
**Cocoa** [1] - 19:11
**collection** [1] - 68:16
**Colombia** [2] - 73:18, 84:16
**color** [4] - 28:8, 29:6, 29:15, 43:3
**colored** [3] - 27:13, 29:6, 30:8
**coming** [7] - 7:19, 8:6, 11:16, 16:11, 16:14, 27:20, 85:4
**Commerce** [8] - 13:12, 18:21, 18:23, 20:2, 20:4, 20:8, 21:13, 29:1
**commerce** [3] - 13:15, 13:18, 28:4
**common** [4] - 36:20, 44:21, 75:15, 75:19
**commonly** [1] - 12:18
**communication** [1] - 11:18
**company** [6] - 26:16, 26:17, 27:15, 28:15, 29:13, 29:22
**Company** [5] - 26:19, 27:12, 29:14, 29:21, 30:1
**compared** [2] - 9:7, 70:9
**completed** [2] - 51:16, 58:17
**completely** [1] - 4:17
**completing** [1] - 34:14
**composite** [3] - 34:19, 51:21, 52:6
**Composite** [1] - 35:21
**conceded** [2] - 5:23, 6:3
**concern** [2] - 11:5, 49:16
**concerned** [3] - 48:18, 48:25, 49:13
**conditions** [1] - 4:12
**conduct** [3] - 24:17, 43:14, 44:9
**conducting** [1] - 81:2
**confidential** [1] - 67:21
**confirmed** [1] - 53:5
**confused** [1] - 8:21
**conjunction** [2] - 62:9, 77:24
**Connecticut** [1] - 18:16
**connection** [1] - 71:16
**considered** [2] - 4:2, 42:18
**consisted** [1] - 65:16
**consistent** [3] - 3:17, 82:24, 85:18
**conspiracy** [8] - 4:6, 4:7, 5:25, 6:4, 6:7, 6:12, 7:3, 9:19
**constant** [1] - 75:5
**contact** [2] - 24:16, 44:2
**contained** [5] - 3:22, 4:25, 44:8, 81:11, 82:22
**containing** [8] - 3:8, 35:25, 36:7, 52:15, 52:18, 81:23, 82:6, 83:3
**CONTD** [1] - 2:1
**content** [2] - 39:10, 40:17
**contents** [2] - 36:15, 43:10
**context** [1] - 84:3
**continue** [3] - 17:2, 17:12, 72:18
**continuously** [1] - 75:1
**control** [1] - 76:3
**controlled** [14] - 33:6, 33:18, 34:3, 34:12, 49:8, 50:9, 50:16, 50:25, 51:10, 57:10, 57:18, 57:25, 61:15, 61:24
**conversations** [1] - 80:1
**convertible** [1] - 17:18
**convicted** [4] - 5:14, 5:21, 8:7, 8:16
**conviction** [5] - 4:9, 4:13, 7:22, 8:6, 8:22
**convictions** [1] - 8:6
**cook** [1] - 74:1
**cooked** [2] - 73:22, 74:1
**cookie** [2] - 46:17, 75:8
**copper** [2] - 27:13, 29:6
**copy** [2] - 3:6, 52:13
**Coral** [1] - 1:20
**Corporation** [1] - 27:14
**correct** [79] - 12:19, 15:2, 17:14, 18:9, 22:8, 22:9, 31:16, 31:19, 31:25, 35:15, 35:18, 36:4, 36:8, 37:16, 37:19, 38:2, 38:12, 39:9, 39:17, 39:18, 39:20, 39:25, 40:7, 40:11, 40:12, 40:16, 40:17, 40:21, 41:1, 41:2, 41:21, 43:12, 43:24, 43:25, 44:3, 44:14, 44:15, 44:19, 44:20, 45:7, 45:14, 46:5, 46:6, 47:14, 47:18, 47:22, 53:4, 53:7, 53:17, 54:1, 54:8, 54:15, 55:2, 55:3, 55:6, 55:8, 55:14, 55:22, 59:18, 59:24, 64:4, 64:7, 64:9, 64:22, 65:15, 65:18, 65:21, 65:25, 66:3, 69:20, 69:23, 70:1, 70:17, 70:20, 70:23, 70:24, 71:1, 72:8
**correctly** [1] - 44:16
**correlates** [2] - 65:9, 65:19
**correspond** [5] - 35:6, 51:24, 52:6, 59:5, 63:15
**corresponds** [21] - 35:21, 37:12, 37:23, 38:4, 40:5, 40:9, 40:10, 40:14, 40:23, 41:19, 52:9, 53:9, 53:12, 54:5, 54:22, 59:3, 59:10, 59:23, 62:14, 63:17, 64:11
**cost** [1] - 11:1
**COUNSEL** [1] - 69:8
**counsel** [5] - 5:12, 7:11, 10:9, 12:1, 47:3
**Count** [1] - 5:7
**count** [3] - 5:25, 7:20, 9:1
**countries** [2] - 69:19, 73:17
**country** [2] - 28:16, 30:23
**County** [8] - 33:24, 69:21, 70:5, 70:6,

70:11, 75:19, 78:14
**couple** [2] - 39:7, 42:12
**course** [9] - 11:10, 11:14, 11:20, 19:11, 68:20, 77:19, 79:23, 80:15, 84:24
**COURT** [110] - 1:1, 1:13, 3:1, 3:19, 3:21, 5:3, 5:18, 6:1, 6:6, 6:13, 6:16, 6:23, 7:10, 7:13, 7:24, 8:11, 8:15, 8:23, 9:2, 9:5, 9:10, 9:12, 9:25, 10:13, 10:15, 10:17, 10:22, 11:1, 11:5, 11:11, 11:20, 11:23, 11:25, 12:2, 12:3, 15:16, 15:18, 15:23, 16:23, 17:10, 20:10, 20:12, 20:14, 22:11, 22:13, 22:15, 22:17, 23:2, 25:16, 25:18, 26:1, 26:10, 31:4, 31:6, 31:8, 32:3, 32:5, 32:7, 32:13, 34:5, 34:25, 39:2, 41:24, 42:25, 43:19, 44:23, 45:20, 46:22, 46:24, 48:23, 49:21, 51:1, 51:3, 51:5, 52:3, 54:17, 56:11, 56:13, 56:18, 58:1, 58:3, 58:25, 59:13, 60:5, 60:8, 60:13, 61:25, 62:2, 62:4, 63:12, 64:25, 65:2, 66:10, 69:6, 69:10, 71:4, 71:13, 72:11, 72:14, 72:18, 72:24, 73:5, 73:11, 78:3, 81:16, 83:7, 85:9, 85:16, 86:3, 86:5
**court** [8] - 16:11, 16:14, 27:20, 33:17, 50:14, 57:11, 61:4, 72:6
**Court** [15] - 2:7, 4:10, 7:9, 7:15, 7:16, 9:23, 14:10, 15:6, 24:12, 25:6, 33:25, 36:24, 36:25, 42:10, 61:20
**COURTROOM** [7] - 12:8, 23:7, 32:17, 49:24, 56:22, 60:17, 66:13
**Courts** [6] - 33:23, 33:24, 48:6, 57:21, 57:22, 61:14
**covers** [1] - 66:21
**crack** [31] - 3:23, 35:25, 36:7, 36:18, 37:5, 37:7, 42:23, 46:5, 46:15, 47:21, 52:16, 53:2, 53:3, 56:5, 63:25, 65:16, 67:13, 72:21, 73:3, 73:22, 73:25, 74:3, 74:6, 74:8, 74:11, 74:19, 75:12, 81:24, 82:6, 82:17, 83:3
**crackers** [2] - 84:25, 85:4
**crime** [2] - 22:24, 81:9
**Crime** [7] - 33:1, 33:2, 50:5, 57:5, 57:7, 60:25, 61:10
**crimes** [1] - 23:23
**Criminalist** [2] - 50:7, 50:8
**criminalist** [2] - 32:25, 33:2
**criteria** [6] - 36:14, 42:13, 42:15, 42:17, 44:25, 49:18
**cross** [8] - 3:11, 20:10, 47:3, 47:6, 48:13, 48:22, 54:17, 59:13
**current** [4] - 13:1, 23:19, 66:23, 72:5
**custody** [2] - 9:24, 10:2
**customer** [3] - 77:22, 77:23, 78:1
**cut** [1] - 84:20
**cutting** [1] - 84:19

## D

**Dade** [16] - 33:1, 33:24, 39:19, 50:5, 57:5, 59:19, 60:25, 61:9, 62:13, 65:19, 66:1, 69:21, 70:5, 70:11, 75:19, 78:14
**Dadeland** [1] - 1:24
**daily** [1] - 13:11
**DATE** [1] - 87:9
**date** [24] - 3:19, 4:1, 39:16, 39:21, 39:24, 40:5, 40:19, 41:19, 41:20, 44:3, 44:5, 44:18, 44:19, 46:2, 48:16, 55:17, 55:21, 55:23, 55:25, 59:20, 59:23, 65:19, 66:1, 67:1
**date-wise** [1] - 3:19
**dated** [1] - 38:6
**Datran** [1] - 1:24
**DAVID** [1] - 2:2
**DAY** [1] - 1:5
**dealing** [1] - 46:2
**deals** [1] - 71:7
**dealt** [2] - 69:24, 72:20
**death** [1] - 6:2
**December** [2] - 41:20, 55:22
**decided** [1] - 7:16
**decreases** [1] - 84:21
**Defendant** [1] - 5:13
**defendant's** [1] - 85:19
**defendants** [3] - 4:16, 85:16
**Defendants** [1] - 1:9
**DEFENDANTS** [1] - 1:19
**defense** [6] - 5:17, 9:8, 10:15, 47:3, 69:6, 72:14
**definitely** [1] - 78:16
**definition** [6] - 17:17, 21:7, 27:6, 29:12, 29:17, 30:4
**degradation** [2] - 49:1, 49:5
**degraded** [1] - 49:7
**Degree** [3] - 12:24, 33:12, 61:7
**DeLeon** [1] - 1:19
**delivers** [1] - 77:8
**Department** [10] - 22:22, 33:1, 55:21, 57:5, 59:19, 60:25, 61:9, 62:13, 65:19, 66:2
**department** [1] - 44:19
**DEPUTY** [7] - 12:8, 23:7, 32:17, 49:24, 56:22, 60:17, 66:13
**Deputy** [1] - 12:24
**describe** [6] - 12:22, 16:13, 16:22, 78:7, 78:8, 84:14
**described** [5] - 21:13, 35:24, 37:15, 41:15, 50:21
**description** [2] - 22:8, 41:13
**designed** [2] - 17:18, 27:6
**detection** [1] - 79:9
**detective** [4] - 67:7, 67:8, 67:12, 67:15
**detectives** [1] - 10:11
**determination** [2] - 38:16, 49:10
**determine** [22] - 13:11, 14:25, 16:19, 20:2, 20:3, 21:4, 21:12, 22:6, 24:20, 24:24, 33:6, 34:11, 45:5, 46:7, 46:11, 47:20, 47:24, 48:2, 49:7, 50:9, 50:15, 51:10
**determined** [1] - 53:3
**difference** [3] - 37:5, 81:3, 81:5
**differences** [1] - 70:5
**different** [14] - 4:14, 4:17, 22:21, 31:18, 31:24, 48:23, 69:18, 69:19, 70:3, 70:11, 73:23, 76:9, 78:13
**differentiate** [1] - 48:4
**differentiation** [1] - 42:22
**differently** [1] - 48:7
**difficult** [1] - 41:10
**dire** [1] - 69:9
**direct** [1] - 45:8
**disassembled** [1] - 29:16
**discussing** [3] - 10:1, 17:22, 18:8
**DISCUSSION** [1] - 69:8
**displayed** [1] - 59:8
**displaying** [2] - 37:25, 54:11
**Dispoto** [2] - 10:24, 11:7
**DISPOTO** [44] - 1:16, 11:10, 32:6, 32:15, 32:21, 34:1, 34:6, 34:22, 35:1, 38:25, 42:24, 44:22, 46:25, 47:1, 49:20, 49:23, 50:3, 50:23, 51:4, 51:6, 51:25, 52:4, 54:16, 56:17, 56:19, 57:1, 57:23, 58:4, 58:22, 59:1, 59:12, 60:12, 60:15, 60:21, 61:22, 62:3, 62:5, 63:9, 63:13, 64:23, 65:1, 66:8, 86:1, 86:4
**distinguished** [1] - 3:12
**distribute** [1] - 77:23
**distributed** [3] - 74:8, 76:4, 82:12
**distributes** [1] - 76:20
**distribution** [36] - 68:2, 68:5, 68:21, 68:24, 69:2, 69:5, 70:13, 74:10, 74:13, 74:21, 74:24, 75:10, 75:13, 75:17, 76:2, 76:5, 76:6, 76:10, 76:25, 77:6, 77:7, 77:16, 77:19, 77:25, 78:7, 78:14, 78:22, 79:2, 79:10, 79:11, 79:13, 80:17, 82:8, 82:13, 84:4, 84:25
**District** [2] - 6:17, 70:22
**DISTRICT** [3] - 1:1, 1:2, 1:13
**Division** [2] - 23:21, 66:19
**DIVISION** [1] - 1:2
**Dixon** [5] - 3:3, 3:25, 5:6, 5:21, 7:1
**DIXON** [1] - 1:8
**document** [3] - 11:21, 62:21, 63:6
**documented** [1] - 34:15
**documents** [1] - 62:25
**dollars** [2] - 74:7, 74:22
**Dominican** [1] - 73:18
**done** [4] - 7:2, 15:3, 21:9, 25:2
**Donet** [9] - 3:6, 3:7, 3:21, 5:18, 6:19, 22:11, 32:3, 45:20, 71:4
**DONET** [17] - 2:2, 3:22, 5:20, 6:3, 22:12, 32:4, 45:21, 46:21, 56:15, 60:10, 66:6, 69:9, 69:11, 71:5, 71:6, 71:11, 72:16
**dove** [1] - 85:6
**down** [8] - 16:25, 23:2, 26:8, 26:12, 32:13, 49:21, 60:13, 66:10
**draft** [5] - 5:13, 7:8, 7:12, 34:14, 36:20
**drafted** [1] - 36:9
**drafting** [1] - 47:23
**drive** [1] - 80:25
**drive-by** [1] - 80:25

