UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-CR-20017-WILLIAMS(s)(s)

UNITED STATES OF AMERICA

v.

MAURIN CHACON et al.,

       **Defendants.**

_____/

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF COUNT 6**
**(VIOLENT CRIME IN AID OF RACKETEERING)**

      The United States, by and through the undersigned Assistant United States Attorney, hereby files this memorandum in support of forthcoming argument regarding proof of Count 6 of the Second Superseding Indictment. Based on the trial evidence the government submits that Count 6 has been sufficiently proven to warrant submission to the jury for determination.

    A. **Synopsis of Trial Evidence**

      Since as early as 2008 members of the Big Money Team or "BMT," have operated in the City of Miami, Florida. The trial testimony from both within and outside of the BMT established that the group distributed narcotics, robbed citizens, directed prostitution and sought to impose criminal order in the area 4th Street and 11th Avenue, Miami, Florida. *See for e.g.* Testimony of Jose Mendoza, Daily Transcript February 11, 2015, Pg. 47-48 ("Many times I would go out to tell them not to sell drugs in front of my gate -- the front gate of my house. And many times they did pay attention to me because I would go out and tell them and they would move. Many times new ones would come, so I would tell one of the older ones to tell him, listen, I need for you to tell him not to sell drugs right in front of my house."); *id*. at 51 ("Well, what happened was that when the robberies, the assaults took place they were all there; so it's all of them."); *id*. at Pg. 59 ("What they

did was -- is that they left us without any privacy in the entire neighborhood . . . But at the end of 2013 that is when the invasion occurred; almost all of them came."); *see also id*. at 61 ("Q. Why did you decide to speak with Patron about moving drug sales from the front of your house? A. Because I could see he was the one that had more authority.").

Moreover, the government presented evidence that as part of the BMT's narcotics distribution activities, its members committed robberies and directed prostitution to raise capital for drug purchases. Further, the government has played jailhouse phone calls in which the defendants were captured planning continued drug activities, the prospect of investigation and discussing the attack on a suspected witness.

The trial testimony has also included evidence from the government's proactive investigation in which enterprise members were shown coordinating with one another for the distribution of narcotics from areas they claimed to control. Further, evidence also demonstrated that for several years, the BMT has used the internet to facilitate communication between enterprise members and plan activities. Through social media evidence the government has secured images of the defendants demonstrating symbols of association of video recordings of group members claiming affiliation with the enterprise.

## II.     The VICAR Allegation is Proven by the Trial Evidence

To establish a Violent Crime in Aid of Racketeering ("VICAR"), the government must prove the following beyond a reasonable doubt: 1.) An enterprise affecting interstate commerce existed; 2.) The enterprise engaged in racketeering activity; 3.) the defendant committed, threatened to commit, attempted to commit, conspired to commit a crime of violence; and 4.) the defendant's purpose in committing, threatening to commit, attempting to commit, or conspiring to

commit the crime of violence was to gain entrance to, or to maintain, or to increase his position in the enterprise. *See* 9th Circuit Pattern Jury Instruction § 8.151 (2013) (modified). The trial evidence has proven each of the elements against defendants Chacon and Altamirano under direct or vicarious liability theories.

**Element 1: The BMT constitute an enterprise affecting interstate commerce**

An "enterprise" is defined as any group of individuals associated in fact, although not a legal entity. 18 U.S.C. § 1961(4). The existence of an association-in-fact enterprise is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). It is not necessary to prove that the defendant is a member of the charged enterprise to be guilty of a VICAR offense. *See United States v. Rolett*, 151 F. 3d 787, 790 (8th Cir. 1998). Rather, a defendant may be a complete outsider who committed an underlying crime of violence for the purpose of assisting another person to gain entrance to or maintain or increase his position in the charged enterprise.

Establishing that members of an enterprise operated together in furtherance of a common purpose may be proven by direct or circumstantial evidence including, inferences from the members' commission of similar acts in furtherance of a shared objective, financial ties, coordination of activities, interlocking nature of the schemes, and overlapping nature of the wrongful conduct. *United States v. Gianni*, 678 F.2d 956, 959 (11th Cir. 1982) ("There is rarely any direct evidence of an agreement to join a criminal conspiracy, so that a defendant's assent can be inferred from acts furthering the conspiracy's purpose.").

