DAILY COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No.: 14-20017-CR-KMW

**UNITED STATES OF AMERICA,** March 3, 2015

Plaintiff, **DAY 15**
**P.M. SESSION**

-v-

**MAURIN CHACON,** MIAMI, FLORIDA
**RODOLFO PORTELA,**
**CHRISTOPHER ALTAMIRANO,**
**JAMES DIXON,**
**JAY ANTHONY FLORES,**

Defendants. PAGES: 1-173

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

FOR THE UNITED STATES:
**IGNACIO J. VÁZQUEZ, AUSA**
**ILHAM HOSSEINI, AUSA**
**MARK DISPOTO, AUSA**
99 N.E. Fourth Street
Miami, FL 33132

FOR THE DEFENDANTS:
**MANUEL GONZALEZ, JR., ESQUIRE**
2000 Ponce De Leon Boulevard
Suite 614
Coral Gables, FL 33134

**PAUL M. KORCHIN, AFPD**
150 West Flagler Street
Miami, FL 33130

**PHILIP R. HOROWITZ, ESQUIRE**
9130 South Dadeland Boulevard
Suite 1910
Miami, FL 33156

DAILY COPY

APPEARANCES CONTINUED:

**DAVID A. DONET, JR., ESQUIRE**
3250 Mary Street
Suite 406
Coconut Grove, FL 33133

**HERMAN F. RUBIO, JR., ESQUIRE**
1107 N.E. 104th Street
Miami Shores, FL 33138

REPORTED BY:

TAMRA K. PIDERIT, FPR, RDR, CRR
Janoca Reporting Services, Inc.
681 Live Oak Lane
Weston, Florida 33327

P R O C E E D I N G S

(Proceedings resumed at 12:01 PM.)

THE COURT: Are we all here?

Ms. Greer is trying to --

MR. RUBIO: We took care of that, Judge. I had made arrangements with them downstairs and told him, and I guess they changed personnel, and they said please leave a copy of the subpoena. So when I went down and I mentioned it to them, oh, that's you with the subpoena, okay.

Thank you very much for the Court's assistance. He is outside, and hopefully we will move things along and get it done today.

THE COURT: Okay. Hopefully we will.

MR. RUBIO: I may ask you to help me at the end of the day to let him know if he has to come back.

THE COURT: Yes, I will have the talk.

All our jurors are here?

MR. HOROWITZ: I'm in the middle of cross exam.

(Jury returns at 12:02 PM.)

THE COURT: Everyone be seated. Good afternoon, Ladies and Gentlemen.

Mr. Horowitz, I think you were cross examining.

**SPECIAL AGENT ROSNIEL PEREZ, Continued**

**CONTINUED CROSS EXAMINATION**

**BY MR. HOROWITZ:**

**Q. Good afternoon, Special Agent Perez. How are you?**

A. Good afternoon, sir.

**Q. Agent Perez, what I would like to do is direct the attention to the events of November 20th and November 21st, if I may?**

A. Yes, sir.

**Q. You testified about Government's Exhibit 39. Do you recall that?**

A. Yes, sir.

**Q. This is the $88 that was found in the Dodge Magnum outside of 435 -- in the vicinity of 435 N.W. 11th Street, correct?**

A. Yes, sir.

**Q. This money, was it ever processed for fingerprints?**

A. I don't believe so.

**Q. And fingerprints can be taken from paper, can it not, to your knowledge?**

A. I believe so.

**Q. Where was this found within the Dodge Magnum?**

A. I don't know exactly.

**Q. And the money sheet that's in here, it's a City of Miami form. It simply tallies the amount of money, how many ones, how many fives, how many tens, things of that nature, correct?**

A. Yes, sir.

**Q. Now, one of the things that was found inside the Dodge Magnum was Steven Castro's wallet, to your knowledge?**
A. Yes, sir.
**Q. How much of this was in Steven Castro's wallet?**
A. I don't know exactly.
**Q. Therefore, you can't -- strike that. Let me go to a different topic, if I may.**
**It's your understanding that Mr. Altamirano was stopped a few hours after the robbery, was he not?**
MR. VÁZQUEZ: Objection; calls for hearsay.
THE COURT: Overruled.
MR. HOROWITZ: His knowledge, Your Honor. It's just setting up the next question.
THE COURT: Overruled.
A. Yes.
**Q. And it's also your understanding that a weapon was discharged on the evening of November 20th, was it not?**
A. Yes, sir.
**Q. Could you explain to the ladies and gentlemen of the jury what a gunshot residue test is?**
MR. VÁZQUEZ: Objection; calls for expert testimony.
THE COURT: Only if he knows. He is an ATF agent, so overruled.
A. It's a test that gets done on articles to find out if there is any residue from powder or the powder that goes inside the

actual bullets.

**Q. And the test can be done not just on a material, it can be done on human beings, like a hand that holds a gun, correct?**

A. Yes.

**Q. And the test is done similar to where a swab is taken, and then the results of the swab are then analyzed, correct?**

A. I believe so.

**Q. And if it tests positive for the presence of gun powder, that's really what they are looking for, are they not?**

A. Um --

**Q. The contents of a round?**

A. I believe so, but I also believe it's not very reliable after a few hours.

**Q. So such test was never done on Mr. Altamirano that evening, was it?**

A. Not that I know of.

MR. HOROWITZ: No further questions. Thank you, Your Honor.

THE COURT: Mr. Korchin.

**CROSS EXAMINATION**

**BY MR. KORCHIN:**

**Q. Agent Perez, I'm showing you Government's Exhibit 362. Do you have it there on your screen?**

A. Yes, sir.

**Q. It appears to be a couple of photographs as well as an entry**

**on this social media. Is that a Facebook post below there in the writing or Instagram? It's some social media post, correct?**

A. Yes, sir.

**Q. Okay. And I think did you identify Mr. Portela in these photographs?**

A. Yes, sir.

**Q. Okay. Now, isn't it true that -- well, you see the date here in the social media writing of January 11, 2014? Do you see that?**

A. Yes.

**Q. Isn't it true that the photographs in this exhibit which contain an image of Mr. Portela could not possibly have been taken on January 11, 2014? Isn't that correct?**

A. I believe Mr. Portela was incarcerated at that time.

**Q. Exactly. As a matter of fact, Mr. Portela was arrested on November 18, 2013, correct?**

A. Yes, sir.

**Q. And he remained at the Dade County Jail until January of 2014, correct?**

A. I don't know exactly when he was transferred into federal custody.

**Q. Isn't it correct that he was transferred into federal custody for this case in January of 2014?**

A. Like I say, I don't know if it was exactly in January, but he was transferred.

**Q. Okay. Well, did you test -- do you recall testifying at hearings in this case in January of 2014 pertaining to Mr. Portela?**

A. I'm not sure exactly. I have testified in several hearings.

**Q. Okay. Would it be accurate to say that after Mr. Portela was arrested on November 18, 2013, he has remained in custody, either county or federal, since that date to the present?**

A. Yes.

**Q. So the pictures in Exhibit 362 with Mr. Portela in them could not actually have been taken on January 11, 2014, correct?**

A. It probably means that it was reposted on that day.

**Q. Exactly. But he was in custody, so the pictures could not have been taken in January of 2014?**

A. That's correct.

**Q. Okay. Now, Mr. Portela is charged with being involved in a conspiracy to possess with intent to distribute crack cocaine and methylone and marijuana between January of 2011 and approximately July or a little later 2014, correct?**

A. Yes, sir.

**Q. Now, with respect to that time frame, January of 2011 to July -- approximately July of 2014, that is the conspiracy charged in Count 1 of the indictment, can you specify between January of 2011 and July of 2014 any date on which Mr. Portela sold crack cocaine?**

A. No.

**Q. Can you specify between January of 2011 and July of 2014 any date on which Mr. Portela sold methylone?**
A. No, sir.
**Q. And can you specify any date in that time frame when Mr. Portela sold marijuana?**
A. November 18th.
**Q. Well --**
A. -- of 2013.
**Q. Is that from your investigation in the case a half a gram of marijuana was seized from him, correct?**
A. Yes, sir.
**Q. But he was not in the process of selling it at that moment, was he?**
A. He was in the process of going somewhere to sell it.
**Q. That's your opinion, right?**
A. That's what the evidence tells me.
**Q. Okay. But is there any transaction in which Mr. Portela actually sold marijuana to another person between January of 2011 and July of 2014?**
A. Transaction? No.
**Q. With respect to Mr. Portela, did you seize any large amounts of money from him in this case?**
A. No, sir.
**Q. Or any valuable assets of any kind? Jewelry, for instance?**
A. Firearms.

**Q. Well, jewelry, did you seize any jewelry?**

A. No.

**Q. No large amounts of money?**

A. No, sir.

**Q. No expensive vehicles?**

A. No, sir.

**Q. This is the -- this is in evidence. This is the marijuana which was taken from Mr. Portela on November 18, 2013, correct?**

A. Yes, sir.

**Q. From your experience in law enforcement -- well, let me ask it this way: This has been described by a chemist as approximately a half a gram of marijuana. From your experience as a law enforcement officer, do you know or have any idea what this half of a gram of marijuana, what it's value would have been on November 18, 2013?**

A. It depends on the seller or what people would ask for it. I wouldn't know.

**Q. You have no idea what a half a gram of marijuana would have gone for?**

A. A bag that size probably 10 or 20.

**Q. Ten to $20 in your opinion?**

A. Yes, sir.

**Q. That amount of marijuana, if not for sale, is also consistent with a person's personal consumption?**

MR. VÁZQUEZ: Objection; calls for legal conclusion.

THE COURT: Overruled.

A. I'm sorry, sir?

**Q. That amount of marijuana if not to be sold is consistent with a person's personal consumption or use of it, correct?**

A. If it could be sold, it could be consumed, yes.

MR. KORCHIN: I have no further questions, Your Honor.

THE COURT: Okay. Mr. Donet?

MR. VÁZQUEZ: Your Honor, permission to approach?

THE COURT: Yes.

(Bench conference commenced):

MR. VÁZQUEZ: Your Honor, we are going to object to the use of a demonstrative for the cross examination of this witness as irrelevant. This is certainly something Mr. Donet could use in his closing argument, but...

THE COURT: Okay. So what is it?

MR. DONET: Judge, what I propose to use are several photographs, four or five photographs depending on how the agent testifies, as to the BMT hand sign and its uniqueness. But one photograph would be of President Ronald Reagan displaying the BMT hand sign, LeBron James displaying the BMT hand sign, Jay Z displaying the BMT hand sign, members of the Black Eyed Peas displaying the BMT hand sign, and a young Michael Jackson displaying the BMT hand sign.

THE COURT: So tell me what the question is.

MR. DONET: Well --

THE COURT: These are isn't --

MR. DONET: It's a very popular sign in American culture. It's a very popular hand gesture in American culture. If he says no, then I can impeach him with those photographs. If he says yes, I guess I will move on.

I guess I will use them in closing argument if he gives me it's going to be a popular hand sign, but if he doesn't, I would like to impeach him.

There has been testimony that non-BMT members used the hand sign. It's been a highlight of the Government's case, three fingers up and the BMT hand sign. I should be able to show other members of the culture who are not members.

MR. VÁZQUEZ: These gestures are not consistent with the hand sign, which is down. Mr. Donet is A okay. This is down. That's my recollection of the images.

MR. DONET: Judge, I have them up on the podium, I can go get them. There is images with the palms facing themselves, with the palms facing out, and there is three fingers up, not three fingers down. That's the testimony.

MR. VÁZQUEZ: I don't think they are up like that.

(Bench conference concluded.)

THE COURT: So we will have our first break of the day. It will be a short one, but I need to review some evidence with the lawyers.

So I believe chips were requested last week, and we

have gotten some of those provisions.

Ten minutes.

(Jury retires at 12:20 PM.)

(Witness excused from the courtroom.)

THE COURT: Could you pull for me, Mr. Vázquez and/or Mr. Donet, the BMT sign? I do agree that Mr. Donet can use this in his closing as a demonstrative, but if there is some distinctiveness about the BMT directionally, I would like to see that.

MR. DONET: If I may be allowed to use the Elmo. Looking at Government's Exhibit 246 --

THE COURT: There we go.

MR. DONET: I apologize for not knowing how to work that. This is 246. You have, I believe, Mr. Zerquera, holding the three fingers sideways, you have Mr. Patron holding the three fingers up, not three fingers down, as Mr. Vázquez had commented.

On page 2, I forgot who the individual on the left-hand side of the screen is, but he is holding it palm out, three fingers out as the okay, or A okay sign. Very similar to how President Reagan was displaying the BMT hand sign in my proposed exhibit.

On page 3 of that exhibit we have another three fingers, I guess diagonally. These are from Exhibit 246. There is Mr. Tinoco. I'm not sure what page that is.

THE COURT: I think we can eliminate Mr. Jackson. I think he is doing the A okay here. A little too young to throw down yet, but the others I would allow you to cross examine the agent on.

MR. DONET: Here is one with Mr. Dixon with the palm out.

THE COURT: Okay.

MR. DONET: That's 332.

THE COURT: All right. So defendants -- well, go ahead with the young Mr. Jackson. Who am I to say? A through E will be --

MR. DONET: I believe it's B, Your Honor, because I had labeled something A earlier in the trial, but it wasn't introduced.

THE COURT: B is President Reagan?

MR. DONET: Yes, Judge. I don't have an A. I have B through -- I may have not put a sticker over on it.

THE COURT: So could you live with four?

MR. DONET: Sure.

THE COURT: The stickered ones?

MR. DONET: Yes, Judge.

THE COURT: Okay. Any other things with regard to the cross that -- so I don't --

MR. DONET: That's why I brought it to Mr. Vázquez's attention ahead of time.

THE COURT: Since we are -- is there anything, Mr. Rubio, with your cross that you think perhaps we would like to discuss before.

MR. RUBIO: I don't believe so.

THE COURT: Okay. I told them 10 minutes, and I gave them chips, right?

Does anyone need to take a bathroom break, because now is the time to do it.

All right. We will resume at 12:30.

(Recessed at 12:24 PM.)

(Resumed at 12:30 PM.)

THE COURT: Everyone may be seated. For the record, Ms. Merino asked -- she mentioned that she is leaving Sunday and wanted to make sure that everybody understood that. So that has been conveyed to me apropos of nothing. There was no inquiry made. We were passing out chips.

The witness isn't here? Good.

So, Mr. Donet, the question is: Agent you were aware, you will show him the sign, this is a fairly common American hand gesture. He says yes, and you have that for your closing, or he says no, and then you show him the pictures as part of an impeachment.

MR. DONET: Yes, Judge. My cross won't be very long. I can't imagine that it would be more than 15 minutes.

MR. VÁZQUEZ: Did Ms. Merino say, just to confirm, when

she was returning? Because we have some discrepancy on our notes as far as when she said she would be back.

THE COURT: She comes back the evening of the 12th. Somebody collect our witness.

MR. VÁZQUEZ: Yes.

(The witness returns to the witness stand.)

THE COURT: Everybody rise and please bring in the jury.

(Jury returns at 12:32 PM.)

THE COURT: Be seated everyone.

Mr. Donet.

**CROSS EXAMINATION**

**BY MR. DONET:**

**Q. Good afternoon, Agent. How are you?**

A. Good afternoon.

**Q. I want to talk to you about some of the evidence that you had gathered in this case. Specifically I want to talk about some of these Facebook postings and photographs. You were the one who acquired them through the search warrant, correct?**

A. Yes, sir.

**Q. And you reviewed them, correct?**

A. Yes, sir.

**Q. There are a lot of photographs that I went over in your direct testimony which you purport indicate affiliation with BMT, correct?**

A. Yes, sir.

**Q. And a lot of those photographs you don't know when they were taken, correct?**

A. That's correct, sir.

**Q. So they could have been taken over the course of just a few days or many months, correct?**

A. Possibility, yes.

**Q. All right. And with relation to some photographs related to Mr. Dixon, I'm going to show you Government's Exhibit 308. You do not know when that photograph was taken, correct?**

A. No, sir.

**Q. And with relation to Government's Exhibit 299, that's a photograph of Mr. Dixon. You don't know when that photograph was taken, correct?**

A. No, I can only tell when it was posted on the account.

**Q. Okay. Do you happen to know when this one was posted on the account?**

A. I would have to see the preceding pages. It will say it in there.

**Q. I believe your testimony with this exhibit, number 299, that this was near where some narcotics were located on May 2nd of 2014, correct?**

A. That's correct, sir.

**Q. On that date, May 2, 2014, Mr. Dixon was nowhere near those narcotics that were recovered, correct?**

A. I don't believe so.

**Q. And Mr. Dixon was not arrested that day regarding any narcotics that were found at that location, correct?**

A. No, he was not.

**Q. And you don't even know if he was there on that block on that day, correct?**

A. No, I don't have any information on that.

**Q. Now I'm showing you Government's Exhibit 245. You don't have a recollection as to when that photograph was taken, correct?**

A. No, sir, I do not.

**Q. But I guess you could tell that it was posted on page 160 of -- I guess this is Angel Martinez's Facebook account?**

A. Yes, sir.

**Q. Now, in this same exhibit there is some postings, but these postings occur some 80 pages later, page 247, correct?**

A. I'm not sure if that's the actual -- if this stuff that was shown on the screen is actually related to the photograph.

**Q. I see. I'm just going by the top page number on Government's Exhibit 245.**

A. Okay. But that might not necessarily be the preceding page of that photograph.

**Q. Right. I know it's not. There is 80 pages in between of Facebook posts. The last page is another photograph of Mr. Dixon. That's page 770 of this search warrant return,**

**correct?**

A. Yes, sir.

**Q. And you would agree with me that that photograph was taken on the same day as this photograph, as both Mr. Dixon and Mr. Martinez are wearing the same clothes and it's at the same location, correct?**

A. It's a possibility.

**Q. Chances are they are standing in front of the same wall wearing the same clothes, it's reasonable to assume that those two photographs were taken at the same time?**

A. It could be.

**Q. Now, as to Government's Exhibit 246, this is a composite exhibit, and Mr. Dixon came out -- I believe this was from Dayaan Zerquera's account. This photograph of Mr. Dixon, could you tell when that photograph was taken?**

A. No, sir.

**Q. How about this photograph where Mr. Dixon comes out, do we know when that photograph was taken?**

A. Not just looking at the photograph, no.

**Q. Or this photograph, do you know when that one was taken?**

A. Not just by looking at the photograph.

**Q. I guess this is the last photograph that you introduced. This one, Government's Exhibit 332, does have the data log with the posting. I believe we can tell it was posted on February 23, 2014, correct, on the top?**

A. Yes, sir.

**Q. But we don't know if the photograph was taken that day? That's just when it was posted, correct?**

A. That's correct, sir.

**Q. Similar to what Mr. Korchin brought up with Mr. Portela, there was a photograph posted when it was physically impossible for him to have been there. It was clearly an older photograph that was posted later on, correct?**

A. Yes, sir.

**Q. Now, you spoke a lot in your testimony about the BMT hand sign. And the BMT hand sign is something that's unique to that gang, correct, or that group, correct?**

A. I believe so, sir.

**Q. And in your training and experience, you know that gang signs are very unique, correct?**

A. Yes, sir.

**Q. And wouldn't you agree that most hand signs require some skill? I mean, you have to kind of contort your hand or fingers in a difficult way, and being able to do that shows that, you know, you really are part of that group, correct?**

A. I don't know about requires some skill to do a sign.

**Q. Would you agree that what you call the BMT hand sign, the three fingers up, that's a hand gesture relatively easy to make, correct?**

A. To me it is.

**Q. And you are familiar with other gangs and other hand signs associated with other gangs, correct?**

A. Yes.

**Q. You are familiar with I believe it was the Allapattah that was discussed in this case, and that required some type of contorting your fingers in a difficult way, correct?**

A. Every gang has a different requirement, I guess, for their signs. I don't know -- I mean, I can't say that it necessarily requires skill.

**Q. You would agree it's more difficult, correct?**

A. I guess, yeah, in your point of view.

**Q. Now, this BMT hand sign that you have talked about, it's a very common hand gesture in American society, correct?**

A. Sometimes.

**Q. Wouldn't you agree that it's something that all people from all sectors of American society use it as a common hand sign?**

A. No, not necessarily.

**Q. Okay. And so somebody who uses that hand sign you would automatically associate as somebody who is with BMT or somehow affiliated?**

A. No, I don't think it gets used in the same context.

**Q. But you don't believe it to be a popular type of hand gesture, correct?**

A. I believe the context is what makes it the association.

MR. VÁZQUEZ: Objection based on the Court's ruling.

THE COURT: Well, approach.

(Bench conference commenced):

THE COURT: I think he kind of got away from you there in the context. It's something that you can use in closing, but I think he said whether or not it was BMT depended on context.

MR. DONET: Okay. Judge, I should be able to show him and he can testify that based on that context no it's not or based on the other context it is.

THE COURT: Pick a picture. One picture.

MR. DONET: I would ask for two pictures.

MR. VÁZQUEZ: This is argumentative. This is purely argumentative. This is to make a spectacle of this agent.

THE COURT: He is walking through the door here. How he walks through the door and when he walks through the door --

MR. VÁZQUEZ: The agent did not say that was some sort of foreign gesture that was impossible to do, and he was denied -- and despite the fact that he did not get what the Court said was the predicate, he is still going after it. That is purely for the spectacle purpose.

The agent did not say that this is some sort of impossible hand sign that makes President Reagan a member of this criminal group. He did not say that. So the sole purpose of doing this is to create this demonstration.

MR. DONET: Judge, I would argue that he did say it was a unique hand sign, that it was unique, and then he added at the

very end it depends on the context. But I should be allowed to cross-examine in on this context.

THE COURT: You can cross-examine as to -- as opposed to the context, but I think that the demonstratives can wait until the closing.

MR. DONET: Yes, Judge.

(Bench conference concluded.)

**CONTINUED CROSS EXAMINATION**

**BY MR. DONET:**

**Q. Now, Mr. Perez, based on your investigation, you have never seen any images of Mr. Dixon using any other gang signs, correct?**

A. No, sir.

**Q. You have never seen him using any images of that Allapattah gang sign or hand gesture?**

A. No, sir, I don't recall any instances.

**Q. And there has been discussion of an AP Mob or some other gang or association, and you have never seen any images of Mr. Dixon displaying any of those hand signs, correct?**

A. No, sir, I don't recall any.

**Q. Now, I want to talk a bit about the jail phone calls. I believe you testified there were over 100 hours of jail phone calls?**

A. A lot more than that.

**Q. A lot more? What would be your estimate, your best**

**estimate?**
A. Probably a couple hundred.
**Q. A couple hundred hours?**
A. Yeah.
**Q. Of those phone calls?**
A. Yes, sir.
**Q. Now, on those phone calls you would agree with me it's very difficult to understand everything that is said, correct?**
A. Some parts of it are difficult, yes.
**Q. And you would agree with me that the voices are also very similar at times, correct?**
A. No, I wouldn't say that.
**Q. Well, in fact, I believe it's Exhibit 73 in the transcript for Exhibit 73, that transcript, there is a disclaimer that the voices aren't 100 percent accurate because of the similarity in the voices and poor quality, correct?**
A. I would have to look at it.
**Q. Do you have your transcript binder there, sir?**
A. Not of the jailhouse.
**Q. I'm sorry, Agent, I don't have the tab number for that, but it's Exhibit 73. I believe that's a call that was placed in November.**
MR. VÁZQUEZ: For the purpose of the record, it's tab 19.
THE COURT: Thank you, Mr. Vázquez.

MR. DONET: Thank you.

A. I believe that disclaimer is in most of the jail calls.

**Q. So on most of the jail calls, the company or the individuals that you had transcribe it, they themselves couldn't be 100 percent sure of the identity, correct?**

A. They are not as familiar with the voices as I am.

**Q. But you are sure? You heard every second of those calls, and you are sure as to the voices?**

A. I mean, I'm pretty sure. I could make a mistake, but I'm pretty familiar with the voices.

**Q. Okay. In fact, as to transcript number 68, I'm not sure what tab that is, maybe five tabs back. What tab is that, sir?**

MR. VÁZQUEZ: For purposes of the record, tab 14.

**BY MR. DONET:**

**Q. On tab 14, Exhibit 68, you testified that that was Mr. Dixon's voice. But if you listen carefully to that recording again and compare it to Mr. Moore's voice, the reality is that's Mr. Moore speaking and not Mr. Dixon, wouldn't you agree with me?**

A. I couldn't tell you that because I would have to have the recording played so that I can compare.

**Q. Now, of the couple hundred hours of jail phone calls, I believe what was introduced in evidence here was maybe less than 15 minutes or 10 minutes of Mr. Dixon's voice on any one of those phone calls, correct?**

A. I don't know the exact amount.

**Q. There was only a handful, a half a dozen phone calls, correct?**

A. Yeah. I believe it was six or seven of them, yeah.

**Q. Now, you also reviewed over 100,000 pages of Facebook, correct?**

A. Yes, sir.

**Q. And those were search warrants that were obtained on a number of individuals, correct?**

A. Yes, sir.

**Q. You never obtained a search warrant for any Facebook account of Mr. Dixon, correct?**

A. That's correct.

**Q. You never obtained a search warrant for any Twitter account of Mr. Dixon, correct?**

A. I didn't get a search warrant for Twitter for any account.

**Q. So no social media for Mr. Dixon? You didn't look? You didn't try to look, correct?**

A. I tried to look. I didn't find any right away.

**Q. Okay. And there were no search warrants regarding his cell phone to get text messages, correct?**

A. That is correct.

**Q. And the text message -- I believe the testimony was there was over 50,000 text messages, correct?**

A. Yes, sir.

**Q. Now, in your review of all these Facebook postings, Mr. Dixon never posted anything on any Facebook or other types of social media, correct?**
A. That I was able to find, no.
**Q. He never posted or bragged about any affiliation with BMT, correct?**
A. I don't know if he posted them. I didn't find any.
**Q. You didn't find anything regarding him bragging or boasting about the sale of narcotics, did you?**
A. That's correct.
**Q. You never found any postings of Mr. Dixon and other members, other defendants or people that you have talked about, discussing any narcotics transactions, correct?**
A. I'm sorry, can you repeat that question?
**Q. Sure. You didn't find any postings by Mr. Dixon of him discussing narcotic transactions with any other individuals, correct?**
A. That's correct.
**Q. You didn't find any postings or text message of Mr. Dixon with regards to any robberies or other crimes, correct? Where he posted anything?**
A. Well, he posted on social media, no, but on jail calls he does discuss robberies.
**Q. No, no, no. The jail calls are what the jail calls are, correct?**

A. Yes, sir.
**Q. And the jury can hear that, and they will make up their own mind as to what the conversations were, correct?**
A. That's correct.
**Q. But I'm talking about Facebook and social media. He never posted any discussion of anybody else about committing other crimes or about any narcotics transactions, correct?**
A. No, sir, none that I could find.
**Q. In fact, any mention of Mr. Dixon is posts made by other individuals, correct?**
A. Yes, sir.
**Q. Now, with regards to the cell phones, there were nine different accounts that were encompassed by the search warrants, correct?**
A. I'm not sure about the amount. It was several, yeah.
**Q. Okay. And it was roughly 6 months of activity, October through -- I believe it was October through April, October '13 through April '14, that you reviewed?**
A. Yes. Somewhere around that neighborhood, yes.
**Q. Now, Mr. Dixon is not related by blood with any of the other members in this organization that you have testified about, correct, as far as you know?**
A. As far as I know, no.
**Q. And Mr. Dixon doesn't speak Spanish, correct?**
A. I don't know that.

**Q. Okay. And as far as you know, Mr. Dixon was never raised in Allapattah or Little Havana, correct?**
A. I'm not aware of any information like that, no.
**Q. Well, you were involved in the arrest of Mr. Dixon, correct?**
A. I was but I wouldn't know where he was raised.
**Q. Okay. But you know that Mr. Dixon lived in Overtown, correct?**
A. At some point, yes.
**Q. That's part of the investigation you did? You wanted to find out a little bit about Dixon, correct?**
A. Yes, sir.
**Q. So you knew he was from Overtown?**
A. Yeah, at some point he was.
**Q. And when Mr. Dixon was arrested, you checked the -- normal procedure to check and document any tattoos, correct?**
A. Yes, sir.
**Q. And I believe it was either your testimony or perhaps within your knowledge that gang tattoos are a sign of a gang affiliation, correct?**
A. I haven't testified to that.
**Q. Okay. In your experience gang tattoos is a sign of a gang affiliation, correct?**
A. Not necessarily.
**Q. All right. But Mr. Dixon doesn't have any BMT tattoos, correct?**

A. I believe only two people in the organization do.

**Q. Okay. In fact, Mr. Dixon doesn't have any tattoos, correct?**

A. Yeah, that I know of, no.

**Q. And Mr. Dixon at the time of this conspiracy, we are talking about this October '13 to June of 2014, he is only 19 or 20 years old at the time, correct?**

A. Are you referring to the time of the phone calls?

**Q. The time of the phone calls he was 19 and then he turned 20 at some point, correct?**

A. I'm not sure what his birthday is at that point. I have looked at it, I just don't know it off the top of my head.

**Q. You don't remember any posts of Mr. Dixon talking about going to strip clubs or any other nightclubs, correct?**

A. That's correct.

**Q. There were other people who you saw posts about going out to nightclubs, but you never saw anything related to Mr. Dixon joining them to any of those nightclubs, correct?**

A. No.

**Q. And you came across information on social media of other members socializing together at nightclubs or on Miami Beach or at other events, but in any of that social media did you ever see any indication that Mr. Dixon participated in any of that, correct?**

A. I don't recall off the top of my head right now.

**Q. And I believe you testified that there was a pole camera**

**that was installed, I believe, in April of 2014 -- two pole cameras that were installed April of 2014, correct?**
A. Yes, sir.
**Q. And one of those pole cameras was directed right there what you testified to is the trap, correct?**
A. They were not directed at the property itself. They encompass part of the neighborhood which one of those -- actually, two of those addresses were in between the area that the cameras covered.
**Q. Sure. And that camera was running 24 hours a day, correct?**
A. Yes, sir.
**Q. For about 5 months more or less, a little less?**
A. Yes.
**Q. Now, Mr. Dixon, according to your investigation, first has contact or was first seen or heard of within this group it's not until November of 2013, correct?**
A. Yes, sir.
**Q. This indictment the conspiracy period talks about events that happen in 2011 or beginning of 2011. But Mr. Dixon isn't even on your radar screen until November of -- the end of November of 2013, correct?**
A. Yes, that's correct, that's when I first noticed Mr. Dixon.
**Q. All right. And you have no -- you have no information or you have no evidence that Mr. Dixon was involved in any robbery, that is, the robberies that were testified to here, correct?**

A. Well, from interviews of cooperating defendants, yes.

**Q. Evidence, hard evidence, physical evidence, do you have any physical evidence that would indicate that Mr. Dixon was involved in any robbery?**

A. No, I do not.

**Q. Do you have any physical evidence, any concrete evidence that Mr. Dixon was involved in harassing any of the individuals in the neighborhood?**

A. I don't.

**Q. Now, as part of this investigation, Mr. Dixon was stopped numerous times by Detective Bernat, Detective Coladas, and others that were participating in this investigation, correct?**

MR. VÁZQUEZ: I'm going to object. Calls for hearsay.

THE COURT: Overruled.

**BY MR. DONET:**

**Q. If you know.**

A. I'm not too sure how many times they had contact with him.

**Q. But you know --**

A. They have had contact with him, I just don't know how many times.

**Q. Sure. That's fair. But they have never, as far as you know, they never located any firearms on Mr. Dixon, correct?**

A. That's correct.

**Q. Never found large amounts of money on Mr. Dixon?**

A. That's correct.

**Q. Never found any narcotics on Mr. Dixon?**
A. Not on his person, no.
**Q. Now, as far as your investigation of Mr. Dixon, we know that he doesn't own any real property, doesn't own any real estate, correct?**
A. That's correct.
**Q. He doesn't have any bank accounts that you were able to find, correct?**
A. That's correct.
**Q. He didn't have any large amounts of cash when he was arrested or at any other time that he was encountered with by law enforcement, correct?**
A. That's correct.
**Q. Doesn't own any cars, correct?**
A. Correct.
**Q. During the course of your investigation, you never saw him driving, like, a fancy rental car or any rental cars, correct, where he, like, leased a Mercedes or leased some type of car, correct?**
A. No, sir.
**Q. As a matter of fact, about every single time Mr. Dixon is seen, he is either walking or maybe riding a bike, correct?**
A. Or in his girlfriend's car.
**Q. Okay. Now, in part of this investigation you never saw Mr. Dixon go to any fancy restaurant and spend lots of money?**

A. That's correct.

**Q. Now, in your experience, drug trafficking, crime trafficking organizations usually have a cache of cash, would that be true?**

MR. VÁZQUEZ: Objection; relevance.

THE COURT: Overruled.

A. Not necessarily.

MR. DONET: If I may just have one moment, Your Honor.

THE COURT: Yes.

**BY MR. DONET:**

**Q. Now, as to the amount of crack cocaine that's involved in this conspiracy, the only amount that was seized by the police were the amounts during these 20 or 21 or 22 undercover buys, correct?**

A. And the narcotics that we found on May 2nd after -- well, you can say they were abandoned. They are obviously hidden in the same manner that it was hidden when your client went to retrieve it for the seller that he did on April 1st.

**Q. Those are the only narcotics that were recovered, correct?**

A. Yes, sir.

**Q. And those narcotics that were purchased were always at the direction of Detective Veloz or the CI? They requested those amounts, correct?**

A. Yes.

**Q. And there were times when they requested a larger amount or larger amount, and the people who provided the crack had trouble**

**getting it together? They had to pull it together or get it together from different people, correct?**

A. Sometimes, yes.

**Q. Would it be fair to say that it was the police that was driving the weight or the amount of crack that was being bought? You guys, the police, law enforcement were the ones that were driving that amount higher and higher as the investigation went on, correct?**

A. No. We requested whether they could come up with the amounts, and for the most part they did.

**Q. Now, the only date that you had any physical proof that Mr. Dixon sold narcotics was on April 1, 2014, correct?**

A. Actual physical purchase from him, yes, on April 1st.

**Q. And that was just two-tenths of one gram of crack cocaine, correct? Six little rocks?**

A. I don't know the specific amount from memory.

MR. DONET: I have no further questions.

THE COURT: Mr. Rubio.

**CROSS EXAMINATION**

**BY MR. RUBIO:**

**Q. Agent Perez, I wanted to ask you some questions about your investigation in this particular case. Understand?**

A. Yes, sir.

**Q. You stated that your investigation started back on July 16th of 2013; is that correct? You came into the investigation?**

A. Well, sometime after July 26th.

**Q. Okay.**

A. I think it was the beginning of August, somewhere around there.

**Q. Of 2013?**

A. Yes, sir.

**Q. And I believe it was your testimony that -- this investigation commenced by you listening to some conversation -- jailhouse conversations or conversations from the jail; is that correct?**

A. No, sir. It began with the arrest of Mr. Portela.

**Q. Did you obtain search warrants in this case?**

A. Yes, sir, I did.

**Q. And would it be fair to say that you got those search warrants as a result of names that you learned from jailhouse calls?**

A. Some were, yes.

**Q. And I believe it was your testimony that after you got these search warrants, you then made controlled purchases? You made controlled purchases in this case?**

A. Yes, at some point we did.

**Q. And I believe you used the term "confidential informant"?**

A. Yes, sir.

**Q. And that's where you used someone wired for sound, and as we have seen in this case you wired for video in this case,**

**correct?**

A. Yes, sir.

**Q. Would it be fair to say that at no time was any confidential informant sent to make a purchase from Mr. Flores?**

A. That's correct.

**Q. And, in fact, no drugs had been seized from Mr. Flores during this investigation other than on the date of his arrest in June of 2014, correct?**

A. Yes, sir, that's correct.

**Q. And the only drug that was attributable to Mr. Flores that has been introduced into evidence is the personal use or personal use amount of marijuana that was recovered when he was arrested back on June of 2014?**

MR. VÁZQUEZ: Objection; calls for legal conclusion.

THE COURT: Overruled.

A. No, sir, that was not personal use amount. That was individually wrapped for sale.

**Q. All right. Do you recall the amount?**

A. No, not from memory.

**Q. But it's been introduced, has it not? It was in a small packet?**

A. It's been introduced.

**Q. Okay. Now, Mr. Flores is not charged in any specific drug count other than the conspiracy in this case; is that correct?**

A. That's correct, sir.

**Q. And would it be fair to say that your investigation revealed that he never sold any drugs from any of the traps or locations that were introduced in photographs by the Government, correct?**
A. No, I can't say that. We didn't see him sell from there, but that doesn't mean he didn't.
**Q. You don't have any proof or any evidence that he ever sold from any of these traps, correct?**
A. Not on video or on recording, no.
**Q. In fact, you are the lead agent in this case, correct?**
A. Yes, sir.
**Q. And you sat through this case?**
A. Yes.
**Q. And you are aware of all of the reports and investigations by other officers in this case, correct?**
A. Yes, sir.
**Q. And you heard -- you have also debriefed certain individuals that were arrested in this case, correct?**
A. Yes, sir.
**Q. And what we mean by debriefed is you talked to them about what their activities were in this case, correct?**
A. Yes, sir.
**Q. And while you were sitting here with the Government listening to the evidence, you heard testimony from Mr. Guzman, who is a cooperating defendant, correct?**
A. That's correct.

**Q. You also heard testimony from a cooperating defendant by the name of Dayaan Zerquera, correct?**

A. That's correct.

**Q. And would it be fair that they said, they indicated that they never saw Mr. Flores selling from any of those locations that were photographed and introduced by the Government?**

MR. VÁZQUEZ: Your Honor, one, hearsay. Two comment on the testimony of another witness.

THE COURT: Yes, sustained.

**BY MR. RUBIO:**

**Q. Now, did your investigation reveal to you that Mr. Flores was not in the area of Little Havana and was, in fact, not in the area of Miami from mid April of 2013 through the end of October of 2013?**

A. No, I don't have any knowledge of that.

**Q. Did your investigation ever reveal that he was sent to a residential drug program in Tampa?**

MR. VÁZQUEZ: Objection; relevance.

**Q. If you know.**

THE COURT: Gentlemen, approach.

(Bench conference commenced):

THE COURT: So if he knows.

MR. VÁZQUEZ: I have no qualm with if the witness knows that he was for whatever reason out of pocket or not available. What I have had an issue with Mr. Rubio on this is that this is

an appeal for sympathy. Where he was is irrelevant. That he was not there is relevant; I agree with that.

MR. RUBIO: Judge, if I may, I'm looking for prejudice for us, not sympathy in this manner. I think my questioning will show that under Government's Exhibit 265, you are not going to find any text messages from Mr. Flores during that period of time.

THE COURT: Previous counsel had, you know, it was a different situation, but they indicated that it was physically impossible for the posts to have been done because their client wasn't available.

You may ask did your investigation reveal that he was not, in fact, in Little Havana. He said he didn't know. Then just say so you were unaware that my client was not in the vicinity of these events from this time to this time, and then if you want to prove where he was, you can.

MR. VÁZQUEZ: We object to that where he was. We can prove that he was out of pocket, but to put in front of the jury that he was in a residential drug program I think --

THE COURT: If his client takes the stand, I'm going to let him say whatever he needs to, but that's how that gets in. All right.

(Bench conference concluded.)

THE COURT: So rephrase that, Mr. Rubio.

**BY MR. RUBIO:**

**Q. Agent Flores --**

A. I'm not Agent Flores.

**Q. I'm sorry, Agent Perez. What did I say?**

THE COURT: Flores.

**Q. I'm sorry. My apologies.**

**Agent Perez, were you aware that Mr. Flores was not in Little Havana or not in Miami during that period of time of mid April 2013 through October of 2013?**

A. No, sir, I'm not aware of that information.

**Q. Okay. Now, you are familiar with the Government's Exhibit 265. That would have been all the text messages that you secured from a search warrant that related to Mr. Flores? Are you familiar with the --**

A. I wouldn't know if that's exactly the corresponding exhibit number for it.

**Q. Okay. Let's talk about the text messages that were recovered from Mr. Flores' text messages from his phone. Would you agree that there are no text messages between the middle of October -- excuse me, the middle of April 2013 through the middle or the end of October of 2013?**

A. I couldn't tell from the actual text messages because we only requested from October 2013 on. So if it happened before that, I wouldn't have any text messages.

**Q. So you are saying that you have no text messages belonging**

**to Mr. Flores prior to October of 2013?**
A. I don't believe we requested before October of 2013.
MR. RUBIO: May I request Exhibit 265 from the Government and approach this agent, Your Honor?
THE COURT: Sure.
MR. RUBIO: May I approach?
THE COURT: You may.
**BY MR. RUBIO:**
**Q. Agent, are you now familiar with that particular exhibit, and particularly tab 9 that I just opened it up for you?**
A. Yes, sir.
**Q. Does it not, in fact, show text messages beginning in January of 2013?**
A. No, sir. It starts in January of 2014.
**Q. Okay.**
MR. RUBIO: May I approach the witness?
THE COURT: Yes.
MR. RUBIO: My apologies. The witness is correct.
THE COURT: Okay.
**BY MR. RUBIO:**
**Q. Agent Perez, would it be fair to say that based upon all of those text messages that you have just referred to that commenced -- you said it started after October of 2014, correct?**
A. We requested after October, yes.
**Q. And that exhibit shows that there were text messages**

**commencing in January of 2014; is that correct?**

A. That's what we received from Metro PCS, yes.

**Q. And would it be fair to say that no charges arose or no charges were presented against Mr. Perez -- excuse me, Mr. Flores as a result of those text messages?**

MR. VÁZQUEZ: Objection; calls for legal conclusion.

THE COURT: Yes, sustained.

**BY MR. RUBIO:**

**Q. Other than the charge of conspiracy, has Mr. Flores been arrested for any other offense during this investigation?**

MR. VÁZQUEZ: Objection; relevance.

THE COURT: Overruled.

A. For any -- I'm sorry, can you repeat the question?

**Q. Other than for the offense of conspiracy in this charge, has Mr. Flores been arrested for any other offense as a result of this investigation?**

A. He hasn't been indicted for anything else other than conspiracy.

**Q. He was only indicted for the conspiracy?**

A. Yes, sir.

**Q. Now, we have heard testimony about a pole surveillance camera. Are you familiar with that?**

A. Yes, sir.

**Q. And have you had occasion to review that camera?**

A. Yes, sir.

**Q. In fact, I believe that it was like a 2 terabyte hard disk of surveillance photos that were accumulated during your investigation?**

A. Bigger, sir.

**Q. And would it be fair to say that at no point was Mr. Flores ever identified in that surveillance tape?**

A. I have seen Mr. Flores on the surveillance.

**Q. On the surveillance tape?**

A. Yes.

**Q. And that tape has not been introduced; is that correct?**

A. That's correct.

**Q. Now, would it be fair to say as a result of your investigation, there has been no evidence that Mr. Flores participated in any robberies; is that correct?**

A. That's correct.

**Q. And it would be fair to say that Mr. Flores has never been charged with any robbery; is that correct?**

A. Yes, sir, that's correct.

**Q. And would it also be fair to say that Mr. -- there is no evidence that Mr. Flores participated in any shootings; is that correct?**

A. That's correct.

**Q. And Mr. Flores is not charged with any shootings; is that correct?**

A. That's correct, sir.

**Q. And would it also be fair to say that there is no evidence that Mr. Flores was even present during any of the shootings; is that correct?**

A. That is correct.

**Q. Now, we have heard some testimony from several -- a couple of cooperating witnesses that Mr. Flores was sent customers. Do you recall that?**

MR. VÁZQUEZ: Your Honor, object to hearsay and comment on the testimony of another witness.

THE COURT: I don't know where -- he can answer the question. It's just the next question we have to --

So you heard that testimony, yes?

THE WITNESS: I heard that testimony, yes.

THE COURT: Okay. Next question, Mr. Rubio.

**BY MR. RUBIO:**

**Q. No drugs were ever recovered from any alleged sales that Mr. Flores made; is that correct?**

A. That is correct.

**Q. Okay. And your debriefings of codefendants who have decided to cooperate in this case, you have had information from these very cooperators that Mr. Flores was not a member of BMT, was not a formal member of BMT, correct?**

MR. VÁZQUEZ: Objection; calls for hearsay and comment on the testimony of another witness.

THE COURT: It does call for hearsay, so I will sustain

that objection.

MR. RUBIO: One moment, Judge.

I have nothing further, Judge.

THE COURT: All right. Redirect, Mr. Vázquez?

**REDIRECT EXAMINATION**

**BY MR. VÁZQUEZ:**

**Q. Agent, in the course of this investigation, did you see Mr. Chacon, Mr. Altamirano, Mr. Dixon participate in the undercover drug sales?**

A. Yes, sir, I did.

**Q. I want to draw your attention to Government's 104. Do you recall the November 2013 drug transaction involving defendant Raymond Moore that's been admitted into evidence?**

A. Yes, sir, I do.

**Q. Who was present?**

A. Raymond Moore and Mr. Dixon.

**Q. Agent, Government's 104, we talked about music videos earlier and things of that nature. Was the ATF and City of Miami participating in a music video for the creation of this exhibit?**

A. No, sir.

**Q. Showing you Government's 114, do you recognize it?**

A. Yes, sir, I do.

**Q. Who is in it?**

A. That would be Mr. Chacon and Mr. Dixon.

**Q. And where was this?**

A. That was at 435 N.W. 11th Avenue.

**Q. Did the ATF and City of Miami participate in any kind of music video for this matter?**

A. No, sir.

**Q. Showing you Government's 176, do you recognize it?**

A. Yes, sir, I do.

**Q. Who is in Government's 176?**

A. Mr. James Dixon.

**Q. Where is Government's 176 taking place at?**

A. 428 N.W. 11th Avenue.

**Q. And drawing reference to the video that's in evidence that corresponds with Government's 176, who participated in this event?**

A. Mr. James Dixon, the undercover agent, and the confidential informant, as well as Mr. Rodriguez.

**Q. Agent, while you were conducting the undercover investigation, you made reference to hand signs, drawing attention to Mr. Donet's line of questioning. Do you recall that testimony earlier?**

A. Yes, sir.

**Q. While you were in the area of 428 N.W. 11th Avenue, did you see random people throwing up the hand sign that you have attributed in the course of your testimony to BMT?**

MR. DONET: Objection; leading.

THE COURT: Yes. And let's not open the door, Mr. Vázquez. So don't lead.

**BY MR. VÁZQUEZ:**

**Q. Who did you see during the investigation demonstrating the BMT hand sign in the area of 428 N.W. 11th Avenue?**

MR. HOROWITZ: Objection.

THE COURT: Overruled.

MR. HOROWITZ: As to time.

THE COURT: Well, we have the place. I mean, I guess it would be --

MR. VÁZQUEZ: We have in the course of the investigation.

THE COURT: And within the time specified in the indictment, so overruled.

A. Only members or associates of BMT.

**Q. You were asked earlier about familiar, family association, between some of the members, correct?**

A. Yes, sir.

**Q. And in your testimony with regard to Mr. Donet, you stated that Mr. Dixon, to the extent that you know, is not blood related to some of the members of BMT; is that correct?**

A. Yes, sir.

**Q. I want to show you an image in the Zerquera Facebook account and its corresponding post. Do you know if Mr. Zerquera and Mr. Alioth Salas are related by blood?**

A. I don't -- no, they don't.

**Q. Agent, you were also shown a number of pictures and different members of the defense asked you questions about the pictures. Your testimony, if I recall correctly, was you don't know exactly when the images were taken; is that correct?**

A. Yes, sir.

**Q. From looking at the images, from looking at the images, do the defendants reasonably appear of the same age as to when you interacted with them during the course of this investigation?**

MR. HOROWITZ: Objection; leading.

MR. KORCHIN: Form; leading.

MR. DONET: Objection.

THE COURT: Overruled.

A. Yes, sir, they look like recent pictures.

**Q. Agent, in the course of this investigation, did you secure a Facebook interaction between the Rodolfo Portela account and the Chris Ramirez account?**

A. Yes, sir, I did.

**Q. On November 18, 2013, was there a conversation regarding the provision of marijuana?**

A. Yes, sir.

**Q. Showing you Government's 242. Was there a request for Mr. Ramirez to get marijuana from Mr. Portela on November 18, 2013?**

A. There was.

**Q. When was Mr. Portela arrested last?**
A. He was arrested on November 18, 2013.
**Q. What was found on his person on November 18, 2013?**
A. There was a bag of marijuana and a firearm recovered from him.
**Q. Agent, in the course of this investigation, did you secure images of Mr. Jay Anthony Flores associating with Mr. Chacon?**
A. I did.
**Q. Showing you Government's 287, where is this?**
A. This was in the area of 13th Avenue and N.W. 3rd Street.
**Q. And how far is that from the area in which the BMT have been identified selling narcotics?**
A. About two blocks away.
**Q. Showing you Government's 363, do you recognize it?**
A. Yes, sir, I do.
**Q. What is it?**
A. That's a photograph of Mr. Chacon and Mr. Flores.
**Q. And do you have a general idea of where this image is taken?**
A. I don't recognize that location.
**Q. In the course of the investigation, did you review Mr. Flores's text message?**
A. Yes, sir, I did.
**Q. Were those -- did those text messages include interaction with BMT accounts?**
A. Yes, sir.

**Q. In the course of these text messages, did Mr. Flores's account provide advertisement to the sale of a firearm?**
A. Yes, sir.
**Q. Did Mr. Flores's account make reference to the sale of narcotics?**
A. Yes, sir.
**Q. Did Mr. Flores identify the sale of narcotics in the area of the BMT's distribution locations?**
A. Yes, sir.
**Q. Agent, in the course of this investigation, did you monitor the social media accounts for how members -- some members of BMT were spending money?**
A. Yes, sir.
MR. VÁZQUEZ: Permission to approach, Your Honor?
THE COURT: Yes.
**BY MR. VÁZQUEZ:**
**Q. Agent, I'm showing you what has been marked as Government's 364; it's a new exhibit. It is a four-page exhibit. Do you recognize this, this composite from the Facebook search warrant return?**
A. Yes, sir, I do.
**Q. Is this a fair and accurate representation of the postings on the Chacon account?**
A. Yes, sir, it is.
MR. VÁZQUEZ: At this time I would move Government's

364 into evidence.

THE COURT: Any objection?

MR. GONZALEZ: Yes. Beyond the scope of redirect.

THE COURT: You can pass it up to me, Mr. Vázquez.

MR. VÁZQUEZ: I need to explain.

THE COURT: All right. Come sidebar.

(Bench conference commenced):

THE COURT: So, I mean, they are just more pictures.

MR. VÁZQUEZ: It shows them spending money. It costs money to get into these establishments. They are enjoying the fruits of their labor. And Mr. Horowitz on the last page said there was no picture of Mr. Altamirano throwing up the BMT hand sign. We found one for him.

THE COURT: There you go.

MR. GONZALEZ: Are we going to get an opportunity to recross on this document?

THE COURT: Why? It's rebutting what you brought up on your cross. You said these poor people, they had no money, no cars because they were not wise in investing with their friends. And Mr. Horowitz said no sign, and there you go, the universal sign, as we will find out in your closing, but nonetheless in context a BMT sign.

MR. GONZALEZ: We should get a chance to cross on the document.

THE COURT: He didn't need it until you brought it up.

MR. GONZALEZ: I ask for recross.

THE COURT: No, no recross.

MR. GONZALEZ: Okay.

(Bench conference concluded.)

MR. VÁZQUEZ: Your Honor, the Government would move 364, a four-page composite, into evidence.

THE COURT: Is it 364 or 264?

MR. VÁZQUEZ: It's 364.

THE COURT: Government's 364 is admitted.

(Document marked as Government's Exhibit 364 admitted into evidence)

MR. VÁZQUEZ: Permission to publish?

THE COURT: You may.

**BY MR. VÁZQUEZ:**

**Q. Agent, I'm showing you the first page of Government's 364. Do you see it?**

A. Yes, sir.

**Q. And are you able to see it with the glare? I apologize.**

A. I can see most of it.

**Q. What is it?**

A. Photograph of Angel Martinez and Mr. Chacon that appears to be at a nightclub.

**Q. And what are they doing?**

A. Holding bottles of vodka.

**Q. And do you know from any personal experience buying items**

**what the approximate value of these items might be?**

THE COURT: Well --

MR. GONZALEZ: Objection.

MR. HOROWITZ: Objection.

THE COURT: Yes, sustained.

**BY MR. VÁZQUEZ:**

**Q. Showing you the second page, Government's 364, do you recognize it?**

A. Yes, sir, I do.

**Q. What is it?**

A. Another photograph of a nightclub with Mr. Chacon, Mr. Martinez, and I'm having trouble seeing the rest of the subjects in the photograph.

MR. VÁZQUEZ: Permission to approach, Your Honor? The glare is too much.

THE COURT: Yes.

**BY MR. VÁZQUEZ:**

**Q. Agent, if you would describe it to the best of your ability.**

A. Yes. It's a photograph with Angel Martinez on the right side of the photograph, Michael Piedy right next to him on his left, Moises Pineer right next to -- right to the left of Mr. Piedy. Right in the middle of the photograph is Mr. Chacon. There is a male behind Mr. Chacon that I can't identify, and to the left of him is Freddy Chacon, and they are inside a nightclub.

**Q. Agent, I'm showing you another image. Do you recognize it?**
A. Yes, sir, I do.
**Q. What is it?**
A. It's a photograph of Mr. Chacon, Freddy Chacon, Babou Fortun, Luis Salas, and another male that I believe is Isaac Chacon at a nightclub as well with alcohol, what appears to be alcohol.
**Q. Just the last -- fourth page of Government's Exhibit 364. Do you recognize it?**
A. Yes, sir, I do.
**Q. What is it?**
A. A photograph of Mr. Chacon and Mr. Altamirano, and Mr. Chacon is holding alcohol as well.
**Q. What is Mr. Altamirano doing?**
A. Mr. Altamirano is doing the BMT hand sign.
MR. VÁZQUEZ: Permission to publish?
THE COURT: Yes.
(Exhibit published to the jury.)
**BY MR. VÁZQUEZ:**
**Q. Agent, in the course of this investigation, did you do any kind of surveillance activities to sort of monitor nightclubs and things where individuals might have been going?**
A. Yes, sir.
**Q. Do you have to pay money to get inside?**
MR. HOROWITZ: Objection.

THE COURT: Overruled.

A. Most places you do.

**Q. These venues, do they give away bottles of alcohol for free?**

A. They do not. As a matter of fact, even to perform you have to pay.

MR. GONZALEZ: Objection. Calls for speculation, lack of personal knowledge.

THE COURT: Well --

MR. GONZALEZ: Not his area of expertise.

THE COURT: One hopes not.

MR. GONZALEZ: Pardon me?

THE COURT: One hopes not, but I will overrule the objection.

And I think this area has been exhausted, Mr. Vázquez. Move on.

MR. VÁZQUEZ: Yes, Your Honor.

**BY MR. VÁZQUEZ:**

**Q. Agent, do you know the length of time between the commission of the November 20, 2013, robbery and when Mr. Altamirano was intercepted on November 21, 2013?**

A. I believe it was within an hour or two.

**Q. Based on your experience and your work in the ATF, does gunshot residue dissipate and dissipate quickly?**

A. Yes, it does.

**Q. Does gunshot residue --**

THE COURT: Well, do not lead, Mr. Vázquez.

**BY MR. VÁZQUEZ:**

**Q. What is gunshot residue?**

A. It's the residue that remains after a firearm has been shot, and the powder from the bullet itself actually gets in the air and lands on whatever article.

**Q. How is gunshot residue impacted by the passage of time?**

A. It dissipates, it can rub off, it can actually just fly off.

**Q. Does the passage of time affect whether gunshot residue is collected at all?**

A. It depends on whoever is processing the scene at that point whether they request it or not.

**Q. When you reviewed the jailhouse phone calls involving Mr. Dixon, did you identify his voice?**

A. Yes, sir, I did.

**Q. Okay. Were you familiar with his voice when you were reviewing them?**

A. Yes, sir.

**Q. Were you able to find Mr. Dixon's account?**

A. I was not.

**Q. Were you able to find Mr. Altamirano's account?**

A. I was not.

**Q. Does every member of the BMT have a Facebook, Instagram, or Twitter feed?**

A. No, I don't believe so.

**Q. In the course of this investigation, were narcotics kept at all times on the person of targets, of defendants?**

MR. GONZALEZ: Objection; leading.

MR. HOROWITZ: Objection. And beyond the scope.

THE COURT: Sustained.

**BY MR. VÁZQUEZ:**

**Q. Where were your narcotics maintained prior to a sale by defendants?**

MR. HOROWITZ: Objection.

THE COURT: Overruled.

A. I believe --

MR. HOROWITZ: Objection. Calls for speculation as to what he believes.

**BY MR. VÁZQUEZ:**

**Q. Based on your review of video evidence --**

THE COURT: Yes, I will sustain that objection.

So now rephrase, Mr. Vázquez.

**BY MR. VÁZQUEZ:**

**Q. Agent, based on your review of the video evidence and the surveillance that you participated in, where were narcotics maintained by the defendants?**

A. What I was going to say is that on the 20 something purchases that we made, I don't think we ever had any that the narcotics were actually on the person. They were always hidden somewhere, either under the sod or in a hole in the ground or

somewhere near trees. It was never on the person.

MR. VÁZQUEZ: One moment, Your Honor.

**BY MR. VÁZQUEZ:**

**Q. Agent, in the course of the investigation, you made reference to this regarding the AP hand sign. Do you recall that?**

A. Yes, sir.

**Q. What significance does AP have to BMT, if you know?**

A. A lot of --

MR. HOROWITZ: Objection. Relevance, beyond the scope.

THE COURT: Overruled.

A. A lot of original members of BMT grew up in Allapattah and came over into the Little Havana area.

**Q. Do members who continue to maintain affiliation with BMT, did you see them also throw the AP hand sign?**

A. Yes, sir.

MR. VÁZQUEZ: No further questions, Your Honor.

THE COURT: You may step down, Agent.

(Witness excused.)

THE COURT: Call your next witness, Government.

MR. VÁZQUEZ: I have to confer with the defense on documents that I provided to them.

THE COURT: All right. Ladies and Gentlemen, we will take a break and come back. Don't talk about the case.

(Jury retires at 1:37 PM.)

THE COURT: So what we are conferring on now is the 404(b) evidence; is that correct?

MR. VÁZQUEZ: Yes, Your Honor.

THE COURT: And I take it that the defense wants me to give a cautionary instruction before that is published, and that would be the trial instruction 1; it's on page 662 of the book. I don't know where it's found in the computer generated, but it will say you will -- "you are going to hear evidence of acts that may be similar to those charged in the indictment but were committed on other occasions. You must not consider this evidence to decide if the defendant committed the acts charged in the indictment, but you may consider this evidence for other very limited purposes."

And then if you find beyond a reasonable doubt, it lists what you can consider it for, the defendant had the state of mind or intent, the defendant had a motive of opportunity, acted according to a plan, the identity of the defendant, committed the acts charged in the indictment by accident or mistake.

Would we want to add -- there is so much here -- the final clause that Mr. Rubio had asked for in the trial instruction, "but these acts must only be considered against those defendants"?

MR. HOROWITZ: Judge, I would prefer that since Mr. Altamirano has no 404(b) evidence coming in against him.

At the beginning I would ask that "you have just heard evidence of acts of some of the defendants."

THE COURT: Okay. It's actually -- did you want me to give it before "you will hear"?

MR. HOROWITZ: That's fine.

THE COURT: Okay. All right. "You will hear evidence of acts of some of the defendants," and then I will add that last -- I have to find it in this mess, but I will add that last provision that we put in the trial instructions, and then you will publish that to the jury, Mr. Vázquez.

Is there anything else that you will be publishing to the jury?

MR. VÁZQUEZ: No, Your Honor. I do want to make a final clarification before they are formally executed on Mr. Chacon whether the robbery is -- I think the Court had still held back on the strong arm or the robbery by sudden snatch was going to come in as 404(b).

THE COURT: No.

MR. VÁZQUEZ: No. That's out, so that's resolved.

I gave Mr. Donet our proposed revision, so it just needs to be formally executed, and then we are prepared to present it, and I believe we will rest.

THE COURT: Okay.

MR. GONZALEZ: Judge, there is just one final thing that we had not received a ruling from the Court. It was late

in the evening on one of the days, but -- actually on Friday at the end of the day I had moved for admission of 1A through 1H, which were the Facebook entries --

THE COURT: Right.

MR. GONZALEZ: -- with regards to Mr. Nadim Guzman. And it was coming in -- if it was to come in, it would have come in, of course, through the agent.

THE COURT: Right. Yes, you are right. And remind me. It's nothing we have to do now.

MR. GONZALEZ: No. I just wanted to make sure.

THE COURT: So we will take care of it. Remind me because I knew there was something, and I said to Ms. Rosoborough I can't find my list, and that was it.

So we will take some time out, you will confer with the defense. I will give the instruction, you will give them the stipulations, the Government will then rest.

I will then send the jury out again, or we could hear from Mr. Rubio's witness. Your Rule 29s, there will be no waiver because wasn't -- is that satisfactory, gentlemen?

MR. HOROWITZ: Yes, Your Honor.

MR. GONZALEZ: Yes.

THE COURT: And then is the Government going to do rebuttal?

MR. VÁZQUEZ: Depending on what they have. If it's just Mr. Rubio saying that his client was out of the

jurisdiction or not part of participating, he was locked away for a period of time, no.

THE COURT: Okay. Confer so we can...

(Recessed at 1:43 PM.)

(Resumed at 1:49 PM.)

THE COURT: So you are all squared away, Mr. Vázquez?

MR. VÁZQUEZ: I have not gotten executed stipulations yet.

THE COURT: Okay.

MR. VÁZQUEZ: But I think we are on the road.

I think Mr. Rubio and I have something to talk to the Court about, whenever it's proper.

THE COURT: Okay. Are we all here?

MR. DONET: Everybody is here, Judge.

THE COURT: Okay. So, Mr. Vázquez, you have all of your stipulations squared away?

MR. VÁZQUEZ: Not yet.

MR. KORCHIN: Your Honor, regarding the stipulation, I wanted the record to reflect that I have explained to Mr. Portela we are not waiving our objection to the admission of these prior convictions as 404(b). This stipulation is agreeing to the way they are going to be presented to the jury and that they actually exist.

THE COURT: Okay.

MR. VÁZQUEZ: He has objected to the 404(b), and we had

an argument about that.

THE COURT: I said it's coming in.

MR. VÁZQUEZ: And he has preserved that.

MR. KORCHIN: I wanted to make sure it was preserved.

THE COURT: This is an agreement as to the presentation as opposed to the fact of the admission.

MR. GONZALEZ: Judge, the same goes with Mr. Chacon. We renew our previous objections to the 404(b) objections as was litigated and the Court ruled.

MR. DONET: Same for Mr. Dixon.

MR. HOROWITZ: As far as Mr. Altamirano was concerned, we would ask the Court give the instruction that I submitted, it's docket entry 818, page 5, that adds the language to the pattern that "the evidence of acts done by some of the defendants on other occasions that may be similar may be only considered against the defendant as to whom they have been admitted."

That's the language that I admitted, and it's not part of the pattern. In absence of 404(b) of Mr. Altamirano, I ask that that be given.

THE COURT: What is the docket entry?

MR. HOROWITZ: 818, page 5.

THE COURT: Could you show it to Mr. Vázquez to see if he has an objection, as it is a modification of the --

MR. VÁZQUEZ: I have no objection to that. It should

not be applied to anyone else other than the defendant.

THE COURT: I thought you had agreed, Mr. Horowitz, to Mr. Rubio's language, which I was going to add.

MR. HOROWITZ: Your Honor is correct, I did agree with Mr. Rubio's language.

THE COURT: So what I was going to add was, "of course, similar-act evidence of one defendant may not be considered in determining the guilt or innocence of any other defendant."

MR. HOROWITZ: Perfect. That's fine, Judge.

THE COURT: So we are on track.

MR. VÁZQUEZ: Yes.

THE COURT: The Government will put in its evidence, rest.

And, Mr. Rubio, you are prepared to go forward with your witness?

MR. RUBIO: Yes, Your Honor.

MR. GONZALEZ: Do you want us to go one by one announcing our decision?

THE COURT: Yes.

MR. GONZALEZ: Okay.

THE COURT: Bring in our jury.

(Jury returns at 1:54 PM.)

THE COURT: And I will instruct them first, Mr. Vázquez.

Be seated everyone.

Ladies and Gentlemen, I have an instruction for you with regard to the evidence you are about to hear. You will hear evidence of acts of some of the defendants that may be similar to those charged in the indictment but that were committed on other occasions. You must not consider this evidence to decide if the defendant committed the acts charged in the indictment, but you may consider the evidence for other very limited purposes.

So if you find beyond a reasonable doubt from other evidence that the defendant committed the acts charged in the indictment, then you may consider evidence of other similar acts allegedly committed on other occasions to decide whether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment, the defendant had the motive or opportunity to commit the acts charged in the indictment, the defendant acted according to a plan or in preparing to commit a crime, the identity of the defendant has been established as the perpetrator of the crime charged in the indictment, or the defendant committed the acts charged in the indictment by accident or mistake.

Of course, similar-act evidence of one defendant may not be considered in determining the guilt or innocence of any other defendant.

With that, Mr. Vázquez, you may call your next witness.

MR. VÁZQUEZ: Your Honor, the Government will offer, I

believe without objection, Government's 365 between the United States and Defendant Maurin Chacon final trial stipulation.

Comes now the United States of America by and through the undersigned Assistant United States Attorney and the Defendant, Maurin Chacon, personally and through his attorney and stipulate as set forth below: Prior to and on February 25, 2014, the Defendant, Maurin Chacon, had been convicted in a court of a crime punishable by imprisonment for a term in excess of one year. That is a felony offense.

Further, the Defendant Maurin Chacon's rights to possess a firearm or ammunition have not been restored pursuant to Florida law. Accordingly, he was not and is not legally allowed to own or possess a firearm or ammunition.

Maurin Chacon was previously convicted of cocaine possession under Miami-Dade County Circuit Court Case No. F0715355.

The Government would offer without objection the following trial stipulation, Governments's 367 for the record, United States of America versus Rodolfo Portela.

Comes now the United States of America by and through the undersigned Assistant United States Attorney and the Defendant, Rodolfo Portela, personally and through his attorney stipulate as set forth below: Prior to and on July 26, 2013, the Defendant, Rodolfo Portela, had been convicted in a court of a crime punishable by imprisonment for a term in excess of one

year. That is a felony offense.

Rodolfo Portela was previously convicted of carrying a concealed firearm under Miami-Dade Circuit Court Case No. F0516780.

Rodolfo Portela was previously convicted of cocaine possession with intent to distribute within 1000 feet of a school under Miami-Dade County Circuit Court Case No. F076123.

Rodolfo Portela was previously convicted of cocaine possession with intent to distribute in Miami-Dade County Circuit Court Case No. F1032264C.

Government offers 366 without objection, United States of America versus James Dixon trial stipulation. Comes now the United States of America by and through the undersigned Assistant United States attorney and Defendant James Dixon, personally and through his attorney, stipulate and set forth below: James Dixon was previously convicted of cocaine possession on March 30, 2011.

Your Honor, with that, the Government rests.

THE COURT: Ladies and Gentlemen, the Government has rested meaning it has presented all of the evidence it intends to in what is known as its case-in-chief.

I will now turn to the defendants and ask Mr. Gonzalez, do you wish to call any witness?

MR. GONZALEZ: Your Honor, at this time the Defendant Chacon rests.

THE COURT: Mr. Horowitz?

MR. HOROWITZ: Good afternoon, Your Honor. On behalf of Christopher Altamirano, the defense rests.

THE COURT: Mr. Korchin?

MR. KORCHIN: Your Honor, Mr. Rodolfo Portela rests.

THE COURT: Mr. Donet?

MR. DONET: Your Honor, Mr. Dixon rests his case.

THE COURT: Mr. Rubio?

MR. RUBIO: Your Honor, Mr. Flores wishes to call a witness, Mr. Franklin Flores.

May I go outside and bring him in?

THE COURT: You may.

**FRANKLIN FLORES, sworn**

THE COURTROOM DEPUTY: Please be seated. Would you please state your full name for the record, and please spell your full name.

THE WITNESS: Franklin Flores, F-R-A-N-K-L-I-N F-L-O-R-E-S.

**DIRECT EXAMINATION**

**BY MR. RUBIO:**

**Q. Are you related to the Defendant Jay Flores?**

A. Yes, I am. I'm his uncle, brother of his mother, Evelyn Flores.

**Q. His mother is related to you how?**

A. She is my sister.

**Q. Okay. And where do you live, sir?**
A. I live in Miami.
**Q. And did you go to high school?**
A. Yes, I did. I went to Miami Senior High. I graduated back in 1997.
**Q. Are you currently employed?**
A. Yes, I am. I work for Elevator Structural, I'm a superintendent there. I have been working there for 2 years, and what we do is high-risers.
**Q. Now, do you actively participate in any sport?**
A. Yes, I do boxing. I have been doing it since I was in middle school.
**Q. Okay. And do you also train others in this sport?**
A. Yes, I do. I train young kids to defend themselves. I love the sport. It's very disciplined.
**Q. Are you a member of a gym, a nearby gym?**
A. Yes, it's called Panama Boxing Gym. It's down on 6th Street N.W. and 12th Avenue.
**Q. And what area of town is that?**
A. That would be Little Havana.
**Q. How close were you to Jay and his mom, your sister, as he grew up?**
A. Well, we kept it close. I mean, she is my only sister here, I'm her only brother. And I know Jay, and I seen him since he was born. We kept him more like a father-to-son relationship

instead of uncle and nephew.

**Q. Did there come a time when you moved into their home?**

A. Yes. It was back in June of 2012.

**Q. Okay. That would have been roughly the middle of 2012?**

A. Yes, June 2012, correct.

**Q. What was your reason for moving there?**

A. Well, I moved in with her because she was having a little bit of financial problems, and also I thought it was best for my knowledge to be close to my niece and nephews as well.

**Q. Okay. Now, did there come a time when you encountered a group of men in that neighborhood where you were living?**

A. Yes, sir. It comes back to November of 2012.

**Q. And how do you remember this particular incident?**

A. It was close to Thanksgiving, and we already have dinner with the family. My nephew was out with four guys in front of the buildings, four of his friends, and all of a sudden he comes up and looks for me and tells me, uncle, something is wrong.

MR. VÁZQUEZ: Objection; hearsay.

THE COURT: Yes, sustained.

**BY MR. RUBIO:**

**Q. Tell us what you did as a result of your nephew coming upstairs to where you were at.**

THE COURT: Don't tell us anything someone told you. Just tell us things that you did.

THE WITNESS: Okay.

THE COURT: Okay.

A. So at that moment I grab my shoes and put on a shirt and went downstairs with them. As we are walking out, I see two cars, approximately like 12 guys outside across the street yelling and screaming their lungs out. So as we are walking down, I'm like, okay, what's the problem. And I go towards the guys over and ask them what's going on, what's the problem, what's the issue.

So one of the gentleman tells me --

MR. VÁZQUEZ: Objection; hearsay.

THE COURT: Mr. Rubio.

**BY MR. RUBIO:**

**Q. What happens as a result of your conversation with these men --**

A. Okay.

**Q. -- or whoever you spoke to? What happened?**

A. The thing was that they wanted to fight.

MR. VÁZQUEZ: Objection. Calls for hearsay, move to strike.

THE COURT: Whoa, whoa, whoa.

MR. RUBIO: I'm trying to --

THE COURT: Yes, I know.

Let me reintroduce myself. I will be your judge today.

The objection is sustained.

You may rephrase, Mr. Rubio. Try to get out the

information without eliciting hearsay, if you would.

MR. RUBIO: Yes, Your Honor.

**BY MR. RUBIO:**

**Q. Tell us what happened as a result of your conversation with this group of people.**

A. Well, they wanted to fight somebody.

**Q. What did you observe? What happened?**

A. So at that moment I spoke to one of the guys, and I told him if there is going to be a fight, it's going to be a clean fight. No weapons, includes gun, knife, no jumping nobody.

**Q. And what happened?**

A. Come to find out that the guy they wanted to fight is one of the kids that I train.

MR. VÁZQUEZ: Objection; calls for hearsay.

THE COURT: Well, no. He is identifying someone.

**BY MR. RUBIO:**

**Q. What happened. What did you observe?**

A. It comes to find out that the guy they want to fight is the kid that I trained. At that moment I approached the gentleman and I told him they wanted to fight you. You do not have to fight if you don't want to. I can go back upstairs and call the police. He told me, well --

THE COURT: No, no, no.

**Q. You can't say --**

A. Okay. So at that moment --

**Q. What did you see? What happened?**

A. He is, like, I will give them a fight, a fair fight, one on one --

**Q. What happened?**

A. -- are you going to stand next to me?

So I say, yeah, I will be there with you. The guys fought.

**Q. And what happened?**

A. My nephew's friend beat the other guy, but, you know.

**Q. Okay. And then what happened?**

A. The other guys had to pick up his friend from the floor, put him in the car, and they left. Not 2 minutes later they come back again. So the same --

**Q. Describe for us the people that were there, the group that was there, what you actually saw, how many people were there. Give us an idea of --**

A. There was approximately, like, around 12 or 13 guys there in their late twenties. You know? Messing around with young kids, early 15s.

**Q. How old was Jay at this point in time, 2012?**

A. Jay was about 17 years old.

**Q. Okay. And so tell us what happened after the fight and they come back.**

A. Well, after the fight was done, I thought that was it, it was over and a done deal. But, like I said, 2 minutes later or

so they came right back. And the same gentleman I spoke to before, he comes and approached me and tells me, listen --

MR. VÁZQUEZ: Objection; calls for hearsay.

THE COURT: Wait. Wait.

(Bench conference commenced):

THE COURT: Mr. Rubio, have you prepared your witness to testify in a way consistent with the rules of evidence, that is, not telling us what other people told him?

MR. RUBIO: Yes, Judge. I spent 4 hours with him going over that and explaining objections and problems with the testimony.

THE COURT: Okay.

MR. RUBIO: It has been very, very difficult. However, I don't think this is coming in for the truth of the matter asserted, but to show, you know, what he did, what he observed.

THE COURT: Well, the question then becomes what is the relevance of what he did. He is not a party to this, so I will allow you to lead, Mr. Rubio. But what is it he is now going to say about after they came back in the car?

MR. RUBIO: That they fought again and that he then confronted the group and let them go in the Little Havana area in an abandoned house and that Jay was hanging out with this group of people.

THE COURT: And how does he know this? Because Jay told him it?

MR. RUBIO: Because they were there.

THE COURT: And he is going to tell us that these people came to the apartment and he saw them confront Jay?

You understand, Mr. Rubio, no hearsay.

MR. RUBIO: I understand.

THE COURT: Well, if you understand it, and we understand it, and the witness doesn't understand it, the witness's time on the stand is going to be abbreviated. So you need to find a way -- I don't know how you are going to get out that they were troubling Jay without him saying what Jay told him unless he is going to be able to talk us through he saw them confront, he saw them beat, he saw them dog, he saw them follow. It's all got to be active verbs that don't involve statements.

MR. RUBIO: I understand.

THE COURT: Okay.

(Bench conference concluded.)

**BY MR. RUBIO:**

**Q. After this fight, was there an occasion that you saw this group of guys again around in the neighborhood?**

A. Yes. It was like 3 to 4 weeks later on I come to find out that they were in the neighborhood and took over some abandoned buildings like 3 blocks down.

MR. VÁZQUEZ: Objection; calls for hearsay.

THE COURT: Well, no. Where doesn't.

If you would, Mr. Flores, just answer the question that

Mr. Rubio asks you, and then he is going to have some follow-up questions.

THE WITNESS: Okay.

THE COURT: He will take you through it.

**BY MR. RUBIO:**

**Q. In what area was this that you saw these guys again in the neighborhood?**

A. It was on 4th Street N.W. and 11th Avenue.

**Q. Did you again have another situation where there was a problem with these group of guys?**

A. Yes, I did.

**Q. And did you have to confront them again?**

A. Yes, I did.

**Q. Can you tell us when and where you did that?**

A. It was in the beginning of 2013 in January. I started noticing my nephew was scared to go and run chores for his mother, to go and pick up his little sister, and he wasn't coming out from the house like he used to be.

**Q. What did you do as a result of that?**

A. So me and him had a little talk, and he said --

THE COURT: No, no, no.

**Q. Can't say what he said.**

A. Okay. So what I did is I grabbed him, and I told him do you know where the guys are at? He said yes.

**Q. What did you do as a result of having this conversation with**

**your nephew? Where did you go and what did you do and what did you see?**

A. We went towards the guys, where they were at on 4th Street and 11th.

**Q. Did you have a conversation with any particular person?**

A. Yes, I did. I had a conversation with the same gentleman of the last incident.

**Q. As a result of that, did you resolve matters and did you then leave the area again?**

A. Well, from my circumstances I would say yes, I did solve the issue at that point. But then, again --

**Q. When was this? Just tell us when you had this conversation with this group of guys again.**

A. It was in January, beginning of January 2013.

**Q. Okay. Did there come a point in time that Jay, your nephew, left the area of Miami?**

A. Yes, he did.

**Q. And when was that?**

A. It was on the fourth of 2013 he was taken.

**Q. That would have been April of 2013?**

A. April 2013.

**Q. Do you know where he went and how you know that?**

A. Yes. I found out that he was taken to --

THE COURT: Wait, wait, wait.

Mr. Rubio, Mr. Vázquez, is this what we talked about

earlier? That's a yes or no.

MR. RUBIO: Is that to me, Judge?

THE COURT: Yes, one of you.

MR. RUBIO: Yes.

THE COURT: Okay. So, Mr. Vázquez, I think you had --

MR. VÁZQUEZ: I'm objecting to --

THE COURT: Sustained.

MR. VÁZQUEZ: Yes.

**BY MR. RUBIO:**

**Q. Did your nephew leave the area of Miami?**

A. Yes, he did.

**Q. And for what period of time did he leave the area of Miami?**

A. He left for a period of time of 6 months.

**Q. During that period of time, did he ever come back home?**

A. No, not at all.

**Q. Did there come a point in time where he came back from where he was at?**

A. Yes. At the end of October of 2013.

**Q. Tell us what happened when he came back?**

A. He came back, I come home from work, and he was waiting for me in the living room. He is waiting to tell me and show me some certificate --

MR. VÁZQUEZ: Objection; relevance.

THE COURT: No, no, no.

Mr. Flores, answer the question that the lawyer asks.

Just that question.

MR. RUBIO: Judge, if I may, if I can ask for a sidebar because I did want to show him some documents.

THE COURT: Yes.

(Bench conference commenced):

MR. RUBIO: I have marked these as Defendants Exhibit A, B, and C. These are the documents that have been handed to me by Mr. Franklin Flores outside the courtroom when he got here. These are the documents that he just intended to refer to that he received from Jay.

THE COURT: What possible relevance is Mr. Flores' stay in rehab, other than to demonstrate, as you have, that he wasn't here in Miami and could not himself have done any acts? What possible relevance is his being in drug rehab for this case?

MR. RUBIO: The fact that it's our theory of defense that as a result of these incidents that he had with these group of guys, these guys then allowed him to be in the area, not only with BMT, but actually addicted him to drugs, and that's the reason a) why he had to go into the program, and when he came back he had finished that, but they --

THE COURT: But that theory that they addicted him to drugs I will allow through your client, Mr. Flores. That theory will then eliminate any multiple conspiracy requests you have, but that theory is not coming in through the uncle nor are these certificates.

MR. RUBIO: Okay. May I make these part of the record?

THE COURT: Outside the presence of the jury.

MR. RUBIO: Will do, Judge.

THE COURT: Okay.

(Bench conference concluded.)

**BY MR. RUBIO:**

**Q. After Jay came back, did you have occasion to observe him? And tell us about his demeanor.**

A. Well, yeah. After he returned from the program --

THE COURT: No.

A. -- he was --

THE COURT: No, no, no.

And to you, Mr. Rubio, no.

**BY MR. RUBIO:**

**Q. Did there come a time that you had a conversation with Jay's mother?**

A. Yes.

**Q. And as a result of that conversation, did you -- did something happen? What happened?**

A. Yes. We decided to move away from the neighborhood, to take Jay away from that neighborhood.

**Q. Where did you move to?**

A. I moved to Homestead, and my sister moved to Allapattah.

**Q. And is Allapattah relatively close to the area where you were living?**

A. Yes, it is.

**Q. When did you next hear about your nephew? What happened after that?**

A. On --

**Q. In June.**

A. In June of 2013, I come to find out that he got arrested.

MR. RUBIO: I have nothing further, Judge.

THE COURT: Cross examination, Mr. Vázquez?

MR. GONZALEZ: No cross from the defense.

THE COURT: Okay. I was going to --

MR. GONZALEZ: All right.

THE COURT: Do you want me to start with you?

MR. GONZALEZ: I don't think we have any questions.

THE COURT: Mr. Gonzalez, any questions?

MR. GONZALEZ: No.

THE COURT: Mr. Horowitz?

MR. HOROWITZ: No, I have no questions, Your Honor.

THE COURT: Mr. Korchin?

MR. KORCHIN: Same, Your Honor.

THE COURT: Mr. Donet?

MR. DONET: No, Your Honor.

THE COURT: All right. Mr. Vázquez.

**CROSS EXAMINATION**

**BY MR. VÁZQUEZ:**

**Q. Mr. Flores, at the beginning of your testimony, you talked**

**about troubles that Mr. Flores was having with persons in an area in 2012; is that right?**

A. Yes, sir.

**Q. The area of town, was that close to Riverside, the Riverside area of Little Havana?**

A. When you mention Riverside, you are talking about the river, or you are talking about the school eventually?

**Q. Riverside the school, Riverside the neighborhood.**

A. Well, I know it as Little Havana. That's how I know it of.

**Q. Is there an area that's known as Riverside?**

A. Yeah, you got the school named Riverside Elementary.

**Q. Okay. And is there an area of town in Little Havana where there is 3rd Street that runs through Little Havana?**

A. Yes.

**Q. Whoever these people were, you don't know who they are now, right?**

A. No, sir.

**Q. Mr. Flores did have friends that weren't these -- whoever these people were, correct?**

A. Correct.

**Q. And you saw him hanging around with these people, correct?**

A. Never did.

**Q. You never did?**

A. No.

**Q. So you only saw Mr. Flores hanging around with people that**

**were harassing him, not people that were friendly with him?**
A. People that were friendly with him as his own age.
**Q. Right. You saw people like that with Mr. Flores?**
A. Yes.
**Q. Young people?**
A. Yes, sir.
**Q. Sir, you obviously have a close connection with Mr. Flores, correct?**
A. Right.
**Q. You care about him deeply?**
A. Yes, sir.
**Q. And prior to testifying today, you met with Mr. Rubio, correct?**
A. Yes, sir.
**Q. Were you in contact with Mr. Flores -- were you friendly on day-to-day working communication with him in January of 2014?**
A. No, sir.
**Q. You didn't know what he was doing in January of 2014?**
A. No, sir.
**Q. Did you know what he was doing in February of 2014?**
MR. RUBIO: I'm going to object; outside the scope of direct examination.
THE COURT: Overruled.
**BY MR. VÁZQUEZ:**
**Q. Did you know what he was doing in February of 2014?**

A. No, sir.

**Q. Did you know what he was doing in March of 2014?**

A. No, sir.

**Q. Did you know what he was doing in April of 2014?**

A. That's when he got arrested, around that time. That's when I found out. That was the last thing I remember from him.

**Q. Other than the arrest, did you know about anything else that happened in 2014 until his arrest?**

A. No, sir.

**Q. You weren't involved in his life?**

A. Not at all.

**Q. And it's your testimony that you don't know who was in those buildings on 4th Street and 11th Avenue, correct?**

A. That I don't know them? I don't. But that I have seen them there? Yes, I have.

**Q. You had seen people there, you just don't know who they are?**

A. Exactly.

**Q. You don't know who they are today?**

A. Well, I seen the news, so I recognize the face.

**Q. I'm asking you about today, sir.**

A. To today? I seen the news and I saw a couple of faces --

MR. VÁZQUEZ: I'm sorry. Object, nonresponsive.

THE COURT: Right.

The question, Mr. Flores, is today as you are sitting here, can you identify those people?

THE WITNESS: Well, yeah.

**BY MR. VÁZQUEZ:**

**Q. Do you see them here today?**

A. Some of them.

**Q. Who do you see?**

A. I see Mr. Chacon named Tiny.

**Q. Is he one of the team that you were talking to Mr. Flores about -- to Mr. Rubio about?**

A. That was one of the guys that I spoke to most often.

**Q. And your nephew had a hard time with them; is that right?**

A. Not with that gentleman.

**Q. Not with that gentleman?**

A. Not with that gentleman.

**Q. So, no?**

A. Not with him, like I said.

**Q. Okay. So he was okay with your nephew, correct?**

A. So far that I know of, yes.

**Q. Okay. Anybody else had a problem in court today with your nephew?**

A. No.

**Q. Okay. Your nephew was friendly with Mr. Chacon, correct?**

A. Well, I can't say that, if they were friends or buddies.

**Q. You didn't see him mistreating him?**

A. No.

**Q. You didn't see anybody in court today mistreating your**

**nephew?**

A. No.

MR. VÁZQUEZ: Your Honor, I have no further questions of this witness.

THE COURT: Redirect, Mr. Rubio?

**REDIRECT EXAMINATION**

**BY MR. RUBIO:**

**Q. Mr. Chacon was one of the individuals that you spoke to the first time Jay asked you -- came upstairs and asked you to come down?**

A. Yes, sir.

**Q. And did you have a conversation with Mr. Chacon?**

A. Yes, sir.

**Q. And was that over what was occurring outside that you were witnessing?**

A. Yes, sir.

**Q. Did there come a second time when you went back and saw these guys in the neighborhood?**

A. Yes, sir.

**Q. And that would have been in the area of where the abandoned houses were?**

A. That's correct.

**Q. Did you again have a conversation with Mr. Chacon?**

A. Yes, I did.

**Q. And was that over what was occurring with respect to your**

**nephew, Jay?**

MR. VÁZQUEZ: Objection; leading.

THE COURT: It is.

MR. RUBIO: I have nothing further.

THE COURT: Okay. You may step down, sir. Thank you.

(Witness excused.)

THE COURT: Mr. Rubio, call your next witness.

MR. RUBIO: Mr. Flores rests, Your Honor.

THE COURT: Government, redirect -- rebuttal?

MR. VÁZQUEZ: None, Your Honor.

THE COURT: Ladies and Gentlemen, all of the parties have rested. That means all the evidence that you are going to hear has been submitted to you. I now need to talk to the lawyers about some legal matters. We are going to be a few minutes, but I will call you back in with a schedule of what's happening next.

So I would suggest you, one, most importantly, do not talk to each other about the case. It is not yet time. You have not heard my legal instructions to you. You have not heard closing arguments. The case is not over. It is not time to discuss the case.

So you may have coffee or tea, you can get your parking stamped, and I will call you back in after I have discussed some matters with the lawyers.

(Jury retires at 2:26 PM.)

THE COURT: Everyone be seated.

We will, of course, take up each parties' Rule 29 sufficiency arguments and finalize, perhaps, jury instructions.

The question now becomes, again, what is the parties' position as to juror number 2, Martha Merino?

Mr. Horowitz, you sent me a case. Thank you.

MR. HOROWITZ: It was the only one that I could find where there was a pretrial waiver to the right of twelve jurors.

THE COURT: Except there were, in fact, only twelve jurors, number one. Number two, despite the fact of the agreement, apparently Mr. Moller appealed.

MR. HOROWITZ: Absolutely, Judge. I couldn't find any cases where eleven was accepted and everybody was happy, especially from the defense side.

THE COURT: Even when they agreed, and that case Moller spawned other cases where there was a discussion of whether or not it comported with Rule 23, whether or not the waiver need be in writing, which also reminded me, I don't know why, I think my thinking has been infected by civil cases, that, in fact, the alternates must be seated in the order in which they were selected. So that addressing the puzzled looks I got from the Government.

So the question becomes now what to do. Best case scenario, we spend tomorrow closing, and we only have 2 days for deliberation. Again, all of the cases are concerned with

pressure being put on the jury to deliver a verdict. That is eliminated, of course, if we seat juror number 13.

What is the Government's position?

MR. VÁZQUEZ: May I have a moment?

THE COURT: Yes. I will step out and give everybody time to confer.

(Recessed at 2:30 PM.)

(Resumed at 2:36 PM.)

THE COURT: Everyone can be seated.

Government, what is your position with regard to going forward?

MR. VÁZQUEZ: Well, Your Honor, I think it makes sense to -- Ms. Merino sat through a lot of the trial so far, to allow her to participate in closings. And then if the Court is inclined, and I would really like for this to be almost a defense initiative so we don't get some sort of motion against us in the event that we are successful, that there is some basis. They are joining in the Court's request that she be released at the close of the arguments, and then in the event that there is some sort of mishap, she could be -- the Court has the option of bringing her back.

THE COURT: I don't even understand what you just said, but I will turn to the defense.

MR. DONET: Yes, Judge. We have had an opportunity to discuss it amongst ourselves. It's our position that we would

like the original twelve jurors to be the ones that decide the case. We think that they will have all day Thursday and Friday. Those are the twelve jurors that we selected that we liked.

THE COURT: And you also -- let's make it clear, you chose those two alternates. You exercised a preemptory with regard to one of the other gentleman, so you chose those alternates. Why, why are we going forward when we know she is done Friday?

MR. DONET: Judge, it's our position that we did choose those alternates, but we chose them as alternates where we chose Ms. Merino as one of the twelve that we wanted. And to preemptively before we get to Friday night excuse her, our position is that we would like those twelve to start. If the deliberations can't finish by Friday or they don't finish by Friday and then she is released, I believe we are all prepared to take the verdict with the eleven.

MR. VÁZQUEZ: We do not join the eleven.

THE COURT: So apparently no party is willing to give me any guidance based on the law or based on the facts with regard to how we go forward with this composition of the jurors. The eleven is a nonstarter because we have alternates. Nobody has proposed any kind of -- nobody has proposed anything.

MR. DISPOTO: May I have a moment to speak to Mr. Vázquez?

THE COURT: Yes.

MR. VÁZQUEZ: Your Honor, I apologize if I wasn't clear. Maybe if what I'm saying doesn't make any sense, I'm sorry.

THE COURT: Okay.

MR. VÁZQUEZ: What we are trying to say is if you allow Ms. Merino to sit through the closings, then Ms. Merino after the close is completed is allowed to leave but told don't talk about the case, don't research the case, and then we add one of the alternates after the close. If something happens that is unforeseen, it gives the Court the option of calling her back. I don't anticipate that happening. That's my only point.

If that is not the Court's preference, then it doesn't make any sense to make her sit through the closings.

THE COURT: If something unforeseen happens, then number 14 comes in. That is why we have alternates.

MR. VÁZQUEZ: If something happens to another person, it just gives us one more safety net.

THE COURT: Right.

MR. VÁZQUEZ: That's all I'm saying.

THE COURT: I understand. If Ms. Merino is released, she is released. And no one has addressed the idea that there is a ticking time bomb scheduling-wise if Ms. Merino stays on the jury that the jury is then pressured to come back with a verdict within those 2 days.

MR. VÁZQUEZ: We are agreeing with the Court with the

cases that the Court has cited. We were just giving an additional wrinkle to it. But we agree with you, you eliminate that by addressing her one way or another so that she is not under the pressure to come to a verdict.

MR. DISPOTO: Judge, may I address the Court?

THE COURT: Yes.

MR. DISPOTO: And I don't mean to complicate things, but would the Court consider the additional step of inquiring with Ms. Merino as to whether in order to keep her on the jury as to whether there was any chance her plans could be changed?

I merely say that out of concern for her. She has put a lot of time into this endeavor, and if she is simply excused without inquiring as to whether she can change her plans knowing that she will be excused if she can't, she may deem this process as having been unfair to her.

If the Court can somehow tactfully inquire with her and inform her that we are concerned about her schedule, we are concerned about the time, we are inclined to excuse her unless her plans can be changed. Leave it up to her because maybe she wants to see this through in light of the fact that she has been here now for over 3 weeks.

THE COURT: All right. Anything in particular -- I will ask her, you know, we are concerned about her schedule, we still have another day, day and a half of work to do, we were wondering if her plans could be changed, if she could go later

in the week allowing her sufficient time, or if -- what her situation is.

Please bring in Ms. Merino.

(Ms. Merino returns at 2:44 PM.)

THE COURT: Everyone may be seated.

Hello, Ms. Merino. How are you?

JUROR MERINO: I am fine.

THE COURT: Good.

We called you out here because we are now toward the end of the case, but we still have my instructions and closing arguments, and that is going to take another day and a half, and then the jury would be asked to deliberate.

I don't want there to be any pressure on the jury or on you, and I was wondering -- I know you have your tickets. I was wondering if there is any way for you to go a little later in the week so that you can participate in the jury deliberation without pressure or if it's an absolute necessity that you leave Sunday night. So we wanted to talk to you about that.

JUROR MERINO: Unfortunately for me, I have to cancel my event in Mexico because since I was here, I didn't put a lot of attention in how my campaign was going.

THE COURT: So you are not leaving Sunday night?

JUROR MERINO: I can talk with my boss because it's not necessary to go. I cancelled my event yesterday.

THE COURT: Yesterday. Okay.

I am so glad that we brought you out. I wanted you to know, though, that all of the lawyers were very concerned truly about your schedule. And if there is anything once this is over that you need from the Court for your employer to let them know how hard you worked and what you have done, we are happy to do that.

This is great relief to us, and thank you, and you can now return to the jury room.

JUROR MERINO: Just one question. For the Chile event, I will be free?

THE COURT: Both you and I will be gone if that's the case.

JUROR MERINO: Thank you.

THE COURT: No worries, Ms. Merino.

(Juror retires at 2:47 PM.)

THE COURT: There you have it. Mr. Dispoto remains any favorite lawyer.

MR. DISPOTO: I will take a bow with that one.

THE COURT: Go ahead.

So we made inquiry, just so the record is clear, and Ms. Merino, unbeknownst to us, unfortunately changed. But hopefully she will call upon the Court to write a letter to her employer so that they know how important her work here was.

All right. So I will now -- we have yet to finalize the jury instructions and do the Rule 29s. So what I suggest,

everybody help me with this timewise, the Government wants 3 hours. You can have 3 hours, 2 and 1 is the split. So if you started at 10, you would go to noon, lunch.

Mr. Gonzalez, you said 45 minutes or an hour.

MR. GONZALEZ: I asked for an hour, but realistically I think I can get it done within 45, 50 minutes, Judge.

THE COURT: Mr. Horowitz, you would like 45 minutes?

MR. HOROWITZ: No, Your Honor, 30.

THE COURT: Thirty. Okay. And everybody else is 30.

That takes us to 5:30. So I just don't want to bring them in at 9 and not really be ready for them. Do we reasonably think we can have arguments and jury instructions done as we leave today at 5 or 5:30?

MR. HOROWITZ: Judge, I think we are to the point where we are waiting on the final draft to go over it.

THE COURT: Since Ms. Rosoborough -- since we are out here, it's hard to be back there.

MR. HOROWITZ: Right. I think we have gone through everything. I think it's a couple typos here and there. The Court has made rulings as to instructions. Maybe it could be something that's emailed to us later that we could meet at maybe 9 and go over them.

THE COURT: All right. What I'm going to do is I'm going to ask the jury to -- we need to get this all done in one day, because I just don't think rolling it over to the next

day...

I'm going to ask the jury to be here at 9:30. We are going to go quickly. If by the end of the day we all need to reconvene, we will reconvene at 8:30.

The gentlemen of the defense, you can't get here until 9 because of some elevator issues?

THE COURTROOM DEPUTY: It's resolved.

THE COURT: You can get here at 8:30.

Let's bring in the jury and tell them when they are coming back tomorrow, and then we will start our work.

(Jury returns at 2:50 PM.)

THE COURT: Everyone be seated.

All right, ladies and gentlemen of the jury, I have discussed the scheduling with the lawyers, and this is what we plan on doing: We do have some legal arguments yet to be made, but I don't want you to sit around any longer. So what we are going to do is recess for the day.

We will start tomorrow at 9:30 sharp. And I say that because we are going to hear all of the closing arguments tomorrow. We are going to go full day. So there is only going to be an hour for lunch. If all want to brown bag or go down to the cafeteria, but it really is only going to be an hour for lunch tomorrow. Our breaks are going to be much more limited so we can get it all done tomorrow.

And then Friday morning -- Thursday morning when you

come back -- I have lost track -- I will instruct you on the law, and then you will deliberate.

So I'm going to excuse you for the day with the following admonition: We are so very close. You are so very close to the end of the case. It is so very important that you not discuss this case with anyone, that you maintain your impartiality, the fairness, the reason why you have been chosen as this jury, that is, to make your decision based only on the witnesses' testimony and the evidence that you will have before you.

The reason why I have alluded to it, why you can't even tell your husband or wife or anyone who asks you anything about the case is because when you start to think about the case, you start making decisions about what was important and what you heard, and you start the deliberation process. And you cannot start that process until the case is over, you are all together in the jury room with the evidence, you have heard the closing arguments, and you have heard my instructions on the law.

So have a good night. Have a good rest. Set your alarms and your clocks. Make sure you are here at 9:30 ready to have our CSOs bring you in to hear closing argument in this matter, but for today we are adjourned.

(Jury retires at 2:54 PM.)

THE COURT: I was going to say -- be seated, if you'd like. I was going to ask if anyone wanted to rush to 7, but

then you will bump into the jurors. I will just ask Ms. Greer to put on another pot of coffee.

Let's talk about the -- let's go through the Rule 29s. I'm going to ask Ms. Rosoborough, if she could, to start putting together kind of a mock-up of the instructions that we have all either reached accord on or that I have ruled on. And perhaps by the time we are concluded with argument, they will be available for you all to start going through. I think it would behoove us to do that today while we are all here.

First question before we go to the 29, the exhibits, we are all agreed on. It's 1A through E?

MR. GONZALEZ: 1A through H.

THE COURT: And remind me again what they are, Mr. Gonzalez.

MR. GONZALEZ: Your Honor, these were the Facebook pages that when Nadim Guzman was testifying --

THE COURT: Right.

MR. GONZALEZ: -- he was confronted with -- he basically gave a statement that he had not done any drug dealing after he came out and that he had not posted any of this on Facebook. So he was confronted and impeached with that.

I was moving it in because not only is it admissions by Mr. Guzman clearly, but they are also in furtherance of the conspiracy because he continued drug dealing.

So I think that --

THE COURT: Can you pass up your copies? I will give them back to you, but in this morass I don't know where they might have...

Just so everyone knows, Ms. Merino's plans to go to Chile are on the 8th, and I do intend to leave with her if there is no...

So, Mr. Vázquez, what is your thinking on the admission of these as admissions by Mr. Guzman? Do you have a copy of one?

MR. VÁZQUEZ: I have seen them, Judge.

THE COURT: Okay.

MR. VÁZQUEZ: They are certainly business records. But as far as hearsay which is admissible under an exception, he is not a defendant. So I mean they are proper to impeach him with and confront him with, but as far as -- they were offered for --

THE COURT: Right. He didn't deny -- I think you got him to say that he was, in fact, dealing after he --

MR. GONZALEZ: He denied it at first.

THE COURT: Right, but then when you confronted him, as a good impeachment will do, he admitted it.

Yeah, I don't think this comes in under any hearsay exception, Mr. Gonzalez. If he had -- if there was -- and I don't recall any particular point where once confronted he pushed back at you.

MR. GONZALEZ: No.

THE COURT: Okay. I will -- if you would, do you want me to keep this as part of the record, your proffer?

MR. GONZALEZ: I'm going to use it as part of my closing just to point out --

THE COURT: Okay.

MR. GONZALEZ: -- to the jury.

MR. VÁZQUEZ: If they are not admissible, they should not be used as a demonstrative.

MR. GONZALEZ: I'm not going to use them as a demonstrative. I'm going to basically tell the jury that he was confronted with the following, you know, Facebook question and answer, he denied doing that, and then when he was confronted he admitted that, yes, there were Facebook postings. I will read exactly, without saying that it's in evidence, but I will read the question that I asked him and his response.

THE COURT: Right.

MR. GONZALEZ: I'm not going to --

THE COURT: But you can't because, of course, it's not in evidence.

MR. GONZALEZ: Right.

THE COURT: So if it's not in evidence, it can't be shown or referred. You can read from the daily your question and answer, and you can argue to the jury it wasn't until I confronted him with his own Facebook postings that he said, and then you read from the daily.

MR. GONZALEZ: That's fine. I'm not going to flash this.

THE COURT: No.

MR. GONZALEZ: That's fine.

THE COURT: All right. So other than that, we are resolved on all other evidence? Everyone agrees what's there and what can go back to the jury?

MR. GONZALEZ: Yes, Judge.

THE COURT: I will start with you, Mr. Gonzalez.

Actually, you know what, the last two are going to be the difficult ones, so I'm going to start with you, Mr. Rubio.

MR. RUBIO: Judge, I would move for a judgment of acquittal at this point at the end of the Government's case. I renew all of my previously made motions and objections and the pretrial motions that were made in this case.

THE COURT: Okay. If you would, Mr. Vázquez, as to each defendant, I don't need the exhaustive list, but if you could recite what evidence the Government induced to support in Mr. Flores's case, his conspiracy to possess with intent to distribute.

MR. VÁZQUEZ: The Government relied on text message communications showing that Mr. Flores was in contact with or was associating with members of the conspiracy related to narcotics distribution. He also was identified by members, former members of the conspiracy who testified on behalf of the

Government that he was a person who was permitted to sell narcotics in the territory of the BMT and that he was a person, specifically with Mr. Guzman, that was referred to and also referred clients to the group.

Based on that activity and based on the text messages, based on the photos, Mr. Flores did demonstrate, although not a member of BMT, did demonstrate what we referred to as that BMT hand sign showing association, we think that the evidence is proper for submission to the jury on the conspiracy count for Mr. Flores.

THE COURT: Okay. I think that while clearly on the hierarchy, the low man in this case, there is sufficient evidence to demonstrate Flores's participation. However, again, low in the pantheon of dealers or however brief his participation in the 2014 time frame that he was part of this conspiracy.

Let me ask you this, Mr. Rubio: Are you, and maybe I should have sussed this out earlier, but are you arguing that Mr. Flores was somehow victimized, for lack of a better term, by other members of the conspiracy?

MR. RUBIO: Yes, Your Honor.

THE COURT: Okay. Because then I don't think that -- tell me, then, how I reconcile that with an instruction on multiple conspiracies?

MR. RUBIO: Because -- well, I think, as I have

mentioned earlier, I think that based upon the Government's evidence that we are entitled to a multi-conspiracy instruction because of the fact that even in these text messages that were obtained as a result of the search warrant, if Your Honor will recall, there was some that I think in response to some of Mr. Vázquez's questions was that they were BMT members or known to be BMT members.

But a lot of those texts the Government conceded and their witness conceded that they didn't know who these persons were. And it could very well be that Mr. Flores had a separate group of people that he dealt with that these BMT members took advantage of.

The reason for the threats and stuff that I'm alluding to is that he initially had problems. But we are trying to, and I'm not so sure we got it from Franklin, Mr. Franklin Flores, was as a result of his discussions with this group, they left him alone and they let him do his thing. And he was addicted to drugs, and he sold to his own group in order to satisfy his habit.

Judge, if you recall, some of the questions were that he had sold them personal use marijuana to Mr. Guzman, that he didn't buy the marijuana to resell it. So I think it's indicative of somebody that's -- there was no large-scale sales on his part, there was no -- it seemed that even the Government's witnesses indicated that he didn't sell -- none of

them at least saw him selling from the traps. If anything, he was selling from his home or a separate location.

For that reason I believe that we should have --

THE COURT: I don't -- so the answer to the question is he guilty of conspiracy, as I understand your saying it is, no, he is not guilty of conspiracy. He had addiction issues. Any kind of activity, drug activity, that the Government saw or thought they saw had to do with his addiction issues.

MR. RUBIO: But if he is a member of any conspiracy, he is a member of some separate conspiracy, not the conspiracy with these BMT members, especially in light of the fact that there is quite a few texts of other people that have not been identified as members of BMT. In fact, quite a few more.

THE COURT: Texts with Mr. Flores?

MR. RUBIO: Texts with Mr. Flores.

THE COURT: Okay. All right.

MR. VÁZQUEZ: Our position is that all that does is that it establishes he was a drug dealer. There is no evidence of Mr. Flores's participation in a conspiracy with anyone else. He is a seller. And if he has a buyer/seller relationship with anybody else, that's not a conspiracy.

But we have affirmative evidence of his participation in this conspiracy. And absent showing there is a second conspiracy, and there has been nothing offered from the defense on that part, he should not receive the multiple conspiracy

instruction.

THE COURT: Well, maybe I should have asked earlier, and I will ask now, Mr. Rubio, as I go down the table, if you could identify those texts that suggest activity with others in terms of drug dealing, then I can take a look at those.

MR. RUBIO: I think -- that's fine, I can pull those. If Your Honor will recall, there was quite a few that the Government's witness, Mr. Perez, admitted that they weren't identified to any BMT members. There is quite a few.

THE COURT: No, no. I know that there are texts that aren't affiliated with BMT, but I need to see the texts from Mr. Flores or to Mr. Flores with regard to drug dealing from these not-BMT people.

MR. RUBIO: I understand what you are saying.

THE COURT: Right.

MR. RUBIO: I don't know if I can show that because we don't know -- just like the Government doesn't know, we don't know.

We do know the one where Mr. Zerquera said that he called a female for Mollies, and the female told Mr. Zerquera to contact Mr. Flores. I believe the testimony was that he had his cousin go to see Mr. Flores.

MR. VÁZQUEZ: Which puts him in the conspiracy.

MR. RUBIO: Well, which I think shows that he has -- there may be a separate organization or a separate group there

that when BMT members couldn't get their drugs, they would then, you know, go to Mr. Flores.

THE COURT: Well, classically in the multiple conspiracy cases there is evidence of the hub and spoke, and that's not -- or there is evidence of other activity with other persons that could constitute a drug conspiracy that isn't necessarily affiliated.

The speculative nature is --

MR. RUBIO: What about the situation with Mr. Guzman? He testified that there was a period there that he moved in, that he wasn't a member of BMT, but, yes, he did buy marijuana, and, yes, he did buy marijuana from people that were not a member of BMT, and he himself indicated that he bought marijuana. In fact, that was his thing. Whether he bought before or --

THE COURT: If he were sitting there and he asked for a multiple conspiracy, I would give it to him. But what does that have to do with Mr. Flores?

MR. RUBIO: That Mr. Flores -- I think that circumstantially we can infer that he had his own group of people that he sold to in light of the fact that the great number of texts we don't know who those other persons were.

THE COURT: Okay. I keep coming back to that. I'm not quarrelling with you, but I need to see the texts that talk about drug dealing to these unknown persons. If they are just

talking about let's hook up, let's do this, let's do that, the fact that they are unknown is one thing. If they are using the same parlance as other texts that the Government has introduced to demonstrate drug dealing, and they are with unknown persons, and Mr. Flores is in that conversation, then that would support, I think, what you are saying. I just need to see them.

MR. VÁZQUEZ: So that we don't waste any of the Court's time, he is texting, according to Government's theory, people about selling drugs, and it's clear. He says coke and it's to an unknown person. Our position is that this is just buyer/seller. That doesn't make you a coconspirator. What we have here is affirmative evidence of his participation in a conspiracy with BMT members.

I didn't, and I can go through with Mr. Rubio, I don't have text messages that I can see link him to a separate conspiracy, just that he is a drug dealer and he has clients and he is allowed to sell -- our testimony has been that he has been allowed to sell in this area, that he has a business relationship with BMT. That's what our evidence has been.

From the text messages I can't see a second conspiracy where I know what it is. I just see people buying drugs from him and him buying drugs from them.

THE COURT: Maybe if somebody could cull out a few of those, I could take a look at them.

Mr. Donet?

MR. DONET: On behalf of Mr. Dixon, we would move on Rule 29 for judgment of acquittal. We believe that the evidence that has come forth in this case is insufficient to sustain a conviction as to the count of conspiracy to distribute crack.

THE COURT: Okay. Could you briefly outline your support for conspiracy with regard to Mr. Dixon?

MR. VÁZQUEZ: In the course of this case and the trial evidence, we have had coconspirators who have acknowledged Mr. Dixon is a part of the conspiracy, we have had evidence of Mr. Dixon selling from locations that are, according to jailhouse phone calls, under the control of the BMT, we have seen Mr. Dixon operating as what the Government will argue or argues as a lookout on two other occasions.

We think that this activity in one transaction he, in fact, makes change with a coconspirator over a drug deal right in front of the target location, 428 N.W. 11th Avenue. He is also on jailhouse phone calls counseling Mr. Altamirano about robbing and hustling.

So based on those circumstances, we believe that there is -- and hustling was identified as drug dealing activity -- we believe that it is proper to submit to the jury.

THE COURT: Okay. I don't know if I said this, but I am denying -- I think I did, but I'm denying Mr. Flores's request for a Rule 29. I think there is sufficient evidence.

And similarly I'm denying Mr. Dixon's request for

Rule 29 for the reasons and facts outlined by Mr. Vázquez in terms of his, his Mr. Dixon's, participating in the conspiracy.

Mr. Korchin?

MR. KORCHIN: Your Honor, Mr. Portela moves for a judgment of acquittal on each count that he is charged with in the indictment. As to Count 1, the drug conspiracy, we have shown during the trial that, of course, Mr. Portela did not sell any drugs, whether we are talking about crack, methylone, or marijuana.

We also have shown during the trial that from November 18, 2013, to the end of the charged time frame of the indictment, Mr. Portela was incarcerated and did not participate in any of the drug sales which were testified to primarily by Detective Veloz throughout 2014.

So primarily on the basis of those two points, we move for a judgment of acquittal on the grounds that the evidence of Mr. Portela's involvement in the conspiracy is slim, not sufficient to go to the jury.

Now, with respect to Counts 2 and 3, we also move for judgment of acquittal. Those are the charges, Count 2, July 26, 2013, possession of ammunition by a convicted felon, Count 3, November 18, 2013, possession of a firearm and ammunition by a convicted felon. We move for a judgment of acquittal on those counts.

On Count 4, possession of a controlled substance with

intent to distribute, November 18, 2013, of course that is the situation where Mr. Portela had half a gram of marijuana in his personal possession. We believe that there is insufficient evidence to support the charge that he possessed a half a gram of marijuana with the intent to distribute it.

And that links us with Count 5, which is possession of a firearm in furtherance of a drug trafficking crime on November 18, 2013. It is our position that with respect to Count 4, that is not a drug trafficking crime, and Count 5 must fall if Count 4 -- if there is a judgment of acquittal on Count 4.

So for these reasons, Your Honor, we would move for a judgment of acquittal on all counts with which Mr. Portela is charged.

THE COURT: Tell me again, Mr. Vázquez, how was the marijuana that was retrieved from Mr. Portela packaged?

MR. VÁZQUEZ: It was in a small baggie consistent with some of the other baggies that we have recovered in the course of this investigation. But in addition to that, it's not just a baggie because I recognize how it stains. But there are two separate sets of facts which show that this was with possession with intent to distribute and certain that it makes it proper for the jury to consider.

One, when Mr. Portela was arrested, he made a subsequent jailhouse phone call he described that's been

admitted into evidence, he described the nature of what he was doing on November 18, 2013. He was out trying to make some money. Didn't say I was out trying to smoke some marijuana by myself in front of a store. He said I was out trying to make some money.

Two, in the Facebook entry that we entered into evidence on November 18, 2013, Christian Ramirez solicited from Mr. Portela marijuana because he was on house arrest and he needed some. That same day Mr. Portela is caught in the vehicle.

We think that those facts, the jailhouse phone call, the timing of the Facebook post, the possession of the firearm, the location of the firearm make it such that it is proper to submit to the jury possession with intent to distribute based on his own words on that count.

To the conspiracy, if Your Honor like, I can move to the rest of the Counts.

THE COURT: Sure. I don't think I need as to Count 2 and 3.

MR. VÁZQUEZ: Yes.

THE COURT: I think the facts of the possessions are in and of themselves sufficient.

MR. VÁZQUEZ: Yes. And as far as the conspiracy count, there was testimony from Nadim Guzman Mr. Portela was a participant of the drug conspiracy.

Two, Mr. Portela following his arrest on November 18, 2013, made statements on jailhouse phone calls directing to his coconspirators to clear the set, the feds are coming, be careful, get everything out of there.

Dayaan Zerquera testified that Maurin Chacon was receiving information about staying off of the phone to avoid a wire tap, that's why he did not have a cellular phone.

Mr. Portela was in custody at that time. We have the jailhouse phone calls showing Mr. Portela reaching out to his associates regarding the investigation -- their investigation.

Mr. Portela I think somewhat ties into another argument that we are going to have with another defendant, but Mr. Portela when he is in custody talks to his associates about being -- Dwight Forte's car being a case breaker as to them whereas if he had no affiliation with the conspiracy, he had nothing to do with any of these guys, why is Dwight Forte's car so critical to him? He brings that up. He uses the word "case breaker."

I think that ties all of that together and makes it proper for the jury's consideration. He was an actual participant in the conspiracy and corroborates the corroborating defendant testimony as to his role in the conspiracy and the length of the role in the conspiracy.

THE COURT: All right. I'm going to deny Mr. Portela's request for Rule 29, although I think without -- I mean, I think

the marijuana charge is right over the line. What takes it over the line is packaging similar to other packages of drugs that have been sold in this case, the jailhouse call.

I don't know about the Facebook page. He could have been just delivering a gift. But I think of the counts that one had me more intrigued by what the Government had deduced.

I think what the Government has outlined is sufficient to let the matter go to a jury, although I expect I will hear Mr. Korchin making valid argument about why it's not really intent to distribute amount.

All right. Mr. Horowitz and also Mr. Gonzalez, I would like you to now talk to me about everything except Count 7 and 8.

MR. HOROWITZ: Six and 7.

THE COURT: The conspiracy and the other substantive counts.

MR. HOROWITZ: Your Honor, reserving on my Rule 29(a) as to Count 6 and 7, as to Counts 1, 14, 15, 16, 17, 29, 31, and 32 which Mr. Altamirano is charged with, the defendant would move pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure that when the evidence considered in light most favorable to the Government, no reasonable juror would find Mr. Altamirano guilty of those counts.

I have no further argument as to those counts, Judge.

THE COURT: All right. I think I will not call upon

Mr. Vázquez actually on this. I think the codefendant testimony, the undercover testimony, the videos, the Facebook postings, the jailhouse conversations all provide a basis for the jury to make a determination as to all counts regarding Mr. Altamirano, both conspiracy and substantive counts.

I will say, Mr. Vázquez, is there anything in particular that you would like to highlight as to Mr. Altamirano?

MR. VÁZQUEZ: Your Honor, Mr. Altamirano was identified by cooperating defendants as a member of the conspiracy. He at times was the person who received the confidential informant and received the confidential informant when we were expecting Maurin Chacon. He made sales in the area where the BMT claimed to control. His jailhouse phone calls with cooperating defendants he is talking about going back out and hustling and talking to Mr. Castro about the importance of his phone. He lends the phone to associates who are then using it, and he inquires is it making money. My phone is the only way I have to make money I think shows his participation in the conspiracy.

He is selling on May 2nd, on the same day with Mr. Chacon, the same day that we also find a large quantity of narcotics stashed in a location very close to the drug distribution site.

I think all of these facts, substantively they are on video, show that he was a participant to the conspiracy and that

it should be submitted to the jury for their consideration.

THE COURT: All right. The Court, and this is as to all defendants, the Court acknowledges that the evidence is not -- that the evidence in this case as to some defendants does not -- is not direct, that they actually made -- Mr. Portela's case made a sale of drugs to somebody that was acknowledged.

But I think as to Mr. Portela and all other defendants, the totality of the evidence and the circumstances are such that a reasonable juror could infer circumstantially not only participation in the conspiracy, but the substantive counts that they are charged with.

Mr. Gonzalez?

MR. GONZALEZ: Yes, Your Honor. On behalf of Mr. Chacon, at this time at the end of the Government's case in chief and also at the conclusion of all of the evidence, we would ask you to move for a judgment of acquittal.

I will mention the counts, and then I will go over some of the counts. Counts 1, 5, and I know the Court is going to address 6 and 7 separately, but those counts, and 8, 9, 12, 13, 18, 19 --

THE COURT: Slow down. Slow down.

MR. GONZALEZ: -- 18, 19, 20, 21, 22, 23, 28, and 30.

Judge, I will begin with addressing Count 5, and that is the November 18, 2013. I believe that clearly it's been established that this is Mr. Portela with his girlfriend. They

are -- the officers, the Miami-Dade Police detectives testified when the vehicle was stopped, there is a smell of marijuana, so clearly these individuals are smoking marijuana. They find a firearm underneath the passenger side.

Judge, I don't think that this is something reasonably foreseeable. This is not in Little Havana, this is something that happens on the other neck of the woods. At no time is Mr. Chacon directing Mr. Portela to do anything, and there is nothing in all of these texts or emails that would even suggest that Mr. Chacon had any idea that Mr. Portela is at the other end of town.

So we would move for a judgment of acquittal as to Count 5, and that is that November 18, 2013, of which, of course, the Government doesn't charge him with the possession of a controlled substance with the intent to distribute that they do charge Mr. Portela in Count 4. That doesn't make any sense because if it's reasonably foreseeable about the firearm and the same argument goes as to the marijuana, and I would argue because the marijuana is personal use and was being -- there was smoking going on, which is the testimony of the detectives that made the stop.

THE COURT: Well, that's a good question.

So why not? Why is that, Mr. Vázquez, if we are operating under this Pinkerton theory?

MR. VÁZQUEZ: We could have certainly exercised

discretion and charged Mr. Chacon and charged every single defendant in the drug conspiracy with the drug acts because the drug acts are foreseeable in a drug conspiracy.

We think it's clear that Mr. Portela and Mr. Chacon were in a joint conspiracy to distribute narcotics, and the -- it's just a question of how many times are we going to charge Mr. Chacon over and over again. The firearm is significant, which is why we exercise our discretion to do that.

It's certainly foreseeable that a person who is in a drug conspiracy is going to make drug sales and drug deliveries and that they are going to carry a firearm. Mr. Chacon doesn't have to know the workings of every aspect of the people who he is working with to distribute narcotics. What he has to know is that they are participating in drug conspiracies.

The evidence has been that he did know that, that he did know Mr. Portela was part of his group, and that, in fact, when Mr. Portela went out riding around, that was foreseeable to him. That wasn't a break, that wasn't an unusual act. It wasn't like we were charging Mr. Chacon with a kidnapping that had nothing to do with the case. It was the gravamen of the conspiracy itself, the sale of narcotics, the distribution of narcotics.

We have a Facebook post, and I know that the Court has kind of looked at it with limited impact, but I don't think it's a small thing that on the same day that he is arrested in

possession of marijuana, there is a person who is in the group asking him for marijuana, and then he is in a car with marijuana, and he has got a car, and he has a gun underneath his seat.

THE COURT: I'm not saying that -- I'm talking about my comment was directed to with intent to distribute, not that he didn't have the marijuana, not that he didn't have the gun, but that amount, was it meant for sale as opposed to share.

MR. VÁZQUEZ: I don't think it has to be, if I look at the jury instructions, that it has to be for pecuniary value, although Mr. Portela himself says I was trying to make some money.

So I think from Chacon's point of view was it foreseeable that one of his coconspirators in a drug conspiracy would go to distribute drugs? Yes. Was it foreseeable that a drug distributor would carry a firearm? Yes.

The Eleventh Circuit has used colorful language to say that drugs and guns go together like peas and carrots. It was certainly not an unforeseeable event for Mr. Chacon.

THE COURT: Okay. Continue, Mr. Gonzalez.

MR. GONZALEZ: Your Honor, the next would be specifically --

THE COURT: Eight.

MR. GONZALEZ: -- Count 8. I would just, you know, renew with regards to Count 8, Judge, I would renew the motion,

but I do understand that that is the place where they apparently were hanging out, staying in, and there is testimony that actually some of them were living there.

There was certainly no evidence that Mr. Chacon at any point in time possessed any firearm. And, if anything, it would be -- this is the continuation of Count 6 and 7 whereby these individuals came back to the area, to the abandoned house, and then went into the house, and there is where law enforcement found some narcotics, which Nadim Guzman admitted that there was narcotics there that were his. And he also blamed Joseph Thompson for the dope, but he did admit that he did have drugs there, and he did try -- then the firearm was found, I think, in a ceiling, like a fake or a hidden area of a ceiling.

So as to Count 8 and 9, we would renew our motion for judgment of acquittal, and that's the facts that there are with regards to that.

THE COURT: Let me ask -- I can't remember the peas-and-carrots case, so under a Pinkerton theory, how does the possession instruction -- how do they work? The argument is constructive possession?

MR. VÁZQUEZ: Well, under Pinkerton, let's say in Count 8, Count 8 is a different dynamic.

THE COURT: Well, he is in the house.

MR. VÁZQUEZ: He is in the house.

THE COURT: Let's talk about Count 5. So he is riding

around, Mr. Portela is riding around, he has a gun, he is charged with possession of a weapon in furtherance of drug trafficking. The jury is going to be, you know, three kinds of sold, joint --

MR. VÁZQUEZ: I think the way the Government would argue it and would ask for permission to argue it is that Mr. Portela had constructive possession of that firearm at the very least. We have evidence that he bought the gun. So before it went underneath the seat and through his post-Miranda statements, he was in physical possession, so that would be actual possession.

For Pinkerton purposes, the Government says if Mr. Portela, and going through the elements of Pinkerton if that conduct in the eyes of the jury was reasonably foreseeable and we hit all the elements in their eyes, as a factual determination then they can find Mr. Chacon guilty under a Pinkerton liability.

It isn't a question of what was Mr. Chacon's actual constructive possession. It's by virtue of Mr. Portela's actual or constructive possession he can also be found guilty.

THE COURT: Okay. You can continue, Mr. Gonzalez.

MR. GONZALEZ: Yes. Your Honor, with regards to the -- that was Counts 8 and 9.

THE COURT: Correct.

MR. GONZALEZ: We would just for purposes of the

record, Judge, we would renew -- we would do the motion for Rule 29, renew it again as to Counts 12 and 13.

But I would actually move on to Count 18 and specifically address that one more specifically with the following, Judge: That is the count where the Court allowed Detective Bernat to testify as to what he was hearing on the other end. There was no eyeball with regards to this count, no eyeball. It was mentioned that it might be Detective Cadavid, C-A-D-A-V-I-D; he never testified. And the actual video you see a gentleman interacting and carrying on a conversation that is not Mr. Chacon in that conversation.

Then there is an image, a still, which the Government is going to argue that that still is Chacon somewhere in there. But clearly I don't think that that is competent or sufficient evidence as to Count 18 with regard to the fact that there is not any one identifying that they actually saw a hand-to-hand transaction there. You don't see it on the video.

So with regards to that count, that would be my argument, Judge. That is Count 18.

Counts 19, 20, and 21 I would just, you know, renew my objections. I know that there is certain evidence that was produced, whether it be videos or audios, and these are different. So I will just leave my arguments there with regards to those counts, 21 and 22.

And 23 I would just, you know, renew my request for the

entrapment instruction with regards to that, but for purposes of preserving the record. I know that's not Rule 29 material.

THE COURT: Right. I understand.

MR. GONZALEZ: And then, Judge, I would move, then, to page 18 of the second superseding, and that's Count 28 and Count --

THE COURT: Thirty.

MR. GONZALEZ: Count 28, and it's the same situation as with regards to the Portela November 18th matter, and that is that Mr. Chacon in Count 28 is charged with firearm possession in furtherance of a drug trafficking crime. Dayaan Zerquera basically said it was his gun, he had purchased it. This was not under any instructions or directions of Mr. Chacon, so I don't think that it's reasonably foreseeable.

As you can see, that correlates to Count 26, and Count 26 is where Dayaan Zerquera and Christian Ramirez are the ones charged with the possession with intent to distribute. Chacon was never arrested there, you know, that day or anything of that nature.

I would ask the Court to grant judgment of acquittal on Count 28. Based on those arguments, I don't think it was reasonably foreseeable.

And then Count 30, just my general renewal of Rule 29. And, you know, there is video evidence on that which I recognize.

THE COURT: Okay.

MR. GONZALEZ: Thank you, Judge.

THE COURT: All right. Well, again, I will ask Mr. Vázquez to give me the most salient points, but I think the record is fairly replete with evidence demonstrating Mr. Chacon's involvement in a conspiracy Count 1.

And as to each of the individual counts, the law of the Eleventh Circuit with regard to Pinkerton, and as I said, I have decided that with regard to the gun possession, I will give the Pinkerton instruction with regard to the drug possession, I will give the aiding and abetting, that if it is reasonably foreseeable that weapons will be used in the course of the conspiracy, Pinkerton applies.

Here from pictures, from statements of the defendants themselves, and from testimony of codefendants, clearly weapons were part of the overall drug conspiracy and were used to protect not only the trap, but the sale and delivery.

I do think it's interesting, as you point out, that there is no similar charges to the substantive counts, and make of that what you wish. If the Government has made this decision, it is supported, I think, by case law.

As to Count 18, I do remember our discussion there was also, I think, testimony, correct me if I'm wrong, by the detective that he cleaned the CI before going in and what he retrieved when the CI came out and monitored his progress

through the deal at all times. I believe he testified that he had no Molly when he went to meet, and he did when he came out.

So while there is no evidence of hand to hand, there is certainly evidence from which a reasonable juror could infer that those persons in the pictures -- who is the other person?

MR. VÁZQUEZ: I don't remember the --

MR. GONZALEZ: He was not identified, Judge.

THE COURT: He wasn't identified?

MR. GONZALEZ: He could not tell who it was.

MR. VÁZQUEZ: He is an unidentified target. He is the individual with the tattoo in the center of his face.

THE COURT: Oh. But the other person was identified by the detective as Mr. Chacon, correct?

MR. VÁZQUEZ: The detective who was listening -- both detectives recognize Mr. Chacon's voice, and there is a point in the transaction where it goes from the interaction with the tattooed person, tattooed on the face, and then Chacon at the end.

We argued that and the Court ruled as it will, but Pinkerton or aiding and abetting are valid theories to prove that, even if the jury is unclear as to who did the hand-to-hand transaction. Because this was a trap of the conspiracy, of which Mr. Chacon is a part of, was able to use and sell out of.

In addition to that, Mr. Chacon is, according to the Detective's recollection, is participating at the tail end of

that drug transaction, and he recognized him by voice.

THE COURT: Right. No, I do not quarrel with the viability of either of those theories of law. But what I do feel is important is that once all the evidence has been developed, that these vicarious liability theories are tailored to what the evidence has demonstrated.

In some cases the Judge Middlebrooks case, which I can't think of right now, where he did not allow Pinkerton theory to go forward, but in aiding and abetting I think trial judges are called upon to see that -- what fits. I think in this instance the Government has been clear all along, at least with regard to the weapons charges, that it was proceeding on Pinkerton. So I think in order to avoid confusion, we should focus which theory is being advanced to whatever substantive count.

In any event, under aiding and abetting or under a straight up Mr. Chacon dealt Molly at that time, I think the Government has adduced sufficient evidence for a jury to make its decision as to whether or not the Government has met its burden of proof.

So now we go to --

MR. VÁZQUEZ: Your Honor, just so the record is clear, it was Molly and marijuana were purchased on that date.

THE COURT: Oh, it was both.

MR. VÁZQUEZ: That's my recollection.

THE COURT: Okay. Let's take 5 minutes, and then we will go to -- I will see where we are on the instruction, and then we will go to the whole Vicar discussion.

As to, though, all the Defendants' Rule 29 motions, is there anything now that we have been discussing it, something that you thought of, failed to mention, your memory was jogged when you heard other conversations?

MR. RUBIO: The same argument now will be at the conclusion of all the evidence.

THE COURT: Yes.

MR. RUBIO: We renew all the same objections.

MR. DONET: Mr. Dixon renews all his previous objections.

THE COURT: All right. Mr. Portela and Mr. Altamirano and Mr. Chacon would also be considered to have renewed all of their motions at the conclusion of the evidence and every objection that had been --

And your continuing objection, Mr. Rubio. It continuous.

MR. RUBIO: In perpetuity.

THE COURT: And will continue unless it's stopped by some verdict.

All right. Mr. Vázquez?

MR. VÁZQUEZ: Nothing, Your Honor. I'm just standing up.

THE COURT: Does anyone have the need for caffeine?

MR. VÁZQUEZ: I will join.

THE COURT: All right.

(Recessed at 3:45 PM.)

(Resumed at 4:05 PM.)

THE COURT: We are all here.

I don't want to repeat anything we have talked about earlier with regard to Count 6 and 7, but, Mr. Vázquez, clearly in my mind's eye, I think that these are problematic counts.

If it goes to the jury, I think the only person in this group of defendants who is Vicar eligible is Mr. Altamirano because he actually was identified as part of the robbery, and I don't think Pinkerton applies.

So you have given me case cites and we discussed it earlier, but if you can just summarize your most salient points and why it is you think that Mr. Chacon should not get a Rule 29 on these counts.

MR. VÁZQUEZ: Pinkerton is applicable in this case because considering the entire conspiracy and the entire nature of the conspiracy, there is no doubt, from the Government's perspective, that robberies were an integral part of how the -- robbery were an integral part to how the conspiracy functioned.

The consequence of that was that it was totally foreseeable to Mr. Chacon that this robbery would happen. An example of that comes from Government's 82, page 2 of the

transcript, where Mr. Chacon, I believe speaking with Mr. Alioth Salas, talks about putting a person by the name Jose on a lick and all, commissioning a robbery.

Mr. Chacon is on video committing what the Government believes is a robbery. There is testimony that he committed robberies as part of this association.

On the night of the robbery itself, the testimony from Nadim Guzman was that Mr. Chacon was there in the trap, the 435 N.W. 11th Avenue location. When Altamirano left, he told the occupants of the 435 trap we are going to go bust a mission. He said that with Dwight Forte, and he left with Forte and Thompson and got into the car, and he returned, and he told -- and he announced what he had done.

I understand the Court's concerns, but I think with this record, with the amount of evidence that has come in that makes clear that robberies are the feeding -- one of the feeding mechanisms for this conspiracy, to say that it was not foreseeable to Mr. Chacon that this would happen, I just disagree.

Alternatively, I think that although the Court has said how it will apply aiding and abetting, I think that in an instance where a group of men take over a block, take over an abandoned house, what Mr. Altamirano calls a bando, and then stage robberies out of that and as a group made this environment possible, and Mr. Chacon has been a part of that group, that he

is also liable under that theory, under just a plain application of aiding and abetting. He is giving them the staging ground for the robbery, he has participated in that effort.

I think that that is relevant. I think that in the case that we cited to the Court, United States versus Diaz, which is a Second Circuit case, but cites -- and it is a Vicar case, but like the Court notes, it is a conspiracy case that had a Vicar, but it cited to United States versus Alvarez, which is an Eleventh Circuit case which talked about the scope of Pinkerton in the Eleventh Circuit, and it included both reasonably foreseeable and the originally unintended substantive crimes.

I don't think that this could be classified as an unintended crime that was just some sort of mutation that just grew out. This was an individual -- this was a robbery that happened as a clear practice of the organization and that Pinkerton allows it, aiding and abetting allows it.

As far as Mr. Chacon, Your Honor, I greatly appreciate the time to give my position, but I think I have exhausted my intellectual ability to make my case.

I would just ask -- I have consulted with our appellate division. This is a case that it was authorized by main justice, if it was possible to reserve and enter its ruling so that we do have access, that's the only thing that I can ask at this point if the Court is inclined to exercise its authority

and enter Rule 29 for Mr. Chacon. I can reserve my arguments for Mr. Altamirano.

THE COURT: Mr. Gonzalez?

MR. GONZALEZ: Your Honor, you know, I don't think that Pinkerton applies in this particular case. I had concentrated on the Thai case that the Court had talked about yesterday. Those particular cases the individuals involved are ordering the homicides to take place or the bombing, which is the Thai case.

So with regards to this matter and Mr. Chacon, there is clearly no evidence that he had any involvement, and that's from Nadim Guzman. Nadim Guzman basically testified that they were there, that they basically went to sleep and then were woken up when these individuals came back. They did not know what they were actually going to do.

Also the part that I would also argue, Judge, is that I know that Mr. Vázquez keeps talking about the robbery, but the object here was the knowingly and unlawfully assault these individuals with a dangerous weapon. Those individuals came in and said Mr. Chacon had nothing to do with that, and that was not really foreseeable.

There is nothing that that event of November 20th had anything to do with these individuals promoting BMT or that Mr. Altamirano to gain entry or further his participation in the BMT. And to put Mr. Chacon in this light I think is not appropriate. I don't think that the evidence supports it, and I

would rely on the cases the Court has cited and the Thai case.

The line of cases are cases where there is homicides, there is fighting going on with different gangs, and this is something where one gang member is trying to up his position within the gang.

There is nothing that ties Mr. Chacon giving orders, direct orders or indirect orders or expecting something to come out of this. This is something that these individuals out of the blue decided to go do, and it had nothing -- they didn't consult Chacon with regards to that. There is nothing of that. Mr. Guzman clearly stated that.

I would ask the Court to grant the Rule 29 on Count 6 and 7.

MR. VÁZQUEZ: Judge, I just want to quickly turn to Alvarez, just so I make the point. In Alvarez footnote 21, and we are talking about assaults. The reason why it's charged as an assault is because Vicar enumerates what we can charge as its predicate offense. In this instance because no one was killed, it's an aggravated assault. Aggravated assault is integral to the commission of robbery. It's how they got people to give up their phones and money.

The Alvarez opinion in footnote 21 at page 8 -- I believe it's 848, says drug conspiracies result in assaults at least as frequently as they result in murders, if not more so. Our conclusion that murder is reasonably foreseeable -- is a

reasonable foreseeable consequence of a drug conspiracy necessarily forecloses the appellate's argument with respect to the assault convictions.

So in a drug conspiracy fed by robbery where assault is part and parcel to how you commit a robbery, how are you going to scare someone to give you your things unless you do the scarring; that's the assault.

I return to the transcript. Mr. Guzman did say that he was with Chacon when Altamirano and Forte announced they were going to bust a mission.

That's all I had to say.

MR. GONZALEZ: Judge, I would just to finish off on Alvarez, at 851, a different point there is the Court goes on to say in addition, all three appellants had actual knowledge of at least some of the circumstances and events leading up to the murder. You know, there is nothing here with regards to that. Okay?

With regards to Mr. Guzman's admissions, he said he didn't know what this mission was about because the mission could be to go to the store to get something, mission could be just whatever it is that you decided to call it. It did not have to do with a robbery, an assault, or anything of that nature.

THE COURT: All right. I think I am with Mr. Vázquez in that my intellect has been compromised by the length of the

day and the length of discussion, but here is my thought on this matter: We are, I think, comparing apples and oranges. I think it's Robertson that referenced Alvarez, or whichever case referenced Alvarez, in terms the applicability of the Pinkerton doctrine theory.

In this case, unlike the other RICO Vicar cases, gang cases, there is no evidence that this assault was identified as BMT, had -- was done in retaliation for something perceived as a slight to BMT, was outside the traps identified by BMT. There is no evidence, and, in fact, evidence to the contrary that Mr. Chacon ordered this to happen. In fact, while he was at the trap when they left and when they returned, there was evidence that the perpetrators of the robbery, who also perpetrated the assault, fought amongst themselves about the $40. So clearly that money wasn't going to BMT or Mr. Chacon.

The issue I have is the last element of proof, which is advancing one's position in the organization or solidifying one's position in the organization. Again, United States versus Hileman, which is a Third Circuit case, 377 federal appendix 157, and the other cases I have reviewed, the connection is not between the purpose of the enterprise, which clearly as I said robberies came in as inextricably intertwined to the conduct of the conspiracy, Vicar addresses the purpose of the crime as related to the actors' position in the enterprise.

I don't think that you can pluck Vicar out of the

statutory universe and connect it to a drug conspiracy and find that the mens rea has been satisfied.

In all of the other Vicar cases involving Pinkerton, there was an underlying RICO conspiracy with the predicate act listed or a conspiracy to murder, assault, and the person was charged in that conspiracy. So the Court found that that person's liability, guilt under conspiracy was sufficient for a Pinkerton, which is related only to conspiracy, for the Pinkerton instruction to be made.

And in those other cases, Houston, Tse, T-S-E, even I think Robertson, all of those cases involved persons who while they did not perform all of the acts, murder, mostly murder, they either -- there was evidence that they ordered it, that they participated. Houston in one of the murders that there had been discussion about the act. There was some connection other than it's part of a conspiracy.

So for the reasons that I have stated previously, the cases that I cited previously, I'm going to grant Mr. Chacon's motion for judgment of the acquittal as to Count 6 and then necessarily Count 7, which leaves us with Mr. Altamirano.

And Altamirano I find, Mr. Horowitz, you can give me your argument, but I have to say the argument that Mr. Vázquez just advanced while, again, the activities here are not commensurate with the activities in other cases, reasonable inference can be made because your client was, in fact, a

perpetrator of the assault.

So I'm not saying -- I have been candid about my qualms about these counts, but tell me, Mr. Horowitz, why Mr. Altamirano, who is, in fact, someone who allegedly committed the assault, unlike Mr. Chacon, why he does not go forward on Count 6 and 7.

MR. HOROWITZ: Judge, first of all, I just want to address two aspects of it. While I don't agree that there is an enterprise here, I understand that that portion may survive the Rule 29 motion.

However, if there is an enterprise here, there is no evidence that the enterprises's activity affected interstate or foreign commerce as is required as a second element of 1959.

In addition, I'm going to quote the Thai case that the Court cited specifically. Let me fine the page number. The headnote is right around 69 and 70 where it talks about the fifth element, that the crime of violence, that is assault with a dangerous weapon, which is what's charged here, was committed for the purpose of gaining entrance to or maintaining or increasing position within the enterprise.

The Thai case talks about at page 817 that this is a motive requirement and satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that

membership.

The evidence in the light most favorable to the Government was there was discussions and there was talk about going to rob a pawn shop. That's the Government's evidence that evening, if we believe the Government's evidence to be true.

There was nothing in the robbery or in the assault that showed that Mr. Altamirano's motive was to increase his membership or to do anything in furtherance of the enterprise. Simple statements such as we are going to find us a pawn shop doesn't mean anything as far as the enterprise. It's an individual activity unconnected with the enterprise made for their own personal gain. That doesn't make it a Vicar count.

As I think the Thai case also pointed out that not every robbery is a part of a RICO, and not every robbery is a Hobbs Act. In this case it's clearly not a Hobbs Act robbery because there is no interstate commerce affected. The enterprise has nothing to do with interstate commerce. It is in the light most favorable to the Government a drug distribution conspiracy. That's what the case is.

This incident does not rise to the level of a Vicar offense because the motive was to get money for himself and for Mr. Thompson and had nothing to do with the enterprise, and it has nothing to do with him expecting to have his membership status increased, maintained, or to gain entry into the group.

As a result -- and there is no evidence that that's the

reason any of these robberies were done. As I say this out of respect to Mr. Chacon, there is one videotape where I think he was shown patting down somebody and maybe reaching into a pocket. That's at worst case scenario no firearm involved, has nothing to do with the enterprise. If that's how money was made, so be it. That doesn't make it a racketeering offense, but it's just that simple pat down wasn't done to maintain membership in the racketeering organization to increase stature. It's very similar to something like that.

The assault in the light most favorable to the Government does not -- there was absolutely no evidence of how that robbery was to increase or maintain a position within a racketeering enterprise. And the motive requirement that the Thai case talks about was clearly not met in this case.

THE COURT: Mr. Vázquez?

MR. VÁZQUEZ: Yes, Your Honor?

THE COURT: I vaguely remember, but tell me about interstate commerce.

MR. VÁZQUEZ: Yes. We called Agent Mayo who testified cocaine originates from outside the United States. We cited this in our memorandum. United States versus Vázquez, no relation, it is, "Engaging in narcotics trafficking affects interstate commerce, at the very least, regardless of where the materials originate."

So by virtue of the fact that these individuals were

distributing narcotics which did not originate from the United States, they have the impact on interstate commerce.

Second, the motive requirement is also in Robertson, an Eleventh Circuit case, and it is an "or" like Mr. Horowitz noted. Because the defendant knew it was expected of him by virtue of membership or to further, and that is the rise and fall status question.

In this case there is evidence from cooperating defendants that you would lose status if you didn't help out on a robbery. You would not -- you could be ostracized, you weren't treated as well as people that said hold my drugs or help me with a robbery. Nadim Guzman testified to that.

The Court has heard testimony that the group robs people as a practice. And although it's different from the Kamahele case, in some respects the Court in that case noted that robbery, the gang not only knew about robberies, but also encouraged members to engage in the type of criminal behavior. In this case, that's exactly what happened. They had a pecking order system were people were encouraged to commit robberies.

So when Mr. Thompson wanted to do a robbery, Mr. Altamirano is going to help him and Forte helped him. It was an integral aspect of their membership. In that regard the motive element is proven.

In addition to that, Mr. Altamirano did commit this in furtherance of his membership. Mr. Altamirano, and this is what

makes it different from a standalone robbery, if these folks were, as I think the defense may argue tomorrow, ships passing in the night, they don't know each other, they are just guys hanging around, they would not announce to one another I'm going to commit this mission. Fine. No one knows what a mission means. They leave. They come back.

Altamirano says to the group we committed the robbery. He talks about using a firearm to the group. Why do that? What is the purpose other than saying look at what I did?

That is a statement against interest. The reason why he has said that is because it serves a purpose greater than I committed a robbery. A person who did not want to get caught would not announce that they committed a robbery. So why is he doing it? Because he wants them to know, and we tie that to the jailhouse phone calls where he is repeatedly talking about respect.

He chides Mr. Chacon for keeping information from him because he wants to be a more integral aspect -- integral player in this organization. He specifically says you have to respect my word, you are not respecting my word, there is going to be problems, you are going to have to leave Little Havana.

There is no doubt that those statements have real meaning because he told these individuals I just put a gun to people. He told them that and he was worthy of their respect or fear, whatever quality is valuable for this organization. He

did that, and it did make him a more serious actor in the group.

I have made my statements on Chacon. I leave it be on the field. But I think for Mr. Altamirano, you cannot announce what you did, you cannot tell people and then say it had no relationship to where I stood in the group.

He is not Jay Flores, he is not James Dixon. He is putting guns to people and he is letting people know. Why? He wants it known.

THE COURT: Okay. Briefly, Mr. Horowitz.

MR. HOROWITZ: Yes, most respectful to the Government, Mr. Altamirano made no announcements to the group like hey, let me throw my chest out, look at me, look at what I just did. There is nothing like that. That doesn't exist in the record.

The jailhouse calls have no relevance to the Vicar count and Count 6 other than the Government may infer the talk about the revolver in some of the earlier calls and where is my gun, where is my gun. Other than that, there is no relationship between the jail calls and this count.

The count is whether this crime was committed, number one, by Mr. Altamirano in the first place where there is no ID from the victims, either in court or out of court. And no matter what the officer testified to, four victims were here, four of them didn't identify Mr. Altamirano that night or in court.

With that being said, the evidence has to show when

considered in the light most favorable to the Government the motive that's required for this count to go to the jury. There is no motive. No matter how much Mr. Vázquez wants this Court to be reviled by the act that was committed, it has to comport with the elements that are necessary for this count to go to the jury, which it does not do based on the evidence even when considered in the light most favorable to the Government.

THE COURT: All right. Well, any kind of robbery, especially with weapons, is a heinous act. But the problem I had with the Vicar is that in contrast juxtaposition to the cases that I had reviewed, the activities reviewed in those cases were far more heinous and worthy of revulsion. So that's really not a factor here.

The Kamahele case does have some language, I think, that supports Mr. Vázquez's position, but in Kamahele they also had the exit document which talked about the defendant's commitment to advancing his reputation.

It's light. This is not a linear case such as those I reviewed. Again, where there is evidence of announcement of gang, gang colors, discussion. But there is evidence, there is the evidence of codefendants about committing violence garners respect, although I would imagine even outside a gang committing violence garners respect by some people at least or at least garners fear.

It is -- the actors do go back to the trap. Whether or

not they boasted, that's a matter for the jury to decide. If it was Mr. Altamirano's motive to have personal gain, the Banks case talks about the fact that oftentimes people act with mixed motives. So the fact that Mr. Altamirano might want to have kept the money I don't think necessarily precludes a finding that he engaged in the assault, the violent act, in order to maintain his position as a lieutenant of BMT. I think that's where the jailhouse calls come in.

I don't find the evidence is overwhelming, but I think it's sufficient to go to a jury, and I will deny Mr. Altamirano's request for Rule 29 on this.

MR. HOROWITZ: Judge, do you want to hear argument on Count 7? It kind of goes hand in hand with Count 6.

THE COURT: Right. What would be the argument as to Count 7?

MR. HOROWITZ: The argument would be that the evidence is insufficient, obviously, in the light most favorable to the Government. The evidence would show that we have four victims, no identification. Mr. Altamirano is not seen by law enforcement at the house.

Mr. Guzman testified about the miracle that occurred, that the lights went out, and Mr. Altamirano wasn't there when the lights went on. He made this Houdiniesque disappearance. Ultimately Mr. Altamirano is found a couple blocks away, not wearing the hoody that the perpetrators used in the assault, no

gunshot residue tests were made, no weapon was ever found, and, therefore, I'd move for judgment on acquittal for Mr. Altamirano on Count 7.

THE COURT: Didn't somebody identify Mr. Altamirano as the guy who shot the gun in the air?

MR. VÁZQUEZ: The out-of-court identification brought in through the detective established that Mr. Altamirano was the shooter and the discharge, and the out-of-court identification established by multiple witnesses that he was a participant to the robbery. In addition to that, Mr. Altamirano gave a very extended play by play of where his firearm was, where he had stashed it by a particular bando. He said what? Is it there? No. Is it there?

THE COURT: Is that that conversation?

MR. VÁZQUEZ: Yes.

THE COURT: That was painful.

MR. VÁZQUEZ: That was right after the robbery right when he was arrested. He talks about his revolver, he tells his mom, mom, I need my revolver. His mom tells him stop talking about the gun. He tells James Dixon I'm going to go back and rob again and hustle. I met some guys here. We are going to go back out there.

Mr. Altamirano implicates himself. Mr. Altamirano is identified out of court. There was no in-court identification. Mr. Altamirano is the person who either was the shooter, I don't

think that there is any argument that Joseph Thompson was a shooter, and Mr. Altamirano is the only one that is talking about a revolver on his jailhouse phone calls right after he is arrested.

MR. HOROWITZ: That's a great leap to say it was the same gun. It could have been put there any time. Could have been put there a week ago, 2 weeks ago. We don't know, but I leave it to the Court's discretion.

THE COURT: I fully expect you to argue that, Mr. Horowitz, but I think that it is a matter that the jury should be allowed to determine.

Okay. So we have dispensed with the Rule 29 arguments.

Does everyone have a copy? This is a rough people, so...

Just so you understand, we have paginated the jury instructions, numbers at the bottom. At the top -- we haven't done that yet, sorry. We are going to, though.

At the top we distinguish individual instructions by letter until you get to the offense instructions where we merely identify what counts the offense instructions are appropriate to.

Obviously with my rulings, I will have to change the Pinkerton instruction as to Mr. Chacon. I think I may have hedged my bet a little on that.

MR. VÁZQUEZ: It hurts. It hurts.

THE COURT: Feel better.

And I would direct Mr. Chacon, Mr. Gonzalez, I'm sorry, I don't have page numbers, but neither did all of you, so there. It's kind of toward the back, the aiding and abetting. Obviously since that is directed to Mr. Chacon, again, I had included a reference to him. Am I correct it's just Mr. Chacon, adding and abetting?

MR. VÁZQUEZ: I think it also applies to transactions involving Mr. Dixon on one day. He helped accomplish -- he had Miguel Rodriguez help him. I don't know if it necessarily needs to be defined. Chacon is the only person who we have asked for Pinkerton.

THE COURT: Okay. Then I don't need to do counts on aiding and abetting?

MR. VÁZQUEZ: I don't believe so.

THE COURT: Okay.

MR. VÁZQUEZ: I would like to argue Pinkerton more broadly, but I think the Court has said it's only going to apply to Chacon.

THE COURT: Yeah.

So that -- the aiding and abetting will become Q -- good, we are not going to run out of alphabet.

I would also direct the parties' attention to Count 7, which would be with regard, again, to Mr. Altamirano what we talked about earlier, and Mr. Vázquez had submitted two separate

instructions.

Ms. Greer, we have to redact Mr. Chacon's name.

THE COURTROOM DEPUTY: Yes, Judge. I made a note.

THE COURT: I am not going to ask you all to argue tonight because we are going to -- we are all going to be here again at 8:30, and I'm going to go page by page for final objections.

I am going to -- because I don't think they will be ready by 9:30 for me to instruct the jury, even though I know there has been a request, but I will have closings go forward, and then if there are any issues, we can have the jury come back later Thursday and continue our discussion then. I do want you to look this over tonight if you have any final objections, if I have missed something.

The only thing that remains is the multiple conspiracy, and Mr. Rubio you were going to direct me to particular texts.

MR. RUBIO: Judge, I need a little more guidance on it. I can't -- I think the only thing those texts show are phone numbers to who those text messages were going. It's impossible for me, and I asked the agent during the break if he had -- if he was able to determine who these text messages were going to, and he said no. He only did it with reference to the people that he knew were in this case.

THE COURT: But the text messages themselves, the content does indicate Mr. Flores engaging in drug dealing.

MR. RUBIO: Okay.

THE COURT: With persons who are unknown --

MR. RUBIO: Yes.

THE COURT: -- to either the agent or -- as we sit here today, there are other folk.

MR. VÁZQUEZ: There are other clients.

THE COURT: Okay. All right. I will consider that this evening, then.

MR. RUBIO: Thank you, Judge.

MR. VÁZQUEZ: I don't read them, and I can sit with Mr. Rubio, as coconspirator like hey bring me this, I have a customer. We don't know who it is. Jay, do you have some white? Okay. Yes, I will give you some. Not coconspirator activity.

THE COURT: Right.

MR. VÁZQUEZ: They sound like clients.

THE COURT: That's what you wanted to find out, if there was any evidentiary support, even though the Government disagrees with it, that Mr. Flores is operating his own deal, side deal, and he is not participating in the conspiracy, although I think the Government's rejoinder is he is just a busy fellow. That doesn't mean he is not guilty of what's set out here.

As I said, I was intending to give it, and then we came up with the victimization of addiction, so I kind of got thrown

off a little there. I will look at that tonight, Mr. Rubio.

I think as to the instructions, I said I was going to give Mr. Horowitz's instruction as to the Vicar.

MR. HOROWITZ: I noticed it's subsection P.

THE COURT: P.

MR. HOROWITZ: P as in Peter. And that has Mr. Vázquez's instruction on the Vicar, not the defense-requested instruction.

THE COURT: This is the Government's original?

MR. HOROWITZ: Yes, it is, Your Honor, because it's complete with citations, I think, on the third page.

THE COURT: Okay.

MR. HOROWITZ: And we had agreed it was going to be the defense instruction.

THE COURT: Good. See, this is what I need from you all.

MR. HOROWITZ: Other than that I found a couple of typos.

THE COURT: Okay. We will do that tomorrow, then. So we will go through tomorrow so that we can get the packet ready. You all will be prepared to start your closing arguments at 9:30. If we have to, again, meet Thursday morning before the jury comes back for my instructions, we will do so at that time.

MR. VÁZQUEZ: What is the earliest that we can arrive? We have a PowerPoint that we are going to use for our first

close, and I want to make sure that we have a test run to make sure.

THE COURT: What is the earliest -- Ms. Greer, what is the earliest we can have this open and IT up here?

THE COURTROOM DEPUTY: 8:30, Judge. I can call them.

THE COURT: 8:30, I think.

MR. VÁZQUEZ: That's fine.

THE COURT: If somebody could attend to the jury instruction discussion, someone could be talking to IT about PowerPoint. We will multitask.

MR. VÁZQUEZ: Yes.

THE COURT: Okay. Now, I think I have gone through my list. Is there anything else to discuss tonight in terms of argument that I said I would reserve on or anything else?

MR. VÁZQUEZ: Nothing for the Government.

MR. GONZALEZ: No, Your Honor.

THE COURT: All right. I know we have -- tomorrow will be an early day, so I will tell all of you what I tell the jury. Go to bed, have a good dinner, and I will see you all here at 8:30 tomorrow morning.

(Thereupon, the proceedings were adjourned at 4:51 PM.)

**I N D E X**

WITNESS PAGE

**SPECIAL AGENT ROSNIEL PEREZ, CONTINUED**

CONTINUED CROSS EXAMINATION BY MR. HOROWITZ............. 4

CROSS EXAMINATION BY MR. KORCHIN........................ 6

CROSS EXAMINATION BY MR. DONET......................... 16

CROSS EXAMINATION BY MR. RUBIO......................... 35

REDIRECT EXAMINATION BY MR. VÁZQUEZ.................... 46

**FRANKLIN FLORES, SWORN**................................. 69

DIRECT EXAMINATION BY MR. RUBIO........................ 69

CROSS EXAMINATION BY MR. VÁZQUEZ....................... 82

REDIRECT EXAMINATION BY MR. RUBIO...................... 87

EXHIBITS

Government's Exhibit 364 in evidence................... 53

* * * * * * * *

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

March 3, 2015

/s/ ***Tamra K. Piderit***

Florida Professional Reporter
Registered Diplomate Reporter
Certified Realtime Reporter

**$**

**$20** [1] - 10:21
**$40** [1] - 134:14
**$88** [1] - 4:12

**'**

**'13** [2] - 28:17, 30:5
**'14** [1] - 28:18

**/**

**/s** [1] - 151:23

**1**

**1** [8] - 8:22, 35:12, 60:6, 96:2, 110:6, 114:18, 116:18, 124:6
**10** [4] - 10:20, 15:5, 25:24, 96:3
**100** [3] - 23:22, 24:15, 25:5
**100,000** [1] - 26:5
**1000** [1] - 68:6
**104** [2] - 46:11, 46:17
**104th** [1] - 2:5
**11** [3] - 7:8, 7:13, 8:10
**1107** [1] - 2:5
**114** [1] - 46:22
**11th** [10] - 4:13, 47:2, 47:11, 47:22, 48:5, 77:8, 78:4, 85:13, 109:16, 129:9
**12** [4] - 72:4, 74:17, 116:19, 122:2
**12:01** [1] - 3:2
**12:02** [1] - 3:19
**12:20** [1] - 13:3
**12:24** [1] - 15:10
**12:30** [2] - 15:9, 15:11
**12:32** [1] - 16:9
**12th** [2] - 16:3, 70:18
**13** [4] - 74:17, 90:2, 116:19, 122:2
**13th** [1] - 50:10
**14** [4] - 25:13, 25:15, 92:15, 114:18
**14-20017-CR-KMW** [1] - 1:2
**15** [4] - 1:5, 15:24, 25:24, 114:18
**150** [1] - 1:22
**157** [1] - 134:20
**15s** [1] - 74:19
**16** [2] - 114:18, 151:6
**160** [1] - 18:12
**16th** [1] - 35:24
**17** [2] - 74:21, 114:18
**176** [4] - 47:6, 47:8, 47:10, 47:13
**18** [24] - 7:16, 8:6, 10:8, 10:15, 49:19, 49:23, 50:2, 50:3, 110:11, 110:22, 111:1, 111:8, 112:2, 112:7, 113:1, 116:20, 116:22, 116:24, 117:13, 122:3, 122:15, 122:19, 123:5, 124:22
**18th** [2] - 9:6, 123:9
**19** [6] - 24:24, 30:5, 30:8, 116:20, 116:22, 122:20
**1910** [1] - 1:24
**1959** [1] - 136:13
**1997** [1] - 70:5
**1:37** [1] - 59:25
**1:43** [1] - 63:4
**1:49** [1] - 63:5
**1:54** [1] - 65:22
**1A** [3] - 62:2, 99:11, 99:12
**1H** [1] - 62:2
**1st** [2] - 34:17, 35:13

**2**

**2** [15] - 13:18, 17:24, 44:1, 70:8, 74:12, 74:25, 89:5, 89:24, 92:24, 96:2, 110:19, 110:20, 112:18, 128:25, 145:7
**20** [8] - 10:20, 30:6, 30:8, 34:12, 56:19, 58:22, 116:22, 122:20
**2000** [1] - 1:19
**2011** [8] - 8:17, 8:20, 8:23, 9:1, 9:19, 31:19, 68:17
**2012** [6] - 71:3, 71:4, 71:5, 71:12, 74:20, 83:2
**2013** [44] - 7:16, 8:6, 9:8, 10:8, 10:15, 31:16, 31:21, 35:25, 36:5, 39:13, 39:14, 41:9, 41:20, 41:21, 41:23, 42:1, 42:2, 42:13, 46:12, 49:19, 49:24, 50:2, 50:3, 56:19, 56:20, 67:23, 77:15, 78:14, 78:19, 78:20, 78:21, 79:18, 82:6, 110:11, 110:21, 110:22, 111:1, 111:8, 112:2, 112:7, 113:2, 116:24, 117:13
**2014** [34] - 7:8, 7:13, 7:19, 7:23, 8:2, 8:10, 8:13, 8:18, 8:21, 8:23, 9:1, 9:19, 17:22, 17:24, 19:25, 30:5, 31:1, 31:2, 35:12, 37:8, 37:13, 42:14, 42:23, 43:1, 67:7, 84:16, 84:18, 84:20, 84:25, 85:2, 85:4, 85:8, 103:15, 110:14
**2015** [2] - 1:4, 151:22
**20th** [3] - 4:7, 5:17, 131:21
**21** [7] - 34:12, 56:20, 116:22, 122:20, 122:24, 132:15, 132:22
**21st** [1] - 4:7
**22** [3] - 34:12, 116:22, 122:24
**23** [4] - 19:25, 89:17, 116:22, 122:25
**24** [1] - 31:10
**242** [1] - 49:22
**245** [2] - 18:8, 18:20
**246** [4] - 13:11, 13:14, 13:24, 19:12
**247** [1] - 18:16
**25** [1] - 67:6
**26** [4] - 67:23, 110:20, 123:15, 123:16
**264** [1] - 53:7
**265** [3] - 40:5, 41:12, 42:3
**26th** [1] - 36:1
**28** [5] - 116:22, 123:5, 123:8, 123:10, 123:21
**287** [1] - 50:9
**29** [17] - 89:2, 99:10, 109:2, 109:24, 110:1, 113:25, 114:18, 122:2, 123:2, 123:23, 127:4, 128:16, 131:1, 132:12, 136:10, 143:11, 145:12
**29(a** [2] - 114:17, 114:20
**299** [2] - 17:12, 17:20
**29s** [3] - 62:18, 95:25, 99:3
**2:26** [1] - 88:25
**2:30** [1] - 90:7
**2:36** [1] - 90:8
**2:44** [1] - 94:4
**2:47** [1] - 95:15
**2:50** [1] - 97:11
**2:54** [1] - 98:23
**2nd** [3] - 17:21, 34:14, 115:20

**3**

**3** [11] - 1:4, 13:23, 76:20, 76:22, 93:21, 96:2, 110:19, 110:21, 112:19, 151:22
**30** [5] - 68:17, 96:8, 96:9, 116:22, 123:23
**308** [1] - 17:9
**31** [1] - 114:18
**32** [1] - 114:19
**3250** [1] - 2:2
**33130** [1] - 1:22
**33132** [1] - 1:17
**33133** [1] - 2:3
**33134** [1] - 1:20
**33138** [1] - 2:5
**33156** [1] - 1:25
**332** [2] - 14:8, 19:23
**33327** [1] - 2:10
**35** [1] - 151:7
**362** [2] - 6:23, 8:9
**363** [1] - 50:14
**364** [11] - 51:18, 52:1, 53:6, 53:7, 53:8, 53:9, 53:10, 53:15, 54:7, 55:8, 151:14
**365** [1] - 67:1
**366** [1] - 68:11
**367** [1] - 67:18
**377** [1] - 134:19
**39** [1] - 4:9
**3:45** [1] - 128:4
**3rd** [2] - 50:10, 83:13

**4**

**4** [8] - 75:9, 76:20, 110:25, 111:9, 111:10, 111:11, 117:16, 151:4
**404(b** [5] - 60:2, 60:25, 63:25, 64:8, 64:19
**404(b)** [2] - 61:17, 63:21
**406** [1] - 2:3
**428** [4] - 47:11, 47:22, 48:5, 109:16
**435** [5] - 4:13, 47:2, 129:9, 129:10
**45** [3] - 96:4, 96:6, 96:7
**46** [1] - 151:8
**4:05** [1] - 128:5
**4:51** [1] - 150:22
**4th** [3] - 77:8, 78:3, 85:13

**5**

**5** [11] - 31:12, 64:13, 64:22, 96:13, 111:6, 111:9, 116:18, 116:23, 117:13, 120:25, 127:1
**50** [1] - 96:6
**50,000** [1] - 26:24
**53** [1] - 151:14
**5:30** [2] - 96:10, 96:13

**6**

**6** [12] - 28:16, 79:13, 114:18, 116:19, 120:6, 128:8, 132:12, 135:19, 136:6, 141:15, 143:13, 151:5
**614** [1] - 1:20
**662** [1] - 60:6
**68** [2] - 25:11, 25:15
**681** [1] - 2:10
**69** [3] - 136:16, 151:9, 151:10
**6th** [1] - 70:18

**7**

**7** [14] - 98:25, 114:12, 114:14, 114:18, 116:19, 120:6, 128:8, 132:13, 135:20, 136:6, 143:13, 143:15, 144:3, 146:23
**70** [1] - 136:16
**73** [3] - 24:13, 24:14, 24:21
**770** [1] - 18:25

**8**

**8** [9] - 114:13, 116:19, 119:24, 119:25, 120:14, 120:22, 121:23, 132:22
**80** [2] - 18:16, 18:23
**817** [1] - 136:21
**818** [2] - 64:13, 64:22

**82** [2] - 128:25, 151:11
**848** [1] - 132:23
**851** [1] - 133:13
**87** [1] - 151:12
**8:30** [6] - 97:4, 97:8, 147:6, 150:5, 150:6, 150:20
**8th** [1] - 100:5

**9**

**9** [7] - 42:10, 96:11, 96:22, 97:6, 116:19, 120:14, 121:23
**9130** [1] - 1:24
**99** [1] - 1:17
**9:30** [5] - 97:2, 97:18, 98:20, 147:9, 149:22

**A**

**abandoned** [6] - 34:15, 75:22, 76:21, 87:20, 120:7, 129:23
**abbreviated** [1] - 76:8
**abetting** [11] - 124:11, 125:20, 126:9, 126:16, 129:21, 130:2, 130:17, 146:4, 146:7, 146:14, 146:21
**ability** [2] - 54:18, 130:20
**able** [11] - 12:11, 20:19, 22:6, 27:4, 33:7, 53:18, 57:19, 57:21, 76:11, 125:23, 147:21
**above-entitled** [1] - 151:19
**absence** [1] - 64:19
**absent** [1] - 105:23
**absolute** [1] - 94:17
**absolutely** [2] - 89:12, 138:11
**accepted** [1] - 89:13
**access** [1] - 130:24
**accident** [2] - 60:18, 66:20
**accomplish** [1] - 146:9
**accord** [1] - 99:6
**according** [6] - 31:14, 60:17, 66:16, 108:8, 109:10, 125:24
**Accordingly** [1] - 67:12
**account** [15] - 17:15, 17:17, 18:13, 19:14, 26:11, 26:14, 26:16, 48:23, 49:16, 49:17, 51:2, 51:4, 51:23, 57:19, 57:21
**accounts** [4] - 28:13, 33:7, 50:24, 51:11
**accumulated** [1] - 44:2
**accurate** [3] - 8:5, 24:15, 51:22
**acknowledged** [2] - 109:8, 116:6
**acknowledges** [1] - 116:3
**acquired** [1] - 16:19
**acquittal** [14] - 102:13, 109:2, 110:5, 110:16, 110:20, 110:23, 111:10, 111:13, 116:16, 117:12, 120:15, 123:20, 135:19, 144:2
**Act** [2] - 137:15
**act** [9] - 65:7, 66:21, 118:18, 135:4, 135:15, 142:4, 142:9, 143:3, 143:6
**acted** [2] - 60:17, 66:16
**active** [1] - 76:13
**actively** [1] - 70:10
**activities** [5] - 38:20, 55:21, 135:23, 135:24, 142:11
**activity** [11] - 28:16, 103:5, 105:7, 106:4, 107:5, 109:14, 109:20, 136:12, 137:11, 148:14
**actor** [1] - 141:1
**actors** [1] - 142:25
**actors'** [1] - 134:24
**acts** [17] - 60:8, 60:11, 60:18, 60:22, 61:2, 61:7, 64:14, 66:3, 66:6, 66:10, 66:11, 66:15, 66:19, 80:13, 118:2, 118:3, 135:12
**actual** [10] - 6:1, 18:17, 35:13, 41:22, 113:20, 121:11, 121:18, 121:19, 122:9, 133:14
**add** [6] - 60:20, 61:7, 61:8, 65:3, 65:6, 92:8
**added** [1] - 22:25
**addicted** [3] - 80:18, 80:21, 104:17
**addiction** [3] - 105:6, 105:8, 148:25
**adding** [1] - 146:7
**addition** [6] - 111:19, 125:24, 133:14, 136:14, 139:24, 144:10
**additional** [2] - 93:2, 93:8
**address** [4] - 93:5, 116:19, 122:4, 136:8
**addressed** [1] - 92:21
**addresses** [2] - 31:8, 134:23
**addressing** [3] - 89:21, 93:3, 116:23
**adds** [1] - 64:13
**adduced** [1] - 126:18
**adjourned** [2] - 98:22, 150:21
**admissible** [2] - 100:13, 101:7
**admission** [4] - 62:2, 63:20, 64:6, 100:7
**admissions** [3] - 99:22, 100:8, 133:18
**admit** [1] - 120:11
**admitted** [10] - 46:13, 53:9, 53:11, 64:17, 64:18, 100:20, 101:13, 106:8, 112:1, 120:9
**admonition** [1] - 98:4
**advanced** [2] - 126:14, 135:23
**advancing** [2] - 134:17, 142:17
**advantage** [1] - 104:12
**advertisement** [1] - 51:2
**affect** [1] - 57:9
**affected** [2] - 136:12, 137:16
**affects** [1] - 138:22
**affiliated** [3] - 21:20, 106:11, 107:7
**affiliation** [6] - 16:24, 27:5, 29:19, 29:22, 59:14, 113:15
**AFPD** [1] - 1:21
**afternoon** [6] - 3:20, 4:4, 4:5, 16:14, 16:15, 69:2
**age** [2] - 49:8, 84:2
**agent** [30] - 5:22, 11:17, 14:4, 15:18, 22:12, 22:15, 22:20, 38:9, 41:2, 42:4, 42:9, 46:7, 46:17, 47:15, 47:17, 49:2, 49:15, 50:6, 51:10, 51:17, 53:15, 54:18, 55:1, 55:20, 56:18, 58:19, 59:4, 62:7, 147:20, 148:4
**AGENT** [2] - 4:1, 151:3
**Agent** [12] - 4:4, 4:6, 6:22, 16:14, 24:20, 35:21, 41:3, 41:4, 41:7, 42:21, 59:18, 138:19
**aggravated** [2] - 132:19
**ago** [2] - 145:7
**agree** [14] - 13:6, 19:3, 20:17, 20:22, 21:10, 21:15, 24:7, 24:10, 25:19, 40:2, 41:19, 65:4, 93:2, 136:8
**agreed** [4] - 65:2, 89:15, 99:11, 149:13
**agreeing** [2] - 63:21, 92:25
**agreement** [2] - 64:5, 89:11
**agrees** [1] - 102:6
**ahead** [3] - 14:9, 14:25, 95:19
**aiding** [10] - 124:11, 125:20, 126:9, 126:16, 129:21, 130:2, 130:17, 146:4, 146:14, 146:21
**air** [2] - 57:5, 144:5
**alarms** [1] - 98:20
**alcohol** [4] - 55:6, 55:7, 55:13, 56:3
**Alioth** [2] - 48:25, 129:1
**Allapattah** [6] - 21:4, 23:14, 29:2, 59:12, 81:23, 81:24
**alleged** [1] - 45:16
**allegedly** [2] - 66:12, 136:4
**allow** [6] - 14:3, 75:18, 80:22, 90:13, 92:5, 126:8
**allowed** [9] - 13:10, 23:1, 67:13, 80:17, 92:7, 108:17, 108:18, 122:5, 145:11
**allowing** [1] - 94:1
**allows** [2] - 130:17
**alluded** [1] - 98:11
**alluding** [1] - 104:13
**almost** [1] - 90:15
**alone** [1] - 104:17
**alphabet** [1] - 146:22
**ALTAMIRANO** [1] - 1:8
**Altamirano** [49] - 5:8, 6:14, 46:8, 52:12, 55:12, 55:14, 55:15, 56:19, 60:25, 64:11, 64:19, 69:3, 109:17, 114:19, 114:23, 115:5, 115:8, 115:9, 127:14, 128:11, 129:9, 129:23, 131:2, 131:23, 133:9, 135:20, 135:21, 136:4, 139:21, 139:24, 139:25, 140:7, 141:3, 141:11, 141:20, 141:23, 143:4, 143:19, 143:22, 143:24, 144:2, 144:4, 144:7, 144:10, 144:23, 144:25, 145:2, 146:24
**Altamirano's** [4] - 57:21, 137:7, 143:2, 143:11
**alternates** [8] - 89:20, 91:5, 91:7, 91:10, 91:21, 92:9, 92:15
**alternatively** [1] - 129:20
**Alvarez** [7] - 130:8, 132:15, 132:22, 133:13, 134:3, 134:4
**AMERICA** [1] - 1:4
**America** [5] - 67:3, 67:19, 67:20, 68:12, 68:13
**American** [5] - 12:2, 12:3, 15:19, 21:13, 21:16
**ammunition** [4] - 67:11, 67:13, 110:21, 110:22
**amount** [18] - 4:23, 10:23, 11:3, 26:1, 28:15, 34:10, 34:11, 34:24, 34:25, 35:5, 35:7, 35:16, 37:12, 37:16, 37:18, 114:10, 119:8, 129:15
**amounts** [7] - 9:21, 10:3, 32:24, 33:10, 34:12, 34:22, 35:10
**analyzed** [1] - 6:6
**Angel** [3] - 18:13, 53:21, 54:19

**announce** [3] - 140:4, 140:13, 141:3
**announced** [2] - 129:13, 133:9
**announcement** [1] - 142:19
**announcements** [1] - 141:11
**announcing** [1] - 65:18
**answer** [6] - 45:10, 76:25, 79:25, 101:12, 101:23, 105:4
**Anthony** [1] - 50:7
**ANTHONY** [1] - 1:9
**anticipate** [1] - 92:11
**AP** [4] - 23:17, 59:5, 59:8, 59:15
**apartment** [1] - 76:3
**apologies** [2] - 41:6, 42:18
**apologize** [3] - 13:13, 53:18, 92:1
**appeal** [1] - 40:1
**appealed** [1] - 89:11
**appear** [1] - 49:8
**APPEARANCES** [2] - 1:14, 2:1
**appellants** [1] - 133:14
**appellate** [1] - 130:21
**appellate's** [1] - 133:2
**appendix** [1] - 134:19
**apples** [1] - 134:2
**applicability** [1] - 134:4
**applicable** [1] - 128:18
**application** [1] - 130:1
**applied** [1] - 65:1
**applies** [4] - 124:13, 128:13, 131:5, 146:8
**apply** [2] - 129:21, 146:18
**appreciate** [1] - 130:18
**approach** [8] - 11:8, 22:1, 39:20, 42:4, 42:6, 42:16, 51:14, 54:14
**approached** [2] - 73:19, 75:2
**appropriate** [2] - 131:25, 145:20
**approximate** [1] - 54:1
**April** [13] - 28:17, 28:18, 31:1, 31:2, 34:17, 35:12, 35:13, 39:13, 41:9, 41:20, 78:20, 78:21, 85:4
**apropos** [1] - 15:15
**area** [30] - 31:8, 39:12, 39:13, 47:22, 48:5, 50:10, 50:11, 51:7, 56:9, 56:14, 59:13, 70:19, 75:21, 77:6, 78:9, 78:16, 79:10, 79:12, 80:17, 81:24, 83:2, 83:4, 83:5, 83:10, 83:12, 87:20, 108:18, 115:13, 120:7, 120:13
**argue** [12] - 22:24, 101:23, 109:12, 117:18, 121:6, 122:13, 131:15, 140:2, 145:9, 146:17, 147:4
**argued** [1] - 125:19
**argues** [1] - 109:13
**arguing** [1] - 103:18
**argument** [20] - 11:14, 12:6, 64:1, 98:21, 99:7, 113:11, 114:9, 114:24, 117:18, 120:19, 122:19, 127:8, 133:2, 135:22, 143:12, 143:14, 143:16, 145:1, 150:14
**argumentative** [2] - 22:11, 22:12
**arguments** [13] - 88:20, 89:3, 90:19, 94:11, 96:12, 97:15, 97:19, 98:18, 122:23, 123:21, 131:1, 145:12, 149:21
**arm** [1] - 61:16
**arose** [1] - 43:3
**arrangements** [1] - 3:6
**arrest** [7] - 29:4, 36:11, 37:7, 85:7, 85:8, 112:8, 113:1
**arrested** [18] - 7:15, 8:6, 18:2, 29:14, 33:11, 37:13, 38:17, 43:10, 43:15, 50:1, 50:2, 82:6, 85:5, 111:24, 118:25, 123:18, 144:18, 145:4
**arrive** [1] - 149:24
**article** [1] - 57:6
**articles** [1] - 5:24
**aspect** [3] - 118:12, 139:22, 140:18
**aspects** [1] - 136:8
**assault** [18] - 131:17, 132:17, 132:19, 133:3, 133:4, 133:7, 133:22, 134:7, 134:14, 135:5, 136:1, 136:5, 136:17, 137:6, 138:10, 143:6, 143:25
**assaults** [2] - 132:16, 132:23
**asserted** [1] - 75:15
**assets** [1] - 9:24
**assistance** [1] - 3:10
**Assistant** [3] - 67:4, 67:21, 68:14
**associate** [1] - 21:19
**associated** [1] - 21:2
**associates** [4] - 48:15, 113:10, 113:13, 115:17
**associating** [2] - 50:7, 102:23
**association** [5] - 21:24, 23:18, 48:16, 103:8, 129:6
**assume** [1] - 19:9
**ATF** [4] - 5:22, 46:18, 47:3, 56:22
**attend** [1] - 150:8
**attention** [6] - 4:6, 14:25, 46:11, 47:19, 94:21, 146:23
**Attorney** [2] - 67:4, 67:21
**attorney** [4] - 67:5, 67:22, 68:14, 68:15
**attributable** [1] - 37:10
**attributed** [1] - 47:24
**audios** [1] - 122:22
**August** [1] - 36:3
**AUSA** [3] - 1:15, 1:16, 1:16
**authority** [1] - 130:25
**authorized** [1] - 130:22
**automatically** [1] - 21:19
**available** [3] - 39:24, 40:11, 99:8
**Avenue** [10] - 47:2, 47:11, 47:22, 48:5, 50:10, 70:18, 77:8, 85:13, 109:16, 129:9
**avoid** [2] - 113:6, 126:13
**aware** [5] - 15:18, 29:3, 38:13, 41:7, 41:10

## B

**Babou** [1] - 55:4
**bag** [3] - 10:20, 50:4, 97:21
**baggie** [2] - 111:17, 111:20
**baggies** [1] - 111:18
**bando** [2] - 129:23, 144:12
**bank** [1] - 33:7
**Banks** [1] - 143:2
**based** [19] - 21:25, 22:7, 22:8, 23:10, 42:21, 56:22, 58:15, 58:19, 91:19, 98:8, 103:5, 103:6, 104:1, 109:19, 112:14, 123:21, 142:6
**basis** [3] - 90:18, 110:15, 115:3
**bathroom** [1] - 15:7
**Beach** [1] - 30:20
**beat** [2] - 74:9, 76:12
**become** [1] - 146:21
**becomes** [3] - 75:16, 89:4, 89:23
**bed** [1] - 150:19
**began** [1] - 36:11
**begin** [1] - 116:23
**beginning** [7] - 31:19, 36:3, 42:12, 61:1, 77:15, 78:14, 82:25
**behalf** [4] - 69:2, 102:25, 109:1, 116:13
**behavior** [1] - 139:17
**behind** [1] - 54:23
**behoove** [1] - 99:9
**beings** [1] - 6:3
**believes** [2] - 58:13, 129:5
**belonging** [1] - 41:25
**below** [4] - 7:1, 67:6, 67:23, 68:16
**Bench** [12] - 11:10, 12:21, 22:2, 23:7, 39:21, 40:23, 52:7, 53:4, 75:5, 76:16, 80:5, 81:5
**Bernat** [2] - 32:11, 122:6
**best** [4] - 23:25, 54:18, 71:8, 89:23
**bet** [1] - 145:24
**better** [2] - 103:19, 146:1
**between** [13] - 8:17, 8:22, 9:1, 9:18, 18:23, 31:8, 41:19, 48:17, 49:16, 56:18, 67:1, 134:21, 141:18
**beyond** [5] - 52:3, 58:4, 59:10, 60:14, 66:9
**bigger** [1] - 44:4
**bike** [1] - 33:22
**binder** [1] - 24:18
**birthday** [1] - 30:10
**bit** [3] - 23:21, 29:10, 71:8
**Black** [1] - 11:21
**blamed** [1] - 120:10
**block** [2] - 18:5, 129:22
**blocks** [3] - 50:13, 76:22, 143:24
**blood** [3] - 28:20, 48:20, 48:25
**blue** [1] - 132:9
**BMT** [62] - 11:18, 11:20, 11:21, 11:22, 11:23, 12:9, 12:11, 13:6, 13:8, 13:21, 16:25, 20:10, 20:11, 20:22, 21:12, 21:19, 22:5, 27:5, 29:24, 45:21, 45:22, 47:24, 48:5, 48:15, 48:21, 50:11, 50:24, 51:11, 52:12, 52:22, 55:15, 57:23, 59:8, 59:12, 59:14, 80:18, 103:2, 103:7, 104:6, 104:7, 104:11, 105:11, 105:13, 106:9, 106:11, 106:13, 107:1, 107:11, 107:13, 108:13, 108:19, 109:11, 115:13, 131:22, 131:24, 134:8, 134:9, 134:15, 143:7
**BMT's** [1] - 51:8
**boasted** [1] - 143:1
**boasting** [1] - 27:8
**bomb** [1] - 92:22
**bombing** [1] - 131:8
**book** [1] - 60:6
**born** [1] - 70:25
**boss** [1] - 94:23
**bottles** [2] - 53:24, 56:3
**bottom** [1] - 145:16
**bought** [4] - 35:5, 107:13, 107:14, 121:8
**Boulevard** [2] - 1:19,

DAILY COPY

1:24
**bow** [1] - 95:18
**boxing** [1] - 70:11
**Boxing** [1] - 70:17
**bragged** [1] - 27:5
**bragging** [1] - 27:8
**break** [5] - 12:22, 15:7, 59:24, 118:18, 147:20
**breaker** [2] - 113:14, 113:18
**breaks** [1] - 97:23
**brief** [1] - 103:14
**briefly** [2] - 109:5, 141:9
**bring** [8] - 16:7, 65:21, 69:11, 94:3, 96:10, 97:9, 98:21, 148:11
**bringing** [1] - 90:21
**brings** [1] - 113:17
**broadly** [1] - 146:18
**brother** [2] - 69:22, 70:24
**brought** [6] - 14:24, 20:5, 52:17, 52:25, 95:1, 144:6
**brown** [1] - 97:21
**buddies** [1] - 86:22
**buildings** [3] - 71:16, 76:22, 85:13
**bullet** [1] - 57:5
**bullets** [1] - 6:1
**bump** [1] - 99:1
**burden** [1] - 126:20
**business** [2] - 100:12, 108:18
**bust** [2] - 129:10, 133:10
**busy** [1] - 148:21
**but..** [1] - 11:14
**buy** [3] - 104:22, 107:11, 107:12
**buyer/seller** [2] - 105:20, 108:11
**buying** [3] - 53:25, 108:21, 108:22
**buys** [1] - 34:12
**BY** [50] - 2:9, 4:3, 6:21, 16:13, 23:9, 25:14, 32:15, 34:9, 35:20, 39:10, 41:1, 42:8, 42:20, 43:8, 45:15, 46:6, 48:3, 51:16, 53:14, 54:6, 54:17, 55:19, 56:17, 57:2, 58:6, 58:14, 58:18, 59:3, 69:20, 71:20, 72:12, 73:3, 73:16, 76:17, 77:5, 79:9, 81:6, 81:14, 82:24, 84:24, 86:2, 87:7, 151:4, 151:5, 151:6, 151:7, 151:8, 151:10, 151:11, 151:12

## C

**cache** [1] - 34:3
**Cadavid** [1] - 122:8
**CADAVID** [1] - 122:9
**cafeteria** [1] - 97:22
**caffeine** [1] - 128:1
**camera** [4] - 30:25, 31:10, 43:22, 43:24
**cameras** [3] - 31:2, 31:4, 31:9
**campaign** [1] - 94:21
**can..** [1] - 63:3
**cancel** [1] - 94:19
**cancelled** [1] - 94:24
**candid** [1] - 136:2
**cannot** [3] - 98:15, 141:3, 141:4
**car** [10] - 33:17, 33:18, 33:23, 74:12, 75:19, 113:14, 113:16, 119:2, 119:3, 129:12
**care** [3] - 3:5, 62:11, 84:10
**careful** [1] - 113:4
**carefully** [1] - 25:16
**carrots** [2] - 119:18, 120:18
**carry** [2] - 118:11, 119:16
**carrying** [2] - 68:2, 122:10
**cars** [4] - 33:14, 33:17, 52:19, 72:4
**case** [89] - 1:2, 7:23, 8:2, 9:9, 9:22, 12:10, 16:17, 21:5, 35:22, 36:12, 36:20, 36:25, 37:24, 38:9, 38:11, 38:14, 38:17, 38:20, 45:20, 59:24, 68:21, 69:7, 80:14, 88:18, 88:20, 88:21, 89:6, 89:15, 89:23, 91:2, 92:8, 94:10, 95:12, 98:5, 98:6, 98:13, 98:16, 102:13, 102:15, 102:19, 103:12, 109:3, 109:7, 113:14, 113:17, 114:3, 116:4, 116:6, 116:14, 118:20, 120:18, 124:21, 126:7, 128:14, 128:18, 130:5, 130:6, 130:7, 130:9, 130:20, 130:22, 131:5, 131:6, 131:8, 132:1, 134:3, 134:6, 134:19, 136:14, 136:21, 137:13, 137:15, 137:19, 138:4, 138:14, 139:4, 139:8, 139:15, 139:18, 142:14, 142:18, 143:3, 147:23
**Case** [4] - 67:15, 68:3, 68:7, 68:10
**case-in-chief** [1] - 68:21
**cases** [21] - 89:13, 89:16, 89:19, 89:25, 93:1, 107:4, 126:7, 131:7, 132:1, 132:2, 134:6, 134:7, 134:20, 135:3, 135:10, 135:11, 135:18, 135:24, 142:11, 142:12
**cash** [2] - 33:10, 34:3
**Castro** [1] - 115:16
**Castro's** [2] - 5:2, 5:4
**caught** [2] - 112:9, 140:12
**cautionary** [1] - 60:5
**ceiling** [2] - 120:13
**cell** [2] - 26:20, 28:12
**cellular** [1] - 113:7
**center** [1] - 125:11
**certain** [3] - 38:16, 111:22, 122:21
**certainly** [7] - 11:13, 100:12, 117:25, 118:9, 119:19, 120:4, 125:4
**certificate** [1] - 79:22
**certificates** [1] - 80:25
**Certified** [1] - 151:25
**certify** [1] - 151:18
**Chacon** [79] - 46:8, 46:25, 50:7, 50:17, 51:23, 53:21, 54:11, 54:22, 54:23, 54:24, 55:4, 55:6, 55:12, 55:13, 61:15, 64:7, 67:2, 67:5, 67:7, 67:14, 68:25, 86:6, 86:21, 87:8, 87:12, 87:23, 113:5, 115:13, 115:21, 116:14, 117:8, 117:10, 118:1, 118:4, 118:7, 118:11, 118:19, 119:19, 120:4, 121:16, 122:11, 122:13, 123:10, 123:13, 123:17, 125:13, 125:17, 125:23, 125:24, 126:17, 127:15, 128:16, 128:24, 129:1, 129:4, 129:8, 129:18, 129:25, 130:18, 131:1, 131:9, 131:19, 131:24, 132:6, 132:10, 133:9, 134:11, 134:15, 136:5, 138:2, 140:17, 141:2, 145:23, 146:2, 146:5, 146:6, 146:11, 146:19
**CHACON** [1] - 1:7
**Chacon's** [7] - 67:10, 119:13, 121:18, 124:6, 125:15, 135:18, 147:2
**chance** [2] - 52:23, 93:10
**chances** [1] - 19:8
**change** [3] - 93:13, 109:15, 145:22
**changed** [5] - 3:7, 93:10, 93:19, 93:25, 95:21
**charge** [8] - 43:9, 43:14, 111:4, 114:1, 117:14, 117:16, 118:6, 132:17
**charged** [28] - 8:15, 8:22, 37:23, 44:17, 44:23, 60:9, 60:11, 60:18, 66:4, 66:6, 66:10, 66:14, 66:15, 66:18, 66:19, 110:5, 110:11, 111:14, 114:19, 116:11, 118:1, 121:2, 123:10, 123:17, 132:16, 135:6, 136:18
**charges** [5] - 43:3, 43:4, 110:20, 124:19, 126:12
**charging** [1] - 118:19
**check** [1] - 29:15
**checked** [1] - 29:14
**chemist** [1] - 10:11
**chest** [1] - 141:12
**chides** [1] - 140:17
**chief** [2] - 68:21, 116:15
**Chile** [2] - 95:9, 100:5
**chips** [3] - 12:25, 15:6, 15:16
**choose** [1] - 91:9
**chores** [1] - 77:16
**chose** [4] - 91:5, 91:6, 91:10
**chosen** [1] - 98:7
**Chris** [1] - 49:17
**Christian** [2] - 112:7, 123:16
**Christopher** [1] - 69:3
**CHRISTOPHER** [1] - 1:8
**CI** [3] - 34:21, 124:24, 124:25
**Circuit** [11] - 67:15, 68:3, 68:7, 68:10, 119:17, 124:8, 130:6, 130:9, 130:10, 134:19, 139:4
**circumstances** [4] - 78:10, 109:19, 116:8, 133:15
**circumstantially** [2] - 107:20, 116:9
**citations** [1] - 149:11
**cited** [7] - 93:1, 130:5, 130:8, 132:1, 135:18, 136:15, 138:20
**cites** [2] - 128:14, 130:6
**City** [3] - 4:22, 46:18, 47:3
**civil** [1] - 89:19
**claimed** [1] - 115:13
**clarification** [1] - 61:14
**classically** [1] - 107:3
**classified** [1] - 130:13
**clause** [1] - 60:21
**clean** [1] - 73:9
**cleaned** [1] - 124:24
**clear** [10] - 91:4, 92:2, 95:20, 108:9, 113:3, 118:4, 126:11, 126:22, 129:16, 130:16
**clearly** [14] - 20:7, 99:23, 103:11, 116:24, 117:3, 122:14, 124:15, 128:8, 131:10, 132:11, 134:14, 134:21, 137:15, 138:14

**client** [7] - 34:16, 40:10, 40:14, 40:20, 62:25, 80:22, 135:25
**clients** [4] - 103:4, 108:16, 148:6, 148:16
**clocks** [1] - 98:20
**close** [14] - 70:21, 70:23, 71:9, 71:14, 81:24, 83:4, 84:7, 90:19, 92:7, 92:9, 98:4, 98:5, 115:22, 150:1
**closing** [15] - 11:14, 12:6, 13:7, 15:20, 22:4, 23:5, 52:21, 88:20, 89:24, 94:10, 97:19, 98:17, 98:21, 101:4, 149:21
**closings** [4] - 90:14, 92:6, 92:13, 147:10
**clothes** [2] - 19:5, 19:9
**clubs** [1] - 30:13
**cocaine** [9] - 8:16, 8:24, 34:10, 35:14, 67:14, 68:5, 68:8, 68:16, 138:20
**coconspirator** [4] - 108:11, 109:15, 148:11, 148:13
**coconspirators** [3] - 109:8, 113:3, 119:14
**Coconut** [1] - 2:3
**codefendant** [1] - 115:1
**codefendants** [3] - 45:19, 124:15, 142:21
**coffee** [2] - 88:22, 99:2
**coke** [1] - 108:9
**Coladas** [1] - 32:11
**collect** [1] - 16:4
**collected** [1] - 57:10
**colorful** [1] - 119:17
**colors** [1] - 142:20
**coming** [10] - 60:25, 62:6, 64:2, 71:21, 75:14, 77:18, 80:24, 97:10, 107:23, 113:3
**commenced** [8] - 11:10, 22:2, 36:8, 39:21, 42:23, 52:7, 75:5, 80:5
**commencing** [1] - 43:1
**commensurate** [1] - 135:24
**comment** [4] - 39:7, 45:8, 45:23, 119:6
**commented** [1] - 13:17
**commerce** [6] - 136:13, 137:16, 137:17, 138:18, 138:23, 139:2
**commission** [2] - 56:18, 132:20
**commissioning** [1] - 129:3
**commit** [7] - 66:13, 66:15, 66:17, 133:5, 139:19, 139:24, 140:5
**commitment** [1] - 142:17
**committed** [18] - 60:10, 60:11, 60:18, 66:5, 66:6, 66:10, 66:12, 66:19, 129:5, 136:4, 136:18, 136:23, 136:25, 140:7, 140:12, 140:13, 141:19, 142:4
**committing** [4] - 28:6, 129:4, 142:21, 142:22
**common** [3] - 15:19, 21:13, 21:16
**communication** [1] - 84:16
**communications** [1] - 102:22
**company** [1] - 25:3
**compare** [2] - 25:17, 25:21
**comparing** [1] - 134:2
**competent** [1] - 122:14
**complete** [1] - 149:11
**completed** [1] - 92:7
**complicate** [1] - 93:7
**comport** [1] - 142:4
**comported** [1] - 89:17
**composite** [3] - 19:12, 51:19, 53:6
**composition** [1] - 91:20
**compromised** [1] - 133:25
**computer** [1] - 60:7
**concealed** [1] - 68:3
**conceded** [2] - 104:8, 104:9
**concentrated** [1] - 131:5
**concern** [1] - 93:11
**concerned** [6] - 64:11, 89:25, 93:17, 93:18, 93:23, 95:2
**concerns** [1] - 129:14
**concluded** [7] - 12:21, 23:7, 40:23, 53:4, 76:16, 81:5, 99:7
**conclusion** [7] - 10:25, 37:14, 43:6, 116:15, 127:9, 127:16, 132:25
**concrete** [1] - 32:6
**conduct** [2] - 121:14, 134:22
**conducting** [1] - 47:17
**confer** [4] - 59:21, 62:14, 63:3, 90:6
**conference** [12] - 11:10, 12:21, 22:2, 23:7, 39:21, 40:23, 52:7, 53:4, 75:5, 76:16, 80:5, 81:5
**conferring** [1] - 60:1
**confidential** [5] - 36:22, 37:3, 47:15, 115:11, 115:12
**confirm** [1] - 15:25
**confront** [4] - 76:3, 76:12, 77:12, 100:15
**confronted** [8] - 75:21, 99:18, 99:21, 100:19, 100:23, 101:11, 101:12, 101:24
**confusion** [1] - 126:13
**connect** [1] - 135:1
**connection** [3] - 84:7, 134:20, 135:15
**consequence** [2] - 128:23, 133:1
**consider** [9] - 60:10, 60:12, 60:15, 66:5, 66:7, 66:11, 93:8, 111:23, 148:7
**consideration** [2] - 113:20, 116:1
**considered** [8] - 60:22, 64:16, 65:7, 66:22, 114:21, 127:15, 142:1, 142:7
**considering** [1] - 128:19
**consistent** [5] - 10:24, 11:3, 12:13, 75:7, 111:17
**conspiracies** [3] - 103:24, 118:14, 132:23
**conspiracy** [83] - 8:16, 8:21, 30:4, 31:18, 34:11, 37:24, 43:9, 43:14, 43:18, 43:19, 80:23, 99:24, 102:19, 102:23, 102:25, 103:9, 103:16, 103:20, 104:2, 105:5, 105:6, 105:9, 105:10, 105:19, 105:21, 105:23, 105:24, 105:25, 106:23, 107:4, 107:6, 107:17, 108:13, 108:16, 108:20, 109:4, 109:6, 109:9, 110:2, 110:6, 110:17, 112:16, 112:23, 112:25, 113:15, 113:21, 113:22, 113:23, 114:15, 115:5, 115:10, 115:19, 115:25, 116:10, 118:2, 118:3, 118:5, 118:10, 118:21, 119:14, 124:6, 124:13, 124:16, 125:22, 128:19, 128:20, 128:22, 129:17, 130:7, 133:1, 133:4, 134:23, 135:1, 135:4, 135:5, 135:6, 135:7, 135:8, 135:16, 137:19, 147:15, 148:20
**constitute** [1] - 107:6
**constructive** [4] - 120:20, 121:7, 121:19, 121:20
**consult** [1] - 132:10
**consulted** [1] - 130:21
**consumed** [1] - 11:5
**consumption** [2] - 10:24, 11:4
**contact** [6] - 31:15, 32:17, 32:19, 84:15, 102:22, 106:21
**contain** [1] - 7:12
**content** [1] - 147:25
**contents** [1] - 6:11
**context** [10] - 21:21, 21:24, 22:4, 22:5, 22:7, 22:8, 23:1, 23:2, 23:4, 52:22
**continuation** [1] - 120:6
**continue** [5] - 59:14, 119:20, 121:21, 127:21, 147:12
**Continued** [1] - 4:1
**CONTINUED** [5] - 2:1, 4:2, 23:8, 151:3, 151:4
**continued** [1] - 99:24
**continuing** [1] - 127:18
**continuous** [1] - 127:19
**contort** [1] - 20:18
**contorting** [1] - 21:6
**contrary** [1] - 134:10
**contrast** [1] - 142:10
**control** [2] - 109:11, 115:14
**controlled** [4] - 36:19, 36:20, 110:25, 117:15
**conversation** [16] - 36:8, 49:19, 72:13, 73:4, 77:25, 78:5, 78:6, 78:12, 81:15, 81:18, 87:12, 87:23, 108:5, 122:10, 122:11, 144:14
**conversations** [5] - 28:3, 36:9, 115:3, 127:7
**conveyed** [1] - 15:15
**convicted** [9] - 67:7, 67:14, 67:24, 68:2, 68:5, 68:8, 68:16, 110:21, 110:23
**conviction** [1] - 109:4
**convictions** [2] - 63:21, 133:3
**cooperate** [1] - 45:20
**cooperating** [7] - 32:1, 38:24, 39:1, 45:6, 115:10, 115:14, 139:8
**cooperators** [1] - 45:21
**copies** [1] - 100:1
**copy** [3] - 3:7, 100:8, 145:13
**Coral** [1] - 1:20
**correct** [179] - 4:13, 4:24, 6:3, 6:6, 7:2, 7:13, 7:16, 7:19, 7:22, 8:10, 8:14, 8:18, 9:10, 10:8, 11:4, 16:19, 16:21, 16:25, 17:3, 17:4, 17:6, 17:10, 17:14, 17:22, 17:23, 17:25, 18:3, 18:6, 18:10, 18:16, 19:1, 19:6, 19:25, 20:3, 20:4, 20:8, 20:12, 20:15, 20:20, 20:24, 21:2,

21:6, 21:10, 21:13, 21:23, 23:12, 23:19, 24:8, 24:11, 24:16, 25:5, 25:25, 26:3, 26:6, 26:9, 26:12, 26:13, 26:15, 26:18, 26:21, 26:22, 26:24, 27:3, 27:6, 27:10, 27:13, 27:17, 27:18, 27:20, 27:25, 28:3, 28:4, 28:7, 28:10, 28:14, 28:22, 28:24, 29:2, 29:4, 29:7, 29:10, 29:15, 29:19, 29:22, 29:25, 30:2, 30:6, 30:9, 30:13, 30:14, 30:17, 30:23, 31:2, 31:5, 31:10, 31:16, 31:21, 31:22, 31:25, 32:12, 32:22, 32:23, 32:25, 33:5, 33:6, 33:8, 33:9, 33:12, 33:13, 33:14, 33:15, 33:17, 33:19, 33:22, 34:1, 34:13, 34:18, 34:22, 35:2, 35:8, 35:12, 35:15, 35:25, 36:10, 37:1, 37:5, 37:8, 37:9, 37:24, 37:25, 38:3, 38:7, 38:9, 38:14, 38:17, 38:20, 38:24, 38:25, 39:2, 39:3, 42:18, 42:23, 43:1, 44:10, 44:11, 44:14, 44:15, 44:17, 44:18, 44:21, 44:22, 44:24, 44:25, 45:3, 45:4, 45:17, 45:18, 45:22, 48:17, 48:21, 49:5, 60:2, 65:4, 71:5, 83:19, 83:20, 83:21, 84:8, 84:13, 85:13, 86:16, 86:21, 87:22, 121:24, 124:23, 125:13, 146:6, 151:18

**correctly** [1] - 49:4

**correlates** [1] - 123:15

**corresponding** [2] - 41:15, 48:24

**corresponds** [1] - 47:13

**corroborates** [1] - 113:21

**corroborating** [1] - 113:21

**costs** [1] - 52:9

**counsel** [1] - 40:8

**counseling** [1] - 109:17

**Count** [47] - 8:22, 110:6, 110:20, 110:21, 110:25, 111:6, 111:9, 111:10, 111:11, 112:18, 114:12, 114:18, 116:23, 117:13, 117:16, 119:24, 119:25, 120:6, 120:14, 120:22, 120:25, 122:3, 122:15, 122:19, 123:5, 123:6, 123:8, 123:10, 123:15, 123:21, 123:23, 124:6, 124:22, 128:8, 132:12, 135:19, 135:20, 136:6, 141:15, 143:13, 143:15, 144:3, 146:23

**count** [16] - 37:24, 103:9, 109:4, 110:5, 112:15, 112:23, 122:5, 122:7, 122:18, 126:15, 137:12, 141:15, 141:18, 141:19, 142:2, 142:5

**Counts** [6] - 110:19, 112:17, 114:18, 116:18, 121:23, 122:2

**counts** [21] - 110:24, 111:13, 114:5, 114:16, 114:23, 114:24, 115:4, 115:5, 116:10, 116:17, 116:18, 116:19, 122:20, 122:24, 124:7, 124:19, 128:9, 128:17, 136:3, 145:20, 146:13

**County** [4] - 7:18, 67:15, 68:7, 68:9

**county** [1] - 8:7

**couple** [9] - 6:25, 24:2, 24:3, 25:22, 45:5, 85:21, 96:19, 143:24, 149:17

**course** [26] - 17:5, 33:16, 46:7, 47:24, 48:11, 49:9, 49:15, 50:6, 50:20, 51:1, 51:10, 55:20, 58:1, 59:4, 62:7, 65:6, 66:21, 89:2, 90:2, 101:18, 109:7, 110:7, 111:1, 111:18, 117:14, 124:12

**Court** [42] - 22:18, 61:15, 61:25, 63:12, 64:9, 64:12, 67:15, 68:3, 68:7, 68:10, 90:14, 90:20, 92:10, 92:25, 93:1, 93:5, 93:8, 93:16, 95:4, 95:22, 96:20, 116:2, 116:3, 116:18, 118:23, 122:5, 123:20, 125:19, 129:20, 130:5, 130:7, 130:25, 131:6, 132:1, 132:12, 133:13, 135:6, 136:15, 139:13, 139:15, 142:3, 146:18

**COURT** [295] - 1:1, 3:3, 3:13, 3:16, 3:20, 5:11, 5:14, 5:22, 6:19, 11:1, 11:7, 11:9, 11:15, 11:24, 12:1, 12:22, 13:5, 13:12, 14:1, 14:7, 14:9, 14:15, 14:18, 14:20, 14:22, 15:1, 15:5, 15:12, 16:3, 16:7, 16:10, 22:1, 22:3, 22:9, 22:13, 23:3, 24:25, 32:14, 34:5, 34:8, 35:18, 37:15, 39:9, 39:20, 39:22, 40:8, 40:20, 40:24, 41:5, 42:5, 42:7, 42:17, 42:19, 43:7, 43:12, 45:10, 45:14, 45:25, 46:4, 48:1, 48:7, 48:9, 48:13, 49:13, 51:15, 52:2, 52:4, 52:6, 52:8, 52:14, 52:17, 52:25, 53:2, 53:7, 53:9, 53:13, 54:2, 54:5, 54:16, 55:17, 56:1, 56:8, 56:10, 56:12, 57:1, 58:5, 58:10, 58:16, 59:11, 59:18, 59:20, 59:23, 60:1, 60:4, 61:3, 61:6, 61:18, 61:23, 62:4, 62:8, 62:11, 62:22, 63:3, 63:6, 63:9, 63:13, 63:15, 63:24, 64:2, 64:5, 64:21, 64:23, 65:2, 65:6, 65:10, 65:12, 65:19, 65:21, 65:23, 68:19, 69:1, 69:4, 69:6, 69:8, 69:12, 71:19, 71:23, 72:1, 72:11, 72:20, 72:22, 73:15, 73:23, 75:4, 75:6, 75:12, 75:16, 75:24, 76:2, 76:6, 76:15, 76:24, 77:4, 77:21, 78:24, 79:3, 79:5, 79:7, 79:24, 80:4, 80:11, 80:21, 81:2, 81:4, 81:10, 81:12, 82:8, 82:10, 82:12, 82:14, 82:16, 82:18, 82:20, 82:22, 84:23, 85:23, 87:5, 88:3, 88:5, 88:7, 88:9, 88:11, 89:1, 89:9, 89:15, 90:5, 90:9, 90:22, 91:4, 91:18, 91:25, 92:4, 92:14, 92:18, 92:20, 93:6, 93:22, 94:5, 94:8, 94:22, 94:25, 95:11, 95:14, 95:16, 95:19, 96:7, 96:9, 96:16, 96:23, 97:8, 97:12, 98:24, 99:13, 99:17, 100:1, 100:11, 100:16, 100:19, 101:1, 101:5, 101:16, 101:18, 101:21, 102:3, 102:5, 102:9, 102:16, 103:11, 103:22, 105:4, 105:14, 105:16, 106:2, 106:10, 106:15, 107:3, 107:16, 107:23, 108:23, 109:5, 109:22, 111:15, 112:18, 112:21, 113:24, 114:15, 114:25, 116:2, 116:21, 117:22, 119:5, 119:20, 119:23, 120:17, 120:23, 120:25, 121:21, 121:24, 123:3, 123:7, 124:1, 124:3, 125:8, 125:12, 126:2, 126:24, 127:1, 127:10, 127:14, 127:21, 128:1, 128:3, 128:6, 131:3, 133:24, 138:15, 138:17, 141:9, 142:8, 143:14, 144:4, 144:14, 144:16, 145:9, 146:1, 146:13, 146:16, 146:20, 147:4, 147:24, 148:2, 148:4, 148:7, 148:15, 148:17, 149:5, 149:9, 149:12, 149:15, 149:19, 150:3, 150:6, 150:8, 150:12, 150:17

**court** [11] - 67:8, 67:24, 86:18, 86:25, 141:21, 141:24, 144:6, 144:8, 144:24

**Court's** [7] - 3:10, 21:25, 90:18, 92:12, 108:7, 129:14, 145:8

**COURTROOM** [4] - 69:14, 97:7, 147:3, 150:5

**courtroom** [2] - 13:4, 80:8

**cousin** [1] - 106:22

**covered** [1] - 31:9

**crack** [8] - 8:16, 8:24, 34:10, 34:25, 35:5, 35:14, 109:4, 110:8

**create** [1] - 22:23

**creation** [1] - 46:19

**crime** [14] - 34:2, 66:14, 66:17, 66:18, 67:8, 67:25, 111:7, 111:9, 123:11, 130:14, 134:23, 136:17, 136:23, 141:19

**crimes** [3] - 27:20, 28:7, 130:12

**Criminal** [1] - 114:20

**criminal** [2] - 22:22, 139:17

**critical** [1] - 113:17

**cross** [13] - 3:18, 3:22, 11:12, 14:3, 14:23, 15:2, 15:23, 23:2, 23:3, 52:18, 52:23, 82:8, 82:9

**CROSS** [11] - 4:2, 6:20, 16:12, 23:8, 35:19, 82:23, 151:4, 151:5, 151:6, 151:7, 151:11

**cross-examine** [2] - 23:2, 23:3

**CRR** [1] - 2:9

**CSOs** [1] - 98:21

**cull** [1] - 108:23

**culture** [3] - 12:3,

12:12
**custody** [6] - 7:21, 7:23, 8:6, 8:12, 113:8, 113:13
**customer** [1] - 148:12
**customers** [1] - 45:6

## D

**Dade** [6] - 7:18, 67:15, 68:3, 68:7, 68:9, 117:1
**Dadeland** [1] - 1:24
**daily** [2] - 101:22, 101:25
**dangerous** [2] - 131:18, 136:18
**data** [1] - 19:23
**date** [9] - 7:7, 8:7, 8:23, 9:2, 9:4, 17:24, 35:11, 37:7, 126:23
**DAVID** [1] - 2:2
**DAY** [1] - 1:5
**day-to-day** [1] - 84:16
**day..** [1] - 97:1
**Dayaan** [5] - 19:14, 39:2, 113:5, 123:11, 123:16
**days** [4] - 17:6, 62:1, 89:24, 92:24
**De** [1] - 1:19
**deal** [5] - 74:25, 109:15, 125:1, 148:19, 148:20
**dealer** [2] - 105:18, 108:16
**dealers** [1] - 103:14
**dealing** [9] - 99:19, 99:24, 100:17, 106:5, 106:12, 107:25, 108:4, 109:20, 147:25
**dealt** [2] - 104:11, 126:17
**debriefed** [2] - 38:16, 38:19
**debriefings** [1] - 45:19
**decide** [5] - 60:11, 66:6, 66:12, 91:1, 143:1
**decided** [5] - 45:19, 81:20, 124:9, 132:9, 133:21
**decision** [4] - 65:18, 98:8, 124:21, 126:19
**decisions** [1] - 98:14
**deduced** [1] - 114:6
**deem** [1] - 93:14
**deeply** [1] - 84:10
**defend** [1] - 70:14
**defendant** [28] - 38:24, 39:1, 46:12, 60:11, 60:15, 60:16, 60:17, 64:16, 65:1, 65:7, 65:8, 66:6, 66:10, 66:13, 66:14, 66:16, 66:17, 66:19, 66:21, 66:23, 100:14, 102:17, 113:12, 113:22, 114:19, 118:2, 136:23, 139:5
**Defendant** [9] - 67:2, 67:5, 67:7, 67:10, 67:22, 67:24, 68:14, 68:24, 69:21
**defendant's** [1] - 142:16
**Defendants** [2] - 1:10, 80:6
**defendants** [21] - 14:9, 27:12, 32:1, 49:8, 58:2, 58:8, 58:21, 60:23, 61:2, 61:7, 64:15, 66:3, 68:22, 115:10, 115:15, 116:3, 116:4, 116:7, 124:14, 128:11, 139:9
**DEFENDANTS** [1] - 1:19
**Defendants'** [1] - 127:4
**defense** [15] - 49:3, 59:21, 60:4, 62:15, 69:3, 80:15, 82:9, 89:14, 90:16, 90:23, 97:5, 105:24, 140:2, 149:8, 149:14
**defense-requested** [1] - 149:8
**defined** [1] - 146:11
**deliberate** [2] - 94:12, 98:2
**deliberation** [3] - 89:25, 94:16, 98:15
**deliberations** [1] - 91:14
**deliver** [1] - 90:1
**deliveries** [1] - 118:10
**delivering** [1] - 114:5
**delivery** [1] - 124:17
**demeanor** [1] - 81:8
**demonstrate** [5] - 80:12, 103:6, 103:7, 103:13, 108:4
**demonstrated** [1] - 126:6
**demonstrating** [2] - 48:4, 124:5
**demonstration** [1] - 22:23
**demonstrative** [4] - 11:12, 13:7, 101:8, 101:10
**demonstratives** [1] - 23:4
**denied** [3] - 22:17, 100:18, 101:12
**deny** [3] - 100:16, 113:24, 143:10
**denying** [3] - 109:23, 109:25
**depended** [1] - 22:5
**DEPUTY** [4] - 69:14, 97:7, 147:3, 150:5
**describe** [2] - 54:18, 74:14
**described** [3] - 10:11, 111:25, 112:1
**despite** [2] - 22:17, 89:10
**Detective** [6] - 32:11, 34:21, 110:14, 122:6, 122:8
**detective** [4] - 124:24, 125:13, 125:14, 144:7
**Detective's** [1] - 125:25
**detectives** [3] - 117:1, 117:20, 125:15
**determination** [2] - 115:4, 121:16
**determine** [2] - 145:11, 147:21
**determining** [2] - 65:8, 66:22
**developed** [1] - 126:5
**diagonally** [1] - 13:24
**Diaz** [1] - 130:5
**different** [12] - 5:7, 21:7, 28:13, 35:2, 40:9, 49:3, 120:22, 122:23, 132:3, 133:13, 139:14, 140:1
**difficult** [7] - 20:19, 21:6, 21:10, 24:8, 24:9, 75:13, 102:11
**dinner** [2] - 71:14, 150:19
**Diplomate** [1] - 151:24
**direct** [8] - 4:6, 16:24, 84:22, 116:5, 132:7, 146:2, 146:23, 147:16
**DIRECT** [2] - 69:19, 151:10
**directed** [4] - 31:4, 31:6, 119:6, 146:5
**directing** [2] - 113:2, 117:8
**direction** [1] - 34:21
**directionally** [1] - 13:8
**directions** [1] - 123:13
**disagree** [1] - 129:19
**disagrees** [1] - 148:19
**disappearance** [1] - 143:23
**discharge** [1] - 144:8
**discharged** [1] - 5:17
**disciplined** [1] - 70:15
**disclaimer** [2] - 24:14, 25:2
**discrepancy** [1] - 16:1
**discretion** [3] - 118:1, 118:8, 145:8
**discuss** [6] - 15:3, 27:23, 88:21, 90:25, 98:6, 150:13
**discussed** [4] - 21:5, 88:23, 97:14, 128:14
**discussing** [3] - 27:13, 27:16, 127:5
**discussion** [10] - 23:17, 28:6, 89:16, 124:22, 127:3, 134:1, 135:15, 142:20, 147:12, 150:9
**discussions** [2] - 104:16, 137:3
**disk** [1] - 44:1
**dispensed** [1] - 145:12
**displaying** [7] - 11:19, 11:20, 11:21, 11:22, 11:23, 13:21, 23:19
**DISPOTO** [5] - 1:16, 91:23, 93:5, 93:7, 95:18
**Dispoto** [1] - 95:16
**dissipate** [2] - 56:23
**dissipates** [1] - 57:8
**distinctiveness** [1] - 13:8
**distinguish** [1] - 145:18
**distribute** [16] - 8:16, 68:6, 68:9, 102:20, 109:4, 111:1, 111:5, 111:22, 112:14, 114:10, 117:15, 118:5, 118:13, 119:6, 119:15, 123:17
**distributing** [1] - 139:1
**distribution** [5] - 51:8, 102:24, 115:23, 118:21, 137:18
**distributor** [1] - 119:16
**DISTRICT** [3] - 1:1, 1:1, 1:13
**division** [1] - 130:22
**DIVISION** [1] - 1:2
**Dixon** [69] - 14:5, 17:9, 17:13, 17:24, 18:2, 18:25, 19:4, 19:13, 19:14, 19:17, 23:11, 23:19, 25:18, 26:12, 26:15, 26:17, 27:2, 27:11, 27:15, 27:19, 28:9, 28:20, 28:24, 29:1, 29:4, 29:6, 29:10, 29:14, 29:24, 30:2, 30:4, 30:12, 30:16, 30:22, 31:14, 31:19, 31:22, 31:24, 32:3, 32:7, 32:10, 32:22, 32:24, 33:1, 33:3, 33:21, 33:25, 35:12, 46:8, 46:16, 46:25, 47:9, 47:15, 48:20, 57:14, 64:10, 68:12, 68:14, 68:16, 69:7, 109:1, 109:6, 109:9, 109:10, 109:12, 127:12, 141:6, 144:20, 146:9
**DIXON** [1] - 1:8
**Dixon's** [5] - 25:16, 25:24, 57:19, 109:25, 110:2
**docket** [2] - 64:13, 64:21
**doctrine** [1] - 134:5
**document** [4] - 29:15, 52:16, 52:24, 142:16
**Document** [1] - 53:10
**documents** [4] - 59:22, 80:3, 80:7, 80:9
**Dodge** [3] - 4:12, 4:20, 5:1
**dog** [1] - 76:12
**done** [23] - 3:11, 5:24, 6:2, 6:3, 6:5, 6:14, 40:10, 64:14, 74:24, 74:25, 80:13, 91:8, 95:5, 96:6, 96:12, 96:24, 97:24, 99:19, 129:13, 134:8, 138:1, 138:7, 145:17
**DONET** [37] - 2:2, 11:16, 11:25, 12:2, 12:16, 13:10, 13:13,

14:5, 14:8, 14:12, 14:16, 14:19, 14:21, 14:24, 15:23, 16:13, 22:6, 22:10, 22:24, 23:6, 23:9, 25:1, 25:14, 32:15, 34:7, 34:9, 35:17, 47:25, 49:12, 63:14, 64:10, 69:7, 82:21, 90:24, 91:9, 109:1, 127:12
**Donet** [12] - 11:7, 11:13, 12:14, 13:6, 15:18, 16:11, 48:19, 61:20, 69:6, 82:20, 108:25
**Donet's** [1] - 47:19
**DONET......................** [1] - 151:6
**door** [4] - 22:13, 22:14, 48:1
**dope** [1] - 120:11
**doubt** [4] - 60:14, 66:9, 128:20, 140:22
**down** [18] - 3:8, 12:14, 12:15, 12:19, 13:16, 14:3, 59:18, 70:17, 72:6, 76:22, 87:10, 88:5, 97:21, 106:3, 116:21, 138:3, 138:7
**downstairs** [2] - 3:6, 72:3
**dozen** [1] - 26:2
**draft** [1] - 96:15
**draw** [1] - 46:11
**drawing** [2] - 47:12, 47:18
**driving** [3] - 33:17, 35:5, 35:7
**drug** [47] - 34:2, 37:10, 37:23, 39:17, 40:19, 46:9, 46:12, 80:14, 99:19, 99:24, 105:7, 105:18, 106:5, 106:12, 107:6, 107:25, 108:4, 108:16, 109:15, 109:20, 110:6, 110:13, 111:7, 111:9, 112:25, 115:22, 118:2, 118:3, 118:10, 118:14, 119:14, 119:16, 121:2, 123:11, 124:10, 124:16, 126:1, 132:23, 133:1, 133:4, 135:1, 137:18, 147:25
**drugs** [17] - 37:6, 38:2, 45:16, 80:18, 80:22, 104:18, 107:1, 108:9, 108:21, 108:22, 110:8, 114:2, 116:6, 119:15, 119:18, 120:11, 139:11
**during** [14] - 33:16, 34:12, 37:7, 40:6, 41:8, 43:10, 44:2, 45:2, 48:4, 49:9, 79:14, 110:7, 110:10, 147:20
**Dwight** [3] - 113:14, 113:16, 129:11
**dynamic** [1] - 120:22

## E

**earliest** [3] - 149:24, 150:3, 150:4
**early** [2] - 74:19, 150:18
**easy** [1] - 20:23
**effort** [1] - 130:3
**eight** [1] - 119:23
**either** [10] - 8:7, 29:17, 33:22, 58:25, 99:6, 126:3, 135:13, 141:21, 144:25, 148:4
**element** [4] - 134:16, 136:13, 136:17, 139:23
**Elementary** [1] - 83:11
**elements** [3] - 121:13, 121:15, 142:5
**elevator** [1] - 97:6
**Elevator** [1] - 70:7
**eleven** [4] - 89:13, 91:16, 91:17, 91:21
**Eleventh** [5] - 119:17, 124:8, 130:9, 130:10, 139:4
**eliciting** [1] - 73:1
**eligible** [1] - 128:11
**eliminate** [3] - 14:1, 80:23, 93:2
**eliminated** [1] - 90:2
**Elmo** [1] - 13:10
**emailed** [1] - 96:21
**emails** [1] - 117:9
**employed** [1] - 70:6
**employer** [2] - 95:4, 95:23
**encompass** [1] - 31:7
**encompassed** [1] - 28:13
**encountered** [2] - 33:11, 71:10
**encouraged** [2] - 139:17, 139:19
**end** [17] - 3:14, 23:1, 31:20, 39:13, 41:21, 62:2, 79:18, 94:10, 97:3, 98:5, 102:13, 110:11, 116:14, 117:11, 122:7, 125:18, 125:25
**endeavor** [1] - 93:12
**enforcement** [6] - 10:10, 10:13, 33:12, 35:6, 120:8, 143:20
**engage** [1] - 139:17
**engaged** [1] - 143:6
**Engaging** [1] - 138:22
**engaging** [1] - 147:25
**enjoying** [1] - 52:10
**enter** [2] - 130:23, 131:1
**entered** [1] - 112:6
**enterprise** [13] - 134:21, 134:24, 136:9, 136:11, 136:20, 136:25, 137:8, 137:10, 137:11, 137:17, 137:22, 138:5, 138:13
**enterprises's** [1] - 136:12
**entire** [2] - 128:19
**entitled** [2] - 104:2, 151:19
**entrance** [1] - 136:19
**entrapment** [1] - 123:1
**entries** [1] - 62:3
**entry** [6] - 6:25, 64:13, 64:21, 112:6, 131:23, 137:24
**enumerates** [1] - 132:17
**environment** [1] - 129:24
**especially** [3] - 89:14, 105:11, 142:9
**ESQUIRE** [4] - 1:19, 1:23, 2:2, 2:4
**established** [4] - 66:18, 116:25, 144:7, 144:9
**establishes** [1] - 105:18
**establishments** [1] - 52:10
**estate** [1] - 33:4
**estimate** [2] - 23:25, 24:1
**Evelyn** [1] - 69:22
**evening** [6] - 5:17, 6:14, 16:3, 62:1, 137:5, 148:8
**event** [9] - 47:14, 90:17, 90:19, 94:20, 94:24, 95:9, 119:19, 126:16, 131:21
**events** [5] - 4:7, 30:21, 31:18, 40:15, 133:15
**eventually** [1] - 83:7
**evidence** [111] - 9:16, 10:7, 12:23, 16:16, 25:23, 31:24, 32:2, 32:3, 32:6, 37:11, 38:6, 38:23, 44:13, 44:20, 45:1, 46:13, 47:12, 52:1, 53:6, 53:11, 58:15, 58:19, 60:2, 60:8, 60:11, 60:12, 60:25, 61:2, 61:6, 64:14, 65:7, 65:12, 66:2, 66:3, 66:6, 66:7, 66:10, 66:11, 66:21, 68:20, 75:7, 88:12, 98:9, 98:17, 101:14, 101:19, 101:21, 102:6, 102:18, 103:8, 103:13, 104:2, 105:18, 105:22, 107:4, 107:5, 108:12, 108:19, 109:2, 109:8, 109:9, 109:24, 110:16, 111:4, 112:1, 112:7, 114:21, 116:3, 116:4, 116:8, 116:15, 118:15, 120:4, 121:8, 122:15, 122:21, 123:24, 124:5, 125:3, 125:4, 126:4, 126:6, 126:18, 127:9, 127:16, 129:15, 131:10, 131:25, 134:7, 134:10, 134:12, 135:13, 136:12, 137:2, 137:4, 137:5, 137:25, 138:11, 139:8, 141:25, 142:6, 142:19, 142:20, 142:21, 143:9, 143:16, 143:18
**evidence...................** [1] - 151:14
**evidentiary** [1] - 148:18
**exact** [1] - 26:1
**exactly** [12] - 4:21, 5:5, 7:15, 7:20, 7:24, 8:4, 8:12, 41:15, 49:5, 85:17, 101:14, 139:18
**exam** [1] - 3:18
**examination** [3] - 11:12, 82:8, 84:22
**EXAMINATION** [17] - 4:2, 6:20, 16:12, 23:8, 35:19, 46:5, 69:19, 82:23, 87:6, 151:4, 151:5, 151:6, 151:7, 151:8, 151:10, 151:11, 151:12
**examine** [3] - 14:3, 23:2, 23:3
**examining** [1] - 3:22
**example** [1] - 128:25
**except** [2] - 89:9, 114:12
**exception** [2] - 100:13, 100:22
**excess** [2] - 67:8, 67:25
**excuse** [5] - 41:20, 43:4, 91:12, 93:18, 98:3
**excused** [5] - 13:4, 59:19, 88:6, 93:12, 93:14
**executed** [3] - 61:14, 61:21, 63:7
**exercise** [2] - 118:8, 130:25
**exercised** [2] - 91:5, 117:25
**exhausted** [2] - 56:14, 130:19
**exhaustive** [1] - 102:17
**Exhibit** [22] - 4:9, 6:23, 8:9, 13:11, 13:24, 17:9, 17:12, 18:8, 18:20, 19:12, 19:23, 24:13, 24:14, 24:21, 25:15, 40:5, 41:12, 42:3, 53:10, 55:8, 80:7, 151:14
**exhibit** [13] - 7:11, 13:22, 13:23, 17:20, 18:15, 19:13, 41:15, 42:9, 42:25, 46:20, 51:18, 55:18
**EXHIBITS** [1] - 151:13
**exhibits** [1] - 99:10
**exist** [2] - 63:23, 141:13
**exit** [1] - 142:16
**expect** [2] - 114:8,

DAILY COPY

145:9
**expected** [2] - 136:24, 139:5
**expecting** [3] - 115:12, 132:7, 137:23
**expensive** [1] - 10:5
**experience** [7] - 10:10, 10:12, 20:14, 29:21, 34:2, 53:25, 56:22
**expert** [1] - 5:21
**expertise** [1] - 56:9
**explain** [2] - 5:19, 52:5
**explained** [1] - 63:19
**explaining** [1] - 75:10
**extended** [1] - 144:11
**extent** [1] - 48:20
**eye** [1] - 128:9
**eyeball** [2] - 122:7, 122:8
**Eyed** [1] - 11:21
**eyes** [2] - 121:14, 121:15

## F

**F-L-O-R-E-S** [1] - 69:18
**F0516780** [1] - 68:4
**F0715355** [1] - 67:16
**F076123** [1] - 68:7
**F1032264C** [1] - 68:10
**face** [3] - 85:19, 125:11, 125:17
**Facebook** [24] - 7:1, 16:18, 18:13, 18:24, 26:5, 26:11, 27:1, 27:2, 28:5, 48:23, 49:16, 51:19, 57:23, 62:3, 99:15, 99:21, 101:11, 101:13, 101:24, 112:6, 112:12, 114:4, 115:2, 118:23
**faces** [1] - 85:21
**facing** [2] - 12:17, 12:18
**fact** [37] - 7:15, 22:17, 24:13, 25:11, 28:9, 30:2, 33:21, 37:6, 38:9, 39:12, 40:13, 42:12, 44:1, 56:4, 64:6, 80:15, 89:9, 89:10, 89:19, 93:20, 100:17, 104:3, 105:11, 105:13, 107:14, 107:21, 108:2, 109:15, 118:16, 122:15, 134:10, 134:11, 135:25, 136:4, 138:25, 143:3, 143:4
**factor** [1] - 142:13
**facts** [7] - 91:19, 110:1, 111:21, 112:11, 112:21, 115:24, 120:15
**factual** [1] - 121:15
**failed** [1] - 127:6
**fair** [15] - 32:21, 35:4, 36:14, 37:3, 38:1, 39:4, 42:21, 43:3, 44:5, 44:12, 44:16, 44:19, 45:1, 51:22, 74:2
**fairly** [2] - 15:19, 124:5
**fairness** [1] - 98:7
**fake** [1] - 120:13
**fall** [2] - 111:10, 139:7
**familiar** [10] - 21:1, 21:4, 25:6, 25:10, 41:11, 41:14, 42:9, 43:22, 48:16, 57:16
**family** [2] - 48:16, 71:15
**fancy** [2] - 33:17, 33:25
**far** [16] - 16:2, 28:22, 28:23, 29:1, 32:21, 33:3, 50:11, 64:11, 86:17, 90:13, 100:13, 100:15, 112:23, 130:18, 137:10, 142:12
**father** [1] - 70:25
**father-to-son** [1] - 70:25
**favorable** [7] - 114:22, 137:2, 137:18, 138:10, 142:1, 142:7, 143:17
**favorite** [1] - 95:17
**fear** [2] - 140:25, 142:24
**February** [4] - 19:25, 67:6, 84:20, 84:25
**fed** [1] - 133:4
**federal** [4] - 7:20, 7:22, 8:7, 134:19
**Federal** [1] - 114:20
**feds** [1] - 113:3
**feed** [1] - 57:24
**feeding** [2] - 129:16
**feet** [1] - 68:6
**fellow** [1] - 148:22
**felon** [2] - 110:21, 110:23
**felony** [2] - 67:9, 68:1
**female** [2] - 106:20
**few** [9] - 5:9, 6:13, 17:5, 88:14, 105:12, 105:13, 106:7, 106:9, 108:23
**field** [1] - 141:3
**fifth** [1] - 136:17
**fight** [13] - 72:17, 73:6, 73:9, 73:12, 73:18, 73:20, 73:21, 74:2, 74:22, 74:24, 76:18
**fighting** [1] - 132:3
**final** [7] - 60:21, 61:14, 61:24, 67:2, 96:15, 147:6, 147:13
**finalize** [2] - 89:3, 95:24
**financial** [1] - 71:8
**fine** [9] - 61:5, 65:9, 94:7, 102:1, 102:4, 106:6, 136:15, 140:5, 150:7
**fingerprints** [2] - 4:15, 4:17
**fingers** [11] - 12:11, 12:18, 12:19, 13:15, 13:16, 13:20, 13:24, 20:18, 20:23, 21:6
**finish** [3] - 91:14, 133:12
**finished** [1] - 80:20
**firearm** [22] - 50:4, 51:2, 57:4, 67:11, 67:13, 68:3, 110:22, 111:7, 112:12, 112:13, 117:4, 117:17, 118:7, 118:11, 119:16, 120:5, 120:12, 121:7, 123:10, 138:4, 140:8, 144:11
**firearms** [2] - 9:25, 32:22
**first** [12] - 12:22, 31:14, 31:15, 31:22, 53:15, 65:23, 87:9, 99:10, 100:18, 136:7, 141:20, 149:25
**fits** [1] - 126:10
**five** [2] - 11:17, 25:12
**fives** [1] - 4:24
**FL** [6] - 1:17, 1:20, 1:22, 1:25, 2:3, 2:5
**Flagler** [1] - 1:22
**flash** [1] - 102:1
**floor** [1] - 74:11
**Flores** [67] - 37:4, 37:6, 37:10, 37:23, 39:5, 39:11, 40:6, 41:2, 41:3, 41:5, 41:7, 41:13, 42:1, 43:5, 43:9, 43:15, 44:5, 44:7, 44:13, 44:16, 44:20, 44:23, 45:2, 45:6, 45:17, 45:21, 50:7, 50:17, 51:7, 69:9, 69:10, 69:17, 69:21, 69:23, 76:25, 79:25, 80:8, 80:22, 82:25, 83:1, 83:18, 83:25, 84:3, 84:7, 84:15, 85:24, 86:7, 88:8, 102:22, 103:6, 103:10, 103:19, 104:10, 104:15, 105:14, 105:15, 106:12, 106:21, 106:22, 107:2, 107:18, 107:19, 108:5, 141:6, 147:25, 148:19
**FLORES** [3] - 1:9, 69:13, 151:9
**Flores'** [2] - 41:18, 80:11
**Flores's** [7] - 50:21, 51:1, 51:4, 102:19, 103:13, 105:19, 109:23
**florida** [1] - 151:24
**Florida** [2] - 2:10, 67:12
**FLORIDA** [2] - 1:1, 1:7
**fly** [1] - 57:8
**focus** [1] - 126:14
**folk** [1] - 148:5
**folks** [1] - 140:1
**follow** [2] - 76:12, 77:1
**follow-up** [1] - 77:1
**following** [5] - 67:18, 98:4, 101:11, 113:1, 122:5
**footnote** [2] - 132:15, 132:22
**FOR** [2] - 1:15, 1:19
**forecloses** [1] - 133:2
**foregoing** [1] - 151:18
**foreign** [2] - 22:16, 136:13
**foreseeable** [17] - 117:6, 117:17, 118:3, 118:9, 118:17, 119:14, 119:15, 121:14, 123:14, 123:22, 124:12, 128:24, 129:18, 130:11, 131:20, 132:25, 133:1
**forgot** [1] - 13:18
**form** [2] - 4:23, 49:11
**formal** [1] - 45:22
**formally** [2] - 61:14, 61:21
**former** [1] - 102:25
**Forte** [4] - 129:11, 133:9, 139:21
**Forte's** [2] - 113:14, 113:16
**forth** [4] - 67:6, 67:23, 68:15, 109:3
**Fortun** [1] - 55:5
**forward** [7] - 65:14, 90:11, 91:7, 91:20, 126:9, 136:5, 147:10
**fought** [3] - 74:7, 75:20, 134:14
**four** [9] - 11:17, 14:18, 51:18, 53:6, 71:15, 71:16, 141:22, 141:23, 143:18
**four-page** [2] - 51:18, 53:6
**Fourth** [1] - 1:17
**fourth** [2] - 55:8, 78:19
**FPR** [1] - 2:9
**frame** [4] - 8:20, 9:4, 103:15, 110:11
**Franklin** [5] - 69:10, 69:17, 80:8, 104:15
**FRANKLIN** [3] - 69:13, 69:17, 151:9
**Freddy** [2] - 54:24, 55:4
**free** [2] - 56:3, 95:10
**frequently** [1] - 132:24
**Friday** [7] - 62:1, 91:2, 91:8, 91:12, 91:14, 91:15, 97:25
**friend** [2] - 74:9, 74:11
**friendly** [4] - 84:1, 84:2, 84:15, 86:21
**friends** [4] - 52:19, 71:16, 83:18, 86:22
**front** [5] - 19:8, 40:18, 71:15, 109:16, 112:4
**fruits** [1] - 52:11
**full** [3] - 69:15, 69:16, 97:20
**fully** [1] - 145:9
**functioned** [1] - 128:22
**furtherance** [7] - 99:23, 111:7, 121:2, 123:11, 136:25, 137:8, 139:25

## G


**Gables** [1] - 1:20
**gain** [4] - 131:23, 137:12, 137:24, 143:2
**gaining** [1] - 136:19
**gang** [17] - 20:12, 20:14, 21:7, 23:11, 23:15, 23:18, 29:18, 29:21, 132:4, 132:5, 134:6, 139:16, 142:20, 142:22
**gangs** [3] - 21:1, 21:2, 132:3
**garners** [3] - 142:21, 142:23, 142:24
**gathered** [1] - 16:17
**general** [2] - 50:18, 123:23
**generated** [1] - 60:7
**gentleman** [9] - 72:9, 73:19, 75:1, 78:6, 86:11, 86:12, 86:13, 91:6, 122:10
**Gentlemen** [5] - 3:21, 59:23, 66:1, 68:19, 88:11
**gentlemen** [5] - 5:19, 39:20, 62:19, 97:5, 97:13
**gesture** [7] - 12:3, 15:20, 20:23, 21:13, 21:23, 22:16, 23:15
**gestures** [1] - 12:13
**gift** [1] - 114:5
**girlfriend** [1] - 116:25
**girlfriend's** [1] - 33:23
**given** [2] - 64:20, 128:14
**glad** [1] - 95:1
**glare** [2] - 53:18, 54:15
**Gonzalez** [12] - 68:22, 82:14, 96:4, 99:14, 100:22, 102:9, 114:11, 116:12, 119:20, 121:21, 131:3, 146:2
**GONZALEZ** [51] - 1:19, 52:3, 52:15, 52:23, 53:1, 53:3, 54:3, 56:6, 56:9, 56:11, 58:3, 61:24, 62:5, 62:10, 62:21, 64:7, 65:17, 65:20, 68:24, 82:9, 82:11, 82:13, 82:15, 96:5, 99:12, 99:15, 99:18, 100:18, 100:25, 101:3, 101:6, 101:9, 101:17, 101:20, 102:1, 102:4, 102:8, 116:13, 116:22, 119:21, 119:24, 121:22, 121:25, 123:4, 123:8, 124:2, 125:7, 125:9, 131:4, 133:12, 150:16
**Government** [48] - 38:3, 38:22, 39:6, 42:4, 53:5, 59:20, 62:16, 62:22, 65:12, 66:25, 67:17, 68:11, 68:18, 68:19, 88:9, 89:22, 90:10, 96:1, 102:18, 102:21, 103:1, 104:8, 105:7, 106:17, 108:3, 109:12, 114:6, 114:7, 114:22, 117:14, 121:5, 121:12, 122:12, 124:20, 126:11, 126:18, 126:19, 129:4, 137:3, 137:18, 138:11, 141:10, 141:15, 142:1, 142:7, 143:18, 148:18, 150:15
**Government's** [44] - 4:9, 6:22, 12:10, 13:11, 17:9, 17:12, 18:8, 18:20, 19:12, 19:23, 40:5, 41:11, 46:11, 46:17, 46:22, 47:6, 47:8, 47:10, 47:13, 49:22, 50:9, 50:14, 51:17, 51:25, 53:9, 53:10, 53:15, 54:7, 55:8, 67:1, 90:3, 102:13, 104:1, 104:25, 106:8, 108:8, 116:14, 128:20, 128:25, 137:4, 137:5, 148:21, 149:9, 151:14
**Governments's** [1] - 67:18
**grab** [1] - 72:2
**grabbed** [1] - 77:23
**graduated** [1] - 70:4
**gram** [7] - 9:9, 10:12, 10:14, 10:18, 35:14, 111:2, 111:4
**grant** [3] - 123:20, 132:12, 135:18
**gravamen** [1] - 118:20
**great** [3] - 95:7, 107:21, 145:5
**greater** [1] - 140:11
**greatly** [1] - 130:18
**Greer** [4] - 3:4, 99:1, 147:2, 150:3
**grew** [3] - 59:12, 70:22, 130:15
**ground** [2] - 58:25, 130:2
**grounds** [1] - 110:16
**group** [32] - 20:12, 20:20, 22:22, 31:15, 71:11, 73:5, 74:14, 75:21, 75:23, 76:19, 77:10, 78:13, 80:16, 103:4, 104:11, 104:16, 104:18, 106:25, 107:20, 118:16, 119:1, 128:11, 129:22, 129:24, 129:25, 137:24, 139:13, 140:7, 140:8, 141:1, 141:5, 141:11
**Grove** [1] - 2:3
**guess** [10] - 3:6, 12:5, 12:6, 13:24, 18:12, 18:13, 19:22, 21:7, 21:11, 48:9
**guidance** [2] - 91:19, 147:17
**guilt** [3] - 65:8, 66:22, 135:7
**guilty** [6] - 105:5, 105:6, 114:23, 121:16, 121:20, 148:22
**gun** [15] - 6:3, 6:8, 73:10, 119:3, 119:7, 121:1, 121:8, 123:12, 124:9, 140:23, 141:17, 144:5, 144:20, 145:6
**guns** [2] - 119:18, 141:7
**gunshot** [7] - 5:20, 56:23, 56:25, 57:3, 57:7, 57:9, 144:1
**guy** [4] - 73:12, 73:18, 74:9, 144:5
**guys** [21] - 35:6, 71:15, 72:4, 72:7, 73:8, 74:6, 74:11, 74:17, 76:19, 77:6, 77:10, 77:24, 78:3, 78:13, 80:17, 86:9, 87:18, 113:16, 140:3, 144:21
**Guzman** [17] - 38:23, 62:5, 99:16, 99:23, 100:8, 103:3, 104:21, 107:9, 112:24, 120:9, 129:8, 131:11, 132:11, 133:8, 139:12, 143:21
**Guzman's** [1] - 133:18
**gym** [2] - 70:16
**Gym** [1] - 70:17


## H


**habit** [1] - 104:19
**half** [9] - 9:9, 10:12, 10:14, 10:18, 26:2, 93:24, 94:11, 111:2, 111:4
**hand** [47] - 6:3, 11:18, 11:20, 11:21, 11:22, 11:23, 12:3, 12:7, 12:10, 12:11, 12:14, 13:18, 13:21, 15:20, 20:10, 20:11, 20:17, 20:18, 20:22, 20:23, 21:1, 21:12, 21:13, 21:16, 21:18, 21:22, 22:21, 22:25, 23:15, 23:19, 47:18, 47:23, 48:5, 52:12, 55:15, 59:5, 59:15, 103:8, 122:16, 125:3, 125:21, 143:13
**hand-to-hand** [2] - 122:16, 125:21
**handed** [1] - 80:8
**handful** [1] - 26:2
**hanging** [5] - 75:22, 83:21, 83:25, 120:2, 140:4
**happy** [2] - 89:13, 95:5
**harassing** [2] - 32:7, 84:1
**hard** [5] - 32:2, 44:1, 86:10, 95:5, 96:17
**Havana** [13] - 29:2, 39:12, 40:13, 41:8, 59:13, 70:20, 75:21, 83:5, 83:9, 83:12, 83:13, 117:6, 140:21
**have..** [1] - 100:3
**head** [2] - 30:11, 30:24
**headnote** [1] - 136:16
**hear** [13] - 28:2, 60:8, 61:4, 61:6, 62:17, 66:2, 66:3, 82:2, 88:13, 97:19, 98:21, 114:8, 143:12
**heard** [17] - 25:7, 31:15, 38:16, 38:23, 39:1, 43:21, 45:5, 45:12, 45:13, 61:1, 88:19, 98:15, 98:17, 98:18, 127:7, 139:13
**hearing** [1] - 122:6
**hearings** [2] - 8:2, 8:4
**hearsay** [16] - 5:10, 32:13, 39:7, 45:8, 45:23, 45:25, 71:18, 72:10, 72:18, 73:1, 73:14, 75:3, 76:4, 76:23, 100:13, 100:21
**hedged** [1] - 145:24
**heinous** [2] - 142:9, 142:12
**held** [1] - 61:16
**hello** [1] - 94:6
**help** [6] - 3:14, 96:1, 139:9, 139:12, 139:21, 146:10
**helped** [2] - 139:21, 146:9
**HERMAN** [1] - 2:4
**hidden** [4] - 34:15, 34:16, 58:24, 120:13
**hierarchy** [1] - 103:12
**high** [2] - 70:3, 70:9
**High** [1] - 70:4
**high-risers** [1] - 70:9
**higher** [2] - 35:7
**highlight** [2] - 12:10, 115:7
**Hileman** [1] - 134:19
**himself** [5] - 80:13, 107:13, 119:11, 137:21, 144:23
**hit** [1] - 121:15
**Hobbs** [2] - 137:15
**hold** [1] - 139:11
**holding** [5] - 13:14, 13:15, 13:19, 53:24, 55:13
**holds** [1] - 6:3
**hole** [1] - 58:25
**home** [4] - 71:2, 79:14, 79:20, 105:2
**Homestead** [1] - 81:23
**homicides** [2] - 131:8, 132:2
**Honor** [58] - 5:12, 6:18, 11:6, 11:8, 11:11, 14:12, 34:7, 39:7, 42:4, 45:8, 51:14, 53:5, 54:14, 56:16, 59:2, 59:17, 60:3, 61:13, 62:20, 63:18, 65:4, 65:16, 66:25, 68:18, 68:24, 69:2, 69:5, 69:7,

69:9, 73:2, 82:17, 82:19, 82:21, 87:3, 88:8, 88:10, 90:12, 92:1, 96:8, 99:15, 103:21, 104:4, 106:7, 110:4, 111:12, 112:16, 114:17, 115:9, 116:13, 119:21, 121:22, 126:22, 127:24, 130:18, 131:4, 138:16, 149:10, 150:16
**HONORABLE** [1] - 1:12
**hoody** [1] - 143:25
**hook** [1] - 108:1
**hopefully** [3] - 3:11, 3:13, 95:22
**hopes** [2] - 56:10, 56:12
**Horowitz** [14] - 3:22, 52:11, 52:20, 65:2, 69:1, 82:16, 89:6, 96:7, 114:11, 135:21, 136:3, 139:4, 141:9, 145:10
**HOROWITZ** [40] - 1:23, 3:18, 4:3, 5:12, 6:17, 48:6, 48:8, 49:10, 54:4, 55:25, 58:4, 58:9, 58:12, 59:10, 60:24, 61:5, 62:20, 64:11, 64:22, 65:4, 65:9, 69:2, 82:17, 89:7, 89:12, 96:8, 96:14, 96:18, 114:14, 114:17, 136:7, 141:10, 143:12, 143:16, 145:5, 149:4, 149:6, 149:10, 149:13, 149:17
**Horowitz's** [1] - 149:3
**HOROWITZ...........** [1] - 151:4
**HOSSEINI** [1] - 1:16
**Houdiniesque** [1] - 143:23
**hour** [5] - 56:21, 96:4, 96:5, 97:21, 97:22
**hours** [9] - 5:9, 6:13, 23:22, 24:3, 25:22, 31:10, 75:9, 96:2
**house** [9] - 75:22, 77:18, 112:8, 120:7, 120:8, 120:23, 120:24, 129:23, 143:20
**houses** [1] - 87:21
**Houston** [2] - 135:10, 135:14
**hub** [1] - 107:4
**human** [1] - 6:3
**hundred** [3] - 24:2, 24:3, 25:22
**hurts** [2] - 145:25
**husband** [1] - 98:12
**hustle** [1] - 144:21
**hustling** [3] - 109:18, 109:20, 115:15

**I**

**ID** [1] - 141:20
**idea** [6] - 10:13, 10:18, 50:18, 74:16, 92:21, 117:10
**identification** [4] - 143:19, 144:6, 144:8, 144:24
**identified** [14] - 44:6, 50:12, 102:24, 105:12, 106:9, 109:20, 115:9, 125:7, 125:8, 125:12, 128:12, 134:7, 134:9, 144:24
**identify** [9] - 7:4, 51:7, 54:23, 57:14, 85:25, 106:4, 141:23, 144:4, 145:20
**identifying** [2] - 73:15, 122:16
**identity** [3] - 25:5, 60:17, 66:17
**IGNACIO** [1] - 1:15
**ILHAM** [1] - 1:16
**image** [5] - 7:12, 48:23, 50:18, 55:1, 122:12
**images** [9] - 12:15, 12:17, 23:11, 23:14, 23:18, 49:5, 49:7, 50:7
**imagine** [2] - 15:24, 142:22
**impact** [2] - 118:24, 139:2
**impacted** [1] - 57:7
**impartiality** [1] - 98:7
**impeach** [3] - 12:4, 12:8, 100:14
**impeached** [1] - 99:21
**impeachment** [2] - 15:22, 100:20
**implicates** [1] - 144:23
**importance** [1] - 115:16
**important** [4] - 95:23, 98:5, 98:14, 126:4
**importantly** [1] - 88:17
**impossible** [5] - 20:6, 22:16, 22:21, 40:10, 147:19
**imprisonment** [2] - 67:8, 67:25
**in-court** [1] - 144:24
**Inc** [1] - 2:9
**incarcerated** [2] - 7:14, 110:12
**incident** [3] - 71:13, 78:7, 137:20
**incidents** [1] - 80:16
**inclined** [3] - 90:15, 93:18, 130:25
**include** [1] - 50:23
**included** [2] - 130:10, 146:6
**includes** [1] - 73:10
**increase** [3] - 137:7, 138:8, 138:12
**increased** [1] - 137:24
**increasing** [1] - 136:20
**indicate** [3] - 16:24, 32:3, 147:25
**indicated** [4] - 39:4, 40:9, 104:25, 107:13
**indication** [1] - 30:22
**indicative** [1] - 104:23
**indicted** [2] - 43:17, 43:19
**indictment** [15] - 8:22, 31:18, 48:14, 60:9, 60:12, 60:18, 66:4, 66:7, 66:11, 66:14, 66:16, 66:19, 66:20, 110:6, 110:12
**indirect** [1] - 132:7
**individual** [6] - 13:18, 124:7, 125:11, 130:15, 137:11, 145:18
**individually** [1] - 37:17
**individuals** [18] - 25:3, 26:9, 27:16, 28:10, 32:7, 38:16, 55:22, 87:8, 117:3, 120:7, 131:7, 131:13, 131:18, 131:22, 132:8, 138:25, 140:23
**induced** [1] - 102:18
**inextricably** [1] - 134:22
**infected** [1] - 89:19
**infer** [5] - 107:20, 116:9, 125:4, 136:23, 141:15
**inference** [1] - 135:25
**inform** [1] - 93:17
**informant** [5] - 36:22, 37:4, 47:16, 115:11, 115:12
**information** [9] - 18:7, 29:3, 30:19, 31:23, 41:10, 45:20, 73:1, 113:6, 140:17
**initiative** [1] - 90:16
**innocence** [2] - 65:8, 66:22
**inquire** [1] - 93:16
**inquires** [1] - 115:18
**inquiring** [2] - 93:8, 93:13
**inquiry** [2] - 15:15, 95:20
**inside** [4] - 5:1, 5:25, 54:24, 55:24
**Instagram** [2] - 7:2, 57:23
**installed** [2] - 31:1, 31:2
**instance** [4] - 9:24, 126:11, 129:22, 132:18
**instances** [1] - 23:16
**instead** [1] - 71:1
**instruct** [3] - 65:23, 98:1, 147:9
**instruction** [20] - 60:5, 60:6, 60:22, 62:15, 64:12, 66:1, 103:23, 104:2, 106:1, 120:19, 123:1, 124:10, 127:2, 135:9, 145:23, 149:3, 149:7, 149:8, 149:14, 150:9
**instructions** [18] - 61:9, 88:19, 89:3, 94:10, 95:25, 96:12, 96:20, 98:18, 99:5, 119:10, 123:13, 145:16, 145:18, 145:19, 145:20, 147:1, 149:2, 149:23
**insufficient** [3] - 109:3, 111:3, 143:17
**integral** [6] - 128:21, 128:22, 132:19, 139:22, 140:18
**intellect** [1] - 133:25
**intellectual** [1] - 130:20
**intend** [1] - 100:5
**intended** [1] - 80:9
**intending** [1] - 148:24
**intends** [1] - 68:20
**intent** [14] - 8:16, 60:16, 66:13, 68:6, 68:9, 102:19, 111:1, 111:5, 111:22, 112:14, 114:10, 117:15, 119:6, 123:17
**interacted** [1] - 49:9
**interacting** [1] - 122:10
**interaction** [3] - 49:16, 50:23, 125:16
**intercepted** [1] - 56:20
**interest** [1] - 140:10
**interesting** [1] - 124:18
**interstate** [6] - 136:12, 137:16, 137:17, 138:18, 138:23, 139:2
**intertwined** [1] - 134:22
**interviews** [1] - 32:1
**intrigued** [1] - 114:6
**introduced** [10] - 14:14, 19:22, 25:23, 37:11, 37:20, 37:22, 38:3, 39:6, 44:10, 108:3
**investigation** [38] - 9:9, 23:10, 29:9, 31:14, 32:10, 32:12, 33:3, 33:16, 33:24, 35:7, 35:22, 35:24, 35:25, 36:8, 37:7, 38:1, 39:11, 39:16, 40:12, 43:10, 43:16, 44:3, 44:13, 46:7, 47:18, 48:4, 48:12, 49:9, 49:15, 50:6, 50:20, 51:10, 55:20, 58:1, 59:4, 111:19, 113:10
**investigations** [1] - 38:13
**investing** [1] - 52:19
**involve** [1] - 76:13
**involved** [10] - 8:15, 29:4, 31:24, 32:4, 32:7, 34:10, 85:10, 131:7, 135:11, 138:4
**involvement** [3] - 110:17, 124:6, 131:10
**involving** [4] - 46:12, 57:13, 135:3, 146:9
**irrelevant** [2] - 11:13, 40:1

**Isaac** [1] - 55:5
**issue** [4] - 39:25, 72:8, 78:11, 134:16
**issues** [4] - 97:6, 105:6, 105:8, 147:11
**IT** [2] - 150:4, 150:9
**items** [2] - 53:25, 54:1
**itself** [4] - 31:6, 57:5, 118:21, 129:7

## J

**Jackson** [3] - 11:22, 14:1, 14:10
**Jail** [1] - 7:18
**jail** [10] - 23:21, 23:22, 25:2, 25:3, 25:22, 27:22, 27:24, 36:9, 141:18
**jailhouse** [17] - 24:19, 36:9, 36:15, 57:13, 109:11, 109:17, 111:25, 112:11, 113:2, 113:9, 114:3, 115:3, 115:14, 140:15, 141:14, 143:8, 145:3
**JAMES** [1] - 1:8
**James** [8] - 11:20, 47:9, 47:15, 68:12, 68:14, 68:16, 141:6, 144:20
**janoca** [1] - 2:9
**January** [21] - 7:8, 7:13, 7:18, 7:23, 7:24, 8:2, 8:10, 8:13, 8:17, 8:20, 8:23, 9:1, 9:18, 42:13, 42:14, 43:1, 77:15, 78:14, 84:16, 84:18
**JAY** [1] - 1:9
**Jay** [20] - 11:20, 50:7, 69:21, 70:21, 70:24, 74:20, 74:21, 75:22, 75:24, 76:3, 76:10, 78:15, 80:10, 81:7, 81:21, 87:9, 88:1, 141:6, 148:12
**Jay's** [1] - 81:15
**jewelry** [3] - 9:24, 10:1
**jogged** [1] - 127:6
**join** [2] - 91:17, 128:2
**joining** [2] - 30:17, 90:18
**joint** [2] - 118:5, 121:4
**Jose** [1] - 129:2
**Joseph** [2] - 120:10, 145:1
**JR** [3] - 1:19, 2:2, 2:4
**judge** [21] - 11:16, 12:16, 22:6, 22:24, 40:3, 60:24, 61:24, 64:7, 72:23, 80:2, 91:9, 96:14, 102:12, 104:20, 116:23, 117:5, 132:14, 133:12, 136:7, 143:12, 147:17
**JUDGE** [1] - 1:13
**Judge** [32] - 3:5, 14:16, 14:21, 15:23, 23:6, 46:2, 46:3, 63:14, 65:9, 75:9, 79:2, 81:3, 82:7, 89:12, 90:24, 93:5, 96:6, 100:10, 102:8, 114:24, 119:25, 122:1, 122:5, 122:19, 123:4, 124:2, 125:7, 126:7, 131:15, 147:3, 148:9, 150:5
**judges** [1] - 126:10
**judgment** [14] - 102:12, 109:2, 110:5, 110:16, 110:20, 110:23, 111:10, 111:13, 116:16, 117:12, 120:15, 123:20, 135:19, 144:2
**July** [10] - 8:18, 8:21, 8:23, 9:1, 9:19, 35:24, 36:1, 67:23, 110:20
**jumping** [1] - 73:10
**June** [7] - 30:5, 37:8, 37:13, 71:3, 71:5, 82:5, 82:6
**jurisdiction** [1] - 63:1
**juror** [6] - 89:5, 90:2, 95:15, 114:22, 116:9, 125:4
**JUROR** [5] - 94:7, 94:19, 94:23, 95:9, 95:13
**jurors** [7] - 3:17, 89:8, 89:10, 91:1, 91:3, 91:20, 99:1
**jury** [65] - 5:19, 13:3, 16:8, 16:9, 28:2, 40:18, 55:18, 59:25, 61:10, 61:12, 62:17, 63:22, 65:21, 65:22, 81:2, 88:25, 89:3, 90:1, 92:23, 93:9, 94:12, 94:13, 94:16, 95:8, 95:25, 96:12, 96:24, 97:2, 97:9, 97:11, 97:13, 98:8, 98:17, 98:23, 101:6, 101:10, 101:23, 102:7, 103:9, 109:21, 110:18, 111:23, 112:14, 114:8, 115:4, 116:1, 119:10, 121:3, 121:14, 125:21, 126:18, 128:10, 136:22, 142:2, 142:6, 143:1, 143:10, 145:10, 145:15, 147:9, 147:11, 149:23, 150:8, 150:18
**Jury** [1] - 3:19
**JURY** [1] - 1:12
**jury's** [1] - 113:20
**justice** [1] - 130:23
**juxtaposition** [1] - 142:10

## K

**Kamahele** [3] - 139:15, 142:14, 142:15
**KATHLEEN** [1] - 1:12
**keep** [3] - 93:9, 101:2, 107:23
**keeping** [1] - 140:17
**keeps** [1] - 131:16
**kept** [4] - 58:1, 70:23, 70:25, 143:5
**kid** [1] - 73:19
**kidnapping** [1] - 118:19
**kids** [3] - 70:14, 73:13, 74:18
**killed** [1] - 132:18
**kind** [13] - 9:24, 20:18, 22:3, 47:3, 55:21, 91:22, 99:5, 105:7, 118:24, 142:8, 143:13, 146:4, 148:25
**kinds** [1] - 121:3
**knife** [1] - 73:10
**knowing** [2] - 13:13, 93:13
**knowingly** [1] - 131:17
**knowledge** [8] - 4:18, 5:2, 5:12, 29:18, 39:15, 56:7, 71:9, 133:14
**known** [4] - 68:21, 83:10, 104:6, 141:8
**knows** [5] - 5:22, 39:22, 39:23, 100:4, 140:5
**Korchin** [6] - 6:19, 20:5, 69:4, 82:18, 110:3, 114:9
**KORCHIN** [9] - 1:21, 6:21, 11:6, 49:11, 63:18, 64:4, 69:5, 82:19, 110:4
**KORCHIN.................. ....** [1] - 151:5

## L

**labeled** [1] - 14:13
**labor** [1] - 52:11
**lack** [2] - 56:6, 103:19
**ladies** [2] - 5:19, 97:13
**Ladies** [5] - 3:20, 59:23, 66:1, 68:19, 88:11
**lands** [1] - 57:6
**Lane** [1] - 2:10
**language** [6] - 64:13, 64:18, 65:3, 65:5, 119:17, 142:14
**large** [6] - 9:21, 10:3, 32:24, 33:10, 104:23, 115:21
**large-scale** [1] - 104:23
**larger** [2] - 34:24, 34:25
**last** [12] - 12:25, 18:24, 19:22, 50:1, 52:11, 55:8, 61:8, 78:7, 85:6, 102:10, 134:16
**late** [2] - 61:25, 74:18
**law** [13] - 10:10, 10:13, 33:12, 35:6, 67:12, 91:19, 98:2, 98:18, 120:8, 124:7, 124:21, 126:3, 143:19
**lawyer** [2] - 79:25, 95:17
**lawyers** [5] - 12:24, 88:14, 88:24, 95:2, 97:14
**lead** [4] - 38:9, 48:2, 57:1, 75:18
**leading** [6] - 47:25, 49:10, 49:11, 58:3, 88:2, 133:15
**leap** [1] - 145:5
**learned** [1] - 36:15
**leased** [2] - 33:18
**least** [8] - 105:1, 121:8, 126:11, 132:24, 133:15, 138:23, 142:23
**leave** [14] - 3:7, 78:9, 79:10, 79:12, 92:7, 93:19, 94:17, 96:13, 100:5, 122:23, 140:6, 140:21, 141:2, 145:8
**leaves** [1] - 135:20
**leaving** [2] - 15:13, 94:22
**LeBron** [1] - 11:20
**left** [11] - 13:18, 54:21, 54:24, 74:12, 78:16, 79:13, 104:16, 129:9, 129:11, 134:12
**left-hand** [1] - 13:18
**legal** [6] - 10:25, 37:14, 43:6, 88:14, 88:19, 97:15
**legally** [1] - 67:12
**lends** [1] - 115:17
**length** [4] - 56:18, 113:23, 133:25, 134:1
**Leon** [1] - 1:19
**less** [3] - 25:23, 31:12
**letter** [2] - 95:22, 145:19
**letting** [1] - 141:7
**level** [1] - 137:20
**liability** [3] - 121:17, 126:5, 135:7
**liable** [1] - 130:1
**lick** [1] - 129:2
**lieutenant** [1] - 143:7
**life** [1] - 85:10
**light** [12] - 93:20, 105:11, 107:21, 114:21, 131:24, 137:2, 137:18, 138:10, 142:1, 142:7, 142:18, 143:17
**lights** [2] - 143:22, 143:23
**limited** [4] - 60:13, 66:8, 97:23, 118:24
**line** [4] - 47:19, 114:1, 114:2, 132:2
**linear** [1] - 142:18
**link** [1] - 108:15
**links** [1] - 111:6
**list** [3] - 62:13, 102:17, 150:13
**listed** [1] - 135:5
**listen** [2] - 25:16, 75:2
**listening** [3] - 36:8, 38:23, 125:14
**lists** [1] - 60:15

**litigated** [1] - 64:9
**live** [3] - 14:18, 70:1, 70:2
**Live** [1] - 2:10
**lived** [1] - 29:6
**living** [4] - 71:11, 79:21, 81:25, 120:3
**located** [2] - 17:21, 32:22
**location** [8] - 18:3, 19:6, 50:19, 105:2, 109:16, 112:13, 115:22, 129:9
**locations** [4] - 38:2, 39:5, 51:8, 109:10
**locked** [1] - 63:1
**log** [1] - 19:23
**look** [13] - 24:17, 26:17, 26:18, 26:19, 49:14, 106:5, 108:24, 119:9, 140:9, 141:12, 147:13, 149:1
**looked** [2] - 30:11, 118:24
**looking** [7] - 6:9, 13:11, 19:19, 19:21, 40:3, 49:7
**lookout** [1] - 109:13
**looks** [2] - 71:17, 89:21
**lose** [1] - 139:9
**lost** [1] - 98:1
**love** [1] - 70:14
**low** [2] - 103:12, 103:14
**Luis** [1] - 55:5
**lunch** [3] - 96:3, 97:21, 97:23
**lungs** [1] - 72:5

## M

**Magnum** [3] - 4:12, 4:20, 5:2
**main** [1] - 130:22
**maintain** [5] - 59:14, 98:6, 138:7, 138:12, 143:7
**maintained** [3] - 58:7, 58:21, 137:24
**maintaining** [1] - 136:19
**male** [2] - 54:23, 55:5
**man** [1] - 103:12
**manner** [2] - 34:16, 40:4
**MANUEL** [1] - 1:19
**March** [4] - 1:4, 68:17, 85:2, 151:22
**marijuana** [35] - 8:17, 9:5, 9:10, 9:18, 10:7, 10:12, 10:14, 10:18, 10:23, 11:3, 37:12, 49:20, 49:23, 50:4, 104:21, 104:22, 107:11, 107:12, 107:14, 110:9, 111:2, 111:5, 111:16, 112:3, 112:8, 114:1, 117:2, 117:3, 117:18, 117:19, 119:1, 119:2, 119:3, 119:7, 126:23
**MARK** [1] - 1:16
**marked** [3] - 51:17, 53:10, 80:6
**Martha** [1] - 89:5
**Martinez** [4] - 19:5, 53:21, 54:12, 54:19
**Martinez's** [1] - 18:13
**Mary** [1] - 2:2
**material** [2] - 6:2, 123:2
**materials** [1] - 138:24
**matter** [15] - 7:15, 33:21, 47:4, 56:4, 75:14, 98:22, 114:8, 123:9, 131:9, 134:2, 141:22, 142:3, 143:1, 145:10, 151:19
**matters** [3] - 78:8, 88:14, 88:24
**MAURIN** [1] - 1:7
**Maurin** [7] - 67:2, 67:5, 67:7, 67:10, 67:14, 113:5, 115:13
**Mayo** [1] - 138:19
**mean** [13] - 20:18, 21:8, 25:9, 38:5, 38:19, 48:9, 52:8, 70:23, 93:7, 100:14, 113:25, 137:10, 148:22
**meaning** [2] - 68:20, 140:23
**means** [3] - 8:11, 88:12, 140:6
**meant** [1] - 119:8
**mechanisms** [1] - 129:17
**media** [10] - 7:1, 7:2, 7:8, 26:17, 27:3, 27:22, 28:5, 30:19, 30:21, 51:11
**meet** [3] - 96:21, 125:2, 149:22
**member** [12] - 22:21, 45:21, 45:22, 57:23, 70:16, 103:7, 105:9, 105:10, 107:11, 107:13, 115:10, 132:4
**members** [28] - 11:21, 12:9, 12:12, 27:11, 28:21, 30:20, 48:15, 48:17, 48:21, 49:3, 51:11, 59:12, 59:14, 102:23, 102:24, 102:25, 103:20, 104:6, 104:7, 104:11, 105:11, 105:13, 106:9, 107:1, 108:13, 139:17
**membership** [8] - 136:24, 137:1, 137:8, 137:23, 138:8, 139:6, 139:22, 139:25
**memorandum** [1] - 138:21
**memory** [3] - 35:16, 37:19, 127:6
**men** [3] - 71:11, 72:14, 129:22
**mens** [1] - 135:2
**mention** [4] - 28:9, 83:6, 116:17, 127:6
**mentioned** [4] - 3:8, 15:13, 104:1, 122:8
**Mercedes** [1] - 33:18
**merely** [2] - 93:11, 145:19
**Merino** [15] - 15:13, 15:25, 89:5, 90:13, 91:11, 92:6, 92:20, 92:22, 93:9, 94:3, 94:4, 94:6, 95:14, 95:21
**MERINO** [5] - 94:7, 94:19, 94:23, 95:9, 95:13
**Merino's** [1] - 100:4
**mess** [1] - 61:8
**message** [4] - 26:23, 27:19, 50:21, 102:21
**messages** [23] - 26:21, 26:24, 40:6, 41:12, 41:17, 41:18, 41:19, 41:22, 41:24, 41:25, 42:12, 42:22, 42:25, 43:5, 50:23, 51:1, 103:5, 104:3, 108:15, 108:20, 147:19, 147:21, 147:24
**messing** [1] - 74:18
**met** [4] - 84:12, 126:19, 138:14, 144:21
**methylone** [3] - 8:17, 9:2, 110:8
**Metro** [1] - 43:2
**Mexico** [1] - 94:20
**MIAMI** [2] - 1:2, 1:7
**Miami** [21] - 1:17, 1:22, 1:25, 2:5, 4:22, 30:20, 39:13, 41:8, 46:19, 47:3, 67:15, 68:3, 68:7, 68:9, 70:2, 70:4, 78:16, 79:10, 79:12, 80:13, 117:1
**Miami-Dade** [5] - 67:15, 68:3, 68:7, 68:9, 117:1
**Michael** [2] - 11:22, 54:20
**mid** [2] - 39:13, 41:8
**middle** [7] - 3:18, 41:19, 41:20, 41:21, 54:22, 70:12, 71:4
**Middlebrooks** [1] - 126:7
**might** [6] - 18:21, 54:1, 55:22, 100:3, 122:8, 143:4
**Miguel** [1] - 146:10
**mind** [3] - 28:3, 60:16, 66:13
**mind's** [1] - 128:9
**minutes** [12] - 13:2, 15:5, 15:24, 25:24, 74:12, 74:25, 88:15, 96:4, 96:6, 96:7, 127:1
**miracle** [1] - 143:21
**Miranda** [1] - 121:9
**mishap** [1] - 90:20
**missed** [1] - 147:14
**mission** [7] - 129:10, 133:10, 133:19, 133:20, 140:5
**mistake** [3] - 25:9, 60:19, 66:20
**mistreating** [2] - 86:23, 86:25
**mixed** [1] - 143:3
**Mob** [1] - 23:17
**mock** [1] - 99:5
**mock-up** [1] - 99:5
**modification** [1] - 64:24
**Moises** [1] - 54:21
**Moller** [2] - 89:11, 89:15
**Mollies** [1] - 106:20
**Molly** [3] - 125:2, 126:17, 126:23
**mom** [4] - 70:21, 144:19
**moment** [10] - 9:12, 34:7, 46:2, 59:2, 72:2, 73:8, 73:19, 73:25, 90:4, 91:23
**money** [22] - 4:15, 4:22, 4:23, 9:22, 10:3, 32:24, 33:25, 51:12, 52:9, 52:10, 52:18, 55:24, 112:3, 112:5, 115:18, 115:19, 119:12, 132:21, 134:15, 137:21, 138:5, 143:5
**monitor** [2] - 51:10, 55:21
**monitored** [1] - 124:25
**months** [4] - 17:6, 28:16, 31:12, 79:13
**Moore** [3] - 25:18, 46:13, 46:16
**Moore's** [1] - 25:17
**morass** [1] - 100:2
**morning** [4] - 97:25, 149:22, 150:20
**most** [18] - 20:17, 25:2, 25:3, 35:10, 53:19, 56:2, 86:9, 88:17, 114:21, 124:4, 128:15, 137:2, 137:18, 138:10, 141:10, 142:1, 142:7, 143:17
**mostly** [1] - 135:12
**mother** [4] - 69:22, 69:24, 77:17, 81:16
**motion** [6] - 90:16, 119:25, 120:14, 122:1, 135:19, 136:10
**motions** [4] - 102:14, 102:15, 127:4, 127:16
**motive** [11] - 60:16, 66:15, 136:22, 137:7, 137:21, 138:13, 139:3, 139:23, 142:2, 142:3, 143:2
**motives** [1] - 143:4
**move** [21] - 3:11, 12:5, 51:25, 53:5, 56:15, 72:18, 81:20, 81:22, 102:12, 109:1, 110:15, 110:19, 110:23, 111:12,

112:16, 114:20, 116:16, 117:12, 122:3, 123:4, 144:2
**moved** [6] - 62:2, 71:2, 71:7, 81:23, 107:10
**moves** [1] - 110:4
**moving** [2] - 71:6, 99:22
**MR** [341] - 3:5, 3:14, 3:18, 4:3, 5:10, 5:12, 5:21, 6:17, 6:21, 10:25, 11:6, 11:8, 11:11, 11:16, 11:25, 12:2, 12:13, 12:16, 12:20, 13:10, 13:13, 14:5, 14:8, 14:12, 14:16, 14:19, 14:21, 14:24, 15:4, 15:23, 15:25, 16:5, 16:13, 21:25, 22:6, 22:10, 22:11, 22:15, 22:24, 23:6, 23:9, 24:23, 25:1, 25:13, 25:14, 32:13, 32:15, 34:4, 34:7, 34:9, 35:17, 35:20, 37:14, 39:7, 39:10, 39:18, 39:23, 40:3, 40:17, 41:1, 42:3, 42:6, 42:8, 42:16, 42:18, 42:20, 43:6, 43:8, 43:11, 45:8, 45:15, 45:23, 46:2, 46:6, 47:25, 48:3, 48:6, 48:8, 48:11, 49:10, 49:11, 49:12, 51:14, 51:16, 51:25, 52:3, 52:5, 52:9, 52:15, 52:23, 53:1, 53:3, 53:5, 53:8, 53:12, 53:14, 54:3, 54:4, 54:6, 54:14, 54:17, 55:16, 55:19, 55:25, 56:6, 56:9, 56:11, 56:16, 56:17, 57:2, 58:3, 58:4, 58:6, 58:9, 58:12, 58:14, 58:18, 59:2, 59:3, 59:10, 59:17, 59:21, 60:3, 60:24, 61:5, 61:13, 61:19, 61:24, 62:5, 62:10, 62:20, 62:21, 62:24, 63:7, 63:10, 63:14, 63:17, 63:18, 63:25, 64:3, 64:4, 64:7, 64:10, 64:11, 64:22, 64:25, 65:4, 65:9, 65:11, 65:16, 65:17, 65:20, 66:25, 68:24, 69:2, 69:5, 69:7, 69:9, 69:20, 71:18, 71:20, 72:10, 72:12, 72:18, 72:21, 73:2, 73:3, 73:14, 73:16, 75:3, 75:9, 75:13, 75:20, 76:1, 76:5, 76:14, 76:17, 76:23, 77:5, 79:2, 79:4, 79:6, 79:8, 79:9, 79:23, 80:2, 80:6, 80:15, 81:1, 81:3, 81:6, 81:14, 82:7, 82:9, 82:11, 82:13, 82:15, 82:17, 82:19, 82:21, 82:24, 84:21, 84:24, 85:22, 86:2, 87:3, 87:7, 88:2, 88:4, 88:8, 88:10, 89:7, 89:12, 90:4, 90:12, 90:24, 91:9, 91:17, 91:23, 92:1, 92:5, 92:16, 92:19, 92:25, 93:5, 93:7, 95:18, 96:5, 96:8, 96:14, 96:18, 99:12, 99:15, 99:18, 100:10, 100:12, 100:18, 100:25, 101:3, 101:6, 101:7, 101:9, 101:17, 101:20, 102:1, 102:4, 102:8, 102:12, 102:21, 103:21, 103:25, 105:9, 105:15, 105:17, 106:6, 106:14, 106:16, 106:23, 106:24, 107:9, 107:19, 108:7, 109:1, 109:7, 110:4, 111:17, 112:20, 112:23, 114:14, 114:17, 115:9, 116:13, 116:22, 117:25, 119:9, 119:21, 119:24, 120:21, 120:24, 121:5, 121:22, 121:25, 123:4, 123:8, 124:2, 125:6, 125:7, 125:9, 125:10, 125:14, 126:22, 126:25, 127:8, 127:11, 127:12, 127:20, 127:24, 128:2, 128:18, 131:4, 132:14, 133:12, 136:7, 138:16, 138:19, 141:10, 143:12, 143:16, 144:6, 144:15, 144:17, 145:5, 145:25, 146:8, 146:15, 146:17, 147:17, 148:1, 148:3, 148:6, 148:9, 148:10, 148:16, 149:4, 149:6, 149:10, 149:13, 149:17, 149:24, 150:7, 150:11, 150:15, 150:16, 151:4, 151:5, 151:6, 151:7, 151:8, 151:10, 151:11, 151:12
**multi** [1] - 104:2
**multi-conspiracy** [1] - 104:2
**multiple** [7] - 80:23, 103:24, 105:25, 107:3, 107:17, 144:9, 147:15
**multitask** [1] - 150:10
**murder** [5] - 132:25, 133:16, 135:5, 135:12
**murders** [2] - 132:24, 135:14
**music** [3] - 46:17, 46:19, 47:4
**must** [5] - 60:10, 60:22, 66:5, 89:20, 111:9
**mutation** [1] - 130:14

## N

**N.E** [2] - 1:17, 2:5
**N.W** [10] - 4:13, 47:2, 47:11, 47:22, 48:5, 50:10, 70:18, 77:8, 109:16, 129:9
**Nadim** [8] - 62:5, 99:16, 112:24, 120:9, 129:8, 131:11, 139:12
**name** [5] - 39:2, 69:15, 69:16, 129:2, 147:2
**named** [2] - 83:11, 86:6
**names** [1] - 36:15
**narcotic** [1] - 27:16
**narcotics** [29] - 17:21, 17:25, 18:3, 27:9, 27:13, 28:7, 33:1, 34:14, 34:18, 34:20, 35:12, 50:12, 51:5, 51:7, 58:1, 58:7, 58:20, 58:24, 102:24, 103:2, 115:22, 118:5, 118:13, 118:21, 118:22, 120:9, 120:10, 138:22, 139:1
**nature** [7] - 4:24, 46:18, 107:8, 112:1, 123:19, 128:19, 133:23
**near** [3] - 17:21, 17:24, 59:1
**nearby** [1] - 70:16
**necessarily** [10] - 18:21, 21:8, 21:17, 29:23, 34:6, 107:7, 133:2, 135:20, 143:5, 146:10
**necessary** [3] - 66:13, 94:24, 142:5
**necessity** [1] - 94:17
**neck** [1] - 117:7
**need** [20] - 12:23, 15:7, 52:5, 52:25, 76:9, 88:13, 89:17, 95:4, 96:24, 97:3, 102:17, 106:11, 107:24, 108:6, 112:18, 128:1, 144:19, 146:13, 147:17, 149:15
**needed** [1] - 112:9
**needs** [3] - 40:21, 61:21, 146:10
**neighborhood** [11] - 28:19, 31:7, 32:8, 71:11, 76:19, 76:21, 77:7, 81:20, 81:21, 83:8, 87:18
**nephew** [14] - 71:1, 71:15, 71:21, 77:16, 78:1, 78:15, 79:10, 82:2, 86:10, 86:16, 86:19, 86:21, 87:1, 88:1
**nephew's** [1] - 74:9
**nephews** [1] - 71:9
**net** [1] - 92:17
**never** [26] - 6:14, 23:10, 23:14, 23:18, 26:11, 26:14, 27:2, 27:5, 27:11, 28:5, 29:1, 30:16, 32:21, 32:22, 32:24, 33:1, 33:16, 33:24, 38:2, 39:5, 44:16, 59:1, 83:22, 83:23, 122:9, 123:18
**new** [1] - 51:18
**news** [2] - 85:19, 85:21
**next** [13] - 5:13, 45:11, 45:14, 54:20, 54:21, 59:20, 66:24, 74:5, 82:2, 88:7, 88:16, 96:25, 119:21
**niece** [1] - 71:9
**night** [7] - 91:12, 94:18, 94:22, 98:19, 129:7, 140:3, 141:23
**nightclub** [4] - 53:22, 54:11, 54:25, 55:6
**nightclubs** [5] - 30:13, 30:16, 30:17, 30:20, 55:21
**nine** [1] - 28:12
**no..** [1] - 100:6
**nobody** [3] - 73:10, 91:21, 91:22
**non** [1] - 12:9
**non-BMT** [1] - 12:9
**none** [3] - 28:8, 88:10, 104:25
**nonetheless** [1] - 52:21
**nonresponsive** [1] - 85:22
**nonstarter** [1] - 91:21
**noon** [1] - 96:3
**normal** [1] - 29:14
**not-BMT** [1] - 106:13
**note** [1] - 147:3
**noted** [2] - 139:5, 139:15
**notes** [2] - 16:2, 130:7
**nothing** [23] - 15:15, 46:3, 62:9, 82:7, 88:4, 105:24, 113:16, 117:9, 118:20, 127:24, 131:19, 131:21, 132:6, 132:9, 132:10, 133:16, 137:6, 137:17, 137:22, 137:23, 138:5, 141:13, 150:15
**noticed** [2] - 31:22, 149:4
**noticing** [1] - 77:16
**November** [31] - 4:7, 5:17, 7:16, 8:6, 9:6, 10:8, 10:15, 24:22, 31:16, 31:20, 31:21, 46:12, 49:19, 49:23, 50:2, 50:3, 56:19, 56:20, 71:12, 110:11, 110:22, 111:1, 111:8, 112:2, 112:7, 113:1,

116:24, 117:13, 123:9, 131:21
**nowhere** [1] - 17:24
**number** [15] - 17:20, 18:19, 24:20, 25:11, 26:9, 41:16, 49:2, 89:5, 89:10, 90:2, 92:15, 107:22, 136:15, 141:19
**numbers** [3] - 145:16, 146:3, 147:19
**numerous** [1] - 32:11

## O

**Oak** [1] - 2:10
**object** [7] - 11:11, 32:13, 40:17, 45:8, 84:21, 85:22, 131:17
**objected** [1] - 63:25
**objecting** [1] - 79:6
**objection** [43] - 5:10, 5:21, 10:25, 21:25, 34:4, 37:14, 39:18, 43:6, 43:11, 45:23, 46:1, 47:25, 48:6, 49:10, 52:2, 54:3, 54:4, 55:25, 56:6, 56:13, 58:3, 58:4, 58:9, 58:12, 58:16, 59:10, 63:20, 64:24, 64:25, 67:1, 67:17, 68:11, 71:18, 72:10, 72:18, 72:24, 73:14, 75:3, 76:23, 79:23, 88:2, 127:17, 127:18
**Objection** [1] - 49:12
**objections** [9] - 64:8, 75:10, 102:14, 122:21, 127:11, 127:13, 147:7, 147:13
**observe** [3] - 73:7, 73:17, 81:7
**observed** [1] - 75:15
**obtain** [1] - 36:12
**obtained** [4] - 26:8, 26:11, 26:14, 104:4
**obviously** [5] - 34:15, 84:7, 143:17, 145:22, 146:5
**occasion** [3] - 43:24, 76:18, 81:7
**occasions** [5] - 60:10, 64:15, 66:5, 66:12, 109:13
**occupants** [1] - 129:10
**occur** [1] - 18:16
**occurred** [1] - 143:21
**occurring** [2] - 87:14, 87:25
**October** [14] - 28:16, 28:17, 30:5, 39:14, 41:9, 41:20, 41:21, 41:23, 42:1, 42:2, 42:23, 42:24, 79:18
**OF** [3] - 1:1, 1:4, 1:12
**offense** [10] - 43:10, 43:14, 43:15, 67:9, 68:1, 132:18, 137:21, 138:6, 145:19, 145:20
**offer** [2] - 66:25, 67:17
**offered** [2] - 100:15, 105:24
**offers** [1] - 68:11
**officer** [2] - 10:13, 141:22
**officers** [2] - 38:14, 117:1
**often** [1] - 86:9
**oftentimes** [1] - 143:3
**old** [3] - 30:6, 74:20, 74:21
**older** [1] - 20:7
**once** [3] - 95:3, 100:23, 126:4
**one** [68] - 5:1, 11:18, 12:23, 14:5, 16:19, 17:16, 19:20, 19:23, 22:9, 25:24, 31:4, 31:7, 34:7, 35:14, 39:7, 46:2, 52:13, 56:10, 56:12, 59:2, 61:24, 62:1, 65:7, 65:17, 66:21, 67:9, 67:25, 72:9, 73:8, 73:12, 74:2, 74:3, 79:3, 86:7, 86:9, 87:8, 88:17, 89:7, 89:10, 91:6, 91:11, 92:8, 92:17, 92:21, 93:3, 95:9, 95:18, 96:24, 100:9, 106:19, 108:2, 109:14, 111:24, 114:5, 119:14, 122:4, 122:16, 129:16, 132:4, 132:18, 135:14, 138:2, 140:4, 140:5, 141:20, 145:2, 146:9
**one's** [2] - 134:17, 134:18
**ones** [6] - 4:23, 14:20, 35:6, 91:1, 102:11, 123:16
**open** [2] - 48:1, 150:4
**opened** [1] - 42:10
**operating** [3] - 109:12, 117:24, 148:19
**opinion** [3] - 9:15, 10:21, 132:22
**opportunity** [4] - 52:15, 60:16, 66:15, 90:24
**opposed** [3] - 23:3, 64:6, 119:8
**option** [2] - 90:21, 92:10
**oranges** [1] - 134:2
**order** [6] - 89:20, 93:9, 104:18, 126:13, 139:19, 143:6
**ordered** [2] - 134:11, 135:13
**ordering** [1] - 131:7
**orders** [3] - 132:6, 132:7
**organization** [9] - 28:21, 30:1, 106:25, 130:16, 134:17, 134:18, 138:8, 140:19, 140:25
**organizations** [1] - 34:3
**original** [3] - 59:12, 91:1, 149:9
**originally** [1] - 130:11
**originate** [2] - 138:24, 139:1
**originates** [1] - 138:20
**ostracized** [1] - 139:10
**ourselves** [1] - 90:25
**out-of-court** [2] - 144:6, 144:8
**outline** [1] - 109:5
**outlined** [2] - 110:1, 114:7
**outside** [11] - 3:11, 4:12, 69:11, 72:4, 80:8, 81:2, 84:21, 87:14, 134:9, 138:20, 142:22
**overall** [1] - 124:16
**overrule** [1] - 56:12
**overruled** [15] - 5:11, 5:14, 5:23, 11:1, 32:14, 34:5, 37:15, 43:12, 48:7, 48:14, 49:13, 56:1, 58:10, 59:11, 84:23
**Overtown** [2] - 29:6, 29:12
**overwhelming** [1] - 143:9
**own** [12] - 28:2, 33:4, 33:14, 67:13, 84:2, 101:24, 104:18, 107:20, 112:15, 137:12, 148:19

## P

**P.M** [1] - 1:5
**packaged** [1] - 111:16
**packages** [1] - 114:2
**packaging** [1] - 114:2
**packet** [2] - 37:21, 149:20
**PAGE** [1] - 151:2
**page** [28] - 13:18, 13:23, 13:25, 18:12, 18:16, 18:19, 18:21, 18:24, 18:25, 51:18, 52:11, 53:6, 53:15, 54:7, 55:8, 60:6, 64:13, 64:22, 114:4, 123:5, 128:25, 132:22, 136:15, 136:21, 146:3, 147:6, 149:11
**pages** [5] - 17:18, 18:16, 18:23, 26:5, 99:16
**PAGES** [1] - 1:10
**paginated** [1] - 145:15
**painful** [1] - 144:16
**palm** [2] - 13:19, 14:5
**palms** [2] - 12:17, 12:18
**Panama** [1] - 70:17
**pantheon** [1] - 103:14
**paper** [1] - 4:17
**parcel** [1] - 133:5
**pardon** [1] - 56:11
**parking** [1] - 88:22
**parlance** [1] - 108:3
**part** [28] - 15:21, 20:20, 29:9, 31:7, 32:10, 33:24, 35:10, 63:1, 64:18, 81:1, 101:2, 101:3, 103:15, 104:24, 105:25, 109:9, 118:16, 124:16, 125:23, 128:12, 128:21, 128:22, 129:6, 129:25, 131:15, 133:5, 135:16, 137:14
**participant** [4] - 112:25, 113:21, 115:25, 144:9
**participate** [6] - 46:8, 47:3, 70:10, 90:14, 94:16, 110:12
**participated** [7] - 30:22, 44:14, 44:20, 47:13, 58:20, 130:3, 135:14
**participating** [7] - 32:12, 46:19, 63:1, 110:2, 118:14, 125:25, 148:20
**participation** [8] - 103:13, 103:15, 105:19, 105:22, 108:12, 115:19, 116:10, 131:23
**particular** [11] - 35:22, 42:9, 71:13, 78:5, 93:22, 100:23, 115:7, 131:5, 131:7, 144:12, 147:16
**particularly** [1] - 42:10
**parties** [1] - 88:11
**parties'** [3] - 89:2, 89:4, 146:23
**parts** [1] - 24:9
**party** [2] - 75:17, 91:18
**pass** [2] - 52:4, 100:1
**passage** [2] - 57:7, 57:9
**passenger** [1] - 117:4
**passing** [2] - 15:16, 140:2
**pat** [1] - 138:7
**patron** [1] - 13:15
**pattern** [2] - 64:14, 64:19
**patting** [1] - 138:3
**PAUL** [1] - 1:21
**pawn** [2] - 137:4, 137:9
**pay** [2] - 55:24, 56:5
**PCS** [1] - 43:2
**Peas** [1] - 11:21
**peas** [2] - 119:18, 120:18
**peas-and-carrots** [1] - 120:18
**pecking** [1] - 139:18
**pecuniary** [1] - 119:10
**people** [45] - 10:16, 21:15, 27:12, 30:1, 30:15, 34:25, 35:2, 47:23, 52:18, 73:5, 74:14, 74:15, 75:8, 75:23, 76:3, 83:15, 83:19, 83:21, 83:25, 84:1, 84:2, 84:3, 84:5, 85:16, 85:25, 104:11, 105:12, 106:13, 107:12, 107:21, 108:8, 108:21, 118:12,

132:20, 139:11, 139:14, 139:19, 140:24, 141:4, 141:7, 142:23, 143:3, 145:13, 147:22
**perceived** [1] - 134:8
**percent** [2] - 24:15, 25:5
**PEREZ** [2] - 4:1, 151:3
**Perez** [10] - 4:4, 4:6, 6:22, 23:10, 35:21, 41:4, 41:7, 42:21, 43:4, 106:8
**perfect** [1] - 65:9
**perform** [2] - 56:4, 135:12
**perhaps** [4] - 15:2, 29:17, 89:3, 99:6
**period** [8] - 31:18, 40:6, 41:8, 63:2, 79:12, 79:13, 79:14, 107:10
**permission** [6] - 11:8, 51:14, 53:12, 54:14, 55:16, 121:6
**permitted** [1] - 103:1
**perpetrated** [1] - 134:13
**perpetrator** [2] - 66:18, 136:1
**perpetrators** [2] - 134:13, 143:25
**perpetuity** [1] - 127:20
**person** [23] - 9:18, 33:2, 50:3, 58:2, 58:24, 59:1, 78:5, 92:16, 103:1, 103:2, 108:10, 115:11, 118:9, 119:1, 125:5, 125:12, 125:17, 128:10, 129:2, 135:5, 140:12, 144:25, 146:11
**person's** [3] - 10:24, 11:4, 135:7
**personal** [12] - 10:24, 11:4, 37:11, 37:12, 37:16, 53:25, 56:7, 104:21, 111:3, 117:19, 137:12, 143:2
**personally** [3] - 67:5, 67:22, 68:15
**personnel** [1] - 3:7
**persons** [9] - 83:1, 104:9, 107:6, 107:22, 107:25, 108:4, 125:5, 135:11, 148:2
**perspective** [1] - 128:21
**pertaining** [1] - 8:2
**Peter** [1] - 149:6
**PHILIP** [1] - 1:23
**phone** [27] - 23:21, 23:22, 24:5, 24:7, 25:22, 25:25, 26:2, 26:21, 30:7, 30:8, 41:18, 57:13, 109:11, 109:17, 111:25, 112:11, 113:2, 113:6, 113:7, 113:9, 115:14, 115:16, 115:17, 115:18, 140:15, 145:3, 147:18
**phones** [2] - 28:12, 132:21
**photograph** [30] - 11:19, 17:10, 17:13, 18:9, 18:18, 18:22, 18:24, 19:3, 19:4, 19:14, 19:15, 19:17, 19:18, 19:19, 19:20, 19:21, 19:22, 20:2, 20:6, 20:7, 50:17, 53:21, 54:11, 54:13, 54:19, 54:20, 54:22, 55:4, 55:12
**photographed** [1] - 39:6
**photographs** [12] - 6:25, 7:5, 7:11, 11:17, 12:4, 16:18, 16:23, 17:2, 17:8, 19:10, 38:3
**photos** [2] - 44:2, 103:6
**physical** [6] - 32:2, 32:3, 32:6, 35:11, 35:13, 121:10
**physically** [2] - 20:6, 40:9
**pick** [3] - 22:9, 74:11, 77:17
**picture** [3] - 22:9, 52:12
**pictures** [10] - 8:9, 8:12, 15:21, 22:10, 49:2, 49:4, 49:14, 52:8, 124:14, 125:5
**piderit** [1] - 151:23
**PIDERIT** [1] - 2:9
**Piedy** [2] - 54:20, 54:22
**Pineer** [1] - 54:21
**Pinkerton** [24] - 117:24, 120:18, 120:21, 121:12, 121:13, 121:17, 124:8, 124:10, 124:13, 125:20, 126:8, 126:13, 128:13, 128:18, 130:10, 130:17, 131:5, 134:4, 135:3, 135:8, 135:9, 145:23, 146:12, 146:17
**place** [5] - 47:10, 48:9, 120:1, 131:8, 141:20
**placed** [1] - 24:21
**places** [1] - 56:2
**plain** [1] - 130:1
**Plaintiff** [1] - 1:5
**plan** [3] - 60:17, 66:16, 97:15
**plans** [5] - 93:10, 93:13, 93:19, 93:25, 100:4
**play** [2] - 144:11
**played** [1] - 25:21
**player** [1] - 140:18
**pluck** [1] - 134:25
**PM** [20] - 3:2, 3:19, 13:3, 15:10, 15:11, 16:9, 59:25, 63:4, 63:5, 65:22, 88:25, 90:7, 90:8, 94:4, 95:15, 97:11, 98:23, 128:4, 128:5, 150:22
**pocket** [3] - 39:24, 40:18, 138:4
**podium** [1] - 12:16
**point** [24] - 21:11, 29:8, 29:13, 30:9, 30:10, 36:21, 44:5, 57:11, 74:20, 78:11, 78:15, 79:16, 92:11, 96:14, 100:23, 101:4, 102:13, 119:13, 120:5, 124:18, 125:15, 130:25, 132:15, 133:13
**pointed** [1] - 137:13
**points** [3] - 110:15, 124:4, 128:15
**pole** [4] - 30:25, 31:1, 31:4, 43:21
**Police** [1] - 117:1
**police** [4] - 34:11, 35:4, 35:6, 73:22
**Ponce** [1] - 1:19
**poor** [2] - 24:16, 52:18
**popular** [4] - 12:2, 12:3, 12:7, 21:22
**PORTELA** [1] - 1:7
**Portela** [56] - 7:4, 7:12, 7:14, 7:15, 8:3, 8:5, 8:9, 8:15, 8:23, 9:2, 9:5, 9:17, 9:21, 10:8, 20:5, 36:11, 49:16, 49:23, 50:1, 63:20, 67:19, 67:22, 67:24, 68:2, 68:5, 68:8, 69:5, 110:4, 110:7, 110:12, 111:2, 111:13, 111:16, 111:24, 112:8, 112:9, 112:24, 113:1, 113:8, 113:9, 113:11, 113:13, 116:7, 116:25, 117:8, 117:10, 117:16, 118:4, 118:16, 118:17, 119:11, 121:1, 121:7, 121:13, 123:9, 127:14
**Portela's** [4] - 110:17, 113:24, 116:5, 121:19
**portion** [1] - 136:9
**position** [18] - 89:5, 90:3, 90:10, 90:25, 91:9, 91:13, 105:17, 108:10, 111:8, 130:19, 132:4, 134:17, 134:18, 134:24, 136:20, 138:12, 142:15, 143:7
**positive** [1] - 6:8
**possess** [4] - 8:16, 67:11, 67:13, 102:19
**possessed** [2] - 111:4, 120:5
**possession** [26] - 67:15, 68:6, 68:9, 68:17, 110:21, 110:22, 110:25, 111:3, 111:6, 111:21, 112:12, 112:14, 117:14, 119:1, 120:19, 120:20, 121:2, 121:7, 121:10, 121:11, 121:19, 121:20, 123:10, 123:17, 124:9, 124:10
**possessions** [1] - 112:21
**possibility** [2] - 17:7, 19:7
**possible** [4] - 80:11, 80:14, 129:25, 130:23
**possibly** [1] - 7:12
**post** [6] - 7:1, 7:2, 48:24, 112:12, 118:23, 121:9
**post-Miranda** [1] - 121:9
**posted** [14] - 17:15, 17:16, 18:12, 19:24, 20:3, 20:6, 20:8, 27:2, 27:5, 27:7, 27:21, 27:22, 28:6, 99:20
**posting** [1] - 19:24
**postings** [11] - 16:18, 18:15, 18:16, 27:1, 27:11, 27:15, 27:19, 51:22, 101:13, 101:24, 115:3
**posts** [5] - 18:24, 28:9, 30:12, 30:15, 40:10
**pot** [1] - 99:2
**powder** [4] - 5:25, 6:8, 57:5
**PowerPoint** [2] - 149:25, 150:10
**practice** [2] - 130:16, 139:14
**preceding** [2] - 17:18, 18:21
**precludes** [1] - 143:5
**predicate** [3] - 22:18, 132:18, 135:4
**preemptively** [1] - 91:12
**preemptory** [1] - 91:5
**prefer** [1] - 60:24
**preference** [1] - 92:12
**prejudice** [1] - 40:3
**prepared** [5] - 61:21, 65:14, 75:6, 91:15, 149:21
**preparing** [1] - 66:17
**presence** [2] - 6:8, 81:2
**present** [4] - 8:7, 45:2, 46:15, 61:22
**presentation** [1] - 64:5
**presented** [3] - 43:4, 63:22, 68:20
**preserved** [2] - 64:3, 64:4
**preserving** [1] - 123:2
**President** [4] - 11:19, 13:21, 14:15, 22:21
**pressure** [4] - 90:1, 93:4, 94:13, 94:17
**pressured** [1] - 92:23

DAILY COPY

**pretrial** [2] - 89:8, 102:15
**pretty** [2] - 25:9, 25:10
**previous** [3] - 40:8, 64:8, 127:12
**previously** [8] - 67:14, 68:2, 68:5, 68:8, 68:16, 102:14, 135:17, 135:18
**primarily** [2] - 110:13, 110:15
**problem** [5] - 72:6, 72:7, 77:10, 86:18, 142:9
**problematic** [1] - 128:9
**problems** [4] - 71:8, 75:10, 104:14, 140:21
**Procedure** [1] - 114:21
**procedure** [1] - 29:15
**proceeding** [1] - 126:12
**PROCEEDINGS** [1] - 1:12
**Proceedings** [1] - 3:2
**proceedings** [2] - 150:21, 151:19
**process** [5] - 9:12, 9:14, 93:14, 98:15, 98:16
**processed** [1] - 4:15
**processing** [1] - 57:11
**produced** [1] - 122:22
**Professional** [1] - 151:24
**proffer** [1] - 101:2
**program** [4] - 39:17, 40:19, 80:19, 81:9
**progress** [1] - 124:25
**promoting** [1] - 131:22
**proof** [4] - 35:11, 38:6, 126:20, 134:16
**proper** [7] - 63:12, 100:14, 103:9, 109:21, 111:22, 112:13, 113:20
**properly** [1] - 136:22
**property** [2] - 31:6, 33:4
**propose** [1] - 11:16
**proposed** [4] - 13:21, 61:20, 91:22
**protect** [1] - 124:17
**prove** [3] - 40:16, 40:18, 125:20
**proven** [1] - 139:23
**provide** [2] - 51:2, 115:3
**provided** [2] - 34:25, 59:22
**provision** [2] - 49:20, 61:9
**provisions** [1] - 13:1
**publish** [3] - 53:12, 55:16, 61:10
**published** [2] - 55:18, 60:5
**publishing** [1] - 61:11
**pull** [3] - 13:5, 35:1, 106:6
**punishable** [2] - 67:8, 67:25
**purchase** [2] - 35:13, 37:4
**purchased** [3] - 34:20, 123:12, 126:23
**purchases** [3] - 36:19, 36:20, 58:23
**purely** [2] - 22:11, 22:19
**purport** [1] - 16:24
**purpose** [8] - 22:19, 22:22, 24:23, 134:21, 134:23, 136:19, 140:9, 140:11
**purposes** [6] - 25:13, 60:13, 66:8, 121:12, 121:25, 123:1
**pursuant** [2] - 67:11, 114:20
**pushed** [1] - 100:24
**put** [14] - 14:17, 40:18, 61:9, 65:12, 72:2, 74:11, 90:1, 93:11, 94:20, 99:2, 131:24, 140:23, 145:6, 145:7
**puts** [1] - 106:23
**putting** [3] - 99:4, 129:2, 141:7
**puzzled** [1] - 89:21

## Q

**quality** [2] - 24:16, 140:25
**qualm** [1] - 39:23
**qualms** [1] - 136:2
**quantity** [1] - 115:21
**quarrel** [1] - 126:2
**quarrelling** [1] - 107:24
**questioning** [2] - 40:4, 47:19
**questions** [13] - 6:17, 11:6, 35:17, 35:21, 49:3, 59:17, 77:2, 82:13, 82:14, 82:17, 87:3, 104:6, 104:20
**quickly** [3] - 56:23, 97:3, 132:14
**quite** [4] - 105:12, 105:13, 106:7, 106:9
**quote** [1] - 136:14

## R

**racketeering** [3] - 138:6, 138:8, 138:13
**radar** [1] - 31:20
**raised** [2] - 29:1, 29:5
**Ramirez** [4] - 49:17, 49:23, 112:7, 123:16
**random** [1] - 47:23
**Raymond** [2] - 46:13, 46:16
**RDR** [1] - 2:9
**rea** [1] - 135:2
**reached** [1] - 99:6
**reaching** [2] - 113:9, 138:3
**read** [5] - 101:13, 101:14, 101:22, 101:25, 148:10
**ready** [4] - 96:11, 98:20, 147:9, 149:20
**Reagan** [4] - 11:19, 13:21, 14:15, 22:21
**real** [3] - 33:4, 140:22
**realistically** [1] - 96:5
**reality** [1] - 25:17
**really** [8] - 6:9, 20:20, 90:15, 96:11, 97:22, 114:9, 131:20, 142:13
**Realtime** [1] - 151:25
**reason** [11] - 39:24, 71:6, 80:19, 98:7, 98:11, 104:13, 105:3, 132:16, 136:24, 138:1, 140:10
**reasonable** [8] - 19:9, 60:14, 66:9, 114:22, 116:9, 125:4, 133:1, 135:24
**reasonably** [10] - 49:8, 96:11, 117:5, 117:17, 121:14, 123:14, 123:22, 124:11, 130:11, 132:25
**reasons** [3] - 110:1, 111:12, 135:17
**rebuttal** [2] - 62:23, 88:9
**rebutting** [1] - 52:17
**receive** [1] - 105:25
**received** [5] - 43:2, 61:25, 80:10, 115:11, 115:12
**receiving** [1] - 113:6
**recent** [1] - 49:14
**recess** [1] - 97:17
**Recessed** [4] - 15:10, 63:4, 90:7, 128:4
**recite** [1] - 102:18
**recognize** [12] - 46:22, 47:6, 50:14, 50:19, 51:19, 54:8, 55:1, 55:9, 85:19, 111:20, 123:25, 125:15
**recognized** [1] - 126:1
**recollection** [4] - 12:15, 18:9, 125:25, 126:25
**reconcile** [1] - 103:23
**reconvene** [2] - 97:4
**record** [16] - 15:12, 24:23, 25:13, 63:19, 67:18, 69:15, 81:1, 95:20, 101:2, 122:1, 123:2, 124:5, 126:22, 129:15, 141:13, 151:19
**recording** [3] - 25:17, 25:21, 38:8
**records** [1] - 100:12
**recovered** [7] - 17:25, 34:18, 37:12, 41:18, 45:16, 50:4, 111:18
**recross** [3] - 52:16, 53:1, 53:2
**redact** [1] - 147:2
**redirect** [4] - 46:4, 52:3, 87:5, 88:9
**REDIRECT** [4] - 46:5, 87:6, 151:8, 151:12
**refer** [1] - 80:10
**reference** [6] - 47:12, 47:18, 51:4, 59:5, 146:6, 147:22
**referenced** [2] - 134:3, 134:4
**referred** [5] - 42:22, 101:22, 103:3, 103:4, 103:7
**referring** [1] - 30:7
**reflect** [1] - 63:19
**regard** [16] - 14:22, 48:19, 66:2, 90:10, 91:6, 91:20, 106:12, 109:6, 122:15, 124:8, 124:9, 124:10, 126:12, 128:8, 139:22, 146:24
**regarding** [8] - 18:2, 26:20, 27:8, 49:19, 59:5, 63:18, 113:10, 115:4
**regardless** [1] - 138:23
**regards** [15] - 27:20, 28:12, 62:5, 119:25, 120:16, 121:22, 122:7, 122:18, 122:23, 123:1, 123:9, 131:9, 132:10, 133:16, 133:18
**Registered** [1] - 151:24
**rehab** [2] - 80:12, 80:14
**reintroduce** [1] - 72:23
**rejoinder** [1] - 148:21
**related** [12] - 17:8, 18:18, 28:20, 30:16, 41:13, 48:21, 48:25, 69:21, 69:24, 102:23, 134:24, 135:8
**relation** [3] - 17:8, 17:12, 138:22
**relationship** [5] - 70:25, 105:20, 108:19, 141:5, 141:17
**relatively** [2] - 20:23, 81:24
**released** [4] - 90:19, 91:15, 92:20, 92:21
**relevance** [9] - 34:4, 39:18, 43:11, 59:10, 75:17, 79:23, 80:11, 80:14, 141:14
**relevant** [2] - 40:2, 130:4
**reliable** [1] - 6:12
**relied** [1] - 102:21
**relief** [1] - 95:7
**rely** [1] - 132:1
**remained** [2] - 7:18, 8:6
**remains** [3] - 57:4, 95:16, 147:15
**remember** [7] - 30:12, 71:13, 85:6, 120:17, 124:22, 125:6, 138:17
**remind** [3] - 62:8, 62:11, 99:13
**reminded** [1] - 89:18
**renew** [10] - 64:8, 102:14, 119:25,

120:14, 122:1, 122:2, 122:20, 122:25, 127:11
**renewal** [1] - 123:23
**renewed** [1] - 127:15
**renews** [1] - 127:12
**rental** [2] - 33:17
**repeat** [3] - 27:14, 43:13, 128:7
**repeatedly** [1] - 140:15
**rephrase** [3] - 40:24, 58:17, 72:25
**replete** [1] - 124:5
**REPORTED** [1] - 2:9
**Reporter** [3] - 151:24, 151:24, 151:25
**Reporting** [1] - 2:9
**reports** [1] - 38:13
**reposted** [1] - 8:11
**representation** [1] - 51:22
**reputation** [1] - 142:17
**request** [10] - 42:3, 49:22, 57:12, 90:18, 109:24, 109:25, 113:25, 122:25, 143:11, 147:10
**requested** [8] - 12:25, 34:21, 34:24, 35:9, 41:23, 42:2, 42:24, 149:8
**requests** [1] - 80:23
**require** [1] - 20:17
**required** [3] - 21:5, 136:13, 142:2
**requirement** [4] - 21:7, 136:22, 138:13, 139:3
**requires** [2] - 20:21, 21:9
**research** [1] - 92:8
**resell** [1] - 104:22
**reserve** [3] - 130:23, 131:1, 150:14
**reserving** [1] - 114:17
**residential** [2] - 39:17, 40:19
**residue** [9] - 5:20, 5:25, 56:23, 56:25, 57:3, 57:4, 57:7, 57:9, 144:1
**resolve** [1] - 78:8
**resolved** [3] - 61:19, 97:7, 102:6
**respect** [12] - 8:20, 9:21, 87:25, 110:19, 111:8, 133:2, 138:2, 140:16, 140:19, 140:24, 142:22, 142:23
**respectful** [1] - 141:10
**respecting** [1] - 140:20
**respects** [1] - 139:15
**response** [2] - 101:15, 104:5
**rest** [6] - 54:12, 61:22, 62:16, 65:13, 98:19, 112:17
**restaurant** [1] - 33:25
**rested** [2] - 68:20, 88:12
**restored** [1] - 67:11
**rests** [6] - 68:18, 68:25, 69:3, 69:5, 69:7, 88:8
**result** [17] - 36:15, 43:5, 43:15, 44:12, 71:21, 72:13, 73:4, 77:19, 77:25, 78:8, 80:16, 81:18, 104:4, 104:16, 132:23, 132:24, 137:25
**results** [1] - 6:6
**resume** [1] - 15:9
**resumed** [1] - 3:2
**Resumed** [4] - 15:11, 63:5, 90:8, 128:5
**retaliation** [1] - 134:8
**retires** [5] - 13:3, 59:25, 88:25, 95:15, 98:23
**retrieve** [1] - 34:17
**retrieved** [2] - 111:16, 124:25
**return** [4] - 18:25, 51:20, 95:8, 133:8
**returned** [3] - 81:9, 129:12, 134:12
**returning** [1] - 16:1
**returns** [6] - 3:19, 16:6, 16:9, 65:22, 94:4, 97:11
**reveal** [3] - 39:11, 39:16, 40:12
**revealed** [1] - 38:1
**review** [6] - 12:23, 27:1, 43:24, 50:20, 58:15, 58:19
**reviewed** [8] - 16:21, 26:5, 28:18, 57:13, 134:20, 142:11, 142:19
**reviewing** [1] - 57:17
**reviled** [1] - 142:4
**revision** [1] - 61:20
**revolver** [4] - 141:16, 144:18, 144:19, 145:3
**revulsion** [1] - 142:12
**RICO** [3] - 134:6, 135:4, 137:14
**riding** [4] - 33:22, 118:17, 120:25, 121:1
**rights** [1] - 67:10
**rise** [3] - 16:7, 137:20, 139:6
**risers** [1] - 70:9
**river** [1] - 83:6
**Riverside** [7] - 83:4, 83:6, 83:8, 83:10, 83:11
**road** [1] - 63:10
**rob** [2] - 137:4, 144:21
**robberies** [12] - 27:20, 27:23, 31:25, 44:14, 128:21, 129:6, 129:16, 129:24, 134:22, 138:1, 139:16, 139:19
**robbery** [37] - 5:9, 31:24, 32:4, 44:17, 56:19, 61:15, 61:16, 128:12, 128:22, 128:24, 129:3, 129:5, 129:7, 130:3, 130:15, 131:16, 132:20, 133:4, 133:5, 133:22, 134:13, 137:6, 137:14, 137:15, 138:12, 139:10, 139:12, 139:16, 139:20, 140:1, 140:7, 140:12, 140:13, 142:8, 144:10, 144:17
**robbing** [1] - 109:18
**Robertson** [3] - 134:3, 135:11, 139:3
**robs** [1] - 139:13
**rocks** [1] - 35:15
**Rodolfo** [8] - 49:16, 67:19, 67:22, 67:24, 68:2, 68:5, 68:8, 69:5
**RODOLFO** [1] - 1:7
**Rodriguez** [2] - 47:16, 146:10
**role** [2] - 113:22, 113:23
**rolling** [1] - 96:25
**Ronald** [1] - 11:19
**room** [3] - 79:21, 95:8, 98:17
**ROSNIEL** [2] - 4:1, 151:3
**Rosoborough** [3] - 62:13, 96:16, 99:4
**rough** [1] - 145:13
**roughly** [2] - 28:16, 71:4
**round** [1] - 6:11
**rub** [1] - 57:8
**RUBIO** [67] - 2:4, 3:5, 3:14, 15:4, 35:20, 39:10, 40:3, 41:1, 42:3, 42:6, 42:8, 42:16, 42:18, 42:20, 43:8, 45:15, 46:2, 65:16, 69:9, 69:20, 71:20, 72:12, 72:21, 73:2, 73:3, 73:16, 75:9, 75:13, 75:20, 76:1, 76:5, 76:14, 76:17, 77:5, 79:2, 79:4, 79:9, 80:2, 80:6, 80:15, 81:1, 81:3, 81:6, 81:14, 82:7, 84:21, 87:7, 88:4, 88:8, 102:12, 103:21, 103:25, 105:9, 105:15, 106:6, 106:14, 106:16, 106:24, 107:9, 107:19, 127:8, 127:11, 127:20, 147:17, 148:1, 148:3, 148:9
**Rubio** [30] - 15:2, 35:18, 39:25, 40:24, 45:14, 60:21, 62:25, 63:11, 65:14, 69:8, 72:11, 72:25, 75:6, 75:18, 76:4, 77:1, 78:25, 81:13, 84:12, 86:8, 87:5, 88:7, 102:11, 103:17, 106:3, 108:14, 127:18, 147:16, 148:11, 149:1
**Rubio's** [3] - 62:18, 65:3, 65:5
**RUBIO**..................... [1] - 151:12
**RUBIO**...................... . [1] - 151:10
**RUBIO**...................... .. [1] - 151:7
**Rule** [21] - 62:18, 89:2, 89:17, 95:25, 99:3, 109:2, 109:24, 110:1, 113:25, 114:17, 114:20, 122:2, 123:2, 123:23, 127:4, 128:16, 131:1, 132:12, 136:10, 143:11, 145:12
**ruled** [3] - 64:9, 99:6, 125:19
**Rules** [1] - 114:20
**rules** [1] - 75:7
**ruling** [3] - 21:25, 61:25, 130:23
**rulings** [2] - 96:20, 145:22
**run** [3] - 77:16, 146:22, 150:1
**running** [1] - 31:10
**runs** [1] - 83:13
**rush** [1] - 98:25

## S

**safety** [1] - 92:17
**Salas** [3] - 48:25, 55:5, 129:2
**sale** [11] - 10:23, 27:9, 37:17, 51:2, 51:4, 51:7, 58:7, 116:6, 118:21, 119:8, 124:17
**sales** [6] - 45:16, 46:9, 104:23, 110:13, 115:13, 118:10
**salient** [2] - 124:4, 128:15
**sat** [2] - 38:11, 90:13
**satisfactory** [1] - 62:19
**satisfied** [2] - 135:2, 136:22
**satisfy** [1] - 104:18
**saw** [22] - 30:15, 30:16, 33:16, 33:24, 39:5, 74:15, 76:3, 76:11, 76:12, 76:18, 77:6, 83:21, 83:25, 84:3, 85:21, 87:17, 105:1, 105:7, 105:8, 122:16
**scale** [1] - 104:23
**scare** [1] - 133:6
**scared** [1] - 77:16
**scarring** [1] - 133:7
**scenario** [2] - 89:24, 138:4
**scene** [1] - 57:11
**schedule** [4] - 88:15, 93:17, 93:23, 95:3
**scheduling** [2] - 92:22, 97:14
**scheduling-wise** [1] - 92:22
**school** [6] - 68:7, 70:3, 70:12, 83:7,

83:8, 83:11
**scope** [5] - 52:3, 58:4, 59:10, 84:21, 130:9
**screaming** [1] - 72:5
**screen** [4] - 6:23, 13:19, 18:18, 31:20
**search** [14] - 16:19, 18:25, 26:8, 26:11, 26:14, 26:16, 26:20, 28:13, 36:12, 36:14, 36:19, 41:13, 51:19, 104:4
**seat** [3] - 90:2, 119:4, 121:9
**seated** [11] - 3:20, 15:12, 16:10, 65:25, 69:14, 89:1, 89:20, 90:9, 94:5, 97:12, 98:24
**second** [8] - 25:7, 54:7, 87:17, 105:23, 108:20, 123:5, 136:13, 139:3
**Second** [1] - 130:6
**sectors** [1] - 21:16
**secure** [2] - 49:15, 50:6
**secured** [1] - 41:13
**see** [38] - 7:7, 7:9, 13:8, 17:18, 18:19, 30:22, 38:4, 46:7, 47:23, 48:4, 53:16, 53:18, 53:19, 59:15, 64:23, 72:3, 74:1, 78:2, 86:3, 86:5, 86:6, 86:23, 86:25, 93:20, 106:11, 106:22, 107:24, 108:6, 108:15, 108:20, 108:21, 122:9, 122:17, 123:15, 126:10, 127:2, 149:15, 150:19
**seeing** [1] - 54:12
**seize** [2] - 9:21, 10:1
**seized** [3] - 9:10, 34:11, 37:6
**selected** [2] - 89:21, 91:3
**sell** [8] - 9:14, 38:4, 103:1, 104:25, 108:17, 108:18, 110:7, 125:23
**seller** [3] - 10:16, 34:17, 105:20
**selling** [8] - 9:12, 39:5, 50:12, 105:1, 105:2, 108:9, 109:10, 115:20
**send** [1] - 62:17
**Senior** [1] - 70:4
**sense** [4] - 90:12, 92:2, 92:13, 117:16
**sent** [4] - 37:4, 39:16, 45:6, 89:6
**separate** [8] - 104:10, 105:2, 105:10, 106:25, 108:15, 111:21, 146:25
**separately** [1] - 116:19
**serious** [1] - 141:1
**serves** [1] - 140:11
**Services** [1] - 2:9
**SESSION** [1] - 1:5
**set** [6] - 67:6, 67:23, 68:15, 98:19, 113:3, 148:22
**sets** [1] - 111:21
**setting** [1] - 5:13
**seven** [1] - 26:4
**several** [4] - 8:4, 11:16, 28:15, 45:5
**share** [1] - 119:8
**sharp** [1] - 97:18
**sheet** [1] - 4:22
**ships** [1] - 140:2
**shirt** [1] - 72:2
**shoes** [1] - 72:2
**shooter** [3] - 144:8, 144:25, 145:2
**shootings** [3] - 44:20, 44:23, 45:2
**shop** [2] - 137:4, 137:9
**Shores** [1] - 2:5
**short** [1] - 12:23
**shot** [2] - 57:4, 144:5
**show** [18] - 12:12, 15:19, 15:21, 17:9, 22:6, 40:5, 42:12, 48:23, 64:23, 75:15, 79:21, 80:3, 106:16, 111:21, 115:25, 141:25, 143:18, 147:18
**showed** [1] - 137:7
**showing** [15] - 6:22, 18:8, 46:22, 47:6, 49:22, 50:9, 50:14, 51:17, 53:15, 54:7, 55:1, 102:22, 103:8, 105:23, 113:9
**shown** [6] - 18:18, 49:2, 101:22, 110:7, 110:10, 138:3
**shows** [5] - 20:19, 42:25, 52:9, 106:24, 115:19
**side** [5] - 13:19, 54:20, 89:14, 117:4, 148:20
**sidebar** [2] - 52:6, 80:2
**sideways** [1] - 13:15
**sign** [37] - 11:18, 11:20, 11:21, 11:22, 11:23, 12:2, 12:7, 12:10, 12:11, 12:14, 13:6, 13:20, 13:21, 15:19, 20:11, 20:21, 20:22, 21:12, 21:16, 21:18, 22:21, 22:25, 23:15, 29:18, 29:21, 47:23, 48:5, 52:13, 52:20, 52:21, 52:22, 55:15, 59:5, 59:15, 103:8
**significance** [1] - 59:8
**significant** [1] - 118:7
**signs** [7] - 20:15, 20:17, 21:1, 21:8, 23:11, 23:19, 47:18
**similar** [13] - 6:5, 13:20, 20:5, 24:11, 60:9, 64:15, 65:7, 66:4, 66:11, 66:21, 114:2, 124:19, 138:9
**similar-act** [2] - 65:7, 66:21
**similarity** [1] - 24:15
**similarly** [1] - 109:25
**simple** [2] - 137:9, 138:7
**simply** [2] - 4:23, 93:12
**single** [2] - 33:21, 118:1
**sister** [5] - 69:25, 70:21, 70:23, 77:17, 81:23
**sit** [5] - 92:6, 92:13, 97:16, 148:4, 148:10
**site** [1] - 115:23
**sitting** [3] - 38:22, 85:24, 107:16
**situation** [6] - 40:9, 77:9, 94:2, 107:9, 111:2, 123:8
**six** [3] - 26:4, 35:15, 114:14
**size** [1] - 10:20
**skill** [3] - 20:18, 20:21, 21:9
**sleep** [1] - 131:12
**slight** [1] - 134:9
**slim** [1] - 110:17
**slow** [2] - 116:21
**small** [3] - 37:20, 111:17, 118:25
**smell** [1] - 117:2
**smoke** [1] - 112:3
**smoking** [2] - 117:3, 117:20
**snatch** [1] - 61:16
**so..** [1] - 145:14
**social** [10] - 7:1, 7:2, 7:8, 26:17, 27:3, 27:22, 28:5, 30:19, 30:21, 51:11
**socializing** [1] - 30:20
**society** [2] - 21:13, 21:16
**sod** [1] - 58:25
**sold** [14] - 8:24, 9:2, 9:5, 9:18, 11:3, 11:5, 35:12, 38:2, 38:6, 104:18, 104:21, 107:21, 114:3, 121:4
**sole** [1] - 22:22
**solicited** [1] - 112:7
**solidifying** [1] - 134:17
**solve** [1] - 78:10
**someone** [6] - 36:24, 71:23, 73:15, 133:6, 136:4, 150:9
**sometime** [1] - 36:1
**sometimes** [2] - 21:14, 35:3
**somewhat** [1] - 113:11
**somewhere** [6] - 9:14, 28:19, 36:3, 58:25, 59:1, 122:13
**son** [1] - 70:25
**sorry** [10] - 11:2, 24:20, 27:14, 41:4, 41:6, 43:13, 85:22, 92:3, 145:17, 146:2
**sort** [6] - 22:15, 22:20, 55:21, 90:16, 90:20, 130:14
**sound** [2] - 36:24, 148:16
**South** [1] - 1:24
**SOUTHERN** [1] - 1:1
**Spanish** [1] - 28:24
**spawned** [1] - 89:16
**speaking** [2] - 25:18, 129:1
**SPECIAL** [2] - 4:1, 151:3
**Special** [1] - 4:4
**specific** [2] - 35:16, 37:23
**specifically** [7] - 16:17, 103:3, 119:22, 122:4, 136:15, 140:19
**specified** [1] - 48:13
**specify** [3] - 8:22, 9:1, 9:4
**spectacle** [2] - 22:12, 22:19
**speculation** [2] - 56:6, 58:12
**speculative** [1] - 107:8
**spell** [1] - 69:15
**spend** [2] - 33:25, 89:24
**spending** [2] - 51:12, 52:9
**spent** [1] - 75:9
**split** [1] - 96:2
**sport** [3] - 70:10, 70:13, 70:15
**squared** [2] - 63:6, 63:16
**stage** [1] - 129:24
**staging** [1] - 130:2
**stains** [1] - 111:20
**stamped** [1] - 88:23
**stand** [4] - 16:6, 40:20, 74:5, 76:8
**standalone** [1] - 140:1
**standing** [2] - 19:8, 127:24
**start** [13] - 82:12, 91:13, 97:10, 97:18, 98:13, 98:14, 98:15, 98:16, 99:4, 99:8, 102:9, 102:11, 149:21
**started** [4] - 35:24, 42:23, 77:15, 96:3
**starts** [1] - 42:14
**stashed** [2] - 115:22, 144:12
**state** [3] - 60:15, 66:13, 69:15
**statement** [2] - 99:19, 140:10
**statements** [7] - 76:13, 113:2, 121:10, 124:14, 137:9, 140:22, 141:2
**States** [15] - 67:2, 67:3, 67:4, 67:19, 67:20, 67:21, 68:11, 68:13, 68:14, 130:5, 130:8, 134:18, 138:20, 138:21, 139:2
**STATES** [4] - 1:1, 1:4, 1:13, 1:15
**stature** [1] - 138:8
**status** [3] - 137:24, 139:7, 139:9
**statutory** [1] - 135:1

**stay** [1] - 80:11
**staying** [2] - 113:6, 120:2
**stays** [1] - 92:22
**step** [4] - 59:18, 88:5, 90:5, 93:8
**Steven** [2] - 5:2, 5:4
**sticker** [1] - 14:17
**stickered** [1] - 14:20
**still** [6] - 22:18, 61:15, 93:24, 94:10, 122:12, 122:13
**stipulate** [3] - 67:6, 67:23, 68:15
**stipulation** [5] - 63:18, 63:21, 67:2, 67:18, 68:12
**stipulations** [3] - 62:16, 63:7, 63:16
**stood** [1] - 141:5
**stop** [2] - 117:21, 144:19
**stopped** [4] - 5:8, 32:10, 117:2, 127:21
**store** [2] - 112:4, 133:20
**straight** [1] - 126:17
**Street** [11] - 1:17, 1:22, 2:2, 2:5, 4:13, 50:10, 70:18, 77:8, 78:3, 83:13, 85:13
**street** [1] - 72:4
**strike** [2] - 5:6, 72:19
**strip** [1] - 30:13
**strong** [1] - 61:16
**Structural** [1] - 70:7
**stuff** [2] - 18:17, 104:13
**subjects** [1] - 54:13
**submission** [1] - 103:9
**submit** [2] - 109:21, 112:14
**submitted** [4] - 64:12, 88:13, 116:1, 146:25
**subpoena** [2] - 3:8, 3:9
**subsection** [1] - 149:4
**subsequent** [1] - 111:25
**substance** [2] - 110:25, 117:15
**substantive** [6] - 114:15, 115:5, 116:10, 124:19, 126:14, 130:11
**substantively** [1] - 115:24
**successful** [1] - 90:17
**sudden** [2] - 61:16, 71:16
**sufficiency** [1] - 89:3
**sufficient** [10] - 94:1, 103:12, 109:24, 110:18, 112:22, 114:7, 122:14, 126:18, 135:7, 143:10
**suggest** [4] - 88:17, 95:25, 106:4, 117:9
**suite** [1] - 1:20
**Suite** [2] - 1:24, 2:3
**summarize** [1] - 128:15
**Sunday** [3] - 15:13, 94:18, 94:22
**superintendent** [1] - 70:8
**superseding** [1] - 123:5
**support** [5] - 102:18, 108:5, 109:6, 111:4, 148:18
**supported** [1] - 124:21
**supports** [2] - 131:25, 142:15
**surveillance** [7] - 43:21, 44:2, 44:6, 44:7, 44:8, 55:21, 58:20
**survive** [1] - 136:9
**sussed** [1] - 103:18
**sustain** [3] - 45:25, 58:16, 109:3
**sustained** [7] - 39:9, 43:7, 54:5, 58:5, 71:19, 72:24, 79:7
**swab** [2] - 6:5, 6:6
**sworn** [1] - 69:13
**SWORN....................** ............ [1] - 151:9
**sympathy** [2] - 40:1, 40:4
**system** [1] - 139:19

**T**

**tab** [7] - 24:20, 24:24, 25:12, 25:13, 25:15, 42:10
**table** [1] - 106:3
**tabs** [1] - 25:12
**tactfully** [1] - 93:16
**tail** [1] - 125:25
**tailored** [1] - 126:5
**talks** [9] - 31:18, 113:13, 129:2, 136:16, 136:21, 138:14, 140:8, 143:3, 144:18
**tallies** [1] - 4:23
**Tampa** [1] - 39:17
**TAMRA** [1] - 2:9
**Tamra** [1] - 151:23
**tap** [1] - 113:7
**tape** [3] - 44:6, 44:8, 44:10
**target** [2] - 109:16, 125:10
**targets** [1] - 58:2
**tattoo** [1] - 125:11
**tattooed** [2] - 125:17
**tattoos** [5] - 29:15, 29:18, 29:21, 29:24, 30:2
**tea** [1] - 88:22
**team** [1] - 86:7
**ten** [2] - 10:21, 13:2
**tens** [1] - 4:24
**tenths** [1] - 35:14
**terabyte** [1] - 44:1
**term** [4] - 36:22, 67:8, 67:25, 103:19
**terms** [4] - 106:5, 110:2, 134:4, 150:13
**territory** [1] - 103:2
**test** [7] - 5:20, 5:24, 6:2, 6:5, 6:14, 8:1, 150:1
**testified** [21] - 4:9, 8:4, 23:22, 25:15, 28:21, 29:20, 30:25, 31:5, 31:25, 102:25, 107:10, 110:13, 113:5, 117:1, 122:9, 125:1, 131:11, 138:19, 139:12, 141:22, 143:21
**testifies** [1] - 11:18
**testify** [3] - 22:7, 75:7, 122:6
**testifying** [3] - 8:1, 84:12, 99:16
**testimony** [40] - 5:21, 12:9, 12:19, 16:24, 17:20, 20:10, 26:23, 29:17, 36:7, 36:18, 38:23, 39:1, 39:8, 43:21, 45:5, 45:9, 45:12, 45:13, 45:24, 47:20, 47:24, 48:19, 49:4, 75:11, 82:25, 85:12, 98:9, 106:21, 108:17, 112:24, 113:22, 115:2, 117:20, 120:2, 124:15, 124:23, 129:5, 129:7, 139:13
**tests** [2] - 6:8, 144:1
**text** [27] - 26:21, 26:23, 26:24, 27:19, 40:6, 41:12, 41:17, 41:18, 41:19, 41:22, 41:24, 41:25, 42:12, 42:22, 42:25, 43:5, 50:21, 50:23, 51:1, 102:21, 103:5, 104:3, 108:15, 108:20, 147:19, 147:21, 147:24
**texting** [1] - 108:8
**texts** [13] - 104:8, 105:12, 105:14, 105:15, 106:4, 106:10, 106:11, 107:22, 107:24, 108:3, 117:9, 147:16, 147:18
**Thai** [7] - 131:6, 131:8, 132:1, 136:14, 136:21, 137:13, 138:14
**Thanksgiving** [1] - 71:14
**THE** [306] - 1:12, 1:15, 1:19, 3:3, 3:13, 3:16, 3:20, 5:11, 5:14, 5:22, 6:19, 11:1, 11:7, 11:9, 11:15, 11:24, 12:1, 12:22, 13:5, 13:12, 14:1, 14:7, 14:9, 14:15, 14:18, 14:20, 14:22, 15:1, 15:5, 15:12, 16:3, 16:7, 16:10, 22:1, 22:3, 22:9, 22:13, 23:3, 24:25, 32:14, 34:5, 34:8, 35:18, 37:15, 39:9, 39:20, 39:22, 40:8, 40:20, 40:24, 41:5, 42:5, 42:7, 42:17, 42:19, 43:7, 43:12, 45:10, 45:13, 45:14, 45:25, 46:4, 48:1, 48:7, 48:9, 48:13, 49:13, 51:15, 52:2, 52:4, 52:6, 52:8, 52:14, 52:17, 52:25, 53:2, 53:7, 53:9, 53:13, 54:2, 54:5, 54:16, 55:17, 56:1, 56:8, 56:10, 56:12, 57:1, 58:5, 58:10, 58:16, 59:11, 59:18, 59:20, 59:23, 60:1, 60:4, 61:3, 61:6, 61:18, 61:23, 62:4, 62:8, 62:11, 62:22, 63:3, 63:6, 63:9, 63:13, 63:15, 63:24, 64:2, 64:5, 64:21, 64:23, 65:2, 65:6, 65:10, 65:12, 65:19, 65:21, 65:23, 68:19, 69:1, 69:4, 69:6, 69:8, 69:12, 69:14, 69:17, 71:19, 71:23, 71:25, 72:1, 72:11, 72:20, 72:22, 73:15, 73:23, 75:4, 75:6, 75:12, 75:16, 75:24, 76:2, 76:6, 76:15, 76:24, 77:3, 77:4, 77:21, 78:24, 79:3, 79:5, 79:7, 79:24, 80:4, 80:11, 80:21, 81:2, 81:4, 81:10, 81:12, 82:8, 82:10, 82:12, 82:14, 82:16, 82:18, 82:20, 82:22, 84:23, 85:23, 86:1, 87:5, 88:3, 88:5, 88:7, 88:9, 88:11, 89:1, 89:9, 89:15, 90:5, 90:9, 90:22, 91:4, 91:18, 91:25, 92:4, 92:14, 92:18, 92:20, 93:6, 93:22, 94:5, 94:8, 94:22, 94:25, 95:11, 95:14, 95:16, 95:19, 96:7, 96:9, 96:16, 96:23, 97:7, 97:8, 97:12, 98:24, 99:13, 99:17, 100:1, 100:11, 100:16, 100:19, 101:1, 101:5, 101:16, 101:18, 101:21, 102:3, 102:5, 102:9, 102:16, 103:11, 103:22, 105:4, 105:14, 105:16, 106:2, 106:10, 106:15, 107:3, 107:16, 107:23, 108:23, 109:5, 109:22, 111:15, 112:18, 112:21, 113:24, 114:15, 114:25, 116:2, 116:21, 117:22, 119:5, 119:20, 119:23, 120:17, 120:23, 120:25, 121:21, 121:24, 123:3, 123:7, 124:1, 124:3, 125:8, 125:12, 126:2,

126:24, 127:1, 127:10, 127:14, 127:21, 128:1, 128:3, 128:6, 131:3, 133:24, 138:15, 138:17, 141:9, 142:8, 143:14, 144:4, 144:14, 144:16, 145:9, 146:1, 146:13, 146:16, 146:20, 147:3, 147:4, 147:24, 148:2, 148:4, 148:7, 148:15, 148:17, 149:5, 149:9, 149:12, 149:15, 149:19, 150:3, 150:5, 150:6, 150:8, 150:12, 150:17
**themselves** [7] - 12:17, 25:4, 70:14, 112:22, 124:15, 134:14, 147:24
**theories** [3] - 125:20, 126:3, 126:5
**theory** [11] - 80:15, 80:21, 80:22, 80:24, 108:8, 117:24, 120:18, 126:9, 126:14, 130:1, 134:5
**therefore** [2] - 5:6, 144:2
**Thereupon** [1] - 150:21
**thinking** [2] - 89:19, 100:7
**Third** [1] - 134:19
**third** [1] - 149:11
**thirty** [2] - 96:9, 123:7
**Thompson** [5] - 120:11, 129:12, 137:22, 139:20, 145:1
**threats** [1] - 104:13
**three** [11] - 12:11, 12:18, 12:19, 13:15, 13:16, 13:19, 13:23, 20:23, 121:3, 133:14
**throughout** [1] - 110:14
**throw** [3] - 14:2, 59:15, 141:12
**throwing** [2] - 47:23, 52:12
**thrown** [1] - 148:25
**Thursday** [4] - 91:2, 97:25, 147:12, 149:22
**tickets** [1] - 94:14
**ticking** [1] - 92:22
**tie** [1] - 140:14
**ties** [3] - 113:11, 113:19, 132:6
**timewise** [1] - 96:1
**timing** [1] - 112:12
**Tinoco** [1] - 13:25
**Tiny** [1] - 86:6
**today** [14] - 3:12, 72:23, 84:12, 85:18, 85:20, 85:21, 85:24, 86:3, 86:18, 86:25, 96:13, 98:22, 99:9, 148:5
**together** [8] - 30:20, 35:1, 35:2, 98:16, 99:5, 113:19, 119:18
**tomorrow** [11] - 89:24, 97:10, 97:18, 97:20, 97:23, 97:24, 140:2, 149:19, 149:20, 150:17, 150:20
**tonight** [4] - 147:5, 147:13, 149:1, 150:13
**took** [3] - 3:5, 76:21, 104:11
**top** [6] - 18:19, 19:25, 30:11, 30:24, 145:16, 145:18
**topic** [1] - 5:7
**totality** [1] - 116:8
**totally** [1] - 128:23
**toward** [2] - 94:9, 146:4
**towards** [2] - 72:6, 78:3
**town** [4] - 70:19, 83:4, 83:12, 117:11
**track** [2] - 65:10, 98:1
**trafficking** [7] - 34:2, 111:7, 111:9, 121:3, 123:11, 138:22
**train** [3] - 70:13, 70:14, 73:13
**trained** [1] - 73:19
**training** [1] - 20:14
**transaction** [8] - 9:17, 9:20, 46:12, 109:14, 122:17, 125:16, 125:22, 126:1
**transactions** [4] - 27:13, 27:16, 28:7, 146:8
**transcribe** [1] - 25:4
**transcript** [7] - 24:13, 24:14, 24:18, 25:11, 129:1, 133:8, 151:18
**TRANSCRIPT** [1] - 1:12
**transferred** [3] - 7:20, 7:22, 7:25
**trap** [7] - 31:5, 124:17, 125:22, 129:8, 129:10, 134:12, 142:25
**traps** [4] - 38:2, 38:7, 105:1, 134:9
**treated** [1] - 139:11
**trees** [1] - 59:1
**trial** [12] - 14:13, 60:6, 60:21, 61:9, 67:2, 67:18, 68:12, 90:13, 109:7, 110:7, 110:10, 126:9
**TRIAL** [1] - 1:12
**tried** [1] - 26:19
**trouble** [2] - 34:25, 54:12
**troubles** [1] - 83:1
**troubling** [1] - 76:10
**true** [4] - 7:7, 7:11, 34:3, 137:5
**truly** [1] - 95:2
**truth** [1] - 75:14
**try** [3] - 26:18, 72:25, 120:12
**trying** [9] - 3:4, 72:21, 92:5, 104:14, 112:2, 112:3, 112:4, 119:11, 132:4
**Tse** [1] - 135:10
**TSE** [1] - 135:10
**turn** [3] - 68:22, 90:23, 132:14
**turned** [1] - 30:8
**twelve** [6] - 89:8, 89:9, 91:1, 91:3, 91:11, 91:13
**twenties** [1] - 74:18
**Twitter** [3] - 26:14, 26:16, 57:24
**two** [20] - 19:10, 22:10, 30:1, 31:1, 31:8, 35:14, 39:7, 50:13, 56:21, 72:3, 89:10, 91:5, 102:10, 109:13, 110:15, 111:20, 112:6, 113:1, 136:8, 146:25
**two-tenths** [1] - 35:14
**type** [4] - 21:5, 21:22, 33:18, 139:17
**types** [1] - 27:2
**typos** [2] - 96:19, 149:18

## U

**ultimately** [1] - 143:24
**unaware** [1] - 40:14
**unbeknownst** [1] - 95:21
**uncle** [4] - 69:22, 71:1, 71:17, 80:24
**unclear** [1] - 125:21
**unconnected** [1] - 137:11
**under** [19] - 40:5, 58:25, 67:15, 68:3, 68:7, 93:4, 100:13, 100:21, 109:11, 117:24, 120:18, 120:21, 121:16, 123:13, 126:16, 130:1, 135:7
**undercover** [5] - 34:12, 46:9, 47:15, 47:17, 115:2
**underlying** [1] - 135:4
**underneath** [3] - 117:4, 119:3, 121:9
**undersigned** [3] - 67:4, 67:21, 68:13
**understood** [1] - 15:14
**unfair** [1] - 93:15
**unforeseeable** [1] - 119:19
**unforeseen** [2] - 92:10, 92:14
**unfortunately** [2] - 94:19, 95:21
**unidentified** [1] - 125:10
**unintended** [2] - 130:11, 130:14
**unique** [4] - 20:11, 20:15, 22:25
**uniqueness** [1] - 11:18
**United** [15] - 67:1, 67:3, 67:4, 67:19, 67:20, 67:21, 68:11, 68:13, 68:14, 130:5, 130:8, 134:18, 138:20, 138:21, 139:1
**UNITED** [4] - 1:1, 1:4, 1:13, 1:15
**universal** [1] - 52:20
**universe** [1] - 135:1
**unknown** [5] - 107:25, 108:2, 108:4, 108:10, 148:2
**unlawfully** [1] - 131:17
**unless** [4] - 76:11, 93:18, 127:21, 133:6
**unlike** [2] - 134:6, 136:5
**unusual** [1] - 118:18
**up** [36] - 5:13, 12:11, 12:16, 12:18, 12:20, 13:16, 20:5, 20:23, 28:2, 35:9, 42:10, 47:23, 52:4, 52:12, 52:17, 52:25, 59:12, 70:22, 71:17, 74:11, 77:1, 77:17, 89:2, 93:19, 99:5, 100:1, 108:1, 113:17, 126:17, 127:25, 131:12, 132:4, 132:20, 133:15, 148:25, 150:4
**upstairs** [3] - 71:22, 73:21, 87:9
**uses** [2] - 21:18, 113:17

## V

**vaguely** [1] - 138:17
**valid** [2] - 114:9, 125:20
**valuable** [2] - 9:24, 140:25
**value** [3] - 10:14, 54:1, 119:10
**vehicle** [2] - 112:10, 117:2
**vehicles** [1] - 10:5
**Veloz** [2] - 34:21, 110:14
**venues** [1] - 56:3
**verbs** [1] - 76:13
**verdict** [5] - 90:1, 91:16, 92:24, 93:4, 127:22
**versus** [6] - 67:19, 68:12, 130:5, 130:8, 134:18, 138:21
**viability** [1] - 126:3
**Vicar** [15] - 127:3, 128:11, 130:6, 130:8, 132:17, 134:6, 134:23, 134:25, 135:3, 137:12, 137:20, 141:14, 142:10, 149:3, 149:7
**vicarious** [1] - 126:5
**vicinity** [2] - 4:13, 40:15
**victimization** [1] - 148:25
**victimized** [1] - 103:19
**victims** [3] - 141:21, 141:22, 143:18

**video** [12] - 36:25, 38:8, 46:19, 47:4, 47:12, 58:15, 58:19, 115:25, 122:9, 122:17, 123:24, 129:4
**videos** [3] - 46:17, 115:2, 122:22
**videotape** [1] - 138:2
**view** [2] - 21:11, 119:13
**violence** [3] - 136:17, 142:21, 142:23
**violent** [2] - 136:23, 143:6
**virtue** [3] - 121:19, 138:25, 139:6
**vodka** [1] - 53:24
**voice** [7] - 25:16, 25:17, 25:24, 57:14, 57:16, 125:15, 126:1
**voices** [6] - 24:10, 24:15, 24:16, 25:6, 25:8, 25:10
**VÁZQUEZ** [131] - 1:15, 5:10, 5:21, 10:25, 11:8, 11:11, 12:13, 12:20, 15:25, 16:5, 21:25, 22:11, 22:15, 24:23, 25:13, 32:13, 34:4, 37:14, 39:7, 39:18, 39:23, 40:17, 43:6, 43:11, 45:8, 45:23, 46:6, 48:3, 48:11, 51:14, 51:16, 51:25, 52:5, 52:9, 53:5, 53:8, 53:12, 53:14, 54:6, 54:14, 54:17, 55:16, 55:19, 56:16, 56:17, 57:2, 58:6, 58:14, 58:18, 59:2, 59:3, 59:17, 59:21, 60:3, 61:13, 61:19, 62:24, 63:7, 63:10, 63:17, 63:25, 64:3, 64:25, 65:11, 66:25, 71:18, 72:10, 72:18, 73:14, 75:3, 76:23, 79:6, 79:8, 79:23, 82:24, 84:24, 85:22, 86:2, 87:3, 88:2, 88:10, 90:4, 90:12, 91:17, 92:1, 92:5, 92:16, 92:19, 92:25, 100:10, 100:12, 101:7, 102:21, 105:17, 106:23, 108:7, 109:7, 111:17, 112:20, 112:23, 115:9, 117:25, 119:9, 120:21, 120:24, 121:5, 125:6, 125:10, 125:14, 126:22, 126:25, 127:24, 128:2, 128:18, 132:14, 138:16, 138:19, 144:6, 144:15, 144:17, 145:25, 146:8, 146:15, 146:17, 148:6, 148:10, 148:16, 149:24, 150:7, 150:11, 150:15
**VÁZQUEZ.................** [1] - 151:8
**VÁZQUEZ.......................** [1] - 151:11
**Vázquez** [37] - 13:5, 13:16, 24:25, 46:4, 48:2, 52:4, 56:14, 57:1, 58:17, 61:10, 63:6, 63:15, 64:23, 65:24, 66:24, 78:25, 79:5, 82:8, 82:22, 91:24, 100:7, 102:16, 110:1, 111:15, 115:1, 115:6, 117:23, 124:4, 127:23, 128:8, 131:16, 133:24, 135:22, 138:15, 138:21, 142:3, 146:25
**Vázquez's** [4] - 14:24, 104:6, 142:15, 149:7

## W

**wait** [6] - 23:4, 75:4, 78:24
**waiting** [3] - 79:20, 79:21, 96:15
**waiver** [3] - 62:19, 89:8, 89:17
**waiving** [1] - 63:20
**walking** [4] - 22:13, 33:22, 72:3, 72:5
**walks** [2] - 22:14
**wall** [1] - 19:8
**wallet** [2] - 5:2, 5:4
**wants** [7] - 60:4, 93:20, 96:1, 140:14, 140:18, 141:8, 142:3
**warrant** [8] - 16:19, 18:25, 26:11, 26:14, 26:16, 41:13, 51:19, 104:4
**warrants** [6] - 26:8, 26:20, 28:13, 36:12, 36:15, 36:19
**waste** [1] - 108:7
**weapon** [5] - 5:16, 121:2, 131:18, 136:18, 144:1
**weapons** [5] - 73:10, 124:12, 124:15, 126:12, 142:9
**wearing** [3] - 19:5, 19:9, 143:25
**week** [4] - 12:25, 94:1, 94:16, 145:7
**weeks** [3] - 76:20, 93:21, 145:7
**weight** [1] - 35:5
**West** [1] - 1:22
**Weston** [1] - 2:10
**whereas** [1] - 113:15
**whereby** [1] - 120:6
**whichever** [1] - 134:3
**white** [1] - 148:13
**whoa** [3] - 72:20
**whole** [1] - 127:3
**wife** [1] - 98:12
**WILLIAMS** [1] - 1:12
**willing** [1] - 91:18
**wire** [1] - 113:7
**wired** [2] - 36:24, 36:25
**wise** [2] - 52:19, 92:22
**wish** [2] - 68:23, 124:20
**wishes** [1] - 69:9
**witness** [25] - 11:12, 13:4, 15:17, 16:4, 16:6, 39:8, 39:23, 42:16, 42:18, 45:9, 45:24, 59:20, 62:18, 65:15, 66:24, 68:23, 69:10, 75:6, 76:7, 87:4, 88:6, 88:7, 104:9, 106:8
**WITNESS** [6] - 45:13, 69:17, 71:25, 77:3, 86:1, 151:2
**Witness** [1] - 59:19
**witness's** [1] - 76:8
**witnesses** [3] - 45:6, 104:25, 144:9
**witnesses'** [1] - 98:9
**witnessing** [1] - 87:15
**woken** [1] - 131:12
**wondering** [3] - 93:25, 94:14, 94:15
**woods** [1] - 117:7
**word** [3] - 113:17, 140:20
**words** [1] - 112:15
**workings** [1] - 118:12
**worries** [1] - 95:14
**worst** [1] - 138:4
**worthy** [2] - 140:24, 142:12
**wrapped** [1] - 37:17
**wrinkle** [1] - 93:2
**write** [1] - 95:22
**writing** [3] - 7:2, 7:8, 89:18

## Y

**year** [2] - 67:9, 68:1
**years** [3] - 30:6, 70:8, 74:21
**yelling** [1] - 72:5
**yesterday** [3] - 94:24, 94:25, 131:6
**young** [6] - 11:22, 14:2, 14:10, 70:14, 74:18, 84:5

## Z

**Zerquera** [9] - 13:14, 39:2, 48:23, 48:24, 106:19, 106:20, 113:5, 123:11, 123:16
**Zerquera's** [1] - 19:14