UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-20017-CR-WILLIAMS(s)(s)

UNITED STATES OF AMERICA

v.

CHRISTOPHER ALTAMIRANO,

        Defendant.
_____/

**UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT**

      The United States, by and through the undersigned Assistant United States Attorney, files this Response to Defendant Christopher Altamirano's Motion for Judgment of Acquittal Notwithstanding the Verdict. For the reasons set forth below, the defendant's motion should be denied.

1. Facts Introduced at Trial

      Since as early as 2008 members of the Big Money Team or "BMT," have operated in the City of Miami, Florida. The trial testimony from both within and outside of the BMT established that the group distributed narcotics, robbed citizens, directed prostitution and sought to impose order in the area 4th Street and 11th Avenue, Miami, Florida. The trial testimony established that narcotics, including crack cocaine, were sold by the BMT members on a daily basis. The convicted trial defendants, Maurin Chacon, Christopher Altamirano, Rodolfo Portela and James Dixon were specifically addressed as participants in the BMT's drug conspiracy by testifying witnesses.

      Moreover, the government also presented evidence that as part of the BMT's narcotics distribution activities, its members committed robberies and directed prostitution to raise capital

for drug purchases. Further, the government played jailhouse phone calls in which the defendants were captured planning continued drug activities, the prospect of investigation and discussing the attack on a suspected witness. Evidence from the witnesses and the jailhouse calls themselves established that BMT members persisted in their criminal conduct despite moments of incarceration.

Additionally, the trial evidence included the government's proactive investigation in which BMT members were shown coordinating with one another for the distribution of narcotics from areas they claimed to control. Further, evidence also demonstrated that for several years, the BMT has used the internet to facilitate communication between enterprise members and plan activities. Through social media evidence the government has secured images of the defendants demonstrating symbols of association of video recordings of group members claiming affiliation with the enterprise.

As a result four of the five trial defendants were convicted of a majority of their charged offenses. Co-defendant Jay Anthony Flores was acquitted. The defendants await their respective sentencing dates.

**2. Standard of Review**

"In considering a motion for the entry of a judgment of acquittal, a district court 'must view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Miranda,* 425 F.3d 953, 959 (11th Cir. 2005) (quoting *United States v. Sellers,* 871 F.2d 1019, 1021 (11th Cir. 1989)). "The prosecution need not rebut all reasonable hypotheses other than guilt. The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility

determinations made by the jury." *Sellers,* 871 F.2d at 1021 (internal quotations and citations omitted).

A reviewing Court is "bound by the jury's credibility choices and view the evidence in the light most favorable to the government." *See United States v. Peters,* 403 F.3d 1263, 1268 (11th Cir. 2005); *see also United States v. Gamory,* 635 F.3d 480, 497 (11th Cir. 2011).

### 3. The Evidence was Sufficient to Sustain the Verdict as to a Conspiracy to Distribute, Narcotics including over 280 Grams of Cocaine Base.

To prove the defendant engaged in a narcotics distribution conspiracy, the government was required to prove that an agreement existed between two or more persons to possess or distribute narcotics and that the defendant knowingly and voluntarily joined or participated in the conspiracy. *See for e.g.*, *United States v. Ndiaye*, 434 F.3d 1270, 1294 (11th Cir. 2006). The existence of a conspiracy may be proven by circumstantial evidence. *Id*. "[T]he defendant's knowledge of and membership in the conspiracy may be proven by acts on his part which furthered the goal of the conspiracy." *United States v. Cross*, 928 F.2d 1030, 1042 (11th Cir. 1991). As to a drug quantity amount specified by the indictment, evidence is sufficient to support jury's finding on quantity based upon evidence such as associate testimony on the rate of distribution over a specified period of time. *See United States v. Jackson*, 544 F.3d 1176, 1186 (11th Cir. 2008); see also *Unites States v. Gray*, 544 Fed. Appx. 870, 888 n.13 (11th Cir. 2013); *United States v. Ceja*, 543 Fed. Appx. 948, 957 (11th Cir. 2013); *see also United States v. Hunter*, 558 F.3d 495, 503 (6th Cir. 2009).

In proving the requisite knowledge for a conspiracy offense, the government may show knowing participation in the conspiracy through either circumstantial or direct evidence, and it need only prove that the defendant knew of the general nature and scope of the conspiracy.

