### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-20017-CR-WILLIAMS(s)(s)

UNITED STATES OF AMERICA

v.

CHRISTOPHER ALTAMIRANO,

      Defendant.

_____/

### GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT & GOVERNMENT'S OBJECTION

The United States, by and through the undersigned Assistant United States Attorney, files this Response to Christopher Altamirano's Objections to the Presentence Investigation Report ("PSI") and submits the Government's Objections.

### I.     RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSI

**1.     Objection 1, Drug Quantity Attribution**

A "defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3 cmt. n. 2. "For sentencing purposes a member of a drug conspiracy is liable for his own acts and the acts of others in furtherance of the activity that the defendant agreed to undertake and that are reasonably foreseeable in connection with that activity." *United States v. Ismond,* 993 F.2d 1498, 1499 (11th Cir. 1993) (*citing* U.S.S.G. § 1B1.3(a)(1); *see also United States v. Seymour*, 519 F.3d 700, 710–11 (7th Cir. 2008) (noting for a conviction of conspiring to traffic narcotics, a sentencing court can include not only the drugs the defendant directly sold or knew about, but can also include the "reasonably foreseeable quantity of drugs sold

by his or her coconspirators" in its calculation of drug quantity attributable to the defendant); *see also United States v. Crawford*, 407 F.3d 1174, 1178-79 (11th Cir. 2005) (noting that district courts are obliged to consider conduct uncharged, but relevant, to calculate the advisory guideline range); *see also United States v. Knight*, 213 Fed. Appx. 835, 838 (11th Cir. 2007) (citing *United States v. Ignancio Munio,* 909 F.2d 436, 438-39 (11th Cir. 1990)) ("It is well-settled that the district court may hold a defendant accountable for additional amounts of drugs involved in the conspiracy, but not charged in the indictment, as relevant conduct.").

The evidence establishes that defendant Altamirano was involved in the narcotics conspiracy within the time frame charged in the second superseding indictment.   The drug quantity is derived from the testimony of actors in the charged drug conspiracy and is measured from January 2013.   *See for e.g.*, Trial Testimony of Nadim Guzman, February 17, 2015, Page 20 ("Q. While you were a member of the BMT during the year 2013 how many grams of crack cocaine were sold on an average day? A. By everybody? A. Depends on how many people were selling; a gram per person. Q. How many people were selling at a given time on average? A. Anywhere from 3 to 6 people."); *id*. at 27 ("Q. While you were a member of BMT, during the year 2013, what role did Defendant Altamirano play? A. He was also one of the top guys. Q. Why do you say that? A. He would sell every day with myself. He would I say call shots. Q. What does it mean to call shots? A. Tell people how to do this, how to sell, where to go, who to talk to, who not to talk to."); *see also for e.g.*, Trial Testimony of Dayan Zerquera, February 18, 2015, Page 83-84 ("We would sell -- if it's, let's say, six people out there, sometimes it would be six people. Between us we will probably sell between 16 to 18 grams." Q. What was the least amount of crack cocaine you saw sold from a BMT trap and who was there? A. The least? The least maybe would be, like,

3 grams. And Bodie would be there, Angel would be there, Ali would be there. "Q. And how often in 2014 were drugs being sold from a BMT trap? A. Every day."). The testimony thus supports a finding that the conspiracy involved in excess of 2.8 but less that 8.4 kilograms of cocaine base.