**drives** [1] - 80:19
**driving** [1] - 79:8
**drug** [26] - 49:8, 52:21, 56:5, 74:24, 75:10, 75:13, 75:17, 76:2, 76:4, 76:6, 76:10, 76:25, 77:6, 77:7, 77:16, 77:19, 77:25, 78:13, 79:2, 79:10, 79:11, 79:20, 80:10, 80:17, 81:2, 82:13
**drugs** [11] - 36:12, 56:1, 75:18, 75:23, 76:3, 76:24, 77:9, 77:10, 77:17, 84:19, 84:20
**during** [5] - 33:8, 47:6, 50:13, 67:19, 67:25
**dust** [1] - 41:16
**duties** [10] - 13:4, 13:5, 14:24, 23:22, 24:23, 33:5, 36:20, 37:1, 50:8, 67:5
**dynamics** [1] - 6:8

## E

**e-mail** [1] - 3:5
**earliest** [1] - 67:1
**early** [2] - 3:6, 20:20
**educated** [2] - 33:10, 50:20
**education** [1] - 61:5
**educational** [2] - 12:22, 57:12
**efficiency** [1] - 11:6
**eight** [10] - 15:10, 27:10, 27:11, 27:16, 29:5, 38:10, 40:22, 83:23, 83:25, 84:5
**eighth** [1] - 84:1
**either** [2] - 6:24, 44:2
**ejected** [1] - 81:8
**electronic** [2] - 16:17, 68:16
**Eleventh** [1] - 6:10
**ELMO** [4] - 16:22, 26:9, 52:13, 83:10
**embedded** [1] - 39:22
**employed** [7] - 12:15, 12:20, 23:14, 23:15, 23:17, 66:17, 66:18
**employment** [1] - 71:16
**empty** [1] - 29:25
**enables** [1] - 57:13
**end** [2] - 9:14, 77:9
**enforce** [2] - 13:2, 13:5
**enforcement** [14] - 44:2, 49:3, 66:24, 67:2, 68:8, 70:19, 75:3, 75:24, 76:1, 76:14, 76:16, 79:9, 80:19
**enter** [1] - 7:23
**entered** [2] - 25:22, 62:22
**enters** [1] - 22:2
**entire** [1] - 33:8
**entitled** [3] - 10:18, 10:20, 87:4
**equivalent** [1] - 48:6
**ESQ** [4] - 1:19, 1:23, 2:2, 2:4
**establishing** [1] - 8:7
**estimate** [1] - 45:17
**events** [1] - 5:9
**eventual** [1] - 84:17
**eventually** [1] - 73:19
**evidence** [32] - 5:25, 7:19, 9:1, 10:13, 10:14, 10:19, 11:4, 11:9, 11:16, 11:18, 15:20, 25:22, 34:23, 35:3, 39:6, 40:9, 41:5, 52:1, 57:9, 58:10, 58:11, 58:23, 60:4, 61:3, 63:10, 65:10, 68:16, 81:9, 81:13, 81:18, 85:25, 86:1
**evidentiary** [1] - 81:12
**exact** [6] - 37:16, 38:23, 43:10, 45:5, 56:7, 68:25
**exactly** [1] - 44:4
**examination** [14] - 3:11, 16:13, 18:10, 18:19, 19:21, 20:10, 24:17, 27:4, 27:22, 45:8, 47:4, 47:6, 48:13, 59:13
**examinations** [1] - 61:11
**examine** [7] - 13:10, 14:14, 14:25, 16:10, 27:19, 34:11, 62:8
**examined** [5] - 14:13, 21:11, 21:15, 22:19, 46:4
**examiner** [7] - 13:7, 13:9, 13:10, 13:21, 13:23, 13:25, 24:7
**example** [5] - 13:13, 14:2, 14:13, 14:18, 70:19
**EXCUSED** [1] - 85:15
**Exeter** [1] - 28:22
**exhibit** [17] - 34:19, 35:6, 35:10, 35:12, 35:23, 38:15, 51:21, 52:6, 52:9, 53:9, 54:5, 54:22, 64:17, 64:18, 64:24
**Exhibit** [105] - 9:14, 15:20, 18:5, 18:8, 18:24, 18:25, 19:13, 19:14, 19:16, 19:19, 20:16, 25:23, 27:8, 27:17, 28:5, 29:3, 29:9, 29:10, 29:20, 29:24, 30:5, 30:7, 30:15, 30:17, 34:8, 34:18, 34:23, 35:7, 35:9, 35:16, 35:18, 35:20, 35:21, 37:9, 37:11, 37:12, 37:14, 37:22, 37:23, 38:3, 38:9, 38:13, 39:7, 40:9, 40:11, 40:14, 40:23, 42:5, 43:2, 43:16, 43:24, 44:8, 45:25, 46:4, 46:19, 47:9, 48:11, 51:8, 51:20, 52:1, 52:10, 52:11, 52:25, 53:8, 53:11, 53:13, 53:22, 54:4, 54:9, 54:22, 55:24, 58:14, 58:19, 58:23, 59:4, 59:5, 59:6, 59:10, 60:3, 62:6, 62:7, 63:10, 63:15, 63:16, 63:17, 63:18, 63:20, 64:10, 64:11, 64:14, 64:16, 65:7, 65:10, 65:22, 81:19, 82:3, 82:15, 82:19, 83:1, 83:9, 83:17, 83:19, 83:21, 85:24
**exhibits** [2] - 52:6, 63:15
**Exhibits** [1] - 58:6
**expect** [1] - 10:10
**expel** [1] - 17:19
**experience** [9] - 20:18, 27:5, 31:14, 68:20, 69:21, 69:24, 71:25, 75:15, 85:22
**expert** [26] - 15:5, 15:11, 15:14, 25:5, 25:11, 25:14, 33:17, 34:2, 50:14, 50:18, 50:24, 51:3, 57:17, 57:24, 61:14, 61:23, 62:2, 68:5, 69:1, 69:4, 70:22, 72:17, 78:4, 78:5, 78:6, 85:20
**expertise** [1] - 78:11
**explain** [2] - 36:9, 39:12
**explosive** [3] - 13:3, 17:19, 27:7
**Explosives** [2] - 12:17, 23:16
**explosives** [1] - 13:6
**extensive** [1] - 61:10
**extra** [1] - 10:3
**EZ** [1] - 34:24

## F

**F-L-E-I-S-H-E-R** [1] - 50:2
**fact** [14] - 4:15, 5:3, 17:8, 18:5, 19:5, 27:1, 29:11, 39:19, 47:16, 50:15, 53:6, 80:5, 82:20, 85:4
**factors** [1] - 79:6
**failed** [2] - 15:11, 25:11
**fairly** [1] - 10:10
**false** [2] - 5:10, 49:14
**familiar** [15] - 14:1, 69:18, 75:7, 76:9, 76:25, 77:16, 77:25, 80:11, 82:12, 83:23, 84:3, 84:6, 84:8, 84:11, 85:6
**far** [7] - 70:4, 70:9, 71:21, 74:8, 77:14, 79:6, 82:8
**FBI** [2] - 68:9, 71:17
**features** [3] - 14:3, 14:16, 14:18
**February** [9] - 3:20, 3:25, 39:16, 39:24, 40:6, 40:20, 44:11, 44:13, 65:20
**Federal** [28] - 13:2, 13:5, 14:1, 14:10, 15:6, 17:17, 18:16, 19:17, 24:11, 25:6, 27:6, 28:4, 29:12, 29:16, 29:21, 30:1, 30:4, 33:24, 36:24, 36:25, 45:2, 48:6, 61:20, 66:18, 68:19, 68:24, 69:1
**feeds** [1] - 22:3
**felon** [2] - 8:7, 8:16
**felony** [3] - 4:9, 4:13, 8:5
**few** [2] - 59:2, 70:10
**field** [14] - 15:6, 25:6, 33:16, 33:17, 34:2, 50:14, 50:24, 57:18, 57:24, 61:15, 61:23, 68:5, 69:2, 85:23
**Field** [1] - 23:20
**fifteen** [3] - 48:15, 49:2, 49:15
**fifth** [1] - 38:6
**fighting** [1] - 79:25
**FILED** [1] - 87:9
**final** [1] - 40:22
**finally** [3] - 28:23, 38:13, 64:16
**findings** [2] - 48:24, 61:3
**fine** [2] - 9:8, 42:3
**finger** [2] - 26:15, 30:9
**fingerprints** [1] - 9:7
**fire** [3] - 27:7, 29:17, 81:10
**firearm** [66] - 13:11, 13:13, 14:13, 14:14, 14:15, 14:16, 16:6, 16:19, 17:8, 17:14, 17:17, 17:21, 18:2, 18:7, 18:11, 18:20, 19:3, 19:5, 19:7, 19:9, 19:22, 19:25, 20:17, 20:18, 20:23, 20:25, 21:1, 21:4, 21:5, 21:8, 21:10, 21:12, 21:20, 21:23, 21:24, 22:8, 22:19, 24:15, 24:17, 24:19, 24:21, 26:14, 27:1, 27:6, 27:23, 28:2, 28:7, 28:9, 28:13, 28:25, 29:7, 29:10, 29:12, 29:15, 30:7, 30:13, 30:24, 31:15, 31:16, 31:18, 32:10, 80:16, 80:18, 80:24, 84:7
**firearm's** [3] - 14:12, 26:16, 28:15
**firearms** [24] - 13:3, 13:6, 13:10, 13:17, 13:23, 14:2, 14:25, 15:4, 15:7, 15:15, 23:23, 23:25, 24:3, 24:24, 25:3, 25:7, 25:15, 31:13, 79:23, 80:9, 80:10, 80:12, 80:14
**Firearms** [3] - 12:17, 23:16, 24:5
**firearms'** [1] - 24:14