Furthermore, the requisite continuity of the enterprise and of the functioning of its

associates is not defeated merely because there is a gap or interruption in the racketeering activities of the enterprise, or because membership of the enterprise changes over time. *United States v. Church*, 955 F.3d 688, 697-700 (11th Cir. 1992) (ruling that the association-in-fact, drug trafficking enterprise functioned as a continuing unit from 1973 to 1986, even though there was a three year gap in the commission of criminal acts from 1980 to 1983). The enterprise may exist even if its membership changes over time. *United States v. Perholtz*, 842 F.2d 343, 364 (D.C. Cir. 1988); *see also Church*, 955 F. 2d at 698 (enterprise established where the "personnel of the enterprise was not the same from beginning to end"); *see also United States v. Weinstein*, 762 F. 2d 1522, 1537 n.13 (11th Cir. 1985) (liability for participation in a enterprise does not require "participation of all members throughout the life of the enterprise"); *see also United States v. Hewes*, 729 F. 2d 1302, 1317 (11th Cir. 1984) ("The law does not require all members of the RICO enterprise to have maintained their association with it throughout the enterprise's life"); *United States v. Cagnina*, 697 F.2d 915, 921-22 (11th Cir.) ("Although the enterprise grew in membership and its activities became more diverse, these facts do not negate its existence."), cert. denied, 464 U.S. 856 (1983).

The Eleventh Circuit has held that an enterprise need not have an ascertainable structure. *United States v. Goldin Industries, Inc.*, 219 F.3d 1271, 1274-75 (11th Cir. 2000). Further, the existence of an enterprise should be evaluated on the totality of the evidence and may be inferred from the evidence establishing the pattern of racketeering activity. *Id*. In *United States v. Pipkins*, 378 F.3d 1281, 1288-94 (11th Cir. 2004) (reversed on other grounds), the Court held that the evidence established the alleged enterprise comprised of an association of pimps, who operated in Atlanta and furthered a shared objective to make money from prostituting juveniles, and that

there was no requirement that the enterprise be a formally structured group.  Similarly, in *United States v. Church*, 955 F.2d at 698-99, the court held that the evidence established the enterprise comprised of an association of individuals where the enterprise was devoted to making money from repeated criminal activity and protecting that money by any means necessary even though enterprise's membership was not the same from beginning to end, but "[a]s participants left the enterprise, others joined, each becoming involved in multiple aspects of the enterprise[.]" *See also United States v. Hewes*, 729 F.2d 1302, 1310 (11th Cir. 1984), cert. denied, 469 U.S. 1110 (1985) (holding there was sufficient to establish an association-in-fact enterprise even though the enterprise consisted of a "group of persons who had committed a variety of unrelated offenses with no agreement as to any particular crime," but who were "associated for the purpose of making money from the repeated criminal activity."); *see also United States v. Cagnina*, 697 F.2d 915, 921-22 (11th Cir.), cert. denied, 464 U.S. 856 (1983). The *Cagnina* Court held that *Turkette* "did not suggest that the enterprise must have a distinct, formalized structure" and that "[a]lthough both an enterprise and a pattern of racketeering activity must be shown, . . . . the proof used to establish the two elements may in particular cases coalesce." The Eleventh Circuit has also held that the Government need not prove an enterprise distinct from evidence showing a pattern of racketeering, and found that the enterprise was adequately established where evidence showed an informal association with a common purpose, i.e., making money from repeated criminal activity. *Id*.

In *Boyle v. United States*, 556 U.S. 938, 946 (2009), the Supreme Court held that by holding that an association-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to

permit these associates to pursue the enterprise's purpose." The Court reiterated its statement from *Turkette* that although the existence of an enterprise and the pattern are distinct elements, the evidence used to prove these elements "may in particular cases coalesce," *Id*. at 947 (citing *Turkette*, 452 U.S. at 583) and that "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id*.

It is important to note that a single enterprise may be found even where members of an association-in-fact enterprise form opposing factions. For example, in *United States v. Orena*, 32 F.3d 704, 710 (2d Cir. 1994), the indictment alleged that the RICO enterprise was an association-in-fact consisting of "members and associates of the Colombo Organized Crime Family." The indictment also referred to an internal war between two competing factions of the Colombo Family. On appeal, the defendant argued that the indictment failed to allege the existence of an ongoing enterprise because of the Family's infighting. The Second Circuit concluded, however, that the allegations and subsequent proof of the internecine war presented the question whether the enterprise was sufficiently proven, not whether the enterprise was adequately pled, and held that the enterprise element was sufficiently pled.