3

*United States v. Pineiro*, 389 F.3d 1359, 1368 (11th Cir. 2004).  Although mere presence at the scene of a crime is insufficient to establish knowing participation, presence is a material and probative factor that the jury may consider. *United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005).  The defendant's knowledge of the conspiratorial goal may be established "when the circumstances surrounding [the defendant's] presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006).

      Here proof of a conspiracy was both established through direct and circumstantial evidence. For example, Altamirano completed a drug transaction that was commenced by co-conspirator Chacon.  The preceding phone and drug transaction, and many others, were recorded and presented to the jury.  Further, jailhouse calls, social media evidence and cellular text messages were all presented placing Altamirano in the drug conspiracy.  Jailhouse calls were especially pertinent to Altamirano's evidence by showing his provision of a cellular phone to co-conspirators for the purpose of continuing drug activity.  Further, during jail calls Altamirano implicated himself in the operation of the conspiracy and provided advice on future perpetuation.

      In addition to the recorded and documented evidence, witness testimony also demonstrated that Altamirano was a member of the drug conspiracy.  The witness testimony described Altamirano's participation in the drug conspiracy.  The witness testimony was then corroborated by Altamirano's recorded participation in the drug conspiracy during the undercover aspect of the investigation played for the jury.  These facts when viewed in totality show that the Court properly denied the motion for judgment of acquittal and that the jury had

more than a reasonable basis to determine Altamirano's involvement in the conspiracy. *Sellers,* 871 F.2d at 1021 (internal quotations and citations omitted).

### 4. The Evidence Supported the Verdict on Count 6

To establish a Violent Crime in Aid of Racketeering ("VICAR"), the government must prove the following beyond a reasonable doubt: 1.) An enterprise affecting interstate commerce existed; 2.) The enterprise engaged in racketeering activity; 3.) the defendant committed, threatened to commit, attempted to commit, conspired to commit a crime of violence; and 4.) the defendant's purpose in committing, threatening to commit, attempting to commit, or conspiring to commit the crime of violence was to gain entrance to, or to maintain, or to increase his position in the enterprise. *See* 9th Circuit Pattern Jury Instruction § 8.151 (2013) (modified). The trial evidence has proved each of the elements against defendant Altamirano under direct or vicarious liability theories.

Through his motion for judgment of acquittal, Altamariano makes three distinct challenges: 1.) The BMT was not an enterprise; 2.) Altamirano was not a BMT member; and 3 Altamirano's purpose in committing the charged act of violence.

**Proof of Membership in the Established Enterprise is not Required**

An "enterprise" is defined as any group of individuals associated in fact, although not a legal entity. 18 U.S.C. § 1961(4). The existence of an association-in-fact enterprise is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). It is not necessary to prove that the defendant is a member of the charged enterprise to be guilty of a VICAR offense. *See United States v. Rolett*, 151 F. 3d 787, 790 (8th Cir. 1998). Rather, a defendant may be a complete outsider who committed an underlying crime of violence for the

5

purpose of assisting another person to gain entrance to or maintain or increase his position in the charged enterprise. Of course, Altamirano's membership was proven at trial by evidence such as witness testimony, jail calls and his demonstration of the BMT hand sign.

Establishing that members of an enterprise operated together in furtherance of a common purpose may be proven by direct or circumstantial evidence including, inferences from the members' commission of similar acts in furtherance of a shared objective, financial ties, coordination of activities, interlocking nature of the schemes, and overlapping nature of the wrongful conduct. *United States v. Gianni*, 678 F.2d 956, 959 (11th Cir. 1982) ("There is rarely any direct evidence of an agreement to join a criminal conspiracy, so that a defendant's assent can be inferred from acts furthering the conspiracy's purpose.").

Furthermore, the requisite continuity of the enterprise and of the functioning of its associates is not defeated merely because there is a gap or interruption in the racketeering activities of the enterprise, or because membership of the enterprise changes over time. *United States v. Church*, 955 F.3d 688, 697-700 (11th Cir. 1992) (ruling that the association-in-fact, drug trafficking enterprise functioned as a continuing unit from 1973 to 1986, even though there was a three year gap in the commission of criminal acts from 1980 to 1983). The enterprise may exist even if its membership changes over time. *United States v. Perholtz*, 842 F.2d 343, 364 (D.C. Cir. 1988); *see also Church*, 955 F. 2d at 698 (enterprise established where the "personnel of the enterprise was not the same from beginning to end"); *see also United States v. Weinstein*, 762 F. 2d 1522, 1537 n.13 (11th Cir. 1985) (liability for participation in a enterprise does not require "participation of all members throughout the life of the enterprise"); *see also United States v. Hewes*, 729 F. 2d 1302, 1317 (11th Cir. 1984) ("The law does not require all members of the RICO enterprise to have maintained their association with it throughout the enterprise's life"); *United*

*States v. Cagnina*, 697 F.2d 915, 921-22 (11th Cir.) ("Although the enterprise grew in membership and its activities became more diverse, these facts do not negate its existence."), cert. denied, 464 U.S. 856 (1983).