**2.      Objection 2, Violence/Threat Enhancement**

The violence and threat enhancement is properly applied based on the trial testimony establishing enterprise members, including Altamirnao, routinely used firearms as a means of protecting and furthering their drug ventures.   *See for e.g.* Trial Testimony of Nadim Guzman, February 12, 2015, Page 22 ("Q. During your time with the BMT in the year 2013 were you ever present when firearms were possessed? A. Yes. Q. When and by whom. A. When we would be selling and at nighttime by Christopher Altamirano, Rodolfo Portela, Maurin Chacon."); *id*. at 23 ("Q. How were firearms used by BMT members during the time you were a member? A. For protection mostly or for robberies. Q. Were you present when firearms were used for protection, and if so when? A. At night when we would sell they would have the firearm there . . . Q. Who had the firearms stashed? A. Christopher Altamirano."); *see for e.g. id*. at 58 ("Q. What is BMT? A. Big Money Team.   Q. What does it mean to be part of this organization? A. That you can sell drugs and make money with them."); *see also id.* at 65-66 ("Q. Where did the money for the drugs come from? A. From robberies. Q. Who committed robberies? A. Christopher Altamirano -- from the people that are here Q. Yes. A. Christopher Altamirano and Maurin Chacon."); *see also for e.g.*, Trial Testimony of Dayan Zerquera, February 18, 2015, Page 92 ("Q. Were you ever present in 2014 when members of the BMT would hold drugs for each other? A. Yes. Q. Who would hold drugs for each other in 2014? A. Mostly all of us; Patron, me, Smoke, Altamirano, Fat Boy, Bodie, Telli, Ali.").

Page **3** of **10**

3. **Downward Departure and Variance Requests**

Through his time as member of the BMT, Altamirano served as one of the organizations "top" figures. *See* Trial Testimony of Nadim Guzman, February 17, 2015, Page 27, 108 and 115; *see also for e.g.*, Christopher Altamirano Jailhouse Phone Call, 11/22/13 12:32 A.M., Page 3 ("Altamirano: You, Gunna, Telly, and - and Cubita. You feel me? Y'all don't be letting nobody in the crib, bra. And y'all stash everything outside. You feel me?"); *see also* for e.g., Christopher Altamirano Jailhouse Phone Call, 11/22/13 12:32 A.M., Page 14 ("Altamirano: Yeah. Not only that. Y'all got to change location, dog. Chacon: Of course, nigga."); *see also* for e.g., Christopher Altamirano Jailhouse Phone Call, 12/07/13 12:33 A.M., Page 16 (Altamirano: "The seven heads is the only people you need. (Unintelligible). Them seven people that you got over there with you right now, those the only people you need to work with, bro.); *see also for e.g.*, Christopher Altamirano Jailhouse Phone Call, 12/09/13 1:07 P.M., Page 9.

The evidence demonstrates that as a top member of the organization, Altamirano was also a direct participant in the BMT's effort to control territory.   *See for e.g.,* Trial Testimony of Nadim Guzman, February 17, 2015, Page 11, 108 and 115 ("Q. What happened between George Andrade and Christopher Altamirano? A. He was just told he can't sell there in that spot because he is not BMT, and that was the spot we would sell at.").   Further, Altamirano participated in funding his BMT narcotics activities through robberies where victims were at times select based on ethnicity. *See for e.g.,* Trial Testimony of Nadim Guzman, February 17, 2015, Page 16 ("Q. Who in court today referred to robbery victims as Ponchos? A. Maurin Chacon, Christopher Altamirano. Q. How would they use the word Poncho in referring to a robbery victim? If you could give us the sentence.   A. Let's go get that Poncho that's walking down the street.").

Altamirano is one of the keystone elements of the BMT.   Jailhouse calls and undercover drug purchases revealed him to be a savvy and thoughtful actor.     As a result of his intelligence, Altamirano aided his fellow BMT members with plans, strategies and schemes.   *See* for e.g., Christopher Altamirano Jailhouse Phone Call, 12/07/13 12:33 A.M., Page 2-3 ("CA: All right. Listen, dog. I ain't gon' lie, dog. I got to a scheme for you, dog. You feel me? RM: What's up? What's up? CA: You got your head on right, fool? RM: I ain't gon' lie, bro. I do, dog, but, you know, (unintelligible) but I'm really keeping my [expletive] together now, dog. Like, you know what I'm saying?").   As a leader and planner in the BMT, Altamirano bears heavy responsibility for the lawlessness citizens in the effected neighborhood endured.   *See for e.g.* Testimony of Jose Mendoza, Daily Transcript February 11, 2015, Pg. 47-48 ("Many times I would go out to tell them not to sell drugs in front of my gate -- the front gate of my house. And many times they did pay attention to me because I would go out and tell them and they would move. Many times new ones would come, so I would tell one of the older ones to tell him, listen, I need for you to tell him not to sell drugs right in front of my house."); *id*. at 51; *id*. at Pg. 59 ("What they did was -- is that they left us without any privacy in the entire neighborhood . . . But at the end of 2013 that is when the invasion occurred; almost all of them came."); *see also id*. at 6.