**fired** [1] - 22:5
**first** [8] - 13:23, 20:17, 30:12, 42:13, 56:6, 63:20, 67:2, 76:22
**fit** [2] - 29:7, 32:9
**fits** [1] - 17:17
**five** [5] - 37:20, 45:17, 46:8, 51:7, 54:6
**FL** [7] - 1:17, 1:20, 1:22, 1:25, 2:3, 2:5, 2:8
**Flagler** [1] - 1:22
**flash** [1] - 21:3
**Fleischer** [1] - 49:23
**Fleisher** [6] - 50:1, 50:4, 51:3, 54:19, 54:21, 62:2
**Flint** [1] - 21:2
**Flores** [1] - 9:16
**FLORES** [1] - 1:8
**Florida** [20] - 12:23, 13:14, 13:16, 13:19, 18:12, 18:23, 19:23, 19:25, 20:1, 20:8, 23:16, 27:24, 28:2, 33:13, 48:4, 57:14, 57:16, 73:3, 73:9, 73:15
**FLORIDA** [1] - 1:2
**flu** [1] - 6:2
**fluent** [1] - 69:14
**fluid** [1] - 10:22
**follow** [1] - 72:25
**follow-up** [1] - 72:25
**following** [2] - 68:4, 68:7
**FOR** [2] - 1:15, 1:19
**force** [2] - 14:14, 71:7
**foregoing** [1] - 87:3
**Foreign** [2] - 18:21, 21:13
**foreign** [1] - 28:3
**Forensic** [1] - 61:1
**forensic** [2] - 57:6, 57:15
**form** [2] - 8:14, 74:2
**formal** [1] - 61:11
**Fort** [1] - 2:3
**forth** [1] - 75:6
**forthcoming** [1] - 86:3
**forward** [3] - 8:3, 11:22, 11:25
**forwarded** [1] - 8:14
**foundation** [1] - 72:17
**Four** [1] - 23:21
**four** [9] - 27:11, 27:14, 29:20, 53:14, 55:4, 55:10, 55:13, 56:8, 61:10
**fourth** [1] - 44:11
**frame** [5] - 17:20, 17:21, 19:9, 21:20, 21:23
**FRANK** [1] - 2:4
**free** [12] - 36:18, 37:3, 37:5, 37:8, 43:12, 43:14, 46:15, 47:14, 47:17, 47:21, 47:25, 48:2
**front** [9] - 34:7, 35:11, 37:9, 51:7, 58:5, 58:14, 59:3, 62:6, 64:21
**full** [8] - 4:23, 12:8, 23:7, 32:17, 49:24, 56:22, 60:17, 66:13

## G

**Gables** [1] - 1:20
**Gang** [1] - 68:10
**gang** [3] - 72:4, 84:9, 84:10
**gangs** [1] - 69:24
**gather** [1] - 78:24
**general** [1] - 8:16
**generally** [2] - 13:4, 31:13
**generated** [4] - 36:5, 43:8, 44:12, 47:8
**gentlemen** [3] - 12:4, 32:23, 85:9
**geographic** [2] - 68:12, 70:11
**ghost** [1] - 7:1
**given** [6] - 3:24, 4:11, 7:1, 10:8, 40:19, 44:13
**gloves** [1] - 14:15
**gold** [1] - 29:6
**GONZA** [1] - 34:24
**GONZALEZ** [26] - 1:19, 8:5, 8:17, 9:8, 11:2, 15:17, 20:11, 25:17, 31:5, 34:4, 39:3, 41:22, 51:2, 52:2, 54:18, 56:10, 58:2, 58:24, 59:14, 60:1, 62:1, 63:11, 65:3, 65:4, 66:4, 78:2
**Gonzalez** [10] - 7:7, 7:16, 7:23, 7:25, 8:13, 20:10, 39:2, 54:17, 59:13, 65:2
**gonzalez** [1] - 31:4
**Government** [14] - 5:17, 5:24, 10:18, 23:3, 32:14, 32:15, 49:21, 49:23, 50:23, 57:23, 60:14, 60:15, 61:22, 66:11
**Government's** [77] - 15:20, 18:5, 18:8, 18:24, 18:25, 19:19, 25:22, 27:8, 27:16, 28:5, 29:3, 29:9, 29:10, 29:20, 29:24, 30:5, 30:7, 30:15, 30:17, 34:8, 34:18, 34:23, 37:11, 37:23, 38:9, 38:13, 39:6, 40:9, 40:11, 40:14, 40:23, 42:5, 43:2, 43:15, 43:24, 47:9, 48:11, 51:8, 51:20, 52:1, 52:25, 53:8, 53:11, 53:12, 53:22, 54:4, 54:9, 54:21, 58:6, 58:14, 58:18, 58:23, 59:3, 59:6, 59:10, 62:6, 62:7, 63:10, 63:15, 63:16, 63:17, 63:20, 64:10, 64:14, 65:7, 65:10, 65:22, 81:19, 82:3, 82:15, 82:19, 83:1, 83:9, 83:17, 83:19, 83:21
**graduated** [1] - 12:23
**graduating** [1] - 12:24
**gram** [8] - 38:22, 41:3, 45:10, 45:13, 45:16, 45:17, 46:20, 74:6
**grams** [25] - 3:10, 4:24, 36:3, 36:22, 37:18, 38:17, 39:9, 40:16, 41:1, 42:16, 42:18, 53:16, 53:22, 55:2, 55:7, 55:13, 56:6, 56:8, 59:17, 64:3, 65:14, 65:24, 75:12, 84:2
**greater** [1] - 42:20
**Greer** [1] - 3:7
**gross** [2] - 39:11, 39:14
**grounds** [1] - 9:18
**Group** [1] - 23:21
**group** [4] - 6:8, 76:2, 79:11, 79:14
**grown** [1] - 73:9
**guess** [1] - 5:25
**guesstimate** [1] - 45:15
**guns** [1] - 80:22

## H

**Haiti** [4] - 68:14, 69:22, 71:10, 73:18
**half** [4] - 10:4, 45:16, 67:3, 75:7
**Hampshire** [1] - 28:22
**hand** [1] - 6:21
**handing** [1] - 29:3
**handle** [4] - 26:20, 29:15, 48:6, 67:9
**handles** [1] - 71:9
**handwriting** [1] - 51:15
**Harrington** [1] - 16:3
**Havana** [3] - 4:2, 69:24, 70:3
**head** [4] - 14:22, 18:1, 30:18, 30:19
**head-stamp** [1] - 18:1
**hear** [2] - 68:20, 80:21
**heard** [1] - 6:2
**held** [1] - 66:23
**HELD** [2] - 1:12, 69:8
**help** [2] - 10:12, 11:8
**helps** [1] - 7:3
**hereby** [1] - 87:3
**HERMAN** [1] - 2:4
**heroin** [1] - 67:11
**hide** [2] - 75:22, 75:25
**higher** [1] - 46:8
**hired** [1] - 68:9
**hold** [3] - 19:13, 77:15, 77:17
**holding** [2] - 76:9, 77:21
**Holt** [2] - 6:17, 7:5
**home** [1] - 4:18
**Honor** [38] - 3:5, 3:22, 5:11, 5:20, 6:4, 6:9, 6:22, 7:14, 7:18, 9:11, 9:13, 10:7, 11:2, 11:10, 11:13, 15:17, 20:11, 22:14, 22:16, 23:1, 25:17, 25:19, 32:12, 41:25, 46:23, 46:25, 50:23, 51:2, 57:23, 58:2, 60:7, 61:22, 62:1, 64:23, 65:3, 72:13, 72:16, 86:4
**HONORABLE** [1] - 1:12
**Horowitz** [10] - 20:12, 31:6, 41:24, 47:5, 47:7, 47:13, 47:19, 56:11, 60:6, 71:12
**HOROWITZ** [18] - 1:23, 10:16, 10:18, 20:13, 31:7, 41:25, 42:1, 43:1, 43:18, 56:12, 60:2, 60:7, 69:7, 71:15, 72:13, 72:23, 73:4, 73:10
**Horowitz's** [1] - 3:11
**Hosseini** [3] - 11:8, 12:5, 17:12
**HOSSEINI** [25] - 1:16, 12:6, 12:12, 15:13, 15:22, 15:24, 16:21, 16:24, 17:13, 20:9, 22:16, 22:18, 23:1, 23:4, 23:11, 25:13, 25:19, 25:20, 25:25, 26:2, 26:8, 26:11, 31:3, 32:8, 32:12
**hour** [1] - 10:4
**huge** [2] - 74:18, 82:11
**hundred** [3] - 50:19, 74:7, 74:16
**hundreds** [2] - 25:3, 74:22

## I

**identification** [8] - 15:1, 15:6, 15:14, 24:24, 25:6, 25:14, 34:18, 51:19
**identified** [2] - 35:24, 36:2
**identify** [6] - 24:18, 24:24, 30:19, 32:22, 35:5, 36:18
**identifying** [5] - 14:3, 14:12, 14:18, 18:1, 24:14
**IGNACIO** [1] - 1:15
**ignition** [1] - 21:2
**II** [2] - 50:7, 50:8
**III** [3] - 72:2, 72:6, 72:9
**ILHAM** [1] - 1:16
**impact** [1] - 79:3
**importer** [4] - 14:6, 28:18, 28:20, 28:21
**imprisonment** [1] - 5:10
**in-fighting** [1] -