Through the trial evidence the Court and Jury have been provided evidence that the purpose of the BMT was to generate illicit income. *See for e.g.* Testimony of Nadim Guzman, Daily Transcript February 12, 2015, Pg. 58 ("Q. What is BMT? A. Big Money Team. Q. What does it mean to be part of this organization? A. That you can sell drugs and make money with them."). The BMT operated as an association-in-fact whose members participated in the distribution of narcotics and whose members and associates sold street level quantities of cocaine base, marijuana and MDMC. The BMT defended their narcotics distribution interests with

violence and the threat of violence. Moreover, witness testimony has established that several members of the enterprise acquired capitol for the purchase distribution quantities of narcotics through robbery, theft and the direction of prostitution activities.

The BMT's devotion to "making money from repeated criminal activity," demonstrates the enterprise's "common purpose of engaging in a course of conduct," regardless of whether the criminal activity is diverse. *Cagnina,* 697 F.2d at 921. Chacon and Altamirano were each chief drug distributors through their association with the enterprise. Moreover, both Altamirano and Chacon shared a common purpose with the enterprise - the distribution of drugs for profit. *See United States v. Starret*, 55 F.3d 1525, 1545 (11th Cir. 1995) (proof of an association's devotion to making money from repeated criminal activity demonstrates an enterprise's common purpose).

According to witness Zerquera, a former member of the enterprise, the BMT has existed since 2008 and its members have combined to generate profits from drug distribution activities in the City of Miami, Florida since at least 2008. *See for e.g.* Testimony of Dayaan Zerquera, Daily Transcript February 18, 2015, Pg. 57; *see United States v. McLean*, 138 F.3d 1398, 1404 (11th Cir. 1998) (uncharged misconduct showing prior relationship between defendant and another participant in charged offense is admissible as inextricably intertwined with evidence of charged offense); *see also United States v. Lehder-Rivas*, 955 F.2d 1510, 1516 (11th Cir. 1992) (introduction of defendants earlier drug smuggling activities which began four years before the charged offense and involved many of the same people was intrinsic evidence that explained the roles and motives of the various co-conspirators during the charged conspiracy).

Through the enterprise's lifespan it has utilized multiple physical locations to conduct drug distribution, store contraband and provide shelter for membership. The trial evidence also

demonstrated that the BMT constituted an ongoing organization where various associates functioned as a continuing unit. *Turkette,* 452 U.S. at 583.  Defendants Maurin Chacon, Alioth Salas, Carlos Tinoco, Angel Martinez and Dayaan Zerquera were identified as maintaining continued association with each other as BMT members since 2008.  While the enterprise's membership roster adjusted over time, it maintained a continuous identity as the BMT.  As participants left the enterprise, others joined, each becoming involved in multiple aspects of the enterprise. In *United States v. Hewes,* 729 F.2d 1302, 1311 (11th Cir. 1984), *cert. denied,* 469 U.S. 1110 (1985), the Eleventh Circuit made clear that "shifting associations" whose participants "overlapped to a significant degree" formed an enterprise*.; see also United States v. Young*, 906 F.2d 615, 619 (11th Cir. 1990) ("an enterprise can exist in the absence of a formally structured group."); *see also Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1284 (11th Cir. 2006) ("This Court has never required anything other than a "loose or informal" association of distinct entities."); s*ee also United States v. Harris,* 695 F.3d 1125, 1136 (10th Cir. 2012) (holding that Crips gang sets constituted an association-in-fact enterprise when they "jointly operated the houses from which various set members sold drugs").  The duration of relationships between BMT members and their association with the group permitted the criminal network participants to pursue the enterprise's central purpose . . . the realization of illicit drug sale profits.

The gravamen of the defendants challenge to the government's case rests on a contention that their actions were independent of one another.  Under the defendants' theory the drug distribution, robbery, theft, firearm possession and prostitution direction acts addressed by the trial evidence were nothing but the coincidental alignment of unaffiliated souls crossing by happenstance in the area of 4th Street and 11th Avenue, Miami, Florida like ships passing in the

night. The proposition defies reason. The evidence shows both the existence of the enterprise and Chacon and Altamirano's extensive participation in its activities toward the goal of generating drug sale profits.