The Eleventh Circuit has held that an enterprise need not have an ascertainable structure. *United States v. Goldin Industries, Inc.*, 219 F.3d 1271, 1274-75 (11th Cir. 2000). Further, the existence of an enterprise should be evaluated on the totality of the evidence and may be inferred from the evidence establishing the pattern of racketeering activity. *Id*. In *United States v. Pipkins*, 378 F.3d 1281, 1288-94 (11th Cir. 2004) (reversed on other grounds), the Court held that the evidence established the alleged enterprise comprised of an association of pimps, who operated in Atlanta and furthered a shared objective to make money from prostituting juveniles, and that there was no requirement that the enterprise be a formally structured group. Similarly, in *United States v. Church*, 955 F.2d at 698-99, the court held that the evidence established the enterprise comprised of an association of individuals where the enterprise was devoted to making money from repeated criminal activity and protecting that money by any means necessary even though enterprise's membership was not the same from beginning to end, but "[a]s participants left the enterprise, others joined, each becoming involved in multiple aspects of the enterprise[.]" *See also United States v. Hewes*, 729 F.2d 1302, 1310 (11th Cir. 1984), cert. denied, 469 U.S. 1110 (1985) (holding there was sufficient to establish an association-in-fact enterprise even though the enterprise consisted of a "group of persons who had committed a variety of unrelated offenses with no agreement as to any particular crime," but who were "associated for the purpose of making money from the repeated criminal activity."); *see also United States v. Cagnina*, 697 F.2d 915, 921-22 (11th Cir.), cert. denied, 464 U.S. 856 (1983). The *Cagnina* Court held that *Turkette* "did not suggest that the enterprise must have a distinct, formalized structure" and that "[a]lthough both

7

an enterprise and a pattern of racketeering activity must be shown, . . . . the proof used to establish the two elements may in particular cases coalesce." The Eleventh Circuit has also held that the Government need not prove an enterprise distinct from evidence showing a pattern of racketeering, and found that the enterprise was adequately established where evidence showed an informal association with a common purpose, i.e., making money from repeated criminal activity. *Id*.

In *Boyle v. United States*, 556 U.S. 938, 946 (2009), the Supreme Court held that by holding that an association-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." The Court reiterated its statement from *Turkette* that although the existence of an enterprise and the pattern are distinct elements, the evidence used to prove these elements "may in particular cases coalesce," *Id*. at 947 (citing *Turkette*, 452 U.S. at 583) and that "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id*.

It is important to note that a single enterprise may be found even where members of an association-in-fact enterprise form opposing factions. For example, in *United States v. Orena*, 32 F.3d 704, 710 (2d Cir. 1994), the indictment alleged that the RICO enterprise was an association-in-fact consisting of "members and associates of the Colombo Organized Crime Family." The indictment also referred to an internal war between two competing factions of the Colombo Family. On appeal, the defendant argued that the indictment failed to allege the existence of an ongoing enterprise because of the Family's infighting. The Second Circuit concluded, however, that the allegations and subsequent proof of the internecine war presented the question

whether the enterprise was sufficiently proven, not whether the enterprise was adequately pled, and held that the enterprise element was sufficiently pled.

Through the trial evidence the Jury was provided evidence that the purpose of the BMT was to generate illicit income. *See for e.g.* Testimony of Nadim Guzman, Transcript February 12, 2015, Pg. 58 ("Q. What is BMT? A. Big Money Team. Q. What does it mean to be part of this organization? A. That you can sell drugs and make money with them."). The BMT operated as an association-in-fact whose members participated in the distribution of narcotics and whose members and associates sold street level quantities of cocaine base, marijuana and MDMC. The BMT defended their narcotics distribution interests with violence and the threat of violence. Moreover, witness testimony has established that several members of the enterprise acquired capitol for the purchase distribution quantities of narcotics through robbery, theft and the direction of prostitution activities. The trial evidence established Altamirano was identified as significant member of BMT.