- **Section 3553(a)(1):   Nature and Circumstances of the Offense; History and Characteristics of the Defendant.**

Altamirano and his BMT compatriots sought to exist as a law unto themselves.   Despite his numerous arrests, Altamirano has been steadfastly committed to his career of criminality. The depth of Altimirano's persistence were best captured in jail calls which captured him proclaiming he would he immediately return to the commission of robberies upon when release and instructed his colleagues to conduit to direct prostitution.   Christopher Altamirano Jailhouse

Phone Call, 11/22/13 12:26 A.M., Page 4 ("Naw, bra, but trust me, bra when I jump, fool. I'm still gonna hit licks and I'm going to hustle, bra."); *see also for e.g.*, Christopher Altamirano Jailhouse Phone Call, 12/09/13 1:07 P.M., Page 9 ("They need a pimp, dog. That's why I'm a put 'em on the list."); *see for e.g.,* Trial Testimony of Nadim Guzman, February 17, 2015, Page 18 (Witness Guzman testifying to Altimairano's quantification of a prostitute earning value in terms of narcotics: ("He said she was like -- that they hit for a brick Q. What does the word brick mean in the context you are using it now? A. A lot of cocaine, like a kilo of cocaine; he was meaning like a lot of money."). Altamirano, is neither foolish or inexperienced.   Rather, his jailhouse communications reflect a belief that systems of government were completely feckless to thwart him and his cohorts as they openly profited from violent criminality.

Consistent with his participation in the conspiracy, the bulk of Altamirano's prior offenses relate to narcotics and theft.   Moreover, through the trial evidence the Court learned that as part of BMT, Altamirano was a prolific robber.   The defendant's participation narcotics distribution and robbery demonstrates a palpable threat to public safety compounded by his access to firearms. *United States v. Hromada,* 49 F.3d 685, 689 (11th Cir. 1995) ("Guns and violence go hand-in-hand with illegal drug operations."); s*ee also United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011) ("As an initial matter, this Court has long recognized that, as Forrest Gump might say, drugs and guns go together like peas and carrots.").

Further, a defendant's prior conduct associated with underlying reversed and overruled convictions, as well as unindicted conduct, is relevant for determining an offender's likelihood for recidivism.   Even where prior conduct results in a conviction deemed unconstitutional or reversed on other grounds, the Guidelines still provide for consideration of the conduct. *See* U.S.S.G. §

4A1.3; *see also United States v. Lynch*, 934 F.2d 1226, 1234 n. 8 (11th Cir. 1991) (noting an acquittal does not bar a sentencing court from considering the acquitted conduct in imposing a sentence); *see also United States v. Schweihs,* 971 F.2d 1302, 1319 (7th Cir. 1992) ("although one element of the charged offense was not proved," the sentencing court could consider conduct underlying reversed conviction); *see also United States v. Johnson,* 934 F.2d 1237, 1239 (11th Cir. 1991) (permitting consideration of prior conduct not leading to a conviction); *United States v. Keys,* 899 F.2d 983, 989 (10th Cir. 1990) (holding that prison disciplinary record can be used for upward departure); *see also United States v. Funt*, 896 F.2d 1288, 1300 (11th Cir. 1990) ("[A] sentence may be imposed based on a wide range of considerations, including, for example, conduct for which the defendant has not been indicted.").   Through the trial testimony the Court learned that Altamirano was involved in numerous robberies that have never been assessed, yet merit consideration now at sentencing.