79:25
**incident** [1] - 6:11
**inclined** [2] - 8:1, 9:23
**include** [2] - 33:5, 50:8
**included** [1] - 44:5
**Incorporated** [2] - 17:4, 28:21
**Indiana** [1] - 33:25
**indicate** [4] - 44:1, 47:13, 47:16, 48:2
**indicated** [7] - 8:1, 44:24, 47:16, 53:19, 55:10, 58:18, 64:2
**individual** [9] - 35:3, 46:13, 75:20, 77:1, 82:10, 82:20, 82:21, 82:23, 83:13
**individually** [3] - 3:15, 74:16, 83:15
**individuals** [3] - 76:9, 77:5, 77:17
**informants** [1] - 67:21
**information** [1] - 28:20
**infrared** [1] - 43:4
**inquire** [1] - 71:13
**inserted** [1] - 30:14
**inside** [3] - 40:17, 45:12, 75:20
**inspect** [2] - 23:25, 81:20
**inspection** [1] - 24:2
**instructed** [1] - 42:15
**integrity** [1] - 49:1
**intend** [1] - 7:8
**intent** [3] - 3:18, 5:7, 6:12
**intercept** [6] - 67:23, 68:1, 72:6, 72:7, 72:10, 85:3
**intercepts** [4] - 68:19, 71:22, 72:3, 80:21
**International** [4] - 12:23, 33:13, 57:15, 57:16
**interpretation** [1] - 43:11
**interstate** [6] - 13:7, 13:9, 13:20, 13:22, 14:14, 24:6
**Interstate** [9] - 13:12, 18:20, 18:22, 20:2, 20:4, 20:8, 21:12, 24:5, 29:1
**introduce** [1] - 5:24
**introduction** [1] - 9:22
**investigate** [3] - 23:23, 67:13, 68:13
**investigating** [2] - 67:8, 84:24
**investigations** [5] - 67:10, 67:16, 67:19, 68:23, 72:20
**Investigations** [1] - 66:19
**investigative** [1] - 67:18
**involved** [2] - 3:18, 67:23
**involves** [1] - 3:8
**involving** [1] - 23:23
**IS** [1] - 55:1
**issue** [2] - 5:7, 7:3
**item** [33] - 3:9, 15:25, 26:3, 27:9, 28:6, 29:4, 29:9, 29:10, 30:6, 35:14, 35:24, 36:16, 38:16, 39:23, 40:3, 44:3, 44:10, 44:13, 44:18, 45:3, 45:9, 49:1, 49:2, 49:9, 49:14, 52:20, 52:21, 52:22, 53:2, 53:5, 54:2, 59:2, 59:16
**items** [26] - 16:10, 27:19, 29:19, 33:5, 34:7, 34:11, 35:3, 35:10, 36:21, 44:8, 44:25, 50:8, 50:15, 51:7, 51:9, 51:12, 51:16, 58:5, 58:7, 58:11, 62:8, 62:12, 64:6, 64:8
**itself** [3] - 22:8, 41:6, 82:1

## J

**JAMES** [1] - 1:8
**Jason** [2] - 23:4, 23:9
**Javier** [2] - 12:6, 12:10
**JAVIER** [1] - 12:10
**JAY** [1] - 1:8
**Jersey** [1] - 61:8
**job** [3] - 57:13, 61:9, 71:23
**John** [1] - 32:19
**Jonia** [2] - 56:19, 56:24
**JONIA** [1] - 56:25
**JR** [2] - 2:2, 2:4
**JUDGE** [1] - 1:13
**Judge** [3] - 6:16, 6:17, 71:5
**July** [1] - 70:25
**jurisdiction** [1] - 28:4
**jurors** [1] - 3:2
**JURY** [2] - 1:12, 85:15
**jury** [5] - 5:15, 12:1, 12:4, 32:23, 85:10
**juvenile** [1] - 4:8
**Juvenile** [1] - 61:21

## K

**Karen** [4] - 49:23, 50:1, 60:15, 60:19
**KAREN** [1] - 50:1
**KATHLEEN** [1] - 1:12
**keep** [5] - 11:3, 33:15, 76:19, 77:1, 79:24
**Kel** [7] - 19:3, 19:10, 19:25, 20:3, 21:11, 22:7, 22:22
**Kel-Tec** [7] - 19:3, 19:10, 19:25, 20:3, 21:11, 22:7, 22:22
**kept** [1] - 74:3
**kind** [6] - 10:22, 13:20, 48:4, 48:8, 61:6, 78:22
**knowing** [1] - 79:22
**knowledge** [1] - 85:21
**known** [4] - 16:3, 61:1, 79:4, 80:5
**Korchin** [8] - 7:7, 9:10, 20:14, 31:8, 43:19, 48:10, 56:13, 60:8
**KORCHIN** [12] - 1:21, 9:11, 20:15, 22:10, 31:9, 32:2, 43:20, 45:19, 48:20, 56:14, 60:9, 66:5
**Korchin's** [1] - 48:9
**Korea** [1] - 27:15

## L

**lab** [7] - 8:18, 33:14, 48:14, 48:24, 49:15, 50:13, 61:12
**labeling** [2] - 14:2, 16:15
**laboratory** [5] - 33:12, 34:11, 44:10, 44:21, 46:14
**Laboratory** [7] - 33:1, 33:3, 50:5, 57:5, 57:8, 60:25, 61:10
**lacks** [1] - 72:17
**ladies** [3] - 12:4, 32:23, 85:9
**large** [3] - 82:7, 82:17, 83:4
**larger** [5] - 39:15, 46:17, 76:3, 82:21, 83:16
**last** [5] - 10:7, 65:24, 67:6, 70:10, 70:25
**Lauderdale** [1] - 2:3
**law** [23] - 5:4, 6:10, 30:1, 36:11, 42:19, 42:21, 42:22, 44:1, 49:3, 57:11, 61:4, 66:24, 67:2, 68:8, 70:19, 75:3, 75:23, 75:25, 76:14, 76:16, 79:9, 80:19
**lead** [1] - 10:11
**leading** [2] - 73:4, 78:2
**learned** [1] - 3:11
**least** [3] - 41:13, 48:15, 55:10
**leave** [3] - 81:8, 81:12, 81:14
**leaves** [1] - 84:15
**leaving** [1] - 75:6
**lectures** [1] - 61:11
**left** [1] - 7:15
**legally** [1] - 48:6
**less** [14] - 3:9, 4:24, 36:3, 37:18, 38:17, 41:3, 42:16, 45:13, 53:15, 53:21, 55:2, 56:6, 64:2
**level** [11] - 67:10, 68:24, 69:2, 69:5, 70:12, 74:8, 74:21, 78:7, 82:17, 84:15, 84:20
**Liberty** [3] - 4:3, 68:14, 69:22
**library** [1] - 16:18
**lieutenant** [1] - 78:18
**limits** [1] - 36:12
**line** [1] - 5:4
**lines** [1] - 28:3
**listen** [2] - 68:1, 68:17
**local** [2] - 44:1, 75:3
**location** [21] - 74:11, 75:22, 75:25, 76:8, 76:21, 76:23, 76:24, 78:19, 78:25, 79:1, 79:2, 79:3, 79:6, 79:14, 80:2, 80:3, 80:5, 80:7, 80:25, 83:5, 83:14
**locations** [12] - 22:21, 67:22, 74:20, 75:1, 75:4, 75:24, 76:17, 78:15, 78:18, 79:5, 79:18
**lock** [1] - 21:2
**look** [18] - 7:4, 7:24, 14:21, 16:17, 17:22, 21:24, 26:15, 35:22, 37:13, 62:9, 70:7, 73:21, 76:13, 76:16, 79:7, 81:19
**look-outs** [1] - 76:13
**looked** [8] - 14:15, 14:16, 14:18, 16:14, 17:3, 22:21, 30:12, 49:9
**looking** [5] - 16:22, 21:18, 22:7, 30:18, 63:23
**looks** [1] - 17:25
**loose** [1] - 41:6
**low** [1] - 49:11
**Luger** [1] - 30:25
**LUNCH** [1] - 86:6
**lunch** [4] - 10:4, 85:11, 85:12

## M

**M-A-Y-O** [1] - 66:15
**M11140502128817** [1] - 64:19
**M1140211042695** [1] - 63:19
**M1140219050998** [1] - 64:12
**ma'am** [18] - 14:11, 15:8, 15:12, 16:1, 16:12, 17:1, 17:9, 17:15, 17:23, 18:13, 19:1, 19:6, 19:20, 20:5, 22:25, 57:2, 60:22, 62:10
**magazine** [1] - 30:13
**mail** [1] - 3:5
**main** [1] - 78:20
**maintain** [1] - 79:20
**maintained** [1] - 75:18
**major** [1] - 30:22
**make-up** [1] - 73:23
**man** [2] - 76:20, 78:23
**MANUEL** [1] - 1:19
**manufacture** [2] - 14:20, 30:9

**manufactured** [19] - 13:14, 13:17, 16:19, 17:6, 18:2, 18:3, 18:11, 18:13, 18:15, 18:17, 19:10, 19:22, 19:24, 20:1, 20:19, 21:1, 21:5, 24:22, 27:23
**manufacturer** [10] - 14:3, 14:16, 14:19, 14:22, 16:15, 17:3, 28:15, 28:19, 30:20, 30:23
**March** [1] - 50:12
**marijuana** [7] - 9:21, 45:3, 45:6, 45:12, 52:18, 52:23, 67:11
**MARK** [1] - 1:16
**mark** [2] - 14:6, 26:19
**marked** [3] - 34:17, 51:19, 62:24
**marking** [2] - 18:1, 18:2
**markings** [5] - 14:19, 24:18, 24:20, 26:14, 28:9
**Marshal** [1] - 12:25
**marshall** [2] - 10:19, 11:8
**Marshals** [1] - 10:3
**Mary** [1] - 2:2
**Massachusetts** [8] - 16:20, 17:6, 18:14, 18:17, 26:17, 26:25, 28:1, 30:11
**material** [1] - 49:4
**math** [1] - 20:22
**matter** [3] - 49:11, 85:10, 87:5
**MAURIN** [1] - 1:6
**Mayo** [3] - 66:15, 71:16, 75:7
**Mayo's** [1] - 85:17
**mean** [3] - 13:9, 44:17, 85:2
**means** [2] - 55:25, 67:18
**medium** [1] - 82:10
**meet** [2] - 27:5, 30:3
**meets** [1] - 29:16
**member** [2] - 9:21, 68:15
**members** [2] - 4:5, 77:1
**memorialize** [1] - 62:18
**memorialized** [2] - 51:17, 54:13
**mentioned** [2] - 48:3, 63:5
**Metro** [1] - 39:19
**Mexico** [1] - 73:16
**mIAMI** [1] - 1:2
**Miami** [35] - 1:17, 1:22, 1:25, 2:5, 2:7, 2:8, 8:9, 12:25, 13:8, 22:22, 23:16, 23:20, 23:21, 33:1, 36:10, 39:21, 50:5, 57:5, 59:19, 60:25, 61:9, 62:13, 65:19, 66:1, 66:19, 68:9, 69:21, 70:5, 70:11, 71:10, 73:19, 75:19, 78:9, 78:14, 84:17
**microscope** [1] - 43:3
**might** [1] - 5:8
**millimeter** [2] - 30:13, 30:25
**minimum** [2] - 42:21, 61:19
**Minnesota** [5] - 18:17, 19:25, 20:7, 29:23, 30:1
**misapprehension** [1] - 5:8
**Miss** [1] - 49:23
**misspoke** [1] - 64:24
**MOD49** [1] - 26:18
**model** [7] - 14:17, 16:4, 16:15, 17:5, 26:6, 26:18, 28:17
**models** [2] - 78:13, 78:17
**moldy** [1] - 49:6
**moment** [1] - 69:7
**money** [10] - 76:17, 76:18, 76:19, 77:1, 77:12, 77:13, 77:14, 77:15, 84:19
**month** [1] - 44:15
**months** [6] - 44:17, 44:18, 48:15, 49:2, 49:15, 61:10
**morning** [27] - 3:6, 12:3, 12:13, 12:14, 23:12, 23:13, 32:19, 32:22, 39:4, 39:5, 42:2, 43:21, 45:22, 45:23, 50:4, 54:19, 54:20, 56:24, 57:2, 57:3, 59:15, 60:22, 60:23, 65:5, 65:6, 69:12, 69:13
**most** [9] - 23:24, 67:1, 71:9, 73:17, 74:10, 74:12, 79:12, 79:22, 80:7
**mostly** [2] - 33:7, 67:10
**move** [8] - 34:22, 35:20, 38:3, 51:25, 53:8, 58:22, 63:9, 79:16
**movies** [1] - 21:3
**moving** [2] - 37:9, 64:10
**MR** [152] - 3:5, 3:20, 3:22, 5:11, 5:20, 6:3, 6:4, 6:9, 6:15, 6:22, 7:6, 7:11, 7:14, 8:5, 8:13, 8:17, 8:21, 8:25, 9:3, 9:6, 9:8, 9:11, 9:13, 10:7, 10:14, 10:16, 10:18, 10:25, 11:2, 11:10, 11:13, 11:21, 11:24, 15:17, 20:11, 20:13, 20:15, 22:10, 22:12, 22:14, 25:17, 31:5, 31:7, 31:9, 32:2, 32:4, 32:6, 32:15, 32:21, 34:1, 34:4, 34:6, 34:22, 34:24, 35:1, 38:25, 39:3, 41:22, 41:25, 42:1, 42:24, 43:1, 43:18, 43:20, 44:22, 45:19, 45:21, 46:21, 46:23, 46:25, 47:1, 48:20, 49:20, 49:23, 50:3, 50:23, 51:2, 51:4, 51:6, 51:25, 52:2, 52:4, 54:16, 54:18, 56:10, 56:12, 56:14, 56:15, 56:16, 56:17, 56:19, 57:1, 57:23, 58:2, 58:4, 58:22, 58:24, 59:1, 59:12, 59:14, 60:1, 60:2, 60:7, 60:9, 60:10, 60:11, 60:12, 60:15, 60:21, 61:22, 62:1, 62:3, 62:5, 63:9, 63:11, 63:13, 64:23, 65:1, 65:3, 65:4, 66:4, 66:5, 66:6, 66:7, 66:8, 66:9, 66:16, 69:4, 69:7, 69:9, 69:11, 71:5, 71:6, 71:11, 71:15, 72:13, 72:16, 72:19, 72:23, 73:2, 73:4, 73:6, 73:10, 73:12, 78:2, 78:12, 81:15, 81:17, 83:6, 83:8, 86:1, 86:4
**MS** [24] - 12:6, 12:12, 15:13, 15:22, 15:24, 16:21, 16:24, 17:13, 20:9, 22:16, 22:18, 23:1, 23:4, 23:11, 25:13, 25:19, 25:20, 25:25, 26:2, 26:8, 26:11, 31:3, 32:8, 32:12
**Mt** [1] - 61:7