Further, the evidence clearly shows the BMT is engaged in interstate commerce because witness testimony and electronic evidence demonstrates the distribution of cocaine base and use avenues of commerce to complete the enterprise narcotics activities. Courts have held that only a *de minimis* effect on interstate or foreign commerce is required in each particular case, and have rejected challenges that Section 1959 exceeds Congress' authority under the Commerce Clause. Accordingly, courts have found the requisite effect on interstate or foreign commerce in a wide variety of circumstances. *United States v. Vasquez*, 267 F. 3d 79, 90 (11th Cir. 2001) ("Engaging in narcotics trafficking affects *interstate* commerce, at the very least, regardless of where the raw materials originate."). FBI Special Agent Christopher Mayo's testimony that cocaine does not originate from the State of Florida, and in fact comes from intentional sources in to the United States, establishes the interstate impact on commerce resulting from the enterprise's activities.

**Element 2: The Pattern of Racketeering**

Section 1959 explicitly requires proof that the "enterprise engaged in racketeering activity" and provides that "racketeering activity" has the same meaning as set forth under RICO Act. However, Section 1959 does not require that a defendant committed a "pattern of racketeering activity." Compare 18 U.S.C. § 1959(b) with 18 U.S.C. §§ 1961(5) and 1962. Therefore, courts have held that to establish a Section 1959 violation, it is not necessary to prove that any defendant committed a pattern of racketeering activity. Rather, Section 1959 requires evidence that "the enterprise" "engaged in racketeering activity." Therefore, there must be some nexus between the

enterprise and the racketeering activity to conclude that the charged enterprise "engaged in racketeering activity." That an enterprise consisting of a group of individuals associated in fact "engaged in racketeering activity" may be established by evidence that individual members committed racketeering activity "for the group and/or in concert with other members, or acted in ways that contributed to [or furthered] the purposes of the group, or that were facilitated or made possible by the group." *United States v. Feliciano*, 223 F.3d 102, 116-117 (2d Cir. 2000); *see also United States v. Phillips*, 239 F.3d 829, 845 (7th Cir. 2001) (sufficient that "the shooting was the type of behavior encouraged and demanded of members of [the enterprise]"); *United States v. Gray*, 137 F.3d 765, 773 (4th Cir. 1998) ("[T]he evidence that the enterprise dealt in drugs would likewise be sufficient to support a jury finding that the enterprise engaged in racketeering"); *United States v. Fiel*, 35 F. 3d 997, 1004 (4th Cir. 1994) (sufficient that the enterprise, a group of individuals who were members of a motorcycle club, facilitated drug dealing).

Over a period of several years, the members of the BMT enterprise sold significant qualities of street-level narcotics in the Miami metropolitan area. *See United States v. Wilson,* 116 F.3d 1066, 1078 (5th Cir. 1997) ("[D]rug trafficking constitutes 'racketeering activity' for the purposes of VICAR."). Specifically, cooperating defendant testimony yielded that the BMT routinely sold a minimum of 16 grams of cocaine base a day from their drugs traps. The defendants' participation in the distribution of narcotics plainly constitutes racketeering activity. Further, to advance their drug trafficking activities, the trial evidence demonstrated that BMT members engaged in a series of illicit acts, such as robbery, theft, assault and directing prostitution, to both gain resources for their narcotics ventures and to protect their organization.

Through cellular information search warrants, intercepted jail calls and undercover

recordings, BMT members were documented engaging in numerous conversations which addressed the operation of drug trafficking activities. In light of the intercepted jail house calls, cellular phone communications, social media, calls, the cooperator testimony, historical drug activity and narcotics recovered during the undercover investigation, the evidence of a pattern of racketeering has been established.