The BMT's devotion to "making money from repeated criminal activity," demonstrates the enterprise's "common purpose of engaging in a course of conduct," regardless of whether the criminal activity is diverse. *Cagnina,* 697 F.2d at 921. Altamirano was a keyf drug distributor through his association with the enterprise. Moreover, both Altamirano shared a common purpose with the enterprise - the distribution of drugs for profit. *See United States v. Starret*, 55 F.3d 1525, 1545 (11th Cir. 1995) (proof of an association's devotion to making money from repeated criminal activity demonstrates an enterprise's common purpose).

According to witness Zerquera, a former member of the enterprise, the BMT has existed since 2008 and its members have combined to generate profits from drug distribution activities in the City of Miami, Florida since at least 2008. *See for e.g.* Testimony of Dayaan Zerquera,

9

Daily Transcript February 18, 2015, Pg. 57; *see United States v. McLean*, 138 F.3d 1398, 1404 (11th Cir. 1998) (uncharged misconduct showing prior relationship between defendant and another participant in charged offense is admissible as inextricably intertwined with evidence of charged offense); *see also United States v. Lehder-Rivas*, 955 F.2d 1510, 1516 (11th Cir. 1992) (introduction of defendants earlier drug smuggling activities which began four years before the charged offense and involved many of the same people was intrinsic evidence that explained the roles and motives of the various co-conspirators during the charged conspiracy).

Through the enterprise's lifespan it utilized multiple physical locations to conduct drug distribution, store contraband and provide shelter for membership. The trial evidence also demonstrated that the BMT constituted an ongoing organization where various associates functioned as a continuing unit. *Turkette,* 452 U.S. at 583. While the enterprise's membership roster adjusted since the inception date of 2008, it maintained a continuous identity as the BMT. As participants left the enterprise, others joined, each becoming involved in multiple aspects of the enterprise. In *United States v. Hewes,* 729 F.2d 1302, 1311 (11th Cir. 1984), *cert. denied,* 469 U.S. 1110 (1985), the Eleventh Circuit made clear that "shifting associations" whose participants "overlapped to a significant degree" formed an enterprise*.; see also United States v. Young*, 906 F.2d 615, 619 (11th Cir. 1990) ("an enterprise can exist in the absence of a formally structured group."); *see also Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1284 (11th Cir. 2006) ("This Court has never required anything other than a "loose or informal" association of distinct entities."); s*ee also United States v. Harris,* 695 F.3d 1125, 1136 (10th Cir. 2012) (holding that Crips gang sets constituted an association-in-fact enterprise when they "jointly operated the houses from which various set members sold drugs"). The duration of relationships between

BMT members and their association with the group permitted the criminal network participants to pursue the enterprise's central purpose . . . the realization of illicit drug sale profits.

The gravamen of Altamirano's challenge to the government's case rested on a contention that his actions were independent from the BMT. Under the defendant's theory the drug distribution, robbery, theft, firearm possession and prostitution direction acts addressed by the trial evidence were nothing but the coincidental alignment of unaffiliated souls crossing by happenstance in the area of 4th Street and 11th Avenue, Miami, Florida like ships passing in the night. The proposition defies reason and was rejected by the jury's finding. The evidence shows both the existence of the enterprise and Altamirano's extensive participation in its activities toward the goal of generating drug sale profits.

### Altamirano committed the crime of violence to gain entrance to, or to maintain, or to increase his position in the enterprise.

The evidence demonstrated that the assaults committed during the November 20, 2013 robbery occurred to increase or maintain defendants Altamirano, Thompson and Forte's position in the enterprise. *See United States v. Kamahele*, 748 F. 3d 984, 1008-10 (10th Cir. 2014) ("The Government does not need to prove that the defendant's 'sole or principal motive' was to maintain or increase his position in the enterprise . . . Rather, the Government need only establish that the predicate violent crime was committed as an 'integral aspect of membership' in the enterprise (TCG). . . But Mr. Kepa Maumau's accomplice (Mr. Kamoto) testified that he and Mr. Kepa Maumau were TCG members, that TCG members were expected to commit crimes, and that criminal activity served to advance their reputations in the gang. Mr. Kamoto also testified that the crimes had raised his status in the gang and that he had received greater attention from fellow gang members upon his release from prison. This testimony supports the inference that the gang not

only knew about the robberies, but also encouraged members to engage in this type of criminal behavior.").