- **Section 3553(a)(6) (4): Warranted Sentencing Distinctions**

 "A well-founded claim of disparity, however, assumes that apples are being compared to apples," *United States v. Docampo,* 573 F.3d 1091, 1101 (11th Cir. 2009).   This litigation has addressed the conduct of a criminal organization with over thirty members and associates. Within the criminal enterprise, a subset of senior members has been identified: Maurin Chacon, Rodolfo Portela, Christopher Altamirano, Dayan Zerquera, Alioth Salas, Angel Martinez, Raymond Moore and Carlos Tinoco.   Within the senior class, only Chacon, Portela and Altamirano failed to accept responsibility, *and* exhibited leadership over other members *and* were implicated in the group's systemic violent activities.   The government submits these three

defendants' respective backgrounds and activities warrant significant differentiation from their counterparts.

Plainly, Section 3553(a)(6) does not call for the Court to treat the minion and mastermind as equals.   *See United States v. Starks*, 536 F. App'x 843, 850 (11th Cir. 2013) *cert. denied*, 134 S. Ct. 1042 (2014); *see also United States v. Yanes*, 542 F. App'x 797, 803 (11th Cir. 2013) (Noting district court properly addressed "substantial" difference between defendants with similar records who have been found guilty of similar conduct based need to extradite); *see also United States v. Hill*, 643 F.3d 807, 885 (11th Cir. 2011) ("First, Hill's co-defendants who received much more lenient sentences were not leaders in the conspiracy; he was the leader, the kingpin who orchestrated the whole thing. Without Hill there would have been no conspiracy, no massive amount of mortgage fraud resulting from it, and no ruined lives in the wake of it. He bore the greatest responsibility for the massive crime and deserved the longest sentence. Although "the need to avoid unwarranted sentence disparities" is a factor to be considered in sentencing, *see* § 3553(a)(6), there is no unwarranted disparity between Hill's sentence and those of his co-defendants.").   Chacon and Portela, Altamirano's rejection of responsibility, systemic violence and leadership leave the three defendants uniquely situated from their peers. Accordingly, a signification sentencing differentiation is necessary.

## II.   GOVERNMENT'S OBJECTIONS TO THE PSI

### 1.   Objection 1, Possession of a dangerous weapon (including a firearm)

The government objects to the non-assessment of the enhancement for possession of a dangerous weapon (including a firearm) was possessed. *See* U.S.S.G. Sec. § 2D1.1(b)(1).   The

record is clear that Altamirano possessed a firearm in furtherance of his participation in the drug conspiracy and that other members also carried weapons as part of the crime

**2.  Objection 2, Total Offense Level and Guideline Range**

Based upon a total offense level of 38 and a criminal history category of III, the guideline imprisonment range is 292 to 365 months. As to Count Seven, a consecutive term of imprisonment of not less than five years is required, § 5G1.2(a).

### III.     GOVERNMENT'S SENTENCING RECOMMENDATION

The government has previously identified Chacon as the most culpable member of the enterprise and has submitted a sentencing memorandum in support of a life sentence.   Defendants Portela and Altamirano fall below Chacon in responsibility but stand near one another in terms of the enterprise's operation.   Due to his criminal history, Portela is presently exposed to a mandatory life term as a result of the jury verdict.

As to defendant Altamirano, the government recommends, a concurrent but not coterminous, sentence of 300 months as to Counts 1[1], 6, 14, 15, 16, 29, 31, and 32.   As to Count 7, the government recommends that consecutive to the 300 month term, the statutory mandatory consecutive 60 month term be imposed.   As a result, the government recommends a total incarceration period of 360 months.

---

1 Count 1 carries a mandatory 120 month term which the government asks be imposed.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the

defendant's contested objections to the PSI and sustain the government's objections.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:    /s/ Ignacio J. Vázquez, Jr.
Ignacio J. Vázquez, Jr.
Assistant United States Attorney
Florida Bar No. 16275
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9318
Fax: (305) 530-7976

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was uploaded onto

the Court's CM/ECF system and sent via CM/ECF to all counsel of record on August 24, 2015.

/s/ Ignacio J. Vázquez, Jr.
Ignacio J. Vázquez, Jr.
Assistant United States Attorney