## N

**N.E** [2] - 1:17, 2:5
**name** [20] - 12:8, 12:10, 23:7, 23:9, 26:16, 30:9, 30:20, 30:22, 32:17, 32:19, 32:25, 49:24, 50:1, 56:22, 56:24, 60:17, 60:19, 66:13, 66:15
**narcotic** [1] - 84:24
**narcotics** [38] - 4:15, 23:24, 54:23, 66:21, 67:8, 67:10, 67:20, 67:21, 68:2, 68:5, 68:21, 68:24, 69:2, 69:5, 70:13, 74:10, 74:20, 75:2, 75:3, 75:23, 76:1, 76:18, 76:21, 77:8, 77:11, 77:21, 77:23, 78:21, 79:15, 80:8, 83:5, 84:2, 84:4, 84:14, 84:22, 84:23, 85:8
**Narcotics** [1] - 67:7
**narrative** [1] - 11:18
**Nathaniel** [1] - 6:17
**nature** [2] - 6:24, 10:14
**near** [1] - 4:16
**need** [8] - 10:3, 14:2, 14:10, 24:11, 47:23, 78:4, 78:21, 85:22
**needed** [1] - 37:1
**needs** [1] - 14:6
**neighborhoods** [1] - 69:25
**net** [2] - 39:11, 39:14
**network** [1] - 79:14
**never** [3] - 46:14, 70:15, 70:18
**New** [2] - 28:22, 61:8
**new** [2] - 6:13, 80:2
**next** [16] - 10:20, 12:5, 23:3, 26:22, 26:24, 30:5, 32:14, 37:2, 38:9, 40:13, 49:22, 55:5, 56:18, 60:13, 66:10, 68:8
**nexus** [6] - 13:7, 13:9, 13:21, 13:22, 14:15, 24:6
**Nexus** [1] - 24:5
**nice** [1] - 85:12
**nine** [9] - 8:13, 16:8, 30:13, 30:24, 34:19, 35:5, 43:22, 48:11, 67:3
**Ninja** [1] - 82:2
**none** [2] - 31:2, 69:24
**noon** [1] - 10:4
**normal** [1] - 80:23
**normally** [14] - 36:11, 45:2, 74:11, 74:15, 74:18, 75:22, 79:13, 80:4, 80:23, 84:1, 84:7, 84:18, 85:7
**North** [12] - 2:7, 29:13, 67:3, 67:12, 67:15, 67:23, 67:25, 68:4, 68:7, 70:2, 70:21, 71:17
**notes** [2] - 7:25, 16:15
**nothing** [4] - 41:4, 56:10, 60:1, 66:4
**notice** [1] - 37:2
**November** [3] - 38:6, 43:7, 44:3
**Number** [1] - 1:3
**number** [46] - 14:4, 14:7, 14:17, 16:4, 16:15, 16:16, 17:5, 17:7, 19:12, 20:20, 26:7, 26:21, 28:23, 31:15, 35:11, 35:13, 35:15, 38:5, 38:10, 39:19, 39:22, 40:2, 40:5, 40:22, 44:1, 44:5, 44:19, 46:1, 48:16, 52:20, 52:21, 52:22, 55:21, 55:23, 58:13, 59:16, 59:19, 59:20, 62:13, 62:14, 65:20, 66:2, 68:25
**numbers** [1] - 31:18
**numerous** [8] - 13:22, 68:25, 71:21, 80:1, 80:12, 80:13, 81:23, 83:15
**NW** [2] - 4:3

## O

**object** [9] - 9:13, 9:18, 9:22, 10:16, 10:17, 27:5, 48:20, 72:16, 72:21
**objected** [1] - 85:17
**objection** [21] - 10:1,

15:16, 25:16, 34:4, 34:24, 42:24, 44:22, 48:21, 51:1, 52:2, 52:3, 58:1, 58:24, 58:25, 61:25, 63:11, 63:12, 72:23, 73:4, 73:10, 78:2
**observed** [1] - 80:1
**observing** [1] - 49:14
**obvious** [1] - 21:15
**obviously** [2] - 75:1, 85:21
**occasion** [1] - 70:23
**occur** [2] - 4:1, 77:19
**occurrence** [1] - 44:21
**October** [2] - 55:15, 55:20
**OF** [3] - 1:2, 1:4, 1:12
**OFF** [1] - 69:8
**Offender** [1] - 4:11
**offense** [1] - 5:14
**office** [1] - 22:23
**OFFICER** [1] - 12:2
**officer** [4] - 14:14, 36:10, 67:3, 71:17
**often** [1] - 74:24
**old** [3] - 3:24, 21:3, 49:11
**once** [4] - 37:14, 40:16, 61:9, 83:2
**one** [37] - 5:7, 8:5, 8:17, 8:25, 10:11, 10:18, 18:16, 28:18, 29:24, 29:25, 35:10, 35:12, 35:18, 37:20, 39:8, 40:10, 40:13, 40:22, 41:3, 41:14, 42:10, 42:12, 44:10, 46:7, 46:20, 52:12, 52:13, 52:15, 52:18, 52:20, 52:21, 59:6, 59:7, 63:24, 64:18, 70:23, 83:13
**ones** [1] - 62:12
**open** [5] - 7:15, 67:10, 74:13, 80:10, 80:16
**opening** [2] - 5:23, 6:2
**operate** [4] - 18:7, 19:19, 27:16, 78:14
**operation** [2] - 77:20, 81:2
**operations** [1] - 78:19
**opinion** [5] - 18:10, 18:19, 19:21, 27:22, 27:25
**opportunity** [4] - 14:25, 16:10, 27:19, 68:1
**opposite** [2] - 26:21, 28:14
**order** [5] - 18:23, 20:7, 22:5, 43:14, 63:22
**ordered** [1] - 72:6
**organization** [1] - 79:20
**origin** [5] - 15:1, 15:14, 24:25, 25:14, 72:20
**originally** [3] - 24:21, 36:22, 44:24
**origination** [2] - 15:7, 25:7
**origins** [2] - 14:12, 24:14
**ounce** [1] - 84:1
**outs** [1] - 76:13
**outside** [10] - 13:14, 13:17, 14:5, 14:19, 18:11, 19:22, 19:24, 27:23, 28:1, 28:19
**overnight** [1] - 11:13
**overrule** [2] - 10:1, 48:24
**overruled** [3] - 72:18, 73:11, 85:18
**Overtown** [3] - 4:3, 68:14, 69:22
**owed** [1] - 77:10
**own** [2] - 42:21, 77:1