> **Element 3: The Defendant committed, threatened to commit, attempted to commit, conspired to commit a crime of violence**

Witnesses Mauricio Ordonez, Donald Rivera, Norlyn Obregon and Pedro Llerena reported having been the victims of a robbery with armed assault during which a firearm was discharged on November 20, 2013. Each of the victims reported that firearms were pointed at their persons and at their fellow victims. During the trial out court identifications, witness testimony and jailhouse phone calls implicated Altamirano, Thompson and Forte as direct participants in the robberies. Further, the evidence makes clear Altamirano was specifically the party who discharged the firearm. The pointing of a firearm at the victims constituted an aggravated assault by Altamirano, Thompson and Forte in violation of Florida law. *See* Florida State Statute 784.021 (Florida Aggravated Assault); *see also for e.g. Reynolds v. State*, 452 So. 2d 1018, 1019 (3d DCA 1984).

> **Element 4: The Defendant's committed the crime of violence to gain entrance to, or to maintain, or to increase his position in the enterprise.**

The evidence demonstrates that the assaults committed during the November 20, 2013 robbery occurred to increase or maintain defendants Altamirano, Thompson and Forte's position in the enterprise. *See United States v. Kamahele*, 748 F. 3d 984, 1008-10 (10th Cir. 2014) ("The Government does not need to prove that the defendant's 'sole or principal motive' was to maintain

or increase his position in the enterprise . . . Rather, the Government need only establish that the predicate violent crime was committed as an 'integral aspect of membership' in the enterprise (TCG). . . But Mr. Kepa Maumau's accomplice (Mr. Kamoto) testified that he and Mr. Kepa Maumau were TCG members, that TCG members were expected to commit crimes, and that criminal activity served to advance their reputations in the gang. Mr. Kamoto also testified that the crimes had raised his status in the gang and that he had received greater attention from fellow gang members upon his release from prison. This testimony supports the inference that the gang not only knew about the robberies, but also encouraged members to engage in this type of criminal behavior.").

Altamirano, Thompson and Forte were fulfilling their roles as members of BMT by committing the assaults attendant top the November 20, 2013 robbery. Each of the defendants stood to lose standing or respect in the group had they declined to carry out the assaults which were needed to accomplish the robberies. *See United States v. Robertson*, 736 F.3d 1317, 1330 (11th Cir. 2013) ("Therefore, '[t]he motive element' of each VICAR murder charge 'is satisfied if the jury could properly infer that [Robertson] committed [murder] because he knew it was expected of him by reason of his membership in [Tampa Blood and Honour] or that he committed [murder] in furtherance of that membership.'") (quoting *United States v. Whitten,* 610 F.3d 168, 178–79 (2d Cir. 2010) (alterations and internal quotation marks omitted)); *see also United States v. Banks*, 514 F.3d 959, 971 (9th Cir. 2008). ("the evidence is sufficient for a VICAR conviction even if, for example, the jury could reasonably infer no more than that Banks acted out of concern for his status in the eyes of his 'little homies' within the gang, or his reputation among other gang members generally."); see also *United States v. Concepcion,* 983 F.2d 369, 381 (2d Cir. 1992)

(holding that § 1959(a) simply required that the defendant's "general purpose in [committing an act of violence] was to maintain or increase his position in the enterprise."); see also *United States v. Pimentel,* 346 F.3d 285, 295–96 (2d Cir. 2003) (quoting *Concepcion,* 983 F.2d at 381) (holding that the purpose element is met if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." ); *see also United States v. Smith,* 413 F.3d 1253, 1277–78 (10th Cir. 2005) (holding that proof a violent crime was committed as an integral aspect of membership in an enterprise is sufficient to establish the is § 1959(a) motive element where the jury could properly infer that a defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.); *see also United States v. Tse,* 135 F.3d 200, 206 (1st Cir. 1998) (holding that the government need not prove "that the crime was solely motivated by a desire to maintain or increase a particular position within the enterprise ").

The armed assault of the November 20, 2013 robbery victims maintained or increased the positions of Altamirano, Thompson and Forte in the BMT. *See for e.g.* Testimony of Dayaan Zerquera, Daily Transcript February 19, 2015, Pg. 26 ("Q. All right. And in the group, the more violent members received more respect, correct? A. Correct."); *see for e.g.* Testimony of Nadim Guzman, Daily Transcript February 17, 2015, Pg. 29 ("Q. How does a person gain or lose respect in the BMT? A. Not complying like -- let's say you are asked to do something or to help with a robbery or something and you don't want to do it or somebody is fighting and you don't help them out and they end up beaten, you lose respect."). Moreover, the evidence also established that robbery was a key aspect of how the BMT maintained its existence. *See for e.g.* Testimony of

Julio Mendoza, Daily Transcript February 11, 2015, Pg. 19 ("You cannot go by at night because they would snatch things from people"); *see also for e.g.* Testimony of Nadim Guzman, Daily Transcript February 17, 2015, Pg. 19 ("Q. How did BMT members buy drugs? A. With money, hustling. Q. What is hustling? A. Either selling stuff that you have stolen or just robbing . . . Whenever someone would be broke they will try to like come up on electronics or something they could sell in order to buy more drugs.").