Altamirano, Thompson and Forte were fulfilling their roles as members of BMT by committing the assaults attendant top the November 20, 2013 robbery. Each of the defendants stood to lose standing or respect in the group had they declined to carry out the assaults which were needed to accomplish the robberies. *See United States v. Robertson*, 736 F.3d 1317, 1330 (11th Cir. 2013) ("Therefore, '[t]he motive element' of each VICAR murder charge 'is satisfied if the jury could properly infer that [Robertson] committed [murder] because he knew it was expected of him by reason of his membership in [Tampa Blood and Honour] or that he committed [murder] in furtherance of that membership.'") (quoting *United States v. Whitten,* 610 F.3d 168, 178–79 (2d Cir. 2010) (alterations and internal quotation marks omitted)); *see also United States v. Banks*, 514 F.3d 959, 971 (9th Cir. 2008). ("the evidence is sufficient for a VICAR conviction even if, for example, the jury could reasonably infer no more than that Banks acted out of concern for his status in the eyes of his 'little homies' within the gang, or his reputation among other gang members generally."); see also *United States v. Concepcion,* 983 F.2d 369, 381 (2d Cir. 1992) (holding that § 1959(a) simply required that the defendant's "general purpose in [committing an act of violence] was to maintain or increase his position in the enterprise."); see also *United States v. Pimentel,* 346 F.3d 285, 295–96 (2d Cir. 2003) (quoting *Concepcion,* 983 F.2d at 381) (holding that the purpose element is met if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." ); *see also United States v. Smith,* 413 F.3d 1253, 1277–78 (10th Cir. 2005) (holding that proof a violent crime was committed as an integral aspect of membership in an enterprise is sufficient to establish the is § 1959(a)

motive element where the jury could properly infer that a defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.); *see also United States v. Tse,* 135 F.3d 200, 206 (1st Cir. 1998) (holding that the government need not prove "that the crime was solely motivated by a desire to maintain or increase a particular position within the enterprise ").

The armed assault on November 20, 2013 maintained or increased the positions of Altamirano, Thompson and Forte in the BMT. *See for e.g.* Testimony of Dayaan Zerquera, Daily Transcript February 19, 2015, Pg. 26 ("Q. All right. And in the group, the more violent members received more respect, correct? A. Correct."); *see for e.g.* Testimony of Nadim Guzman, Daily Transcript February 17, 2015, Pg. 29 ("Q. How does a person gain or lose respect in the BMT? A. Not complying like -- let's say you are asked to do something or to help with a robbery or something and you don't want to do it or somebody is fighting and you don't help them out and they end up beaten, you lose respect."). In fact rather than hide his commission of armed robberies, Altamirano proclaimed his crime so other BMT memebrs would know what he had accomplished. By pronouncing his crime Altamirano traded in the currency of violence which gave him access to elevated status in the BMT.

Moreover, the evidence also established that robbery was a key aspect of how the BMT maintained its existence. *See for e.g.* Testimony of Julio Mendoza, Daily Transcript February 11, 2015, Pg. 19 ("You cannot go by at night because they would snatch things from people"); *see also for e.g.* Testimony of Nadim Guzman, Daily Transcript February 17, 2015, Pg. 19 ("Q. How did BMT members buy drugs? A. With money, hustling. Q. What is hustling? A. Either selling stuff that you have stolen or just robbing . . . Whenever someone would be broke they will try to like come up on electronics or something they could sell in order to buy more drugs.").

Through the trial evidence the government has established that assaults and the commission of robberies were fundamental acts to the BMT's activities. Members of the organization knew that violent acts were routinely conducted, particularly for pecuniary gain. Moreover, the culture of the enterprise rewarded acts of violence with increased status. Conversely, members who were none violent fell behind in the pecking order and became subservient. *See* Testimony of Dayaan Zerquera, Daily Transcript February 18, 2015, Pg. 19 ("Q. How do people view each other as far as respect in the group? A. Sometimes people do violent stuff. You know, sometimes a lot of us get violent, and the dudes that are not so violent, they look at that and they get intimidated.").