## P

**P-32** [2] - 19:3, 19:10
**P-R-I-E-T-O** [1] - 56:25
**package** [6] - 41:6, 45:9, 45:12, 51:24, 82:21, 83:16
**packaged** [6] - 3:16, 41:9, 74:16, 82:10, 82:21, 83:15
**packages** [1] - 62:14
**packaging** [4] - 5:3, 51:15, 75:20, 81:25
**packet** [2] - 34:20, 58:13
**page** [64] - 34:19, 35:5, 35:15, 35:20, 35:23, 36:5, 37:11, 37:20, 37:22, 37:24, 37:25, 38:3, 38:5, 38:10, 38:11, 39:8, 40:8, 40:10, 40:13, 40:22, 42:9, 43:6, 43:22, 47:9, 48:11, 52:8, 52:11, 52:12, 52:13, 53:8, 53:10, 53:12, 53:14, 53:15, 53:21, 54:4, 54:6, 54:10, 55:1, 55:4, 55:5, 55:24, 56:8, 59:3, 59:6, 59:7, 59:8, 59:10, 59:16, 63:17, 63:19, 63:20, 63:24, 64:5, 64:10, 64:12, 64:13, 64:16, 64:18, 65:9, 65:24
**PAGES** [1] - 1:6
**pages** [13] - 6:17, 35:5, 35:22, 37:13, 42:4, 45:25, 52:6, 54:11, 54:22, 58:17, 63:15, 64:16, 64:20
**paper** [1] - 3:6
**papers** [1] - 6:20
**paradigms** [1] - 78:8
**parens** [1] - 37:3
**part** [6] - 5:8, 9:19, 13:5, 18:8, 38:22, 45:1
**participant** [1] - 7:21
**participants** [1] - 77:25
**participate** [2] - 67:15, 68:15
**participated** [1] - 68:23
**participation** [1] - 67:25
**particular** [10] - 13:13, 30:21, 31:13, 31:15, 38:15, 38:16, 72:21, 75:17, 79:3, 79:11
**parties** [1] - 5:15
**pass** [1] - 11:9
**passed** [2] - 24:4, 49:9
**passes** [1] - 49:18
**past** [2] - 4:1, 21:9
**PATRICIA** [2] - 2:6, 87:9
**patricia_sanders@flsd.uscourts.gov** [1] - 2:9
**patrol** [1] - 67:6
**PAUL** [1] - 1:21
**pay** [1] - 76:15
**peer** [1] - 70:15
**penalties** [1] - 42:19
**people** [7] - 69:19, 75:6, 76:13, 77:11, 79:22, 79:24, 80:6
**people's** [1] - 77:14
**percentage** [1] - 46:9
**perhaps** [2] - 10:11, 82:2
**permission** [2] - 81:15, 83:6
**person** [11] - 9:6, 76:6, 76:8, 76:17, 77:7, 77:22, 78:20, 79:14, 79:17, 80:2, 80:18
**person's** [1] - 80:3
**personal** [3] - 4:21, 9:15, 9:19
**perspective** [2] - 48:18, 82:7
**pertain** [1] - 39:23
**pertains** [3] - 24:16, 42:5, 43:24
**pertinent** [1] - 6:18
**Peters** [1] - 27:12
**PHILIP** [1] - 1:23
**phone** [2] - 76:21, 76:23
**phones** [1] - 17:10
**phrase** [3] - 83:23, 84:11, 85:6
**physical** [3] - 24:17, 27:4, 61:3
**picking** [1] - 22:7
**piece** [5] - 30:19, 30:21, 31:22, 46:17, 74:17
**pieces** [5] - 11:16, 27:14, 46:4, 46:13, 46:16
**Pinkerton** [1] - 7:21
**pistol** [8] - 19:4, 28:8, 30:9, 80:24, 81:4, 81:6, 81:7
**pistols** [1] - 80:12
**place** [4] - 4:16, 34:7, 51:7, 79:8
**placed** [4] - 4:9, 58:5, 58:14, 64:21
**placing** [2] - 52:13, 62:6
**plane** [1] - 13:15
**plant** [1] - 49:4
**plastic** [10] - 3:8, 3:15, 30:8, 35:24, 36:6, 39:10, 40:18, 52:15, 52:18, 65:16
**play** [1] - 79:6
**point** [6] - 5:6, 6:21, 49:7, 74:13, 79:13, 82:8
**points** [2] - 74:10, 78:22
**police** [5] - 44:18, 67:3, 71:17, 85:3, 85:5
**Police** [11] - 22:22, 33:1, 39:19, 55:21, 57:5, 59:19, 60:25, 61:9, 62:13, 65:19, 66:1
**Ponce** [1] - 1:19
**Poongsan** [1] - 27:14
**Portela** [1] - 7:9
**PORTELA** [1] - 1:7
**portions** [1] - 6:18
**position** [1] - 67:2
**positions** [1] - 66:23
**positive** [1] - 49:14
**possession** [9] - 4:20, 5:5, 5:21, 6:6, 6:11, 8:11, 8:22, 9:15
**possibility** [1] - 49:4
**possible** [3] - 16:21, 46:12, 46:14
**possibly** [1] - 49:13
**potent** [1] - 84:22
**potential** [2] - 48:25, 80:25
**powder** [4] - 3:13, 3:23, 21:3, 42:23
**powdery** [1] - 73:22
**practical** [1] - 85:22
**predicate** [1] - 8:15
**predominately** [1] - 69:25
**prepare** [1] - 51:17
**prepared** [2] - 34:20, 55:15
**presence** [1] - 57:10
**present** [3] - 13:4, 23:22, 85:5
**press** [2] - 11:22, 11:25
**presumption** [1] - 44:4
**pretty** [1] - 41:11
**previous** [2] - 16:14, 29:11
**previously** [7] - 17:22, 18:7, 25:22, 29:8, 34:17, 37:15, 47:25
**Prieto** [6] - 56:20, 56:24, 57:4, 58:3, 58:5, 59:15
**primary** [1] - 4:17
**print** [1] - 62:23
**proactive** [1] - 67:16
**proceed** [1] - 25:18
**PROCEEDINGS** [1] - 1:12
**proceedings** [1] - 87:4
**process** [2] - 5:17,

24:15
**product** [1] - 6:24
**proffer** [1] - 34:1
**proffers** [3] - 50:24, 57:24, 61:23
**program** [1] - 33:14
**projectile** [4] - 17:19, 27:7, 29:7, 30:2
**proper** [1] - 72:17
**property** [2] - 41:13, 55:9
**propose** [1] - 5:11
**prosecuted** [1] - 42:10
**prosecutor** [1] - 70:25
**protect** [7] - 79:22, 79:23, 80:4, 80:7, 80:8, 80:25, 81:1
**protecting** [1] - 80:24
**prove** [1] - 6:12
**provide** [1] - 13:24
**provided** [1] - 3:6
**publish** [1] - 83:6
**published** [3] - 70:15, 70:18, 85:23
**purchase** [4] - 67:20, 67:21, 75:2, 76:24
**purchases** [1] - 84:21
**purity** [6] - 46:9, 46:12, 46:15, 84:15, 84:20, 84:23
**purposes** [4] - 6:5, 8:6, 81:2, 81:12
**put** [8] - 5:3, 5:9, 14:15, 28:20, 37:3, 43:12, 43:14, 83:15
**putting** [2] - 5:6, 42:7

## Q

**qualifications** [3] - 71:2, 71:14, 72:15
**qualified** [5] - 57:17, 57:21, 70:21, 70:22, 72:17
**qualifies** [1] - 61:6
**qualify** [2] - 15:11, 25:11
**quality** [1] - 46:8
**quanties** [2] - 74:21, 82:10
**quantities** [1] - 74:9
**quantity** [2] - 9:15, 82:12
**questioning** [1] - 48:10
**questions** [46] - 20:11, 20:13, 22:10, 22:12, 31:3, 31:5, 31:7, 31:12, 32:2, 32:4, 32:6, 32:12, 35:2, 38:25, 39:7, 40:8, 41:22, 42:4, 43:18, 45:19, 45:24, 46:23, 47:2, 47:5, 47:11, 48:9, 48:10, 48:21, 52:5, 54:16, 56:12, 56:14, 56:15, 56:16, 59:2, 60:2, 60:9, 60:10, 60:11, 63:14, 65:1, 66:5, 66:6, 66:7, 71:11, 72:12

## R

**R-I-B-B-A-S** [1] - 12:11
**rack** [1] - 22:3
**ramp** [1] - 22:3
**ranges** [1] - 74:13
**rare** [1] - 75:11
**rather** [1] - 85:19
**read** [1] - 6:14
**readily** [1] - 17:18
**reading** [1] - 22:8
**ready** [1] - 85:12
**really** [2] - 22:6, 49:19
**reason** [1] - 48:2
**receipt** [2] - 41:13, 55:9
**receive** [3] - 11:17, 24:9, 40:4
**received** [3] - 44:17, 71:18, 71:20
**receiver** [1] - 17:20
**receives** [1] - 11:21
**recess** [1] - 85:11
**RECESS** [1] - 86:6
**recognize** [16] - 15:25, 16:2, 18:25, 26:3, 51:9, 51:11, 51:12, 51:21, 51:23, 58:7, 58:11, 58:13, 62:12, 62:24, 63:3, 82:3
**recognized** [6] - 15:5, 25:5, 34:5, 51:3, 58:3, 62:2
**recollection** [1] - 55:18
**RECORD** [1] - 69:8
**record** [15] - 9:14, 12:9, 23:8, 32:18, 34:8, 37:25, 38:11, 49:25, 51:8, 56:23, 60:18, 64:13, 64:23, 66:14, 85:16
**recording** [1] - 39:13
**recordings** [1] - 68:17
**recover** [1] - 76:1
**redacted** [1] - 5:16
**redirect** [7] - 22:15, 32:7, 46:24, 48:20, 56:17, 60:12, 66:8
**redo** [1] - 43:8
**refer** [4] - 54:21, 65:8, 65:23, 85:4
**reference** [7] - 7:19, 35:9, 35:15, 37:23, 47:8, 63:1, 84:23
**referenced** [2] - 3:15, 46:1
**referred** [5] - 12:18, 64:24, 82:22, 83:10, 84:9
**referring** [2] - 22:1, 43:21
**refers** [4] - 84:1, 85:3, 85:5, 85:7
**refresh** [1] - 55:18
**regard** [12] - 5:4, 8:17, 39:6, 39:8, 40:8, 55:9, 59:16, 65:7, 65:13, 65:22, 72:14, 79:2
**regarding** [9] - 13:3, 13:6, 14:2, 36:6, 48:9, 64:5, 68:23, 70:12, 71:20
**regulations** [3] - 13:3, 13:5, 14:1
**relate** [1] - 64:16
**related** [2] - 45:24, 68:2
**relates** [11] - 33:18, 34:2, 50:15, 50:25, 53:22, 57:18, 57:25, 61:15, 61:24, 64:5, 64:18
**relationship** [1] - 79:10
**relevance** [4] - 42:24, 44:22, 72:23, 73:10
**relevant** [2] - 3:18, 9:18
**remaining** [4] - 35:2, 52:5, 59:2, 63:14
**remind** [1] - 60:5
**Remington** [2] - 18:2, 27:12
**remote** [1] - 3:23
**remoteness** [1] - 4:14
**rephrase** [1] - 62:20
**report** [45] - 8:18, 35:14, 36:2, 36:5, 36:6, 36:9, 36:15, 36:19, 37:1, 38:6, 38:19, 39:8, 39:16, 40:19, 41:19, 42:5, 42:9, 42:11, 43:6, 43:10, 43:22, 44:12, 45:25, 47:8, 47:14, 47:17, 47:24, 48:3, 52:8, 53:9, 53:12, 53:18, 53:25, 54:5, 54:7, 54:14, 55:15, 62:9, 63:17, 63:24, 64:2, 64:5, 64:11, 65:9, 65:23
**REPORTED** [1] - 2:6
**Reporter** [1] - 2:7
**reports** [17] - 34:14, 34:20, 35:12, 36:21, 46:1, 51:17, 51:24, 58:17, 62:15, 62:19, 62:21, 62:23, 63:4, 63:5, 63:6, 64:20, 65:8
**represented** [1] - 27:13
**represents** [1] - 30:9
**Republic** [1] - 73:18
**requested** [6] - 35:23, 43:8, 43:10, 52:15, 54:2, 62:8
**required** [1] - 68:16
**research** [2] - 16:17, 16:18
**reserved** [1] - 8:2
**residue** [2] - 4:25, 41:9
**respect** [8] - 20:16, 21:11, 31:21, 37:14, 38:15, 53:5, 54:9, 63:24
**response** [1] - 8:14
**responsibilities** [1] - 33:5
**responsible** [1] - 66:21
**result** [2] - 52:20, 52:22
**results** [9] - 34:15, 37:2, 43:11, 51:17, 58:18, 58:19, 62:18, 62:22, 63:6
**resupply** [1] - 74:19
**retail** [8] - 67:11, 74:10, 74:13, 74:19, 75:24, 78:19, 82:8, 83:5
**retaliation** [1] - 81:1
**retest** [1] - 36:17
**retrieved** [1] - 14:15
**review** [1] - 70:16
**revisit** [1] - 7:18
**revolver** [18] - 16:4, 16:14, 18:13, 18:22, 20:17, 22:23, 26:6, 26:21, 26:23, 27:25, 28:10, 30:12, 81:3, 81:5, 81:6, 81:10, 81:11, 81:13
**Ribbas** [7] - 12:6, 12:10, 15:19, 16:25, 17:14, 20:16, 22:19
**Richardson** [1] - 16:3
**riding** [1] - 76:15
**rifle** [2] - 16:9, 18:4
**rifles** [3] - 80:13, 80:22
**rise** [2] - 12:2, 53:18
**robbed** [1] - 80:25
**robbery** [2] - 7:17, 8:2
**rock** [9] - 35:25, 36:7, 41:14, 52:16, 74:1, 82:21, 82:22, 83:13
**rocks** [11] - 8:13, 8:18, 46:7, 46:20, 55:11, 55:13, 63:25, 74:17, 81:23, 82:10, 83:3
**RODOLFO** [1] - 1:7
**roles** [4] - 76:9, 76:12, 78:8, 78:18
**Rosenbaum** [1] - 6:16
**rotten** [1] - 49:6
**round** [6] - 18:16, 22:2, 22:4, 28:12, 32:9, 81:8
**rounds** [11] - 15:4, 16:8, 17:22, 19:17, 27:10, 27:11, 27:16, 29:5, 29:20, 30:17, 81:10
**RPR** [2] - 2:6, 87:9
**Rubio** [4] - 9:12, 22:13, 32:5, 46:22
**RUBIO** [7] - 2:4, 9:13, 22:14, 46:23, 56:16, 60:11, 66:7
**rudimentary** [1] - 69:16
**run** [3] - 74:19, 79:13, 80:5
**running** [2] - 76:6, 79:18