Through the trial evidence the government has established that assaults and the commission of robberies were fundamental acts to the BMT's activities. Members of the organization knew that violent acts were routinely conducted, particularly for pecuniary gain. Moreover, the culture of the enterprise rewarded acts of violence with increased status. Conversely, members who were none violent fell behind in the pecking order and became subservient. *See* Testimony of Dayaan Zerquera, Daily Transcript February 18, 2015, Pg. 19 ("Q. How do people view each other as far as respect in the group? A. Sometimes people do violent stuff. You know, sometimes a lot of us get violent, and the dudes that are not so violent, they look at that and they get intimidated.").

For defendants Altamirano, Thompson and Forte, the November 20, 2013 robbery presented an opportunity to demonstrate their worthiness of respect and status in the enterprise. By demonstrating the wiliness to inflict harm and collect proceeds for future narcotics endeavors the November 20, 2013 robbery trio augmented their *bona fides* as violent members of the BMT. As the jailhouse calls make clear, Altamirano desired respect in the organization. S*ee for e.g.* Christopher Altamirano, Jailhouse Call Transcript, December 1, 2013, 7:54 p.m., Pg. 10 ("CA: They can't respect a nigga decision, dog, it shows -- you feel me, it just shows, dog. Get that

message across. If I don't get -- if you don't get that shit in the next two days, that I said, dog, they could keep that shit, but fuck them, 'cause when I come out it's gon' be problems, dog. You heard me?"); *see also for e.g.* Christopher Altamirano, Jailhouse Call Transcript, December 7, 2013, 12:33 a.m., Pg. 4 ("CA: Whenever I say, you feel me, y'all don't do nothing, fool, like, please respect my word, dog.");s*ee also for e.g.* Christopher Altamirano, Jailhouse Call Transcript, December 11, 2013, 1:12 p.m., Pg. 6 ("CA: I be trying to tell you, bro, it ain't the same without me right there, dog. I'm that nigga right there, bro. JD: (Unintelligible). CA: It's like niggas -- it's like niggas respect my presence. But once a niggagone, you feel me, out the picture it's like fuck you, you feel me?").

Moreover, the trial evidence has established that robbery was a principal practice for the enterprise. As a result the assaults committed during the November 20, 2013 robbery were part and parcel to integral aspects of the BMT's business model, serving to both fund the purchase of distribution amounts of narcotics and to demonstrate the individual members' worthiness of respect. *See Kamahele*, 748 F. 3d at 1008-10. However, the VICAR motive element is still satisfied if position in the enterprise was one of many motives which could be inferred for the assaults. *Id.*; see also *Robertson*, 736 F.3d at 1330.

Accordingly, because the evidence permits the inference that the aggravated assaults were committed either as integral aspects of membership, or to gain or maintain status in the enterprise the VICAR motive has been sufficiently proven to submit the question to the jury.

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that sufficient evidence has been introduced at trial to submit Count 6 of Second Superseding Indictment to the jury for deliberations.

                            Respectfully submitted,

                            WIFREDO A. FERRER
                            UNITED STATES ATTORNEY

By:   /s/ Ignacio J. Vázquez, Jr.
        Ignacio J. Vázquez, Jr.
        Assistant United States Attorney
        Florida Bar No. 16275
        U.S. Attorney's Office - SDFL
        99 Northeast Fourth Street, 6th Floor
        Miami, Florida 33132-2111
        Telephone: (305) 961-9318
        Facsimile: (305) 536-4699
        E-mail: ignacio.vazquez@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was uploaded onto the Court's CM/ECF system and sent via CM/ECF to all counsel of record on March 1 1, 2015.

                            /s/ Ignacio J. Vázquez, Jr.
                            Ignacio J. Vázquez, Jr.
                            Assistant United States Attorney