For defendants Altamirano, Thompson and Forte, the November 20, 2013 robbery presented an opportunity to demonstrate their worthiness of respect and status in the enterprise. By demonstrating the willingness to inflict harm and collect proceeds for future narcotics endeavors the November 20, 2013 robbery trio augmented their *bona fides* as violent members of the BMT. As the jailhouse calls make clear, Altamirano desired respect in the organization. S*ee for e.g.* Christopher Altamirano, Jailhouse Call Transcript, December 1, 2013, 7:54 p.m., Pg. 10 ("CA: They can't respect a nigga decision, dog, it shows -- you feel me, it just shows, dog. Get that message across. If I don't get -- if you don't get that shit in the next two days, that I said, dog, they could keep that shit, but fuck them, 'cause when I come out it's gon' be problems, dog. You heard me?"); *see also for e.g.* Christopher Altamirano, Jailhouse Call Transcript, December 7, 2013, 12:33 a.m., Pg. 4 ("CA: Whenever I say, you feel me, y'all don't do nothing, fool, like, please respect my word, dog.");s*ee also for e.g.* Christopher Altamirano, Jailhouse Call Transcript, December 11, 2013, 1:12 p.m., Pg. 6 ("CA: I be trying to tell you, bro, it ain't the same without me right there, dog. I'm that nigga right there, bro. JD: (Unintelligible). CA: It's like niggas -- it's like

niggas respect my presence. But once a niggagone, you feel me, out the picture it's like fuck you, you feel me?").

Moreover, the trial evidence has established that robbery was a principal practice for the enterprise. As a result the assaults committed during the November 20, 2013 robbery were part and parcel to integral aspects of the BMT's business model, serving to both fund the purchase of distribution amounts of narcotics and to demonstrate the individual members' worthiness of respect. *See Kamahele*, 748 F. 3d at 1008-10. However, the VICAR motive element is still satisfied if position in the enterprise was one of many motives which could be inferred for the assaults. *Id*.; see also *Robertson*, 736 F.3d at 1330.

Accordingly, because the evidence permits the finding that the aggravated assaults were committed either as integral aspects of membership, or to gain or maintain status in the enterprise the VICAR motive was sufficiently proven such that the jury's finding should remain undisturbed.

   **5. Sufficient Evidence Existed in Counts 7**

During the trial evidence in the form of witness testimony was presented that Altamirano left to complete "a mission" with Dwight Forte and Joseph Thompson. The trio left the BMT drug site in Forte's vehicle. Victims testified to being robbed and assaulted with a firearm by persons matching the descriptions of Altamirano and Thompson. Victims testified that during the robbery a firearm was discharged. Victim testimony also identified that a car matching Forte's vehicle was involved in the robbery. Out-of-court identification testimony implicated Altamirano as one the armed robbery participants.

Further, Nadim Guzman testified Forte and Altamirano returned from his "mission" with Joseph Thompson and Dwight Forte. Back in the drug site, Altamirano and Foprte argued over robbery proceeds. Victim property was recovered from the drug distribution site. Further,

15

Altamirano made jailhouse phone calls immediately after the robbery directing co-conspirator Steven Castro to secure his firearm which he hid following the robbery. The jail house calls also had Altamirano detail evidence he knew was left in Forte's vehicle; the same evidence was recovered by law enforcement and admitted in the trial.

Based on these facts, the jury reasonably held Altamirano to account for the firearm used during the robbery assault episode charged in Count 9.

### 6. Altamirano's Convictions for Possession with Intent to Distribute should remain Undisturbed.

The recovered narcotics, paraphernalia and recordings introduced at trial provided the jury with the basis to convict Altamirano for his multiple counts of possession with intent to distribute a controlled substance. See for e.g., *United States v. Joseph*, 445 Fed. Appx. 301, 305-06 (11th Cir. 2011); s*ee also United States v. Gonzalez*, 404 Fed. Appx. 406, 407 (11th Cir. 2010) (finding the use of fifteen plastic baggies as indicative of possession for the purpose of sale or distribution).

In the present case, the circumstances, recordings and recovered evidence establish possession of narcotics with intent to distribute in accord with Eleventh Circuit precedent. The quantity and packaging of the cocaine, and completed sales demonstrated the intent to distribute. Based on the surrounding evidence described the jury reasonably found Altamirano guilty of the possession with intent to distribute counts.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the defendant's motion for judgment of acquittal.

> Respectfully submitted,
>
> WIFREDO A. FERRER
> UNITED STATES ATTORNEY
>
> By:   /s/ Ignacio J. Vázquez, Jr.
> Ignacio J. Vázquez, Jr.
> Assistant United States Attorney
> Florida Bar No. 16275
> 99 Northeast 4th Street
> Miami, Florida 33132-2111
> Tel: (305) 961-9318
> Fax: (305) 530-7976

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was uploaded onto the Court's CM/ECF system and sent via CM/ECF to all counsel of record on April 30, 2015.

> /s/ Ignacio J. Vázquez, Jr.
> Ignacio J. Vázquez, Jr.
> Assistant United States Attorney