# S

**S-N-I-P-E-S** [1] - 32:20
**S-T-A-N-K-I-E-W-I-C-Z** [1] - 23:10
**safe** [1] - 50:20
**sale** [11] - 4:19, 5:5, 5:23, 7:1, 67:13, 77:12, 77:21, 79:3, 83:5, 83:14, 84:17
**sales** [3] - 74:24, 77:3, 80:10
**Samurai** [1] - 82:2
**Sanctions** [1] - 4:11
**SANDERS** [3] - 2:6, 87:7, 87:9
**sanitized** [1] - 5:10
**Sauer** [4] - 28:7, 28:9, 28:15, 29:8
**saw** [2] - 29:8, 41:15
**scene** [3] - 22:24, 81:9, 81:13
**School** [1] - 24:5
**school** [1] - 24:6
**Science** [2] - 57:14, 61:7
**science** [1] - 57:15
**scientific** [1] - 49:17
**scientifically** [1] - 37:7
**scope** [2] - 46:18, 48:22
**scrape** [1] - 41:18
**scraped** [1] - 41:8
**screen** [9] - 35:18, 38:1, 38:7, 38:11, 42:7, 42:9, 54:7, 54:11, 59:8
**seals** [2] - 51:14, 62:17
**seated** [2] - 3:1, 12:3
**second** [5] - 10:21, 40:10, 56:3, 59:24, 66:2
**SECURITY** [1] - 12:2
**see** [44] - 11:11, 17:4, 17:6, 17:25, 19:9, 19:12, 21:3, 21:18, 21:20, 21:23, 21:24, 26:16, 26:18, 26:20, 26:21, 26:24, 27:11, 28:9, 28:11, 28:21, 30:7, 30:21, 38:15, 38:17, 41:8, 42:7, 49:17, 51:14, 52:25, 53:23, 54:13, 62:17, 65:11, 72:24, 75:5, 75:6, 81:25, 85:14, 86:5
**seeded** [1] - 22:4
**seeing** [1] - 80:11
**seeking** [1] - 7:19
**seized** [3] - 44:2, 48:15, 49:3
**sell** [5] - 9:21, 74:10, 74:12, 74:21, 78:23
**sellers** [2] - 74:18, 79:3
**selling** [1] - 77:11
**semi** [6] - 19:4, 28:8, 30:8, 81:4, 81:5, 81:7
**semi-automatic** [5] - 28:8, 30:8, 81:4, 81:5, 81:7
**seminars** [1] - 33:15
**send** [1] - 7:11
**separate** [1] - 76:19
**serial** [13] - 14:3, 14:6, 14:17, 16:4, 16:16, 17:7, 19:12, 20:20, 26:7, 26:20, 28:23, 31:15, 31:18
**series** [1] - 65:7
**Service** [1] - 57:6
**Services** [1] - 61:1
**SESSION** [1] - 1:5
**set** [4] - 74:12, 76:15, 78:18, 80:3
**setting** [1] - 80:2
**seven** [11] - 12:21, 38:5, 38:21, 40:8, 40:13, 45:9, 45:13, 54:10, 67:6, 68:18, 72:2
**several** [3] - 34:7, 79:6, 82:6
**shaped** [1] - 18:1
**shooting** [2] - 81:9, 81:13
**Shores** [1] - 2:5
**shot** [1] - 81:8
**show** [6] - 18:24, 25:21, 26:14, 28:5, 30:5, 30:15
**showed** [1] - 16:6
**showing** [13] - 15:19, 27:8, 29:9, 29:18, 34:17, 51:19, 62:24, 81:18, 82:3, 83:9, 83:17, 83:19, 83:21
**shows** [1] - 64:8
**sic** [1] - 13:22
**side** [2] - 26:21, 28:14
**sidebar** [1] - 78:3
**Sig** [5] - 28:7, 28:9, 28:15, 28:21, 29:8
**SIG** [1] - 28:14
**signature** [3] - 51:14, 58:13, 62:17
**significance** [1] - 80:16
**silence** [1] - 11:1
**silver** [1] - 29:15
**similar** [1] - 7:8
**similarities** [3] - 70:4, 70:8, 70:10
**simple** [1] - 4:19
**simply** [2] - 3:14, 30:3
**sit** [1] - 10:11
**site** [14] - 75:13, 75:17, 76:5, 76:7, 77:6, 77:20, 78:1, 78:14, 79:2, 79:3, 79:10, 80:17, 82:13
**sites** [9] - 74:21, 74:25, 75:10, 76:10, 77:1, 77:7, 77:16, 79:4
**situation** [1] - 10:23
**situations** [1] - 77:5
**six** [11] - 3:8, 3:15, 3:22, 4:22, 19:17, 35:24, 36:6, 46:4, 46:13, 46:19, 54:10
**sixth** [1] - 41:20
**size** [1] - 28:12
**slang** [8] - 68:2, 70:2, 70:4, 70:9, 71:20, 71:24, 71:25, 84:5
**slide** [1] - 22:3
**small** [19] - 9:15, 36:13, 36:25, 41:5, 45:3, 74:10, 74:14, 74:15, 74:16, 80:14, 80:16, 80:18, 80:24, 81:23, 82:7, 82:17, 82:18, 83:4, 83:5
**smaller** [2] - 29:11, 76:4
**Smith** [6] - 26:6, 26:16, 26:19, 28:10, 28:11, 30:10
**snatching** [1] - 8:9
**Snipes** [13] - 32:15, 32:20, 32:22, 32:25, 34:5, 34:10, 39:1, 39:4, 41:23, 42:2, 45:22, 47:2, 49:13
**snipes** [1] - 43:21
**sold** [4] - 7:2, 9:20, 73:23, 75:12
**someone** [9] - 76:7, 76:14, 76:20, 76:22, 76:23, 77:21, 80:21, 84:21
**sometimes** [2] - 75:5, 80:21
**somewhere** [3] - 40:2, 75:22, 75:25
**sorry** [3] - 8:21, 18:17, 21:22
**sort** [1] - 81:1
**sorts** [1] - 80:12
**South** [5] - 1:24, 27:15, 66:22, 71:8, 73:8
**Southern** [1] - 70:22
**sOUTHERN** [1] - 1:2
**SP** [1] - 28:17
**Spanish** [6] - 69:14, 69:16, 69:17, 69:19, 69:25, 71:25
**speaking** [1] - 69:25
**spec** [1] - 43:3
**special** [11] - 12:16, 13:2, 23:20, 24:23, 26:22, 66:18, 71:18, 71:20, 71:21, 75:7
**Special** [6] - 23:4, 25:21, 31:10, 32:9, 71:16, 85:17
**specialized** [1] - 85:21
**specific** [2] - 14:20, 36:24
**specifically** [5] - 3:13, 7:15, 28:7, 48:10, 52:11
**spectrometer** [1] - 43:4
**spell** [7] - 12:9, 23:8, 32:18, 49:25, 56:23, 60:18, 66:14
**spelled** [1] - 23:10
**spent** [7] - 29:24, 31:2, 67:6, 68:11, 81:7, 81:11, 81:14
**Sphere** [2] - 30:22
**spoken** [1] - 7:7
**Springfield** [1] - 26:25
**squad** [5] - 66:21, 68:15, 71:9, 72:4, 72:5
**Squad** [1] - 68:10
**stamp** [6] - 14:22, 18:1, 26:19, 30:18, 30:19, 82:1
**stamped** [1] - 31:22
**standards** [2] - 42:21, 45:4
**Stankiewicz** [5] - 23:5, 23:9, 25:21, 31:10, 32:9
**start** [3] - 52:8, 59:5, 63:16
**started** [2] - 13:23, 67:6
**starting** [3] - 35:6, 67:1
**state** [9] - 12:8, 23:7, 28:3, 32:17, 42:21, 49:24, 56:22, 60:17, 66:13
**State** [38] - 3:12, 8:19, 8:20, 13:14, 13:15, 13:18, 16:20, 18:12, 18:13, 18:23, 19:23, 19:24, 20:1, 20:7, 26:17, 27:24, 28:1, 28:2, 29:14, 29:22, 30:11, 33:24, 36:11, 36:14, 42:10, 42:13, 42:15, 42:17, 42:19, 42:22, 44:25, 45:3, 48:3, 61:8, 61:20, 73:9, 73:15
**States** [13] - 2:7, 11:3, 12:6, 12:25, 13:18, 14:5, 14:6, 14:19, 19:11, 23:4, 28:19, 29:22, 56:19
**STATES** [4] - 1:1, 1:4, 1:13, 1:15
**statute** [1] - 36:14
**step** [8] - 16:25, 23:2, 26:8, 26:12, 32:13, 49:21, 60:13, 66:10
**stephen** [1] - 32:15
**Stephen** [2] - 32:19, 32:25
**STEPHEN** [1] - 32:20
**stepped** [1] - 10:25
**stickers** [1] - 35:10
**still** [2] - 29:16, 49:10
**stipulate** [1] - 9:24
**stipulated** [1] - 8:7
**stipulation** [5] - 5:15, 5:21, 7:8, 7:23, 9:4
**stipulations** [2] - 5:13, 10:8
**stops** [1] - 84:16
**stored** [2] - 49:5, 49:12
**street** [16] - 37:7, 67:10, 68:1, 68:24, 69:2, 69:5, 70:2, 70:4, 70:9, 70:12, 74:8, 74:21, 75:19, 78:7, 82:17, 84:18
**Street** [4] - 1:17, 1:22, 2:2, 2:5
**streets** [2] - 73:21, 73:24
**Stret** [1] - 4:4

**strong** [2] - 7:16, 8:2
**subject** [1] - 69:5
**submission** [1] - 36:10
**submit** [1] - 5:1
**submitted** [6] - 36:14, 44:10, 45:1, 48:14, 48:15, 49:2
**subsequently** [4] - 36:21, 37:15, 48:14, 55:4
**substance** [3] - 39:14, 43:15, 73:22
**substances** [13] - 33:6, 33:19, 34:3, 34:12, 50:9, 50:16, 50:25, 51:10, 57:10, 57:19, 57:25, 61:16, 61:24
**substitute** [1] - 10:12
**sufficient** [2] - 36:17, 48:1
**sufficiently** [2] - 33:10, 50:20
**suggest** [1] - 85:18
**Suite** [4] - 1:20, 1:24, 2:3, 2:7
**summarizing** [1] - 78:5
**supplemental** [15] - 36:6, 36:9, 36:21, 37:1, 38:19, 42:11, 43:6, 45:5, 47:8, 47:24, 53:18, 53:25, 54:14, 64:5, 65:23
**supplier** [2] - 78:20, 78:25
**surrogate** [1] - 11:17
**surveil** [1] - 75:5
**suspect** [2] - 3:9, 41:14
**suspected** [10] - 35:25, 36:7, 46:5, 52:16, 52:18, 52:22, 53:2, 55:10, 63:25, 65:16
**Sustained** [2] - 44:23, 73:5
**sustained** [4] - 42:25, 48:21, 72:11, 78:3
**Switzerland** [1] - 28:16
**SWORN** [6] - 12:7, 23:6, 32:16, 56:21, 60:16, 66:12
**system** [3] - 21:2, 21:3, 62:22

## T

**TAKEN** [1] - 86:6
**task** [2] - 14:14, 71:7
**taught** [1] - 21:9
**Tec** [7] - 19:3, 19:10, 19:25, 20:3, 21:11, 22:7, 22:22
**technology** [1] - 13:24
**ten** [3] - 23:18, 70:3, 70:9
**tender** [4] - 15:13, 20:9, 25:13, 69:4
**tends** [1] - 5:3
**tenths** [5] - 38:21, 45:9, 45:13, 45:17, 46:20
**term** [9] - 37:7, 67:16, 75:7, 75:19, 84:3, 84:5, 84:6, 84:8, 84:25
**terminology** [1] - 68:20
**terms** [5] - 5:4, 6:24, 58:19, 68:2, 71:20
**territory** [1] - 79:16
**test** [11] - 43:3, 44:9, 45:5, 46:9, 46:12, 46:15, 49:6, 49:10, 49:17, 52:15
**testable** [1] - 49:12
**tested** [11] - 36:22, 42:12, 44:11, 44:25, 47:14, 55:25, 56:2, 56:3, 62:12, 63:24, 65:22
**testified** [13] - 15:5, 20:17, 25:5, 33:17, 33:23, 45:8, 48:13, 50:14, 50:18, 50:19, 61:14, 69:1, 72:2
**testify** [8] - 14:10, 24:11, 36:23, 57:11, 61:3, 68:5, 85:17, 85:20
**testifying** [1] - 11:8
**testing** [11] - 36:17, 38:20, 40:4, 43:15, 46:9, 47:20, 47:23, 48:7, 49:1, 52:20, 65:13
**tests** [5] - 34:14, 43:3, 43:5, 48:1, 51:17
**THE** [125] - 1:12, 1:15, 3:1, 3:19, 3:21, 5:3, 5:18, 6:1, 6:6, 6:13, 6:16, 6:23, 7:10, 7:13, 7:24, 8:11, 8:15, 8:23, 9:2, 9:5, 9:10, 9:12, 9:25, 10:13, 10:15, 10:17, 10:22, 11:1, 11:5, 11:11, 11:20, 11:23, 11:25, 12:3, 12:8, 12:10, 15:16, 15:18, 15:23, 16:23, 17:10, 20:10, 20:12, 20:14, 22:11, 22:13, 22:15, 22:17, 23:2, 23:7, 23:9, 25:16, 25:18, 26:1, 26:10, 31:4, 31:6, 31:8, 32:3, 32:5, 32:7, 32:13, 32:17, 32:19, 34:5, 34:25, 39:2, 41:24, 42:25, 43:19, 44:23, 45:20, 46:22, 46:24, 48:23, 49:21, 49:24, 50:1, 51:1, 51:3, 51:5, 52:3, 54:17, 56:11, 56:13, 56:18, 56:22, 56:24, 58:1, 58:3, 58:25, 59:13, 60:5, 60:8, 60:13, 60:17, 60:19, 61:25, 62:2, 62:4, 63:12, 64:25, 65:2, 66:10, 66:13, 66:15, 69:6, 69:8, 69:10, 71:4, 71:13, 72:11, 72:14, 72:18, 72:24, 73:1, 73:5, 73:11, 78:3, 81:16, 83:7, 85:9, 85:16, 86:3, 86:5
**themselves** [2] - 78:23, 79:22
**theory** [1] - 78:5
**thinking** [1] - 6:23
**thinks** [1] - 33:12
**thousands** [2] - 15:4, 25:3
**three** [18] - 3:2, 3:25, 11:2, 11:4, 36:5, 43:3, 43:5, 43:6, 47:9, 48:1, 53:14, 53:15, 55:1, 55:24, 64:13, 65:9, 68:11, 75:12
**threw** [1] - 41:5
**thumb** [2] - 26:22, 26:24
**Title** [3] - 72:2, 72:6, 72:9
**Tobacco** [2] - 12:16, 23:16
**today** [3] - 16:11, 27:20, 85:10
**together** [3] - 78:24, 83:15
**took** [1] - 9:7
**tools** [1] - 67:18
**top** [1] - 30:21
**total** [2] - 46:19
**touch** [1] - 76:18
**towards** [1] - 5:25
**town** [1] - 79:19
**track** [1] - 11:3
**tracking** [1] - 62:22
**traffic** [1] - 75:5
**traffickers** [2] - 79:15, 84:18
**trafficking** [4] - 42:17, 42:19, 79:20, 81:2
**train** [1] - 13:15
**trained** [2] - 33:10, 50:21
**training** [21] - 13:20, 13:22, 13:23, 13:24, 14:1, 20:18, 21:9, 24:2, 27:5, 31:13, 33:14, 33:15, 57:13, 61:5, 61:10, 71:18, 71:20, 71:21, 71:23, 71:25, 85:23
**transaction** [2] - 39:24, 40:1
**TRANSCRIPT** [1] - 1:12
**transcription** [1] - 87:4
**transported** [1] - 14:5
**trap** [1] - 79:13
**traveled** [10] - 13:12, 13:14, 18:20, 18:22, 20:2, 20:4, 20:7, 21:12, 28:3, 28:25
**TRIAL** [1] - 1:12
**trial** [1] - 11:6
**tried** [1] - 6:7
**try** [1] - 84:19
**trying** [2] - 5:24, 46:10
**turn** [4] - 36:5, 37:22, 53:21, 54:4
**turned** [1] - 39:23
**TWELVE** [1] - 1:5
**two** [19] - 27:19, 29:11, 31:18, 35:23, 42:9, 46:20, 52:22, 53:10, 53:21, 54:11, 58:5, 58:17, 59:6, 59:10, 59:16, 64:5, 65:16
**Two** [1] - 1:24
**type** [5] - 4:14, 4:19, 5:20, 81:6, 82:1
**types** [5] - 67:8, 67:18, 76:12, 80:10, 84:24
**typical** [4] - 74:6, 82:20, 83:10, 84:7
**typically** [6] - 73:16, 74:7, 74:23, 76:2, 84:14, 85:3

## U

**unable** [2] - 20:1, 20:3
**unclear** [1] - 5:5
**uncommon** [1] - 36:23
**under** [9] - 5:2, 7:20, 29:12, 30:1, 30:8, 42:19, 42:22, 43:11, 44:25
**undercover** [1] - 67:20
**unique** [2] - 31:15, 62:13
**United** [13] - 2:7, 11:3, 12:6, 12:24, 13:18, 14:5, 14:6, 14:19, 19:11, 23:4, 28:19, 29:22, 56:19
**UNITED** [3] - 1:1, 1:4, 1:15
**uNITED** [1] - 1:13
**University** [4] - 12:23, 33:13, 57:15, 57:16
**unless** [1] - 3:12
**up** [17] - 3:3, 4:10, 6:21, 7:1, 11:9, 22:7, 40:10, 44:1, 60:6, 70:15, 72:25, 73:18, 73:23, 80:2, 80:3, 81:19, 85:10
**USA** [1] - 26:25
**users** [2] - 75:2, 75:23
**uses** [1] - 21:2
**Utah** [1] - 29:14
**utilized** [1] - 67:20

## V

**value** [1] - 74:6
**values** [1] - 74:3
**various** [2] - 13:10, 67:22
**VAZQUEZ** [34] - 1:15, 3:5, 3:20, 5:11, 6:4, 6:9, 6:15, 6:22, 7:6, 7:11, 7:14, 8:13, 8:21, 8:25, 9:3, 9:6, 10:7, 10:14, 10:25,

11:13, 11:21, 11:24, 66:9, 66:16, 69:4, 72:19, 73:2, 73:6, 73:12, 78:12, 81:15, 81:17, 83:6, 83:8
**Vazquez** [12] - 5:9, 6:19, 6:21, 8:4, 9:24, 10:2, 11:9, 11:11, 70:25, 72:18, 72:25, 78:4
**Venezuela** [1] - 73:18
**versus** [2] - 39:11, 70:5
**via** [1] - 14:22
**Vicar** [1] - 7:20
**Vice** [1] - 67:7
**violated** [1] - 4:11
**violations** [1] - 13:3
**Violent** [1] - 68:10
**violent** [1] - 23:23
**voir** [1] - 69:9
**vs** [1] - 1:5

## W

**waiting** [1] - 3:1
**walking** [1] - 79:8
**wants** [1] - 84:21
**Warrior** [2] - 82:2
**watch** [1] - 77:14
**weapon** [11] - 17:18, 27:4, 27:6, 28:17, 28:18, 28:20, 28:23, 30:10, 30:12, 30:14, 81:8
**weapons** [3] - 28:19, 29:11, 80:13
**wee** [1] - 67:5
**weeks** [1] - 3:25
**weigh** [7] - 36:15, 36:21, 37:15, 38:20, 41:7, 47:10, 54:2
**weighed** [9] - 37:20, 39:11, 45:9, 53:15, 54:13, 55:1, 55:4, 56:1, 56:3
**weighing** [1] - 65:14
**weight** [25] - 36:15, 36:16, 36:19, 36:25, 38:21, 38:23, 39:13, 39:14, 39:15, 41:1, 41:10, 41:17, 43:10, 45:6, 46:19, 54:13, 55:7, 55:13, 56:7, 56:8, 64:2, 64:8, 85:19
**Wesson** [6] - 26:6, 26:16, 26:19, 28:10, 28:11, 30:10
**West** [1] - 1:22
**wheel** [1] - 81:6
**whereas** [1] - 81:10
**white** [2] - 39:13, 73:22
**WILLIAMS** [1] - 1:12
**Wilmington** [1] - 70:2
**wire** [10] - 67:23, 67:25, 68:19, 71:22, 72:2, 72:6, 72:9, 80:21, 85:3
**wise** [1] - 3:19
**wish** [1] - 5:9
**witness** [24] - 10:8, 10:10, 12:5, 15:14, 16:21, 20:9, 23:3, 25:14, 25:25, 26:8, 32:14, 34:1, 49:22, 50:24, 51:4, 54:16, 56:18, 57:24, 60:2, 60:13, 61:23, 62:3, 66:10, 69:4
**WITNESS** [14] - 12:7, 12:10, 23:6, 23:9, 32:16, 32:19, 50:1, 56:21, 56:24, 60:16, 60:19, 66:12, 66:15, 73:1
**wood** [1] - 30:8
**wooden** [2] - 26:20, 29:15
**words** [1] - 43:14
**worth** [4] - 74:12, 74:16, 77:8, 85:7
**writing** [1] - 24:18
**written** [1] - 9:4

## Y

**Y14350** [2] - 16:5, 17:7
**year** [9] - 39:20, 41:20, 44:6, 44:20, 55:23, 59:20, 61:13, 65:20, 66:2
**years** [12] - 12:21, 20:21, 20:22, 23:18, 33:4, 61:13, 67:3, 67:6, 68:11, 70:3, 70:9, 70:10
**yesterday** [2] - 9:15, 14:13
**yourself** [1] - 32:22
**Youthful** [1] - 4:11